**No. 26-1591**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

————————

X.AI LLC,

*Plaintiff-Appellant*,

v.

ROB BONTA, in his official capacity as
Attorney General of the State of California,

*Defendant-Appellee.*

————————

On Appeal from the United States District Court for the
Central District of California,
No. 2:25-cv-12295

————————

## BRIEF FOR APPELLANT

————————

ERIN E. MURPHY
 *Counsel of Record*
JAMES Y. XI
MITCHELL K. PALLAKI
ILAN J. POSNER
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Plaintiff-Appellant*

May 14, 2026

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Plaintiff-Appellant X.AI LLC certifies that it is wholly owned by X.AI Corp, which is wholly owned by X.AI Holdings LLC, which is wholly owned by Space Exploration Technologies Corp. No publicly held corporation owns more than ten percent of its stock.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................... i

TABLE OF AUTHORITIES.................................................................. iv

INTRODUCTION ............................................................................... 1

STATEMENT OF JURISDICTION ...................................................... 4

STATEMENT OF THE ISSUES .......................................................... 4

CONSTITUTIONAL AND STATUTORY PROVISIONS ..................... 4

STATEMENT OF THE CASE.............................................................. 5

      A.    Generative Artificial Intelligence .......................................... 5

      B.    xAI Develops Its Own Unique Generative AI Systems ....................... 8

      C.    Assembly Bill 2013 .........................................................11

      D.    Procedural History........................................................... 13

SUMMARY OF ARGUMENT............................................................ 15

STANDARD OF REVIEW ................................................................ 18

ARGUMENT ................................................................................... 18

I.    xAI Is Likely To Succeed On Its First Amendment Claim ......................... 18

      A.    A.B.2013 Is a Compelled-Speech Mandate That Triggers Strict Scrutiny.................................................................... 18

      B.    The District Court Erred by Applying Intermediate Scrutiny............ 21

      C.    A.B.2013 Flunks Any Level of Scrutiny.......................................... 32

II.    xAI Is Likely To Succeed On Its Takings Claims ......................................... 38

      A.    The Takings Clause Prohibits Government-Compelled Disclosures of Trade Secrets ................................................ 39

      B.    A.B.2013 Eviscerates xAI's Trade Secrets ....................................... 41

C.     A.B.2013 Effects Uncompensated Takings of xAI's Trade Secrets...................................................................................... 50

III.   xAI Is Likely To Succeed On Its Vagueness Claim...................................... 55

CONCLUSION ................................................................................................ 59

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases**

*44 Liquormart v. Rhode Island,*
  517 U.S. 484 (1996) .................................................................21

*Abba Rubber Co. v. Seaquist,*
  286 Cal.Rptr. 518 (Cal. Ct. App. 1991) ...............................44

*Alford v. Walton Cnty.,*
  159 F.4th 844 (11th Cir. 2025) ..............................................52

*Alta Devices v. LG Elecs.,*
  343 F.Supp.3d 868 (N.D. Cal. 2018) ....................................49

*Am. Beverage Ass'n v. City & Cnty. of S.F.,*
  916 F.3d 749 (9th Cir. 2019) ........................................... 18, 38

*Am. Meat Inst. v. USDA,*
  760 F.3d 18 (D.C. Cir. 2014) ........................................... 27, 33

*Amgen v. Cal. Corr. Health Care Servs.,*
  260 Cal.Rptr.3d 873 (Cal. Ct. App. 2020) ...........................42

*Ariz. Dream Act Coal. v. Brewer,*
  757 F.3d 1053 (9th Cir. 2014) ................................................59

*Armstrong v. United States,*
  364 U.S. 40 (1960) .................................................................52

*Baggett v. Bullitt,*
  377 U.S. 360 (1964) ...............................................................55

*Bank of Am. v. Hensley Props.,*
  2008 WL 2724875 (E.D. Cal. July 11, 2008) ......................43

*Bd. of Trs. of State Univ. of N.Y. v. Fox,*
  492 U.S. 469 (1989) ...............................................................15

*Bolger v. Youngs Drug Prods. Corp.,*
  463 U.S. 60 (1983) ........................................................ 21, 22, 23

*Butcher v. Knudsen*,
  38 F.4th 1163 (9th Cir. 2022)......................................................................57

*Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*,
  29 F.4th 468 (9th Cir. 2022)........................................................................59

*Cedar Point Nursery v. Hassid*,
  594 U.S. 139 (2021).....................................................................................51

*Cienega Gardens v. United States*,
  331 F.3d 1319 (Fed. Cir. 2003)...................................................................55

*City of Austin v. Reagan Nat'l Advert. of Austin*,
  596 U.S. 61 (2022).......................................................................................20

*City of Cincinnati v. Discovery Network, Inc.*,
  507 U.S. 410 (1993).....................................................................................22

*Comite de Jornaleros v. City of Redondo Beach*,
  657 F.3d 936 (9th Cir. 2011)........................................................................37

*CTIA - The Wireless Ass'n v. City of Berkeley*,
  928 F.3d 832 (9th Cir. 2019)........................................................................33

*Desert Outdoor Advert. v. City of Moreno Valley*,
  103 F.3d 814 (9th Cir. 1996)........................................................................38

*Dex Media W. v. City of Seattle*,
  696 F.3d 952 (9th Cir. 2012)........................................................................27

*Doe v. Harris*,
  772 F.3d 563 (9th Cir. 2014)........................................................................37

*Duarte v. City of Stockton*,
  60 F.4th 566 (9th Cir. 2023)................................................................. 30, 31

*E.W. Bank v. Shanker*,
  2021 WL 3112452 (N.D. Cal. July 22, 2021)..............................................44

*Edenfield v. Fane*,
  507 U.S. 761 (1993)............................................................................. 22, 36

v

*FCC v. Fox Television Stations,*
567 U.S. 239 (2012)........................................................................55

*First Choice Women's Res. Ctrs. v. Davenport,*
2026 WL 1153029 (U.S. Apr. 29, 2026).......................................46

*Free Speech Coalition v. Paxton,*
606 U.S. 461 (2025)........................................................................32

*Friedman v. Rogers,*
440 U.S. 1 (1979)............................................................................24

*Hartley Pen Co. v. U.S. Dist. Ct.,*
287 F.2d 324 (9th Cir. 1961).........................................................51

*Hawaii v. Trump,*
871 F.3d 646 (9th Cir. 2017)..........................................................18

*Hodel v. Irving,*
481 U.S. 704 (1987)........................................................................52

*Hunt v. City of Los Angeles,*
638 F.3d 703 (9th Cir. 2011)..........................................................23

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.,*
515 U.S. 557 (1995)............................................................... 18, 26, 28

*IMDb.com v. Becerra,*
962 F.3d 1111 (9th Cir. 2020) .......................................... 23, 24, 27, 30

*Int'l Dairy Foods Ass'n v. Amestoy,*
92 F.3d 67 (2d Cir. 1996)...............................................................33

*InteliClear v. ETC Glob. Holdings,*
978 F.3d 653 (9th Cir. 2020)............................................... 48, 49

*Johnson v. United States,*
576 U.S. 591 (2015)........................................................................57

*K-2 Ski Co. v. Head Ski Co.,*
467 F.2d 1087 (9th Cir. 1972).......................................................45

*Lingle v. Chevron U.S.A.*,
544 U.S. 528 (2005)..................................................................... 50, 54

*Lorillard Tobacco Co. v. Reilly*,
533 U.S. 525 (2001)...........................................................................36

*Lucas v. S.C. Coastal Council*,
505 U.S. 1003 (1992)..........................................................................52

*McCormack v. Hiedeman*,
694 F.3d 1004 (9th Cir. 2012)............................................................45

*McCullen v. Coakley*,
573 U.S. 464 (2014)..................................................................... 32, 34

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012)..............................................................59

*Milavetz, Gallop & Milavetz P.A. v. United States*,
559 U.S. 229 (2010)...........................................................................32

*Moody v. NetChoice*,
603 U.S. 734 (2024)..................................................................... 33, 34

*NAACP v. Button*,
371 U.S. 415 (1963)..................................................................... 17, 55

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
585 U.S. 755 (2018)..................................................................... 19, 21

*NetChoice v. Bonta*,
113 F.4th 1101 (9th Cir. 2024)..................................................... 19, 25

*Novation Sols., Inc. v. Issuance Inc.*,
2023 WL 5505908 (C.D. Cal. June 27, 2023).....................................49

*O2 Micro Int'l v. Monolithic Power Sys.*,
420 F.Supp.2d 1070 (N.D. Cal. 2006).................................................43

*Packingham v. North Carolina*,
582 U.S. 98 (2017).............................................................................32

vii

*Penn Central Transp. Co. v. City of N.Y.*,
438 U.S. 104 (1978) .................................................................................54

*Philip Morris, Inc. v. Reilly*,
312 F.3d 24 (1st Cir. 2002) .............................................. *passim*

*PhRMA v. Stolfi*,
153 F.4th 795 (9th Cir. 2025) ........................................... *passim*

*Quintara Biosciences v. Ruifeng Biztech*,
149 F.4th 1081 (9th Cir. 2025) ................................................ 49, 50

*Riley v. Nat'l Fed'n of the Blind*,
487 U.S. 781 (1988) ........................................................ *passim*

*Rubin v. Coors Brewing*,
514 U.S. 476 (1995) ................................................................21

*Ruckelshaus v. Monsanto Co.*,
467 U.S. 986 (1984) ........................................................ *passim*

*Sheetz v. Cnty. of El Dorado*,
601 U.S. 267 (2024) ........................................................ 38, 51

*Sorrell v. IMS Health*,
564 U.S. 552 (2011) ................................................................38

*Turner Broad. Sys. v. FCC*,
512 U.S. 622 (1994) ................................................................20

*United States v. Google*,
747 F.Supp.3d 1 (D.D.C. 2024) ...................................................5

*United States v. Google*,
803 F.Supp.3d 18 (D.D.C. 2025) ...................................................7

*United States v. Nosal*,
844 F.3d 1024 (9th Cir. 2016) ...................................... 43, 44, 45, 47

*United States v. United Foods*,
533 U.S. 405 (2001) ........................................................ 22, 27

*United States v. Williams*,
   553 U.S. 285 (2008)............................................................55

*Valle Del Sol Inc. v. Whiting*,
   709 F.3d 808 (9th Cir. 2013)...............................................24

*WeRide Corp. v. Kun Huang*,
   379 F.Supp.3d 834 (N.D. Cal. 2019) ...................................45

*Whyte v. Schlage Lock Co.*,
   125 Cal.Rptr.2d 277 (Cal. Ct. App. 2002) ...........................45

*Wooley v. Maynard*,
   430 U.S. 705 (1977)............................................................18

*X Corp. v. Bonta*,
   116 F.4th 888 (9th Cir. 2024)..................................... *passim*

*Zauderer v. Off. of Disciplinary Couns.*,
   471 U.S. 626 (1985)............................................................32

## Constitutional Provisions

U.S. Const. amend. V........................................................ 38

## Statutes

7 U.S.C. §136h...................................................................40

15 U.S.C. §1454(c)(3).........................................................40

18 U.S.C. §1839(3) ...................................................... 42, 51

Cal. Civ. Code §3110(b)......................................................13

Cal. Civ. Code §3110(f) ......................................................56

Cal. Civ. Code §3111 .................................................11, 24, 31, 56

Cal. Civ. Code §3111(a).............................................. 12, 56, 58

Cal. Civ. Code §3111(a)(1)-(12) ..........................................12

Cal. Civ. Code §3111(a)(1)-(3)............................................52

Cal. Civ. Code §3111(a)(2) ............................................................ 31, 56

Cal. Civ. Code §3111(a)(4) ............................................................ 31, 52

Cal. Civ. Code §3111(a)(5) ............................................................ 52, 57

Cal. Civ. Code §3111(a)(6) ...............................................................52

Cal. Civ. Code §3111(a)(7)-(8) ..........................................................52

Cal. Civ. Code §3111(a)(9) ................................................................ 31

Cal. Civ. Code §3111(a)(12) ..............................................................52

Cal. Civ. Code §3111(b)............................................................... 12, 20

Cal. Civ. Code §3426.1(d) ........................................................... 42, 51

**Rule and Regulation**

Fed. R. App. P. 4(a)(1)(A) .................................................................4

21 C.F.R. §20.61 ..............................................................................40

**Other Authorities**

*Coca-Cola® Original*, The Coca-Cola Co.,
    https://perma.cc/N5K6-JCAD (last visited May 11, 2026) ...............................40

*Meta Halts Mercor Partnership After AI Training Data Breach*,
    The Tech Buzz (Apr. 3, 2026), https://perma.cc/B38K-6QVQ .........................42

Order, *Dow Jones v. Perplexity AI*, No. 1:24-cv-7984
    (S.D.N.Y. Aug. 1, 2025)..................................................................43

Order, *Tremblay v. OpenAI*, No. 4:23-cv-3223
    (N.D. Cal. Sept. 24, 2024) ...............................................................43

*What Is Generative AI?*, McKinsey (Apr. 2, 2024),
    https://perma.cc/GHW4-DZSE...........................................................5

xAI, *Grok 4 Fast Model Card* (Sept. 19, 2025),
    https://perma.cc/FEK8-CYQV ....................................................... 9, 34

**INTRODUCTION**

Like many companies in the burgeoning artificial intelligence ("AI") industry, X.AI LLC ("xAI") develops generative artificial intelligence models, or gen-AI models for short. Gen-AI models are software programs that simulate human intelligence to create original content and perform a wide range of tasks—everything from answering trivia questions and summarizing documents to generating images and videos. To train its models, xAI compiles "datasets"—collections of information derived from different sources. xAI plugs those datasets into its AI models, which users can use to generate new content.

Those models, however, are only as good as their training, which is only as good as the data on which they are trained. Unsurprisingly then, xAI (like its competitors) dedicates substantial resources to identifying and developing high-quality training data, particularly from sources its competitors are not using. And unsurprisingly, xAI (like its competitors) treats such information as proprietary trade secrets. As companies race to build the next successful gen-AI product, the competitive advantage provided by data quality and training efficiency has become increasingly important. Because training data selection and preparation techniques represent years of accumulated expertise about what works and what does not, a rival armed with knowledge about xAI's dataset information could potentially leapfrog

months or years of experimentation, reaching similar performance benchmarks with dramatically less investment.

Though companies in the industry fiercely guard such information from their competitors, California Assembly Bill 2013 ("A.B.2013") requires AI companies to disclose that information to the public. But just as the government could not require, *e.g.*, Coca-Cola to reveal its formula for Coke to the public, California cannot compel AI companies to reveal proprietary information about the datasets they use to train their gen-AI models. In fact, A.B.2013 is unconstitutional thrice over: It violates the First Amendment by compelling xAI to disseminate confidential information about its generative AI models. It violates the Takings Clause by forcing xAI to disclose its economically valuable and fiercely protected trade-secret property rights without any promise of compensation. And it is unconstitutionally vague because it fails to provide regulated parties with sufficient clarity about which datasets it covers and how much detail about that proprietary information they must provide.

The district court's decision denying xAI's preliminary injunction motion is flawed from top to bottom. While the court acknowledged that compelled-speech requirements typically trigger strict scrutiny, it instead decided to apply intermediate scrutiny on the theory that A.B.2013 regulates only "commercial speech." But both the Supreme Court and this Court have repeatedly made clear that "commercial speech" is speech that "proposes a commercial transaction." And A.B.2013 does not

2

purport to regulate any "commercial speech" in which xAI is engaged. The district court nevertheless held that A.B.2013 should be treated as a regulation of "commercial speech" because it compels disclosure of information that the public could find useful in deciding whether to use xAI's products. But this Court has already rejected such a sweeping and limitless conception of "commercial speech." Making matters worse, the district court did not even hold California to its burden under intermediate scrutiny of showing that A.B.2013 is a narrowly tailored means of achieving an important state interest. Though the court acknowledged that "consumer curiosity"—the only interest California asserted below—is not a sufficient state interest, it denied xAI's motion based on speculation that California might someday demonstrate through the "litigation process" that A.B.2013 satisfies intermediate scrutiny for some as-yet-to-be identified reason.

Compounding its First Amendment errors, the district court short-circuited xAI's takings claim on the indefensible ground that xAI failed to show that its dataset information qualifies as a trade secret—even though xAI submitted unrebutted declarations showing precisely why the information A.B.2013 targets so qualifies. As for xAI's vagueness argument, the court ignored that California conspicuously refused to explain what exactly it thinks A.B.2013 requires, even after the district court asked the state for clarity on that very question. The state's position boils down to the notion that it can be vague about what its law requires at the front end, then

3

reserve the power to bring an enforcement action if it later determines that regulated parties get it wrong. That refusal to say what the law really requires invites exactly the kind of arbitrary and discriminatory enforcement that due process prohibits.

The Court should vacate the district court's order and remand with instructions to grant xAI's motion for preliminary injunction.

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. §1331. That court denied xAI's motion for a preliminary injunction on March 4, 2026, and xAI timely filed a notice of appeal on March 16, 2026. Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. §1292(a)(1).

## STATEMENT OF THE ISSUES

1.      Whether xAI is likely to succeed in showing that A.B.2013 violates xAI's First Amendment rights.

2.      Whether xAI is likely to succeed in showing that A.B.2013 effects an uncompensated taking in violation of the Takings Clause.

3.      Whether xAI is likely to succeed in showing that A.B.2013 is unconstitutionally vague.

## CONSTITUTIONAL AND STATUTORY PROVISIONS

Pertinent statutory and constitutional provisions are reproduced in the addendum to this brief. *See* Add.1a-5a.

4

**STATEMENT OF THE CASE**

**A.      Generative Artificial Intelligence.**

"Artificial intelligence is the science and engineering of getting machines … to exhibit intelligent behavior." *United States v. Google*, 747 F.Supp.3d 1, 52 (D.D.C. 2024).   Today, most developers focus on generative artificial intelligence, or gen-AI for short.   Unlike older AI systems, users can create new content with gen-AI systems.   In the past few years, gen-AI's capabilities and potential have progressed rapidly, potentially adding up to $4.4 trillion to the global economy annually.   *What Is Generative AI?*, McKinsey (Apr. 2, 2024), https://perma.cc/GHW4-DZSE.

Datasets are essential to achieving gen-AI's content-generative capabilities. Developers use datasets to teach AI models to recognize patterns and make predictions. ER-185.¶7.  Broadly defined, datasets are collections of information that are stored in an organized manner so that specific entries can be located, studied, and utilized to develop AI systems. ER-185-86.¶¶6-8. The kinds of information that make up a dataset varies wildly, from a table of data points (*e.g.*, spreadsheets containing addresses and emails) to a combination of text, images, and audio (*e.g.*, notes, photos, and voicemails saved on a cellphone). ER-185-86.¶8. Datasets can be gathered from a wide variety of sources.  They can be acquired by purchasing pre-packaged datasets, as advertisers often do when they purchase customer

information. They can be developed by using application programming interfaces, which allow software applications to communicate with one another. And they can be compiled from bespoke sources, including by licensing data.

AI companies acquire datasets to train their AI models. While there is certainly some overlap in the data that these companies use, they do not simply use all of the same data. Each company instead works to acquire and utilize data that others do not. Indeed, what differentiates one company's AI model from another depends in part on the data a company acquires and uses to train it. ER-186-87.¶¶10-11. Take legal data. While many developers might use data from publicly available sources like federal or state courts' websites, some may use data from less obvious or unique or bespoke sources, such as a law firm that specializes in litigating high stakes patent disputes, a collection of legal questions and answers that law professors were hired to draft and rank by the answers' quality of reasoning, or a specialized dataset created by legal experts consisting of annotations on thousands of real commercial contracts. Those latter sources might contain distinct data that provide unique training, giving an AI company that uses them a competitive advantage. ER-186-87.¶11. When developers train their AI models on unique data that their competitors lack, they ensure that their models are more versatile. Thus, datasets—especially the specific sources and unique combinations of data they contain—are central to an AI model's development and success. ER-186.¶9; ER-190-91.¶24.

Before datasets can be used to train AI models, they must be "cleaned" and converted into a format computers can understand. ER-187.¶12. That requires engineers to first remove duplicate or incomplete entries. The actual conversion process involves translating data into numerical representations, called "tokens," the model can process. ER-187.¶13. Tokens are essentially small components of larger datasets that represent words, characters, or phrases. ER-187.¶13. How a company "tokenizes" its data is critical in preparing that data for further processing.

Creating a usable gen-AI model proceeds in several stages. First, in pre-training, engineers develop a foundation model, which describes a basic gen-AI model trained on a vast range of datasets and data formats. ER-187.¶14. These foundation models take data inputs, convert them to tokens, predict the most likely next token in a sequence, then convert those predictions back into language. *See United States v. Google*, 803 F.Supp.3d 18, 44-46 (D.D.C. 2025). A model's ability to predict the next token depends on the quality, diversity, and quantity of the input data. So to build effective foundation models, developers must input volumes of data, which is computationally intensive (requiring thousands of clustered graphics processing units), time-consuming (weeks of processing), and expensive (millions of dollars). ER-187-88.¶14.

With a foundation model in place, the AI model is fine-tuned for specific applications. Developers use tools like reinforcement learning to transform a

foundation model's unfiltered and potentially chaotic responses into more polished and reliable outputs. ER-188.¶15. That typically involves a smaller, yet higher-quality training dataset to hone an AI system's specific capabilities. ER-188.¶16. To create such datasets, developers label and curate targeted data, requiring more direct human involvement. Once the model is fine-tuned, it is regularly assessed, refined, and improved. That can occur through additional fine-tuning or by analyzing the model's actual outputs in response to real-world user prompts.

### B. xAI Develops Its Own Unique Generative AI Systems.

In early 2023, xAI began developing its own AI models. ER-184.¶¶3-4. It invested substantial time and energy to acquire datasets that vary in source, data type, and format to develop and train those AI models. ER-184.¶4; ER-186.¶9; ER-192-93.¶¶27, 29. To do so, xAI used the same methodology outlined above. It acquired and refined data from a variety of public and non-public sources to create a foundation AI model unique to xAI. ER-187.¶¶12-14. xAI engineers then constructed specially curated datasets with bespoke data compositions to help tweak and refine its models. ER-187-88.¶¶14-16. And they adjusted different aspects of the foundation model's code and tested the resulting variations using xAI's curated datasets to see which were most effective. ER-188.¶15.

In November 2023, after months of development, xAI publicly released its flagship AI model, Grok-1. ER-184.¶4. xAI followed that success with the release

8

of Grok-2 (August 2024), Grok-3 (February 2025), and Grok-4 (July 2025). ER-184.¶4. While xAI is constantly developing new versions of its models, with newly constructed datasets, it also releases updates to existing models. ER-184-85.¶4. xAI's models have consistently topped performance benchmarks, demonstrating the success of its development process and the value of its datasets. ER-185.¶5.

Model effectiveness is not xAI's sole concern; xAI values public confidence as well. To facilitate trust and help inform its users, xAI provides up-to-date information about how its models perform. xAI, *Grok 4 Fast Model Card* (Sept. 19, 2025), https://perma.cc/FEK8-CYQV ("Model Card"). For example, xAI evaluates whether its models exhibit political bias and how they fare when asked to give the wrong answer to a question. *See id.* at 4. By focusing on *outputs* and a model's response to real-world questions, these tests replicate how users actually interact with models, thereby helping users assess whether the model can accurately and effectively perform its given tasks. ER-185.¶5; ER-191.¶26.

Due to the critical role xAI's datasets play in the model-development process, details about those datasets are highly valuable—and secret. ER-182.¶¶15-16. If xAI revealed details about its datasets, competitors would immediately move to acquire the sources xAI uses that its competitors lack to ensure that their models match xAI's. ER-190.¶¶22-23; ER-182.¶16. The same is true of the amount of data xAI uses at each step of the training process. The breadth of information xAI uses

9

to train its AI models, including in fine-tuning, affects their ability to perform various tasks. If competitors had insight into how much data xAI incorporates into each of its datasets and their particular uses, they would know whether and in what areas their own models are likely deficient. ER-190-91.¶24. So too for xAI's method for cleaning and refining data; those methods highlight what data xAI considers high-quality and how to prepare that data to maximize a model's capabilities. ER-191.¶25. There is thus significant value in xAI keeping details about the sources, sizes, and preparation methods of its datasets secret. Disclosing that information would undercut xAI's competitive edge.

xAI accordingly takes numerous measures to prevent disclosure and maintain secrecy. All employees who help develop xAI's models sign confidentiality provisions. ER-179.¶4. These provisions, along with xAI's robust confidentiality policy, emphasize that the entire development process is non-public and that nothing may be disclosed. ER-179.¶¶4-5. xAI also securely stores its datasets in locations that can be accessed only by authorized individuals. ER-179-81.¶¶7, 10. It further protects these datasets with security alerts, by encouraging employees to report unauthorized access, and through periodic exercises to simulate security breaches. ER-179.¶6; ER-181-82.¶¶11, 14. xAI has also introduced role-based access requirements, which ensure that an employee's access is limited to the datasets she actually needs, as well as time-limited access controls, so that access does not extend

10

beyond the needs of particular projects. ER-180.¶¶8-9. In short, xAI takes safeguarding dataset information extremely seriously.

### C. Assembly Bill 2013.

In September 2024, California's governor signed A.B.2013 into law. The bill, entitled "Artificial Intelligence Training Data Transparency," imposes substantial information-disclosure requirements on gen-AI developers. It took effect on January 1, 2026.

Though A.B.2013 lacks a statement of purpose, the legislative history describes it as "provid[ing] transparency to consumers of AI systems … by providing important documentation about the data used to train" such systems that will purportedly "help[] identify and mitigate biases." ER-146; ER-149. A.B.2013, however, does nothing to accomplish that goal. It does not require AI companies to disclose information users actually find useful—*e.g.*, how well a model performs real-world tasks. Instead, it requires companies to disclose proprietary dataset information that is meaningful only to parties with the requisite technical expertise to understand it—*viz.*, competitors. ER-182.¶¶15-16; ER-189-91.¶¶20-25.

A.B.2013 requires any "developer" of a "generative artificial intelligence system or service" made "publicly available to Californians for use" after January 1, 2022, to "post" on its "website documentation regarding the data used … to train" the gen-AI system. Cal. Civ. Code §3111. Those disclosures must include, but are

not limited to, a "high-level summary of the datasets used in the development" of the gen-AI model. *Id.* §3111(a). A.B.2013 also identifies a non-exhaustive list of dataset-related information that developers must disclose:

1. The sources or owners of the datasets.
2. A description of how the datasets further the [model's] intended purpose[.]
3. The number of data points included in the datasets.
4. A description of the types of data points[.]
5. Whether the datasets include any data protected by copyright, trademark, or patent.
6. Whether the datasets were purchased or licensed[.]
7. Whether the datasets include personal information.
8. Whether the datasets include aggregate consumer information.
9. Whether there was any cleaning, processing, or other modification to the datasets[, and] the[ir] intended purpose.
10. The time period during which the data … were collected[.]
11. The dates the datasets were first used[.]
12. Whether the [AI] system or service used or continuously uses synthetic data generation in its development.

*Id.* §3111(a)(1)-(12).

California evidently recognizes that these requirements demand the disclosure of valuable, confidential information because A.B.2013 contains three exceptions: It exempts from its onerous requirements models (1) used solely to help ensure security and integrity; (2) used solely for aircraft operations; or (3) developed for federal national security purposes. *Id.* §3111(b).

12

Despite imposing burdensome disclosure obligations, A.B.2013 leaves key terms, like "dataset" and "data point," undefined. And it never explains how "high-level" "summar[ies]" must be—even though it defines "developer" broadly to cover anyone who "designs, codes, produces, or substantially modifies an artificial intelligence system or service." *Id.* §3110(b). Given this uncertainty, xAI anticipates that, to comply, it would need to locate, collect, summarize, and disclose extensive proprietary information about any dataset it has used to train and develop each of its AI models since 2022. ER-192.¶¶27-28.

### D. Procedural History.

Given A.B.2013's potentially sweeping obligations, xAI sued to vindicate its constitutional rights in December 2025. xAI alleged that A.B.2013 violates its First Amendment rights by unlawfully compelling xAI to speak when it would rather not. ER-237-43.¶¶102-16. It alleged that A.B.2013's compelled public disclosure of xAI's trade-secret rights in its dataset information violates the Takings Clause by effecting *per se* and regulatory takings without providing just compensation. ER-225-37.¶¶70-101. And it alleged that A.B.2013 is unconstitutionally vague. ER-243-47.¶¶117-25.

xAI sought preliminary injunctive relief. But as a precautionary measure, xAI made a very limited disclosure under A.B.2013 that intentionally avoids disclosing xAI's trade secrets. ER-175-76. The state has not taken a position on whether that

13

disclosure is sufficient, however. Though the district court directly asked the state "whether [California] [ha]s any current intention to institute an enforcement action against [xAI] based on the disclosures [xAI] has already made," ER-21, the state dodged the question and refused to answer—neither disavowing enforcement against xAI nor making any effort to explain what information would suffice to comply with A.B.2013, ER-19.

Ultimately, the district court denied xAI's motion. It had no difficulty finding that xAI has standing since California "plainly refused to disavow enforcement." ER-6. But the court concluded that xAI failed to show a likelihood of success on the merits of any of its claims. On the First Amendment, the court recognized that A.B.2013 is a content-based speech regulation. ER-10. Yet it applied intermediate scrutiny, on the theory that A.B.2013 implicates only commercial speech because it "give[s] the public information necessary to determine whether" to use xAI's products. ER-10-12 & n.1. Deeming the record before it "insufficient" to determine whether A.B.2013 survives intermediate scrutiny, the court then held that xAI failed to show that it is likely to succeed on its First Amendment claim. ER-13.

With respect to xAI's takings claim, the court held that xAI failed to show that it has trade-secret property rights in its dataset information because it purportedly failed to show that it utilizes "unique" datasets when training its models—even though xAI submitted unrebutted evidence detailing exactly that. ER-7-8. Finally,

14

the court gave A.B.2013 a pass on vagueness as well, concluding that A.B.2013 is not unconstitutionally vague because some of its terms have colloquial definitions, and any other ambiguity may be clarified with "further development of the record." ER-13-14.

## SUMMARY OF ARGUMENT

A.B.2013 violates the Constitution three times over.

I. A.B.2013 violates the First Amendment. As a compelled-speech mandate that forces AI companies to speak when they would not otherwise do so, it is a content-based speech regulation that triggers and fails strict scrutiny.

Despite recognizing that A.B.2013 draws content-based distinctions, the district court applied intermediate scrutiny, positing that A.B.2013 implicates only commercial speech. That is wrong; A.B.2013 compels speech that neither "propose[s] a commercial transaction," *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 473-74 (1989), nor is "tethered to [a] commercial transaction[]," *PhRMA v. Stolfi*, 153 F.4th 795, 821 (9th Cir. 2025). At any rate, A.B.2013 flunks intermediate scrutiny, too. The state does not have a significant interest in requiring companies to disclose proprietary information just to satisfy consumer curiosity. And A.B.2013 does not even meaningfully advance that interest. Consumers are concerned with *outputs* of models, not their inputs, which is why xAI already voluntarily makes significant disclosures about the quality of its models' outputs.

15

*See* Model Card, *supra*. Recognizing those problems, the district court agreed that the AG failed to establish that A.B.2013 is likely to survive intermediate scrutiny. Yet it inexplicably excused that failure by impermissibly flipping the burden, positing that it is enough that the state might someday manage to do so. That was obvious error. Laws triggering heightened First Amendment scrutiny are presumptively unlawful. It was thus California's burden to demonstrate that its law is likely to survive First Amendment scrutiny, and California plainly failed to do so.

II. A.B.2013 also violates the Takings Clause. It forces xAI to publicly disclose its trade secrets—eviscerating those property rights—without any mechanism for just compensation. The district court's contrary conclusion rested on its determination that xAI failed to adequately *allege* that its dataset information qualifies as a trade secret. That is flawed from top to bottom. While xAI absolutely did make those allegations in its complaint, what matters for purposes of xAI's preliminary-injunction motion is the entirety of the evidentiary record—*i.e.*, the complaint *and* the sworn declarations. That record unambiguously shows that xAI's dataset information is unique and draws economic value from being unknown. After all, "knowing what datasets a developer uses to train a specific AI model provides invaluable insight into how that model operates." ER-187.¶11. Hence, "xAI's ability to protect its data, datasets, processes, and related information … is essential to xAI's ability to remain competitive in the AI marketplace." ER-182.¶16. It is bad

16

enough that the district court refused to take the allegations in xAI's complaint at face value; the court's failure to even consider xAI's *unrebutted* declarations is inexplicable. And to the extent the court thought that xAI must disclose the very datasets it claims are protected just to show that they are entitled to protection, that reflects a fundamental misunderstanding of the law.

Because xAI has trade-secrets property rights in its dataset information, it follows that A.B.2013 violates the Takings Clause. The law robs xAI of its right to exclude others from accessing that information—a *per se* taking. But even under the regulatory-taking framework, A.B.2013's novel and categorical disclosure requirements would eviscerate the value of xAI's trade secrets and interfere with xAI's obvious investment-backed expectations in developing its datasets. That is, at the very least, the equivalent of a "classic" taking.

III. A.B.2013 is unconstitutionally vague. It fails to regulate with the "narrow specificity" required of a speech regulation, *NAACP v. Button*, 371 U.S. 415, 433 (1963), as it demands that xAI disclose a "high level summary" of its datasets without explaining what information it covers or how much detail xAI must provide. A.B.2013 is also internally inconsistent and leaves key terms undefined, which increases the risk of arbitrary enforcement of a law that strikes at two fundamental constitutional rights. Proving the point, the AG refused to provide any clarity on

17

what the law means even after the district court expressly invited him to do so. When constitutional rights are at stake, due process requires more.

## STANDARD OF REVIEW

This Court "review[s] the denial of a preliminary injunction for abuse of discretion," and "[a] district court abuses its discretion if it rests its decision 'on an erroneous legal standard or on clearly erroneous factual findings.'" *Am. Beverage Ass'n v. City & Cnty. of S.F.*, 916 F.3d 749, 754 (9th Cir. 2019) (en banc). This Court "review[s] de novo the legal premises underlying a preliminary injunction." *Hawaii v. Trump*, 871 F.3d 646, 654 (9th Cir. 2017).

## ARGUMENT

### I. xAI Is Likely To Succeed On Its First Amendment Claim.

#### A. A.B.2013 Is a Compelled-Speech Mandate That Triggers Strict Scrutiny.

The First Amendment's guarantee of free speech "includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). In "the context of fully protected expression," the "constitutional equivalence of compelled speech and compelled silence" is well "established." *Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 796-97 (1988). And the protection against compelled speech "applies not only to expressions of value, opinion, or endorsement, but equally to *statements of fact* the speaker would rather avoid." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 573 (1995)

18

(emphasis added). Because "[m]andating speech that a speaker would not otherwise make necessarily alters the content of the speech," *Riley*, 487 U.S. at 795, compelled-speech requirements typically trigger strict scrutiny. *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra* (*NIFLA*), 585 U.S. 755, 766-67 (2018); *Stolfi*, 153 F.4th at 810; *X Corp. v. Bonta*, 116 F.4th 888, 900 (9th Cir. 2024); *NetChoice v. Bonta*, 113 F.4th 1101, 1119 (9th Cir. 2024).

A.B.2013 is a compelled-speech mandate. It forces xAI to disclose specific content related to its AI models and datasets that xAI would not otherwise disclose. As the district court recognized, that compelled-speech mandate plainly implicates the First Amendment. *See* ER-10; *X Corp.*, 116 F.4th at 900. And like most compelled-speech mandates, A.B.2013 triggers strict scrutiny. *See Stolfi*, 153 F.4th at 810. The Supreme Court's decision in *Riley* illustrates the point. There, a law requiring fundraisers to disclose the percentage of their charitable contributions "actually turned over to charity" triggered strict scrutiny because forcing fundraisers to convey facts they would rather not convey "necessarily alters the content of the speech." 487 U.S. at 795. This Court applied the same principle in *X Corp.*: By forcing social-media companies to submit reports about their terms of service and content-moderation policies, California compelled them "to recast [their] content-moderation practices in language prescribed by the State," thereby altering the content of X Corp.'s speech. 116 F.4th at 901, 903; *accord NIFLA*, 585 U.S. at 766.

19

A.B.2013 likewise forces xAI to speak a message it does not want to convey. That triggers strict scrutiny.

In fact, A.B.2013 triggers strict scrutiny twice over, since it draws several content-based distinctions on its face. A.B.2013 exempts developers of AI models with certain favored "purpose[s]"—namely, those related to network security, aircraft operations, and national security—from its requirements. Cal. Civ. Code §3111(b). So companies that build AI models that disseminate speech on news, politics, sports, law, etc., are covered by A.B.2013's requirements. But companies that build AI models that disseminate speech on topics that the state thinks warrant more protection (*e.g.*, security, aviation, military) are exempt. That is as content based as it gets. After all, as the Supreme Court observed, laws like A.B.2013 that "discriminate among media" "often present serious First Amendment concerns," particularly where the discrimination risks "distort[ing] the market for ideas." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 659-60 (1994).

California cannot avoid this result by framing these exemptions as distinctions made based on the functionality of the AI model. A "regulation of speech cannot escape classification as facially content based simply by swapping an obvious subject-matter distinction for a 'function or purpose' proxy that achieves the same result." *City of Austin v. Reagan Nat'l Advert. of Austin*, 596 U.S. 61, 74 (2022). That is what A.B.2013 does. By using the content of an AI model's outputs to

20

determine whether disclosure is required, A.B.2013 plainly distinguishes based on content—A.B.2013, at a minimum, uses an AI model's function as a proxy for content. Strict scrutiny applies.

### B. The District Court Erred by Applying Intermediate Scrutiny.

The district court agreed that it is "generally the case that '[m]andating speech that a speaker would not otherwise make necessarily alters the content of the speech.'" ER-9 (quoting *Riley*, 487 U.S. at 795). And it acknowledged that, under this Court's precedents, "the *only* exception is for [disclosures] that qualify as 'commercial speech.'" ER-10 (quoting *Stolfi*, 153 F.4th at 811). It nonetheless applied intermediate scrutiny on the theory that A.B.2013 compels only "commercial speech." That reasoning is flawed from top to bottom.

1. Though the Supreme Court has repeatedly cautioned against "mark[ing] off new categories of speech for diminished constitutional protection," *NIFLA*, 585 U.S. at 767, its approach to "commercial speech" is an exception, *see 44 Liquormart v. Rhode Island*, 517 U.S. 484, 522 (1996) (Thomas, J., concurring in part); *Rubin v. Coors Brewing*, 514 U.S. 476, 493 (1995) (Stevens, J., concurring in judgment). Both the Supreme Court and this Court have applied a lower level of protection (intermediate rather than strict scrutiny) to "commercial speech" in "light of the greater potential for deception or confusion in the context of certain advertising messages." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 65 (1983). But

because the state's interest in regulating the speech must be tied to its "interest in regulating the underlying [commercial] transaction," *Edenfield v. Fane*, 507 U.S. 761, 767 (1993), the Supreme Court has "defined" the category of "commercial speech" narrowly to reach only "speech that *does no more* than propose a commercial transaction," *United States v. United Foods*, 533 U.S. 405, 409 (2001) (emphasis added). For decades, both the Supreme Court and this Court have policed that definition "carefully to ensure that speech deserving of greater constitutional protection is not inadvertently suppressed." *Bolger*, 463 U.S. at 66; *see X Corp.*, 116 F.4th at 900. Time and again, the Supreme Court has confirmed that "the proposal of a commercial transaction" is "*the test* for identifying commercial speech." *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 423 (1993).

In *Bolger*, the Supreme Court identified factors for resolving cases that present "closer question[s]" about whether speech is commercial. 463 U.S. at 66. *Bolger* concerned a federal statute that prohibited mailing unsolicited advertisements for contraceptives. *Id.* at 61-62. The plaintiff there, a contraceptives distributor, challenged the law's application to its mailings, some of which "promot[ed]" its products and others of which "discuss[ed] the desirability and availability of prophylactics in general." *Id.* at 62. The Court concluded that the promotional mailings "fall within the core notion of commercial speech—speech which *does no more* than propose a commercial transaction." *Id.* at 66 (emphasis added). But the

22

"informational pamphlets" required further analysis. *Id.* at 66. Though they were "conceded to be advertisements," that "mere fact" alone did "not compel the conclusion that they [we]re commercial speech." *Id.* "Similarly," their "reference to a specific product d[id] not by itself render the pamphlets commercial speech." *Id.* And "the fact that [the plaintiff] ha[d] an economic motivation for mailing the pamphlets" was "clearly … insufficient by itself to turn the materials into commercial speech." *Id.* at 67. It was only "[t]he combination of *all* these characteristics," the Court held, that rendered them "properly characterized as commercial speech." *Id.*

While courts routinely use the *Bolger* factors to determine whether speech is sufficiently linked to "commercial transactions" to merit lesser First Amendment protection, *id.* at 68, those factors come into play only "[w]here the facts present a close question," *Hunt v. City of Los Angeles*, 638 F.3d 703, 715 (9th Cir. 2011). When the speech at issue clearly *does not* meet the commercial-speech test—*i.e.*, when there is no theory under which it could be said to "propose a commercial transaction"—this Court has held that it "need not reach the *Bolger* factors." *IMDb.com v. Becerra*, 962 F.3d 1111, 1122 (9th Cir. 2020). In *IMDb.com*, for example, this Court held that biographical profiles of movie-industry personnel on an online, public database were not commercial speech. *Id.* "Because IMDb's

23

public profiles do not 'propose a commercial transaction,'" this Court had no need to "reach the *Bolger* factors" at all. *Id.*

2. The disclosures A.B.2013 mandates are plainly not "commercial speech," as they are not being "used as part of a proposal of a commercial transaction." *Friedman v. Rogers*, 440 U.S. 1, 11 (1979). A.B.2013 does not require xAI to make disclosures alongside a proposal to engage in a commercial transaction; it simply requires xAI to post on its website confidential information about the datasets it uses to develop and train its AI models. That has none of the trappings of commercial speech, as it is wholly disconnected from any effort to advertise, market, or sell xAI's models (indeed, it is disconnected from any speech at all). In fact, A.B.2013 applies "regardless of whether the terms" of using xAI's model "include compensation." Cal. Civ. Code §3111. It thus applies without regard to whether xAI is engaged in *any* "speech soliciting a commercial transaction or speech necessary to the consummation of a commercial transaction," let alone speech that communicates the terms of a potential commercial transaction. *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 818 (9th Cir. 2013).

Because it is not even a "close question" whether the dataset information A.B.2013 targets "propose[s] a commercial transaction," *IMDb.com*, 962 F.3d at 1122, this Court can stop there. But even if the Court were to consider the *Bolger* factors, they confirm that A.B.2013 compels the disclosure of non-commercial

24

speech. xAI's dataset information is obviously not an advertisement; it is proprietary information that xAI does *not* want to share with the public. *See NetChoice*, 113 F.4th at 1120. xAI has no economic motivation to make the A.B.2013 disclosures; to the contrary, revealing such information would be economically harmful, as it would give a windfall to xAI's competitors who could use such information to replicate xAI's successes. ER-190-93.¶¶22-29. While A.B.2013's disclosures generally relate to xAI's product, the information does not concern the solicitation or sale of any specific product. Instead, A.B.2013 compels xAI "to go beyond opining about [its] products or services" and requires it to publicly disclose information about its proprietary development processes. *NetChoice*, 113 F.4th at 1120. To say that kind of compelled disclosure has "few indicia of commercial speech," *X Corp.*, 116 F.4th at 901, is an understatement in the extreme. It is not even in the same postal code.

3. The district court reached a contrary conclusion only by misapplying this Court's precedents and adopting a test with no limiting principle. According to the district court, A.B.2013 compels commercial speech because it requires xAI to disclose information that could help consumers "determine whether they will use … [xAI's] model relative to the other options on the market." ER-11. But this Court has explicitly rejected that expansive conception of "commercial speech." In *X Corp.*, for example, the Court addressed a California law that compelled social-

media companies to disclose information about their content-moderation policies. 116 F.4th at 901-02. California argued that the requirement should be analyzed under the commercial-speech doctrine because it was "a transparency measure about the product," "directed to potential consumers," and "may presumably play a role in the decision of whether to use the platform." *Id.* at 902 & n.10. The Court rejected that argument as "untenable," explaining that it "would mean that basically any compelled disclosure by any business about its activities would be commercial and subject to a lower tier of scrutiny." *Id.* Under California's view, this Court explained, a state could "compel[] a social media company to disclose the political affiliations of its managers." *Id.* After all, that "information could conceivably play a role in the potential consumer's decision of whether to use the platform—i.e., if the consumer is concerned about the platform's content being politically skewed." *Id.* "It could not be that such a law compels only commercial speech subject to a lower tier of scrutiny." *Id.* "Protection under the First Amendment cannot be vitiated so easily." *Id.*

The district court tried to distinguish *X Corp.* on the ground that it involved a California statute that required social-media companies to "reveal their opinions on various controversial topics." ER-9. But the protection against compelled speech is not limited to "expressions of value, opinion, or endorsement"; it includes "*statements of fact* the speaker would rather avoid." *Hurley*, 515 U.S. at 573

(emphasis added). And whether speech is "commercial" has never turned on whether the speech is a statement of fact or opinion; it instead turns on whether it "does no more than propose a commercial transaction," *United Foods*, 533 U.S. at 409. *IMDb.com*, for example, involved factual information about professionals in the entertainment industry, including "information on cast, production crew, fictional characters, biographies, plot summaries, trivia and reviews." 962 F.3d at 1122. One could have said there, as the district court said here, that the content found in profiles on IMDb's website would give employers "information necessary to determine whether they will" employ a particular entertainment industry professional. ER-11. But that was not enough to render that speech "commercial." Indeed, it was not even "a close question" since "public profiles on IMDb.com do not 'propose a commercial transaction.'" *IMDb.com*, 962 F.3d at 1122; *see also Dex Media W. v. City of Seattle*, 696 F.3d 952, 957-59 (9th Cir. 2012) (similar).

If the district court were correct that disclosure requirements escape strict scrutiny whenever they "giv[e] the public information necessary to determine whether they will use" a product, ER-11, then there would be "no end to the information that states could require manufacturers to disclose," *Am. Meat Inst. v. USDA*, 760 F.3d 18, 31-32 (D.C. Cir. 2014) (en banc) (Kavanaugh, J., concurring). Companies in every part of the economy could be compelled to reveal sensitive proprietary information about their products and business decisions to the public.

27

Examples are not hard to imagine. Could California compel a car manufacturer to reveal what training it provided to its managers? After all, consumers may adjust their purchasing behavior if they knew that a car manufacturer refused to train its managers in sustainable engineering techniques or responsible supply chain practices. What about a law that requires social-media companies to disclose where their employees went to school, what they majored in, and what textbooks they read? Consumers may well have a general interest in such information and take it into account when deciding whether to use a social-media platform. As this Court has explained, "[i]t could not be that such a law compels only commercial speech subject to a lower tier of scrutiny." *X Corp.*, 116 F.4th at 902 & n.10. "Protection under the First Amendment cannot be vitiated so easily." *Id.*

Worse, under the district court's logic, commercial speech is no longer about the context in which the speech occurs (*i.e.*, commercial transactions); it is instead about the identity of the speaker (*i.e.*, whether the speaker creates or sells products). That is a dangerous reworking of the doctrine, as it guarantees that certain speakers (those in the business of creating or selling products) will receive less First Amendment protection when they wish to stay silent. But as this Court has explained time and again, the prohibition on compelled speech applies not just to "ordinary people" engaged in expression, but to "business corporations" too. *Hurley*, 515 U.S.

28

at 574. A "speaker's rights are not lost merely because compensation is received." *Riley*, 487 U.S. at 801.

The district court attempted to ground its reasoning in this Court's divided decision in *Stolfi*, but that case has no bearing here. *Stolfi* did not involve a "disclosure requirement." 153 F.4th at 809-10. It involved a "government reporting requirement" that required drug manufacturers to disclose certain information about drug pricing decisions to *the government*, not the public. *Id.* As the Court explained, "it makes little sense to determine the appropriate level of scrutiny to apply to *government reporting requirements* using the traditional definitions of commercial speech," as the "commercial speech" test arose in the context of requirements to disclose information to *the public*. *Id.* at 816 (emphasis added). Unlike public-disclosure requirements, government-reporting requirements involve "routine disclosure of economically significant information designed to forward ordinary regulatory purposes." *Id.* at 813. Noting that "[t]here are literally thousands of similar regulations on the books," the Court concluded that it would be a "mistake[]" to subject government-reporting requirements to the same "extensive First Amendment analysis" that typically applies to public-disclosure requirements. *Id.*

To be sure, the Court nevertheless went on to hold that the Oregon law at issue there compelled only "commercial speech," in part because it facilitated the state's ability to "provide market participants with information to facilitate future

29

commercial transactions between drug manufacturers and market participants." *Id.* at 822. But the Court expressly disclaimed announcing any "new legal test." *Id.* at 822 n.18. And in response to the dissent's suggestion that its analysis lacked a "limiting principle," the majority gave assurances that its decision was actually "fact-cabined" and "fact-driven." *Id.* According to the Court itself, it merely held that "some aspects of the commercial speech doctrine are more instructive in this context" (*i.e.*, "government reporting requirements") "than others," which is why the Court did not want to be misunderstood as addressing or revising the legal framework governing public-disclosure requirements. *Id.*

Whatever *Stolfi* has to say about government-reporting requirements, it has little application to public-disclosure requirements like A.B.2013. *Stolfi* certainly does not stand for the sweeping proposition that the latter escape strict scrutiny whenever they "giv[e] the public information necessary to determine whether they will use" a product. ER-11. Such a sweeping rule would contravene decades of Supreme Court and Ninth Circuit precedent explaining that speech must (at a minimum) "propose a commercial transaction" to qualify as "commercial." *IMDb.com*, 962 F.3d at 1122. This Court should not embrace a reading of *Stolfi* that contradicts its earlier precedents (let alone Supreme Court precedent). After all, "one three-judge panel of this court cannot reconsider or overrule the decision of a prior panel." *Duarte v. City of Stockton*, 60 F.4th 566, 574 (9th Cir. 2023). "Therefore,

when a subsequent panel makes a suggestion that is inconsistent with earlier opinions of this court, such suggestions are to be disregarded in favor of the earlier, binding holding." *Id.*

In all events, even if *Stolfi* were relevant here, it made clear that there must still be a "close tether between the speech compelled" and "commercial … transactions." 153 F.4th at 822 n.18. The Court concluded that the drug-pricing information at issue in *Stolfi* qualified because it involved "*economic* information" that is both "tethered to commercial transactions" and "closely tethered to the sale of a product." *Id.* at 821-22 (emphasis added). Here, however, neither the district court nor California ever identified any actual or potential commercial transactions to which A.B.2013's disclosure requirements are tethered. *See supra* pp.24-27. Nor could they have. A.B.2013's disclosure requirements apply *even if there is no commercial transaction at all. See* Cal. Civ. Code §3111. A.B.2013 forces xAI to make "value-laden" disclosures regarding "state-prescribed" categories of dataset information, *Stolfi*, 153 F.4th at 823—everything from why datasets "further [xAI's] intended purpose," the "intended purpose" of any cleaning or processing of data, and overall descriptions of xAI's datasets, Cal. Civ. Code §3111(a)(2), (4), (9). Such narrative details about the datasets on which xAI's products are trained are a far cry from the "pricing" and "marketing information" at issue in *Stolfi*. 153 F.4th at 822.

31

### C.    A.B.2013 Flunks Any Level of Scrutiny.

A.B.2013 cannot satisfy any level of scrutiny, let alone strict scrutiny.[1] Strict scrutiny requires California to demonstrate that A.B.2013 is "the least restrictive means of achieving a compelling state interest." *McCullen v. Coakley*, 573 U.S. 464, 478 (2014).  Intermediate scrutiny requires California to demonstrate that A.B.2013 is "narrowly tailored to serve a significant governmental interest," *Packingham v. North Carolina*, 582 U.S. 98, 105-06 (2017), that is "unrelated to the suppression of free speech," *Free Speech Coalition v. Paxton*, 606 U.S. 461, 471 (2025). California's chosen solution, moreover, may not "burden substantially more speech than necessary to further those interests." *Id.*   A.B.2013 flunks both levels of scrutiny.

1. For starters, California fails to identify any significant (let alone compelling) government interest that A.B.2013 advances.  Indeed, A.B.2013 is purportedly aimed at advancing consumer transparency by providing information that "[c]onsumers may use … to better evaluate if they have confidence in" an AI model.  ER-138.  Even assuming that some users might be curious about the dataset

---

[1] The district court correctly noted that the standard set forth in *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985), is inapposite.  ER-12.  *Zauderer* is limited to "combat[ing]" the unique problems of "misleading commercial advertisements," *Milavetz, Gallop & Milavetz P.A. v. United States*, 559 U.S. 229, 250 (2010), and there is no advertising at issue here (which, of course, begs the question how there could be commercial speech at issue either).

32

information A.B.2013 compels xAI to disclose, *but see infra* pp.34-36, the state has no significant interest in "transparency for its own sake," *Stolfi*, 153 F.4th at 826. As the Supreme Court explained in rejecting a similar argument in *Riley*, the state's "interest" in "informing donors how the money they contribute is spent" is "not as weighty as the State asserts." 487 U.S. at 798. That is why courts have consistently held that transparency for its own sake—a listener's "desire" or "wish to know"—is an "insufficient" interest to justify a compelled-speech mandate. *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 74 (2d Cir. 1996); *Am. Meat Inst.*, 760 F.3d at 23. California's interest "must be more than the satisfaction of mere 'consumer curiosity.'" *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 844 (9th Cir. 2019). Yet satisfying consumer curiosity is (at best) all that A.B.2013 accomplishes.

To the extent California has articulated any interest beyond mere "transparency," that interest "is very much related to the suppression of free expression." *Moody v. NetChoice*, 603 U.S. 734, 740 (2024). In enacting A.B.2013, California proudly proclaimed below that the statute seeks to address AI models that "perpetuate" or "amplify biases." ER-94; ER-155. And in defending the law, California asserted that A.B.2013 is designed to identify AI models that spew "hateful posts" because they are trained on datasets that are "politically incorrect" and "divisive." ER-107. But "a State may not interfere with private actors' speech

33

to advance its own vision of ideological balance." *Moody*, 603 U.S. at 741. Just as the government may not compel the *Los Angeles Times* to disclose its editorial policies or the political affiliations of its editors in an effort to smoke out "bias" in news reporting, California may not compel xAI to disclose information about its datasets in an effort to smoke out bias in its AI models. The First Amendment does not permit the government to regulate speech "to achieve its own conception of speech nirvana." *Id.* at 742.

In all events, A.B.2013 is not narrowly tailored to achieve any of its stated interests. Even assuming those interests are important (and compelling), California has "too readily forgone options that could serve its interests just as well, without substantially burdening" protected speech. *McCullen*, 573 U.S. at 490. Even under intermediate scrutiny, California must still show that it "seriously undertook to address the problem with less intrusive tools readily available to it," and that "alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *Id.* at 494-95. A.B.2013's disclosure obligations are far "more extensive than necessary" to help "consumers … make informed decisions" about AI models. *X Corp.*, 116 F.4th at 903. The best way to assess whether an AI model is biased or reliable is to review its outputs. And xAI already releases "Model Cards" that describe and analyze those outputs for its AI products. *See* Model Card, *supra*; *see supra* pp.9, 11. Reports

34

from developers or outside certifiers who test AI models' effectiveness are far more useful to consumers than a high-level summary of the datasets on which the models were trained. *See* ER-185.¶5; ER-189-92.¶¶20-26; ER-182.¶¶15-16. Indeed, the information that A.B.2013 requires xAI to disclose is "largely meaningless for the average user of AI models"; California has instead succeeded only in enabling xAI's competitors to replicate xAI's successes. ER-191-92¶26.[2]

If a consumer wants to know whether the *Los Angeles Times* or the *New York Times* is biased or reliable, the best way to do that is to read their articles and fact check them for bias and accuracy—not to ask the newspapers to disclose information about where their reporters went to school, which professors they had, and what textbooks they studied. After all, knowing whether a reporter read Karl Marx or Ayn Rand as part of her training would not tell consumers much about whether her reporting might be biased or unreliable, as most reporters not only work hard to report accurate information and remove their biases no matter where or from whom

---

[2] Indeed, A.B.2013's First Amendment problems run deeper. Because A.B.2013 primarily benefits xAI's competitors, it will necessarily disincentivize xAI (and other developers) from developing unique, high-quality datasets. Companies reasonably will not expend resources finding specialized sources of data when they know that they will just have to turn around and disclose the data to their rivals under A.B.2013. But without such unique, high-quality training data, the users of AI models will no longer be able to generate distinct and novel content. ER-182.¶15. In other words, A.B.2013 will chill the creation of new, expressive AI outputs.

they received their training, but also have editors who review their work to police for bias and accuracy as well.

The same is true for AI models: knowing whether an AI model was trained on articles from, *e.g.*, *Slate* or *The Daily Wire* would not tell a user much about whether the model's outputs are biased or accurate. Even if the underlying training material may have some biases or inaccuracies, xAI engineers work hard to ensure that xAI's models' outputs are unbiased and accurate; indeed, training AI on data that might be biased is important to teaching the model how to recognize and mitigate bias. *See* ER-188.¶¶15-17. Of course, no AI model can be 100% fool-proof, just as no newspaper can ensure 100% accuracy or completely unbiased reporting. But just as the best way to assess biases and inaccuracies in a newspaper's articles is to read and factcheck those articles, the best way to assess biases and inaccuracies in an AI model is to test the model's outputs. ER-185.¶5; ER-191.¶26.

California offered little below to counter any of that; it just vaguely suggested that the information A.B.2013 demands "might raise concerns for consumers," or provide something that consumers "may find … useful." ER-113. But "mere speculation or conjecture," *Edenfield*, 507 U.S. at 770, is not enough for intermediate scrutiny. The state must offer actual evidence of its concerns. *See, e.g.*, *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001). Here, California's unsupported *ipse dixit* is insufficient—especially given that A.B.2013 compels disclosures

36

regarding all AI models released since 2022, even those that are no longer used. That "overinclusiveness" underscores that A.B.2013 is far more extensive than necessary to advance California's purported transparency interest. *Comite de Jornaleros v. City of Redondo Beach*, 657 F.3d 936, 949-50 (9th Cir. 2011) (en banc).

2. The district court's contrary conclusion is flawed from top to bottom. The court agreed with xAI that the only interest the state has asserted in defense of A.B.2013 is "consumer curiosity," which "is generally insufficient as a substantial state interest." ER-13. But the court denied relief anyway on the theory that "[t]he information before [it]" was "insufficient to come to [the] conclusion at this stage" that the state lacks a permissible justification. ER-13. After hypothesizing that "litigation may reveal that the State[']s asserted interests here are not limited to transparency for its own sake," the court posited that "[i]t simply remains to be seen" whether A.B.2013 is "'more extensive than necessary' to achieve the goal of transparency for consumers." ER-13. In other words, the court ultimately faulted xAI for failing to affirmatively prove that A.B.2013 flunks intermediate scrutiny.

That gets things backwards. As this Court has made clear, "the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed … at which point the burden *shifts to the government* to justify the restriction." *Doe v. Harris*, 772 F.3d 563, 570 (9th Cir. 2014) (emphasis added). Here, there is no question that A.B.2013 compels speech. ER-12. It is thus the

37

*state's* burden to "affirmatively establish[]" that its law likely satisfies intermediate scrutiny. *Desert Outdoor Advert. v. City of Moreno Valley*, 103 F.3d 814, 819 (9th Cir. 1996); *Sorrell v. IMS Health*, 564 U.S. 552, 571-72 (2011). The district court never held California to that burden. ER-13. To the contrary, it admitted that the record was "insufficient" to show that A.B.2013 likely survives intermediate scrutiny. That should have been enough to find that xAI is likely to succeed on its First Amendment claim. *See Am. Beverage*, 916 F.3d at 756 (reversing denial of a motion for preliminary injunction where the government failed to carry its scrutiny burden on the "preliminary record"). The district court concluded otherwise only by impermissibly flipping the burden.

## II.    xAI Is Likely To Succeed On Its Takings Claims.

The Takings Clause provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. "By requiring the government to pay for what it takes, the Takings Clause saves individual property owners from bearing 'public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Sheetz v. Cnty. of El Dorado*, 601 U.S. 267, 273-74 (2024). By destroying the value in xAI's trade secrets just to satisfy public curiosity, A.B.2013 takes xAI's constitutionally protected property without any compensation at all.

38

### A. The Takings Clause Prohibits Government-Compelled Disclosures of Trade Secrets.

As the Supreme Court explained in *Ruckelshaus v. Monsanto Co.*, the Takings Clause's protections extend to intangible property rights, including trade secrets. 467 U.S. 986, 1003-04 (1984). There, Monsanto, a pesticide manufacturer, argued that provisions of the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) violated the Takings Clause because they authorized the government to publicly disclose Monsanto's trade secrets in the research and test data that it submitted to EPA when registering its pesticides for sale. *Id.* at 990-93. The Court held that, "to the extent that Monsanto has an interest in its health, safety, and environmental data cognizable as a trade-secret property right under Missouri law, that property right is protected by the Takings Clause." *Id.* at 1003-04.

The Court noted that it had not developed a "set formula" for determining whether a compelled disclosure of trade secrets constitutes a taking. Instead, it identified "several factors" (*i.e.*, the *Penn Central* factors) that it typically takes "into account" in regulatory takings cases—including the "character of the governmental action, its economic impact, and its interference with reasonable investment-backed expectations." *Id.* at 1005. But in the context of forced disclosure of trade secrets, the Court explained, the only factor that matters is "interference with reasonable investment-backed expectations," as the "force of th[at] factor is so overwhelming." *Id.* "Once the data that constitute a trade secret are disclosed to others," "the holder

39

of the trade secret has lost his property interest in the data." *Id.* at 1011. So when the government forces the owner to disclose trade secrets that it has not otherwise disclosed to others, that forced disclosure necessarily "frustrate[s] [a trade-secret holder's] reasonable investment-backed expectation[s] with respect to its control over the use and dissemination of the" trade secrets. *Id.*

The upshot of *Ruckelshaus* is that the Takings Clause typically forbids the government from forcing companies to publicly disclose their trade secrets without just compensation. Consistent with that understanding, when the government compels disclosure of information to the public, it typically provides protection for trade secrets. 7 U.S.C. §136h (allowing companies to designate certain information disclosed under FIFRA as trade secrets); 15 U.S.C. §1454(c)(3) (Food, Drug, and Cosmetics Act (the FDCA) protects "any trade secret [from] be[ing] divulged" on an ingredients label); *accord* 21 C.F.R. §20.61. That is why Coca-Cola, for example, is not required to disclose its secret formula for Coke, even though the FDCA typically requires food manufacturers to disclose a list of ingredients on their product labels. Coke instead discloses only generally known ingredients (*i.e.*, water, sugar, caffeine) on its label; the ingredients that differentiate Coke from Pepsi are instead just listed as "natural flavors." *See Coca-Cola® Original*, The Coca-Cola Co., https://perma.cc/N5K6-JCAD (last visited May 11, 2026).

40

In the rare instances when the government *has* forced disclosure of trade secrets, courts have struck those requirements down under the Takings Clause. *Philip Morris, Inc. v. Reilly* is illustrative. There, the en banc First Circuit invalidated a Massachusetts law that forced tobacco companies to publicly disclose "all ingredients besides tobacco, water, or reconstituted tobacco sheet" for their tobacco products under the Takings Clause. 312 F.3d 24, 26 (1st Cir. 2002) (en banc). Although "some ingredients of particular brands are known" and "all ingredients used … are publicly available," the First Circuit recognized that the unique combinations of ingredients contributed to the companies' "distinctive flavor, taste, and aroma," thereby qualifying as protected trade secrets. *Id.* at 27. Because the ingredients lists were unquestionably protected trade secrets, the First Circuit held that Massachusetts could not force tobacco companies to disclose those ingredients lists without just compensation. *Id.* at 44.

### B.     A.B.2013 Eviscerates xAI's Trade Secrets.

Just like the laws at issue in *Ruckelshaus* and *Reilly*, A.B.2013 runs afoul of the Takings Clause because it compels xAI to disclose its confidential dataset information without just compensation. xAI unquestionably holds trade secrets in the sources of its datasets, their sizes, and the methods used to clean and refine them, all of which are at risk of public disclosure under A.B.2013. The district court's

contrary conclusion ignores unrebutted evidence xAI proffered in support of its preliminary-injunction motion.

1. Under both California and federal law, a party has a trade-secrets property right in information that (1) is valuable because it is unknown and (2) the owner has attempted to keep it secret. *Amgen v. Cal. Corr. Health Care Servs.*, 260 Cal.Rptr.3d 873, 886 (Cal. Ct. App. 2020); Cal. Civ. Code §3426.1(d); *accord* 18 U.S.C. §1839(3). xAI's dataset information easily qualifies.

First, information about xAI's datasets is economically valuable precisely because it is unknown. xAI curates the data on which it trains its models. *See supra* p.8. That compilation of data holds significant value, which is why the industry takes great pains to keep that information secret from competitors. "Training data selection and preparation techniques represent years of accumulated expertise about what works and what doesn't," which is why companies like xAI "guard their training methodologies as fiercely as Coca-Cola protects its recipe." *Meta Halts Mercor Partnership After AI Training Data Breach*, The Tech Buzz (Apr. 3, 2026), https://perma.cc/B38K-6QVQ. "Knowing exactly how a rival processes their training data is like getting a peek at their playbook before the championship game."[3] *Id.*

---

[3] Courts across the country have routinely recognized that information about AI training datasets are proprietary by entering protective orders safeguarding AI-training data from disclosure in litigation. *E.g.*, Order.at.2, *Tremblay v. OpenAI*,

As this Court has recognized, "a compilation that affords a competitive advantage and is not readily ascertainable falls within the definition of a trade secret." *United States v. Nosal*, 844 F.3d 1024, 1042 (9th Cir. 2016), *overruled in part on other grounds by Lagos v. United States*, 584 U.S. 577 (2018); *accord O2 Micro Int'l v. Monolithic Power Sys.*, 420 F.Supp.2d 1070, 1089 (N.D. Cal. 2006) ("Combinations of public information from a variety of different sources when combined in a novel way can be a trade secret."). That describes xAI's dataset information. xAI is not claiming a trade secret in the public data itself; its protected trade secret lies in the make-up of each dataset. ER-190-91.¶24. xAI's unique— and generally unknown—decisions about how to craft the best combination of data from public and non-public sources, or how best to balance different mixtures of text, images, and audio data are what make the dataset information valuable to competitors seeking to replicate xAI's top-notch models. ER-190-91.¶¶24-25. Those are protected trade secrets. *See, e.g.*, *Nosal*, 844 F.3d at 1043 (customer lists are trade secrets given the "unique nature of the source lists, which are the customized product of a massive database").

---

No. 4:23-cv-3223 (N.D. Cal. Sept. 24, 2024), Dkt.182; Order.at.3, *Dow Jones v. Perplexity AI*, No. 1:24-cv-7984 (S.D.N.Y. Aug. 1, 2025), Dkt.62. Such orders cannot be entered unless the "party asserting the 'trade secret privilege'" carries its burden of "establishing [its] existence." *Bank of Am. v. Hensley Props.*, 2008 WL 2724875, at *6 (E.D. Cal. July 11, 2008).

As xAI's unchallenged declarations show, the same is true of the amount of data xAI uses, as differences between the datasets each company uses are what give xAI a competitive edge. ER-186-87.¶11; ER-190-91.¶¶23-24. Competitors that know the size of xAI's datasets can ascertain what information xAI has, what they lack, and how they can fill any gaps in their own training. The sizes of xAI's datasets therefore reveal "fact[s] which [competitors] previously did not know." *Abba Rubber Co. v. Seaquist*, 286 Cal.Rptr. 518, 527 (Cal. Ct. App. 1991). xAI's processes for cleaning, modifying, and refining its data are trade secrets for the same reason. If competitors had access to that information, they could pinpoint deficiencies in their training regimen and replicate xAI's successes. *E.W. Bank v. Shanker*, 2021 WL 3112452, at *9 (N.D. Cal. July 22, 2021) (parties can hold trade secrets in "roadmaps related to confidential technology" that enable competitors to recreate their products). In short, because xAI's dataset information draws value "from the unique integration, compilation, cultivation, and sorting of" xAI's uniquely sourced data, *Nosal*, 844 F.3d at 1043, it qualifies for trade-secret protection.

Second, as neither the AG nor the district court disputed, xAI has undertaken extensive efforts to keep this information secret. xAI employees sign confidentiality provisions reinforcing that all parts of the development process are non-public. ER-179.¶¶4-5. xAI likewise utilizes different methods to physically and digitally safeguard the information, including providing role-based and time-limited access

44

on a need-to-know basis, implementing a security-alert system, and running security exercises. ER-179-82.¶¶6-14; *Nosal*, 844 F.3d at 1043. These efforts exist to ensure that xAI alone has access to this highly valuable information. *See Whyte v. Schlage Lock Co.*, 125 Cal.Rptr.2d 277, 286-87 (Cal. Ct. App. 2002); *WeRide Corp. v. Kun Huang*, 379 F.Supp.3d 834, 847 (N.D. Cal. 2019).

2. The district court acknowledged "the important role of datasets in AI training and development," and it agreed that "datasets and details about them could be trade secrets." ER-8. But it declined to recognize trade-secrets protection for xAI's dataset information, on the theory that xAI had failed to sufficiently "*allege*[] that it actually uses datasets that are unique, that it has meaningfully larger or smaller datasets than competitors, or that it cleans its datasets in unique ways." ER-8 (emphasis added). That conclusion is inexplicable.

First, to the extent the district court limited its evaluation to the allegations in xAI's complaint, that is obviously incorrect. Plaintiffs can obviously introduce evidence, including affidavits, to support a motion for preliminary injunction. *K-2 Ski Co. v. Head Ski Co.*, 467 F.2d 1087, 1088-89 (9th Cir. 1972). And a court may not ignore plaintiff's proffered evidence when assessing a request for preliminary relief—especially when that evidence is uncontroverted. *McCormack v. Hiedeman*, 694 F.3d 1004, 1019 (9th Cir. 2012) ("[A]n affidavit and a complaint may be the basis for a preliminary injunction unless the facts are substantially controverted by

45

counter-affidavits."); *accord First Choice Women's Res. Ctrs. v. Davenport*, 2026 WL 1153029, at \*7-8 (U.S. Apr. 29, 2026).

Yet, that is what the district court did. In finding that xAI "resort[ed] to generalizations and hypotheticals," ER-8, the court fixated on the allegations in xAI's complaint and entirely sidelined (indeed, *never* cited) xAI's declarations. Those declarations directly contradict the court's assertions: xAI's Senior Director of Security Engineering detailed the ways in which xAI gathers data from unique sources, how xAI processes that data, and how xAI constructs the specialized training datasets that it uses to test and refine xAI's models. ER-185-88.¶¶8-17. As he explained, "xAI spends significant amounts of time and resources to specially curate and label particular data into effective fine-tuning datasets," including by using "proprietary tools that xAI has built." ER-188.¶16. Those efforts allow xAI and its engineers not only to obtain a substantial amount of data (only some of which its competitors are aware), but also to curate datasets with a "unique makeup" that "xAI has determined is best suited to training xAI's models." ER-190-91.¶24. As another xAI employee attested: "what differentiates xAI's models from its competitors are [its] datasets and training methodologies." ER-182.¶15.

True, xAI constructs training datasets and trains its AI models by using methods that AI companies across the industry also use. But that is beside the point. *Contra* ER-7. Just as companies building customer lists use the same general

46

process (*i.e.*, amalgamating data from public and confidential sources in unique ways to build proprietary customer databases) but still hold trade-secret interests in the resulting databases, *Nosal*, 844 F.3d at 1042, xAI holds protectable trade secrets in its dataset information even though it relies on industry-wide methods to produce that information. xAI put forward specific, unrefuted evidence that *xAI's* particular implementation of that general process and *xAI's* resulting unique datasets are unknown to others. Indeed, the lack of "homogeneity across all AI companies" confirms that AI companies (including xAI) each utilize unique trade-secret-protected "datasets and training methodologies." ER-182.¶15; *Reilly*, 312 F.3d at 27 (efforts to "reverse engineer" rivals' "formulas" underscore their value as trade secrets). The district court's disregard of the evidentiary record requires reversal.

At any rate, the district court's reading of xAI's complaint cannot be squared with the allegations (let alone the obligation to read them in the light most favorable to xAI). To be sure, the complaint includes general background about the AI industry necessary to understand the centrality of datasets in the AI development process. ER-204-10.¶¶22-34. For example, it describes how a company's distinct data sources "provide unique training" for each "AI model that differentiates it from other AI models." ER-206.¶27. But it makes abundantly clear that xAI employs these industry-wide practices in an xAI-specific fashion to provide unique training for its models. ER-211.¶38. For instance, the complaint highlights that xAI engineers use

47

"specially constructed datasets to tweak and refine" its AI models, and that xAI's proprietary "decisions about how to craft the best mixture of data from public and non-public sources—and which public and non-public sources—are what helps it to develop and train top-notch AI models." ER-211.¶39; ER-217.¶52. And xAI's complaint emphasizes (as xAI's uncontroverted evidence confirms) that the sources of its datasets, amount of data it uses, and its cleaning, modifying, and refining processes are all valuable information precisely because they are unique to xAI and not known to competitors. ER-214-16.¶¶47-51. xAI thus did not resort "to generalized, abstract pleading" about the AI industry, *contra* ER-8; it explicitly alleged—and then provided concrete evidence to prove—that *its* distinct dataset information is "confidential information" that reveals "how it develops, trains, and refines its *unique* gen-AI models," ER-197-98.¶7 (emphasis added).

To be sure, this Court has stated that a plaintiff "should describe the subject matter of the trade secret with *sufficient particularity* to separate it from matters of general knowledge in the trade or of special knowledge of those persons ... skilled in the trade." *InteliClear v. ETC Glob. Holdings*, 978 F.3d 653, 658 (9th Cir. 2020). But that requirement arises in trade-secret misappropriations cases, which require the defendant to explain why its product or process differs from the plaintiff's

48

alleged trade secret and require the factfinder to then compare the two.[4] *InteliClear*, 978 F.3d at 658; *Quintara Biosciences v. Ruifeng Biztech*, 149 F.4th 1081, 1088 (9th Cir. 2025). Even in that context, parties are not required to disclose the trade secret itself. Nor could they be, as doing so would eviscerate the trade-secrets protection. *Novation Sols., Inc. v. Issuance Inc.*, 2023 WL 5505908, at \*7 (C.D. Cal. June 27, 2023) ("To successfully allege a trade secret claim, a plaintiff need not spell out the details of the trade secret."). Courts instead routinely recognize, particularly before discovery, that it would be inappropriate to demand that a company "spell out the details of the trade secret"; it need provide only enough information for the defendant to "ascertain at least the boundaries within which the secret lies." *Alta Devices v. LG Elecs.*, 343 F.Supp.3d 868, 881 (N.D. Cal. 2018). As this Court explained in rejecting an argument that a plaintiff's trade-secret description was not sufficiently specific, "it is not fatal" that the plaintiff's "hedging language left open the possibility of expanding its identifications later," as the description was "particular[]" enough to allow for "rebuttal." *InteliClear*, 978 F.3d at 658-59.

---

[4] That "sufficient particularity" requirement is an uneasy fit in this pre-enforcement context. Requiring more detail is understandable in a backward-looking misappropriation case focused on the similarities between a plaintiff's and defendant's product or design. *See InteliClear*, 978 F.3d at 658. But in this forward-looking takings action, where xAI seeks only to protect identifiable categories of trade-secrets rights that are threatened by a public-disclosure law, those justifications have less purchase. *See Reilly*, 312 F.3d at 27 (granting relief against disclosure of trade-secrets rights in "[i]ngredient [l]ists" for tobacco products based on general descriptions about why such formulas are trade secrets).

xAI's detailed complaint and unrebutted declarations easily satisfy that bar. Indeed, both the district court and the AG easily grasped precisely what information xAI claims to be protected trade secrets. *See* ER-7 (identifying xAI's asserted trade secret in "the sources, sizes, and cleaning methods of its datasets"); ER-101-02, 105-06 (similar). And, most importantly, the district court readily understood *why* that information holds economic value. *See* ER-41-44 (observing that knowing the "ingredients" of a dataset does not explain "how to make … the product," and that public disclosure of such information would undercut xAI's "comparative advantage"). In other words, the court understood precisely why xAI's dataset information comfortably meets the definition of a trade secret. *See Quintara*, 149 F.4th at 1085. xAI was not required to do more.

**C.    A.B.2013 Effects Uncompensated Takings of xAI's Trade Secrets.**

Because xAI holds trade-secrets property rights in its dataset information, those rights are protected by the Takings Clause against compelled public disclosure. Whether viewed as a *per se* taking or a regulatory taking, A.B.2013 effects an uncompensated taking of xAI's trade-secrets property rights in violation of the Takings Clause.

A *per se* taking occurs whenever the government effects "a direct government appropriation or physical invasion of private property," *Lingle v. Chevron U.S.A.*, 544 U.S. 528, 537 (2005), including via regulations that appropriate "a fundamental

50

element of the [owner's] property right," *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149-50 (2021). One of the most fundamental elements of property is "the owner's right to exclude others from [its property]." *Sheetz*, 601 U.S. at 274. Laws that appropriate that—"one of the most treasured rights of property ownership"— thus constitute *per se* takings. *Cedar Point*, 594 U.S. at 149, 155.

Compelled disclosures of trade secrets, like those required by A.B.2013, fall comfortably within this *per se* framework. *See Reilly*, 312 F.3d at 51 (Selya, J., concurring in judgment). The key feature of the trade-secret property right is *secrecy*. Cal. Civ. Code §3426.1(d); 18 U.S.C. §1839(3). "The property in a trade secret is the power to make use of it to the exclusion of the world," *Hartley Pen Co. v. U.S. Dist. Ct.*, 287 F.2d 324, 328 (9th Cir. 1961), making "the right to exclude others … central to the very definition of the property interest," *Ruckelshaus*, 467 U.S. at 1011. When the government forces an owner to disclose his trade secrets, he loses the right to exclude others from that information and has thereby "lost his property interest" in the trade secrets entirely. *Id.* That is a *per se* taking. *Cedar Point*, 594 U.S. at 158; *see also Reilly*, 312 F.3d at 51 (Selya, J., concurring in judgment).[5]

---

[5] Despite California's argument to the contrary, ER-102-03, there is "no principled reason to refrain from extending per se takings analysis" to intangible property rights. *Reilly*, 312 F.3d at 51 (Selya, J., concurring in judgment). While *Ruckelshaus* cited the *Penn Central* factors, which are used to assess whether a regulatory taking has occurred, *see Cedar Point*, 594 U.S. at 148, *Ruckelshaus* is

By appropriating xAI's dataset-related trade secrets, A.B.2013's disclosure obligations effect *per se* takings. They compel xAI to reveal the sources of its datasets, their sizes, the type of data xAI uses, and how the datasets further the intended purposes of xAI's models—all information entitled to trade-secrets protections. Cal. Civ. Code §3111(a)(1)-(4), (6). Moreover, A.B.2013 requires xAI to disclose whether its datasets contain intellectual property or personal or aggregate consumer information, and whether xAI cleans or modifies its datasets. *Id.* §3111(a)(5), (7)-(8), (12). To the extent these provisions demand anything more than a "yes" or "no" answer, they too appropriate xAI's trade secrets, as such granular details have all the hallmarks of protected trade secrets. *See supra* pp.9-10, 42-44, 46-50.

Even if this Court were to analyze A.B.2013 under the regulatory-takings framework, A.B.2013 would still be unconstitutional. As *Ruckelshaus* makes clear,

---

best read as a *per se* takings case. After all, the Court held that the only *Penn Central* factor that mattered was an owner's investment-backed expectation that his trade secrets would remain confidential. *Ruckelshaus*, 467 U.S. at 1013-14. Many of the Supreme Court's takings cases at the time discussed the *Penn Central* factors, yet some are understood now as *per se* takings cases. *See Hodel v. Irving*, 481 U.S. 704, 715-17 (1987); *cf. Armstrong v. United States*, 364 U.S. 40, 48-49 (1960) (government action eviscerating mechanic's liens effected a *per se* taking). As Judge Selya observed, those are "per se takings analys[e]s." *Reilly*, 312 F.3d at 51 n.26. *Stolfi* is not to the contrary. The takings claim there was predicated *only* on the alleged loss of all economic value in the plaintiff's trade secrets, 153 F.4th at 833 (citing *Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992)), so the Court never analyzed the "different *per se* rule," *Alford v. Walton Cnty.*, 159 F.4th 844, 855 n.6 (11th Cir. 2025), that xAI has pressed here.

in the trade-secrets context, the only relevant question is whether the statute interferes with "reasonable investment-backed expectations." 467 U.S. at 1005. Here, there is no question that it does.

As the state has never disputed, xAI has not disclosed any confidential information about its datasets. In fact, the record confirms that xAI has gone to great lengths to keep that information secret—information in which xAI unquestionably holds protected trade-secrets property rights under both California and federal law. *See supra* Section II.B. It follows that xAI has reasonable investment-backed expectations that such information will be kept confidential. In *Ruckelshaus*, for example, the Court held that Monsanto had reasonable investment-backed expectations in the secrecy of its data because it disclosed that information to the federal government subject to assurances in FIFRA that the data would remain confidential. 467 U.S. at 1010-11, 1013-14. That xAI has made *no* disclosures of its trade secrets at all (to the government or otherwise) means that its investment-backed expectations are reasonable *a fortiori*. A.B.2013 eviscerates those expectations.

Because *Ruckelshaus* squarely holds that the only *Penn Central* factor that matters in this context is whether xAI has reasonable investment-backed expectations, the Court need not address the other factors. *Id.* at 1005. But even if

53

the Court were to consider them, they only solidify that A.B.2013 effects an unconstitutional taking.

The "economic impact" of forcing xAI to disclose its dataset information unquestionably weighs in favor of finding a taking. *Penn Central Transp. Co. v. City of N.Y.*, 438 U.S. 104, 124 (1978). After all, the economic value xAI holds in its dataset information "lies in the competitive advantage over others that [xAI] enjoys by virtue of its exclusive access to the data," since "disclosure or use by others of the data would destroy that competitive edge." *Ruckelshaus*, 467 U.S. at 1012. "That the data retain usefulness … even after they are disclosed … is irrelevant." *Id.* The disclosure itself would have a "potentially tremendous" economic impact on xAI, thereby "mak[ing] it much easier to reverse engineer" xAI's models. *Reilly*, 312 F.3d at 41; ER-189-91.¶¶20-25.

The character-of-government-action prong points in the same direction. xAI's property right in its dataset information "is extinguished" once it complies with A.B.2013. *Ruckelshaus*, 467 U.S. at 1002. Given that the *Penn Central* inquiry "aims to identify regulatory actions that are functionally equivalent to the classic [*per se*] taking," *Lingle*, 544 U.S. at 539, the categorical nature of that disclosure obligation under A.B.2013—without *any* mechanism for xAI to designate the information as confidential—confirms that this last factor weighs in favor of finding a regulatory taking as well. *See Reilly*, 312 F.3d at 44; *see supra* Section II.A.

54

Indeed, rather than assist consumers, A.B.2013 just benefits xAI's competitors by giving them access to its fiercely guarded trade secrets.  That is precisely "the kind of expense-shifting to a few persons that amounts to a taking."  *Cienega Gardens v. United States,* 331 F.3d 1319, 1338-39 (Fed. Cir. 2003).

In the end, no matter what framework is used, A.B.2013's threatened disclosure of xAI's trade secrets plainly effects uncompensated takings of its property.

## III.    xAI Is Likely To Succeed On Its Vagueness Claim.

A.B.2013 is also unconstitutionally vague.  "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."  *FCC v. Fox Television Stations*, 567 U.S. 239, 253 (2012).  A law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  *United States v. Williams*, 553 U.S. 285, 304 (2008).  "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech."  *Fox*, 567 U.S. at 253-54.  Such laws must speak "with narrow specificity."  *Button*, 371 U.S. at 433.

A.B.2013 does not do so.  It lacks discernable standards and fails to "clearly mark[]" its "boundaries."  *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964).  The law does

55

not define the key terms "dataset" or "data point." It never explains whether they refer to each individual dataset developers might retrieve from a source (*e.g.*, specific websites) and each byte of information there, or only broad categories, like publicly available information on the Internet writ large. Worse, A.B.2013 is internally inconsistent. Its operative provision requires developers to disclose information only about datasets used to train gen-AI models. *See* Cal. Civ. Code §3111; *id.* §3110(f) (defining training as "testing, validating, or fine tuning" the model). But in the next breath, it appears to compel disclosures related to "datasets used in the development" of such models. *Id*. §3111(a). The datasets used to *train* an AI model are different from those used to *develop* that model. While the former focuses on the data specifically used during the training process, the latter is not so limited. It could theoretically cover all data used in the development process, including any lower quality data that xAI sourced, but its engineers ultimately chose to filter out before the data were ever input into an AI model. *See* ER-187.¶¶12-13. This inconsistent language leaves developers guessing as to which datasets the law covers—precisely where vagueness concerns reach their zenith.

Even if xAI could deduce *what* categories of dataset information A.B.2013 covers, the law never explains *how much* information constitutes a "high-level summary." Take subsection (a)(2), which requires a description of how the datasets further a model's "intended purpose." Cal. Civ. Code §3111(a)(2). A.B.2013 gives

no indication whether xAI must disclose its internal strategies regarding how it values individual datasets, or if it can simply state that such information improves AI models' effectiveness. Or consider subsection (a)(5), which requires xAI to disclose whether its datasets include intellectual property. *Id*. §3111(a)(5). Does a simple "yes" or "no" suffice as a "high-level summary" or is more required? In a field as complicated and intricate as gen-AI, there is simply no way for xAI to know whether its "high-level summar[ies]" must be 100 words or 100 pages.

These numerous vagueness concerns "pose[] heightened risks of arbitrary enforcement." *Butcher v. Knudsen*, 38 F.4th 1163, 1169 (9th Cir. 2022). A statute is unlawfully vague if it "offers no reliable way to choose between … competing accounts of what [the law] involves." *Johnson v. United States*, 576 U.S. 591, 598 (2015). That describes A.B.2013 to a T. Despite having multiple opportunities to clarify what A.B.2013 requires, the AG has been unable (or unwilling) to do so. ER-19. The AG's stubborn refusal to take a position on what A.B.2013 requires runs headlong into "arbitrary enforcement" problems. That risk is especially acute here since A.B.2013's focus on rooting out biased AI models risks "disparate treatment of less popular speakers or viewpoints." *Butcher*, 38 F.4th at 1169. Indeed, the mere threat of such arbitrary enforcement forces developers to disclose more information than A.B.2013 requires, thereby exacerbating A.B.2013's infringement on free speech and xAI's trade secrets.

57

The district court's contrary conclusion is mystifying. It agreed that "the term 'high-level summary' is not the picture of clarity." ER-13. That should have been an obvious sign that A.B.2013 is unconstitutionally vague given the constitutional rights at stake. Yet, the court excused that imprecision because "it is followed by a precise list of information to be included." ER-13. That misses the point. While the law may provide a non-exhaustive list of information categories to be disclosed, it fails to explain what constitutes a "high-level summary" of that information. So xAI cannot know *how much* information it must reveal—which is critical to protecting xAI's constitutional rights. Moreover, the information xAI must disclose is expressly "not limited to" those enumerated categories. Cal. Civ. Code §3111(a). There is still no way of knowing what information xAI must provide to fully comply.

A.B.2013 is thus plagued with vagueness problems at every turn. That it leaves developers like xAI guessing about how to comply is bad enough. But that California conspicuously refuses to weigh in on what A.B.2013 requires adds insult to constitutional injury. Due process—and the First Amendment—requires more.

*        *        *

Because A.B.2013, at the very least, likely violates three separate constitutional provisions, the district court plainly should have granted xAI's request for preliminary relief. After all, the state never disputed below that xAI will face irreparable harm if California enforces A.B.2013 against it. That is unsurprising. "It

58

is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). And given that A.B.2013 not only infringes on xAI's First Amendment rights, but also compels xAI to disclose and thereby destroy its trade secrets in such information, there can be no doubt that the law threatens xAI with irreparable harm. *See Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 482 (9th Cir. 2022). On top of all that, the fact that xAI has "establish[ed] a likelihood that [A.B.2013] violates the U.S. Constitution" underscores that xAI has "also established that both the public interest and the balance of the equities favor a preliminary injunction." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014). Because the remaining equitable factors undoubtedly and overwhelmingly favor xAI, this Court should vacate and remand with instructions to preliminarily enjoin enforcement of A.B.2013 against xAI.

## CONCLUSION

For the foregoing reasons, this Court should vacate the district court's order and instruct it to grant xAI's motion for preliminary injunction.

59

Respectfully submitted,

ERIN E. MURPHY
 *Counsel of Record*
JAMES Y. XI
MITCHELL K. PALLAKI
ILAN J. POSNER
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Plaintiff-Appellant*

May 14, 2026

60

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Appellant states that it is not aware of any other cases pending in this Court that are related to the present case.

May 14, 2026

<u>s/Erin E. Murphy</u>
Erin E. Murphy

**CERTIFICATE OF COMPLIANCE**

1.  This brief complies with the type-volume limitation of Circuit R. 32-1 because this brief contains 13,855 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman type.

May 14, 2026

s/Erin E. Murphy
Erin E. Murphy

**CERTIFICATE OF SERVICE**

I hereby certify that on May 14, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the ACMS system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the ACMS system.

s/Erin E. Murphy
Erin E. Murphy