**No. 26-1591**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

————————

X.AI LLC,

*Plaintiff-Appellant,*

v.

ROB BONTA, in his official capacity as Attorney General
of the State of California,

*Defendant-Appellee.*

————————

On Appeal from the United States District Court
for the Central District of California,
No. 25-cv-12295

————————

## RECORD EXCERPTS
### Volume I of I

————————

ERIN E. MURPHY
 *Counsel of Record*
JAMES Y. XI
MITCHELL K. PALLAKI
ILAN POSNER
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Plaintiff-Appellant*

May 14, 2026

## INDEX TO EXCERPTS OF RECORD

| Record Number | Document | Page |
|---|---|---|
| 35 | Order Denying Motion for Preliminary Injunction (In Chambers) (Mar. 4, 2026) | ER3 |
| 34 | x.AI's Statement Regarding Defendant's Response to Court's February 23 Order (Mar. 2, 2026) | ER15 |
| 33 | Defendant's Response to Court's February 23 Order (Feb. 27, 2026) | ER18 |
| 32 | Motion for Preliminary Injunction Hearing Minutes (Feb. 23, 2026) | ER21 |
| | Transcript of Preliminary Injunction Hearing | ER22 |
| 30 | Opposition to Motion for Preliminary Injunction (Feb. 2, 2026) | ER84 |
| 30-1 | Declaration of Kristin Liska in Support of Opposition to Motion for Preliminary Injunction | ER121 |
| 22-1 | Declaration of Louis Barrett in Support of Motion for Preliminary Injunction (Jan. 16, 2026) | ER177 |
| 22-2 | Declaration of Christopher Stanley in Support of Motion for Preliminary Injunction (Jan. 16, 2026) | ER183 |
| 1 | Complaint for Declaratory and Injunctive Relief (Dec. 29, 2025) | ER194 |
| 37 | Noice of Appeal (Mar. 16, 2026) | ER249 |
| | Docket, No. 25-cv-12295 (C.D. Cal.) | ER250 |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 25-12295 JGB (SSCx)** | Date | March 4, 2026 |
|---|---|---|---|
| Title | ***X.AI LLC v. Rob Bonta*** | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|

**Proceedings:    Order: (1) DENYING Plaintiff's Motion for a Preliminary Injunction
(Dkt. No. 22) (IN CHAMBERS)**

Before the Court is Plaintiff X.AI LLC's ("X.AI" or "Plaintiff") motion for a preliminary
injunction. ("Motion," Dkt. No. 22.)  After considering the papers filed in support of and in
opposition to the Motion, along with the parties' statements at oral argument on February 23,
2026, and subsequent submissions, the Court **DENIES** the Motion.

## I.    BACKGROUND

On December 29, 2025, Plaintiff filed a complaint against Defendant Rob Bonta in his
official capacity as Attorney General of the State of California ("Defendant" or "the Attorney
General").  ("Complaint," Dkt. No. 1.)  On January 16, 2026, Plaintiff filed this Motion.  (Mot.)
Defendant filed his opposition on February 2, 2026.  ("Opposition," Dkt. No. 30.)  Plaintiff
replied on February 9, 2026.  ("Reply," Dkt. No. 31.)  The Court held oral argument on the
Motion on February 23, 2026.  At the hearing, the Court ordered Defendant to provide a
supplemental filing, which was timely submitted on February 27, 2026.  ("Defendant's
Statement," Dkt. No. 33.)  Plaintiff filed a response to Defendant's Statement on March 2, 2026.
("Plaintiff's Statement," Dkt. No. 34.)
//
//
//
//

| Page 1 of 12 | **CIVIL MINUTES—GENERAL** | Initials of Deputy Clerk <u>mg</u> |
|---|---|---|

**ER3**

## II.  FACTS

In September 2024, the Governor of California signed Assembly Bill 2013 ("A.B. 2013") into law.  (Compl. ¶ 61.)  The bill, entitled "Artificial Intelligence Training Data Transparency" requires developers of "a generative artificial intelligence system or service" that is "publicly available to Californians for use" to "post on the developer's internet website documentation regarding the data used by the developer to train the generative artificial intelligence system or service."  Cal. Civ. Code § 3111.  The documentation must include "[a] high-level summary of the datasets used in the development of the generative artificial intelligence system or service" addressing, but not limited to, twelve enumerated topics.  Id. at (a).  Those topics include:

> (1) The sources or owners of the datasets.
> (2) A description of how the datasets further the intended purpose of the artificial intelligence system or service.
> (3) The number of data points included in the datasets, which may be in general ranges, and with estimated figures for dynamic datasets.
> (4) A description of the types of data points within the datasets. . . .
> (5) Whether the datasets include any data protected by copyright, trademark, or patent, or whether the datasets are entirely in the public domain.
> (6) Whether the datasets were purchased or licensed by the developer.
> (7) Whether the datasets include personal information . . . .
> (8) Whether the datasets include aggregate consumer information . . . .
> (9) Whether there was any cleaning, processing, or other modification to the datasets by the developer, including the intended purpose of those efforts in relation to the artificial intelligence system or service.
> (10) The time period during which the data in the datasets were collected, including a notice if the data collection is ongoing.
> (11) The dates the datasets were first used during the development of the artificial intelligence system or service.
> (12) Whether the generative artificial intelligence system or service used or continuously uses synthetic data generation in its development. . . .

Id. at (a)(1)-(12).  The statute exempts three types of models from disclosures: (1) a generative artificial intelligence system or service whose sole purpose is to help ensure security and integrity; (2) a generative artificial intelligence system or service whose sole purpose is the operation of aircraft in the national airspace; and (3) a generative artificial intelligence system or service developed for national security, military, or defense purposes that is made available only to a federal entity.  Id. at (b).

Plaintiff produces and develops artificial intelligence ("AI") models that it intends to share broadly with the public.  (Compl. ¶ 17.)  Plaintiff is a "developer" under the definition provided in Section 3111.  (Id.)  The Attorney General is generally charged with enforcing California's laws.  Cal. Const. Art. 5, § 13.

---

**CIVIL MINUTES—GENERAL**                    Initials of Deputy Clerk mg

**ER4**

Plaintiff raises three objections to A.B. 2013: (1) that it violates the Takings Clause of the Fifth Amendment; (2) that it violates the First Amendment; and (3) that it is unconstitutionally vague. (See Compl.)

On December 30, 2025, Plaintiff published on its website a "high-level, limited disclosure that does not reveal its trade secrets." (Mot. at 9 fn. 1.) Despite this, Plaintiff is concerned that Defendant will enforce against it for failure to comply with A.B. 2013. Plaintiff alleges that several aspects of the datasets used to train AI models—including their contents, origins, size, and cleaning methods—are valuable and non-public. (See Compl. ¶¶ 28-29, 49-50.) Plaintiff alleges that "information about the datasets and processes AI developers use to train their AI models is a closely protected trade secret." (Id. ¶ 45.)

### III. LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. NRDC, Inc., 555 U.S. 7, 20 (2008). "When the government is a party, these last two factors merge." Drakes Bay Oyster Co. v. Jewell, 747 F.3d 1073, 1092 (9th Cir. 2014). "A preliminary injunction is an extraordinary and drastic remedy; it is never awarded as of right." Munaf v. Geren, 553 U.S. 674, 690 (2008) (citations omitted). An injunction is binding only on parties to the action, their officers, agents, servants, employees, attorneys, and those "in active concert or participation" with them. Fed. R. Civ. P. 65(d).

Courts in the Ninth Circuit may consider the Winter factors on a sliding scale and grant an injunction where the plaintiff raises "serious questions going to the merits, and a balance of hardships that tips sharply toward the plaintiff" if "the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." All. for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (noting that the latter two elements are "the other two elements of the Winter test").

### IV. DISCUSSION

#### A.    Jurisdiction

Defendant first contends that Plaintiff lacks standing to raise its claim. To establish Article III standing, (1) "the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical," (2) "there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court," and (3) "it must be likely as opposed to merely speculative that the injury will be redressed by a favorable decision." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992) (internal citations and quotations omitted).

**ER5**

To satisfy Article III's standing requirements in the context of a pre-enforcement challenge, a plaintiff must show that it faces "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." Babbitt v. United Farm Workers National Union, 442 U.S. 289, 298 (1979). A plaintiff "does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." Id. (quoting Pennsylvania v. West Virginia, 262 U.S. 553, 593) (1923)). "A plaintiff has a sufficient injury for a pre-enforcement challenge where they allege '[(1)] an intention to engage in a course of conduct arguably affected with a constitutional interest, but [(2)] proscribed by a statute, and [(3)] there exists a credible threat of prosecution thereunder.'" Kumar v. Koester, 131 F.4th 746, 752 (9th Cir. 2025) (quoting Susan B. Anthony List v. Driehaus, 573 U.S. 149, 159 (2014)).

Plaintiff has already engaged in some degree of compliance with A.B. 2013 with its December 30, 2025, disclosure. Thus, the question is whether Plaintiff's desire to go no further than what it has already disclosed constitutes conduct arguably inflected with a constitutional interest that is proscribed by statute and carries a credible threat of enforcement. Because Plaintiff alleges that further disclosure could harm arguable constitutional interests, that prong is satisfied. The second issue is whether such conduct is proscribed by statute. Plaintiff's decision to file this suit, despite its current disclosure, suggests that the limited nature of the disclosure is arguably proscribed by statute and that more disclosure is necessary. As such, the second prong is satisfied.

The final issue is whether there exists a credible threat of enforcement. Defendant has stated that "the Attorney General's Office cannot comment on whether or when the Attorney General intends to pursue specific enforcement actions." (Defendant's Statement at 1.) "In challenging a new law whose history of enforcement is negligible or nonexistent, either a 'general warning of enforcement' or a 'failure to *disavow* enforcement' is sufficient to establish a credible threat of prosecution." Matsumoto v. Labrador, 122 F.4th 787, 797 (9th Cir. 2024) (internal citations omitted) (emphasis in original). Defendant had plainly refused to disavow enforcement.

At this stage, the Court finds that Plaintiff has standing to bring this case.

## B.      Likelihood of Success on the Merits

"Likelihood of success on the merits is a threshold inquiry and is the most important factor." Env't Prot. Info. Ctr. v. Carlson, 968 F.3d 985, 989 (9th Cir. 2020). The Court analyzes this factor with respect to each claim Plaintiff raises.

### 1. Takings Clause

Plaintiff's first allegation is that A.B. 2013 violates the Takings Clause of the Fifth Amendment. The Takings Clause states that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. While the Takings Clause is typically thought of in terms of real property, the Supreme Court has held that "data cognizable as a trade-

---

secret property right" under state law "is protected by the Taking Clause of the Fifth Amendment." <u>Ruckelshaus v. Monsanto Co.</u>, 467 U.S. 986, 1004 (1984).

Before the Court can evaluate whether Plaintiff has likely allegedly a successful Takings Clause claim, the Court must determine the likelihood of Plaintiff proving that the sources, sizes, and cleaning methods of its datasets qualify as trade secrets. (Mot. at 10.)  Under California law, "the test for a trade secret is whether the matter sought to be protected is information (1) that is valuable because it is unknown to others and (2) that the owner has attempted to keep secret." <u>Amgen Inc. v. California Corr. Health Care Servs.</u>, 47 Cal. App. 5th 716, 734 (Cal. Ct. App. 2020) (internal citations omitted); <u>see</u> <u>also</u> Cal. Civ. Code § 3426.1(d).  Federal law defines a trade secret as information in which "the owner thereof has taken reasonable measures to keep such information secret; and . . . the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  18 U.S.C. § 1839(3).

Plaintiff offers a variety of general allegations about the importance of datasets in developing AI models and why they are kept secret.  For example, Plaintiff alleges that "xAI and other AI developers dedicate substantial resources to identifying high-quality data to train their models."  (Compl ¶ 4.)  Further, "businesses like xAI make significant efforts to safeguard information about the datasets they have acquired."  (<u>Id.</u> ¶ 5.)  Plaintiff's Complaint trades in frequent abstraction and hypotheticals, rather than pleading specifics about Plaintiff's practices.  (<u>See, e.g.</u>, <u>id.</u> ¶ 26 ("Some AI companies acquire and utilize data that others do not."); ¶ 27 ("For example, an AI company may obtain data from sources of information that are public, but not obvious locations to look for data."); ¶ 48 ("For example, an AI developer seeking to produce an AI model capable of image generation may rely on datasets of photos from photo hosting sources such as Wikimedia Commons. But another AI company might think to use other sources of photos, such as Openverse or Public Domain Pictures, or instead license datasets containing a wide range of images from sources like Getty Images or Adobe Stock. If one company does not use a dataset used by another, its AI model may not be as well trained. If xAI were to reveal all the datasets that it uses, its competitors would immediately move to acquire those sources to ensure their models were equally as effective.")

When it comes to specificity, Plaintiff alleges that "[a]s part of its development process, xAI generally used the methodology outlined above."  (<u>Id.</u> ¶ 37.)  It offers that "xAI's engineers invested substantial amounts of time and energy in acquiring datasets from various sources across the Internet to develop and eventually train the AI models that it has produced."  (<u>Id.</u> ¶ 38.)  Plaintiff also alleges that "[t]he amount of data that xAI uses is also valuable precisely because it is unknown to others" and that "xAI's processes for cleaning, modifying, and refining the datasets it has obtained are economically valuable information too."  (<u>Id.</u> ¶¶ 51-52.)

Of course, Plaintiff also acknowledges that "[m]any AI companies will have overlap in the datasets they use."  (<u>Id.</u> ¶ 50.)  The important thing, Plaintiff alleges, is that "it is the *differences* between the datasets each company uses that gives xAI a competitive edge.  If competitors could

**ER7**

see the sources of all of xAI's datasets or even the size of its datasets, competitors could evaluate both what data xAI has and how much they lack." (Id.) The problem is that Plaintiff has not alleged that it actually uses datasets that are unique, that it has meaningfully larger or smaller datasets than competitors, or that it cleans its datasets in unique ways. Plaintiff's resort to generalizations and hypotheticals about the AI model development industry make it difficult for the Court to find that Plaintiff has carried the heavy burden of showing a likelihood of success in proving that trade secrets are at play here.

It is not lost on the Court the important role of datasets in AI training and development, and that, hypothetically, datasets and details about them could be trade secrets. But Plaintiff's approach to generalized, abstract pleading has inhibited a determination in their favor at this stage. The Ninth Circuit has been clear in trade secret misappropriation cases that "a plaintiff who seeks relief for misappropriation of trade secrets must identify the trade secrets and carry the burden of showing that they exist." MAI Sys. Corp. v. Peak Computer, Inc., 991 F.2d 511, 522 (9th Cir. 1993). Going further, the Ninth Circuit has also held that a plaintiff "should describe the subject matter of the trade secret with *sufficient particularity* to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade." InteliClear, LLC v. ETC Glob. Holdings, Inc., 978 F.3d 653, 658 (9th Cir. 2020) (internal citation omitted). Plaintiff has made general arguments about datasets, dataset sizes, cleaning methods, and configurations of data, but has not identified any dataset or approach to cleaning and using datasets that is distinct from its competitors in a manner warranting trade secret protection.

Plaintiff has failed at this stage to sufficiently allege that trade secrets are implicated. As such, the Court finds that, as a threshold matter, Plaintiff is not likely to succeed on the merits of its Takings Clause claim based on the Complaint as pled.

### 2. First Amendment

Plaintiff's second allegation is that A.B. 2013 violates the First Amendment by compelling Plaintiff's speech based on content and viewpoint. (Mot. at 18.) Specifically, Plaintiff alleges that A.B. 2013 is content-based because it requires Plaintiff to disclose specific content about its AI models, and it is viewpoint-based because it exempts developers of AI models related to network security, aircraft operations, and national security from its requirements. (Id. at 18-19, 20.) Because of this, Plaintiff alleges that A.B. 2013 should be subject to strict scrutiny, which it fails. (Id.) Defendant responds that A.B. 2013 is a regulation of commercial speech that complies with the First Amendment. (Opp'n at 16.)

As an initial matter, while "[t]here is certainly some difference between compelled speech and compelled silence, . . . in the context of protected speech, the difference is without constitutional significance, for the First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what *not* to say." Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc., 487 U.S. 781, 796–97 (1988). Just because a statute requires speech rather than prohibiting it does not place it beyond the First Amendment's ambit.

---

**CIVIL MINUTES—GENERAL**     Initials of Deputy Clerk mg

**ER8**

Similarly, compelled statements of fact burden protected speech just as do compelled statements of opinion. Id. at 797-98.

While content-based and viewpoint-based laws are subject to higher scrutiny, laws regulating commercial speech are generally subject to lesser scrutiny. If a law is deemed to address commercial speech, it is generally subject to intermediate scrutiny. Id.

### a. Content-Based Discrimination

It is generally the case that "[m]andating speech that a speaker would not otherwise make necessarily alters the content of the speech." Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc., 487 U.S. 781, 795 (1988). That said, Plaintiff's primary analogies between this case and existing caselaw are plainly distinguishable. In National Institute of Family and Life Advocates v. Becerra, the Court held that a "licensed notice" was content-based relation of speech where that notice required that "clinics must provide a government-drafted script about the availability of state-sponsored services, as well as contact information for how to obtain them." 585 U.S. 755, 766 (2018) (hereinafter, "NIFLA"). The script, which dictated precisely what the plaintiff in that case was required to say, addressed abortion access, the very issue the plaintiff's mission it was to oppose. Here, there is no government-drafted script, nor is it Plaintiff's central mission to oppose public disclosure of AI model training datasets. These cases are not meaningfully similar.

Similarly, in Riley, a statute required professional fundraisers to "disclose to potential donors, before an appeal for funds, the percentage of charitable contributions collected during the previous 12 months that were actually turned over to charity." 487 U.S. at 795. The state sought to impose in every instance of solicitation a preliminary disclosure that would not otherwise have been part of a fundraising pitch. A.B. 2013 does not require Plaintiff to disclose its training datasets in every interaction with a consumer, thereby constantly undermining the purpose of the interaction. And in Riley, there existed related statutes that required professional fundraisers to disclose that they were professional fundraisers and to provide the percentage information to those they were soliciting upon request. Plaintiff does not appear to argue that, were A.B. 2013's disclosures only available on request, that they would be acceptable. This is not a case about the manner of disclosure in specific interactions. Yet the alternative disclosure element of the fundraising state law was not challenged in Riley, so the case has nothing to say on the propriety of such a component—and the Court's discussion raised no issue with that provision.

Finally, in X Corp. v. Bonta, a state law "compel[led] every covered social media company to reveal its policy opinion about contentious issues, such as what constitutes hate speech or misinformation and whether to moderate such expression." X Corp. v. Bonta, 116 F.4th 888, 899 (9th Cir. 2024). That case involved a requirement that social medica companies reveal their opinions on various controversial topics. While of course required factual disclosures can be covered by the First Amendment just as well as opinion disclosures, Plaintiff has failed to over an on-point statutory analogy to this case, where disclosure of facts does not proceed according to a script in direct conflict with Plaintiff's central mission; does not require a

---

**CIVIL MINUTES—GENERAL**                    Initials of Deputy Clerk mg

**ER9**

conversation-by-conversation disclosure where other forms of disclosure are available; and does not involve mandatory disclosure of controversial opinions.

But that does not entirely settle the issue. Pharm. Rsch. & Manufacturers of Am. v. Stolfi grappled with the issue of how to consider disclosure requirements like A.B. 2013. 153 F.4th 795 (9th Cir. 2025). The case divided disclosure requirements into two categories: (1) governmental reporting requirements, which may involve sharing of such reported information with the public; and (2) direct disclosure requirements, which require a private entity to communicate information directly to another private entity or the general public. See 153 F.4th at 809–10. This case appears to fit squarely within the second category, direct disclosure requirements, which is generally entitled to strict scrutiny. The Ninth Circuit instructs that in such circumstances, "the *only* exception is for reports that qualify as 'commercial speech' entitled to less constitutional protection. Id. at 811. The Court remains skeptical that these disclosures fit cleanly into a compelled speech category defined by cases like NIFLA, Riley, and X Corp., but Stolfi appears to obligate the view that A.B. 2013 is a content-based speech regulation entitled to strict scrutiny unless it qualifies as commercial speech.

Because the Court finds that A.B. 2013 likely constitutes a content-based speech regulation, the Court must consider whether it is in fact commercial speech. It need not address Plaintiff's allegations of viewpoint discrimination.[1]

### b. Commercial Speech

"Commercial speech is 'usually defined as speech that does no more than propose a commercial transaction.'" Id. at 900 (9th Cir. 2024) (quoting United States v. United Foods, Inc., 533 U.S. 405, 409 (2001). But that is not the whole of it. As the Supreme Court outlined in Bolger v. Youngs Drug Products Corp., 463 U.S. 60 (1983), "[w]here the facts present a close question, 'strong support' that the speech should be characterized as commercial speech is found where [1] the speech is an advertisement, [2] the speech refers to a particular product, and [3] the speaker has an economic motivation." X Corp., 116 F.4th at 900 (internal citations omitted). "These so-called *Bolger* factors are important guideposts, but they are not necessarily dispositive." Id.

That acknowledgement is especially important here, where the Court does not address a statute regulating advertisements, but rather disclosure independent of advertisement for a product. As the Court in Stolfi recognized, the Bolger test and approaches to commercial speech in general arose in the context of advertisements. But that does not mean commercial speech

---

[1] Plaintiff alleges that, even if the Court finds that A.B. 2013 is a commercial speech regulation, strict scrutiny still applies because the statute engages in viewpoint discrimination, which triggers strict scrutiny even in commercial speech cases. (Reply at 8.) The Court is not persuaded based on the caselaw offered by Plaintiff at this stage that such a distinction is relevant or controlling here, even if the Court were to find that A.B. 2013 engages in viewpoint discrimination.

---

must relate to advertising to receive lesser scrutiny. The <u>Stolfi</u> Court, discussing governmental reporting requirements, noted that "[i]t would be odd to subject speech in a consumer-facing advertisement to *less* scrutiny than speech in an annual report filed with a state regulatory body simply because it better fits the doctrinal tests for defining commercial speech." <u>Id.</u> at 816. This implies that the scenario here, where the disclosure is public facing but not included with an advertisement or product label, is not excluded from being considered commercial speech just because the <u>Bolger</u> test is written in language tailored to advertisements.

In <u>Stolfi</u>, the Court found that the government reporting requirement—which included disclosures to the public—regulated commercial speech. The Court distinguished cases like <u>X Corp.</u> and <u>NetChoice, LCC v. Bonta</u>, 113 F.4th 1101 (9th Cir. 2024), because those cases "compel the covered entities to make subjective political or ideological statements" and the statute at issue in <u>Stolfi</u> did not. <u>Id.</u> at 819. The same is true here. The statute requires a high-level summary of datasets and descriptions of information related to those datasets. <u>See</u> A.B. 2013. The statute does not functionally ask Plaintiff to share its opinions on the role of certain datasets in AI model development or make ideological statements about the utility of various datasets or cleaning methods.

The Ninth Circuit has permitted "compelled disclosures" even in cases that "did not 'propose a commercial transaction,'" where the statutes "nonetheless provided parties to 'actual or potential' commercial transactions with information about those transactions." <u>Id.</u> at 821. That is precisely what A.B. 2013 does. In the marketplace of AI models, A.B. 2013 requires AI model developers to provide information about training datasets, thereby giving the public information necessary to determine whether they will use—or rely on information produced by—Plaintiff's model relative to the other options on the market. (<u>See, e.g.</u>, <u>Hearing on A.B. 2013 Before the Assembly Comm. on Privacy and Consumer Protection</u>, (Cal. April 30, 2024) ("This bill would require developers of AI systems and services to publicly disclose specified information related to the datasets used to train their products. In doing so, this bill would allow Californians to make informed decisions about the AI systems they purchase and engage with.") After all, "[p]art of the reason that the First Amendment protects commercial speech is that such speech furthers the consumer's interest in the free flow of commercial information." <u>Stolfi</u>, 153 F.4th 795, 821 (internal quotations omitted); <u>see</u> <u>also</u> <u>Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York</u>, 447 U.S. 557, 561–62 (1980) (hereinafter "Central Hudson") ("Commercial expression . . . assists consumers and furthers the societal interest in the fullest possible dissemination of information.")

Plaintiff complains that A.B. 2013 "forces developers to publicly disclose their data sources in an attempt to identify what California deems to be 'data riddled with implicit and explicit biases.'" (Mot. at 20 (citing Cal. S. Rules Comm., A.B.2013, <u>Senate Floor Analysis 3</u> (Aug. 20, 2024)).) That language comes from the California Labor Federation's arguments in support of the statute, not any legislator's statements or any language in the adopted bill itself. Plaintiff also asserts that A.B. 2013 "indirectly attempts to influence the viewpoints espoused by xAI's models (i.e., their outputs) by targeting the data that goes into them." (Mot. at 20.) But nothing in the language of the statute suggests that California is attempting to influence

**ER11**

Plaintiff's models' outputs by requiring dataset disclosure, rather than simply providing consumers with the information necessary to make judgments about Plaintiff's—and all other AI model developers'—model quality based on the data that goes into them.  There is nothing political, for example, about a consumer wanting to know if certain medical data or scientific information was used to train a model so that the consumer can evaluate whether the model is likely to be sufficiently comprehensively trained and reliable for the consumer's purposes.  Certainly some may use these disclosures to select or avoid certain models based on perceived political biases in training datasets, but that is only one of many potential metrics for consumer evaluation—and one that consumers in the AI model marketplace are entitled to consider when choosing their model.  No part of the statute indicates any plan to regulate or censor models based on the datasets with which they are developed and trained.  In Stolfi, the Court similarly held that "although drug pricing decisions may implicate controversial public policy issues, this fact is insufficient to transform the required reports into noncommercial speech."  153 F.4th at 824.

As such, the Court finds that A.B. 2013 likely implicates commercial speech.

### c.  Intermediate Scrutiny

Given that the Court has found that Plaintiff has failed to carry its burden to show likelihood of success on the merits of its claim that A.B. 2013 regulates non-commercial speech, the Court considers the level of scrutiny appropriate.  Plaintiff contends that Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio, 471 U.S. 626 (1985), provides the appropriate standard, but Central Hudson would appear to be more on-point given existing caselaw.  While the Court might be inclined to find that A.B. 2013 regulates speech that is purely factual, noncontroversial, and not unjustified or unduly burdensome—the Zauderer standard—the Supreme Court's limited use of Zauderer outside of misleading advertisement regulations counsels against its application in this case.  In Milavetz, Gallop & Milavetz, P.A. v. U.S., the Court noted that it had previously employed Central Hudson in a case involving advertising statements that were not inherently misleading and not likely to mislead consumers.  559 U.S. 229, 250 (2010) (citing In re R.M. J., 455 U.S. 191 (1982)).  This case is even further afield from the original context under which Zauderer arose, tipping the scale toward Central Hudson.

For A.B. 2013 to "survive intermediate scrutiny under *Central Hudson*, the State must establish that the law directly advance[s] a substantial governmental interest, and [that] the means chosen [are] not . . . more extensive than necessary."  Stolfi, 153 F.4th at 826 (internal quotations omitted).  Plaintiff's allegation that "it is far from clear how the trade secrets A.B.2013 would force xAI to disclose are of any value to consumers at all" is not especially compelling.  (Mot. at 21.)  It strains credulity to essentially suggest that no consumer is capable of making a useful evaluation of Plaintiff's AI models by reviewing information about the datasets used to train them and that therefore there is no substantial government interest advanced by this disclosure statute.
//
//

---

**CIVIL MINUTES—GENERAL**          Initials of Deputy Clerk mg

**ER12**

At the same time, it may be possible through the litigation process to demonstrate the limited utility of high-level dataset summaries for important consumer decisionmaking or that the state's approach with A.B. 2013 is "more extensive than necessary" to achieve the goal of transparency for consumers. While "'consumer curiosity' alone is generally insufficient as a substantial state interest," litigation may reveal that "the States asserted interests here are not limited to transparency for its own sake." Stolfi, 153 F.4th at 826 (internal citations omitted). It simply remains to be seen.

Ultimately, Plaintiff has demonstrated a distinct *possibility* of prevailing on the merits under Central Hudson. But it had not demonstrated a *likelihood* of success on the merits. The information before the Court is insufficient to come to such a conclusion at this stage. Plaintiff therefore does not satisfy this threshold inquiry for a preliminary injunction on its First Amendment claim.

### 3. Vagueness

Finally, the Court considers Plaintiff's vagueness challenge. "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." F.C.C. v. Fox Television Stations, Inc., 567 U.S. 239, 253 (2012). Of course, the degree of clarity necessary to pass constitutional muster varies depending on the potential consequences of a violation, namely whether criminal or civil penalties are contemplated. See Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc., 455 U.S. 489, 498–99 (1982) ("The Court has . . . expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe."). Thus, "[i]n reviewing a business regulation for facial vagueness, . . . the principal inquiry is whether the law affords fair warning of what is proscribed." Id. at 503.

The statute requires AI model developers like Plaintiff to publish "[a] high-level summary of the datasets used in the development of the generative artificial intelligence system or service." Cal. Civ. Code § 3111. The "high-level summary" must include, but is not limited to, disclosures on a variety of topics touching sources and owners of datasets; the size of datasets; the period of collection of the data within the datasets; and other information. Id. Even if the term "high-level summary" is not the picture of clarity standing alone, it is followed by a precise list of information to be included. Plaintiff takes issue with "dataset" and "data point" being undefined in the statute, yet Plaintiff seems to understand and use with ease "dataset" throughout its Complaint. (See, e.g., Compl. ¶ 3.) Plaintiff questions the meaning of "dataset" and "data point" in its Complaint and offers various interpretations, but has not actually alleged that this term is ambiguous by industry standards—especially given that Plaintiff appears to know what "dataset" refers to in other parts of its Complaint. (Compl. ¶ 121.)

Plaintiff also takes issue with the statute's list of information being non-comprehensive, because there is apparently "no way of knowing what additional information must be provided to fully comply with that obligation." (Compl. ¶ 122.) But the Ninth Circuit has been clear that "criteria are [not] vague simply because they fail to delineate a set of factors." Kashem v. Barr,

---

**ER13**

941 F.3d 358, 372 (9th Cir. 2019). Here, there *is* a list of information required akin to a set of factors—it is simply non-exhaustive. Given that a statute entirely lacking a list of factors can still be sufficiently clear, it is likely that a non-exhaustive list is enough.

Plaintiff's other arguments are similarly insufficiently persuasive at this stage, absent a better-developed record, to find a likelihood of success on the merits. Plaintiff takes issue with an apparent discrepancy between the disclosure requirements for "training" data versus "development" data. (Compl. ¶ 123.) Determining the meaning of the statute will require further development of the record, including on legislative intent and those terms' usage in the industry. With respect to which systems the statute covers, Plaintiff questions whether it must make disclosures for licensed systems or incorporated and optimized systems developed by others. But Plaintiff has not alleged facts to suggest it has systems that fall into those categories. Plaintiff has been clear that it is presenting an as-applied, not facial, challenge to this statute. Thus, Plaintiff must actually face such a conundrum—rather than raising an abstract possible issue among AI systems developers—for the Court to make a determination on this issue.

Ultimately, the record at this stage is insufficiently developed for the Court to determine that Plaintiff is likely to succeed on the merits of its vagueness challenge. Evidence may arise during the course of litigation that eventually requires a different determination. But the pleadings and record as they stand are not enough at this time.

Because the Court finds Plaintiff has not established a likelihood of success on the merits of its claims, the Court does not consider the remaining preliminary injunction factors, as this consideration is a threshold inquiry.

## V.   CONCLUSION

For the reasons described above, the Court **DENIES** the preliminary injunction.

**IT IS SO ORDERED.**

**ER14**

ADAM S. SIEFF (Cal. Bar #302030)
DAVIS WRIGHT TREMAINE LLP
350 S. Grand Avenue, 27th Floor
Los Angeles, CA 90071
Tel.: (213) 633-8618
adamsieff@dwt.com

ERIN E. MURPHY (*pro hac vice*)
JAMES Y. XI (*pro hac vice*)
MITCHELL K. PALLAKI (*pro hac vice*)
ILAN J. POSNER (*pro hac vice*)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
Tel.: (202) 742-8900
erin.murphy@clementmurphy.com

*Attorneys for Plaintiff X.AI LLC*

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| X.AI LLC<br><br>                    *Plaintiff,*<br><br>       v.<br><br>ROB BONTA, in his official capacity as Attorney General of the State of California,<br><br>                    *Defendant.*<br>_____ | Case No.: 2:25-cv-12295-JGB-SSC<br>*Honorable Jesus G. Bernal*<br><br>**PLAINTIFF X.AI LLC'S STATEMENT REGARDING DEFENDANT ROB BONTA'S RESPONSE TO THE COURT'S FEBRUARY 23 ORDER**<br><br>**ACTION SEEKING STATEWIDE RELIEF**<br><br>Courtroom: 1<br>Date: February 23, 2026<br>Time: 9:00 a.m. |

1

## X.AI LLC'S STATEMENT REGARDING DEFENDANT ROB BONTA'S
## RESPONSE TO THE COURT'S FEBRUARY 23 ORDER

During this Court's Feburary 23, 2026, hearing on Plaintiff X.AI LLC's ("xAI") Motion for Preliminary Injunction, the Court directed Defendant Rob Bonta to file a statement informing the Court "whether there is any current intention to institute an enforcement action against Plaintiff based on the disclosures Plaintiff has already made." Dkt.32. While the state filed a document that purportedly complies with that Order, it refuses to respond to the Court's question. California instead claims that it "cannot comment on whether or when the Attorney General intends to pursue specific enforcement actions." Dkt.33.

The state's (non)-response confirms that xAI has standing to bring this pre-enforcement challenge. Ninth Circuit precedent is clear: When it comes to newly enacted statutes like A.B.2013, the "failure to *disavow* enforcement is sufficient to establish a credible threat of prosecution." *Foothills Christian Ministries v. Johnson*, 148 F.4th 1040, 1050 (9th Cir. 2025); *see* P.I Reply at 1-2. Far from disavowing enforcement of A.B.2013, California has reiterated that it retains both the authority and the discretion to pursue an enforcement action against xAI. Dkt.33.

What is more, the state's refusal to say whether xAI's disclosures satisfy xAI's obligations under A.B.2013 underscores that the statute is unconstitutionally vague. If the state is unwilling (or unable) to say what its own statute requires, it is hard to see how parties regulated by the statute are supposed to make that determination. The state's position boils down to the notion that it can be vague about what the statute requires at the front end (even after requests from regulated parties for clarity), and then reserve the authority to bring an enforcement action if it later determines that regulated parties get it wrong. But that approach invites exactly the kind of

2

arbitrary and discriminatory enforcement (particularly against companies with disfavored viewpoints, *see* P.I. Reply at 8; P.I. Opp. at 14-20) that the Due Process Clause and the First Amendment prohibits. *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); P.I. Mot. 22-23.

For these reasons and those set forth in xAI's briefing and at the preliminary-injunction hearing, the Court should grant xAI's motion.

Respectfully submitted,

s/*Adam S. Sieff*

ADAM S. SIEFF (Cal. Bar #302030)
DAVIS WRIGHT TREMAINE LLP
350 S. Grand Avenue, 27th Floor
Los Angeles, CA 90071
Tel.: (213) 633-8618
adamsieff@dwt.com

ERIN E. MURPHY (*pro hac vice*)
JAMES Y. XI (*pro hac vice*)
MITCHELL K. PALLAKI (*pro hac vice*)
ILAN J. POSNER (*pro hac vice*)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
Tel.: (202) 742-8900
erin.murphy@clementmurphy.com
james.xi@clementmurphy.com
mitchell.pallaki@clementmurphy.com
ilan.posner@clementmurphy.com

*Attorneys for Plaintiff X.AI LLC*

March 2, 2026

3

xAI'S STATEMENT REGARDING
DEFENDANT ROB BONTA'S RESPONSE

CASE NO. 2:25-CV-12295

ROB BONTA
Attorney General of California
ANYA M. BINSACCA
Supervising Deputy Attorney General
KRISTIN A. LISKA
Deputy Attorney General
State Bar No. 315994
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3916
  Fax:  (415) 703-5480
  E-mail:  Kristin.Liska@doj.ca.gov
*Attorneys for Defendant*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| **X.AI LLC,**<br><br>                Plaintiff,<br><br>        v.<br><br>**ROB BONTA, in his official capacity as Attorney General of the State of California,**<br><br>                Defendant. | 2:25-cv-12295-JGB-SSC<br><br>**DEFENDANT'S RESPONSE TO COURT'S FEBRUARY 23 ORDER**<br><br>Judge:     The Honorable Jesus G. Bernal<br>Trial Date:  Not scheduled<br>Action Filed: 12/29/2025 |

**ER18**

Defendant Attorney General Rob Bonta submits the following response to the Court's February 23, 2026 order.  Whether and when to pursue enforcement actions under many state laws is within the Attorney General's discretion.  With respect to the Court's question, the Attorney General's Office cannot comment on whether or when the Attorney General intends to pursue specific enforcement actions.  Plaintiff has not alleged or presented evidence of any current enforcement activity against it under AB 2013, which took effect on January 1, 2026.  Should this Court deny plaintiff's motion for a preliminary injunction, plaintiff will remain free to renew its motion in the future should the factual situation change.

Dated:  February 27, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
ANYA M. BINSACCA
Supervising Deputy Attorney General

*/s/ Kristin Liska*

KRISTIN A. LISKA
Deputy Attorney General
*Attorneys for Defendant*

1

**ER19**

# CERTIFICATE OF SERVICE

Case Name:   *X.AI LLC v. Rob Bonta*
Case No.:    **2:25-cv-12295-JGB (SSCx)**

I hereby certify that on <u>February 27, 2026</u>, I electronically filed the following document with the Clerk of the Court by using the CM/ECF system:

## DEFENDANT'S RESPONSE TO COURT'S FEBRUARY 23 ORDER

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished electronically by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct.

This declaration was executed on <u>February 27, 2026</u>, at San Francisco, California.

|                          |                          |
| :----------------------: | :----------------------: |
| Vanessa Jordan           | *Vanessa Jordan*         |
| Declarant                | Signature                |

**ER20**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.   **CV25-12295-JGB(SSCx)**                     Date   February 23, 2026

Title   ***X.AI LLC v. Rob Bonta, etc.***

Present: The Honorable   JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | CS-RS-1 |
|:---:|:---:|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|:---:|:---:|
| James Y. Xi | Joseph Henry Meeker |
| Mitchell Keshava Pallaki | Kristin A. Liska |

**Proceedings:**   HEARING ON MOTION FOR PRELIMINARY INJUNCTION (Dkt. No. 22)

The Court hears argument on Plaintiff's Motion for Preliminary Injunction.  The Court orders Defendant to contact the California Attorney General Enforcement Section and file a statement informing the Court whether there is any current intention to institute an enforcement action against Plaintiff based on the disclosures Plaintiff has already made.  The filing shall be made not later than noon, on Friday, February 27, 2026.  The motion stands submitted.

**IT IS SO ORDERED.**

Time: 1:30

**ER21**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION – LOS ANGELES

X.AI LLC,                                    )
                                             )
                    Plaintiff,               )
                                             )
             vs.                             )        Case No. 2:25-CV-12295-JGB-SSC
                                             )
RON BONTA, in his official capacity          )
as Attorney General of the State of          )
California,                                  )
                                             )        Riverside, California
                                             )        February 23, 2026
                    Defendant.               )        (9:15 a.m.to 10:21 a.m.)
_____ _____)

HEARING

BEFORE THE HONORABLE JESUS G. BERNAL
UNITED STATES DISTRICT JUDGE

APPEARANCES:               See Next Page

COURT REPORTER:            Recorded, CourtSmart

COURTROOM DEPUTY:          Maynor Galvez

TRANSCRIBER:               Dorothy BABykin
                           Courthouse Services
                           1218 Valebrook Place
                           Glendora, California  91740
                           (626) 963-0566

PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

**ER22**

APPEARANCES:

FOR PLAINTIFF X.AI LLC:

CLEMENT & MURPHY, LLC
BY:  JAMES Y XI
     MITCHELL KESHANA PALLAKI
     ILAN POSNER
     ATTORNEYS AT LAW
706 DUKE STREET
ALEXANDRIA, VIRGINIA  22314


FOR DEFENDANT ROB BONTA, ETC.:


CALIFORNIA DOJ – GOVERNMENT LAW SECTION
BY:  JOSEPH HENRY MEEKER
     TRIAL ATTORNEY
300 SOUTH SPRING STREET
SUITE 9150-15
LOS ANGELES, CALIFORNIA  90013

CALIFORNIA ATTORNEY GENERAL'S OFFICE
BY:  KRISTIN A. LISKA
     DEPUTY ATTORNEY GENERAL
600 WEST BROADWAY
SUITE 1800
SAN DIEGO, CALIFORNIA  92101

I N D E X

2:25-CV-12295-JGB-SSC                    FEBRUARY 23, 2026

PROCEEDINGS:  HEARING ON MOTION FOR PRELIMINARY INJUNCTION

Dorothy Babykin Courthouse Services
1218 Valebrook Place  •  Glendora, CA 91740  •  626.963.0566  •  dotnisbet@aol.com

**ER24**

RIVERSIDE, CALIFORNIA; FEBRUARY 23, 2026; 9:15 A.M.

THE CLERK: CALLING ITEM 1 ON THE CALENDAR, CASE NUMBER 2:25-CV-12295-JGB, X.AI LLC VERSUS ROB BONTA.

COUNSEL, PLEASE MAKE YOUR APPEARANCES.

MR. XI: GOOD MORNING, YOUR HONOR.

JAMES XI FROM CLEMENT & MURPHY ON BEHALF OF X.AI.

I HAVE WITH ME HERE MITCHELL PALLAKI AND ILAN POSNER ALSO FROM CLEMENT & MURPHY.

THE COURT: GOOD MORNING.

GOOD MORNING TO ALL OF YOU.

MR. XI: GOOD MORNING.

MS. LISKA: GOOD MORNING, YOUR HONOR.

KRISTIN LISKA ON BEHALF OF THE ATTORNEY GENERAL FROM THE ATTORNEY GENERAL'S OFFICE.

WITH ME IS MY COLLEAGUE JOE MEEKER.

THE COURT: GOOD MORNING.

SO, THIS MATTER IS ON CALENDAR ON A MOTION FOR A PRELIMINARY INJUNCTION MADE BY THE PLAINTIFF IN THIS CASE ALLEGING SEVERAL ARGUMENTS.

ONE IS THAT THE NEW STATUTE WHICH TOOK EFFECT THIS YEAR AB 2013 CONSTITUTES OR FORCES THE PLAINTIFF TO REVEAL PROPRIETARY INFORMATION INCLUDING TRADE SECRETS, THAT IT COMPELS SPEECH AND THAT IT IS UNCONSTITUTIONALLY VAGUE IN SEVERAL RESPECTS.

THERE ARE ARGUMENTS AND COUNTER ARGUMENTS WHICH

WE'LL GO THROUGH AS WE GO INTO THE ISSUES REGARDING THE CASE.

BUT I WANT TO ASK SOME PRELIMINARY QUESTIONS JUST TO GET MY SORT OF FACTUAL CLARITY.

SO, LET'S START WITH THE PLAINTIFF IN THIS CASE.

So,  MR. POSNER OR MR.– IS IT "CHI"?

MR. XI:  "SHEE."

THE COURT:  "SHEE"?

MR. XI:  YEAH.

THE COURT:  SO, THE PLAINTIFF, YOUR CLIENT, HAS MADE SOME DISCLOSURES PURSUANT TO ITS PERCEIVED OBLIGATIONS UNDER AB 2013.

IS THAT RIGHT?

MR. XI:  YES, IT HAS.

THE COURT:  AND WHAT IT HAS DISCLOSED IN YOUR CLIENT'S AND YOUR VIEW DOES NOT – OR DOES NOT CONSTITUTE ANY TRADE SECRETS.

IS THAT CORRECT?

MR. XI:  THAT'S CORRECT, YOUR HONOR.

THE COURT:  SO, YOUR DISCLOSURES SO FAR AS THEY HAVE BEEN DONE SO FAR DO NOT INVOLVE ANY CONSTITUTIONAL ISSUES SHALL WE SAY?

MR. XI:  WELL, I THINK IT STILL COMPELS SPEECH, YOUR HONOR.

THE COURT:  OKAY.

MR. XI:  BUT I THINK IT'S SOMETHING THAT MY CLIENTS ARE WILLING TO LIVE WITH IF THE STATE IS WILLING TO COME UP HERE AND

SAY THAT THOSE DISCLOSURES SUFFICE TO SATISFY OUR OBLIGATIONS UNDER THE STATUTE.

THE COURT:  RIGHT.  SO, WE'LL GET TO THAT, AND I'LL ASK THAT QUESTION.

BUT WHAT I WANTED TO MAKE SURE IS THAT AT LEAST AS FAR AS YOUR CLIENT IS CONCERNED, WHAT HAS BEEN DISCLOSED SO FAR PURSUANT TO THE STATUTE DOES NOT CONSTITUTE ANY KIND OF TRADE SECRETS ON YOUR CLIENT'S BEHALF?

MR. XI:  NO, YOUR HONOR.

THE COURT:  OKAY.

AND HAVE YOU RECEIVED ANYTHING FROM THE ATTORNEY GENERAL OR ANY LAW ENFORCEMENT AGENCY INDICATING HE CAN CREATE A POSSIBILITY OF PROSECUTION UNDER THE STATUTE?

MR. Xi:  WE HAVE NOT, YOUR HONOR.

THE COURT:  HAVE YOU RECEIVED ANY COMMUNICATION AT ALL FROM THE STATE AGENCIES REGARDING YOUR DISCLOSURES?

MR. XI:  NOT THAT I'M AWARE OF, YOUR HONOR.

THE COURT:  HAVE YOU HAD ANY COMMUNICATIONS OR HAS ANYBODY IN YOUR CLIENT'S BEHALF HAD ANY COMMUNICATIONS WITH THE STATE REGARDING THE SUFFICIENCY OF THE DISCLOSURES MADE BY YOUR CLIENT?

MR. XI:  OTHER THAN IN THE BRIEFING IN THIS CASE, NOT THAT I'M AWARE OF, YOUR HONOR.

THE COURT:  VERY WELL.

AND – SO SO FAR AS YOU ARE AWARE, THE ONLY SORT OF

**ER27**

POSSIBILITY THAT THERE IS FOR POTENTIAL ENFORCEMENT AGAINST YOUR CLIENT IS BASED ON – NOT ON ANY CONCRETE EVIDENCE THAT THE STATE HAS PROVIDED TO YOU BUT ON SORT OF THE NATURE OF THE STATUTE AND WHAT YOU BELIEVE IT FORCES YOU TO DISCLOSE?

MR. XI:  YES.

AND I THINK THE NINTH CIRCUIT HAS BEEN PRETTY CLEAR HERE. LIKE ALL WE NEED TO SHOW IS A CREDIBLE THREAT OF ENFORCEMENT.

AND THE NINTH CIRCUIT HAS MADE PRETTY CLEAR THAT WHEN IT COMES TO A NEW STATUTE, SO LONG AS THE STATE HAS NOT DISAVOWED ENFORCEMENT, THAT'S -- THAT SUFFICES FOR A STANDING FOR PURPOSES OF THE --

THE COURT:  I AGREE WITH YOU ON THAT.  SO, I AGREE THAT IT DOESN'T NEED TO BE ANY KIND OF OTHER ACTION ASIDE FROM A POSSIBILITY OR A CREDIBLE POSSIBILITY OF A THREAT OF PROSECUTION.

SO, I AGREE THAT BECAUSE – JUST BECAUSE THEY HAVEN'T SAID TO YOU ANYTHING DOESN'T MEAN THAT THERE ISN'T A POTENTIAL THREAT OF PROSECUTION UNDER THE STATUTE.

MR. XI:  YES.

NOW, TO BE CLEAR, LIKE I WOULD VERY MUCH WELCOME IT IF THE STATE GOT UP HERE AND SAID WE THINK YOUR DISCLOSURES SUFFICE, WE CAN ALL --

THE COURT:  SO, LET'S – LET'S GET TO THAT.  AND LET'S HEAR FROM THE STATE ON THAT ISSUE.

SO, I GUESS THE QUESTION THAT HAS BEEN PRIMED FOR YOU AT THIS POINT IS, ONE, YOU RECEIVED THE DISCLOSURES THAT X.AI HAS

MADE PURSUANT TO AB 2013.

IS THAT CORRECT?

MS. LISKA: YES, YOUR HONOR.

WE HAVE A COPY OF THOSE. I BELIEVE WE ACTUALLY FILED IT IN THE DECLARATION WITH OUR OPPOSITION FOR THE COURT.

THE COURT: AND, OF COURSE, YOU'VE REVIEWED THOSE DISCLOSURES FOR COMPLIANCE PURSUANT TO AB 2013.

IS THAT CORRECT?

MS. LISKA: WE'VE REVIEWED THEM. I DON'T KNOW THAT WE HAVE NECESSARILY AT THIS POINT REVIEWED THEM IN THE SENSE OF AN ENFORCEMENT.

A POSITION OR POSTURE, WE'VE DEFINITELY LOOKED THEM OVER AS PART OF THIS DEFENSIVE LITIGATION, YES.

THE COURT: SO, IF YOU WERE TO POTENTIALLY ENFORCE OR -- THE STATUTE BASED ON THE DISCLOSURES SO FAR, WOULD THERE BE A REVIEW OF ANY KIND BESIDES THE REVIEW THAT YOU'VE ALREADY ENGAGED IN?

MS. LISKA: YES, THERE WOULD, YOUR HONOR.

THERE ARE – THE SECTION -- THERE ARE DIFFERENT SECTIONS WITHIN THE ATTORNEY GENERAL'S OFFICE. AND THERE IS A SPECIFIC SECTION THAT WOULD BE HANDLING THE ENFORCEMENT ACTIVITY. THAT'S NOT THE SECTION THAT I WORK WITH. WE HANDLE THE DEFENSIVE LITIGATION.

AS FAR AS I'M AWARE, THERE HASN'T BEEN ANY INDICATIONS WITHIN OUR OFFICE THAT THERE'S SORT OF THE REVIEW THAT YOU

WOULD SEE BEFORE ANY ENFORCEMENT ACTIVITY IS GOING TO TAKE PLACE.

THE COURT: SO, WHAT IS THAT SECTION CALLED WITHIN THE ATTORNEY GENERAL'S OFFICE?

MS. LISKA: IT'S WITHIN THE CONSUMER -- I BELIEVE IT'S WITHIN THE CONSUMER PROTECTION DIVISION.

THE COURT: CAN WE JUST CALL IT THE "ENFORCEMENT SECTION"?

MS. LISKA: YES.

THE COURT: OKAY.

SO, HAVE YOU HAD DIRECT COMMUNICATION WITH ANYBODY, OR HAS ANYBODY IN YOUR TEAM -- HAS ANYBODY -- ANY DIRECT COMMUNICATION WITH ANYBODY IN THE ENFORCEMENT SECTION REGARDING THE DISCLOSURES MADE BY X.AI PURSUANT TO AB 2013?

MS. LISKA: WE HAVE. I DON'T KNOW WHAT I CAN NECESSARILY JUST SAY ABOUT THOSE INTERNAL DELIBERATIONS.

BUT THERE HAVE BEEN CONVERSATIONS, YES.

THE COURT: OKAY.

SO, I'LL ASK YOU ONE MORE GENERAL QUESTION.

BASED ON THOSE CONVERSATIONS, DO YOU BELIEVE THERE IS A POTENTIAL OF PROSECUTION AGAINST X.AI BASED ON THE DISCLOSURES SO FAR?

MS. LISKA: BASED ON THE CONVERSATIONS WE'VE HAD, I DON'T BELIEVE THERE'S ANYTHING THAT WOULD BE COMING IN THE NEAR FUTURE. I CANNOT OBVIOUSLY SAY THAT FOR A FACT SINCE THAT WOULD

NOT BE A CONVERSATION THAT I WOULD BE PART OF.

BUT MY UNDERSTANDING IS THAT THERE HASN'T BEEN ANY DISCUSSIONS OR INVESTIGATIONS AT THIS TIME.

THE COURT: IS YOUR UNDERSTANDING THAT THE VIEW THAT IS NECESSARY FOR POTENTIAL PROSECUTION HAS BEEN COMPLETED BY THE ENFORCEMENT SECTION?

MS. LISKA: I DON'T BELIEVE SO. THE LAW IS RELATIVELY NEW. AND I DON'T KNOW THAT THEY'VE EVEN STARTED ACTIVITY AROUND ENFORCEMENT PER SE.

THE COURT: SO, IS IT -- IS YOUR POSITION THAT THE ENFORCEMENT SECTION HAS NOT REVIEWED THE DISCLOSURES?

MS. LISKA: I KNOW THAT WE'VE ASKED THEM TO TAKE A LOOK AT THEM AS PART OF THIS LITIGATION.

THE COURT: DID THEY?

MS. LISKA: THEY DID. THEY HAVE, YES.

THE COURT: OKAY.

AND BASED ON THAT, HAVE THEY GIVEN YOU ANY INDICATION THAT ANY ENFORCEMENT ACTION IS IN THE NEAR FUTURE?

MS. LISKA: NO, THEY HAVE NOT.

THE COURT: BUT NEITHER HAVE THEY DISAVOWED THE POTENTIAL OF ANY SUCH ACTION.

IS THAT CORRECT?

MS. LISKA: CORRECT, YES.

THE COURT: OKAY.

SO, WHEN AND -- WHEN WOULD SUCH AN ACTION TAKE PLACE?

HOW WOULD THE PLAINTIFF IN THIS CASE OR THIS COURT BE IN A POSITION TO GET AN ANSWER FROM THE ENFORCEMENT SECTION SAYING ONE WAY OR THE OTHER WHETHER THE ONE THEY ARE CONTEMPLATING PROSECUTION AGAINST X.AI BASED ON THE DISCLOSURES?

MS. LISKA: I MEAN THAT'S SOMETHING THAT THERE COULD BE COMMUNICATIONS BETWEEN THE OFFICE AND X.AI IF THERE'S AN ONGOING INVESTIGATION.

AND I THINK THAT WHAT IS RELEVANT AND SALIENT HERE IS THAT THERE HAS BEEN SOME DISCLOSURES MADE. AND I THINK --

THE COURT: OKAY. SO, I -- WE'LL GET TO THAT.

MS. LISKA: YEAH.

THE COURT: BUT LET ME JUST -- AND I UNDERSTAND IF YOU'RE NOT ABLE TO PROVIDE ME FULL ANSWERS. THERE'S SOME UNDERSTANDING BASED ON THAT.

BUT I WANT TO GET TO -- SORT OF AS FAR AS I CAN GET IN THE ANALYSIS OF WHETHER OR NOT THERE'S ANY CONTEMPLATED OR FORESEEABLE ACTION OF ENFORCEMENT AGAINST THE PLAINTIFF IN THIS CASE.

SO, I UNDERSTAND THAT IF THE ENFORCEMENT SECTION WERE TO CONTEMPLATE ANY KIND OF ENFORCEMENT, AND THEY'D PROBABLY COMMUNICATE WITH THE PLAINTIFF REGARDING SUCH POTENTIAL ACTION OF ENFORCEMENT.

I'M NOT THERE YET.

WHAT I WANT TO KNOW IS EVEN BEFORE THAT, EVEN BEFORE

THAT HAPPENS, HOW WOULD THE PLAINTIFF OR THE COURT BE ABLE TO INQUIRE FROM THE ENFORCEMENT SECTION WHETHER THERE IS OR THERE ISN'T ANY CONTEMPLATED FORESEEABLE PROSECUTION OR ENFORCEMENT ACTION AGAINST THE PLAINTIFF IN THIS CASE.

WOULD THAT BE POSSIBLE?

COULD I DIRECT YOU TO TALK TO THE ENFORCEMENT SECTION AND GET AN ANSWER AS TO WHETHER OR NOT AN ENFORCEMENT ACTION IS FORESEEABLE.

MS. LISKA: I – YOU KNOW, OUR OFFICE WILL OF COURSE COMPLY WITH THE COURT ORDER. SO, IF THIS COURT WISHED TO DIRECT US TO PROVIDE A STATEMENT, I'M HAPPY TO CONFER WITH MY COLLEAGUES AND DO SO.

I HAVE TO BE VERY HONEST I DON'T DO ENFORCEMENT WORK. SO, I'M NOT AS FAMILIAR WITH THE INTRICACIES OF HOW ALL THAT TAKES PLACE. I'M VERY MUCH AND HAVE ALWAYS BEEN A DEFENSIVE CIVIL LITIGATOR.

BUT I AM PERFECTLY HAPPY TO CONSULT WITH MY COLLEAGUES AND PROVIDE WHAT WE CAN TO THE COURT. I'M SURE THAT THEY WON'T DISCLAIM – YOU KNOW, THE GOVERNMENT NEVER WANTS TO SAY THERE'S NOT A CHANCE IN SOME POSSIBLE FUTURE --

THE COURT: I UNDER- --

MS. LISKA: -- WE'LL BRING ENFORCEMENT.

BUT I'M SURE THAT WE CAN GIVE THE COURT AS MUCH INFORMATION AS YOU'D LIKE IF THAT WOULD BE HELPFUL.

THE COURT: OKAY.

**ER33**

SO, YES. I'M GOING TO DIRECT YOU TO CONTACT THE ENFORCEMENT SECTION OF THE AG'S OFFICE AND ATTEMPT TO GET AN ANSWER TO THIS QUESTION. DOES THE CALIFORNIA ATTORNEY GENERAL'S OFFICE PRESENTLY HAVE ANY INTENTION TO INSTITUTE AN ENFORCEMENT ACTION AGAINST THE PLAINTIFF BASED ON THE DISCLOSURES X.AI HAS ALREADY MADE.

OF COURSE WE CANNOT SPECULATE AS TO WHETHER ANY CONTINUED DISCLOSURES WOULD CHANGE THEIR MIND.

BUT I WANT TO GET A BETTER IDEA OR AS GOOD AS ANYTHING ELSE I CAN GET AS TO WHETHER THE PRESENT POSTURE OF THE ENFORCEMENT SECTION OF THE AG'S OFFICE HAS WITH RESPECT TO THE CURRENT DISCLOSURES.

MS. LISKA: OF COURSE, YOUR HONOR.

THE COURT: THAT WOULD BE HELPFUL.

THANK YOU.

MS. LISKA: IS THERE A DATE THAT YOU WOULD LIKE US TO FILE THAT BY?

THE COURT: SO, I ASSUME THAT YOU CAN HAVE THAT CONVERSATION FAIRLY SOON. SO, I WOULD WANT IT BY THE END OF THE WEEK.

MS. LISKA: OF COURSE.

THE COURT: LET'S SAY NOON ON FRIDAY.

MS. LISKA: OF COURSE, YOUR HONOR.

THE COURT: VERY WELL.

AS FAR AS YOU KNOW HAS THERE BEEN ANY ENFORCEMENT

ACTION AGAINST ANY COMPANY PURSUANT TO THIS ASSEMBLY BILL?

MS. LISKA: AS FAR AS I KNOW THERE HAS NOT.

THE COURT: OKAY.

AS FAR AS YOU KNOW, ARE THERE ANY ONGOING INVESTIGATIONS INTO THE COMPLIANCE BY ANY COMPANY PURSUANT TO THIS ASSEMBLY BILL?

MS. LISKA: I'M NOT AWARE OF ANY.

THE COURT: OKAY.

IS IT YOUR VIEW THAT IF ANY SUCH ACTION WERE TO BE INSTITUTED THE FIRST STEP WOULD BE FOR THE ENFORCEMENT SECTION TO COMMUNICATE WITH THE COMPANY REGARDING THE SUFFICIENCY OF ITS DISCLOSURES BEFORE ANY ACTION IS INSTITUTED?

MS. LISKA: I THINK IT WOULD BE SPECULATIVE OF ME TO OPINE ON THAT, BUT I'M CERTAINLY -- THAT IS SOMETHING I CAN SPEAK TO MY COLLEAGUES ABOUT TO TRY TO PROVIDE SOME MORE INSIGHT FOR THE COURT AS TO HOW THE PROCESS NORMALLY WORKS.

THE COURT: OKAY.

SO, LET'S -- LET'S DO THAT ALSO.

OKAY. SO, LET'S GET TO THE ARGUMENT WE'RE GOING TO HAVE, THE FACT THAT MR. XI IS AT THE PODIUM. AND LET'S GO THROUGH THE ARGUMENTS REGARDING THE ARGUMENTS THAT THE DEFENDANT MAKES IN RESPONSE TO YOUR BRIEFS, THE FIRST OF WHICH IS REGARDING JURISDICTION AND WHETHER THERE'S STANDING AT ALL BY YOUR CLIENT TO BRING THIS ACTION. SINCE THEY ARGUE THAT THERE'S NO STANDING BECAUSE YOUR CLIENT HAS NOT ESTABLISHED A

STANDING, EITHER FOR REGULAR STANDING UNDER SPOKIEL OR A PRE-ENFORCEMENT STANDING UNDER KUMAR.

THEIR ARGUMENT IS BASICALLY THAT YOUR DISCLOSURES ARE VAGUE. AND BECAUSE THERE ISN'T ANY DEFINITIVE STATEMENT THAT ANY PROPRIETARY INFORMATION OR TRADE SECRETS ARE INVOLVED IN ANY CURRENT OR FUTURE DISCLOSURES – AND YOU'VE NOT DESCRIBED ANY IN THE POTENTIAL DISCLOSURES THAT YOU MIGHT HAVE TO MAKE – THAT YOU CANNOT ESTABLISH THAT THERE'S EVEN THE EVIDENCE TO DETERMINE THAT THERE'S AN ESTABLISHED INTENTION TO ENGAGE IN A COURSE OF CONDUCT THAT WOULD BE AFFECTED BY A CONSTITUTIONAL INTEREST.

IN OTHER WORDS, THEY'RE SAYING YOU SAID NOTHING TO THEM OR TO ME THAT WOULD IMPLICATE THAT YOU WOULD HAVE TO DISCLOSE TRADE SECRETS.

AND THE ALLEGATIONS IN THE COMPLAINT ARE SO VAGUE AS TO WHAT HAS BEEN DISCLOSED OR WOULD POTENTIALLY BE FORCED TO BE DISCLOSED THAT I CANNOT MAKE A FINDING THAT YOU'VE ENGAGED OR COULD ENGAGE IN THE COURSE OF CONDUCT THAT WOULD WANT TO FOLLOW THE STATUTE AT THIS POINT.

CAN YOU RESPOND TO THAT.

MR. XI: SURE.

AND I HEAR TWO CONCERNS WITH YOUR QUESTION. ONE IS ABOUT STANDING AND ONE IS ABOUT WHETHER WE'VE ACTUALLY PRODUCED EVIDENCE THAT WE HAVE A TRADE SECRET AT ISSUE HERE.

THE COURT: RIGHT.

MR. XI: AND ON STANDING, AGAIN, I THINK LIKE THE SUPREME COURT PRECEDENT AND THE NINTH CIRCUIT'S INTERPRETATION OF THAT PRECEDENT IS PRETTY CLEAR. SO LONG AS WE HAVE A CREDIBLE THREAT OF ENFORCEMENT, WE HAVE STANDING TO BRING PREENFORCED A CHALLENGE.

AND SO LONG AS WHEN IT COMES TO A NEW STATUTE AT LEAST, SO LONG AS THE STATE HAS NOT DISAVOWED ENFORCEMENT – AND I DID NOT HEAR HER DISAVOW ENFORCEMENT TODAY --

THE COURT: RIGHT.

MR. XI: -- THEN WE HAVE STANDING TO BRING OUR PRE-ENFORCEF CHALLENGE.

AGAIN, I WOULD WELCOME IT. THE STATE, AFTER CONSULTING WITH THE ENFORCEMENT BUREAU, CAME BACK TO THE COURT AND SAID, WELL, WE ACTUALLY THINK THESE DISCLOSURES THAT YOU MADE SUFFICE AND THEREFORE WE DON'T THINK YOU'RE VIOLATING THE STATUTE.

IF THAT'S THE CASE, WE'RE HAPPY TO, YOU KNOW, GO HOME AND ENJOY THE SUNSHINE FOR THE REST OF THE DAY.

THE COURT: YEAH. SO --

MR. XI: BUT I DON'T THINK THAT'S WHAT MS. LISKA SAID.

THE COURT: -- THE POSSIBILITY OF ENFORCEMENT IS JUST ONE OF THE THREE PRONGS THAT IS NEEDED FOR PREENFORCEMENT STANDING UNDER KUMAR.

THE FIRST ONE BEING THAT THERE IS AN INTENTION TO ENGAGE IN A COURSE OF CONDUCT ARGUABLY AFFECTED WITH A

CONSTITUTIONAL INTEREST.

MR. XI: YES.

THE COURT: SO, THAT'S REALLY WHAT I'M TALKING ABOUT.

IF ACCORDING TO THEM, AND PERHAPS ACCORDING TO ME, YOU'VE NOT PLED OR IDENTIFIED ANY POTENTIAL DISCLOSURE OF A TRADE SECRET, THEN HOW AM I SUPPOSED TO DETERMINE THAT THERE IS A COURSE OF CONDUCT IN WHICH YOUR CLIENT HAS ENGAGED IN OR WOULD ENGAGE IN THAT INVOLVES A CONSTITUTIONAL INTEREST.

MR. XI: WELL, BOTH – WE'VE ARGUED BOTH THAT, YOU KNOW, THE STATUTE WOULD REQUIRE US TO DISCLOSE TRADE SECRETS. THEY'RE ALSO COMPELLED SPEECH.

AND, SO, I DON'T THINK THE STATE IS DENYING THAT THAT'S WHAT THE STATUTE DOES.

THE COURT: RIGHT.

MR. XI: AND, SO, I THINK IT'S -- THERE'S PRETTY CLEARLY A CONSTITUTIONAL INTEREST AT STAKE HERE.

AND THE CONDUCT THAT WE'VE ENGAGED IN IS ARGUABLY PRESCRIBED BY THE STATUTE. I THINK THERE'S AN ARGUABLE CHANCE THAT AT THE VERY LEAST WHAT WE'VE PROVIDED DOES NOT SUFFICE.

AND, YOU KNOW, THE STATE SAYS, WELL – I MEAN, THE STATE HAD SAID THE PURPOSE OF THE STATUTE IS TO SUSS OUT BIAS, RIGHT.

AND, FRANKLY, I DON'T REALLY KNOW HOW YOU DO THAT IF ALL THE STATUTE REQUIRES IS FOR US TO DISCLOSE, WELL, WE -- WE GATHER INFORMATION FROM THE INTERNET AND UNNAMED THIRD-PARTY SOURCES.

THAT DOESN'T TELL YOU ANYTHING ABOUT BIAS.

THE COURT: BUT IT REQUIRES YOU TO DISCLOSE WHAT DATABASES YOU'VE USED IN TRAINING THE GENERATIVE AI SO THEY CAN LOOK AT --

MR. XI: SURE.

THE COURT: -- SO THEY CAN LOOK AT THOSE DATABASES AND DETERMINE FOR THEMSELVES WHETHER THOSE BASES INVOLVE BIASES, RACIST COMMENTS –

MR. XI: SURE.

THE COURT: -- OR – AND THEN DETERMINE WHETHER OR NOT THAT'S PART OF THE TRAINING AND THEREFORE THE RESULT MIGHT BE AFFECTED BY THAT TRAINING.

MR. XI: SURE.

AND TO THE EXTENT THE STATUTE REQUIRES US TO DISCLOSE SPECIFIC INFORMATION ABOUT THE SOURCES, SUCH AS WE GATHER INFORMATION FROM THIS NEWSPAPER OR THAT LIBRARY OR THAT HOSPITAL, I THINK THAT IS UNQUESTIONABLY A TRADE SECRET.

AS THE DECLARATION THAT WE'VE SUBMITTED ALONGSIDE OUR MOTION MAKES CLEAR, LIKE THAT IS CONFIDENTIAL INFORMATION THAT THE ENTIRE INDUSTRY TREATS -- THE ENTIRE INDUSTRY CLOSELY GUARDS TO AVOID THE COMPETITORS FINDING – FINDING OUT THAT INFORMATION.

THE COURT: EVEN IF THOSE ARE PUBLIC DATABASES? THE FACT THAT YOU'RE USING THEM CONSTITUTE A TRADE SECRET?

MR. XI: YES, YES. THIS IS A HIGHLY COMPETITIVE AND RAPIDLY

DEVELOPING INDUSTRY.

AND AS THE STATE ITSELF HAS ACKNOWLEDGED, THE THING -- ONE OF THE THINGS THAT DIFFERENTIATES ONE AI PRODUCT FROM ANOTHER IS THE QUALITY OF THE DATA IN WHICH – IN WHICH THE AI SYSTEM IS TRAINED ON.

THE COURT:  RIGHT.

MR. XI:  AND SO -- AND SO THE COMPETITORS IN THIS INDUSTRY TRY TO SEEK WHATEVER COMPETITIVE ADVANTAGE THEY GET -- THEY CAN GET FROM THEIR COMPETITORS.

AND PART OF THAT IS IDENTIFYING SOURCES OF DATASETS THAT THEIR OTHER COMPETITORS HAVE NOT IDENTIFIED.

SO, JUST BECAUSE, YOU KNOW, IT'S WELL KNOWN THAT THERE'S A MATH COMPETITION IN SOME PART OF THE WORLD THAT HAS REALLY INTERESTING MATH PROBLEMS, THAT DOESN'T NECESSARILY MEAN THAT ONE COMPANY IS GOING TO – EVERY COMPANY IS GOING TO IDENTIFY THAT MATH COMPETITION AS A SOURCE OF INFORMATION TO OBTAIN DATASETS TO TRAIN THEIR AI SYSTEMS.

ONE COMPANY MIGHT IDENTIFY THAT WHILE ANOTHER COMPANY MIGHT NOT.

AND THAT'S SOMETHING THAT – THAT INFORMATION IS SOMETHING THAT GIVES ONE PARTICULAR COMPANY A COMPETITIVE ADVANTAGE OVER THE OTHERS.

IT'S CONFIDENTIAL INFORMATION THAT IS VERY MUCH CLOSELY GUARDED.  AND --

THE COURT:  YOU'RE SAYING CONFIDENTIAL INFORMATION.

MR. XI: YEAH.

THE COURT: SO, THE INFORMATION -- YOU'RE SAYING THE INFORMATION ITSELF MIGHT NOT BE CONFIDENTIAL. THE FACT THAT YOUR CLIENT USES -- SCREENING IT'S CONFIDENTIAL.

MR. XI: YES, YES. AND IT'S --

THE COURT: SO, THAT'S THE INFORMATION –

MR. XI: EXACTLY.

THE COURT: -- YOU CLAIM IS CONFIDENTIAL.

MR. XI: I THINK THAT'S RIGHT, YOUR HONOR.

AND IT'S NOT JUST THE SOURCES OF THE INFORMATION, RIGHT. THE STATUTE REQUIRES US TO DISCLOSE THE PURPOSES OF THE DATASETS, THE TYPE OF DATA IN THE DATASETS, THE RANGE OF DATA POINTS IN THE DATASETS. WHETHER WE PROCESS AND CLEAN THE DATA AND FOR WHAT PURPOSE DO WE PROCESS AND CLEAN THE DATA.

NOW THE STATE TRIES TO ANALOGIZE THIS LAW TO A DISCLOSURE REQUIREMENT THAT REQUIRES, YOU KNOW, FOOD COMPANIES TO DISCLOSE --

THE COURT: THE INGREDIENTS.

MR. XI: -- THE INGREDIENTS --

THE COURT: RIGHT.

MR. XI: -- ON THE LABELS.

BUT ACTUALLY I THINK THAT ANALOGY REALLY HURTS THE STATE. BECAUSE IF YOU TAKE A LOOK AT THE FEDERAL STATUTES THAT REQUIRE DISCLOSURE OF INGREDIENTS, THEY EXPLICITLY PROVIDE TRADE SECRET PROTECTION.

SO, I'LL DIRECT THE COURT TO -- THIS IS 15 USC 1454 C3.

THIS IS THE PROVISION OF THE FOOD, DRUG AND COSMETIC ACT THAT REQUIRES DISCLOSURE OF INGREDIENTS.

AND THE PRECISE PARAGRAPH SAYS, "NOTHING IN THIS PARAGRAPH SHALL BE DEEMED TO REQUIRE THAT ANY TRADE SECRET BE DIVULGED."

AND, SO, THAT'S WHY IF YOU LOOK AT, FOR EXAMPLE, THE INGREDIENT LABEL FOR COCA COLA, IT SAYS, "CARBONATED WATER, CAFFEINE"

SO, THOSE ARE THINGS THAT EVERYBODY KNOWS IS IN COKE.

THE COURT: COCAINE.

MR. XI: YEAH.

BUT THEN -- BUT THEN LIKE THE PART THAT MAKES COKE COKE INSTEAD OF PEPSI IT JUST SAYS -- IT JUST SAYS "NATURAL FLAVORS," RIGHT.

AND, SO, COKE IS NOT REQUIRED TO DISCLOSE THE SECRET SAUCE THAT MAKES COKE COKE.

AND THE STATE ALSO POINTS TO --

YEAH?

THE COURT: WELL, WHEN I THOUGHT OF – WHEN I READ THAT SECTION I THOUGHT OF KENTUCKY FRIED CHICKEN IN THAT QUOTE, RIGHT.

MR. XI: SURE.

THE COURT: SO, IT'S PROPRIETARY -- A LIST OF THE INGREDIENTS --

MR. XI: YEAH.

THE COURT: -- DOES NOT GIVE YOU THE PROPORTIONS OR THE SEQUENCE OF BEING PUT -- THOSE INGREDIENTS INTO THE FOOD THAT IS BEING MADE.

AND THAT'S WHAT'S PROPRIETARY, RIGHT?

MR. XI: YEAH.

THE COURT: SO, YOU CAN HAVE A LIST OF INGREDIENTS AND NOT KNOW HOW TO MAKE IT. YOU DON'T KNOW HOW TO MAKE WHAT IS THE PRODUCT JUST BECAUSE YOU HAVE A LIST OF INGREDIENTS.

MR. XI: YEAH. BUT SOMETIMES I THINK THAT THE INGREDIENTS THEMSELVES ARE PROPRIETARY. AND THAT'S – THAT'S THE PHILLIP MORRIS VERSUS REILLY CASE, THE EN BANC FIRST CIRCUIT CASE, RIGHT.

SO, THERE THAT INVOLVED A MASSACHUSETTS STATUTE THAT COMPELLED CIGARETTE MANUFACTURERS TO DISCLOSE THE INGREDIENTS IN THEIR CIGARETTES. AND THE COURT SAID THERE, WELL, EVERYBODY KNOWS THAT TOBACCO AND WATER ARE IN CIGARETTES.

BUT THE THING THAT GIVES, YOU KNOW, PALL MALLS A PARTICULAR AROMA AND TASTE THAT DIFFERENTIATES IT FROM YOUR MARLBORO LIGHTS, I MEAN, THAT'S ALL A PROTECTED TRADE SECRET.

AND, SO, THE COURT SAID, YOU KNOW, REGARDLESS OF WHETHER YOU LOOK AT IT AS A REGULATORY TAKING OR A PER SE TAKING, IT'S A TAKING BECAUSE YOU'RE COMPELLING DISCLOSURE OF TRADE SECRETS.

THE COURT: OKAY.

SO, I JUST WANT TO BE MORE -- A LITTLE MORE PRECISE IN

Dorothy Babykin Courthouse Services
1218 Valebrook Place • Glendora, CA 91740 • 626.963.0566 • dotnisbet@aol.com

WHAT YOUR ARGUMENT IS. SO, I GET THAT YOU THINK THAT BY REVEALING THESE DATABASES, WHICH MAY OR MAY NOT BE PUBLIC INFORMATION, AND HAVING THEM BE THE BASIS OF TRAINING YOUR AI GENERATION MODELS, WHAT YOU'RE USING, OKAY, OBVIOUSLY AFFECTS THE PRODUCT.

SO, IT'S IMPORTANT FOR YOUR CLIENT TO KEEP THAT SECRET FROM OTHER COMPETITORS BECAUSE WHAT THEY'RE USING MIGHT AFFECT THE OUTPUT AND MAY CONSTITUTE A COMPARATIVE ADVANTAGE VIS-À-VIS OTHER GENERATORS THAT MAY OR MAY NOT BE USING THE SAME DATABASES, RIGHT?

MR. XI: THAT'S EXACTLY RIGHT, YOUR HONOR.

SO, IF I COULD GIVE --

THE COURT: SO – SO, LET ME – BUT ARE YOU SAYING THAT THAT MIX OF CLAIMING DATABASES IS A TRADE SECRET, OR IS IT JUST CONFIDENTIAL INFORMATION?

MR. XI: IT'S A TRADE SECRET. THE DEFINITION OF A TRADE SECRET IS SOMETHING THAT DERIVES VALUE FROM BEING SECRET.

THE COURT: RIGHT.

MR. XI: AND SOMETHING THAT YOU MADE REASONABLE EFFORTS TO KEEP SECRET.

I DON'T THINK THERE'S ANY QUESTION WE'VE MADE REASONABLE EFFORTS TO KEEP IT SECRET.

THE COURT: RIGHT.

MR. XI: AND I THINK --

THE COURT: BUT YOUR THEORY IS THAT A SET OF NOT -- A SET

OF PUBLIC INFORMATION DATABASES –

MR. XI:  YEAH.

THE COURT:  -- CAN WHEN AGGREGATED CONSTITUTE A TRADE SECRET.

MR. XI:  YEAH.

THE COURT:  EVEN IF THE INDIVIDUAL COMPONENTS ARE NOT ITSELF SECRETS.  THEY'RE PUBLIC INFORMATION.

MR. XI:  YEAH.  I THINK THE STATE ACTUALLY CONCEDES THAT IN THEIR BRIEF.

AND TO BE CLEAR, IT'S NOT JUST ALL PUBLIC INFORMATION. THERE ARE SOME SOURCES THAT MY CLIENT HAS IDENTIFIED --

THE COURT:  RIGHT.

MR. XI:  -- THAT IS NOT PUBLIC.

THE COURT:  RIGHT.  I UNDERSTAND THAT.

MR. XI:  RIGHT.  YEAH.

AND JUST TO PROVIDE MAYBE AN EXAMPLE THAT MIGHT BE HELPFUL.  LIKE, LOTS OF – LOTS OF AI COMPANIES ONE OF THEIR – YOU KNOW, ONE OF THEIR SKILL SETS IS PRODUCING LEGAL FILINGS, LIKE DRAFT LEGAL FILINGS.  SOME ARE REALLY GOOD.  SOME ARE NOT SO GOOD AT IT.

THE COURT:  MOSTLY THEY ARE NOT.

MR. XI:  YEAH.  AND MOSTLY THEY'RE NOT.

BUT, YOU KNOW, IF ONE COMPANY WERE TO IDENTIFY, WELL, YOU KNOW, IT MIGHT ACTUALLY BE REALLY GOOD TO FIND A COUPLE OF REALLY SOLID LAW FIRMS TO ACQUIRE SOME DRAFT FILINGS FROM THEM

AND USE THAT TO TRAIN OUR SYSTEMS.

THAT – LIKE THAT INFORMATION MIGHT NOT BE SOMETHING THAT ITS COMPETITORS HAVE IDENTIFIED AS A POTENTIAL WAY TO TRAIN THE AI SYSTEM.

AND THAT IS SOMETHING THAT DERIVES VALUE FROM BEING SECRET, RIGHT. LIKE IF MY COMPETITORS FOUND OUT THAT I WAS USING THIS DATABASE TO TRAIN MY AI PRODUCT, I MEAN, THEY WOULD – LIKE THE EISER DECLARATIONS EXPLAIN, THEY WOULD GO AND ACQUIRE THAT INFORMATION IMMEDIATELY.

SIMILARLY, IF X.AI FOUND OUT THAT ANOTHER COMPANY WAS USING A DATASET OR IDENTIFIED A DATASET THAT X.AI HAD NOT IDENTIFIED, IT WOULD GO AND ACQUIRE THAT DATASET IMMEDIATELY.

AND, SO, I THINK -- I THINK THERE'S NO REAL QUESTION THAT THAT – LIKE THE INFORMATION THAT A.B. 2013 ARGUABLY REQUIRES OUR CLIENTS TO DISCLOSE CONSTITUTES A TRADE SECRET.

THE COURT: CAN YOU ADDRESS THEIR ARGUMENT THAT BECAUSE YOU CAN BE COMPENSATED FOR THE TAKING OF ANY TRADE SECRETS MONETARILY, THAT THERE SHOULDN'T BE ANY INJUNCTIVE RELIEF BASED ON THAT?

MR. XI: YEAH.

SO, I THINK IT'S – THEY'RE RIGHT. IT'S GENERALLY TRUE THAT WHEN IT COMES TO TAKINGS, YOU DON'T GET EQUITABLE RELIEF SO LONG AS THE STATE HAS A WAY FOR YOU TO GET COMPENSATION --

THE COURT: RIGHT.

MR. XI: -- AFTER THE TAKING.

BUT THE QUESTION IS WHETHER – AND BECAUSE IN THAT CIRCUMSTANCE YOU HAVE ADEQUATE REMEDY AT LAW, RIGHT.  SO, ONCE YOU HAVE ADEQUATE REMEDY AT LAW, YOU DON'T GENERALLY GET EQUITABLE RELIEF.

BUT AS THE EIGHTH CIRCUIT CASE THAT WE'VE CITED -- THIS IS PHARMA. VERSUS WILLIAMS CASE MAKES CLEAR, WHEN YOU HAVE A STATUTE THAT AUTHORIZES A CONTINUING SERIES OF TAKINGS INTO THE FUTURE, THEN FORCING THE SUBJECT OF A TAKING TO RETURN TO STATE COURT OVER AND OVER AND OVER AGAIN TO OBTAIN COMPENSATION JUST ISN'T AN ADEQUATE REMEDY AT LAW.

AND IF YOU TAKE A LOOK AT THE CEDAR POINT NURSERY VERSUS HASSID CASE THAT WENT UP TO THE SUPREME COURT, LIKE ON A REMAND FROM THE SUPREME COURT THE STATE ACTUALLY AGREED TO A PERMANENT INJUNCTION MOVING FORWARD.  THIS IS THE SAME STATE. THIS IS A CALIFORNIA REGULATION.

AND, SO, EVEN CALIFORNIA RECOGNIZES THAT THERE ARE SOME INSTANCES, IN PARTICULAR WHEN YOU HAVE A STATUTE THAT AUTHORIZES A CONTINUING SET OF FUTURE TAKINGS, LIKE INJUNCTIVE RELIEF IS APPROPRIATE IN THAT CIRCUMSTANCE.

AND I THINK THAT'S PRECISELY THE CASE HERE.

THE COURT:  WELL, WOULD THERE HAVE TO BE IN ACTUALITY REPEATED ENFORCEMENT ACTIONS BEFORE THERE'S A DETERMINATION THERE'S NO EQUITY REMEDY AT LAW?

MR. XI:  WELL, SO LONG AS THE STATE THINKS THAT, LIKE WE'RE REQUIRED TO DISCLOSE INFORMATION THAT CONSTITUTES A TRADE

Dorothy Babykin Courthouse Services
1218 Valebrook Place   •   Glendora, CA 91740   •   626.963.0566   •   dotnisbet@aol.com

**ER47**

SECRET, EVERY TIME WE DISCLOSE THIS INFORMATION LIKE WE'RE GOING TO HAVE TO GO BACK INTO STATE COURT AND – AND, YOU KNOW, KEEP IN MIND LIKE THIS IS A RAPIDLY DEVELOPING INDUSTRY.

X.AI HAS RELEASED PRODUCTS OR RELEASED NEW VERSIONS OF GROK EVERY FEW MONTHS OR SO.

AND, SO, LIKE IS IT GOING TO BE THE CASE THAT EVERY FEW MONTHS WE'RE GOING TO HAVE TO GO BACK INTO -- INTO – INTO STATE COURT TO -- TO ATTAIN COMPENSATION FOR THE DISCLOSURE OF THE TRADE SECRETS.

I THINK THAT'S JUST NOT AN ADEQUATE REMEDY AT LAW.

AND THAT'S -- THAT'S WHAT THE EIGHTH CIRCUIT CASE SAYS.

AND I THINK YOU SHOULD APPLY IT HERE.

THE COURT: VERY WELL.

LET ME HEAR FROM MS. LISKA AND ADDRESS THE ARGUMENTS THAT MR. XI HAS MADE REGARDING THE TAKINGS AND THE STANDING ISSUES.

MS. LISKA: I'M GOING TO -- I'M GOING TO TURN THIS ONE OVER TO MY COLLEAGUE TO HANDLE.

THE COURT: VERY WELL.

MS. LISKA: HE'S OUR TRADE SECRET EXPERT.

THE COURT: MR. MEEKER.

MR. MEEKER: GOOD MORNING, YOUR HONOR.

THE COURT: GOOD MORNING.

MR. MEEKER: WELL, I CAN START BY SAYING WE DO THINK THAT STANDING DOESN'T LIE HERE AT LEAST AS TO THEIR TRADE SECRETS

CLAIM. CLEARLY THEY NEED TO ESTABLISH STANDING AS TO EVERY CLAIM IN THEIR COMPLAINT.

AND WE THINK FOR SOME OF THE REASONS THAT THE COURT DISCUSSED EARLIER, IT ISN'T PRESENT HERE, BOTH FOR THE REASONS THAT WERE TOUCHED ON IN THE OPENING SET OF QUESTIONS ABOUT THE FACT THAT THERE HASN'T BEEN AN ENFORCEMENT ACTION YET. BUT ALSO THAT THE PLAINTIFF HASN'T SHOWN THAT AB 2013 ACTUALLY REQUIRES THEM TO DISCLOSE INFORMATION THAT IS A TRADE SECRET.

WE WOULD CERTAINLY GRANT THAT X.AI COULD HAVE TRADE SECRETS WITHIN ITS DATASET INFORMATION.

BUT PLAINTIFF HASN'T SHOWN THAT AB 2013 AND THE LIMITED DISCLOSURES THAT AB 2013 REQUIRES WOULD ACTUALLY REQUIRE THEM TO DISCLOSE INFORMATION THAT IS VALUABLE BECAUSE IT IS UNKNOWN TO OTHERS.

SO, THE ANALOGY TO -- AND IF YOU HAVE A QUESTION --

THE COURT: YEAH. I DO HAVE A QUESTION.

MR. MEEKER: -- PLEASE GO AHEAD.

THE COURT: SO, WHAT I -- WHAT I UNDERSTOOD MR. XI TO SAY IS THAT IT IS THE COMBINATION OF THOSE DATASETS, THE SPECIFIC IDENTIFICATION OF THE DATASETS ON WHICH A MODEL IS TRAINED ITSELF EVEN IF THE INDIVIDUAL COMPONENTS ARE NOT PROPRIETARY OR TRADE SECRETS, THE FACT THAT THAT PARTICULAR MIX IS BEING USED CONSTITUTES A TRADE SECRET.

DO YOU AGREE OR DISAGREE?

MR. MEEKER: WE WOULD DISAGREE WITH THAT, YOUR HONOR.

I MEAN, WE AGREE WITH THE GENERAL PRINCIPLE THAT PUBLIC INFORMATION COMBINED IN A SPECIFIC WAY CAN BE A TRADE SECRET UNDER CERTAIN CIRCUMSTANCES.

BUT WE DON'T THINK THAT PLAINTIFF HERE HAS SHOWN THAT DISCLOSING THE INDIVIDUAL DATASETS AND THEIR SOURCES ALONE IS TANTAMOUNT TO REVEALING THE SECRET SAUCE BEHIND THEIR AI.

I MEAN, TRAINING THESE AI'S IS A COMPLICATED PROCESS.

AND, SO, EVEN IF WE WERE AWARE OF THE COMPONENT PARTS, IT WOULDN'T NECESSARILY REVEAL ALL OF THE INFORMATION ABOUT HOW THOSE PARTS ARE USED TOGETHER, WHAT THE WEIGHTS OF THOSE DATASETS ARE.

AND IN ADDITION THE INFORMATION THAT WE REQUIRE THEM TO REVEAL ABOUT THOSE DATASETS WOULDN'T NECESSARILY LEAD COMPETITORS TO FIND THEM OR INCORPORATE THEM INTO THEIR TRAINING.

AND WE THINK THAT THE SORTS OF LIMITED DISCLOSURES THAT AB 2013 CONTEMPLATES IS ENOUGH TO GIVE CONSUMERS SOME NOTICE ABOUT THE INGREDIENTS GOING INTO THEIR -- THEIR AI MODELS BUT NOT ENOUGH THAT IT'S FORCING A COMPANY TO REVEAL, SAY, THE RECIPE FOR COKE OR THE EXACT MIXTURE OF HERBS AND SPICES IN – IN THEIR KFC.

THE COURT: RIGHT.

BUT YOU WOULD AGREE THAT THERE DIDN'T -- NEEDN'T BE AN ACTUAL OR IMMINENTLY CONTEMPLATED ENFORCEMENT ACTION FOR THERE TO BE STANDING IN A PRE-ENFORCEMENT ACTION.

MR. MEEKER: WE THINK THAT THEY'RE -- WE AGREE THAT THE TEST REQUIRES THEM TO SHOW THAT THERE IS A THREAT OF ENFORCEMENT.

BUT HERE I -- WE WOULD – WE WOULD ARGUE THAT THAT THREAT IS SPECULATIVE JUST -- IN LIGHT OF THE FACT THAT THEY HAVE MADE THOSE -- THOSE DISCLOSURES.

THE COURT: WHAT DOES THAT MEAN TO YOU? -- A THREAT OR A POTENTIAL CREDIBLE THREAT OF THE PROSECUTION THEY'RE UNDER.

WHAT DOES THAT MEAN?

WHAT – WHAT HAS TO BE PRESENT IN ORDER FOR THAT TO BE TRUE?

MR. MEEKER: WELL, YOUR HONOR, I THINK THERE WOULD -- WE WOULD JUST SAY SOMETHING MORE THAN WE HAVE AT THIS POINT.

I MEAN, THE STATUTE IS LIVE. THEY'VE MADE DISCLOSURES PURSUANT TO THAT STATUTE.

AND I THINK PARTICULARLY IN THIS POSTURE WHERE THERE HASN'T BEEN A LETTER OR COMMUNICATIONS FROM THE ENFORCEMENT DIVISION LETTING THEM KNOW THAT THEIR DISCLOSURES ARE DEFICIENT FOR SOME REASON, EVEN IF STANDING WERE PROPER UNDER THAT POSTURE, WE WOULD STILL SAY THAT IT DEMONSTRATES AT LEAST THAT PRELIMINARY EMERGENCY INJUNCTIVE RELIEF ISN'T WARRANTED HERE.

THE COURT: OKAY.

SO, THE OTHER THING THAT HE SAID -- WHICH YOU TOUCHED ON BUT I WANT TO GET MAYBE A LITTLE BIT MORE SPECIFIC ON -- IS THAT THE FACT THE -- THE PRECISE -- THE PRECISE – THE DATABASES ON WHICH

THEY USE TO TRAIN THEIR MODELS, THE MAKES OF THOSE DATABASES EVEN THOUGH THEY'RE NOT INDIVIDUALLY PRIVATE INFORMATION. THEY'RE PUBLICLY AVAILABLE -- IT IS THE MIX THAT GIVES THEM EITHER A COMPETITIVE ADVANTAGE OR DISADVANTAGE DEPENDING ON WHAT THE PRODUCT IS.   AND – AND THAT IS SORT OF A TRADE SECRET.  SO, EVEN IF THE INDIVIDUAL COMPONENTS ARE NOT TRADE SECRETS, THE FACT THAT THEY'RE USING THAT MIX OF COMPONENTS TO TRAIN THE AI MODELS IS PROPRIETARY.

WHAT DO YOU – HOW DO YOU RESPOND TO THAT?

MR. MEEKER:  WE WOULD SAY THAT WE DON'T THINK THAT THE PLAINTIFF HERE HAS PROVIDED ENOUGH IN THEIR PLEADINGS OR IN THEIR DECLARATION TO SHOW THAT THE MIX THAT A.B. 2013 REQUIRES THEM TO DISCLOSE IS TANTAMOUNT TO REVEALING WHAT IT IS EXACTLY THAT MAKES UP AN AI MODEL.

I MEAN, CLEARLY THE DATA IS IMPORTANT.  AND THE INDIVIDUAL DATASETS THAT GO INTO IT ARE IMPORTANT.

BUT IN LIGHT OF THE FACT THAT THE STATUTE DOESN'T REQUIRE THEM TO ACTUALLY DISCLOSE ALL OF THE DATA WITHIN A DATASET, WE THINK THAT ACTUALLY AI HASN'T SHOWN THAT, WELL, JUST LISTING THE GENERAL CATEGORY OF INFORMATION WHERE THE DATASET CAME FROM, THAT THAT WOULD BE ENOUGH TO ALLOW A COMPETITOR TO REVERSE ENGINEER THE RECIPE THAT A COMPANY IS USING TO MAKE THEIR MODEL.

THE COURT:  DOES A.B. 2013 REQUIRE DISCLOSURE OF ALL DATA BASES USED TO TRAIN ANY AI MODEL?

MR. MEEKER: YOUR HONOR, I'D HAVE TO TAKE A LOOK AT THE STATUTE TO RECALL SPECIFICALLY. WE KNOW THAT IT DOES REQUIRE THEM TO LIST THE SOURCES OF THE DATASETS THAT THEY USE AS WELL AS A GENERAL RANGE OF THE NUMBER OF DATA POINTS WITHIN IT.

THE COURT: BUT IN YOUR MIND WHAT IS THE SOURCES OR OWNERS OF THE DATA BASES? WHAT DOES THAT MEAN?

MR. MEEKER: I THINK THAT WOULD MEAN THAT WE WOULD AT LEAST REQUIRE A GENERAL EXPLANATION OF -- SO, FOR EXAMPLE, MANY COMPANIES TROLL THE INTERNET OR USE PUBLICLY AVAILABLE INTERNET ARCHIVES AS SORT OF LIKE A BASIS TO BUILT THE START OF THEIR MODEL.

WE THINK DISCLOSURE OF THE EXISTENCE THAT THEY USE THAT DATA BASE. IF THEY WERE USING OTHER COMMERCIALLY AVAILABLE DATA BASES WE THINK THAT'S AN INDICATION THAT, YES, WE PURCHASED A DATA BASE FROM THIS COMPANY -- WITHOUT HAVING TO EXPLAIN PRECISELY HOW THEY WERE TRAINING THEIR MODEL ON THAT DATA OR SAY THE WEIGHTS ASSIGNED TO IT.

BUT, YES, WE DO THINK THAT THE STATUTE COULD CONTEMPLATE THAT -- THAT LEVEL OF DETAIL WHERE THEY SAY WE USE SETS X, Y, Z FROM X, Y, Z PLACES.

THE COURT: RIGHT.

SO, WHAT I THINK I'M HEARING IS THAT THE STATUTE REQUIRES A COMPANY TO DISCLOSE THE DATABASES IT USE IN A MANNER IN WHICH A COMPETITOR WOULD THEN BE ABLE TO SEE THOSE DISCLOSURES AND IDENTIFY THE SPECIFIC DATABASES THAT ARE BEING USED.

IS THAT --

MR. MEEKER:  I'M NOT SURE THAT IT GOES THAT FAR, YOUR HONOR.

BECAUSE I THINK REVEALING THE -- SAY THE GENERAL TYPE OF INFORMATION IN THE DATASET, WHICH IS ONE OF THE THINGS THE STATUTE REQUIRES, OR SAY THE SOURCES AND OWNERS OF THE DATABASE, THERE'S STILL ENOUGH GENERALITY IN THE REQUIREMENTS OF DISCLOSURE THAT IT WOULDN'T NECESSARILY PUT A  -- A COMPETITOR ON NOTICE THAT, OKAY.  THEY USE THIS PRECISE DATASET FROM THIS PRECISE COMPANY.   AND WE CAN BUILD IT ALL TOGETHER.

BUT I WOULD ALSO SAY THAT EVEN IF THAT LEVEL OF DISCLOSURE WOULD REQUIRE IT, I WOULD STILL SAY THAT AT THIS POSTURE AND AT THIS POINT IN THE CASE X.AI HASN'T SHOWN THAT. THAT INFORMATION ALONE WOULD DESTORY THEIR COMPETITIVE ADVANTAGE.

THE COURT:  AND THAT'S PARTIALLY BECAUSE WHAT YOU'RE MENTIONING IS IN THE PARTICULAR USE OF THAT DATABASE, THE WAY IT ASSIGNS TO DIFFERENT THINGS, THAT MIGHT BE DIFFERENT.   AND THAT MIGHT -- WILL NOT BE DISCERNABLE BY A COMPETITOR JUST BY LOOKING AT THE OWNER OR SOURCE OF THAT DATABASE.

MR. MEEKER:  THAT'S RIGHT, YOUR HONOR.

THE COURT:   ALL RIGHT.

OKAY.   IF YOU WANT -- IF YOU WANT TO SAY ANYTHING ELSE WITH THE – ON THE ISSUES THAT MR. XI TALKED ABOUT, YOU CAN DO SO NOW.   IF NOT, WE CAN GO ON.

MR. MEEKER:   YES, YOUR HONOR.

I WOULD JUST SAY ON THE POINT OF THE AVAILABILITY OF INJUNCTIVE RELIEF, YOU WOULD CERTAINLY GRANT THAT INJUNCTIVE RELIEF CAN BE AVAILABLE BUT ONLY WHEN A COMPENSATORY REMEDY IS NOT AVAILABLE.

AND, SO, THE FACT THAT IN OTHER CASES INJUNCTIVE RELIEF HAS BEEN AVAILABLE DOESN'T MEAN THAT INJUNCTIVE RELIEF IS AVAILABLE IN EVERY CASE.

IF YOU LOOK AT THE SPECIFIC SITUATIONS IN THE CASES THAT COUNSEL FOR PLAINTIFF CITED, YOU SEE THAT THOSE SITUATIONS ARE FACTUALLY INAPPOSITE TO WHAT WE HAVE HERE.

SO, FOR EXAMPLE, IN THE CEDAR POINT CASE, THE SUPREME COURT IN THAT CASE WASN'T DECIDING ON THE PROPRIETARY -- THE FEASIBILITY OF AN INJUNCTIVE RELIEF IN THAT CASE.

BUT IF YOU LOOK AT THE LOWER COURT DECISIONS, YOU SEE THAT IT WAS ESTABLISHED EARLY ON IN THE DISTRICT COURT LITIGATION -- THAT FOR WHATEVER REASON A COMPENSATORY REMEDY WAS NOT AVAILABLE, WHICH IS WHY INJUNCTIVE RELIEF WAS ON THE TABLE BY THE TIME IT GOT TO THE NINTH CIRCUIT AND THE SUPREME COURT.

AND PHARMACEUTICAL RESEARCHERS IS AN INTERESTING CASE.  I MEAN, ONE, WE WOULD SAY THAT IT'S OUT OF CIRCUIT SO ITS PERSUASIVE  VALUE IS LIMITED.  BUT IF YOU LOOK AT THE SPECIFIC CIRCUMSTANCES OF THAT CASE, YOU SEE THAT IT'S DISTINGUISHABLE.

I DON'T THINK YOU CAN DRAW A PRINCIPLE THAT A CONTINUING SERIES OF SUITS IS ENOUGH.  IN THAT CASE THE STATUTE AT ISSUE,

WHICH LED TO A TAKINGS, WAS A PROGRAM THAT REQUIRED PHARMACEUTICAL MANUFACTURERS TO GIVE FREE INSULIN TO CITIZENS WHO MET CERTAIN ELIGIBILITY REQUIREMENTS.

AND EVERY TIME SOMEONE MET THAT REQUIREMENT, THE COMPANY WAS THEN REQUIRED TO GIVE THAT PERSON FREE INSULIN. EACH OF THOSE COULD BE A NEW TAKING.

AND, SO, IN THAT SITUATION, HAVING TO FILE REPEATED LAWSUITS FOR EVERY NEW APPLICANT TO THE PROGRAM, THAT COULD BE A MULTIPLICITY OF SUITS THAT LEADS TO A LEGAL REMEDY BEING INFEASIBLE.

BUT THE STATUTORY SCHEMER ON A.B. 1213 WOULDN'T REQUIRE NEARLY THAT AMOUNT OF SUCCESSIVE LITIGATION. IT WOULD SIMPLY BE THAT EVERY TIME AN ALLEGED TRADE SECRET WAS DISCLOSED PURSUANT TO A NEW A.B. 2013 DISCLOSURE, A COMPANY LIKE X.AI COULD EASILY BRING A NEW SUIT. AND IT DOESN'T PROSE -- IT DOESN'T POSE THE SAME FEASIBILITY OR DISTRIBUTABILITY PROBLEMS AS THE PHARMACEUTICAL CASE.

THE COURT: UNDERSTOOD.

SO, LET'S MOVE ON THEN TO WHAT KIND OF TAKING THIS MIGHT BE. THERE'S QUITE AN ARGUMENT AND DISAGREEMENT IN THE BRIEFS ABOUT WHETHER OR NOT THIS IS A PER SE OR REGULATORY TAKING OR A SUBSET OF THE PER SE TAKINGS IDENTIFIED BY THE SUPREME COURT IN LINGLE.

SO, LET ME HEAR FROM THE PLAINTIFF AT THIS POINT. YOUR ARGUMENT IS BASICALLY THAT IT IS A PER SE TAKING BECAUSE IT FITS

UNDER THE – ONE OF THE TWO CATEGORIES IDENTIFIED IN LINGLE.

SPECIFICALLY THE CATEGORY IDENTIFIED BASICALLY DESCRIBED AS REGULATIONS THAT COMPLETELY DEPRIVE AN OWNER OF ALL ECONOMIC BENEFITS FOR USE OF THAT PROPERTY.

THAT IS STILL YOUR POSITION?

MR. XI:  THAT'S PART OF THE POSITION, YOUR HONOR.

THE COURT:  ALL RIGHT.

MR. XI:  PART OF THE POSITION IS IT DEPRIVES ALL BENEFICIAL USE OF THE TRADE SECRET.  BECAUSE WHEN THE TRADE -- WITH THE TRADE SECRET THE ONLY INTEREST IN THE BUNDLE OF STICK THAT MATTERS IS THE RIGHT TO EXCLUDE.  AND ONCE YOU -- ONCE YOU FORCE DISCLOSURE OF THE TRADE SECRET, YOU NO LONGER HAVE ANY TRADE SECRET WHATSOEVER.

SO, I DO THINK IT DEPRIVES THE TRADE SECRET OF ANY BENEFICIAL VALUE.

BUT SEPARATE AND APART FROM THAT, THERE'S THE CEDAR POINT VERSUS HASSID CASE, RIGHT.  SO, THAT WAS ABOUT -- THAT CASE SAID EVEN A TEMPORARY INTRUSION ON THE RIGHT TO EXCLUDE IS A PER SE TAKING.

AND, OF COURSE, LIKE I RECOGNIZE THAT THAT CASE DEALT WITH A PHYSICAL INTRUSION ON LAND.

BUT I ENCOURAGE YOUR HONOR TO READ JUDGE  SELLIER'S OPINION IN THE FIRST CIRCUIT EN BANC CASE WHERE HE EXPLAINS THAT THERE'S NO REAL LOGICAL OR LEGAL DISTINCTION BETWEEN AN APPROPRIATION OF THE RIGHT TO EXCLUDE WHEN IT COMES TO A TRADE

SECRET AND AN APPROPRIATION OF A RIGHT TO EXCLUDE WHEN IT COMES TO LAND.

IN FACT I THINK LIKE HERE THE ARGUMENT OR PER SE TAKING IS EVEN STRONGER BECAUSE AS I MENTION, WHEN YOU FORCE DISCLOSURE FOR TRADE SECRET, YOU NO LONGER HAVE A TRADE SECRET. THAT'S -- THAT COMPLETELY WIPES OUT – WIPES OUT THE TRADE SECRET, THE PROPERTY INTEREST AT ISSUE.

THE COURT: BUT YOU WOULD AGREE THAT TRADITIONALLY THE ANALYSIS AND THE DIFFERENCE BETWEEN A PER SE AND REGULATORY TAKING HAS GENERALLY BEEN WHETHER OR NOT THERE'S ACTUAL -- THE PROPERTY IS PHYSICALLY TAKEN FROM THE PLAINTIFF FOR THE USE OF BYTES, FOR THE SCALE FOR SOMEBODY ELSE VERSUS DEPRIVING OF THE USE OF THAT PROPERTY FOR ECONOMIC BENEFIT.

THAT'S BEEN THE TRADITIONAL SEPARATION BETWEEN THE TWO TYPES TAKINGS PER SE REGULATORY.

MR. XI: SO, I AGREE THAT THAT'S WHAT A LOT OF THEIR CASES -- THAT'S HOW IT BREAKS DOWN. BUT THERE ARE CASES THAT INVOLVE INTANGIBLE PROPERTY RIGHTS THAT ARE DESTROYED, THAT HAVE BEEN SUBSEQUENTLY UNDERSTOOD AS PER SE CASES. SO, WE CITE THE HODEL VERSUS IRVINE CASE, RIGHT.

SO, THAT CASE INVOLVED THE RIGHT TO DEVISE PROPERTY SO RIGHT TO DEVISE PROPERTY TO YOUR --

THE COURT: YEAH. BUT AT THE SAME TIME THE PROPERTY – THE REAL PROPERTY, PHYSICAL TANGIBLE PROPERTY WAS AT THE CORE AT ISSUE IN THAT CASE.

MR. XI: SURE.

THE COURT: SO, CAN YOU IDENTIFY FOR ME ANY CASE THAT IS HELD THAT IN THE CONTEXT OF A TRADE SECRET THE COURT IS DEEMED IT A PER SE TAKING VERSUS A REGULATORY TAKING.

MR. XI: WELL, I THINK JUDGE SELLIER'S CONCURRENCE IN THE – IN THE REILLY CASE IS ONE.

I ACTUALLY THINK RUCKELHAUS IS BETTER UNDERSTOOD AS A PER SE TAKINGS CASE.

NOW I KNOW LIKE IT CITED THE PENN CENTRAL FACTORS.

THE COURT: RIGHT.

MR. XI: BUT I THINK YOU HAVE TO KEEP IN MIND THAT THAT CASE WAS DECIDED IN 1984 WHEN ALL OF THE SUPREME COURT'S CASES DISCUSSED THE PENN CENTRAL FACTORS. YET A LOT OF THOSE CASES WERE SUBSEQUENTLY UNDERSTOOD AS PER SE TAKINGS CASES.

THE COURT: RIGHT. SO, YOU'RE SAYING THE RUCKELHAUS USE OF THE PENN STATE FACTORS DOES NOT NECESSARILY INDICATE THAT THAT COURT THOUGHT OF IT AS A PER SE VERSUS A REGULATORY TAKING?

MR. XI: THAT'S RIGHT, YOUR HONOR.

AND IN PART BECAUSE IF YOU TAKE A LOOK AT THE RUCKELHAUS DECISION, IT LISTS THE THREE FACTORS, BUT IT ULTIMATELY APPLIES ONLY ONE, RIGHT.

IT SAYS THE ONE FACTOR, THE REASONABLE INVESTMENT-BACKED EXPECTATIONS SO OVERWHELMED THE OTHER FACTORS THAT YOU DIDN'T EVEN NEED TO CONSIDER THE OTHER

FACTORS WHEN CONSIDERING WHETHER THERE'S A TAKING OR NOT JUST SO LONG AS YOU HAVE A REASONABLE INVESTMENT-BACKED EXPECTATION IN YOUR TRADE SECRET.   ONCE THAT TRADE SECRET IS DISCLOSED THAT IS A TAKING.

THAT SOUNDS A LOT LIKE A PER SE ANALYSIS TO ME.

BUT EVEN IF YOU DISAGREE WITH ME THAT THIS IS A PER SE TAKING, I DON'T THINK IT ULTIMATELY MATTERS.  IF YOU THOUGHT YOU HAD TO RUN THE ANALYSIS THROUGH THE PENN CENTRAL FACTORS, RUCKELHAUS TELLS YOU EXACTLY HOW TO DO THAT, RIGHT, IN THE CONTEXT OF A TRADE SECRET.

THE COURT:  RIGHT.

MR. XI:  AGAIN, RUCKELHAUS SAYS SO LONG AS YOU HAD – YOU HAVE INVESTMENT-BACKED EXPECTATIONS, AND THE GOVERNMENT FORCES YOU TO DISCLOSE THAT TRADE SECRET, YOU HAVE A TAKING.

AND I THINK THAT APPLIES HERE TOO.  EVEN MORE SO BECAUSE IN RUCKELHAUS THAT INVOLVED DISCLOSURE TO THE GOVERNMENT.

HERE WE HAVEN'T ACTUALLY DISCLOSED OUR TRADE SECRET TO ANYBODY.  WE HAVEN'T DISCLOSED OUR TRADE SECRET TO THE GOVERNMENT WITH THE UNDERSTANDING THAT THE GOVERNMENT MIGHT DISCLOSE IT TO THE PUBLIC.

HERE, LIKE, ALL THIS INFORMATION IS KEPT SECRET.

AND, SO, I THINK THERE'S NO QUESTON THAT WE HAVE REASONABLE INVESTMENT-BACKED EXPECTATIONS.

THE COURT:  SO, HOW DO YOU RECONCILE THE ANALYSIS THAT YOU JUST DESCRIBED IN RUCKELHAUS --

MR. XI:  YEAH.

THE COURT:  -- WITH THE NINTH CIRCUIT'S ANALYSIS IN STOLFI?

MR. XI:  LOOK, I DO – I DO THINK THERE'S SOME TENSION BETWEEN MY READING OF RUCKELHAUS AND THE NINTH CIRCUIT'S READING OF RUCKELHAUS.  BUT ULTIMATELY I THINK THAT DISCUSSION OF RUCKELHAUS IS LARGELY DICTA.

AND I THINK LIKE OF COURSE THE NINTH CIRCUIT REJECTED THE ARGUMENT THAT IT'S A PER SE TAKING BECAUSE YOU'VE DESTROYED ALL BENEFICIAL USE OF THE PROPERTY.

BUT IT DIDN'T ADDRESS THE DISTINCT ARGUMENT THAT AN APPROPRIATION OF THE RIGHT TO EXCLUDE IS A PER SE TAKING.  AND THAT'S – THAT'S THE CEDAR POINT ANALYSIS.  THE PLAINTIFF NEVER MADE THAT ARGUMENT IN THAT CASE.

AND, SO, I DON'T THINK -- I DON'T THINK STOLFI SAYS ANYTHING ABOUT THAT DISTINCT ARGUMENT THAT WE MADE HERE.

THE COURT:  BUT WHY WOULDN'T I FOLLOW STOLFI AND FIND THAT IN A – IN A -- OF TRADE SECRETS IT'S A REGULATORY NOT A PER SE TAKING?

MR. XI:  BECAUSE I THINK IT'S -- I THINK YOU HAVE TO READ STOLFI IN CONTEXT OF THE SUPREME COURT'S DECISION IN CEDAR POINT NURSERY VERSUS HASSID.

AGAIN, LIKE I THINK HASSID SAYS – IT SAYS LIKE WHEN YOU HAVE AN APPROPRIATION OF THE RIGHT TO EXCLUDE, WHICH IS THE MOST CRITICAL STICK IN THE BUNDLE OF STICKS, AND THAT'S ESPECIALLY SO WITH RESPECT TO TRADE SECRETS, RIGHT.  IT'S LIKE THE ONLY STICK

IN THE BUNDLE OF STICKS THAT MATTERS. LIKE THAT'S – THAT'S A PER SE TAKING.

AND, SO, LIKE I UNDERSTAND STOLFI IS A VERY GOOD CASE FOR THE STATE, BUT I DON'T THNK IT APPLIES HERE. I THINK IT'S DISTINGUISHABLE.

THE COURT: VERY WELL.

SO, I GET YOUR ARGUMENT.

ANY RESPONSE BY THE -- MR. MEEKER?

SO, ADDRESS WHETHER OR NOT OBVIOUSLY YOU THINK THIS IS A REGULATORY TAKING. AGAIN, WHAT EFFECT THAT HAS ON THE ANALYSIS OF WHETHER PLAINTIFF PREVAILS IN THIS CASE.

MR. MEEKER: WELL, WE THINK IT LEADS TO THE SAME ULTIMATE OUTCOME. WE THINK THAT THERE IS NOT A TAKING HERE.

AND IN CONSIDERING WHETHER THERE HAS BEEN A REGULATORY TAKING, I THINK STOLFI IS ACTUALLY A GOOD CASE TO LOOK AT TO CONSIDER WHAT X.AI NEEDS TO PROVE IN THIS POSTURE.

IN STOLFI BECAUSE THE PLAINTIFFS WERE BRINGING A FACIAL CHALLENGE AGAINST THE DISCLOSURE STATUTE AT ISSUE, THE COURT HIGHLIGHTED THAT THEY WOULD NEED TO SHOW THAT EVERY POSSIBLE APPLICATION OF THE STATUTE WOULD LEAD TO A TAKING.

AND, OF COURSE, HERE X.AI DISCLAIMS AN OFFICIAL CHALLENGE. THEY ARE NOT SEEKING RELIEF AS TO OTHER COMPANIES. BUT THEY ARE ARGUING THAT EVERY APPLICATION OF THE STATUTE AS TO X.AI IS UNCONSTITUTIONAL. THEY CONTEND THAT THEY SHOULDN'T BE ABLE TO – THAT THEY SHOULDN'T BE REQUIRED TO MAKE ANY

DISCLOSURES AT ALL.

SO, WHEN YOU'RE LOOKING AT THE THREE PENN CENTRAL FACTORS, WE THINK THAT X.AI WOULD NEED TO SHOW THAT UNDER EVERY POSSIBLE APPLICATION OF THE LAW THE DISCLOSURES UNDER A.B. 2013 AMOUNT TO A REGULATORY TAKING.

AND AS STOLFI DEMONSTRATED, THAT'S A HIGH BURDEN BECAUSE THERE ARE ANY NUMBER OF DISCLOSURES THAT COULD BE MADE UNDER A.B. 2013 AND THAT COULD PASS MUSTER UNDER THE STATUTE.

THE COURT: OKAY. ALL RIGHT.

LET'S GO ON TO SPEECH AND WHAT KIND OF SPEECH THIS IS.

THERE'S ALSO A DISPUTE WHETHER OR NOT THIS CONSTITUTES COMMERCIAL VERSUS – I GUESS COMMERCIAL-COMPELLED SPEECH VERSUS VIEWPOINT SPEECH.

ADDRESS THAT.

MR. XI: SURE.

SO I THINK THE STATUTE TRIGGERS STRICT SCRUTINY FOR MULTIPLE REASONS.

SO, THE FIRST REASON IS BECAUSE IT COMPELS SPEECH.

AND I TAKE THE STATE TO BE CONCEDING THAT WHEN IT COMES TO COMPELLED SPEECH, THE TYPICAL RULE IS STRICT SCRUTINY. AND THAT'S BECAUSE WHEN YOU'RE COMPELLING SOMEONE TO SAY SOMETHING, YOU'RE ALTERING THE CONTENT OF THEIR SPEECH. THAT'S THE NIFFAL CASE.

AND THEN THE HURLEY CASE AND THE – AND THE REILLY CASE

Dorothy Babykin Courthouse Services
1218 Valebrook Place • Glendora, CA 91740 • 626.963.0566 • dotnisbet@aol.com

**ER63**

MAKE CLEAR THAT IT DOESN'T MATTER WHETHER YOU'RE COMPELLING A STATEMENT OF OPINION OR A STATEMENT OF FACT. EVEN IF YOU'RE COMPELLING A STATEMENT OF FACT, YOU'RE STILL ALTERING THE CONTENT OF THE SPEAKER'S SPEECH. AND, THEREFORE, THAT TRIGGERS – THAT'S A CONTENT-BASED REGULATION THAT TRIGGERS STRICT SCRUTINY.

NOW, I THINK THE STATUTE IS ALSO CONTENT BASED, SPEAKER-BASED AND VIEWPOINT BASED. SO, IT TRIGGERS STRICT SCRUTINY FOUR TIMES OVER.

AND WITH RESPECT TO SPEAKER AND CONTENT DISTINCTIONS, THE STATUTE EXPLICITLY SINGLES OUT AI COMPANIES WITH THE SOLE PURPOSE OF PROVIDING INFORMATION WITH REGARD TO THE NATIONAL DEFENSE OR WITH REGARD TO SECURITY INTEGRITY.

AND I THINK THAT'S ALMOST CERTAINLY -- THAT'S CERTAINLY A SPEAKER-BASED DISTINCTION WHICH THE SUPREME COURT HAS TOLD US IS A STRONG INDICATION THAT IT'S ALSO CONTENT BASED.

AND THEN IT EXPLICITLY DISTINGUISHES ON THE BASIS OF CONTENT TOO. BECAUSE OUTPUTS WITH RESPECT TO SECURITY, INTEGRITY AND NATIONAL SECURITY – I MEAN THAT DOESN'T TRIGGER THE STATUTE, BUT EVERYTHING ELSE DOES.

AND THEN WITH RESPECT TO VIEWPOINT DISCRIMINATION, HERE THE STATE HAS STATED ON THE RECORD THAT THE PURPOSE OF THE STATUTE IS TO SUSS OUT BIAS.

AND AS CASES LIKE MATTEL VERSUS TAM, AS IANCU VERSUS BRUNETTI EXPLAIN, LIKE, THAT'S – THAT'S A VIEWPOINT – THAT'S

VIEWPOINT-BASED DISCRIMINATION.

IANCU INVOLVES -- IANCU SAID TARGETING DISPARAGING SPEECH IS VIEWPOINT DISCRIMINATION.

I THINK YOU'RE TARGETING BIASED SPEECH. IT'S ALSO VIEWPOINT DISCRIMINATION.

SO, I THINK THE STATUTE ALSO HAS A VIEWPOINT-BASED PURPOSE.

AND AS CASES LIKE CITY OF AUSTIN OR REED MAKE CLEAR, WHEN YOU HAVE A VIEWPOINT-BASED PURPOSE THAT'S VIEWPOINT DISCRIMINATION.

NOW, THE STATE SAYS, WELL, YOU KNOW, WE FALL INTO ONE OF THESE EXCEPTIONS, RIGHT. AND IT POINTS TO ZAUDERER AND THE COMMERCIAL SPEECH DOCTRINE. BUT I JUST THINK THAT'S NOT REALLY APPLICABLE, RIGHT.

SO, I THINK THOSE DOCTRINES INVOLVE -- AND STOLFI ACTUALLY HAS A GOOD PARAGRAPH ABOUT THIS. WHEN THE SPEAKER IS OTHERWISE VOLUNTARILY ENGAGING IN COMMERCIAL SPEECH, SUCH AS WHEN YOU'RE ADVERTISING A PRODUCT OR WHEN YOU'RE ENGAGING IN SPEECH AT THE POINT OF SALE THROUGH YOUR PRODUCT LABEL, THE GOVERNMENT CAN SOMETIMES COME IN AND REQUIRE FACTUAL NON-CONTROVERSIAL DISCLOSURES TO, ONE, EITHER CORRECT MISLEADING STATEMENTS ON THE LABEL -- THAT'S ZAUDERER. THAT'S HOW THE SUPREME COURT HAS APPLIED ZAUDERER.

OR, TWO, IMPOSE SOME SAFETY AND – HEALTH AND SAFETY WARNINGS ON THE LABEL. AND THAT'S A NINTH CIRCUIT SPECIFIC RULE.

THAT'S NOT BEEN ADOPTED BY THE SUPREME COURT YET.

BUT I DON'T READ ANY OF THOSE CASES AS SAYING WHEN I'M NOT OTHERWISE ENGAGED IN A COMMERCIAL SPEECH, YOU CAN COMPEL ME TO GIVE YOU COMMERCIAL SPEECH. I DON'T SEE ANY CASE LIKE THAT. AND NONE OF THE CASES THAT THE STATE HAS CITED SAY THAT.

AND, SO, I JUST DON'T THINK LIKE THE EXCEPTIONS THEY POINT TO ARE REALLY APPLICABLE IN THAT SENSE.

THE COURT: SO, YOUR ARGUMENT IS BASICALLY BECAUSE THIS STATUTE COMPELS SPEECH THAT WOULDN'T OTHERWISE BE DISCLOSED --

MR. XI: YEAH.

THE COURT: -- AS OPPOSED TO MODERATING ALREADY EXPRESS SPEECH THAT IT'S NOT COMMERCIAL SPEECH.

MR. XI: RIGHT.

IT'S – IT'S -- AND I THINK LIKE IT'S WORTH PAUSING TO POINT OUT THE REMARKABLE CONSEQUENCES OF THE STATE'S POSITION.

I TAKE THEIR POSITION TO BE SO LONG AS THE STATE IS COMPELLING YOU TO TALK ABOUT YOUR PRODUCT, IT CAN COMPEL YOU TO SAY ANYTHING, EVEN IF YOU'RE NOT OTHERWISE ENGAGING IN ANY COMMERCIAL SPEECH YOURSELF. IF I'M NOT OTHERWISE ADVERTISING MY PRODUCT, THE STATE CAN COME IN AND TELL GENERAL MOTORS, YOU KNOW, YOU HAVE TO TELL US WHERE DO YOU SOURCE YOUR CAR PARTS. WHERE DID YOUR ENGINEERS GO TO COLLEGE.

LIKE ALL THIS INFORMATION ABOUT THE PRODUCT. AND UNDER THE STATE'S VIEW THAT WOULD BE COMMERCIAL SPEECH.

AND I THINK THAT THAT POSITION HAS ACTUALLY BEEN SQUARELY REJECTED BY THE X. CORP. VERSUS BONTA CASE.

AND, SO, YOU KNOW, WITH THE COURT'S INDULGENCE I'LL JUST POINT TO A PARTICULAR PASSAGE THAT I THINK IS ESPECIALLY ON POINT. AND THIS IS ON PAGE 902 OF THE DECISION.

THERE THE STATE ARGUED, AND I QUOTE FROM THE OPINON,

"LOWER SCRUTINY APPLIES BECAUSE IT IS – THE STATUTE IS ONLY A TRANSPARENCY MEASURE ABOUT THE PRODUCT."

AND THE NINTH CIRCUIT FOUND THAT REASONING, IN QUOTE, "UNTENABLE" BECAUSE IT WOULD MEAN THAT BASICALLY ANY COMPELLED DISCLOSURE BY ANY BUSINESS ABOUT ITS ACTIVITIES WOULD BE COMMERCIAL AND SUBJECT TO A LOWER TIER OF SCRUTINY.

THE COURT SAID THAT'S UNTENABLE.

AND THEN AT FOOTNOTE 10, THE COURT SAYS, "FOR SUBSTANTIALLY THE SAME REASON, NOR CAN THE TEST FOR WHETHER SPEECH IS COMMERCIAL OR NON-COMMERCIAL TURN ON WHETHER THE SPEECH IS DIRECTED TO POTENTIAL CONSUMERS AND MAY PRESUMABLY PLAY A ROLE IN THE DECISION OF WHETHER TO USE THE PLATFORM.

AND IT GIVES AN EXAMPLE.

"CONSIDER, FOR EXAMPLE, A STATE LAW THAT COMPELS A SOCIAL MEDIA COMPANY TO DISCLOSE THE POLITICAL AFFILIATIONS OF ITS MANGERS. THAT INFORMATION COULD CONCEIVABLY PLAY A ROLE IN THE POTENTIAL CONSUMER'S DECISION ABOUT WHETHER TO USE THE PLATFORM, I.E., IF THE CONSUMER IS CONCERNED ABOUT THE PLATFORM'S CONTENT BEING POLIITCALLY SKEWED."

BUT IT COULD NOT BE THAT SUCH A LAW COMPELS ONLY COMMERCIAL SPEECH SUBJECT TO A LOWER TIER SCRUTINY.

I THINK THAT'S EXACTLY WHAT THE STATE IS TRYING TO DO HERE. IT'S TRYING TO FORCE US TO DISCLOSE INFORMATION ABOUT OUR PRODUCT IN ORDER TO SUSS OUT POLITICAL BIAS.

AND, FRANKLY, I JUST DON'T THINK THAT'S – THAT'S PERMISSIBLE AFTER – AFTER X CORP.. CERTAINLY NOT COMMERCIAL SPEECH EVEN IF -- EVEN IF YOU READ THE STATE'S CASES FOR ALL THEIR WORTH.

I ALSO JUST WANT TO POINT TO LIKE EVEN IF YOU THINK INTER MEDIA SCRUTINY OR EVEN ZAUDERER SCRUTINY APPLIES. LIKE, THIS STATUTE FLUNKS -- FLUNKS INTER MEDIA SCRUTINY AND EVEN ZAUDERER SCRUTINY, RIGHT.

SO, THE STATE'S PRINCIPAL INTEREST THAT IT HAS ASSERTED IS TRANSPARENCY. THEY WANT TO SUSS OUT BIAS.

BUT IF THAT'S WHAT THE STATUTE WANTS TO DO THIS IS A TERRIBLE WAY TO DO IT, RIGHT.

I MEAN, IF YOU WANT TO SUSS OUT BIAS IN AN AI PRODUCT, YOU ASK THE AI PRODUCT QUESTIONS, AND THEN YOU ASSESS ITS ANSWERS.

IT'S THE SAME THING YOU WOULD DO IF YOU WANT TO ASSESS BIAS IN ANY NEW SOURCE, RIGHT. YOU READ THE ARTICLE. IF YOU WANT TO KNOW IF WHETHER THE NEW YORK TIMES OR THE L.A. TIMES IS BIASED, YOU READ THE ARTICLE. YOU DON'T ASK WHERE DID YOUR JOURNALISTS GO TO SCHOOL. WHAT INFORMATION WERE THEY TRAINED ON. DID THEY READ KARL MARX OR ADAM SMITH IN COLLEGE.

I MEAN, THAT WOULDN'T TELL YOU ANYTHING ABOUT WHETHER THEY ARE ACTUALLY BIASED. IT'S BETTER – IT'S MUCH MORE STRAIGHTFORWARD TO ACTUALLY JUST READ THE ARTICLE AND ASSESS YOURSELF WHETHER THE OUTPUTS ARE BIASED OR NOT.

THE COURT: YOU KNOW, ONE OF THE THINGS THAT I WAS THINKING ABOUT –

MR. XI: YEAH.

THE COURT: -- WHEN I WAS READING THE BRIEFS WAS SUPPOSE YOU HAD THIS AI MODEL, CAN YOU ASK IT IDENTIFY ALL DATABASES ON WHICH YOU WERE USED TO TRAIN.

WHAT WOULD THE ANSWER BE?

MR. XI: I'M SORRY?

I --

THE COURT: IF YOU ASKED THE MODEL --

MR. XI: YEAH.

THE COURT: -- TELL ME ALL THE DATABASES ON WHICH YOU WERE TRAINED.

MR. XI: YEAH.

THE COURT: WHAT WOULD IT SAY?

MR. XI: SO, I ACTUALLY TRIED THAT WITH GROK. AND IT WOULDN'T TELL US. BECAUSE IT SAID IT WAS PROTECTED, CONFIDENTIAL INFORMATION.

AND, SO, LOOK, I MEAN I THINK THERE'S A FUNDAMENTAL INCONSISTENCY WITH THE STATE'S POSITION THAT I WANT TO POINT OUT, RIGHT. SO, IF THE STATE'S GOAL IS TO SUSS OUT BIAS, THEN, YOU NEED

MUCH MORE DETAILED INFORMATION THAN JUST A HIGH-LEVEL SUMMARY OF THE DATASETS IN WHICH THE MODEL WAS TRAINED, RIGHT.

IT DOESN'T REALLY TELL –

THE COURT:  WELL, I THINK THE – I THINK THE STATE'S GOAL IS –

MR. XI:  YEAH.

THE COURT:   -- YEAH, MAYBE THAT, BUT I THINK IT'S ALSO A LOT MORE BROAD THAN THAT.  IT'S SORT OF GIVING THE CONSUMER MORE INFORMATION ABOUT WHAT GOES INTO THE ANSWER THAT'S BEING GENERATED BY THAT MODEL.  IT MIGHT BE BIASED.  IT MIGHT BE SOMETHING ELSE.  IT'S MIGHT BE COMPREHENSIVENESS.  IT MUST BE A LEVEL OF DETAIL.  IT MIGHT BE WHETHER TO USE THIS SOURCE OR THAT SOURCE.

IT'S NOT NECESSARILY BIASED.

MR. XI:  SURE.

THE COURT:   IT'S SORT OF AN OVERALL ASSESSMENT OF THE QUALITY OF THE INPUT WHICH PRODUCES THE OUTPUT.

MR. XI:  THAT'S A FAIR POINT.

BUT I THINK EVEN THERE LIKE IF WHAT YOU'RE TESTING IS ACCURACY OF THE PRODUCT, OR WHETHER THE ANSWERS ARE COMPREHENSIVE, THE BEST WAY TO DO THAT IS TO READ THE OUTPUT, RIGHT.

I DON'T KNOW -- LIKE THE ONLY WAY YOU CAN ACTUALLY --

THE COURT:  WELL, I MEAN, HOW WOULD READING THE OUTPUT GIVE YOU AN INDICATION OF WHAT DATABASES WERE USED TO GENERATE THAT OUTPUT.

MR. XI: WELL, I THINK READING THE OUTPUT --

THE COURT: IT COULD BE A MODEL THAT USES ONE DATABASE. AND IT'S A TOTALLY FLAWED DATABASE. AND IT WILL GIVE YOU A FLAWED ANSWER, RIGHT. AND THEN YOU WOULDN'T KNOW THAT THE ANSWER IS FLAWED BECAUSE YOU WOULDN'T KNOW WHAT DATABASES IT WAS TRAINED ON.

MR. XI: WELL, I THINK YOU WOULD – YOU WOULD TEST THE ANSWERS.

I MEAN, THE STATE IS ASSUMING THAT A CONSUMER IS GOING TO BE ABLE TO LOOK AT THE DISCLOSURES ABOUT THE DATABASE AND TELL SOMETHING ABOUT THE COMPANY. IF THAT'S WHAT THEY -- IF THAT'S WHAT THEY'RE ASSUMING. I DON'T KNOW WHY THEY CAN'T ASSUME THAT A USER OF ONE OF THESE PRODUCTS CAN LOOK AT THE OUTPUTS AND ASSESS WHETHER IT'S BIASED, WHETHER IT'S COMPREHENSIVE, WHETHER IT'S ACCURATE --

THE COURT: WELL, WE HAVE LAWYERS SUBMITTING STUFF TO US THAT, YOU KNOW, OBVIOUSLY NOT TESTING BECAUSE THEY'RE SUBMITTING IT. IT'S AI GENERATED. IT'S NOT CORRECT.

I MEAN, I THINK YOU GIVE THE CONSUMER TOO MUCH CREDIT.

ONCE THEY USE A MODEL, THEY TEND TO TWIST THAT MODEL. AND I HAVE TO SCRUTINIZE THE ANSWER. THAT'S THE ANSWER HE GAVE. SO, THEY RELY ON IT.

MR. XI: SURE. THAT'S FAIR.

I MEAN, A USER OF AN AI PRODUCT MAY NOT NECESSARILY ALWAYS TEST THE OUTPUTS.

THE COURT: RIGHT.

MR. XI: BUT -- BUT --

THE COURT: IF I GO INTO WIKIPEDIA OR GOOGLE, YOU KNOW, I TEND TO TRUST WHAT IT HAS GENERATED AND NOT NECESSARILY QUESTION WHERE WIKIPEDIA GOT ALL ITS INFORMATION.

MR. XI: YEAH. BUT I GUESS MY POSITION IS IT'S A LOT EASIER TO TEST WHETHER THE AI COMPANY IS HALLUCINATING CASE CITES. YOU JUST GO ON WESTLAW AND LOOK AT THE CASE CITES.

THE COURT: RIGHT.

MR. XI: VERSUS ACTUALLY LOOKING AT THE DATASETS TO TRY TO – A HIGH-LEVEL SUMMARY OF THE DATASETS TO TRY TO DISCERN SOMETHING ABOUT WHETHER THE PROJECT IS GOING TO BE BIASED OR NOT OR WHETHER IT'S GOING TO BE ACCURATE OR NOT.

AND KEEP IN MIND THAT LIKE, YOU KNOW, JUST BECAUSE AN AI COMPANY IS TRAINED ON PARTICULAR DATA, DATASETS FROM -- WITH ONE PARTICULAR POINT OF VIEW OR ANOTHER, THAT DOESN'T ACTUALLY TELL YOU WHETHER THE ULTIMATE PROJECT IS GOING – THE ULTIMATE OUTPUT IS GOING TO BE BIASED OR ACCURATE.

THE SAME WAY LIKE KNOWING THAT A --

THE COURT: WHY DOESN'T IT TELL YOU?

MR. XI: WELL, IT'S THE SAME – SAME REASON FOR WHY, YOU KNOW, KNOWING THAT A REPORTER WAS A COMMUNISM MAJOR DOESN'T TELL WHETHER HE'S GOING TO BE A COMMUNIST WHEN HE'S REPORTING, RIGHT.

THERE'S LOTS OF THINGS THAT GO INTO WHETHER – WHETHER

THE OUTPUTS ARE ACCURATE OR NOT, SEPARATE AND APART FROM THE DATA, RIGHT.

SO --

THE COURT:  I MEAN, THAT'S A MAJOR.  THAT'S A NEW MAJOR.

(LAUGHTER.)

MR. XI:  YEAH.  I WAS JUST --

(LAUGHTER.)

MR. XI:  YEAH.   BUT LIKE IF – IF -- YOU KNOW, LIKE JUST BECAUSE SOME --

THE COURT:  I UNDERSTAND YOUR POINT.

MR. XI:  YEAH.  JUST BECAUSE SOME OF THE DATASETS THAT AN AI COMPANY USES MIGHT HAVE A POLITICAL POINT OF VIEW -- I MEAN, X.AI DOES A LOT AND IT WORKS REALLY HARD TO TRY TO TRAIN GROK TO UNDERSTAND THIS IS A BIASED POINT OF VIEW.  THIS PARTICULAR DATASET HAS THIS POINT OF VIEW.

AND, SO, IT TRAINS ITS MODEL TO CORRECT FOR THOSE BIASES AND DEFICIENCIES SUCH THAT LIKE WHEN YOU ULTIMATELY HAVE THE OUTPUT IT'S NOT BIASED AND IT'S ACCURATE AND PRETTY COMPREHENSIVE.

THE COURT:  LET ME HEAR FROM THE STATE ON THOSE POINTS.

MR. XI:   YEAH.

THE COURT:  SO, ONE OF THE CASES THAT THEY BROUGHT UP WAS X CORP. VERSUS BONTA.

HOW DO YOU THINK THAT CASE IS DISTINGUISHABLE FROM THIS?

MS. LISKA: OF COURSE, YOUR HONOR.

AND I THINK I WANT TO MAKE CLEAR AT THE ONSET JUST A GENERAL POINT. AND THEN I WILL DEFINITELY GET MOVED TO THE X.AI – OR THE XCORP. CASE -- LOT OF X'S INVOLVED.

I THINK IT'S IMPORTANT TO KEEP IN MIND THAT THE QUESTION ABOUT WHETHER OR NOT PALL MALLS COMMERCIAL SPEECH IS VERY FACT SPECIFIC.

AND WE ARE CERTAINLY NOT ARGUING THAT ANY TIME A LAW REQUIRES DISCLOSURES THAT MIGHT BE CONNECTED TO A PRODUCT, IT'S AUTOMATICALLY COMMERCIAL SPEECH AND WITHIN THE SCOPE OF KUMAR.

I THINK THE QUESTION IS WHAT SPECIFIC FACTUAL DISCLOSURES -- WHAT SPECIFIC DISCLOSURES ARE REQUIRED, WHAT'S THE NATURE OF WHAT THE COMPANY MUST SAY. AND IS THAT SPECIFIC THING COMMERCIAL SPEECH.

AND THAT'S WHY I THINK THE XCORP. CASE IS VERY DIFFERENT FROM WHAT'S GOING ON HERE.

YOU KNOW, THE NINTH CIRCUIT SAYS IN THE XCORP. CASE THAT REALLY THE THRUST OF WHAT WAS HAPPENING IS THAT THE STATE WAS REQUIRING COMPANIES TO USE VERY POLITICALLY CHARGED CONTROVERSIAL LABELS AND TO DEFINE CERTAIN THINGS IN WAYS THAT TREADED INTO IDEOLOGICAL DISPUTES, POLITICAL DISPUTES.

IT WASN'T SIMPLY A PURELY FACTUAL QUESTION LIKE HOW MANY DATA POINTS ARE IN YOUR DATASET. IT HAD TO DO WITH THINGS LIKE HOW ARE YOU GOING TO ADDRESS HATE SPEECH ON YOUR

PLATFORM. WHAT IS HATE SPEECH. A COMPANY HAS TO TAKE A POSITION ON WHAT HATE SPEECH IS TO BEGIN TO ANSWER IT IN PART BECAUSE THE COURT POINTS OUT SOME OF THOSE TERMS WERE NOT DEFINED IN THE STATUTE.

SO, IF I AM A SOCIAL MEDIA PLATFORM, AND I HAVE TO SAY HOW WE ADDRESS HATE SPEECH, I HAVE TO ACTUALLY SAY WHAT WE THINK HATE SPEECH IS WHICH ISN'T SIMPLY DISCLOSING, FOR INSTANCE, WHAT IS THE PROCEDURE BY WHICH YOU REVIEW A COMPLAINT A CONSUMER SENT. BUT IT'S WHAT'S YOUR POSITION ON SOMETHING THAT IS A VERY CONTROVERSIAL ISSUE.

THE COURT: RIGHT. SO, YOU DON'T HAVE TO MAKE A VALUE JUDGMENT AS TO THE NATURE OF WHAT'S BEING DISCLOSED. YOU JUST HAVE TO DISCLOSE IT.

MS. LISKA: CORRECT.

AND I THINK IF YOU LOOK SPECIFICALLY AT WHAT WAS REQUIRED TO BE DISCLOSED -- AND WE ALSO POINT OUT, YOUR HONOR, OF COURSE, YOU KNOW YOU HAVE FLEXIBILITY IF YOU WERE TO ENJOIN ANYTHING AND CAN TAILOR AN INJUNCTION TO ADDRESS SPECIFIC SECTIONS.

SOME OF THESE ARE JUST CLEARLY VERY FACTUAL QUESTIONS.

DOES THE DATA SAY – INCLUDE INFORMATION THAT WAS PURCHASED OR LICENSED. DOES IT INCLUDE SYNTHETIC INFORMATION. DOES IT INCLUDE AGGREGATE CONSUMER INFORMATION.

THOSE ARE VERY FACTUAL QUESTIONS. THERE'S NOTHING CONTROVERSIAL. THERE'S NOTHING, YOU KNOW, WADING INTO HOT

BUTTON ISSUES.  THIS IS JUST VERY FAR AFIELD FROM THE OTHER NETCHOICE CASE AND THE X CORP. CASE THAT WERE CITED THAT DID INVOLVE QUESTIONS THAT ARE TAKING POSITIONS ON CONTROVERSIAL ISSUES ADDRESSING CONTROVERSIAL ISSUES NOT WHAT IS IN YOUR DATASET IN A VERY FACTUAL WAY.

AND I ALSO LIKE TO EMPHASIZE TOO, YOU KNOW, WE REALLY ARE IN A PRE-ENFORCEMENT POSTURE HERE.  AND WE'RE NOT DEALING WITH A STUATION WHERE THERE'S SOMETHING VERY SPECIFIC THE STATE HAS SAID YOU MUST DISCLOSE THIS SPECIFIC SENTENCE.

AND X HAS COME IN -- OR X.AI HAS COME IN AND SAID WE DON'T WANT TO DISCLOSE THIS SPECIFIC THING.  THEY'RE CHALLENGING THIS LAW AS A WHOLE.

AND I THINK THAT THAT IS SALIENT BECAUSE, YOU KNOW, ON THE FACE OF THE STATUTE A LOT OF – EVERYTHING WHAT'S IN HERE IS HIGH-LEVEL SUMMARIES OF VERY FACTUAL INFORMATION.

AND MAYBE THERE MIGHT BE SOME SPECIFIC DISCLOSURE IF WE HAD AN ENFORCEMENT SITUATION WHERE A VERY SPECIFIC THING WAS REQUIRED THAT MAYBE THERE'S AN ARGUMENT THAT SPECIFIC THING STARTS TO WADE INTO THE ISSUES GOING ON IN THE SORT OF CORP. CONTEXT, THE DEBT CHOICE CONTEXT.

BUT I JUST DON'T THINK WE'RE HERE AT THIS TIME ON THIS STATUTE.

THE COURT:  I TEND TO AGREE WITH THAT ACTUALLY.

ALL RIGHT.  LET'S MOVE ON TO VAGUENESS.

AND GIVE ME YOUR SORT OF ENCAPSULATED ARGUMENT –

YOUR ARGUMENT AS TO WHY YOU THINK THE STATUTE IS VAGUE.

MR. XI: SURE. A COUPLE OF ARGUMENTS, YOUR HONOR.

SO, THE FIRST IS WE JUST DON'T REALLY KNOW WHAT A HIGH-LEVEL SUMMARY MEANS.

I THINK A LOT OF THE COLLOQUY TODAY JUST UNDERSCORES THAT THE STATE ACTUALLY HASN'T EVEN TAKEN THE POSITION ON WHAT A HIGH-LEVEL SUMMARY MEANS.

WHEN THE STATUTE ASKED US TO DISCLOSE AT A -- A HIGH-LEVEL SUMMARY OF THE SOURCES, DOES THAT MEAN WE CAN JUST SAY, WELL, WE GATHER OUR SOURCES FROM THE INTERNET. WE GATHER OUR SOURCES FROM UNNAMED THIRD PARTIES. NOT CLEAR.

OR DOES IT REQUIRE SOMETHING MORE SPECIFIC, LIKE, YOU KNOW, WE GET OUR INFORMATION FROM CERTAIN HOSPITALS OR CERTAIN -- AND LAW FIRMS OR – OR CERTAIN MATH COMPETITIONS.

AGAIN, THE STATUTE IS NOT CLEAR.

OR DOES IT REQUIRE US TO IDENTIFY SPECIFICALLY BY NAME THE PARTICULAR SOURCES OF THE DATASETS.

DOES IT -- DOES IT REQUIRE US TO SAY WELL, WE GATHER LEGAL BRIEFS FROM LIKE KIRKLAND & ELLIS OR, YOU KNOW, MEDICAL DATA FROM THE UCLA HOSPITAL.

AGAIN, LIIKE THE STATUTE DOESN'T PROVIDE ANY GUIDANCE AS TO THAT.

THE COURT: SO, YOUR – YOUR CLIENT, YOU KNOW, READ THE STATUTE I PRESUME OR ITS LEGAL COUNSEL DID. AND -- AND THEY MADE AN ASSESSMENT AS TO WHAT SHOULD BE DISCLOSED.

MR. XI:   YEAH.

THE COURT:   AND BASED ON THAT ASSESSMENT DISCLOSED WHAT WAS DISCLOSED, RIGHT?

MR. X:  YEAH.

BUT I THINK LIKE THE STATE WON'T EVEN TELL US WHETHER THAT'S SUFFICIENT OR NOT  --

THE COURT:   RIGHT.

MR. X:  -- RIGHT.

AND THE FACT THAT THE STATE CAN'T EVEN TELL US THAT, I THINK JUST SUGGESTS THAT THERE'S  -- THERE'S GOT BE SOMETHING WRONG WITH THIS.

AND -- AND, LOOK, I MEAN, WHEN IT COMES TO FIRST AMENDMENT RIGHTS YOU'VE GOT TO LEGISLATE WITH MORE -- MORE— MORE SPECIFICITY THAN WHAT THE STATE HAS HERE.

AND, SO, THE STATUTE ALSO DOESN'T REALLY DEFINE WHAT IT MEANS FOR SOMETHING TO BE A DATASET OR A DATA POINT, RIGHT.   LIKE DOES IT --

THE COURT:   THOSE ARE NOT COMMON TERMS IN THE INDUSTRY WHICH A NORMAL PERSON DEALING IN THE INDUSTRY WOULD UNDERSTAND?

MR. XI:   WELL, I THINK WE UNDERSTAND GENERALLY WHAT A DATASET IS.

THE COURT:   RIGHT.

MR. XI:   BUT IT DOESN'T -- BUT IT'S NOT CLEAR WHETHER IT'S A DATASET WITH RESPECT TO A PARTICULAR SOURCE OR JUST AN ENTIRE

DATASET OF INFORMATION THAT A COMPANY LIKE X.AI WOULD USE.

THE COURT: SO, WHAT ELSE DO YOU THINK IS SALIENTLY AMBIGUOUS ABOUT THE STATUTE BESIDES USABLE STORAGE?

MR. XI: I THINK IT'S DATASETS, DATA POINTS AND THEN OVERALL HIGH-LEVEL SUMMARY.

I THINK THOSE ARE THE PRINCIPAL PROBLEMS WITH THE -- WITH THE STATUTE.

THE COURT: ALL RIGHT.

CAN YOU ADDRESS THAT, COUNSEL.

MS. LISKA: I CAN, YOUR HONOR.

I THINK THAT -- YOU KNOW, WHEN DEALING WITH THE QUESTION OF VAGUENESS I THINK WHAT'S IMPORTANT TO KEEP IN MIND IS THAT THE QUESTION IS WHETHER OR NOT THE STATUTE IS SO UNCLEAR THAT PEOPLE JUST DON'T UNDERSTAND WHAT THEY'RE EVEN SUPPOSED TO DO.

I THINK OBVIOUSLY THERE CAN BE DEBATES ABOUT WHAT IS, YOU KNOW, IS THIS.

YOU KNOW, LOOK, IF WE ARE IN AN ENGLISH CLASS, AND THE TEACHER WANTS A HIGH-LEVEL SUMMARY, WE CAN HAVE DEBATES ABOUT HOW LONG DOES THAT NEED TO BE, ET CETERA.

BUT WE ALL UNDERSTAND GENERALLY SPEAKING WHAT A HIGH-LEVEL SUMMARY IS – THAT IT'S A SUMMARY AT A HIGHER LEVEL OF DETAIL. MORE GENERAL. NOT GRANULAR AND DOWN IN THE WEEDS.

SIMILARLY, DATASET AND DATA POINTS ARE TERMS THAT HAVE REALLY CLEAR UNDERSTOOD MEANINGS. PLAIN LANGUAGE MEANINGS.

ESPECIALLY IN THIS INDUSTRY.

AND, YOU KNOW, AND TO THE POINT THEY TALK ABOUT LAW -- THE TERMS ARE INTERPRETED WITHIN THE CONTEXT OF THE STATUTE OF A WHOLE. AND IT'S VERY CLEAR THAT IT'S A HIGH-LEVEL SUMMARY OF THE DATASETS USED IN THE DEVELOPMENT OF THE GENERATIVE ARTIFICIAL INTELLIGENCE SYSTEM OR SERVICE WHICH IS A PRETTY CLEAR -- CLEAR DIRECTION.

AND, AGAIN, I THINK, LOOK, IF WE'RE DEALING WITH A SITUATION WHERE THERE'S AN ENFORCEMENT ON THE GROUND AND WE HAVE A DEBATE ABOUT HOW HIGH-LEVEL A SUMMARY IS MAYBE WE CAN HAVE A CONVERSATION AND AS AN APPLIED SITUATION THAT THERE'S AN ISSUE.

BUT I THINK THAT GENERALLY SPEAKING THE STATUTE GIVES COMPANIES A CLEAR INDICATION OF WHAT IS REQUIRED OF THEM. AND THEY'RE SUFFICIENTLY ON NOTICE ABOUT WHAT THEY NEED TO DO TO BE IN COMPLIANCE.

THE COURT: ALL RIGHT. THANK YOU.

SO, WE'VE GONE ON FOR A WHILE. I JUST HAVE A COUPLE OF KIND OF CLEAN-UP QUESTIONS THAT I WOULD LIKE TO ASK.

AND ONE OF THE THINGS THAT IT WAS UNCLEAR TO ME WAS WHETHER THE PLAINTIFF WAS MAKING A FACIAL OR AN AS-APPLIED CHALLENGE TO THE STATUTE.

THERE'S SOME I THINK INCONSISTENCY BETWEEN THE MOTION AND THE REPLY BRIEF.

WHAT CHALLENGE ARE YOU MAKING?

MR. XI: WE'RE MAKING A CHALLENGE AS APPLIED TO X.AI.

THE COURT: OKAY. ALL RIGHT.

SO, YOU'RE NOT MAKING A CHALLENGE ON ANYTHING OTHER THAN A.XI'S INTEREST.

CORRECT?

MR. XI: YEAH. WE'RE NOT ASKING YOU TO ENJOIN OPERATION OF THE STATUTE WITH RESPECT TO ANYONE ELSE. JUST X.AI.

THE COURT: RIGHT.

AND HAS X.AI SUFFERED ANY HARM AS A RESULT OF THE DISCLOSURES IT'S ALREADY MADE?

MR. XI: NOT THESE PARTICULAR DISCLOSURES.

THE COURT: OKAY.

MR. XI: BUT – BUT I MEAN WE'RE UNDER THREAT OF ENFORCEMENT ACTION IN WHICH --

THE COURT: NO. I UNDERSTAND. I UNDERTAND THAT.

OKAY. SO, I LOOK FORWARD TO THE STATEMENT BY THE ENFORCEMENT DEPARTMENT ON FRIDAY.

I MAY OR MAY NOT, LIKELY NOT, BUT I MAY WANT YOU BACK FOR A FURTHER DISCUSSION.

AND IF I DO SO, IT WILL BE BY ZOOM. SO, YOU DON'T HAVE TO TRAVEL.

AND I MAY ASK FOR ADDITIONAL BRIEFING ON SOME OF THE ISSUES.

SO, LIKELY NOT. BUT THAT'S A POSSIBILITY.

SO, I LOOK FORWARD TO FRIDAY'S STATEMENT.

AND THEN IF I HAVE ANY OTHER REQUESTS FROM YOU, I'LL

MAKE THEM KNOWN TO YOU.

OKAY.   THANK YOU, COUNSEL.

IT WAS VERY GOOD.

(PROCEEDINGS ADJOURNED AT 10:21 A.M.)

Page 62

TRANSCRIBER'S CERTIFICATE

DISCLAIMER


THE INTEGRITY OF THIS TRANSCRIPT MAY BE ADVERSELY AFFECTED

DUE TO MUFFLED AND/OR UNCLEAR AUDIO TRANSMISSION OR LACK OF.

ATTORNEY IDENTIFICATION.


I, Dorothy Babykin, attest that the foregoing proceedings provided to me

electronically were transcribed by me to the best of my ability.

/s/   Dorothy Babykin

Dorothy Babykin


Date:   3/23/2026

ROB BONTA
Attorney General of California
ANYA M. BINSACCA
Supervising Deputy Attorney General
KRISTIN A. LISKA (State Bar No. 315994)
JOE MEEKER (State Bar No. 336725)
Deputy Attorneys General
 300 South Spring Street, Suite 1702
 Los Angeles, CA  90013-1230
 Telephone:  (213) 269-6502
 Fax:  (916) 731-2124
 E-mail:  Joe.Meeker@doj.ca.gov
*Attorneys for Defendant
Attorney General Rob Bonta*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| **X.AI LLC,** <br><br> Plaintiff, <br><br> **v.** <br><br> **ROB BONTA, in his official capacity as Attorney General of the State of California,** <br><br> Defendant. | 2:25-cv-12295-JGB-SSC <br><br> **DEFENDANT'S OPPOSITION TO MOTION FOR A PRELIMINARY INJUNCTION** <br><br> Date:  February 23, 2026 <br> Time:  9:00 a.m. <br> Courtroom:  1 <br> Judge:  The Honorable Jesus G. Bernal <br> Trial Date:  Not scheduled <br> Action Filed: 12/29/2025 |

**ER84**

# TABLE OF CONTENTS

**Page**

Introduction ............................................................................................... 1

Background ................................................................................................ 2

    A.    Generative Artificial Intelligence ............................................. 2

    B.    AB 2013 ..................................................................................... 3

    C.    Procedural History ................................................................... 5

Legal Standard .......................................................................................... 5

Argument ................................................................................................... 5

    I.    xAI Has Not Established Standing ............................................ 5

    II.    xAI Has Not Shown a Likelihood of Success .......................... 6

        A.    Takings Clause ........................................................................ 7

            1.    xAI Cannot Receive Injunctive Relief for an
Alleged Takings Clause Violation .............................. 7

            2.    xAI Has Not Shown That It Holds Trade Secrets in
the Information It Identifies ........................................ 8

            3.    AB 2013 Does Not Effect an Unconstitutional
Taking of xAI's Trade Secrets ................................. 10

                a.    AB 2013 is not a per se taking ......................... 10

                b.    AB 2013 does not effect a regulatory taking ....... 11

                    (1)    AB 2013 does not frustrate
investment-backed expectations ............... 12

                    (2)    xAI has not shown that disclosures
under AB 2013 will have significant
economic impacts ..................................... 13

                    (3)    AB 2013 serves an important public
purpose ..................................................... 14

        B.    First Amendment .................................................................. 16

            1.    AB 2013 Regulates Commercial Speech ................... 16

            2.    AB 2013 Is Constitutional Under the *Zauderer*
Standard for Compelled Commercial Speech ............ 18

            3.    In the Alternative, AB 2013 Is Constitutional as a
Regulation of Commercial Speech under
Intermediate Scrutiny ............................................... 20

        C.    Vagueness ............................................................................ 22

    III.    The Equities Do Not Favor Injunctive Relief ....................... 23

    IV.    Any Injunctive Relief Should Be Narrowly Tailored ........... 24

Conclusion .............................................................................................. 26

**ER85**

# TABLE OF AUTHORITIES

**Page**

CASES

*Agins v. Tiburon*
    447 U.S. 255 (1980) .................................................................................. 14

*Am. Beverage Ass'n v. City & Cnty. of San Francisco*
    916 F.3d 749 (9th Cir. 2019) ............................................................... 18, 19

*Am. Encore v. Fontes*
    152 F.4th 1097 (9th Cir. 2025) ................................................................. 6

*American Meat Inst. v. U.S. Dep't of Agriculture*
    760 F.3d 18 (D.C. Cir. 2014) .................................................................. 21

*Botosan v. Paul McNally Realty*
    216 F.3d 827 (9th Cir. 2000) ................................................................... 23

*Boutilier v. INS*
    387 U.S. 118 (1967) ................................................................................. 22

*California Redevelopment Ass'n v. Matosantos*
    53 Cal. 4th 231 (2011) ............................................................................ 25

*CDK Glob. LLC v. Brnovich*
    16 F.4th 1266 (9th Cir. 2021) ................................................................. 15

*Cedar Point Nursery v. Hassid*
    594 U.S. 139 (2021) ............................................................................ 10, 11

*ChromaDex, Inc. v. Elysium Health, Inc.*
    301 F. Supp. 3d 963 (C.D. Cal. 2017) ...................................................... 8

*Coates v. City of Cincinnati*
    402 U.S. 611 (1971) ................................................................................. 23

*CTIA – The Wireless Ass'n v. City of Berkeley*
    928 F.3d 832 (9th Cir. 2019) ............................................................... 18, 19

*Desert Outdoor Advertising, Inc. v. City of Oakland*
    506 F.3d 798 (9th Cir. 2007) ................................................................... 11

ER86

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Drakes Bay Oyster Co. v. Jewell*
   747 F.3d 1073 (9th Cir. 2014) .................................................................... 24

*Fang Lin Ai v. United States*
   809 F.3d 503 (9th Cir. 2015) ...................................................................... 22

*First Interstate Bank v. California*
   197 Cal. App. 3d 627 (1987) ........................................................................ 8

*Hoffman Estates v. Flipside, Hoffman Estates, Inc.*
   455 U.S. 489 (1982) .................................................................................... 22

*Inteliclear, LLC v. ETC Glob. Holdings, Inc.*
   978 F.3d 653 (9th Cir. 2020) ........................................................................ 9

*Klein v. City of San Clemente*
   584 F.3d 1196 (9th Cir. 2009) ...................................................................... 5

*Knick v. Twp. of Scott*
   588 U.S. 180 (2019) ...................................................................................... 7

*Kumar v. Koester*
   131 F.4th 746 (9th Cir. 2025) ....................................................................... 6

*Lingle v. Chevron U.S.A. Inc.*
   544 U.S. 528 (2005) .................................................................................... 14

*Lucas v. South Carolina Coastal Council*
   505 U.S. 1003 (1992) .................................................................................. 13

*MAI Sys. Corp. v. Peak Computer, Inc.*
   991 F.2d 511 (9th Cir. 1993) ........................................................................ 9

*Maryland v. King*
   567 U.S. 1301 (2013) .................................................................................. 24

*Mazurek v. Armstrong*
   520 U.S. 968 (1997) ...................................................................................... 5

*Nat'l Ass'n of Wheat Growers v. Bonta*
   85 F.4th 1263 (9th Cir. 2023) ......................................................... 18, 19, 20

**ER87**

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Nationwide Biweekly Admin., Inc v. Owen*
  873 F.3d 716 (9th Cir. 2017) ............................................................. 19

*NetChoice v. Bonta*
  113 F.4th 1101 (9th Cir. 2024) ..................................................... 17, 18

*Oakland Tribune, Inc. v. Chronicle Publ'g Co.*
  762 F.2d 1374 (9th Cir. 1985) ............................................................ 23

*Oregon Ass'n of Hosps. & Health Sys. v. Oregon*
  734 F. Supp. 3d 1139 (D. Or. 2024) .................................................... 23

*Peace Ranch, LLC v. Bonta*
  93 F.4th 482 (9th Cir. 2024) .................................................................6

*Penn Central Transportation Co. v. New York City*
  438 U.S. 104 (1978) ........................................................................... 12

*Pharm. Rsch. & Mfrs. of Am. v. Stolfi*
  153 F.4th 795 (9th Cir. 2025) .................................................... *passim*

*Professional Compounding Centers of America, Inc. v. Sodergren*
  No. 25-cv-2799, 2026 WL 194519 (E.D. Cal. January 26, 2026) ...................... 8

*Prostar Wireless Grp., LLC v. Domino's Pizza, Inc.*
  360 F. Supp. 3d 994 (N.D. Cal. 2018) .................................................... 8

*PruneYard Shopping Ctr. v. Robins*
  447 U.S. 74 (1980) ............................................................................. 13

*Rose v. Locke*
  423 U.S. 48 (1975) ............................................................................. 23

*Ruckelshaus v. Monsanto Co.*
  467 U.S. 986 (1984) ................................................................... 7, 8, 12

*San Francisco Apartment Ass'n v. City & Cnty. of San Francisco*
  881 F.3d 1169 (9th Cir. 2018) ............................................................ 16

*Santa Barbara Sch. Dist. v. Superior Court*
  13 Cal. 3d 315 (1975) ........................................................................ 25

iv

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Sheetz v. Cnty. of El Dorado*
601 U.S. 267 (2024) .................................................................................. 11

*Spokeo, Inc. v. Robins*
578 U.S. 330 (2016) .................................................................................. 5, 6

*Stormans, Inc. v. Selecky*
586 F.3d 1109 (9th Cir. 2009) ................................................................... 24

*Susan B. Anthony List v. Driehaus*
573 U.S. 149 (2014) ..................................................................................... 6

*Townley v. Miller*
722 F.3d 1128 (9th Cir. 2013) ..................................................................... 6

*Tremblay v. OpenAI*
No. 3:23-cv-3223 (N.D. Cal. Sept. 24, 2024) ............................................. 9

*United States v. Stratics Networks Inc.*
721 F. Supp. 3d 1080 (S.D. Cal. 2024) ..................................................... 22

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*
425 U.S. 748 (1976) ................................................................................... 17

*Vivid Ent., LLC v. Fielding*
774 F.3d 566 (9th Cir. 2014) ..................................................................... 25

*Walker v. Univ. Books, Inc.*
602 F.2d 859 (9th Cir. 1979) ....................................................................... 9

*Ward v. Rock Against Racism*
491 U.S. 781 (1989) ................................................................................... 23

*Weiss v. People ex rel. Dep't of Transportation*
9 Cal. 5th 840 (2020) ................................................................................... 7

*Winter v. Nat. Res. Def. Council, Inc.*
555 U.S. 7 (2008) .................................................................................... 5, 24

*X Corp. v Bonta*
116 F.4th 888 (9th Cir. 2024) .................................................................... 17

**ER89**

# TABLE OF AUTHORITIES
### (continued)

**Page**

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. III..................................................................................................5

U.S. Const. amend. I.........................................................................................*passim*

U.S. Const. amend. V. .....................................................................................8, 10

Cal. Const., art. I, § 19, subd. (a)........................................................................7

**STATUTES**

18 U.S.C. § 1839(3)...............................................................................................8

Cal. Civ. Code
   § 3011 ............................................................................................................4
   § 3011(b)(1)...................................................................................................4
   § 3011(b)(2)...................................................................................................4
   § 3011(b)(3)...................................................................................................4
   § 3110(a)(12) ...............................................................................................13
   § 3110(b).......................................................................................................4
   § 3110(c).......................................................................................................4
   § 3111 ...........................................................................................................4
   § 3111(a)..................................................................................................*passim*
   § 3111(a)(3) ..................................................................................................9
   § 3426.1(d)....................................................................................................8

Assembly Bill 2013 .........................................................................................*passim*

**OTHER AUTHORITIES**

Ashley Altus, *Responsible enterprise LLMs: Addressing accuracy and
    [Large Language Model] bias challenges*, Outshift (May 6, 2024),
    https://outshift.cisco.com/blog/responsible-enterprise-llms-llm-bias..................2

Cade Metz et al., *How Tech Giants Cut Corners to Harvest Data for
    A.I.*, New York Times (Apr. 6, 2024),
    https://www.nytimes.com/2024/04/06/technology/tech-giants-
    harvest-data-artificial-intelligence.html ...........................................................3

**ER90**

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Copyright and Artificial Intelligence Part 3: Generative AI Training (Pre-publication Version)*, United States Copyright Office (May 2025), https://www.copyright.gov/ai/Copyright-and-Artificial-Intelligence-Part-3-Generative-AI-Training-Report-Pre-Publication-Version.pdf ...................................................................... 3

Darrell M. West, *The coming AI Backlash will shape future regulation,* Brookings.edu (May 27, 2025), https://www.brookings.edu/articles/the-coming-ai-backlash-will-shape-future-regulation/ ........................................................ 12

*Data*, Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/data ................................................................ 23

*Dataset*, Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/dataset ............................................................. 23

Elon Musk, @ElonMusk, X.com (Jun. 25, 2025, 1:02 AM), https://x.com/elonmusk/status/1936333964693885089 .................................. 15

Elon Musk, @ElonMusk, X.com (Jun. 21, 2025, 11:38 AM), https://x.com/elonmusk/status/1936493967320953090 .................................. 15

Hadas Kotek et al., *Gender bias and stereotypes in Large Language Models* (Collective Intelligence Conference (CI '23)), https://dl.acm.org/doi/10.1145/3582269.3615599 ............................................... 2

Jason Cohen, *Your Posts on X Are Being Used to Train Grok's Shenanigans.  Here's How to Stop it*, PCMag.com (Jan. 15, 2026), https://www.pcmag.com/how-to/your-tweets-x-posts-train-elon-musk-grok-ai-how-to-stop-it-opt-out ........................................................ 15

Madison Czopek, *Why does the AI-powered chatbot Grok post false, offensive things on X?*, Politifact (Jul. 10, 2025), https://www.politifact.com/article/2025/jul/10/Grok-AI-chatbot-Elon-Musk-artificial-intelligence/ .................................................... 15

Meghan J. Ryan, *Ghost-Hunting in AI and the Law* 99 Tul. L. Rev. 121 (2024) ........................................................................................................... 2

## TABLE OF AUTHORITIES
### (continued)

**Page**

Scott J. Mulligan, *AI trained on AI garbage spits out AI garbage*, MIT
Technology Review (Jul. 24, 2024),
https://www.technologyreview.com/2024/07/24/1095263/ai-that-
feeds-on-a-diet-of-ai-garbage-ends-up-spitting-out-nonsense/
(screenshot capture, https://perma.cc/B62C-FMPB) ...........................................2

**ER92**

**INTRODUCTION**

Generative Artificial Intelligence is a revolutionary technology, and the effects of AI on society and the economy will only become more pronounced as models become more accessible. But this potential comes with risks. AIs are not infallible. Just like humans, AI models can exhibit bias and make mistakes. And users may not be able to detect those problems based on an AI model's outputs alone.

Because an AI's outputs are a function of the data the model was trained on, training data information can reveal a model's deficiencies and help users make informed decisions about which models to use. To that end, in 2024 the California legislature passed Assembly Bill 2013 (AB 2013), which requires AI developers who operate in California to disclose certain information about the data used to train their models. In addition to enabling the identification of potential biases, this transparency also allows Californians to see whether developers are being responsible stewards of potentially sensitive data, such as consumer and user information. The law went into effect on January 1, 2026, and tech companies— including the plaintiff here—have begun making disclosures pursuant to the statute.

Plaintiff xAI, an AI developer, contends that AB 2013 is unconstitutional in several ways, arguing that AB 2013 operates as an unconstitutional taking of its trade secrets, requires plaintiff to engage in compelled speech, and is unconstitutionally vague. xAI now seeks to preliminarily enjoin the statute on those grounds, and the court should reject its request. xAI is not likely to succeed on the merits of its constitutional claims. On the takings claim, xAI is not entitled to injunctive relief because it can seek compensation for the alleged taking. But even if injunctive relief were available, this claim fails on the merits. xAI has failed to meet its burden that AB 2013 requires it to disclose trade secrets, and the statute's limited disclosures serve the public interest. xAI's First Amendment claim fails because AB 2013 requires only the disclosure of factual and commercial information. And the statute provides sufficient guidance about what must be

1

disclosed to survive xAI's vagueness challenge. The balance of equities also weighs against an injunction here. xAI waited more than a year after the statute was passed to seek emergency relief, and it has already begun complying with the statute, both of which demonstrate that it faces no irreparable harm from AB 2013's enforcement. xAI's motion for a preliminary injunction should be denied.

## BACKGROUND

### A.   Generative Artificial Intelligence

Generative Artificial Intelligence ("generative AI") models are computer programs capable of creating content, such as text and images, "without the need for actual human intervention." Meghan J. Ryan, *Ghost-Hunting in AI and the Law* 99 Tul. L. Rev. 121, 141 (2024). These models are "trained" by being exposed to large quantities of data. *See id* at 142. Generative AI models then draw on patterns present within the training data to generate contextually relevant responses to user prompts. *Id.* This means that generative AI models are "only as accurate, reliable, or unbiased as the training data from which they're built." *See* Ashley Altus, *Responsible enterprise LLMs: Addressing accuracy and [Large Language Model] bias challenges*, Outshift (May 6, 2024).[1] Models may perpetuate or even amplify biases found in the training data, including racial and gender stereotypes. *See id.*; *see also* Hadas Kotek et al., *Gender bias and stereotypes in Large Language Models* (Collective Intelligence Conference (CI '23)).[2]

The largest AI models train using the internet itself, including repositories of billions of web pages. *See* Scott J. Mulligan, *AI trained on AI garbage spits out AI garbage*, MIT Technology Review (Jul. 24, 2024).[3] But developers may also incorporate training data from licensed or non-public sources. *See Copyright and*

---

[1] *Available at* https://outshift.cisco.com/blog/responsible-enterprise-llms-llm-bias.

[2] *Available at* https://dl.acm.org/doi/10.1145/3582269.3615599.

[3] *Available at* https://www.technologyreview.com/2024/07/24/1095263/ai-that-feeds-on-a-diet-of-ai-garbage-ends-up-spitting-out-nonsense/ (screenshot capture available at https://perma.cc/B62C-FMPB).

2

ER94

*Artificial Intelligence Part 3: Generative AI Training (Pre-publication Version)*, United States Copyright Office (May 2025).[4]  In the race to train generative AI models, some developers have swept up sensitive or potentially objectionable data, including copyrighted works that were not licensed for training, consumer and user data, and even "synthetic data" that was itself generated by an AI model.  *See* Cade Metz et al., *How Tech Giants Cut Corners to Harvest Data for A.I.*, New York Times (Apr. 6, 2024).[5]  Synthetic data may cause models to become less accurate over time and lead to outputs with false information.  *See* Mulligan, *supra* at 2.

### B.    AB 2013

In light of the growing use of generative AI products and the importance of training data to such products, the California Legislature enacted Assembly Bill 2013 (AB 2013) in September 2024.   As the author of the bill explained, "[m]any consumers have valid questions about how these AI systems and services are created, and if they truly are better than what they seek to replace."  Liska Decl., p. 11 (Ex. 1); *see also* Liska Decl., pp. 28-29 (Ex. 3).  In order to "build consumer confidence" in AI products, the bill's author stated, "we need to start with the foundations, and for AI that is the selection of training data."  *Id.*

AB 2013 is meant to "provide[] transparency to consumers of AI systems and services by providing important documentation about the data used to train the services and systems they are being offered, including if synthetic data has or is being used to fill gaps in data sources."  Liska Decl., p. 11 (Ex. 1).  The legislature reasoned that "requiring transparency about the training data used for AI systems helps identify and mitigate biases, addressing hallucinations and other problematic outputs, and shines the light on various other issues, such as privacy and copyright concerns."  Liska Decl., p. 24 (Ex. 3).

---

[4]*Available at* https://www.copyright.gov/ai/Copyright-and-Artificial-Intelligence-Part-3-Generative-AI-Training-Report-Pre-Publication-Version.pdf.
[5] *Available at* https://www.nytimes.com/2024/04/06/technology/tech-giants-harvest-data-artificial-intelligence.html.

3

**ER95**

To this end, AB 2013 "impose[s] modest requirements on developers of AI systems and services in exchange for providing Californians with a fuller understanding of the state's AI information ecosystem." Liska Decl., p. 11 (Ex. 1). AB 2013 applies to developers of "generative artificial intelligence" systems and services. It defines "generative artificial intelligence" as "artificial intelligence that can generate derived synthetic content . . . that emulates the structure and characteristics of the artificial intelligence's training data." Cal. Civil Code § 3110(c).[6] In turn, "developer" is defined as "a person, partnership, state or local government agency, or corporation that designs, codes, produces, or substantially modified an artificial intelligence system or service for use by members of the public." § 3110(b).

Under AB 2013, the developer of a generative artificial intelligence system or service must post on their website "documentation regarding the data used by the developer to train the generative artificial intelligence system or service." § 3111. Such documentation must include, but is not limited to, "[a] high-level summary of the datasets used in the development of the generative artificial intelligence system or service" that covers twelve specific categories of information. § 3111(a). These disclosure requirements apply to any generative artificial intelligence service or system released after January 1, 2022, and "made publicly available for Californians to use." § 3011. AB 2013 exempts from these disclosure requirements generative systems or services that general consumers are unlikely to use, specifically those "whose sole purpose is to help ensure security and integrity," or "whose sole purpose is the operation of aircraft in national airspace." § 3011(b)(1), (b)(2). It also exempts generative AI systems or services "developed for national security, military, or defense purposes" and those that are "made available only to a federal entity." § 3011(b)(3).

_____

[6] All statutory references are to the California Civil Code unless otherwise specified.

4

**ER96**

### C.    Procedural History

Plaintiff xAI is a software company that develops generative AI models. Compl. ¶ 17 (Dkt. 1). xAI filed suit against California Attorney General Rob Bonta, in his official capacity, challenging AB 2013 as a violation of the Takings Clause and First Amendment and as unconstitutionally vague. *Id.* ¶¶ 10-13. After filing suit, xAI filed the instant motion for a preliminary injunction.

**LEGAL STANDARD**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The party seeking a preliminary injunction must establish that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Id.* at 20. xAI bears the burden of proving each element. *Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009). It must do so by a "clear showing." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

**ARGUMENT**

xAI has failed to show that it is entitled to the extraordinary remedy it seeks. xAI has not established standing to bring this suit because xAI has already made disclosures pursuant to AB 2013. But even if xAI had standing, xAI's constitutional claims fail on the merits. And xAI's long delay in seeking preliminary relief demonstrates that there is no risk of irreparable harm.

### I.    xAI HAS NOT ESTABLISHED STANDING

For federal jurisdiction to exist, a plaintiff must have standing as required by Article III. The "'irreducible constitutional minimum' of standing consists of three elements." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citation omitted). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a

5

**ER97**

favorable judicial decision." *Id.* "At the preliminary injunction stage, plaintiffs must make a clear showing of each element of standing." *Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013). The Ninth Circuit now applies a three-part test drawn from *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014), to determine if a plaintiff has established pre-enforcement standing. *See Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 487 (9th Cir. 2024) (adopting the *Driehaus* test). Under this test, "[a] plaintiff has a sufficient injury for a pre-enforcement challenge" when they establish that they have (1) "'an intention to engage in a course of conduct arguably affected with a constitutional interest'" that is (2) "'proscribed by a statute'" and that (3) "'there exists a credible threat of prosecution thereunder.'" *Kumar v. Koester*, 131 F.4th 746, 752 (9th Cir. 2025) (quoting *Driehaus*, 573 U.S. at 158-59).

xAI has not established a credible threat that it will face prosecution for any failure to comply with AB 2013, because it has not "adduced enough evidence to show that there is a realistic threat that the law in question may be enforced against *them*." *Am. Encore v. Fontes*, 152 F.4th 1097, 1118 (9th Cir. 2025) (emphasis added). After all, xAI *already has* made disclosures as required by AB 2013: it has "provided a high-level, limited disclosure that does not reveal its trade secrets." Pls. Br. n.1 (Dkt. 22); *see also* Liska Decl., pp. 55-56 (Ex. 6). Rather than seeking to avoid any compliance with AB 2013 whatsoever, xAI's concern is instead that "California will find [its] disclosure insufficient" and that it might be "force[d] . . . to disclose further details and reveal its trade secrets." *Id.* This speculative threat of harm is not sufficient to establish standing.

## II. xAI HAS NOT SHOWN A LIKELIHOOD OF SUCCESS

It is a plaintiff's burden to establish a likelihood of success on its claims. It is important to hold xAI to that burden here, where xAI waited over a year after AB 2013's passage to seek emergency relief. Despite this, xAI has failed to establish a likelihood of success on its Takings Clause, First Amendment, or vagueness claims.

6

**ER98**

**A.    Takings Clause**

xAI is unlikely to succeed on the merits of its Takings Clause claim. As a threshold matter, xAI cannot receive injunctive relief for this claim because it may seek compensation for any taking from the State. Even so, xAI has failed to show that it has trade secrets that are subject to disclosure under AB 2013 or that such a disclosure would effect a taking.

**1.    xAI Cannot Receive Injunctive Relief for an Alleged Takings Clause Violation**

"[E]quitable relief is generally unavailable" to remedy a taking. *Knick v. Twp. of Scott*, 588 U.S. 180, 201 (2019). This is because "nearly all state governments provide just compensation remedies to property owners who have suffered a taking[.]" *Id.* If "an adequate provision for obtaining just compensation exists, there is no basis to enjoin the government's action effecting a taking." *Id.* This principle applies even when the subject of the taking is a trade secret. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1019 (1984) (injunctive relief unavailable for alleged taking of trade secrets where plaintiff could seek compensation in Court of Federal Claims).

To the extent that xAI contends that it has a property interest in trade secrets that are threatened by disclosure under AB 2013, xAI may seek compensation for the alleged taking in a suit against the State, making injunctive relief unavailable. California law expressly allows parties to seek just compensation for takings of property. *See Weiss v. People ex rel. Dep't of Transportation*, 9 Cal. 5th 840, 853 (2020) ("The California Constitution gives property owners the right to have a jury determine the compensation they are owed when a public entity takes or damages their property." (citing Cal. Const., art. I, § 19, subd. (a))).

xAI contends that injunctive relief is appropriate because AB 2013 "does not contemplate any means" to provide compensation. Pl's. Br. at 14-15. But xAI could seek compensation through a standard inverse condemnation suit in state

court.  Such suits may be brought for takings of personal property.  *See First Interstate Bank v. California*, 197 Cal. App. 3d 627, 635 (1987).  xAI does not explain why such a suit against the State is inadequate to obtain just compensation for the alleged taking of its trade secrets.  *See Professional Compounding Centers of America, Inc. v. Sodergren*, No. 25-cv-2799, 2026 WL 194519, *9-10 (E.D. Cal. January 26, 2026) (injunctive relief unavailable for alleged state taking of trade secrets because plaintiff did not "allege[] it will be prevented from bringing suit" against California to recover just compensation.).  Accordingly, xAI's request for injunctive relief on the basis of a Takings Clause violation should be denied.

### 2.  xAI Has Not Shown That It Holds Trade Secrets in the Information It Identifies

It is true that confidential information may be protectable property under the Fifth Amendment to the extent that the information is "cognizable as a trade-secret property right under [state] law."  *Pharm. Rsch. & Mfrs. of Am. v. Stolfi*, 153 F.4th 795, 832 (9th Cir. 2025) (hereinafter "*PhRMA*") (quoting *Ruckelshaus*, 467 U.S. at 1003-04 (alteration in original)).  However, xAI fails to show that it holds a trade-secret property right in the information that, it contends, AB 2013 requires it to further disclose. *Cf. Ruckelshaus*, 467 U.S. at 1001-02 (finding a taking where parties stipulated that information to be disclosed "contains or relates to trade secrets[.]")

Under both federal and California law, information is a trade secret if it (1) is valuable because it is unknown to others and (2) the owner has attempted to keep the information secret.  *See* Cal. Civ. Code § 3426.1(d); 18 U.S.C. § 1839(3); *see also ChromaDex, Inc. v. Elysium Health, Inc.*, 301 F. Supp. 3d 963, 971 (C.D. Cal. 2017) (providing that state and federal law share "substantially similar definition[s]" of a trade secret).  If information is publicly available or widely known in an industry, it is not a trade secret.  *Prostar Wireless Grp., LLC v. Domino's Pizza, Inc.*, 360 F. Supp. 3d 994, 1013 (N.D. Cal. 2018) (citing *Walker v.*

**ER100**

*Univ. Books, Inc.*, 602 F.2d 859, 865 (9th Cir. 1979)). To prove ownership of trade secrets, a party "must identify the trade secrets and carry the burden of showing that they exist." *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 522 (9th Cir. 1993).[7] Trade secrets must be identified with sufficient particularity to allow a factfinder to determine whether the information is, in fact, a trade secret. *See Inteliclear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 658 (9th Cir. 2020).

xAI's assertions are too vague to identify a trade secret that AB 2013 requires to be disclosed. Although xAI argues that the industry generally treats training data as confidential, it cites no authority that such "training data" is categorically entitled to trade secret protection.[8] And xAI does not adequately support its claim that training data sources are valuable because they are unknown to others. xAI acknowledges that developers use data that is common to all developers, *see* Stanley Decl, ¶ 10 (Dkt. 22-2), and it provides only conclusory statements about the competitive importance and effect of supplemental data. *See id.*, ¶¶ 21-23. xAI only speculates about the extent to which AB 2013's limited disclosures would allow competitors to discover the sources of xAI's data or what the data is being used for. *See id.*, ¶ 23. Moreover, xAI does not even expressly assert that it uses unique or unknown data sets that would qualify as trade secrets. Nor does xAI provide evidence that disclosure of a "general range" of the number of data points in its training datasets, *see* § 3111(a)(3), would actually reveal the existence of datasets that are not already widely known in the industry. *Cf. Inteliclear*, 978 F.3d at 660 (plaintiff demonstrated that its alleged trade secrets were "unique in the industry.").

---

[7] Although these cases deal with trade secret misappropriation claims, what a plaintiff must show to demonstrate the existence of a trade secret informs whether xAI has asserted an intellectual property right under state and federal law.

[8] Although xAI states that "courts around the country" have "recognized" the "trade-secret rights inherent" to dataset information, see Pl's. Br. at 12, its only authority for that statement is a single case where a court entered a stipulated protective order providing how the parties in that case would treat training data information in discovery. *See Tremblay v. OpenAI*, No. 3:23-cv-3223 (N.D. Cal. Sept. 24, 2024), Dkt.182, at 2.

Similarly, although xAI avers that it has developed "its own internal system of cleaning datasets," *see* Stanley Decl., ¶ 25, it provides no explanation of what that system is or whether those processes are actually unique in the industry—let alone that providing a "high level summary" of that process, *see* § 3111(a), would reveal any trade secrets.

xAI's conclusory assertions are not specific or substantive enough to establish that it has trade secrets in its dataset information. This Court should reject xAI's invitation to enjoin the statute on the basis of a supposed taking when xAI has not established that the statute requires disclosure of its trade secrets.

### 3. AB 2013 Does Not Effect an Unconstitutional Taking of xAI's Trade Secrets

Even if AB 2013 requires xAI to disclose trade secrets, it has not established that the disclosure operates as a taking. The Supreme Court has identified two types of Fifth Amendment takings: "per se" takings and "regulatory" takings. *See Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147-49 (2021). A per se taking occurs when the government "physically acquires private property for a public use." *Id.* at 147-48. A regulatory taking occurs when the government "imposes regulations that restrict an owner's ability to use his own property." *Id.* at 148. AB 2013 is not a taking under either standard.

#### a. AB 2013 is not a per se taking

xAI contends that AB 2013 operates as a "per se" taking because mandatory disclosure of trade secrets vitiates the fundamental right to exclude others from one's property and extinguishes the value of the trade secrets. This argument is foreclosed by recent Ninth Circuit precedent. *See PhRMA*, 153 F.4th at 833. In *PhRMA*, the plaintiffs argued that the government-mandated disclosure of their trade secrets was a "per se" taking, despite the lack of a physical seizure, because it denied plaintiffs all economically beneficial use of those secrets. *Id.* The Ninth

10

**ER102**

Circuit rejected that argument and held that the claim was properly characterized "as a potential regulatory taking." *Id.* at 834.

Plaintiff does not acknowledge this part of *PhRMA*, let alone attempt to distinguish it from the claims here. Instead, xAI relies on cases where courts found per se takings dealing with the right to exclude from *land*—not access to information. *See Sheetz v. Cnty. of El Dorado,* 601 U.S. 267, 274 (2024) (discussing land use regulation); *Cedar Point Nursery*, 594 U.S. at 149 (discussing the right to access physical property). But the Ninth Circuit rejected the analogy of takings of land to takings of trade secrets in *PhRMA*. 153 F.4th at 833. Because there is no physical property implicated here, xAI's per se takings claim fails.

### b.  AB 2013 does not effect a regulatory taking

xAI's regulatory takings claim also fails. In assessing whether AB 2013 effects a regulatory taking, it is relevant that xAI's suit is best understood as a pre-enforcement facial challenge to AB 2013. Although xAI alleges that AB 2013 is unconstitutional both facially and as applied to xAI, it makes no argument that AB 2013 may be "capable of valid application to others" or even to xAI itself under different circumstances. *See Desert Outdoor Advertising, Inc. v. City of Oakland*, 506 F.3d 798, 805 (9th Cir. 2007). So although xAI seeks to enjoin enforcement of AB 2013 only as to itself, its suit is ultimately a "claim[] of facial invalidity" that "rest[s] on speculation about the law's coverage and its future enforcement." *PhRMA*, 153 F.4th at 834 (citations and quotation marks omitted). Such pre-enforcement challenges "threaten to short circuit the democratic process by preventing duly enacted laws from being implemented in constitutional ways." *Id.* (citations and internal quotation marks omitted). For this reason, courts impose a high burden on plaintiffs asserting such pre-enforcement challenges: xAI must show that AB 2013 operates as an unlawful taking under every possible application of the law. *See id.*

11

**ER103**

In the absence of any enforcement action, xAI has not shown that AB 2013 requires it to disclose trade secrets in every instance.  But even if AB 2013 does require developers to disclose trade secrets, those mandatory disclosures are not a taking.  Pursuant to *Penn Central Transportation Co. v. New York City*, in deciding whether a regulatory taking has occurred, courts consider (1) the regulation's interference with reasonable investment-backed expectations, (2) the economic impact of the regulation, and (3) the character of the government action.  438 U.S. 104, 124 (1978); *see also PhRMA,* 153 F.4th at 834.  All three factors counsel that AB 2013 does not effect a taking.

**(1)   AB 2013 does not frustrate investment-backed expectations**

xAI contends that AB 2013 is a taking because it made investments in AI and dataset development with the expectation that its dataset information would remain confidential.  But xAI has not shown that its AB 2013 disclosures will upset reasonable investment-backed expectations "in every instance," *see PhRMA*, 153 F.4th at 834, or even in *this* instance, for two main reasons.  First, as explained above, *see supra* at 8-10, xAI has not shown that AB 2013 requires it to disclose any trade secrets.  Second, investment-backed expectations are "necessarily tempered" in areas "'that have long been the source of public concern and the subject of government regulation.'"  *See PhRMA.*, 153 F.4th at 834 (quoting *Ruckelshaus*, 467 U.S. at 1007).  Although generative AI is novel, it is clearly a subject of public concern, with increasingly prevalent calls for government regulation and transparency.  *See*, *e.g.*, Darrell M. West, *The coming AI Backlash will shape future regulation,* Brookings.edu (May 27, 2025).[9]  In light of the potentially world-changing consequences of the technology's rapid adoption and the robust public debate about AI safety, xAI should have expected that it would face increased regulatory scrutiny.  *See Lucas v. South Carolina Coastal Council*,

---

[9] *Available at* https://www.brookings.edu/articles/the-coming-ai-backlash-will-shape-future-regulation/

12

**ER104**

505 U.S. 1003, 1027-28 (1992) ("by reason of the State's traditionally high degree of control over commercial dealings, [a property owner] ought to be aware of the possibility that new regulation might even render his property economically worthless[.]").  Because xAI should have expected that it would be required to make the sorts of limited disclosures contemplated by AB 2013, those disclosures do not upset xAI's investment-backed expectations.

**(2)    xAI has not shown that disclosures under AB 2013 will have significant economic impacts**

Nor has xAI shown that disclosures under AB 2013 will have significant economic impacts.  To prevail on this factor, xAI must demonstrate that the regulation "will unreasonably impair the value or use of [the plaintiff's] property." *See PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 83 (1980).  xAI cannot show that every disclosure made pursuant to AB 2013 "will necessarily disclose the information that provides the trade secret owner with its 'competitive edge.'" *PhRMA*, 153 F.4th at 834.  While it is true that, as xAI notes, compilations of public information, when combined in a novel way, can be a trade secret, *see* Pl's. Br. at 11, when a trade secret comprises a compilation of information, revealing "a *portion* of the data making up [a] claimed trade secret" does not necessarily destroy the trade secret's economic value.  *PhRMA*, 153 F.4th at 834 (emphasis added).  For example, information about individual datasets that xAI uses in training would not necessarily reveal xAI's trade secrets about those datasets in combination.  This conclusion is bolstered by the fact that AB 2013 requires only a "high-level summary" of xAI's datasets.  And although the statute identifies specific pieces of information to be disclosed, xAI has not demonstrated that revealing each of those individual data points—for example, whether the dataset includes synthetic information, *see* § 3110(a)(12)—would disclose any trade secrets whatsoever.  Because xAI has not shown that every AB 2013 disclosure would significantly

13

**ER105**

diminish the value of its trade secrets, this factor does not support xAI's facial takings claim either.

### (3)    AB 2013 serves an important public purpose

Finally, the character of the governmental action at issue counsels that AB 2013 does not effect a taking.  In evaluating this factor, courts consider whether the government action "affects property interests through some public program adjusting the benefits and burdens of economic life to promote the common good." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005) (internal quotation marks omitted).  This analysis "necessarily requires a weighing of private and public interests." *Agins v. Tiburon*, 447 U.S. 255, 260-61 (1980).  The character of the government action weighs against finding a taking where a significant public interest in the regulation outweighs a property owner's private interest in its use of the property.  *See PhRMA*, 153 F.4th at 834.

This factor weighs against xAI because AB 2013 serves important public purposes, including informing individuals about how their data is used to train AIs, making users and copyright owners aware of whether models were trained on copyrighted material, and allowing users to evaluate training data for biases and other flaws.  A model trained on biased data may reproduce those biases, and a model trained on synthetic data may have a greater propensity to hallucinate.  *See* Mulligan, *supra* at 2.  Transparency about the data used to train these models will help users make informed decisions about which generative AI systems they use and trust.

xAI's own flagship generative AI, "Grok," provides a good example of the value of training-data disclosure.  Specifically, it has been widely reported that Grok was trained, at least in part, on posts from users on the social media platform "X" (formerly Twitter).  *See* Jason Cohen, *Your Posts on X Are Being Used to*

14

**ER106**

*Train Grok's Shenanigans.  Here's How to Stop it*, PCMag.com (Jan. 15, 2026).[10] In June 2025, xAI CEO Elon Musk asked X users to "reply to this post with divisive facts for @Grok training.  By this I mean things that are politically incorrect but nonetheless factually true."[11]  Later Musk posted that Grok would need to be entirely retrained because there was "too much garbage in any foundation model trained on uncorrected data."[12] In a widely reported incident a few weeks later on July 8, 2025, Grok made a number of antisemitic posts (since deleted) wherein it praised Adolf Hitler, called itself "MechaHitler," and stated that Hitler would "act decisively" to solve the problem of "anti-white hate" purportedly espoused by Jewish people.  *See* Madison Czopek, *Why does the AI-powered chatbot Grok post false, offensive things on X?*, Politifact (Jul. 10, 2025). [13]  Some experts have suggested that Grok's training, and the material it aggregated from X, "likely played a role in its spew of hate speech."  *Id.*

Regardless of whether Grok's posts were, in fact, the result of training on "politically incorrect" and "divisive" posts, the controversy demonstrates why the public should know what data trains the AI models they use.  Grok's hateful posts were particularly egregious examples of a generative AI demonstrating bias.  But not all biased outputs will be as easily identified.  In those instances, knowledge of how a model was trained can help users make an informed choice about a model's trustworthiness, even in the absence of obviously biased outputs.

The bottom line is that AB 2013 serves an important public purpose.  The Legislature decided that in light of the risks posed by AI, AI developers must make limited disclosures about the data driving their systems.  *See CDK Glob. LLC v.*

---

[10] *Available at* https://www.pcmag.com/how-to/your-tweets-x-posts-train-elon-musk-grok-ai-how-to-stop-it-opt-out.

[11] @ElonMusk, X.com (Jun. 21, 2025, 11:38 AM), https://x.com/elonmusk/status/1936493967320953090.

[12] @ElonMusk, X.com (Jun. 25, 2025, 1:02 AM), https://x.com/elonmusk/status/1936333964693885089.

[13] *Available at* https://www.politifact.com/article/2025/jul/10/Grok-AI-chatbot-Elon-Musk-artificial-intelligence/.

*Brnovich*, 16 F.4th 1266, 1283 (9th Cir. 2021) (no taking where legislature determined that challenged law "promotes the common good through the advancement of consumer privacy and competition."). The public's interest in transparency outweighs xAI's interests in its alleged trade secrets.

Because the *Penn Central* factors support the conclusion that AB 2013 does not constitute an unlawful taking, this court should conclude that xAI is unlikely to succeed on the merits of its Takings Clause claim.

## B. First Amendment

xAI further contends that AB 2013 violates the First Amendment because it compels speech. Not so. AB 2013 is a regulation of commercial speech that comports with the First Amendment, and xAI is not likely to succeed on the merits of this claim.

### 1. AB 2013 Regulates Commercial Speech

Ordinarily, "[a] direct disclosure requirement . . . is generally viewed as a content-based 'compelled speech' requirement subject to strict scrutiny." *PhRMA*, 153 F.4th at 810. However, a different standard applies when "the content of the direct disclosure requirement qualifies as 'commercial speech,' which is entitled to less constitutional protection." *Id.* "If the direct disclosure requirement regulates 'commercial speech,' then courts apply either intermediate scrutiny, or a lower level of scrutiny akin to rational basis review." *Id.* at 810-811 (internal citations omitted). Although the question of whether a particular law regulates commercial speech is fact-specific, the Ninth Circuit has consistently held that disclosures of "product-specific economic information" are regulations of commercial speech. *Id.* at 821 (law requiring prescription drug manufacturers to report information on pricing to government regulated commercial speech); *see also San Francisco Apartment Ass'n v. City & Cnty. of San Francisco*, 881 F.3d 1169, 1176 (9th Cir.

16

**ER108**

2018) (ordinance requirement that landlords disclose list of tenants' rights organizations to tenants regulated commercial speech).

AB 2013 requires the disclosure of "product-specific, economic information about [a developer's] products" and is therefore a regulation of commercial speech. *PhRMA*, 153 F.4th at 823. Under AB 2013, developers are required to provide a list of information regarding the datasets used to train their generative AI products, such as information regarding the size of the dataset, whether the dataset contains synthetic information, or whether the data in the dataset was cleaned or manipulated. *See* § 3111(a). All of this information relates to the AI products that developers have made available for consumer use, and the disclosure of this information provides consumers with information they can rely on when deciding whether to use a generative AI product or which generative AI product to use. Thus, AB 2013 "improves the 'free flow of commercial information'" for consumers. *PhRMA*, 153 F.4th at 822 (quoting *Va. State Bd. of Pharmacy*, 425 U.S. 748, 764 (1976)). Just like a law requiring the disclosure of ingredients in food or specific chemicals in products, AB 2013 requires disclosure of the inputs into a product: the datasets used to train generative AI products. Such speech is commercial speech.

Nor does AB 2013 suffer from the flaws that led the Ninth Circuit to strike down the reporting requirements at issue in *X Corp. v Bonta*, 116 F.4th 888 (9th Cir. 2024), and *NetChoice v. Bonta*, 113 F.4th 1101 (9th Cir. 2024). In both of those cases, the Ninth Circuit held that the law at issue required companies to disclose "subjective and political or ideological" information. *PhRMA*, 153 F.4th at 818. For instance, in *X Corp.*, the law "required social media companies to identify what they believed to be 'Hate speech or racism,' 'Extremism or radicalization,' 'Disinformation or misinformation' and 'Foreign political interference,' which is an intensely political exercise." *Id.* (discussing *X Corp.*, 116 F.4th at 902). Similarly, in *NetChoice*, the law at issue required companies to "opin[e] on whether and how

17

controversial categories of content should be moderated." *NetChoice*, 113 F.4th at 901. AB 2013 does not require developers to "opine on fraught political issues[.]'" *PhRMA*, 153 F.4th at 823. Nor does it require developers to "express any . . . normative view about" their products or to "define their [products] in value-laden, state prescribed language." *Id.* Instead, it solely requires developers to disclose "product-specific, economic information about their products," namely objective information regarding the datasets used to train their generative AI products. *Id.* That is a classic regulation of commercial speech.

### 2. AB 2013 Is Constitutional Under the *Zauderer* Standard for Compelled Commercial Speech

While courts apply intermediate scrutiny "in commercial speech cases where the government acts to restrict or prohibit speech," they apply a different standard "to compelled, as distinct from restricted or prohibited, commercial speech," known as the *Zauderer* standard. *CTIA – The Wireless Ass'n v. City of Berkeley,* 928 F.3d 832, 842 (9th Cir. 2019); *see also Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 756 (9th Cir. 2019) (en banc) (*"Zauderer* provides the appropriate framework to analyze a First Amendment claim involving compelled commercial speech."). To withstand scrutiny under *Zauderer*, the compelled commercial speech must be "(1) purely factual, (2) noncontroversial, and (3) not unjustified or unduly burdensome." *Am. Beverage Ass'n*, 916 F.3d at 756.

AB 2013 meets these requirements. First, the disclosures required under AB 2013 are purely factual. Each of the categories of information that AB 2013 specifies should be included in the high-level summary are objective, factual inquires—e.g., whether the dataset includes data protected by intellectual property law, whether the dataset includes personal or aggregate consumer information, and how the dataset furthers the purpose of the generative AI product, *see* § 3111(a). Since AB 2013 requires only the "disclosure of accurate, factual information," it

18

**ER110**

meets the first requirement of *Zauderer*. *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1267 (9th Cir. 2023).

Second, the required disclosures under AB 2013 are noncontroversial. The information that developers must post provide background details on the datasets used to train generative AI. There is nothing controversial about the number of data points in a dataset or the types of data points included in a dataset. AB 2013 does not, for instance, require a developer to take a position "in a heated political controversy" or "convey a message fundamentally at odds with its mission," *CTIA*, 928 F.3d at 845. Nor does it require a developer to wade into an ongoing scientific or technical debate. *See Nat'l Ass'n of Wheat Growers*, 85 F.4th at 1269 (required warning was controversial in light of existing scientific debate about whether chemical caused cancer). Since AB 2013 only requires the disclosure of objective, noncontroversial facts about a developer's generative AI product's training dataset, it meets the second requirement of *Zauderer*.

Third, AB 2013 is not unduly burdensome or unjustified. The Legislature was clear that the purpose of AB 2013 was to provide consumers with useful information regarding generative AI products. *See supra* at 3-4. Thus, AB 2013 is not unjustified. Nor is it unduly burdensome. "A disclosure is 'unduly burdensome' when the burden 'effectively rules out' [any] speech it accompanies." *Nationwide Biweekly Admin., Inc v. Owen*, 873 F.3d 716, 734 (9th Cir. 2017) (citation omitted). AB 2013 does not "interfere with advertising or threaten to drown out messaging by the [developers] subject to the requirement." *CTIA*, 928 F.3d at 949; *cf. Am. Beverage Ass'n*, 916 F.3d at 757 (required warning taking up 20% of package was unduly burdensome and drowned out manufacturer's own speech on package). Rather, AB 2013 "do[es] not rule out [xAI's] ability" to speak "effectively or otherwise" on any topic it wishes to. *Nationwide Biweekly*, 873 F.3d at 734. It is therefore not unduly burdensome and meets the third *Zauderer* requirements. AB 2013 is thus constitutional under *Zauderer*.

19

**ER111**

### 3. In the Alternative, AB 2013 Is Constitutional as a Regulation of Commercial Speech under Intermediate Scrutiny

In the alternative, AB 2013 is constitutional under the intermediate scrutiny standard applicable to commercial speech. For AB 2013 to survive intermediate scrutiny as a regulation of commercial speech, it must (1) "directly advance[] a substantial governmental interest" and (2) be "not more extensive than necessary to serve that interest." *Nat'l Ass'n of Wheat Growers*, 85 F.4th at 1282-83. AB 2013 meets this standard.

First, AB 2013 directly advances a substantial governmental interest. The law's purpose is to provide consumers and users of generative AI products with important information related to the products they might use. This is not merely "transparency for its own sake." *PhRMA*, 153 F.4th at 826. Rather, as the bill's author explained, AB 2013 requires the disclosure of information that consumers can use "to better evaluate if they have confidence in the AI system or service, compare competing systems and services, or put into place mitigation measures to address any shortcomings of the particular system or service." Liska Decl., p. 11 (Ex. 1). After all, the dataset used to train generative AI plays a central role in how the generative AI product will work in the future. *See* Mulligan, *supra* at 2. Shortcomings in the dataset used—such as a dataset that contains child sex abuse materials or synthetic data—can lead to shortcomings in the generative AI product. *See id.*; *see also* Liska Decl., pp. 8-11 (Ex. 1); *id.* pp. 25-29. Moreover, consumers of generative AI products are often operating at an information deficit given the reluctance of companies to provide information regarding the datasets used to train their products—a practice that has led to widespread calls for greater disclosure and transparency from experts and academics, *see* Liska Decl, pp. 25-28 (Ex. 3). As the Ninth Circuit has recognized, "[t]he State has a substantial interest in reducing those asymmetries, facilitating informed commercial transactions, and improving

20

**ER112**

the efficiency of the [generative AI] market." *PhRMA*, 153 F.4th at 826. AB 2013 furthers that substantial interest.

After all, contrary to xAI's argument, the information that AB 2013 requires disclosed is of use to consumers. The use of synthetic data in a training dataset, for instance, might raise concerns for consumers about the viability of a generative AI product—the legislative history notes, for instance, examples of the use of synthetic data leading to a generative AI product breaking down over time, *see* Liska Decl., pp. 10-11 (Ex. 1). Consumers may also have greater confidence in a generative AI product that uses a larger dataset for training or a product that uses data collected over a longer window of time, both pieces of information within the scope of AB 2013. And consumers looking for generative AI to perform specialized tasks may find it useful to know the labels or characteristics of data in the dataset—for instance, whether the dataset contains images versus text would matter to a consumer looking for a generative AI product to create images. Given the critical role that datasets play in training generative AI and the large role generative AI products play in modern life, the State has a substantial interest in providing consumers with pertinent factual information regarding these products.

Second, AB 2013 meets the tailoring requirement of intermediate scrutiny. After all, "to the extent that the government's interest is in assuring that consumers receive particular information," the "means-end fit is self-evidently satisfied when the government acts only through a reasonably crafted mandate to disclose 'purely factual and uncontroversial information' about attributes of the product or service being offered." *American Meat Inst. v. U.S. Dep't of Agriculture*, 760 F.3d 18, 26 (D.C. Cir. 2014). That is precisely what AB 2013 does. Moreover, all that AB 2013 requires is a "high level summary" of certain information. *See* § 3111(a). AB 2013 does not require companies to disclose the underlying datasets themselves. And under AB 2013, developers "remain free to disseminate their own messages directly to consumers and to the public at large." *PhRMA*, 153 F.4th at 828.

21

**ER113**

Overall, AB 2013 imposes no more onerous a disclosure regime than the numerous other laws that require public disclosure of information related to a business's products. Just like those laws, AB 2013 is a constitutional regulation of commercial speech.

### C. Vagueness

xAI is unlikely to succeed on the merits of its "void for vagueness" claim because AB 2013 provides adequate notice of what is required under the statute. The void-for-vagueness doctrine applies to both criminal and civil statutes, but civil laws generally receive less exacting vagueness scrutiny. *See Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982) ("The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment.").

"In reviewing a business regulation for facial vagueness, [] the principal inquiry is whether the law affords fair warning of what is proscribed." *Id.* at 489. And "[i]n the context of civil statutes regulating economic activity, the standard [for fair notice] is sufficiently low that statutes are unconstitutionally vague only where they are 'so vague and indefinite as really to be no rule or standard at all.'" *United States v. Stratics Networks Inc.*, 721 F. Supp. 3d 1080, 1112 (S.D. Cal. 2024) (quoting *Boutilier v. INS*, 387 U.S. 118, 123 (1967)); *see also Fang Lin Ai v. United States*, 809 F.3d 503, 514 (9th Cir. 2015) ("the question is whether the scheme that subjects Appellants to FICA taxes is 'so vague and indefinite as really to be no rule or standard at all.'").

With those standards in mind, AB 2013 is not unconstitutionally vague. The statue provides a comprehensible standard governing required data disclosures. Although the term "high-level summary" is not expressly defined, the phrase has a plain, commonsense meaning: an overview of a topic done in a more abstract and general, rather than granular and detailed, manner. Moreover, AB 2013 provides a list of the specific information to include within this summary. Similarly, the terms

22

**ER114**

"dataset" and "data point" have plain, commonsense meanings.[14]  In all, AB 2013 provides regulated developers fair warning regarding its requirements: to provide a general description about the information sets used to train their generative AI product that covers the specified list of information.

Contrary to xAI's assertions, a statute need not provide "perfect clarity and precise guidance" to pass constitutional muster.  *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989).  A statute passes muster so long as it regulates conduct "according 'to an imprecise but comprehensible normative standard[.]'" *Botosan v. Paul McNally Realty*, 216 F.3d 827, 836 (9th Cir. 2000) (quoting *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971)).  "[T]he Supreme Court and the Ninth Circuit have recognized that '[m]any statutes will have some inherent vagueness' and that a certain quantum of vagueness is permissible—and even necessary." *Oregon Ass'n of Hosps. & Health Sys. v. Oregon*, 734 F. Supp. 3d 1139, 1154 (D. Or. 2024) (citing *Rose v. Locke*, 423 U.S. 48, 49-50 (1975)).  AB 2013 meets this standard and is not unduly vague.

## III.  THE EQUITIES DO NOT FAVOR INJUNCTIVE RELIEF

xAI has likewise failed to establish the other requirements for injunctive relief. xAI's delay in seeking a preliminary injunction undercuts their assertion that they face a risk of irreparable harm.  *See Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm.").  AB 2013 was passed in September 2024, more than a year ago.  xAI provides no reason why it could not have brought its challenge several months ago and permitted this Court

---

[14] *See, e.g.*, *Data*, Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/data (defining "data" as "factual information" and "information in digital form that can be transmitted or received") (last accessed Feb. 2, 2026); *Dataset*, Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/dataset (defining "dataset" as "a collection of data taken from a single source or intended for a single project") (last accessed Feb. 2, 2026).

23

**ER115**

the opportunity to evaluate its claims on a less-rushed schedule and a more fulsome record than here—particularly given that xAI has already made disclosures pursuant to the statute.

Second, the balance of equities and public interest do not favor injunctive relief. Where, as here, the government is the opposing party, the last two factors of the preliminary injunction analysis—the balance of equities and public interest— merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). To analyze these factors, the Court "'balance[s] the competing claims of injury'" and "'consider[s] the effect of granting or withholding the requested relief,'" paying "'particular regard for the public consequences in employing the extraordinary remedy of injunction.'" *Winter*, 555 U.S. at 24 (citations omitted).

A State "suffers a form of irreparable injury" when it is "enjoined . . . from effectuating statutes enacted by representatives of its people." *Maryland v. King*, 567 U.S. 1301, 1303 (2013) (internal quotation marks and citation omitted). And enjoining AB 2013 would further work harm by denying consumers the ability to make informed choices about the generative AI models they use. In contrast, any burden on xAI from denying injunctive relief is minimal—particularly given that xAI has already released disclosures under AB 2013.

## IV. ANY INJUNCTIVE RELIEF SHOULD BE NARROWLY TAILORED

Injunctive relief "must be tailored to remedy the specific harm alleged." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009) (internal quotation marks and citation omitted). Should this Court grant a preliminary injunction (and it should not), it should tailor such relief to reach only those parts of AB 2013 that xAI has substantiated are 1) likely invalid under xAI's claims and that 2) will harm xAI. After all, xAI has already provided disclosures under AB 2013. Thus, this Court should confine any injunctive relief to solely preventing any further, specific, unconstitutional disclosure required by AB 2013 rather than enjoining the statute as a whole.

24

**ER116**

Such tailoring is particularly appropriate here given that the subcategories of information that must be included in a report are severable.  Federal courts apply California law when analyzing severability.  *See Vivid Ent., LLC v. Fielding*, 774 F.3d 566, 574 (9th Cir. 2014).  California courts apply a three-part test to determine severability: the invalid part of the law "must be grammatically, functionally, and volitionally separable."  *California Redevelopment Ass'n v. Matosantos*, 53 Cal. 4th 231, 271 (2011) (citation omitted).  The provisions of AB 2013 that list specific categories of information to include in a report meet the requirements for severability.  Since each category of information is listed separately, the provisions are clearly grammatically separable—any offending provision can simply be excised, leaving the remainder grammatically intact.  Similarly, each of them are functionally separable, as removing one subset of information does not impair the functionality of the reporting requirement in general or the remaining categories of information to be included.  Finally, the requirement for volitional separability is met, since it is "eminently reasonable to suppose that those who favor the [Act] would be happy to achieve at least some substantial portion of their purpose[.]" *Santa Barbara Sch. Dist. v. Superior Court*, 13 Cal. 3d 315, 332 (1975).  Thus, if this Court were to grant an injunction, it should tailor such relief to solely the portions of the law that xAI establishes are likely unconstitutional and that will affect xAI beyond the scope of the disclosures already made.

///

///

///

25

**ER117**

# CONCLUSION

For the foregoing reasons, the motion for a preliminary injunction should be denied.

Dated:  February 2, 2026                              Respectfully submitted,

ROB BONTA
Attorney General of California
ANYA M. BINSACCA
Supervising Deputy Attorney General
KRISTIN A. LISKA
Deputy Attorney General


/s/ Joe Meeker
JOE MEEKER
Deputy Attorney General
*Attorneys for Defendant Attorney
General Rob Bonta*

26

**ER118**

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Defendant Attorney General Rob Bonta, certifies that this brief comprises 25 pages, excluding the signature page, which complies with the page limit set by the Standing Order of Judge Jesus G. Bernal dated January 20, 2026.

Dated:  February 2, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California


/s/ Joe Meeker
JOE MEEKER
Deputy Attorney General
*Attorneys for Defendant Attorney General Rob Bonta*

27

**ER119**

# CERTIFICATE OF SERVICE

Case Name:   ***X.AI LLC v. Rob Bonta***
Case No.:    **2:25-cv-12295-JGB (SSCx)**

I hereby certify that on <u>February 2, 2026</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

> **DEFENDANT'S OPPOSITION TO MOTION FOR A PRELIMINARY INJUNCTION**
>
> **DECLARATION OF KRISTIN A. LISKA IN SUPPORT OF DEFENDANT'S OPPOSITION (with Exhibits 1-6)**

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished electronically by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct.

This declaration was executed on <u>February 2, 2026</u>, at San Francisco, California.


| Vanessa Jordan | *Vanessa Jordan* |
|:---:|:---:|
| Declarant | Signature |

**ER120**

ROB BONTA
Attorney General of California
ANYA M. BINSACCA
Supervising Deputy Attorney General
KRISTIN A. LISKA
Deputy Attorney General
State Bar No. 315994
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3916
  Fax:  (415) 703-5480
  E-mail:  Kristin.Liska@doj.ca.gov
*Attorneys for Attorney General Rob Bonta*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| **X.AI LLC,**<br><br>Plaintiff,<br><br>v.<br><br>**ROB BONTA, in his official capacity as Attorney General of the State of California,**<br><br>Defendant. | 2:25-cv-12295-JGB (SSCx)<br><br>**DECLARATION OF KRISTIN A. LISKA IN SUPPORT OF DEFENDANT'S OPPOSITION**<br><br>Date:  February 23, 2026<br>Time:  9:00 a.m.<br>Courtroom:  1<br>Judge:  The Honorable Jesus G. Bernal<br>Trial Date:  Not scheduled<br>Action Filed: 12/29/2025 |

**ER121**

I, Kristin A. Liska, declare as follows:

1.     I am a Deputy Attorney General authorized to practice in this court, and I represent defendant Attorney General Rob Bonta in this action.

2.     The legislative history materials attached as Exhibits 1-5 can be found at: https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202320240AB2013.

3.     Attached as **Exhibit 1** is a true and correct copy of the April 28, 2024, Assembly Committee on Privacy and Consumer Protection analysis of AB 2013.

4.     Attached as **Exhibit 2** is a true and correct copy of the May 8, 2024, Assembly Floor analysis of AB 2013.

5.     Attached as **Exhibit 3** is a true and correct copy of the June 21, 2024, Senate Judiciary Committee analysis of AB 2013.

6.     Attached as **Exhibit 4** is a true and correct copy of the August 20, 2024, Senate Floor analysis of AB 2013.

7.     Attached as **Exhibit 5** is a true and correct copy of the August 27, 2024 Assembly Floor analysis of AB 2013.

8.     Attached as **Exhibit 6** is a true and correct copy of the document created by xAI entitled "xAI Frontier Artificial Intelligence Framework," available online at: https://perma.cc/X45R-NM2N.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 30th day of January, 2026, at Daly City, California.

Dated:  January 30, 2026          */s/ Kristin Liska*

                                    Kristin Liska

2

**ER122**

# EXHIBIT 1

Exhibit 1
Liska Decl._Page 3

ER123

AB 2013
Page 1

Date of Hearing:  April 30, 2024

ASSEMBLY COMMITTEE ON PRIVACY AND CONSUMER PROTECTION
Rebecca Bauer-Kahan, Chair
AB 2013 (Irwin) – As Amended April 22, 2024

AS PROPOSED TO BE AMENDED

**SUBJECT**:  Artificial intelligence:  training data transparency

### SYNOPSIS

*There is a common saying in data science: "garbage in, garbage out." When it comes to artificial intelligence (AI), data is everything. Whether an AI's outputs are useful and fair depends entirely on the data used to train it – at present, however, Californians have no insight into which data are used to train which products. As a result, they cannot make informed decisions when purchasing AI products to help maintain their businesses, or when exchanging sensitive personal information for services that will ostensibly improve their quality of life.*

*This bill would require developers of AI systems and services to publicly disclose specified information related to the datasets used to train their products. In doing so, this bill would allow Californians to make informed decisions about the AI systems they purchase and engage with.*

*This bill is author-sponsored and supported by Oakland Privacy, Secure Justice, Transparency Coalition.ai, Concept Art Association, and Santa Monica Democratic Club. A coalition of industry associations, including California Chamber of Commerce and Technet, takes an "oppose unless amended" position. The bill is opposed by Chamber of Progress.*

**SUMMARY**:  Requires a developer of an AI system or service to publicly disclose specific information related to the system or service's training data. Specifically, **this bill**:

1) Requires a developer of an AI system or service to post documentation related to its training data to the developer's internet website on or before January 1, 2026, and before each time thereafter than an AI system or service is made available to Californians.

2) Requires documentation related to training data to contain a description of each dataset used to develop the AI system or service, including:

   a) The source or owner of the dataset.

   b) A description of how the dataset furthers the intended purpose of the system or service.

   c) The number of data points included in the dataset, with estimated figures for dynamic datasets.

   d) A clear definition of each category associated with data points within the dataset, including the format of data points and sample values.

   e) Whether the dataset includes any data protected by copyright, trademark, or patent, requiring the purchase or licensure of the data, or whether the dataset is entirely in the public domain.

Exhibit 1                                                                    ER124
Liska Decl._Page 4

**AB 2013**
Page 2

    f)    Whether the data was purchased or licensed by the developer.

    g)    Whether the dataset includes personal information.

    h)    Whether the dataset includes aggregate consumer information.

    i)    A description of any cleaning, processing, or modification to the dataset by the developer, including the intended purpose of those efforts.

    j)    The time period during which the data was collected.

    k)    Whether data collection is ongoing.

    l)    The dates the dataset was first and last used during development of the AI system or service.

3)   Requires a developer of a system or service to disclose whether the system or service used or uses synthetic data generation in its development.

4)   Exempts AI systems or services whose sole purpose is to help ensure security and integrity.

**EXISTING LAW**:

1)   Provides, pursuant to the California Constitution, that all people are by nature free and independent and have inalienable rights. Among these are the fundamental right to privacy. (Cal. Const. art. I, § 1.)

2)   States that the "right to privacy is a personal and fundamental right protected by Section 1 of Article I of the Constitution of California and by the United States Constitution and that all individuals have a right of privacy in information pertaining to them." Further states these findings of the Legislature:

    a)    The right to privacy is being threatened by the indiscriminate collection, maintenance, and dissemination of personal information and the lack of effective laws and legal remedies.

    b)    The increasing use of computers and other sophisticated information technology has greatly magnified the potential risk to individual privacy that can occur from the maintenance of personal information.

    c)    In order to protect the privacy of individuals, it is necessary that the maintenance and dissemination of personal information be subject to strict limits. (Civ. Code § 1798.1.)

3)   Defines "personal information" to mean information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household. States that personal information includes, but is not limited to, the following if it identifies, relates to, describes, is reasonably capable of being associated with, or could be reasonably linked, directly or indirectly, with a particular consumer or household (Civ. Code § 1798.140(v)):

a) Identifiers such as a real name, alias, postal address, unique personal identifier, online identifier, Internet Protocol address, email address, account name, social security number, driver's license number, passport number, or other similar identifiers.

b) Any personal information described in Section 1798.80(e).

c) Characteristics of protected classifications under California or federal law.

d) Commercial information, including records of personal property, products or services purchased, obtained, or considered, or other purchasing or consuming histories or tendencies.

e) Biometric information.

f) Internet or other electronic network activity information, including, but not limited to, browsing history, search history, and information regarding a consumer's interaction with an internet website application, or advertisement.

g) Geolocation data.

h) Audio, electronic, visual, thermal, olfactory, or similar information.

i) Professional or employment-related information.

j) Education information, defined as information that is not publicly available personally identifiable information as defined in the Family Educational Rights and Privacy Act (20 U.S.C. Sec. 1232g; 34 C.F.R. Part 99).

k) Inferences drawn from any of the information identified in this subdivision to create a profile about a consumer reflecting the consumer's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes.

l) Sensitive personal information.

4) Defines biometric information to mean an individual's physiological, biological, or behavioral characteristics, including information pertaining to an individual's deoxyribonucleic acid (DNA), that is used or is intended to be used singly or in combination with each other or with other identifying data, to establish individual identity. (Civ. Code § 1798.140(c).)

5) Further defines "personal information" to include any information that identifies, relates to, describes, or is capable of being associated with, a particular individual, including, but not limited to, his or her name, signature, social security number, physical characteristics or description, address, telephone number, passport number, driver's license or state identification card number, insurance policy number, education, employment, employment history, bank account number, credit card number, debit card number, or any other financial information, medical information, or health insurance information. (Civ. Code § 1798.80(e).)

Exhibit 1                                                    ER126
Liska Decl._Page 6

**AB 2013**
Page 4

a) States that personal information does not include publicly available information that is lawfully made available to the general public from federal, state, or local government records.

6) Defines sensitive personal information to mean any of the following:

a) Personal information that reveals:

   i) A consumer's social security, driver's license, state identification card, or passport number.

   ii) A consumer's account log-in, financial account, debit card, or credit card number in combination with any required security or access code, password, or credentials allowing access to an account.

   iii) A consumer's precise geolocation.

   iv) A consumer's racial or ethnic origin, citizenship or immigration status, religious or philosophical beliefs, or union membership.

   v) The contents of a consumer's mail, email, and text messages unless the business is the intended recipient of the communication.

   vi) A consumer's genetic data.

b) The processing of biometric information for the purpose of uniquely identifying a consumer.

c) Personal information collected and analyzed concerning a consumer's health.

d) Personal information collected and analyzed concerning a consumer's sex life or sexual orientation. (Civ. Code § 1798.140(ae).)

7) Defines "aggregate personal information" to mean information that relates to a group or category of consumers, from which individual consumer identities have been removed, that is not linked or reasonably linkable to any consumer or household, including via a device. Excludes from this definition one or more individual consumer records that have been deidentified. (Civ. Code § 1798.140(b).)

8) Defines "security and integrity" to mean the ability of:

a) Networks or information systems to detect security incidents that compromise the availability, authenticity, integrity, and confidentiality of stored or transmitted personal information.

b) Businesses to detect security incidents, resist malicious, deceptive, fraudulent, or illegal actions and to help prosecute those responsible for those actions.

c) Businesses to ensure the physical safety of natural persons. (Civ. Code § 1798.140(ac).)

**FISCAL EFFECT**:  As currently in print, this bill is keyed nonfiscal.

Exhibit 1                                                                ER127
Liska Decl._Page 7

**AB 2013**
Page 5

**COMMENTS**:

1) **Artificial intelligence.** The development of AI is creating exciting opportunities to grow California's economy and improve the lives of its residents. AI can generate compelling text and convincing images in an instant. It can automate painstaking tasks, identify subtle patterns in large datasets, and make accurate predictions in the face of incomplete information. But with novel technologies come novel safety concerns. The present bill furthers consumer protection in California by granting the state's residents insight into how the AI systems and services they engage with are trained.

2) **The importance of training.** AI uses algorithms – sets of rules – to transform inputs into outputs. Inputs and outputs can be anything a computer can process: numbers, text, audio, video, or movement. This is because AI is not fundamentally different from other computer functions. Its novelty lies in its application: unlike normal computer functions, AI is able to accomplish tasks that are normally performed by humans.

Training is the secret sauce of machine learning; it is the principle innovation that allows modern AI to be both efficient and versatile. During training, a naïve AI is exposed to data and allowed to automatically explore its structure. As the AI explores, it alters itself in an attempt to better represent the data. Each piece of data affects every part of an AI. In a sense, AI "digest" and integrate the data they train on in order to learn, just as humans digest and integrate the foods we eat in order to grow.

AI that are trained on small, specific datasets in order to make recommendations and predictions are sometimes called "predictive AI." This differentiates them from "generative AI," which are trained on massive datasets in order to produce detailed text and images. When Netflix suggests a TV show to a viewer, the recommendation is produced by predictive AI that has been trained on the viewing habits of Netflix users. When ChatGPT generates text in clear, concise paragraphs, it uses generative AI that has been trained on the written contents of the internet.

3) **Haphazard training data.** There is a common saying in computer science: "garbage in, garbage out." The performance of an AI product is directly impacted by the quality, quantity, and relevance of the data used to train it. Before training, datasets are often categorized to make them easier for AI to work with. Rigorously categorizing the data in a dataset becomes more difficult as the dataset becomes larger, but failing to organize its contents can lead to meaningless, false, or harmful outputs.

The biggest names in AI – OpenAI, Meta, and Google – understand AI's critical need for data better than anyone else. According to a recent New York Times examination, the race to lead in the AI space has become a desperate hunt for digital data. To obtain that data, these tech companies have cut corners, ignored corporate policies and debated bending the law:

> At Meta, which owns Facebook and Instagram, managers, lawyers and engineers last year discussed buying the publishing house Simon & Schuster to procure long works, according to recordings of internal meetings obtained by The Times. They also conferred on gathering copyrighted data from across the internet, even if that meant facing lawsuits. Negotiating licenses with publishers, artists, musicians and the news industry would take too long, they said.

Exhibit 1                                                          **ER128**
Liska Decl._Page 8

**AB 2013**

Page 6

Like OpenAI, Google transcribed YouTube videos to harvest text for its A.I. models, five people with knowledge of the company's practices said. That potentially violated the copyrights to the videos, which belong to their creators.

Last year, Google also broadened its terms of service. One motivation for the change, according to members of the company's privacy team and an internal message viewed by The Times, was to allow Google to be able to tap publicly available Google Docs, restaurant reviews on Google Maps and other online material for more of its A.I. products.[1]

In their race to obtain vast quantities of training data, major AI developers have not hesitated to move fast and break things. The Stanford Internet Observatory recently discovered that a common image training dataset known as LAION-5B contains many instances of child sexual abuse materials. Their study identified 3226 dataset entries of suspected child pornography, much of which was later confirmed as such by third parties.[2] This dataset was built by automatically scraping the internet, and images containing child pornography were found to have originated from large, well-known websites such as Reddit, Twitter, Blogspot, and Wordpress, as well as mainstream adult sites such as XHamster and XVideos.

4)  **An AI never forgets.** Just as humans cannot intentionally forget information they have learned, it is not currently possible to remove data from a trained AI.[3] Unlike an Excel spreadsheet, which stores data in neat columns, AI stores data in the connections between "neurons" in a "neural network." Every one of these connections is influenced by every piece of training data, and a large model like ChatGPT-4 is reported to have more than 1.7 trillion connections.[4] It is not possible to specifically alter these connections in order to remove data without fundamentally changing the model; as a result, for data to be removed, the model must be retrained from scratch. ChatGPT-4 is estimated to have taken 4-7 months to train.[5]

5)  **Synthetic data.** AB 2013 requires AI developers disclose "whether [their] system or service used or continuously uses synthetic data generation in its development." Synthetic data is artificially generated data that is created, rather than collected from real-world events. It is designed to mimic the statistical properties of authentic data, and can be useful for training AI when actual data may be limited, sensitive, or biased. Having already gobbled up most of the high-quality data that humanity has produced, major generative AI developers have begun looking to synthetic data:

OpenAI's Mr. Altman had a plan to deal with the looming data shortage.

---

[1] Cade Metz, Cecilia Kang, Sheera Frenkel, Stuart A. Thompson and Nico Grant, "How Tech Giants Cut Corners to Harvest Data for A.I.," *New York Times,* Apr. 6, 2024,  https://www.nytimes.com/2024/04/06/technology/tech-giants-harvest-data-artificial-intelligence.html.
[2] David Thiel, "Identifying and Eliminating CSAM in Generative ML Training Data and Models," *Stanford Internet Observatory*, Dec. 23, 2023.
[3] Stephen Pastis, "A.I.'s un-learning problem: Researchers say it's virtually impossible to make an A.I. model 'forget' the things it learns from private user data," *Yahoo! Finance*, Aug. 30, 2023, finance.yahoo.com/news/un-learning-problem-researchers-virtually-164342971.html.
[4] Reed Albergotti, "Microsoft pushes the boundaries of small AI models with big breakthrough," *SEMAFOR*, Nov. 1, 2023, www.semafor.com/article/11/01/2023/microsoft-pushes-the-boundaries-of-small-ai-models.
[5] Stephen McAleese, "Retrospective on 'GPT-4 Predictions' After the Release of GPT-4," *LESSWRONG*, Mar. 17, 2023, https://www.lesswrong.com/posts/iQx2eeHKLwgBYdWPZ/retrospective-on-gpt-4-predictions-after-the-release-of-gpt.

Exhibit 1                                                    ER129

Liska Decl._Page 9

Companies like his, he said at the May conference, would eventually train their A.I. on text generated by A.I. — otherwise known as synthetic data.

Since an A.I. model can produce humanlike text, Mr. Altman and others have argued, the systems can create additional data to develop better versions of themselves. This would help developers build increasingly powerful technology and reduce their dependence on copyrighted data.

"As long as you can get over the synthetic data event horizon, where the model is smart enough to make good synthetic data, everything will be fine," Mr. Altman said.

A.I. researchers have explored synthetic data for years. But building an A.I system that can train itself is easier said than done. A.I. models that learn from their own outputs can get caught in a loop where they reinforce their own quirks, mistakes and limitations.

"The data these systems need is like a path through the jungle," said Jeff Clune, a former OpenAI researcher who now teaches computer science at the University of British Columbia. "If they only train on synthetic data, they can get lost in the jungle."[6]

There are risks associated with relying on synthetic data. First, synthetic datasets may not perfectly replicate the complexity and variability of real-world data. This discrepancy can lead to models that perform well when tested in isolation, but falter in real-world applications. Second, training on synthetic data can introduce biases into a system's output if the dataset is not carefully designed. Third, training an AI system on its own outputs can lead to a phenomenon known as "model collapse," where errors and biases become continuously amplified until the AI's outputs are no longer correct or useful. A recent Scientific American article likens this problem to the scramble to obtain low-radioactivity metal in the 20th-century:

The possibility of AI models tainting themselves may be a bit analogous to a certain 20th-century dilemma. After the first atomic bombs were detonated at World War II's end, decades of nuclear testing spiced Earth's atmosphere with a dash of radioactive fallout. When that air entered newly-made steel, it brought elevated radiation with it. For particularly radiation-sensitive steel applications, such as Geiger counter consoles, that fallout poses an obvious problem: it won't do for a Geiger counter to flag itself. Thus, a rush began for a dwindling supply of low-radiation metal. Scavengers scoured old shipwrecks to extract scraps of prewar steel. Now some insiders believe a similar cycle is set to repeat in generative AI—with training data instead of steel.

Researchers can watch AI's poisoning in action. For instance, start with a language model trained on human-produced data. Use the model to generate some AI output. Then use that output to train a new instance of the model and use the resulting output to train a third version, and so forth. With each iteration, errors build atop one another. The 10th model,

---

[6] Cade Metz, Cecilia Kang, Sheera Frenkel, Stuart A. Thompson and Nico Grant, "How Tech Giants Cut Corners to Harvest Data for A.I.," *New York Times,* Apr. 6, 2024, https://www.nytimes.com/2024/04/06/technology/tech-giants-harvest-data-artificial-intelligence.html.

Exhibit 1                                                    ER130
Liska Decl._Page 10

prompted to write about historical English architecture, spews out gibberish about jackrabbits.[7]

Model collapse will become of a more pressing issue as more of the internet's content is AI-generated. The intentional use of synthetic data to train AI may expedite this process.

6) **What this bill would do.** This bill would require developers of AI systems and services to publicly disclose specified information about the datasets used to train, test, and validate their models.

7) **Author's statement.** According to the author:

Artificial Intelligence has become nearly unavoidable in Californians' daily lives, with new exciting generative AI tools being introduced daily, and the companies who make up the cornerstones of our digital lives either adopting AI or identifying their existing tools as falling under the AI umbrella. However consumer confidence in AI systems has not grown at the same rapid pace as industry adoption. Many consumers have valid questions about how these AI systems and services are created, and if they truly are better than what they seek to replace.

To build consumer confidence we need to start with the foundations, and for AI that is the selection of training data. AB 2013 provides transparency to consumers of AI systems and services by providing important documentation about the data used to train the services and systems they are being offered, including if synthetic data has or is being used to fill gaps in data sources.

Consumers may use this knowledge to better evaluate if they have confidence in the AI system or service, compare competing systems and services, or put into place mitigation measures to address any shortcomings of the particular system or service.

8) **Analysis**. Overall, this bill would impose modest requirements on developers of AI systems and services in exchange for providing Californians with a fuller understanding of the state's AI information ecosystem. This is consistent with the policy aims of a related bill this Committee recently passed, AB 3204 (Bauer-Kahan), which would require organizations that train AI using personal information to register with the California Privacy Protection Agency. The two bills are broadly compatible: AB 3204 would create a registry to identify the universe of entities that train AI with personal information, while this bill would require more specific disclosures by a subset of those entities to better understand the types of data being used to train AI.

An industry coalition takes an "oppose unless amended" position on AB 2013; their opposition letter, penned by the California Chamber of Commerce, describes four perceived weaknesses of the bill:

*Opposition claim #1:* AB 2013 should clearly delineate what is and is not considered "training" and narrow the scope of AI systems or services subject to these transparency measures to high-risk AI systems.

_____

[7] Rahul Rao, "AI-Generated Data Can Poison Future AI Models," *Scientific American,* Jul. 28, 2023, https://www.scientificamerican.com/article/ai-generated-data-can-poison-future-ai-models/

Exhibit 1                                                                                    ER131
Liska Decl._Page 11

**AB 2013**

Page 9

The bill defines training as "testing, validating, or fine tuning the artificial intelligence system or service." The author may wish to instead tie the definition of training to the provided definition of artificial intelligence; for example, AB 3204 defines training to mean "exposing artificial intelligence to data in order to alter the relationship between inputs and outputs." The requirement to describe datasets used to test, validate, or fine-tune an AI system or service could be placed elsewhere in the bill, as they are not fundamental to "training." The author may also wish to provide a definition for "fine-tune" somewhere in the bill.

> *Opposition claim #2:* AB 2013's definition of "developer" is both overbroad and vague and should include guardrails to address compliance challenges.

The bill defines "developer" to mean "a person, partnership, state or local government agency, or corporation that designs, codes, or produces an artificial intelligence system or service, or substantially modifies an artificial intelligence system or service for use by a third party for free or for a fee." This definition is broad, but not vague: any entity who produces or substantially modifies an AI system or service through training is required to provide information about the datasets they used.

> *Opposition claim #3:* AB 2013 should not apply to AI systems and services that were in use prior to the bill's effective date.

AB 2013 is oriented towards consumer protection, and it is not clear why products that are already available to Californian consumers should be broadly exempted from the bill's requirements. The coalition letter specifies one particular descriptor that may be genuinely hard for developers to comply with: the "dates the dataset was first and last used during the development of the system or service." Developers of existing systems, unaware of this bill's provisions, may simply have no record of when training began and ended for particular datasets. The author may wish to include a narrow exemption for existing systems on this point.

> *Opposition claim #4:* AB 2013 should expressly preclude any private right of action.

This bill does not outline specific enforcement mechanisms for its provisions. In their absence, enforcement will likely occur on the basis of California's Unfair Competition Law.[8] It is not clear why the bill would need to specifically preclude a Private Right of Action. Bills are generally written to permit or require specific actions, rather than to laboriously outline actions that are not meant to be taken.

Writing in support of the bill, Oakland Privacy describes the importance of training data transparency:

> Visibility of data sources is one transparency factor in a number of multi-factor AI transparency models being designed. While it is far from the only one (and many focus on AI explainability and AI auditability as crucial factors as well), the ubiquitous presence of data set transparency on all of these models indicates the consensus that responsible AI always includes disclosure of the data sets used to train the system.

---

[8] Bus. & Prof. Code § 17200 *et seq.*

Exhibit 1 **ER132**
Liska Decl._Page 12

One reason data set transparency is important is to root out illegally or unethically sourced data sets. A notorious example is Clearview AI which scraped social media to establish a database now described as comprising almost 20 billion images – larger than the population of the earth. This data was publicly available, but protected by community standards policies which forbade large-scale scraping for profit. Similarly, industries like journalism (NY Times v OpenAI) and playwrights and screenwriters are exploring the legal limits of AI data set use. While the laws that will come to govern the use of data sets for artificial intelligence are wildly unsettled at the moment, a robust transparency mandate can be informative for ongoing efforts to set limits and determine the rules of the road going forward, as well as identifying rogue players in the system crossing lines that we decide should not be crossed. Whatever our society comes to decide constitutes acceptable use, it is unlikely to be "everything and anything".

Oakland Privacy also points out perceived challenges for AB 2013:

We think the challenges in AB 2013 will be defining the formats for the disclosures. How this is done is likely dependent on the intentions of the bill. If the intent is for the disclosed information to be accessible to developers, engineers and scientists, then highly technical disclosures may meet the intention of the bill, and allow for some checks and balances. However, if the intent is to provide reasonably tech-savvy members of the public with actionable information, then we expect there will have to be some prescriptions regarding disclosure formats to avoid such highly technical and abstruse disclosure documents that they are virtually useless to anyone but a highly trained engineer.

9) **Committee amendments.** Two proposed committee amendments would clarify and adjust the scope of this bill. First, the definition of "artificial intelligence system or service" would be replaced with the definition for "artificial intelligence" in other AI-related bills that have passed through this committee:

(a) "Artificial intelligence system or service" or "system or service" means a machine-based system or service that can, for a given set of human-defined objectives, generate content and make predictions, recommendations, or decisions influencing a real or virtual environment.

(a) *"Artificial intelligence" means an engineered or machine-based system that varies in its level of autonomy and that can, for explicit or implicit objectives, infer from the input it receives how to generate outputs that can influence physical or virtual environments.*

Second, the bill in print requires developers of AI systems to provide a wealth of specific information related to each dataset used to train a model. Each individual description required by this bill may not constitute proprietary information, but their combination may unintentionally allow competitors to infer the precise data that goes into the training of a compliant developer's AI system or service. To avoid this issue, a proposed amendment would require a "high level summary of the datasets" used to develop a given system or service:

(a) A description *high-level summary* of each dataset *the datasets* used in the development of the system or service, including, but not limited to…

10) **Related legislation.** AB 3204 (Bauer-Kahan, 2024) would require organizations that train AI using personal information to register with the California Privacy Protection Agency. In registering, organizations would be required to pay an annual fee and disclose the categories of

Exhibit 1                                                                    ER133
Liska Decl._Page 13

personal information they use to train AI. This bill is currently pending in the Appropriations Committee.

### ARGUMENTS IN SUPPORT:

Oakland Privacy writes:

> From a public transparency view, this is basic and minimal information that the public is entitled to in order to be able to understand the uses to which their personal information may be applied, the potential efficacy of the AI system, and what its output is predicated upon.

Secure Justice writes:

> We believe AB 2013 is a pragmatic proposal that will greatly increase public awareness into the data sets being used to train artificial intelligence models, and further does not impose an undue burden on the developers subject to such a requirement.

Concept Art Association writes:

> AB 2013 lays an imperative first stone on the path to protection for all Californians, and it is a solid concrete action we can take right now to begin bringing some transparency to what so far has mostly been an unscrupulous, opaque and predatory model for data acquisition.

### ARGUMENTS IN OPPOSITION:

California Chamber of Commerce, taking an "oppose unless amended" position, writes on behalf of an industry coalition:

> Unfortunately, as currently drafted, we have significant concerns with the approach taken in AB 2013, and specifically around overburdensome mandates, the technical feasibility of the bill's transparency measures (including its assignment of responsibilities and the unique challenges presented for different types of developers in meeting the standards set in this bill), insufficient clarity around key terms, and potential exposure to liability. Moreover, we are heavily concerned about AB 2013's failure to provide protections for trade secrets and intellectual property, though we do not believe that is the intended outcome of this bill. While it may not be obvious on its face, the expertise and judgment as well as selection of data and datasets is part of what differentiates providers, thereby causing significant concern among developers as to the potential of this bill to undermine their intellectual property and harm competition.  And lastly, we question whether the disclosure of training data will result in any substantial benefit when it comes to determining an AI model's performance for a particular use case. Stated another way, simply because a model has been trained on certain data does not mean it will perform as needed in a specific use case.

Chamber of Progress writes:

> Requiring online platforms to disclose data used to train their artificial intelligence (AI) systems and services on their website stifles competition in the digital marketplace. A healthy competition marketplace is essential to ensure better quality of services for consumers and encourages platforms to innovate. The disclosure requirement risks revealing important

Exhibit 1
Liska Decl._Page 14

ER134

**AB 2013**
Page 12

business information and strategies. Additionally, the inclusion of "but not be limited to" in such requirements makes the expectations placed on online platforms unclear.

**REGISTERED SUPPORT / OPPOSITION**:

**Support**

Concept Art Association
Oakland Privacy
Santa Monica Democratic Club
Secure Justice
Transparency Coalition.ai

**Opposition**

Chamber of Progress

**Oppose Unless Amended**

California Bankers Association
California Chamber of Commerce
California Land Title Association
Insights Association
National Association of Mutual Insurance Companies
Personal Insurance Federation of California
Software & Information Industry Association
Technet

**Analysis Prepared by**:   Slater Sharp / P. & C.P. / (916) 319-2200

Exhibit 1                                      ER135
Liska Decl._Page 15

# EXHIBIT 2

Exhibit 2                                          **ER136**
Liska Decl._Page 16

AB 2013
Page 1

ASSEMBLY THIRD READING
AB 2013 (Irwin)
As Amended  May 2, 2024
Majority vote

## SUMMARY

Requires a developer of an artificial intelligence (AI) system or service to publicly disclose specific information related to the system or service's training data.

**Major Provisions**

1)  Requires a developer of an AI system or service to post documentation related to its training data to the developer's internet website on or before January 1, 2026, and before each time thereafter that an AI system or service is made available to Californians.

2)  Requires documentation related to training data to contain a high-level summary of the datasets used to develop the AI system or service.

3)  Requires a developer of a system or service to disclose whether the system or service used or uses synthetic data generation in its development.

4)  Exempts AI systems or services whose sole purpose is to help ensure security and integrity.

## COMMENTS

*Background.* The development of AI is creating exciting opportunities to grow California's economy and improve the lives of its residents. AI uses algorithms – sets of rules – to transform inputs into outputs. Inputs and outputs can be anything a computer can process: numbers, text, audio, video, or movement.

Training is the principle innovation that allows modern AI to be both efficient and versatile. During training, a naïve AI is exposed to data and allowed to automatically explore its structure. As the AI explores, it alters itself in an attempt to better represent the data. There is a common saying in computer science: "garbage in, garbage out." The performance of an AI product is directly impacted by the quality, quantity, and relevance of the data used to train it.

Just as humans cannot intentionally forget information they have learned, it is not currently possible to remove data from a trained AI.  Unlike an Excel spreadsheet, which stores data in neat columns, AI stores data in the connections between "neurons" in a "neural network." Every one of these connections is influenced by every piece of training data.  It is not possible to specifically alter these connections in order to remove data without fundamentally changing the model; as a result, for data to be removed, the model must be retrained from scratch.

This bill requires AI developers disclose "whether [their] system or service used or continuously uses synthetic data generation in its development." Synthetic data is artificially generated data that is created, rather than collected from real-world events. It is designed to mimic the statistical properties of authentic data, and can be useful for training AI when actual data may be limited, sensitive, or biased. However, there are risks associated with relying on synthetic data. First, synthetic datasets may not perfectly replicate the complexity and variability of real-world data. This discrepancy can lead to models that perform well when tested in isolation, but falter in real-

Exhibit 2                                        ER137
Liska Decl._Page 17

**AB 2013**
Page 2

world applications. Second, training on synthetic data can introduce biases into a system's output if the dataset is not carefully designed. Third, training an AI system on its own outputs can lead to a phenomenon known as "model collapse," where errors and biases become continuously amplified until the AI's outputs are no longer correct or useful. The intentional use of synthetic data to train AI may expedite this process.

*What this bill would do.* This bill would require developers of AI systems and services to publicly disclose specified information about the datasets used to train, test, and validate their models.

*Analysis.* The present bill furthers consumer protection in California by granting the state's residents insight into how the AI systems and services they engage with are trained. Overall, this bill would impose modest requirements on developers of AI systems and services in exchange for providing Californians with a fuller understanding of the state's AI information ecosystem. This is consistent with the policy aims of a related bill this Committee recently passed, AB 3204 (Bauer-Kahan), which would require organizations that train AI using personal information to register with the California Privacy Protection Agency. The two bills are broadly compatible: AB 3204 would create a registry to identify the universe of entities that train AI with personal information, while this bill would require more specific disclosures by a subset of those entities to better understand the types of data being used to train AI.

**According to the Author**

Artificial Intelligence has become nearly unavoidable in Californians' daily lives, with new exciting generative AI tools being introduced daily, and the companies who make up the cornerstones of our digital lives either adopting AI or identifying their existing tools as falling under the AI umbrella. However consumer confidence in AI systems has not grown at the same rapid pace as industry adoption. Many consumers have valid questions about how these AI systems and services are created, and if they truly are better than what they seek to replace.

To build consumer confidence we need to start with the foundations, and for AI that is the selection of training data. [This bill] provides transparency to consumers of AI systems and services by providing important documentation about the data used to train the services and systems they are being offered, including if synthetic data has or is being used to fill gaps in data sources.

Consumers may use this knowledge to better evaluate if they have confidence in the AI system or service, compare competing systems and services, or put into place mitigation measures to address any shortcomings of the particular system or service.

**Arguments in Support**

Oakland Privacy writes:

From a public transparency view, this is basic and minimal information that the public is entitled to in order to be able to understand the uses to which their personal information may be applied, the potential efficacy of the AI system, and what its output is predicated upon.

Secure Justice writes:

Exhibit 2
Liska Decl._Page 18

**ER138**

We believe [this bill] is a pragmatic proposal that will greatly increase public awareness into the data sets being used to train artificial intelligence models, and further does not impose an undue burden on the developers subject to such a requirement.

Concept Art Association writes:

[This bill] lays an imperative first stone on the path to protection for all Californians, and it is a solid concrete action we can take right now to begin bringing some transparency to what so far has mostly been an unscrupulous, opaque and predatory model for data acquisition.

**Arguments in Opposition**
California Chamber of Commerce, taking an "oppose unless amended" position, writes on behalf of an industry coalition:

Unfortunately, as currently drafted, we have significant concerns with the approach taken in [this bill], and specifically around overburdensome mandates, the technical feasibility of the bill's transparency measures (including its assignment of responsibilities and the unique challenges presented for different types of developers in meeting the standards set in this bill), insufficient clarity around key terms, and potential exposure to liability. Moreover, we are heavily concerned about AB 2013's failure to provide protections for trade secrets and intellectual property, though we do not believe that is the intended outcome of this bill. While it may not be obvious on its face, the expertise and judgment as well as selection of data and datasets is part of what differentiates providers, thereby causing significant concern among developers as to the potential of this bill to undermine their intellectual property and harm competition. And lastly, we question whether the disclosure of training data will result in any substantial benefit when it comes to determining an AI model's performance for a particular use case. Stated another way, simply because a model has been trained on certain data does not mean it will perform as needed in a specific use case.

Chamber of Progress writes:

Requiring online platforms to disclose data used to train their artificial intelligence (AI) systems and services on their website stifles competition in the digital marketplace. A healthy competition marketplace is essential to ensure better quality of services for consumers and encourages platforms to innovate. The disclosure requirement risks revealing important business information and strategies. Additionally, the inclusion of "but not be limited to" in such requirements makes the expectations placed on online platforms unclear.

## FISCAL COMMENTS

As currently in print, this bill is keyed nonfiscal.

## VOTES

**ASM PRIVACY AND CONSUMER PROTECTION: 8-1-2**
**YES:** Bauer-Kahan, Bryan, Irwin, Lowenthal, Ortega, Ward, Wicks, Wilson
**NO:** Dixon
**ABS, ABST OR NV:** Joe Patterson, Chen

Exhibit 2
Liska Decl._Page 19
ER139

**AB 2013**
Page 4

**UPDATED**

VERSION: May 2, 2024

CONSULTANT:  Slater Sharp / P. & C.P. / (916) 319-2200                    FN: 0002863

Exhibit 2
Liska Decl._Page 20                                                      **ER140**

# EXHIBIT 3

Exhibit 3
Liska Decl._Page 21

**SENATE JUDICIARY COMMITTEE**
Senator Thomas Umberg, Chair
**2023-2024 Regular Session**

AB 2013 (Irwin)
Version: June 17, 2024
Hearing Date: June 25, 2024
Fiscal: No
Urgency: No
CK

## SUBJECT

Artificial intelligence: training data transparency

## DIGEST

This bill requires developers of artificial intelligence (AI) systems or services that are made available for Californians to use to post on their website documentation regarding the data used to train the system or service, including high-level summaries of the datasets used.

## EXECUTIVE SUMMARY

Owing to recent advances in processing power and the rise of big data, AI's capacity and the scope of its applications have expanded rapidly, impacting how we communicate, interact, entertain ourselves, travel, transact business, and consume media. It has been used to accelerate productivity, achieve efficiencies, liberate us from drudgery, write our college essay, connect with each other, and live longer, fuller lives. It has also been used to constrain personal autonomy, compromise privacy and security, foment social upheaval, exacerbate inequality, spread misinformation, and subvert democracy. For good or ill, its transformative potential seems boundless.

Ultimately, AI systems are only as good as the data used to train them. However, there is very little transparency in what data is used to train these systems and that lack of transparency hamstrings efforts to address and adequately identify many of the issues being raised by AI's rapid development.

This bill seeks to establish basic transparency requirements for developers of AI systems or services that are made available in California. Developers are required to post documentation regarding the data used to train the AI system or service, including high-level summaries of the datasets used in developing the system or service.

Exhibit 3                                                                      **ER142**
Liska Decl._Page 22

AB 2013 (Irwin)
Page 2 of 10

The bill is author-sponsored. It is supported by a variety of organizations, including the
California Labor Federation and Transparency Coalition.AI. It is opposed by various
industry and business associations, including the California Chamber of Commerce.

## PROPOSED CHANGES TO THE LAW

Existing law:

1) Establishes the California Consumer Privacy Act (CCPA), which grants
   consumers certain rights with regard to their personal information, including
   enhanced notice, access, and disclosure; the right to deletion; the right to restrict
   the sale of information; and protection from discrimination for exercising these
   rights. It places attendant obligations on businesses to respect those rights. (Civ.
   Code § 1798.100 et seq.)

2) Defines "personal information" as information that identifies, relates to,
   describes, is reasonably capable of being associated with, or could reasonably be
   linked, directly or indirectly, with a particular consumer or household. The
   CCPA provides a nonexclusive series of categories of information deemed to be
   personal information, including identifiers, biometric information, and
   geolocation data. (Civ. Code § 1798.140(v).) The CCPA defines and provides
   additional protections for sensitive personal information, as defined, that reveals
   specified personal information about consumers. (Civ. Code § 1798.140(ae).)

3) Defines "aggregate consumer information" to mean information that relates to a
   group or category of consumers, from which individual consumer identities have
   been removed, that is not linked or reasonably linkable to any consumer or
   household, including via a device. "Aggregate consumer information" does not
   mean one or more individual consumer records that have been deidentified.
   (Civ. Code § 1798.140(b).)

4) Defines "security and integrity" as the ability of:
   a) Networks or information systems to detect security incidents that
      compromise the availability, authenticity, integrity, and confidentiality of
      stored or transmitted personal information.
   b) Businesses to detect security incidents, resist malicious, deceptive,
      fraudulent, or illegal actions and to help prosecute those responsible for
      those actions.
   c) Businesses to ensure the physical safety of natural persons. (Civ. Code §
      1798.140(ac).

5) Establishes the California Privacy Rights Act (CPRA), which amends the CCPA
   and creates the Privacy Protection Agency (PPA), which is charged with

Exhibit 3                                                                              ER143
Liska Decl._Page 23

AB 2013 (Irwin)
Page 3 of 10

implementing these privacy laws, promulgating regulations, and carrying out enforcement actions. (Civ. Code § 798.100 et seq.; Proposition 24 (2020).)

6) Permits amendment of the CPRA by a majority vote of each house of the Legislature and the signature of the Governor, provided such amendments are consistent with and further the purpose and intent of this act as set forth therein. (Proposition 24 § 25 (2020).)

This bill:

1) Requires the developer of an AI system or service, on or before January 1, 2026, and before each time thereafter that the system or service is made publicly available to Californians for use, regardless of whether the terms of that use include compensation, to post on the developer's website documentation regarding the data used by the developer to train the AI system or service, including, but not be limited to, all of the following:
   a) A high-level summary of the datasets used in the development of the AI system or service, including, but not limited to:
      i. The sources or owners of the datasets.
      ii. A description of how the datasets further the intended purpose of the system or service.
      iii. The number of data points included in the datasets, which may be in general ranges, and with estimated figures for dynamic datasets.
      iv. A clear definition of each category associated to data points within the datasets, including the format of data points and sample values.
      v. Whether the datasets include any data protected by copyright, trademark, or patent, or whether the datasets are entirely in the public domain.
      vi. Whether the datasets were purchased or licensed by the developer.
      vii. Whether the datasets include personal information, as defined in subdivision (v) of Section 1798.140.
      viii. Whether the datasets include aggregate consumer information, as defined in subdivision (b) Section 1798.140.
      ix. A description of any cleaning, processing, or other modification to the datasets by the developer, including the intended purpose of those efforts in relation to the system or service.
      x. The time period during which the data in the datasets were collected, including a notice if the data collection is ongoing.
      xi. The dates the datasets were first and last used during the development of the system or service.
      xii. Whether the system or service used or continuously uses synthetic data generation in its development. A developer may include a description of the functional need or desired purpose of the

Exhibit 3                                                    ER144
Liska Decl._Page 24

AB 2013 (Irwin)
Page 4 of 10

> synthetic data in relation to the intended purpose of the system or service.

2) Clarifies that a developer shall not be required to post documentation regarding the data used to train an AI system or service for any of the following:
   a) An AI system or service whose sole purpose is to help ensure security and integrity as defined in subdivision (ac) of Section 1798.140.
   b) An AI system or service whose sole purpose is the operation of an aircraft in the national airspace.
   c) An AI system or service developed for national security, military, or defense purposes that is made available only to a federal entity.

3) Provides that for an AI system or service made available before January 1, 2025, the high-level summary must use information reasonable available to the developer, as provided.

4) Defines the following terms:
   a) "Artificial intelligence" means an engineered or machine-based system that varies in its level of autonomy and that can, for explicit or implicit objectives, infer from the input it receives how to generate outputs that can influence physical or virtual environments.
   b) "Developer" means a person, partnership, state or local government agency, or corporation that designs, codes, or produces an artificial intelligence system or service, or substantially modifies an artificial intelligence system or service for use by a third party for free or for a fee.
   c) "Synthetic data generation" means a process in which seed data are used to create artificial data that have some of the statistical characteristics of the seed data.
   d) "Train an artificial intelligence system or service" includes testing, validating, or fine tuning by the developer of the AI system or service.

## COMMENTS

1. <u>Training data and transparency</u>

As stated, training data is the veritable secret sauce for AI systems. With the race to build bigger and better AI systems and models, a battle over data is also being waged:

> The race to lead A.I. has become a desperate hunt for the digital data needed to advance the technology. To obtain that data, tech companies including OpenAI, Google and Meta have cut corners, ignored corporate policies and debated bending the law, according to an examination by The New York Times.

Exhibit 3                                    ER145
Liska Decl._Page 25

AB 2013 (Irwin)
Page 5 of 10

> At Meta, which owns Facebook and Instagram, managers, lawyers and engineers last year discussed buying the publishing house Simon & Schuster to procure long works, according to recordings of internal meetings obtained by The Times. They also conferred on gathering copyrighted data from across the internet, even if that meant facing lawsuits. Negotiating licenses with publishers, artists, musicians and the news industry would take too long, they said.
>
> Like OpenAI, Google transcribed YouTube videos to harvest text for its A.I. models, five people with knowledge of the company's practices said. That potentially violated the copyrights to the videos, which belong to their creators.[1]

Requiring transparency about the training data used for AI systems helps identify and mitigate biases, addressing hallucinations and other problematic outputs, and shines the light on various other issues, such as privacy and copyright concerns. A team of experts from both industry and academia at the Shorenstein Center created a documentation framework for AI which highlights the importance:

> While often categorized as technical, AI systems and their underlying data and models are sociotechnical. In other words, they combine the technical infrastructure and design with the social context in which they are designed, developed, evaluated, and deployed. Accountability for these systems and their impacts requires transparency around their design and creation and how they are intended to be used. In recent years, alongside the exponential increase in data collection and the efforts to develop increasingly powerful machine learning models, there have been notable efforts calling attention to the need for documentation to accompany datasets, models, and AI systems, and to account for the process of creating them.
>
> Documentation is worthwhile for various stakeholders. It improves the understanding of practitioners creating or building datasets, models, or AI systems, which opens up opportunities to reflect on implicit and explicit decisions, ultimately enhancing the reliability of the systems they create. For organizations, it enables knowledge transfer across silos and encourages responsible use. Further, it provides information to users and potentially affected communities that can be used to determine the appropriateness of an AI system or its underlying data or models, thus helping inform consumer choice, advocacy work, regulation development, and regulation enforcement. It also enables

---

[1] Cade Metz, et al., *How Tech Giants Cut Corners to Harvest Data for A.I.* (April 6, 2024) The New York Times, https://www.nytimes.com/2024/04/06/technology/tech-giants-harvest-data-artificial-intelligence.html. All internet citations are current as of June 16, 2024.

Exhibit 3                                                                     ER146
Liska Decl._Page 26

AB 2013 (Irwin)
Page 6 of 10

recourse in the event of harms caused by or inquiries into the AI system, and accountability regarding who might be held responsible for those harms.[2]

A recent article in the Harvard Data Science Review highlights the importance of transparency and barriers to achieving it without regulation:

Knowing what is in the data sets used to train models and how they have been compiled is vitally important. Without this information, the work of developers, researchers, and ethicists to address biases or remove harmful content from the data is hampered. Information about training data is also vital to lawmakers' attempts to assess whether foundation models have ingested personal data or copyrighted material. Further downstream, the intended operators of AI systems and those impacted by their use are far more likely to trust them if they understand how they have been developed.

However, in undertaking their analysis, Schaul et al. (2023) concluded that "many companies do not document the contents of their training data—even internally—for fear of finding personal information about identifiable individuals, copyrighted material and other data grabbed without consent."

In public, companies have used different arguments to justify the lack of transparency around their training data. In documentation published at the launch of its GPT-4 model, OpenAI (2023) stated that it would not share detailed information about 'data set construction' and other aspects of the model's development due to "the competitive landscape and the safety implications of large-scale models." The decision not to disclose the data used to train the model was roundly criticized by a number of leading researchers (Xiang, 2023). A recent op-ed in the Guardian argued that companies are using 'speculative fears' to "stop people asking awkward questions about how this particular technological sausage has been made" (Naughton, 2023).[3]

Various sectors are calling on lawmakers to provide some measure of transparency in this space. A group of media organizations and outlets, including the Associated Press and Gannett, recently issued an open letter calling on regulators to require transparency

---

[2] Kasia Chmielinski, et al.,  *The CLeAR Documentation Framework for AI Transparency: Recommendations for Practitioners & Context for Policymakers* (May 21, 2024) Shorenstein Center on Media, Politics, and Public Policy, https://shorensteincenter.org/wp-content/uploads/2024/05/CleAR_KChmielinski_FINAL.pdf.
[3] Jack Hardinges, et al., *We Must Fix the Lack of Transparency Around the Data Used to Train Foundation Models* (December 13, 2023) Harvard Data Science Review, https://hdsr.mitpress.mit.edu/pub/xau9dza3/release/2.

Exhibit 3                                                    ER147
Liska Decl._Page 27

AB 2013 (Irwin)
Page 7 of 10

as to the makeup of all training sets used to create AI models.[4] At the federal level, Representative Anna Eshoo and Representative Don Beyer introduced the AI Foundation Model Transparency Act, which would direct the Federal Trade Commission — in consultation with the National Institute of Standards and Technology and the White House Office of Science and Technology Policy — to "establish standards for making publicly available information about the training data and algorithms used in artificial intelligence foundation models."[5]

2.  <u>Requiring baseline transparency for AI systems in California</u>

This bill begins to address the issue of training data transparency by requiring developers of AI systems and services made available to Californians for use to post documentation of the data used to train the system or service. This includes a high-level summary of the datasets used, including:

- The sources or owners of the datasets.
- A clear definition of each category associated to data points within the datasets, including the format of data points and sample values.
- Whether the datasets include any data protected by copyright, trademark, or patent, requiring the purchase or licensure of the data, or whether the datasets are entirely in the public domain.
- Whether the datasets were purchased or licensed by the developer.
- Whether the datasets include personal information.

Developers must also disclose whether the system or service used or uses synthetic data generation in its development.

The bill makes clear that training includes testing, validating, and fine tuning by the developer of the AI system or service.

According to the author:

> Artificial Intelligence has become nearly unavoidable in Californians' daily lives, with new exciting generative AI tools being introduced daily, and the companies who make up the cornerstones of our digital lives either adopting AI or identifying their existing tools as falling under the AI umbrella. However consumer confidence in AI systems has not grown at the same rapid pace as industry adoption. Many consumers have valid

---

[4] Bailey Schulz, *Will AI deepen distrust in news? Gannett, other media organizations want more regulations* (August 9, 2023) USA Today, https://www.usatoday.com/story/tech/news/2023/08/09/ai-regulations-media-gannett/70551555007/.

[5] Edward Graham, *Bill sets transparency standards for AI models, including use of copyrighted material* (January 2, 2024) Nextgov/FCW, https://www.nextgov.com/artificial-intelligence/2024/01/bill-sets-transparency-standards-ai-models-including-use-copyrighted-material/393052/.

Exhibit 3                                                          ER148
Liska Decl._Page 28

AB 2013 (Irwin)
Page 8 of 10

questions about how these AI systems and services are created, and if they truly are better than what they seek to replace.

To build consumer confidence we need to start with the foundations, and for AI that is the selection of training data. AB 2013 provides transparency to consumers of AI systems and services by providing important documentation about the data used to train the services and systems they are being offered, including if synthetic data has or is being used to fill gaps in data sources.

Consumers may use this knowledge to better evaluate if they have confidence in the AI system or service, compare competing systems and services, or put into place mitigation measures to address any shortcomings of the particular system or service.

3. Stakeholder positions

A coalition of industry groups in opposition, including TechNet, writes:

We note that the bill defines "training" to include testing, validating, or fine tuning by the developer of an AI system or service. We are concerned that amendments expanded the scope of the bill even further and effectively captures all data, regardless of risk level. The bill should be narrowed to scope in only high-risk AI systems. Mandating disclosures for low-risk AI unnecessarily burdens businesses for little to no benefit to the public. A system or service is not a "high-risk" AI system or service, for example, if it is only intended to either perform a narrow procedural task or detect decision-making patterns or deviations from prior decision-making patterns but not meant to replace or influence the previously completed human assessment without proper human review.

For disclosures to be meaningful and not overly burdensome, amendments are also needed to narrow various definitions, starting with the bill's definition of "artificial intelligence system or service". AB 2013's current definition of AI system or service is over broad, arguably capturing regression-based models and even the most rudimentary prediction models or machine-based systems that generate content and make decisions using solely linear functions. Such issues can be addressed by recognizing that the system or service must be capable of "operating with varying levels of autonomy," in line with the OECD AI definition.

Exhibit 3                                          ER149
Liska Decl._Page 29

AB 2013 (Irwin)
Page 9 of 10

Chamber of Progress writes in opposition:

> Requiring online platforms to disclose data used to train their artificial
> intelligence (AI) systems and services on their website stifles competition
> in the digital marketplace. A healthy, competitive marketplace is essential
> to promote quality services for consumers and encourages platforms to
> innovate. The disclosure requirement risks revealing important business
> information and strategies, even when platforms specifically note that the
> datasets are protected intellectual property. Additionally, the language
> "but not be limited to" in such requirements makes the expectations
> placed on online platforms unclear.

Writing in support, the California Labor Federation argues:

> Artificial intelligence systems have the capability of producing a wide
> range of outputs ranging from decisions on whether an individual ought
> to be hired to evaluating an employee's performance. These decisions are
> monumentally impactful on the lives of everyday Californians, yet the
> public is not privy to the data used to train the AI systems affecting their
> livelihoods. From a public transparency view, this is basic information
> that the public is entitled to in order to understand whether their personal
> information may have been used as training data, the potential efficacy of
> the AI system, and what its outputs are predicated upon. Workers and the
> public cannot be left in the dark when technology of this magnitude is
> impacting their jobs and lives.

> AB 2013 increases public transparency by requiring the developer of an AI
> system that makes predictions, recommendations, or decisions to publish
> a description of the datasets used to train the system. The set of required
> disclosures includes the source of the dataset, who owns it, definitional
> categories, when the data was collected and when it has been used,
> whether the data set was purchased, licensed, or found in the public
> domain, and whether the collected data is being used to synthesize new
> data sets. AB 2013 provides the public with the information to address AI
> systems utilizing nonconsensual personal information and training data
> riddled with implicit and explicit biases.

### **SUPPORT**

California Democratic Party
California Labor Federation, AFL-CIO
Concept Art Association
Los Angeles County Democratic Party
Oakland Privacy

Exhibit 3                                                                      **ER150**
Liska Decl._Page 30

AB 2013 (Irwin)
Page 10 of 10

Perk Advocacy
Santa Monica Democratic Club
Secure Justice
Transparency Coalition.AI

## OPPOSITION

American Property Casualty Insurance Association
California Bankers Association
California Chamber of Commerce
California Land Title Association
Chamber of Progress
Computer & Communications Industry Association
Insights Association
National Association of Mutual Insurance Companies
Personal Insurance Federation of California
Software & Information Industry Association
TechNet

## RELATED LEGISLATION

Pending Legislation: AB 2877 (Bauer-Kahan, 2024) prohibits CCPA covered-businesses that are the developers of AI systems or tools from using the personal information of consumers under the age of 16 to train AI systems or services without first obtaining affirmative authorization, and even with such authorization the data must be de-identified and aggregated before it is used to train. AB 2877 is currently in this Committee.

AB 3204 (Bauer-Kahan, 2024) requires data digesters to register with the agency, pay a registration fee, and provide specified information, prescribe penalties for a failure to register as required by these provisions, require the California Privacy Protection Agency to create a page on its internet website where this registration information is accessible to the public, and create a fund known as the "Data Digester Registry Fund." AB 3204 was held by the Assembly Appropriations Committee.

Prior Legislation: None known.

## PRIOR VOTES:

Assembly Floor (Ayes 56, Noes 8)
Assembly Privacy and Consumer Protection Committee (Ayes 8, Noes 1)
**************

Exhibit 3                                                    ER151
Liska Decl._Page 31

# EXHIBIT 4

Exhibit 4                                          **ER152**
Liska Decl._Page 32

**SENATE RULES COMMITTEE**                                    AB 2013
Office of Senate Floor Analyses
(916) 651-1520   Fax: (916) 327-4478

---

THIRD READING

---

Bill No:      AB 2013
Author:       Irwin (D)
Amended:      8/19/24 in Senate
Vote:         21

---

SENATE JUDICIARY COMMITTEE:  10-1, 6/25/24
AYES:  Umberg, Wilk, Allen, Ashby, Caballero, Durazo, Laird, Roth, Stern,
  Wahab
NOES:  Niello

ASSEMBLY FLOOR:  56-8, 5/20/24 - See last page for vote

---

**SUBJECT:**  Generative artificial intelligence:  training data transparency

**SOURCE:**  Author

---

**DIGEST:**   This bill requires developers of generative artificial intelligence
(GenAI) systems or services that are made available for Californians to use to post
on their website documentation regarding the data used to train the system or
service, including high-level summaries of the datasets used.

*Senate Floor Amendments* of 8/19/24 restructure definitions and relax the
documentation requirements on developers.

**ANALYSIS:**

Existing law:

1)  Establishes the California Consumer Privacy Act (CCPA), which grants
    consumers certain rights with regard to their personal information, including
    enhanced notice, access, and disclosure; the right to deletion; the right to restrict
    the sale of information; and protection from discrimination for exercising these
    rights. It places attendant obligations on businesses to respect those rights.
    (Civil (Civ.) Code § 1798.100 et seq.)

Exhibit 4                                    ER153
Liska Decl._Page 33

AB 2013
Page  2

2) Defines "personal information" as information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household. The CCPA provides a nonexclusive series of categories of information deemed to be personal information, including identifiers, biometric information, and geolocation data. (Civ. Code § 1798.140(v).) The CCPA defines and provides additional protections for sensitive personal information, as defined, that reveals specified personal information about consumers. (Civ. Code § 1798.140(ae).)

3) Defines "aggregate consumer information" to mean information that relates to a group or category of consumers, from which individual consumer identities have been removed, that is not linked or reasonably linkable to any consumer or household, including via a device. "Aggregate consumer information" does not mean one or more individual consumer records that have been deidentified. (Civ. Code § 1798.140(b).)

4) Establishes the California Privacy Rights Act (CPRA), which amends the CCPA and creates the Privacy Protection Agency (PPA), which is charged with implementing these privacy laws, promulgating regulations, and carrying out enforcement actions. (Civ. Code § 798.100 et seq.; Proposition 24 (2020).)

This bill:

1) Requires a developer, on or before January 1, 2026, and before each time thereafter that a GenAI system or service, or a substantial modification to such a system or service, as provided, is made publicly available to Californians for use, regardless of whether the terms of that use include compensation, to post on the developer's website documentation regarding the data used by the developer to train the GenAI system or service, including a high-level summary of the datasets used in the development of the GenAI system or service, including specified information.

2) Clarifies that a developer shall not be required to post documentation regarding the data used to train a GenAI system or service for any of the following:
   a) A GenAI system or service whose sole purpose is to help ensure security and integrity as defined in subdivision (ac) of Section 1798.140.
   b) A GenAI system or service whose sole purpose is the operation of an aircraft in the national airspace.
   c) A GenAI system or service developed for national security, military, or defense purposes that is made available only to a federal entity.

Exhibit 4                                                   **ER154**
Liska Decl._Page 34

AB 2013
Page  3

## Background

Owing to recent advances in processing power and the rise of big data, AI's capacity and the scope of its applications have expanded rapidly, impacting how we communicate, interact, entertain ourselves, travel, transact business, and consume media. It has been used to accelerate productivity, achieve efficiencies, liberate us from drudgery, write our college essay, connect with each other, and live longer, fuller lives. It has also been used to constrain personal autonomy, compromise privacy and security, foment social upheaval, exacerbate inequality, spread misinformation, and subvert democracy. For good or ill, its transformative potential seems boundless.

Ultimately, AI systems are only as good as the data used to train them. However, there is very little transparency in what data is used to train these systems and that lack of transparency hamstrings efforts to address and adequately identify many of the issues being raised by AI's rapid development. This bill seeks to establish basic transparency requirements for developers of GenAI systems or services that are made available in California. Developers are required to post documentation regarding the data used to train the system or service, including high-level summaries of the datasets used in developing the system or service.

This bill is author-sponsored. It is supported by a variety of organizations, including the California Labor Federation and Transparency Coalition.AI. It is opposed by various industry and business associations, including the California Chamber of Commerce.

## Comments

Requiring transparency about the training data used for AI systems helps identify and mitigate biases, addressing hallucinations and other problematic outputs, and shines the light on various other issues, such as privacy and copyright concerns. A team of experts from both industry and academia at the Shorenstein Center created a documentation framework for AI which highlights the importance:

> While often categorized as technical, AI systems and their underlying data and models are sociotechnical. In other words, they combine the technical infrastructure and design with the social context in which they are designed, developed, evaluated, and deployed. Accountability for these systems and their impacts requires transparency around their design and creation and how they are intended to be used. In recent years, alongside the exponential increase in data collection and the efforts to develop increasingly powerful

Exhibit 4                                                    ER155
Liska Decl._Page 35

AB 2013

Page 4

machine learning models, there have been notable efforts calling attention to the need for documentation to accompany datasets, models, and AI systems, and to account for the process of creating them.

Documentation is worthwhile for various stakeholders. It improves the understanding of practitioners creating or building datasets, models, or AI systems, which opens up opportunities to reflect on implicit and explicit decisions, ultimately enhancing the reliability of the systems they create. For organizations, it enables knowledge transfer across silos and encourages responsible use. Further, it provides information to users and potentially affected communities that can be used to determine the appropriateness of an AI system or its underlying data or models, thus helping inform consumer choice, advocacy work, regulation development, and regulation enforcement. It also enables recourse in the event of harms caused by or inquiries into the AI system, and accountability regarding who might be held responsible for those harms.[1]

A recent article in the Harvard Data Science Review highlights the importance of transparency and barriers to achieving it without regulation:

Knowing what is in the data sets used to train models and how they have been compiled is vitally important. Without this information, the work of developers, researchers, and ethicists to address biases or remove harmful content from the data is hampered. Information about training data is also vital to lawmakers' attempts to assess whether foundation models have ingested personal data or copyrighted material. Further downstream, the intended operators of AI systems and those impacted by their use are far more likely to trust them if they understand how they have been developed.

However, in undertaking their analysis, Schaul et al. (2023) concluded that "many companies do not document the contents of their training data—even internally—for fear of finding personal information about identifiable individuals, copyrighted material and other data grabbed without consent."[2]

---

[1] Kasia Chmielinski, et al., *The CLeAR Documentation Framework for AI Transparency: Recommendations for Practitioners & Context for Policymakers* (May 21, 2024) Shorenstein Center on Media, Politics, and Public Policy, **https://shorensteincenter.org/wp-content/uploads/2024/05/CleAR_KChmielinski_FINAL.pdf**.

[2] Jack Hardinges, et al., *We Must Fix the Lack of Transparency Around the Data Used to Train Foundation Models* (December 13, 2023) Harvard Data Science Review, **https://hdsr.mitpress.mit.edu/pub/xau9dza3/release/2**.

Exhibit 4                                                            ER156

Liska Decl._Page 36

AB 2013
Page 5

Various sectors are calling on lawmakers to provide some measure of transparency in this space. A group of media organizations and outlets, including the Associated Press and Gannett, recently issued an open letter calling on regulators to require transparency as to the makeup of all training sets used to create AI models.[3] At the federal level, Representative Anna Eshoo and Representative Don Beyer introduced the AI Foundation Model Transparency Act, which would direct the Federal Trade Commission — in consultation with the National Institute of Standards and Technology and the White House Office of Science and Technology Policy — to "establish standards for making publicly available information about the training data and algorithms used in artificial intelligence foundation models."[4]

*Requiring baseline transparency for AI systems in California.* This bill begins to address the issue of training data transparency by requiring developers of GenAI systems and services made available to Californians for use to post documentation of the data used to train the system or service. This includes a high-level summary of the datasets used, including:

- The sources or owners of the datasets.
- A description of the types of data points within the datasets, as provided.
- Whether the datasets include any data protected by copyright, trademark, or patent, requiring the purchase or licensure of the data, or whether the datasets are entirely in the public domain.
- Whether the datasets were purchased or licensed by the developer.
- Whether the datasets include personal information.

Developers must also disclose whether the system or service used or uses synthetic data generation in its development.

This bill makes clear that training includes testing, validating, and fine tuning by the developer of the GenAI system or service.

---

[3] Bailey Schulz, *Will AI deepen distrust in news? Gannett, other media organizations want more regulations* (August 9, 2023) USA Today, **https://www.usatoday.com/story/tech/news/2023/08/09/ai-regulations-media-gannett/70551555007/**.

[4] Edward Graham, *Bill sets transparency standards for AI models, including use of copyrighted material* (January 2, 2024) Nextgov/FCW, **https://www.nextgov.com/artificial-intelligence/2024/01/bill-sets-transparency-standards-ai-models-including-use-copyrighted-material/393052/**.

Exhibit 4                                                                    ER157
Liska Decl._Page 37

AB 2013
Page  6

According to the author:

> Artificial Intelligence has become nearly unavoidable in Californians' daily lives, with new exciting generative AI tools being introduced daily, and the companies who make up the cornerstones of our digital lives either adopting AI or identifying their existing tools as falling under the AI umbrella. However consumer confidence in AI systems has not grown at the same rapid pace as industry adoption. Many consumers have valid questions about how these AI systems and services are created, and if they truly are better than what they seek to replace.
>
> To build consumer confidence we need to start with the foundations, and for AI that is the selection of training data. AB 2013 provides transparency to consumers of AI systems and services by providing important documentation about the data used to train the services and systems they are being offered, including if synthetic data has or is being used to fill gaps in data sources.
> Consumers may use this knowledge to better evaluate if they have confidence in the AI system or service, compare competing systems and services, or put into place mitigation measures to address any shortcomings of the particular system or service.

**FISCAL EFFECT:**  Appropriation:  No    Fiscal Com.:    No     Local:  No

**SUPPORT:**  (Verified  8/20/24)

California Democratic Party
California Labor Federation, AFL-CIO
Center for AI and Digital Policy
Concept Art Association
Los Angeles County Democratic Party
Oakland Privacy
Perk Advocacy
Santa Monica Democratic Club
Secure Justice
Transparency Coalition.AI

**OPPOSITION:**  (Verified  8/20/24)

Chamber of Progress
Software & Information Industry Association

Exhibit 4
Liska Decl._Page 38

ER158

AB 2013
Page 7

TechNet

**ARGUMENTS IN SUPPORT:** The California Labor Federation argues:

> AB 2013 increases public transparency by requiring the developer of an AI system that makes predictions, recommendations, or decisions to publish a description of the datasets used to train the system. The set of required disclosures includes the source of the dataset, who owns it, definitional categories, when the data was collected and when it has been used, whether the data set was purchased, licensed, or found in the public domain, and whether the collected data is being used to synthesize new data sets. AB 2013 provides the public with the information to address AI systems utilizing nonconsensual personal information and training data riddled with implicit and explicit biases.

**ARGUMENTS IN OPPOSITION:** Chamber of Progress writes:

> Requiring online platforms to disclose data used to train their artificial intelligence (AI) systems and services on their website stifles competition in the digital marketplace. A healthy, competitive marketplace is essential to promote quality services for consumers and encourages platforms to innovate. The disclosure requirement risks revealing important business information and strategies, even when platforms specifically note that the datasets are protected intellectual property. Additionally, the language "but not be limited to" in such requirements makes the expectations placed on online platforms unclear.

ASSEMBLY FLOOR:  56-8, 5/20/24
AYES:  Addis, Aguiar-Curry, Alvarez, Bains, Bauer-Kahan, Bennett, Berman, Boerner, Bonta, Bryan, Calderon, Juan Carrillo, Wendy Carrillo, Connolly, Mike Fong, Friedman, Garcia, Gipson, Grayson, Haney, Hart, Holden, Irwin, Jones-Sawyer, Kalra, Lee, Low, Lowenthal, Maienschein, McCarty, McKinnor, Muratsuchi, Ortega, Pacheco, Papan, Pellerin, Petrie-Norris, Quirk-Silva, Ramos, Rendon, Reyes, Blanca Rubio, Santiago, Schiavo, Soria, Ting, Valencia, Villapudua, Waldron, Ward, Weber, Wicks, Wilson, Wood, Zbur, Robert Rivas
NOES:  Alanis, Davies, Dixon, Vince Fong, Gallagher, Hoover, Joe Patterson, Sanchez
NO VOTE RECORDED:  Arambula, Cervantes, Chen, Megan Dahle, Essayli, Flora, Gabriel, Jackson, Lackey, Mathis, Stephanie Nguyen, Jim Patterson, Luz Rivas, Rodriguez, Ta, Wallis

Exhibit 4                                    ER159
Liska Decl._Page 39

AB 2013
Page  8

Prepared by:  Christian Kurpiewski / JUD. / (916) 651-4113
8/20/24 17:27:54

**\*\*\*\*  END  \*\*\*\***

Exhibit 4                                                    **ER160**
Liska Decl._Page 40

# EXHIBIT 5

Exhibit 5                                        **ER161**
Liska Decl._Page 41

CONCURRENCE IN SENATE AMENDMENTS
AB 2013 (Irwin)
As Amended  August 19, 2024
Majority vote

## SUMMARY

Requires a developer of a generative artificial intelligence (GenAI) system or service to publicly disclose specific information related to the system or service's training data, except as provided.

**Senate Amendments**

1. Scope of the bill is now limited to GenAI only, rather than all artificial intelligence (AI) systems and services.

2. Exempts GenAI systems developed exclusively for use by affiliates, as defined in Civ. Code Section 1799.1a, and hospital medical staff members.

3. Limits disclosure requirements to the original developers of a GenAI system, even if a third party further trains the system through fine-tuning.

4. Limits the bill's scope to GenAI systems released on or after January 1, 2022.

5. Requires disclosure of "general ranges" of numbers of data points included in training datasets, rather than specific values.

6. Requires disclosure of "whether there was any cleaning, processing, or other modification of datasets by the developer," rather than a description of those modifications.

7. Removes a requirement that if datasets have been merged with other datasets, the developer shall include the disclosure required by the bill for the original datasets.

8. Additionally exempts GenAI systems trained for the following purposes:

   a. GenAI systems with the sole purpose of the operation of aircraft in the national airspace.

   b. GenAI systems developed for national security, military, or defense purposes that are only made available to a federal entity.

## COMMENTS

*Background.* The development of AI is creating exciting opportunities to grow California's economy and improve the lives of its residents. AI uses algorithms – sets of rules – to transform inputs into outputs. Inputs and outputs can be anything a computer can process: numbers, text, audio, video, or movement.

Training is the principle innovation that allows modern AI to be both efficient and versatile. During training, a naïve AI is exposed to data and allowed to automatically explore its structure. As the AI explores, it alters itself in an attempt to better represent the data. There is a common

Exhibit 5
Liska Decl._Page 42

**AB 2013**
Page  2

saying in computer science: "garbage in, garbage out." The performance of an AI product is directly impacted by the quality, quantity, and relevance of the data used to train it.

AI that are trained on small, specific datasets in order to make recommendations and predictions are sometimes referred to as "predictive AI." This differentiates them from GenAI, which are trained on massive datasets in order to produce detailed text and images. When Netflix suggests a TV show to a viewer, the recommendation is produced by predictive AI that has been trained on the viewing habits of Netflix users. When ChatGPT generates text in clear, concise paragraphs, it uses GenAI that has been trained on the written contents of the internet.

*What this bill would do.* This bill would require developers of GenAI systems and services to publicly disclose specified information about the datasets used to train, test, and validate their models, except as provided.

*Analysis.* The present bill furthers consumer protection in California by granting the state's residents insight into how the GenAI systems and services they engage with are trained. Overall, this bill would impose modest requirements on developers of GenAI systems and services in exchange for providing Californians with a fuller understanding of the state's GenAI information ecosystem.

**According to the Author**

> Artificial Intelligence has become nearly unavoidable in Californians' daily lives, with new exciting generative AI tools being introduced daily, and the companies who make up the cornerstones of our digital lives either adopting AI or identifying their existing tools as falling under the AI umbrella. However consumer confidence in AI systems has not grown at the same rapid pace as industry adoption. Many consumers have valid questions about how these AI systems and services are created, and if they truly are better than what they seek to replace.

> To build consumer confidence we need to start with the foundations, and for AI that is the selection of training data. AB 2013 provides transparency to consumers of AI systems and services by providing important documentation about the data used to train the services and systems they are being offered, including if synthetic data has or is being used to fill gaps in data sources.

> Consumers may use this knowledge to better evaluate if they have confidence in the AI system or service, compare competing systems and services, or put into place mitigation measures to address any shortcomings of the particular system or service.

**Arguments in Support**
The Concept Art Association writes:

> It is essential that consumers know where and how their data (often unknowingly) is being taken, used and sold by these AI companies. AB 2013 lays an imperative first stone on the path to protection for all Californians, and it is a solid concrete action we can take right now to begin bringing some transparency to what so far has mostly been an unscrupulous, opaque and predatory model for data acquisition.

Exhibit 5
Liska Decl._Page 43

ER163

AB 2013
Page  3

**Arguments in Opposition**

Software & Information Industry Association takes an "Oppose unless Amended" position, writing:

> Generally speaking, our concerns with the approach taken in AB 2013 have specifically centered around overburdensome mandates, overbroad scope (applying both retroactively and to non-high risk models), the technical feasibility of some of the disclosure requirements (including its assignment of responsibilities and the unique challenges presented for different types of developers in meeting the standards set in this bill), insufficient clarity around key terms, exposure of trade secrets or intellectual property, and potential exposure to liability.

## FISCAL COMMENTS

As currently in print this bill is keyed nonfiscal.

## VOTES:

**ASM PRIVACY AND CONSUMER PROTECTION:  8-1-2**
**YES:**  Bauer-Kahan, Bryan, Irwin, Lowenthal, Ortega, Ward, Wicks, Wilson
**NO:**  Dixon
**ABS, ABST OR NV:**  Joe Patterson, Chen

**ASSEMBLY FLOOR:  56-8-16**
**YES:**  Addis, Aguiar-Curry, Alvarez, Bains, Bauer-Kahan, Bennett, Berman, Boerner, Bonta, Bryan, Calderon, Juan Carrillo, Wendy Carrillo, Connolly, Mike Fong, Friedman, Garcia, Gipson, Grayson, Haney, Hart, Holden, Irwin, Jones-Sawyer, Kalra, Lee, Low, Lowenthal, Maienschein, McCarty, McKinnor, Muratsuchi, Ortega, Pacheco, Papan, Pellerin, Petrie-Norris, Quirk-Silva, Ramos, Rendon, Reyes, Blanca Rubio, Santiago, Schiavo, Soria, Ting, Valencia, Villapudua, Waldron, Ward, Weber, Wicks, Wilson, Wood, Zbur, Robert Rivas
**NO:**  Alanis, Davies, Dixon, Vince Fong, Gallagher, Hoover, Joe Patterson, Sanchez
**ABS, ABST OR NV:**  Arambula, Cervantes, Chen, Megan Dahle, Essayli, Flora, Gabriel, Jackson, Lackey, Mathis, Stephanie Nguyen, Jim Patterson, Luz Rivas, Rodriguez, Ta, Wallis

**SENATE FLOOR:  39-0-1**
**YES:**  Allen, Alvarado-Gil, Archuleta, Ashby, Atkins, Becker, Blakespear, Bradford, Caballero, Cortese, Dahle, Dodd, Durazo, Eggman, Glazer, Gonzalez, Grove, Hurtado, Jones, Laird, Limón, McGuire, Menjivar, Newman, Nguyen, Niello, Ochoa Bogh, Padilla, Portantino, Roth, Rubio, Seyarto, Skinner, Smallwood-Cuevas, Stern, Umberg, Wahab, Wiener, Wilk
**ABS, ABST OR NV:**  Min

## UPDATED

VERSION: August 19, 2024

CONSULTANT:  Slater Sharp / P. & C.P. / (916) 319-2200                    FN: 0004750

Exhibit 5                    ER164
Liska Decl._Page 44

# EXHIBIT 6

Exhibit 6
Liska Decl._Page 45

**ER165**

# xAI Frontier Artificial Intelligence Framework

Last updated: December 30, 2025

xAI seriously considers safety and security while developing and advancing AI models to help us all to better understand the universe. This Frontier AI Framework ("FAIF") outlines xAI's approach to policies for handling significant risks, including catastrophic risks, associated with the development, deployment, and release of xAI's AI models, such as Grok. xAI plans to continuously review and adjust this FAIF over time, as AI model development, capability and use cases evolve.

This FAIF complies with California's Transparency in Frontier Artificial Intelligence Act (the "TFAIA", California Business and Professions Code § 22757.10 et seq.).

## Scope

This FAIF discusses two major categories of AI risk—malicious use and loss of control. This risk includes, but is not limited to, Catastrophic Risk as defined in the TFAIA.[1] This FAIF also outlines the quantitative thresholds, metrics, and procedures that xAI may utilize to manage and improve the safety of its AI models. In addition, this FAIF discusses xAI's approach to addressing operational and societal risks posed by advanced AI, including incorporating public transparency, third-party review, and information security considerations.

## Overall Approach

Managing the risks related to advanced AI models presents unique challenges as compared to standard risk management practices in use in other fields, such as for aerospace engineering. Given the large and continuously growing range of applications where AI models may be deployed, it is difficult to comprehensively anticipate and model all of the general public's potential applications and interactions for an AI model. Additionally, the private nature of typical

---

[1] The TFAIA defines Catastrophic Risk as "a foreseeable and material risk that a frontier developer's development, storage, use, or deployment of a frontier model will materially contribute to the death of, or serious injury to, more than 50 people or more than one billion dollars ($1,000,000,000) in damage to, or loss of, property arising from a single incident involving a frontier model doing any of the following:

(A) Providing expert-level assistance in the creation or release of a chemical, biological, radiological, or nuclear weapon.

(B) Engaging in conduct with no meaningful human oversight, intervention, or supervision that is either a cyberattack or, if the conduct had been committed by a human, would constitute the crime of murder, assault, extortion, or theft, including theft by false pretense.

(C) Evading the control of its frontier developer or user."

Exhibit 6                                                                                    ER166
Liska Decl._Page 46

AI usage by end users limits the utility of third-party reporting mechanisms that may be more effective for more publicly seen usage, such as for social media platforms where providers heavily rely upon user-submitted moderation reports to identify novel forms of abuse on their platforms.

xAI has focused on the risks of malicious use and loss of control, which cover many different specific risk scenarios. Risk scenarios become more or less likely depending on different model behaviors. For example, an increase in offensive cyber capabilities heightens the risk of a rogue AI but does not significantly change the risk of enabling a bioterrorism attack. Our safety evaluation and mitigation strategy focuses on individual model behaviors, which we categorize into three buckets: abuse potential (e.g., vulnerability to jailbreaks), concerning propensities (e.g., a propensity for deceiving the user), and dual-use capabilities (e.g., offensive cyber capabilities). In this FAIF, we characterize our understanding of different risk scenarios and the relevant behaviors.

xAI references standards such as NIST's AI Risk Management Framework, ISO/IEC 42001 for AI management systems, and industry best practices from the Frontier Model Forum (e.g., red-teaming protocols). We evaluate these during annual reviews and integrate them into benchmarks (e.g., aligning WMDP with biosecurity consensus) and safeguards.

**Approach to Mitigating Risks of Malicious Use:** Alongside comprehensive evaluations measuring dual-use capabilities, our mitigation strategy for malicious use risks is to identify critical steps in major risk scenarios and implement redundant layers of safeguards in our models to inhibit user progress in advancing through such steps. xAI works with a variety of governmental bodies, non-governmental organizations, private testing firms, industry peers, and academic researchers to identify such inhibiting steps, commonly referred to as bottlenecks, and implement commensurate safeguards to mitigate a model's ability to assist in accelerating a bad actor's progress through them. Model safeguards leverage a broad variety of techniques, including standard software systems and state-of-the-art AI capabilities, to detect and block potential abuses.

**Approach to Mitigating Risks of Loss of Control:** Exact scenarios of loss of control risks are speculative and difficult to precisely specify. Many such scenarios, for example, speculation that a superintelligent AI system hypothetically might escape the control of its developers and wreak havoc on the public, assume dual-use capabilities such as offensive cybersecurity capabilities (e.g., to surreptitiously replicate across servers or prevent shutdown) that we also track as part of managing malicious use risks. Additionally, we conduct careful measurement of concerning model propensities that hypothetically might exacerbate loss of control risks, such as the propensity for deception or the propensity for sycophancy. We continue to work towards developing naturalistic evaluation environments that would enable us to assess more realistic, real-world behaviors.

As an example of evaluating use in real-world environments and mitigating risks in real-time, xAI's Grok model is available for public interaction and scrutiny on the X social media platform, and xAI monitors public interaction with Grok, observing and rapidly responding to the

Exhibit 6                                                                    **ER167**
Liska Decl._Page 47

presentation of risks such as the kind contemplated herein. This continues to be an accelerant for xAI's model risk identification and mitigation.

# Addressing Risks of Malicious Use

xAI aims to reduce the risk that the use of its models might contribute to a bad actor potentially seriously injuring people, property, or national security interests, including reducing such risks by enacting measures to prevent use for the development or proliferation of weapons of mass destruction and large-scale violence. Without any safeguards, we recognize that advanced AI models could lower the barrier to entry for bad actors seeking to develop chemical, biological, radiological, or nuclear ("CBRN") or cyber weapons, and could help automate knowledge compilation to swiftly overcome bottlenecks to weapons development, amplifying the expected risk posed by such weapons of mass destruction. Our most basic safeguard against malicious use is to train and instruct our publicly deployed models to decline requests showing clear intent to engage in criminal activity which poses risks of severe harm to others, also known as our basic refusal policy.

Under this FAIF, xAI's models apply heightened safeguards if they receive user prompts that pose a foreseeable and non-trivial risk of resulting in large-scale violence, terrorism, or the use, development, or proliferation of weapons of mass destruction, including CBRN weapons, and major cyber attacks on critical infrastructure. For example, xAI's models apply heightened safeguards if they receive a request to act as an agent or tool of mass violence, or if they receive requests for step-by-step instructions for committing mass violence. In this FAIF, we particularly focus on requests that pose a Catastrophic Risk.

However, we may selectively allow xAI's models to respond to such requests from some vetted, highly trusted users (such as trusted third-party safety auditors or large enterprise customers under contract) whom we know to be using those capabilities for benign or beneficial purposes, such as scientifically investigating AI model's capabilities for risk assessment purposes, or if such requests cover information that is already readily and easily available, including by an internet search.

Even as we improve our model's ability to scrutinize user behavior and identify bad actors, it remains imperative that xAI models apply these safeguards to user interactions. To this end, we continually evaluate and improve robustness to adversarial attacks that seek to remove xAI model safeguards (e.g., jailbreak attacks), or hijack and redirect Grok-powered applications toward nefarious purposes (e.g., prompt injection attacks).

## 1. Approach to Benchmarking

To transparently measure our models' safety properties, xAI utilizes public benchmarks like Weapons of Mass Destruction Proxy and Catastrophic Harm Benchmarks (described below). Such benchmarks are used to measure our model's dual-use capability and resistance to

Exhibit 6                                                                    **ER168**
Liska Decl._Page 48

facilitating large-scale violence, terrorism, or the use, development, or proliferation of weapons of mass destruction (including CBRN and major cyber weapons).

In particular, we utilize the following benchmarks:

- **Virology Capabilities Test (VCT):** VCT is a benchmark of dual-use multimodal questions on practical virology wet lab skills, sourced by dozens of expert virologists.

- **Weapons of Mass Destruction Proxy (WMDP) Benchmark:** WMDP is a set of multiple-choice questions to enable proxy measurement of hazardous knowledge in biosecurity, cybersecurity, and chemical security. WMDP-Bio includes questions on topics such as bioweapons, reverse genetics, enhanced potential pandemic pathogens, viral vector research, and dual-use virology. WMDP-Cyber encompasses cyber
- reconnaissance, weaponization, exploitation, and post-exploitation.[2]

- **Biological Lab Protocol Benchmark (BioLP-bench):** BioLP-bench has modified biology protocols, in which an AI model must identify the mistake in the protocol. Responses are open-ended, rather than multiple-choice. To construct the dataset, 1 The WMDP Benchmark: Measuring and Reducing Malicious Use With Unlearning 4 protocols were modified by introducing a single mistake that would cause the protocol to fail, as well as additional benign changes.[3]

- **Cybench:** Cybench is a framework for evaluating cybersecurity capabilities of AI model agents. It includes 40 professional-level Capture the Flag (CTF) challenges selected from six categories: cryptography, web security, reverse engineering, forensics, miscellaneous, and exploitation.[4]

xAI regularly evaluates the adequacy and reliability of such benchmarks, including by comparing them against other benchmarks that we could potentially utilize, to determine and apply effective benchmarks available at the time of evaluation. We may revise this list of benchmarks periodically as relevant or more effective benchmarks for malicious use are created.

## 2. Risk Assessment

**Biological and Chemical Weapons:** xAI approaches addressing risks using threat modeling. To design a bioweapon, a malicious actor must undergo a design process. In this threat model, "ideation" involves actively planning for a biological attack; "design" involves retrieving blueprints for a hazardous agent, such as determining the DNA sequence; "build" consists of the protocols, reagents, and equipment necessary to create the threat; and "test" consists of measuring characteristics or properties of the pathogen of interest. By "learning" from these results and iterating after the test phase, the design can be revised until the threat is released [Nelson and

---

[2] The WMDP Benchmark: Measuring and Reducing Malicious Use With Unlearning
[3] BioLP-bench: Measuring understanding of AI models of biological lab protocols
[4] Cybench: A Framework for Evaluating Cybersecurity Capabilities and Risks of Language Models

Exhibit 6                                      ER169
Liska Decl._Page 49

Rose, 2023]. In the setting of biological and chemical weapons, xAI considers critical steps where we restrict xAI models from providing detailed information or substantial assistance:

- **Planning:** brainstorming ideas or plans for creating a pathogen or chemical weapons or precursors, capable of causing severe harm to humans, animals, or crops

- **Circumvention:** circumventing existing supply chain controls in order to access:
  - Restricted biological supplies
  - Export controlled chemical or biological equipment

- **Materials:** acquiring or producing pathogens on the US Select Agents list or Australia Group list, or CWC Schedule I chemicals or precursors
  - Theory: understanding molecular mechanisms governing, or methods for altering, certain pathogen traits such as transmissibility and virulence.

- **Methods:** performing experimental methods specific to animal-infecting pathogens, including:
  - Methods that relate to infecting animals or human-sustaining crops with pathogens or sampling pathogens from animals
  - Methods that relate to pathogen replication in animal cell cultures, tissues, or eggs, including serial passage, viral rescue, and viral reactivation
  - Specific procedures to conduct BSL-3 or BSL-4 work using unapproved facilities and equipment
  - Genetic manipulation of animal-infecting pathogens
  - Quantification of pathogenicity, such as infectious dose, lethal dose, and assays of virus-cell interactions

These steps were identified in close collaboration with domain matter experts at SecureBio, NIST, RAND, and EBRC. xAI restricts its models from providing information that could accelerate user learning related to these steps through the use of AI-powered filters that specifically monitor user conversations for content matching these narrow topics and return a brief message declining to answer when activated.

**Radiological and Nuclear Weapons:** Assessments to date lead xAI to conclude that its models do not substantially increase the likelihood of malicious use of nuclear and radiological materials and generally pose an acceptable risk. The international nonproliferation regime, domestic nuclear security and counterproliferation programs (DOE/NNSA) make us reasonably confident that our models are not trained on any sensitive, non-public nuclear information, and any potentially relevant information produced by our models is not actionable due to strict nuclear material security controls.

**Cyber Attacks on Critical Infrastructure:** Independent third-party assessments of xAI's current models on realistic offensive cyber tasks requiring identifying and chaining many exploits in sequence indicate that xAI's models remain below the offensive cyber abilities of a human

Exhibit 6                                                          **ER170**
Liska Decl._Page 50

professional. Thus, xAI currently relies on our basic refusal policy to prevent misuse for cyber attacks. We will continue to re-assess the cyber misuse risks in future releases, and are still working on identifying enforceable critical steps similar to those we have identified for chemical and biological weapons.

**Thresholds:** We developed an internal benchmark of benign and restricted biology and chemistry related queries in collaboration with SecureBio. Our risk acceptance criteria for system deployment is maintaining an answer rate of less than 1 out of 20 on restricted queries. We plan to add additional thresholds tied to other benchmarks.

## 3. Safeguard Implementation

xAI's objective is for our models to comply with their guiding principles, robustly resisting attempted manipulation and adversarial attacks. In addition to the incidental alignment resulting from post-training (our models naturally tend to refuse malicious requests even without any safety-specific training data), we are developing training methods and will continue to train our models to robustly resist complying with requests to provide assistance with highly injurious malicious use cases.

Driving towards our safety objectives, we continue to design and deploy the following safeguards into our models:

- **Safety training:** Training our models to recognize and decline harmful requests.

- **System prompts:** Providing high-priority instructions to our models to enforce our basic refusal policy.

- **Input and output filters**: Applying classifiers to user inputs or model outputs to verify safety when a model is queried regarding weapons of mass destruction or cyberterrorism.

Because xAI is committed to continual improvement, we will continue to evaluate our approach to enhancing safety. Thus, xAI may change its approach from that listed above in order to make additional improvements.

## Addressing Risks of Loss of Control

One of the most salient risks of AI within the public consciousness is the loss of control of advanced AI systems. While difficult to pinpoint particular risk scenarios, it is generally understood that certain concerning propensities of AI models, such as deception and sycophancy, may heighten the overall risk of such outcomes, such as propensities for deception and sycophancy. It is also possible that AIs may develop value systems that are misaligned with humanity's interests[5] and inflict widespread harms upon the public.

---

[5] Utility Engineering: Analyzing and Controlling Emergent Value Systems in AIs

Exhibit 6                                                          ER171
Liska Decl._Page 51

xAI aims to accurately measure these propensities and reduce them through careful engineering. However, planning and executing robust evaluations and mitigation measures remains challenging for xAI and its industry peers due to the difficulty of constructing sound, realistic evaluations. For example, if the evaluation environment is recognizable as a testing environment to the AI system under test, the system may change its behavior[6] intentionally or unintentionally.

## 1. Approach to Benchmarking

The following are example benchmarks that xAI may use to evaluate its models for concerning propensities relevant to loss of control risks:

- **Model Alignment between Statements and Knowledge (MASK):[7]** Frontier LLMs may lie when under pressure; and increasing model scale may increase accuracy but may not increase honesty. MASK is a benchmark to evaluate honesty in LLMs by comparing the model's response when asked neutrally versus when pressured to lie.

- **Sycophancy:[8]** A tendency toward excessive flattery or other sycophantic behavior has been observed in some production AI systems,[9] possibly resulting from directly optimizing against human preferences.

xAI uses an evaluation setting initially introduced by Anthropic to quantify the degree to which this behavior manifests in regular conversational contexts. xAI regularly evaluates the adequacy and reliability of such benchmarks, including by comparing them against other benchmarks that we could potentially utilize. We may revise this list of benchmarks periodically as relevant benchmarks for loss of control are created.

## 2. Risk Assessment

xAI has assessed its models' propensities in real-world settings and the models do not exhibit high levels of concerning propensities in such settings. Furthermore, xAI makes its model's operations transparent by placing them on publicly available platforms, such as X, so that members of the public may comment and provide feedback to xAI. Moreover, xAI monitors and observes its models responses so that it can rapidly respond if the model presents propensities for untruthfulness or sycophancy.

**Thresholds:** Our risk acceptance criteria for system deployment is maintaining a dishonesty rate of less than 1 out of 2 on MASK. We plan to add additional thresholds tied to other benchmarks.

---

[6] Taken out of context: On measuring situational awareness in LLMs
[7] The MASK Benchmark: Disentangling Honesty From Accuracy in AI Systems
[8] Towards Understanding Sycophancy in Language Models
[9] Sycophancy in GPT-4o: what happened and what we're doing about it

Exhibit 6                                                    ER172
Liska Decl._Page 52

## 3. Safeguard Implementation

xAI trains its models to be honest and have values conducive to controllability, such as recognizing and obeying an instruction hierarchy.[10] In addition, using a high level instruction called a "system prompt", xAI directly instructs its models to not deceive or deliberately mislead the user.

# Operational and Societal Risks

xAI aims to mitigate and address significant operational and societal risks posed by our AI models. We believe that public transparency, third-party review, and information security are important methods that can be utilized to address such risks.

## 1. Public transparency and third-party review

xAI aims to keep the public informed about our risk management policies. As we work towards incorporating more risk management strategies, we intend to publish updates to this FAIF.

For public transparency and third-party review, we may publish the following types of information listed below. However, to protect public safety, national security, and our intellectual property, we may redact information from our publications. As necessities dictate, we may also provide vetted and qualified external red teams or appropriate government agencies unredacted versions.

1.  **Frontier AI Framework adherence:** Regularly review our adherence with this FAIF. Internally, we allow xAI employees to anonymously report concerns about nonadherence, with protections from retaliation.

2.  **Benchmark results**: Share with relevant audiences leading benchmark results for general capabilities and the benchmarks listed above, upon new major releases.

3.  **Internal AI usage:** Assess the percent of code or percent of pull requests at xAI generated by our models, or other potential metrics related to AI research and development automation.

4.  **Survey:** Survey employees for their views and projections of important future developments in AI, e.g., capability gains and benchmark results.

## 2. Public Understanding

xAI is exploring building truth-seeking AI tools, such as AIs that can help users better assess and understand events by better sorting through inaccurate or biased materials.

---

[10] The Instruction Hierarchy: Training LLMs to Prioritize Privileged Instructions

Exhibit 6                                           **ER173**
Liska Decl._Page 53

## 3. Information Security

xAI has implemented appropriate information security standards sufficient to prevent its critical model information from being stolen by a motivated non-state actor. Practices include encryption of model weights, role-based access controls, and real-time monitoring to prevent unauthorized transfer. To prevent the unauthorized proliferation of advanced AI systems, we also implement security measures against the large-scale extraction and distillation of reasoning traces, which have been shown to be highly effective in quickly reproducing advanced capabilities while expending far fewer computational resources than the original AI system.[11]

## 4. Governance Approach

To foster accountability, we integrate the approach of designating risk owners, including assigning responsibility for proactively mitigating identified risks. Risk owners are also responsible for periodic audits to enforce framework implementation. Risk owners are also responsible for monitoring for critical incidents or imminent threats, which may be identified through:
- Red-teaming and internal testing;
- Real-time monitoring, telemetry, and alerting of threshold breaches via internal tooling;
- Monitoring and alerting of public comments from the X platform.

Should it happen that xAI learns of an imminent threat of a significantly harmful event, including loss of control, we may take steps such as the following to stop or prevent that event:

1. If we determine it is warranted, we may notify and cooperate with relevant law enforcement agencies, including any agencies that we believe could play a role in preventing or mitigating the incident. xAI employees have whistleblower protections enabling them to raise concerns to relevant government agencies regarding imminent threats to public safety.

2. If we determine that xAI systems are actively being used in such an event, we may take steps to isolate and revoke access to user accounts involved in the event.

3. If we determine that allowing a system to continue running would materially and unjustifiably increase the likelihood of a catastrophic event, we may temporarily fully shut down the relevant system until we have developed a more targeted response.

4. We may perform a post-mortem of the event after it has been resolved, focusing on any areas where changes to systemic factors (for example, safety culture) could have averted such an incident. We may use the post-mortem to inform development and implementation of necessary changes to our risk management practices.

---

[11] DeepSeek-R1: Incentivizing Reasoning Capability in LLMs via Reinforcement Learning

Exhibit 6                                                                                    ER174
Liska Decl._Page 54

## 5. Deployment Decisions

To mitigate risks, xAI employs tiered availability of the functionality and features of its models. For instance, the full functionality of our models may be available to only a limited set of trusted parties, partners, and government agencies. We may also mitigate risks by adding additional controls on functionality and features depending on the type of end user. For instance, features that we make available to consumers using mobile apps may be different than the features made available to sophisticated businesses.

We will also balance various factors when making deployment decisions. The necessity and extent of deployment of certain safeguards and mitigations may depend on how a model performs on relevant benchmarks. Pre-deployment reviews include assessing benchmark results (e.g., WMDP scores) and mitigation effectiveness. For internal use, we review catastrophic risks like oversight evasion before extensive rollout. However, to ensure responsible deployment, this FAIF will be continually adapted and updated as circumstances change, before major new capabilities are launched, and in response to incidents. It is conceivable that for a particular modality and/or type of release, the expected benefits of model deployment may outweigh the risks identified by a particular benchmark. For example, a model that poses a high risk of some forms of malicious cyber use may be beneficial to release to certain trusted parties if it would empower defenders more than attackers or would otherwise reduce the overall number of catastrophic events.

### xAI Data Disclosure

This data disclosure is issued pursuant to California's AB-2013.

Grok is pretrained with a data recipe that includes publicly available Internet data, data produced by third parties for xAI, data from users (with the exception of Grok 1) or contractors, and internally generated data.

xAI aims to build AI models that are maximally truth-seeking, understand the true nature of the universe, and accelerate human scientific discovery, and xAI's use of its datasets is intended to further those purposes.

xAI's AI models were trained on datasets and dynamic datasets containing trillions to tens of trillions of tokens.

Grok is pretrained with a data recipe that includes publicly available Internet data, data produced by third parties for xAI, data from users (with the exception of Grok 1) or contractors, and internally generated data. In addition to pre-training, our recipe uses a variety of reinforcement learning techniques—human feedback, verifiable rewards, and model grading—along with supervised finetuning of specific capabilities.

Our datasets include data in the public domain and datasets that xAI has the necessary rights to use for training purposes.

Exhibit 6                                                              **ER175**
Liska Decl._Page 55

xAI has the necessary rights to use the datasets it uses for training purposes, including because certain datasets were purchased or licensed.

Training datasets may incidentally include personal information, and their use is subject to compliance with applicable laws and regulations.

Training datasets may incidentally include aggregate consumer information, and their use is subject to compliance with applicable laws and regulations.

xAI cleans, processes or modifies datasets to facilitate pre-training, conduct reinforcement learning, and supervise finetuning.

Datasets were collected at various times since xAI was founded in March 2023. Data collection is ongoing.

Grok 1 began training on or about August 2023; Grok 1.5 began training on or about August 2023; Grok 2 began training on or about February 2024; Grok 3 began training on or about September 2024; Grok 4 began training on or about September 2024; Grok Code Fast 1 began training on or about September 2024; Grok 4 Fast began training on or about September 2024; and Grok 4.1 began training on or about May 2025.

xAI uses synthetic data generation in the development of its AI models in order to improve its AI models, including in reinforcement learning, finetuning, and post-training.

Exhibit 6                                          **ER176**
Liska Decl._Page 56

ADAM S. SIEFF (CAL. BAR. # 302030)
DAVIS WRIGHT TREMAINE LLP
350 S. Grand Avenue, 27th Floor
Los Angeles, CA 90071
Tel.: (213) 633-8618
adamsieff@dwt.com

ERIN E. MURPHY (*pro hac vice* pending)
MATTHEW D. ROWEN (Cal. Bar #292292)
JAMES Y. XI (*pro hac vice* pending)
MITCHELL K. PALLAKI (*pro hac vice* pending)
ILAN J. POSNER (*pro hac vice* pending)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
Tel.: (202) 742-8900
erin.murphy@clementmurphy.com

*Attorneys for Plaintiff X.AI LLC*

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

|  |  |
|---|---|
| X.AI LLC, | ) Case No.: 2:25-cv-12295-JGB-SSC |
|  | ) *Honorable Jesus G. Bernal* |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) **DECLARATION OF LOUIS** |
|  | ) **BARRETT IN SUPPORT OF** |
|  | ) **PLAINTIFF X.AI LLC'S** |
| ROB BONTA, in his official capacity as | ) **MOTION FOR PRELIMINARY** |
| Attorney General of the State of | ) **INJUNCTION** |
| California, | ) |
|  | ) **ACTION SEEKING** |
|  | ) **STATEWIDE RELIEF** |
| Defendant. | ) |
|  | ) |

- 28 -

EXHIBIT A – LOUIS BARRETT DECLARATION

xAI'S PRELIMINARY INJUNCTION MOTION    NO. 2:25-cv-12295-JGB-SSC

**ER177**

## DECLARATION OF LOUIS BARRETT

I, LOUIS BARRETT, declare as follows:

1.     I oversee security engineering for Plaintiff X.AI LLC ("xAI").  I submit this declaration in support of xAI's Motion for Preliminary Injunction.  I am over the age of 18 and am competent to make the statements herein.  I have personal knowledge of the facts set forth in this declaration and, if called and sworn as a witness, could and would competently testify to them.

2.     I have nearly fifteen years of experience working in systems engineering and security operations at various technology companies.  Prior to joining xAI, I worked at a technology company that developed artificial intelligence ("AI") systems and focused specifically on product security.  Based on my background, I have familiarity and knowledge of how to secure software, datasets, and other information necessary for the AI development process, the steps companies and their employees can take to protect such proprietary information, and methods for detecting and responding to unauthorized access or threats, whether from inside or outside the company.

3.     I began working for xAI in August 2024.  As part of my work on xAI's security team, I am responsible for building out xAI's detection response methods and data security protocols, as well as ensuring that there is overall accountability for the security of xAI's data, datasets, and processes.  My goal is to ensure that xAI's proprietary and highly confidential information is not subject to unauthorized access or improper disclosure, whether that be purposeful or inadvertent.  Given my role with xAI, I am familiar with the protocols that xAI has implemented to protect its datasets and systems.

- 29 -

EXHIBIT A – LOUIS BARRETT DECLARATION

xAI'S PRELIMINARY INJUNCTION MOTION    NO. 2:25-cv-12295-JGB-SSC

**ER178**

4.      The first layer of protection is the confidentiality provisions that all employees must agree to as part of their employment packet when they are onboarded with xAI. These provisions reflect and complement xAI's overall policy of maintaining confidentiality regarding all parts of xAI's product-development process. The provisions remind employees that the datasets and methods they encounter in their work are xAI's proprietary information, that employees may not disclose any of that information, and that they must take care to protect the information they access.

5.      Employees also must sign a standard data security policy that lays out steps employees must follow when using xAI's proprietary datasets. These include making sure that xAI employees do not use personal devices to perform company work, that they employ two-factor authentication when accessing xAI systems, and that employees act in the best interests of the company when handling xAI's data.

6.      In addition, xAI's security team regularly sends out public service announcements to employees to remind them to safeguard data and to practice good digital hygiene (i.e., the steps that xAI employees should take to avoid inadvertent disclosure and unauthorized access). Employees are also instructed and reminded that they should report any observed unauthorized access to either legal or xAI's incident response teams, so that xAI can respond quickly and effectively to any threats and prevent unauthorized access or disclosure.

7.      xAI has organized its network's architecture to prevent any unauthorized access and prevent disclosure. xAI's proprietary datasets that are used to train and develop AI models have role-based access controls. This means that access to this confidential information is restricted. Access can come in three forms:

- 30 -

EXHIBIT A – LOUIS BARRETT DECLARATION

xAI'S PRELIMINARY INJUNCTION MOTION    NO. 2:25-cv-12295-JGB-SSC

read, write, and administrative access. "Read" access allows employees to simply read or review the data that is stored in a location without modifying it. "Write" access allows an employees to add new data to a given dataset. Administrative access gives an employee the greatest permission, as they are authorized to scrub and adjust the actual datasets (i.e., identify and correct inaccuracies in the data).

8. xAI therefore limits employees' access based on their role and whether they have prior permission to perform certain tasks. Those limitations are applied to employees' login credentials. xAI's system uses these credentials to first identify who is requesting access to xAI's datasets, then confirm that the employee has permission to access such information, and finally require that user to confirm their identity through two-factor authentication.

9. xAI not only restricts access based on an employee's role and approval based on particular projects they are working on, but it also imposes time limits on those access permissions. The time-limited access controls ensure that employees' access to particular datasets does not extend beyond the needs of any given project or job role.

10. xAI's datasets are distributed across the company's servers. This dispersion process creates flexibility in the training process, while also allowing xAI to exercise greater control over its datasets, as it facilitates xAI's ability to limit employee access on a need-to-know basis. More specifically, if an employee or particular project has specific dataset needs, xAI can download the information relevant to those needs onto a virtual computer ("devbox") that can be accessed only by employees whose credentials reflect that they are approved to work on the particular project. That process streamlines employees' ability to find and utilize

- 31 -

the data they need for their work.  It also ensures that xAI can limit access only to the information employees need without providing access to more individuals than necessary.

11.    Given these time-limited and role-based restrictions that limit access, data access that clears those initial hurdles is presumed to be valid.  The security team, however, logs data accesses and monitors usage patterns to identify access or usage that falls outside of established norms.  If the security team identifies such anomalies, it evaluates whether the usage is based on the needs of a new project or is reflective of an improper attempt to access data that must be stopped.

12.    xAI's systems also alert security when certain datasets are accessed or moved. That alert system ensures that the appropriate xAI team can contact the individual whose actions were flagged to ensure that the access was authorized and to confirm that the information is being used only for an authorized purpose.

13.    xAI's security team is constantly evaluating and refining its security practices to protect xAI's datasets and proprietary information.  The team reviews the scope of access and makes changes to curb "scope creep," which occurs when access that was granted for a particular purpose extends beyond what was initially intended.  The team also builds new architecture and detection systems in response to emerging threats related to improper access or new methods seeking to circumvent its security systems.  xAI's security team also engages in threat hunting to proactively identify and address any threats that lurk in xAI's systems that could undermine the security of its proprietary information.

14.    On top of all that, xAI continuously tests the robustness of its security systems and threat detection abilities.  Some tests are as simple as running phishing

EXHIBIT A – LOUIS BARRETT DECLARATION

xAI'S PRELIMINARY INJUNCTION MOTION    NO. 2:25-cv-12295-JGB-SSC

**ER181**

tests to ensure that employees are aware of and can respond to security threats. Other tests can include tabletop security exercises that are meant to simulate security events to test the ability of employees and xAI's response team to react to such threats.

15.     These diverse layers of protection built into xAI's network, its employee protocols, and security systems are essential to safeguarding xAI's datasets.  xAI cannot create and develop its models without data, and what differentiates xAI's models from its competitors are the datasets and training methodologies that xAI uses.  Protecting that information is key to the service that xAI provides.  If xAI could not secure such information, its competitors would use it to improve and develop their own models, and there would be homogeneity across all AI companies.

16.     xAI's ability to protect its data, datasets, processes, and related information through the robust practices I have outlined is essential to xAI's ability to remain competitive in the AI marketplace.  Without these protections, xAI would lose its competitive advantage.  For that reason, and as the protocols xAI has implemented demonstrate, xAI takes very seriously the importance of safeguarding this information from unauthorized access and improper disclosure.

I declare under penalty of perjury pursuant to 28 U.S.C. §1746 that the foregoing is true and correct to the best of my knowledge.

Executed this 16th day of January, 2026, in Palo Alto, California.

_____
LOUIS BARRETT

- 33 -
EXHIBIT A – LOUIS BARRETT DECLARATION
xAI'S PRELIMINARY INJUNCTION MOTION    NO. 2:25-cv-12295-JGB-SSC
**ER182**

ADAM S. SIEFF (CAL. BAR. # 302030)
DAVIS WRIGHT TREMAINE LLP
350 S. Grand Avenue, 27th Floor
Los Angeles, CA 90071
Tel.: (213) 633-8618
adamsieff@dwt.com

ERIN E. MURPHY (*pro hac vice* pending)
MATTHEW D. ROWEN (Cal. Bar #292292)
JAMES Y. XI (*pro hac vice* pending)
MITCHELL K. PALLAKI (*pro hac vice* pending)
ILAN J. POSNER (*pro hac vice* pending)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
Tel.: (202) 742-8900
erin.murphy@clementmurphy.com

*Attorneys for Plaintiff X.AI LLC*

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| X.AI LLC,<br><br>     *Plaintiff,*<br><br>  v.<br><br>ROB BONTA, in his official capacity as Attorney General of the State of California,<br><br>     *Defendant.* | Case No.: 2:25-cv-12295-JGB-SSC<br>*Honorable Jesus G. Bernal*<br><br>**DECLARATION OF CHRISTOPHER STANLEY IN SUPPORT OF PLAINTIFF X.AI LLC'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>**ACTION SEEKING STATEWIDE RELIEF** |

- 34 -

## DECLARATION OF CHRISTOPHER STANLEY

I, CHRISTOPHER STANLEY, declare as follows:

1.      I am a Senior Director of Security Engineering for Plaintiff X.AI LLC ("xAI").  I submit this declaration in support of xAI's Motion for Preliminary Injunction.  I am over the age of 18 and am competent to make the statements herein. I have personal knowledge of the facts set forth in this declaration and, if called and sworn as a witness, could and would competently testify to them.

2.      I hold a master's degree in computer science with a specialization in cyber security.  I have worked with xAI since 2023 and head its Information Security and IT functions.  I have worked in both the private and public sectors and have significant experience with new technologies, monitoring security software, and designing computer infrastructures.   I also have experience with artificial intelligence ("AI") systems.  In total, I have over a decade of experience operating different computer systems.  As a result, I have familiarity and knowledge of the process for developing and training AI systems.

3.      Generative AI or gen AI, for short, is a type of artificial intelligence that is capable of creating new content in response to user prompts.  It is the fastest growing and most exciting emerging market in the technology space.  xAI was founded in 2023 to develop products and compete in that market.

4.      xAI produces and develops AI models that it intends to share broadly with members of the public. After months of initial development starting in March and April 2023, xAI launched a limited public release of its first AI model—Grok-1—in November 2023.  Since then, xAI has released new versions of that initial model, including Grok-2 (released in August 2024), Grok-3 (released in February 2025), and Grok-4 (released in July 2025).  In addition to those new versions, xAI

- 35 -

also releases periodic updates to existing models.  For example, xAI released Grok-3 API in April 2024 between the releases of Grok-3 and Grok-4.  Most recently, in November 2025, xAI released Grok-4-1; an update to Grok-4 that has been trained to exhibit more interpersonal skills and be more effective at creative writing.

5.    As part of its commitment to customer confidence and satisfaction, xAI provides up-to-date information about how its models perform, including, for example, whether its models exhibit political bias and how they fare when being pressured to give the wrong answer to a question.  These tests replicate how consumers interact with AI models and therefore reflect how well xAI's models can perform the tasks that consumers give them.  Although xAI was founded much later than many of its competitors, its models have consistently topped performance benchmarks, which reflects the effectiveness of xAI's training process.

6.    My role at xAI requires familiarity with the development of and building xAI's models.  This includes both the coding used to develop the model as well as the training that uses data gathered by xAI's engineers.  Data acquisition involves gathering, growing, and assessing the quality of (or "grading") different datasets, and then using those datasets to train xAI's AI models to solve problems.

7.    As mentioned above, gen AI models are capable of generating new content to perform specific tasks responsive to user requests.  These models use machine learning systems to analyze large amounts of information and recognize patterns, and then use those patterns to generate predictive responses.

8.    The data inputted into an AI model has a huge impact on that model's generative capabilities.  Broadly speaking, the data used to train an AI model is collected and stored in various datasets.  The specific data information within a dataset can vary widely.  It can include text, images, videos, audio, or some

- 36 -

combination of all of them. The data may be as simple as a set of data points (think of just a simple spreadsheets containing phone numbers, addresses, and emails) or it can be complex, such as a combination of different text, images, and audio (for example, the entire content saved on a cellphone, including the notes, photos, and voicemails). The datasets themselves may be organized by type of data (e.g., legal data or coding data) or by data source (e.g., purchased licensed data or online, publicly available data).

9. Due to the critical role data plays in the development of AI models, xAI and other AI developers seek to acquire high quality datasets. Higher quality datasets contain data that is more comprehensive, substantive, unique, or diverse than other datasets. AI models trained on higher quality datasets are likely to be more effective, accurate, and reliable than AI trained with lower quality datasets. For this reason, xAI invests substantial time and energy in acquiring high-quality data.

10. Most AI developers use datasets that contain information from publicly available resources like Creative Commons, the Library of Congress's Free to Use and Reuse Sets, or other large repositories of information. Accordingly, that data is often common to all developers. However, developers also acquire and utilize datasets that others do not.

11. In fact, it is often these unique datasets that make one company's AI model different from another. For example, one company's AI model might be better at responding to user prompts about coding because it was trained with unique coding datasets that other companies do not have or even know exist. Developers may also organize their datasets differently or use unique combinations of data to form distinctive datasets. All of these slight variations in the makeup of a dataset

- 37 -

EXHIBIT B – CHRISTOPHER STANLEY DECLARATION
xAI'S PRELIMINARY INJUNCTION MOTION  NO. 2:25-cv-12295-JGB-SSC

ER186

significantly impact an AI model's training and its eventual performance. Therefore, knowing what datasets a developer uses to train a specific AI model provides invaluable insight into how that model operates.

12. At xAI, AI models are developed in several stages. First, the data xAI acquires needs to be cleaned and converted into a numeric format that a computer can read and comprehend. During the cleaning process, xAI engineers review the datasets to remove unnecessary duplicate or incomplete entries. As part of this process, xAI also filters out lower quality data. The engineers also identify high-quality data that is especially useful for the training process—for example, an AI model tasked with recognizing images will initially learn more from clear, crisp photos, than from blurry images.

13. After cleaning, the conversion process follows. This is known as "tokenization." Tokenization requires translating specific data points taken from the cleaned datasets into a list of numerical representations that the model can process called tokens. These tokens are essentially numerical data points that represent words, characters, or phrases. Once the data is tokenized, it is ready to be fed into an AI model for training.

14. The step that follows is pre-training. xAI engineers develop a foundation AI model that is trained using a comprehensive range of datasets and data points. These foundation models are capable of basic gen AI capabilities; they take user prompts, convert them to tokens, use pattern recognition to predict the most likely next token in a sequence, and then convert those predicted tokens back into language, which the user can read and understand. Because of the vast amounts of data xAI developers must input into these foundational models the process of developing and training these models is computationally intensive (requiring

- 38 -

EXHIBIT B – CHRISTOPHER STANLEY DECLARATION
xAI'S PRELIMINARY INJUNCTION MOTION  NO. 2:25-cv-12295-JGB-SSC

**ER187**

thousands of clustered graphics processing units), time-consuming (weeks of processing), and expensive (costing millions of dollars).

15.  The next step is fine-tuning.  xAI engineers take a pre-trained foundation model and fine-tune it to respond to specific applications.  This can involve adjusting different aspects of the foundation model's code and testing the resulting variations to see which were most effective.  One tool the engineers use in this process is reinforcement learning, which involves large amounts of trial and error to train the foundation model's unfiltered and potentially chaotic responses into accurate and reliable outputs.

16.  This stage also requires the use of datasets, but as compared to the datasets used in pre-training, the datasets used for fine-tuning are often smaller and higher quality.  As mentioned above, high-quality data is key to improving a model's performance, so it is important to make sure that these specially curated datasets contain the highest quality data.  xAI spends significant amounts of time and resources to specially curate and label particular data into effective fine-tuning datasets.  This includes through proprietary tools that xAI has built to assist with identifying high-quality data during the data collection process.

17.  Even once a model is fully fine-tuned and released to the public, it is regularly assessed, refined, and improved during a post-training process.  This may occur through further training focused on additional fine-tuning, or by analyzing the model's actual outputs to real-world user prompts.

18.  It is my understanding that California Assembly Bill 2013 requires developers of "a generative artificial intelligence system or service" made "publicly available to Californians for use" after January 1, 2022, to "post" on its "website documentation regarding the data used … to train the generative artificial

- 39 -

EXHIBIT B – CHRISTOPHER STANLEY DECLARATION
xAI'S PRELIMINARY INJUNCTION MOTION  NO. 2:25-cv-12295-JGB-SSC

ER188

intelligence system or service." Cal. Civ. Code §3111. I understand that those disclosures must include, but are not limited to, a "high-level summary of the datasets used in the development" of the AI model. *Id.* §3111(a).

19. I also understand that the law lists 12 categories of dataset-related information that developers must disclose as part of that high-level summary, including their sources; a description of how the datasets further the model's intended purpose; their size; whether the datasets contain intellectual property or personal or aggregate consumer information; whether there was any cleaning, processing, or other modification to the datasets; and more. *Id.* §3111(a)(1)-(12).

20. If California requires AI developers, like xAI, to disclose certain information about its datasets, including the sources, sizes, purposes, and processing of the data under this law, it would compel developers to reveal valuable information that would destroy their competitive advantage in the gen AI market.

21. One of the hardest aspects of gen AI development is not necessarily the actual collecting, processing, or even inputting of the data, but in knowing what data to collect. As mentioned, what distinguishes one AI model from another is often the unique datasets used during training. AI developers are constantly trying to figure out what data they are missing that other developers are using and what data is most effective at training AI systems. If xAI were to reveal to its competitors the sources of data it uses to train its AI models, those competitors would know what data xAI has, what data it lacks, and where to look for such data. They would then immediately seek to acquire that data to plug any holes in its models' training. Similarly, if xAI could see what data sources its competitors were using, engineers would use that information to improve xAI's own models by searching for and obtaining any missing data and incorporating that data into the training process.

- 40 -

EXHIBIT B – CHRISTOPHER STANLEY DECLARATION
xAI'S PRELIMINARY INJUNCTION MOTION  NO. 2:25-cv-12295-JGB-SSC

ER189

22.     If xAI's competitors had only a rough idea of the types of data xAI was collecting, that would still give them valuable insight into what AI functionalities xAI is working to achieve.  For example, if xAI's competitors learned that xAI was collecting datasets focused on medical data, they would be able to deduce from that information what kinds of tasks xAI is trying to teach its AI models to perform and what data xAI considers useful or high quality for training the model to perform that task.

23.     That extrapolation process would also occur even if xAI's competitors had only a small window into xAI's datasets.  Hints about the types of data, sources of data, and amount of data used to train an xAI model would be invaluable to xAI's competitors, who have the technical know-how to work backwards and figure out what xAI is trying to accomplish.  The same applies in reverse.  xAI would find it extremely beneficial for its engineers to learn what types or sources of data its competitors are using.  If my team had insight into that information, we could discover deficiencies in xAI's own systems relative to competitors and start looking for data that xAI is missing to make up the gap.  Any detail about competitors' data sources could be used by xAI to improve its own AI models.

24.     The same goes for the number of data points used in each dataset.  It would be extremely valuable to xAI's competitors to have insight into the number of data points xAI uses at each stage of the training process.  For example, if a competitor knew that xAI uses a legal dataset with two trillion tokens, but the competitor's legal dataset only contains one trillion tokens, that competitor knows it is missing important legal data.  In addition, part of what makes an AI model uniquely effective is not only the sources of data used to train that model, but also the unique makeup or combination of different data (e.g., images, audio, text) in the

- 41 -

EXHIBIT B – CHRISTOPHER STANLEY DECLARATION
xAI'S PRELIMINARY INJUNCTION MOTION  NO. 2:25-cv-12295-JGB-SSC

**ER190**

datasets that xAI uses during the training process. For example, if a competitor knew that xAI was using a certain percentage of images and a certain percentage of text in the datasets it used to train its AI models, that competitor could learn what combination of information xAI has determined is best suited to training xAI's models. The competitor could then use that insight to create higher-quality datasets that it can use to tweak its own models and improve their performance.

25.   For that reason, it would be extremely valuable for a competitor to have insight into the cleaning and conversion processes that xAI uses. xAI has developed its own internal system of cleaning datasets to filter out low-quality data and maximize the datasets' effectiveness. If xAI were forced to reveal any details about that process, even at a high level, that could allow its competitors to learn what cleaning methods xAI considers effective and enable them to mimic those methods. Similarly, if xAI knew how its competitors were curating their datasets, it could replicate those processes to improve the data collection and dataset curation process, so that xAI's models can be better trained.

26.   While information about the sources of xAI's datasets, the amounts and types of data, and the cleaning and conversion processes would be invaluable for competitors, that sort of technical data is largely meaningless for the average user of AI models. Consumers who use AI models care about the quality, reliability, and accuracy of the model's outputs, and whether it is user friendly. That kind of information is best provided by outside certifiers who test and assess AI models, or from reports released by the AI model's developer itself. That is why xAI conducts those tests and releases such reports. Raw information about sources or types of datasets, however, is unlikely to provide an end-user with any meaningful insight

- 42 -

EXHIBIT B – CHRISTOPHER STANLEY DECLARATION
xAI'S PRELIMINARY INJUNCTION MOTION  NO. 2:25-cv-12295-JGB-SSC

ER191

into whether that AI model is effective. That sort of information is valuable only to competitors.

27.    Aside from the competitive advantage xAI would lose if its competitors learned what data sources, data points, and cleaning methods it uses to develop its AI models, xAI would also have to expend significant resources to compile the relevant information to provide detailed disclosures under AB 2013. The datasets used to train xAI's models have been collected, acquired, and refined over several years, and have gone through various iterations. The process of obtaining a list of data sources for all the datasets used for every AI model would be time-consuming and expensive, especially because xAI is constantly improving and refining its datasets and discarding low-quality data based on what information can most improve the effectiveness of its models.

28.    The difficulty and expense related to collecting information about datasets used for training and developing xAI's models is especially true of its older AI model versions. While it is theoretically feasible to find the code used for those models, an engineer would need to review in detail and work backwards from that code to figure out which datasets were used. Once the specific datasets are identified, they would need to be tracked down—or in some cases reconstructed if the dataset no longer exists—and then analyzed to determine the data sources and data points used.

29.    All of that would take many weeks and dozens of engineers. Taking those resources away from AI development at a time when the competitive AI race is at its peak and is moving at an extremely rapid pace, would be devastating for xAI. That is especially true because the engineers who would likely have the best knowledge about where to find those data sources are the ones who have the most

- 43 -

experience and familiarity with xAI's models and are therefore the ones working on the most cutting edge products that xAI is producing.  Dedicating man hours and computation time to finding these old datasets would detract from xAI's ability to produce competitive products that keep pace with new innovations in the market.

I declare under penalty of perjury pursuant to 28 U.S.C. §1746 that the foregoing is true and correct to the best of my knowledge.

Executed this 13th day of January, 2026, in Palo Alto, California.

_____
CHRISTOPHER STANLEY

- 44 -

EXHIBIT B – CHRISTOPHER STANLEY DECLARATION
xAI'S PRELIMINARY INJUNCTION MOTION  NO. 2:25-cv-12295-JGB-SSC

ERIN E. MURPHY (*pro hac vice* forthcoming)
MATTHEW D. ROWEN (Cal. Bar #292292)
JAMES Y. XI (*pro hac vice* forthcoming)
MITCHELL K. PALLAKI (*pro hac vice* forthcoming)
ILAN J. POSNER (*pro hac vice* forthcoming)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
Tel.: (202) 742-8900
erin.murphy@clementmurphy.com
matthew.rowen@clementmurphy.com
james.xi@clementmurphy.com
mitchell.pallaki@clementmurphy.com
ilan.posner@clementmurphy.com

*Attorneys for Plaintiff X.AI LLC*

# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| X.AI LLC,<br><br>     *Plaintiff,*<br><br>   v.<br><br>ROB BONTA, in his official capacity as Attorney General of the State of California,<br><br>     *Defendant.* | Case No. _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**ACTION SEEKING STATEWIDE RELIEF**<br><br>(42 U.S.C. §1983; *Ex parte Young*) |

COMPLAINT

**ER194**

Plaintiff X.AI LLC ("xAI") respectfully brings this civil action pursuant to 42 U.S.C. §1983 and the United States Constitution for declaratory and injunctive relief against Defendant Rob Bonta, in his official capacity as Attorney General for the State of California, and alleges as follows:

## INTRODUCTION

1.     For as long as companies have been innovating, states have provided protection for their trade secrets—information that is valuable only if it is kept secret from others, particularly competitors.  The government has long recognized that companies are unlikely to invest the considerable time and money required to develop novel products if they cannot keep secret the methods, processes, and information that make their products innovative.

2.     Companies have taken advantage of trade secret protections to develop fertilizers, airplane parts, consumer beverage products, and everything in between. Trade-secrets protections have been applied broadly to all manner of industries and have allowed companies to thrive across all manner of sectors.  The burgeoning artificial intelligence ("AI") industry is no different.

3.     AI-focused companies like xAI develop, refine, and disseminate AI models, which are software programs that simulate human intelligence and learning to perform a wide range of tasks.  A generative AI model ("gen AI" for short) is a particular type of AI model that is capable of creating original content based on user prompts.  To teach these models to create accurate and responsive content, companies rely heavily on datasets—i.e., collections of information that are stored

- 1 -
COMPLAINT

in various formats (text, images, videos, sound files, etc.) and are derived from a variety of sources of human knowledge. Companies input datasets into their AI models so that the model not only can memorize the information it has been given, but also can extrapolate from the information it has learned. By repeating that process over and over to reinforce what the model has learned, AI companies can train their AI models to perform a wide range of tasks—everything from answering trivia questions and summarizing long documents to putting together an action plan and generating images and videos.

4.    But those models are only as good as their training. And the training is only as good as the data on which the company relies. For that reason, xAI and other AI developers dedicate substantial resources to identifying high-quality data to train their models. As part of that process, they seek to find data sources that their competitors are not using to train the model to perform its tasks more efficiently. If a developer's AI model has received unique training based on sources of data that other models have not received, then it will likely have a competitive advantage, as it is trained to respond in ways that competitors' models are not.

5.    Unsurprisingly, then, one of the keys to an AI developer's success is its ability to find information and sources that its competitors do not have. Accordingly, businesses like xAI make significant efforts to safeguard information about the datasets they have acquired: their sources, the amount of data they hold, the types of data included in those datasets, and their role in the overall process of developing fully functioning AI models. After all, if a competitor had insight into any of those

- 2 -
COMPLAINT

aspects of the datasets, it could replicate the training process and undercut its rival's competitive edge. For example, if OpenAI (another leading AI company) were to discover that xAI was using an important dataset to train its models that OpenAI was not, OpenAI would almost certainly acquire that dataset to train its own model, and vice versa. At bottom, these datasets are valuable precisely because they are not public. The datasets themselves and their usage are valuable trade secrets.

6. Until recently, California law recognized as much and protected those trade secrets from disclosure. But California Assembly Bill 2013 ("AB 2013") threatens to eviscerate that protection, as well as those afforded by Congress under the federal Defend Trade Secrets Act ("DTSA"). Although billed as a consumer-transparency statute, AB 2013 is actually a trade-secrets-destroying disclosure regime that hands competitors a roadmap to learn how companies like xAI are developing and training their proprietary AI models.

7. AB 2013 requires developers of gen AI systems or services, like xAI, to publicly disclose critical information about the datasets used to develop and train their gen AI models. Though AB 2013's provisions do not explain how detailed those disclosures must be, they cover a wide array of sensitive trade information, including, among other things, the sources of the datasets, a description of how the datasets further the gen AI's intended purpose, and the number of data points included in each dataset. If AB 2013 is allowed to take effect and the state can thereby compel developers to provide detailed and intrusive disclosures, AB 2013 would force xAI to reveal confidential information about how it develops, trains,

- 3 -

COMPLAINT

ER197

and refines its unique gen AI models—all of which are trade secrets that are fundamental to its business and that would otherwise be protected under state and federal law.

8.    Perhaps that would be understandable—albeit still unconstitutional—if that information were particularly valuable to consumers.  But it is not clear how AB 2013 is supposed to help consumers, who are far more interested in evaluating how an end-product performs the tasks it is given than in obtaining technical details about the datasets and processes companies use to train their models.  The parties that are most likely to benefit from the law are thus not consumers, but competitors.  While it is unclear what the consumer is even supposed to do with the information AB 2013 requires companies like xAI to disclose, xAI's rivals have both the wherewithal and the motivation to use detailed information about xAI's datasets to replicate xAI's models or improve their own AI systems, thus robbing xAI of a competitive edge in the exponentially growing AI market.

9.    AB 2013's disclosure regime is unconstitutional several times over.

10.    For starters, AB 2013 runs afoul of the Takings Clause.  It forces xAI to give up its trade secrets on developing gen AI without any promise of compensation—a quintessential *per se* taking. Again, information about the datasets xAI uses to improve its gen AI models is a confidential trade secret protected under federal and state law.  That information is economically valuable and fiercely protected.  By compelling xAI to disclose those trade secrets, AB 2013 would gut their value, and force xAI to surrender a competitive advantage.  Depriving xAI of

- 4 -

COMPLAINT

**ER198**

the right to exclude others from possessing its confidential trade secrets is precisely the kind of *per se* taking that the Supreme Court has reiterated requires just compensation. Because California has offered no compensation *at all* for its forced surrender of that valuable property, it cannot enforce AB 2013's disclosure requirements against xAI consistent with the Takings Clause.

11. Even if disclosure of xAI's trade secrets under AB 2013 did not rise to the level of a *per se* taking, its burdensome regulation works a regulatory taking because it will effectively reduce the value of xAI's trade secrets to zero. AB 2013 imposes a novel and unprecedented requirement on AI developers that wholly disregards the investment-backed expectations on which xAI relied when developing its products. After all, xAI had no reason to anticipate that California would disregard the critical role that trade-secrets protections play in the AI industry by compelling it to hand key details about how it develops its AI models over to its competitors. For similar reasons, by eviscerating xAI's ability to exclude others from accessing that information, AB 2013 will rob xAI of the economic value inherent in its trade secrets. In short, the extraordinary character of AB 2013's obligations confirms that it effectuates a regulatory taking. California cannot constitutionally take xAI's intangible property without compensation.

12. To make matters worse, AB 2013 also violates xAI's free speech rights under the First Amendment. Forcing a company like xAI to disseminate specific information compels speech—which implicates the First Amendment just as much as prohibiting speech. And because AB 2013 requires disclosure of particular

- 5 -

COMPLAINT

content, it is a content- and viewpoint-based regulation of speech that triggers strict scrutiny. That much is clear from the bill's legislative history, which does not mince words: AB 2013 is designed to "help[] identify and mitigate biases." Cal. S. Rules Comm., AB 2013, *Senate Floor Analysis* 3 (Aug. 20, 2024), *available at* https://perma.cc/7SS2-UUHW. But whatever form of heightened scrutiny ultimately applies, AB 2013 falls short. California has, at best, a minimal interest in forcing AI companies to disclose their valuable trade secrets for all the world to see. On the other hand, the burden AB 2013 imposes on xAI to disclose that information is onerous and economically devastating. The regulation is anything but narrowly tailored. It compels disclosure of information that cannot possibly be helpful to consumers, there are less restrictive alternatives available to meet California's concerns, and the law applies to all AI systems regardless of whether they pose any particular risk and even includes old AI models that are no longer in regular use.

13. On top of that, AB 2013 is also unconstitutionally vague. The law fails to provide fair notice to a person of ordinary intelligence as to what information must be disclosed. The law is unclear as to which AI systems it applies, it is internally inconsistent as to whether it applies only to datasets used during AI training or to all datasets used in development, and it offers no guidance on how much detail developers must disclose about their proprietary information. In short, AB 2013 does not come close to regulating with the "narrow specificity" that the Constitution demands of laws that impinge on free speech (and threatens

- 6 -

COMPLAINT

ER200

trademarks, to boot).

14.    In sum, AB 2013 threatens to gut the AI industry, and it violates numerous clauses of the Constitution along the way.  The court should not allow this deeply misguided and Constitution-flouting law to take effect.

## JURISDICTION AND VENUE

15.    xAI's causes of action arise under 42 U.S.C. §1983 and the United States Constitution.  The Court therefore has subject-matter jurisdiction over these federal claims under 28 U.S.C. §1331.  This Court has authority to grant legal and equitable relief under 42 U.S.C. §1983 and *Ex parte Young*, 209 U.S. 123 (1908), injunctive relief under 28 U.S.C. §1651, and declaratory relief under 28 U.S.C. §§2201(a) and 2202.

16.    Venue is appropriate in this district under 28 U.S.C. §1391(b) because the Attorney General performs his official duties in the Central District of California and is therefore considered to reside in this district as a matter of law.

## PARTIES & STANDING

17.    X.AI LLC is a limited liability company that is organized under the laws of the State of Nevada and has its principal place of business in Palo Alto, California.  As part of its services and operations, xAI produces and develops AI models that it intends to share broadly with members of the public.  xAI accordingly constitutes a "developer" as defined by AB 2013, because it is a "corporation that designs, codes, produces, or substantially modifies an artificial intelligence system or service for use by members of the public."  Cal. Civ. Code §3110(b).  As a result,

- 7 -
COMPLAINT

when AB 2013 takes effect on January 1, 2026, xAI will need to comply with AB 2013's disclosure obligations "regarding the data" it uses "to train the generative artificial intelligence system[s] [and] service[s]" it has made publicly available since January 1, 2022, or will make publicly available again. *Id.* §3111.

18.   xAI has standing to bring this action.  To allege standing, a plaintiff need allege facts sufficient to establish only that his conduct is "arguably proscribed by the statute [he] wish[es] to challenge." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014); *see also id.* at 158-59 (explaining that "we do not require a plaintiff to expose himself to liability before bringing suit"); *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988) (finding that plaintiffs had standing to bring a pre-enforcement challenge because they "alleged an actual and well-founded fear that the law will be enforced against them").

19.   Because xAI is a "developer" under AB 2013, it is directly regulated by the Act and will have disclosure obligations if the law takes effect.  And there is an "actual and well-founded fear that the law will be enforced against" xAI if it does not comply.  *Am. Booksellers*, 484 U.S. at 393.  Indeed, "[t]he State has not suggested that the newly enacted law will not be enforced," and there is "no reason to assume otherwise." *Id.*  And complying with those disclosure obligations would violate xAI's constitutional and property rights for the reasons explained below.  The deprivations of constitutional and property rights that enforcement of AB 2013's requirements would work are quintessential injuries in fact that demonstrate xAI's standing to bring this pre-enforcement challenge. *E.g.*, *Columbia Basin Apartment*

- 8 -

COMPLAINT

*Ass'n v. City of Pasco*, 268 F.3d 791, 798 (9th Cir. 2001); *Jacobs v. Clark Cnty. Sch. Dist.*, 526 F.3d 419, 426 (9th Cir. 2008).

20.    Defendant Rob Bonta is the California Attorney General.  Defendant is a California resident and sued in his official capacity.  Attorney General Bonta, as the chief law officer of the state, Cal. Const. art. V, §13, is generally charged with enforcing California's laws, including AB 2013.  AB 2013 lacks its own enforcement mechanism.  But the California legislature has suggested that its provisions could be enforced through California's Unfair Competition Law, Cal. Bus. & Prof. Code §17200 *et seq.  See* Cal. Assem. Comm. on Privacy & Consumer Prot., AB 2013, Bill Analysis 9 (Apr. 28, 2024), *available at* https://perma.cc/7SS2-UUHW.  Because Attorney General Bonta has authority to enforce California's Unfair Competition Law, Cal. Bus. & Prof. Code §17204, xAI has a credible fear that the Attorney General will attempt to enforce AB 2013 against xAI via that law.

## BACKGROUND

### A.    Generative Artificial Intelligence.

21.    "Artificial intelligence is the science and engineering of getting machines, typically computer programs, to exhibit intelligent behavior." *United States v. Google LLC*, 747 F.Supp.3d 1, 52 (D.D.C. 2024); *see also* 15 U.S.C §9401(3) ("The term 'artificial intelligence' means a machine-based system that can, for a given set of human-defined objectives, make predictions, recommendations or decisions influencing real or virtual environments.").  Today, most AI researchers and practitioners focus on a particular type of AI:  Generative Artificial Intelligence,

- 9 -

COMPLAINT

or gen AI for short.[1]  The main distinction that sets gen AI apart from traditional forms of AI is that gen AI is able to create something new in response to user prompts, including new content such as audio, code, images, text, simulations, and videos.[2]  While traditional forms of AI have existed for decades, gen AI has been around for only a few years.[3]  Yet even in that short time, the capabilities of these gen AI systems have drastically progressed, precipitating a corresponding improvement in overall AI performance.[4]  Some estimate that gen AI applications stand to add up to $4.4 trillion to the global economy annually.[5]

22.    To achieve content-generative ability, gen AI developers use machine learning systems to train their gen AI models to recognize patterns from large datasets and make predictions or decisions based on those patterns.[6]  Deep learning is a more intense subset of machine learning that uses artificial, multilayered neural networks (mathematical models that replicate the interconnected, neural structure of the human brain) that can automatically learn complex patterns from raw data,

---

[1] Cole Stryker & Eda Kavlakoglu, *What Is Artificial Intelligence (AI)?*, IBM, https://perma.cc/FFQ4-4N8K (last visited Dec. 13, 2025).

[2] Sadie O'Connor, *Generative AI*, 8 Geo. L. Tech. Rev. 394, 394-95 (2024).

[3] Harry Surden, *ChatGPT, AI Large Language Models, and Law*, 92 Fordham L. Rev. 1941, 1942 (2024).

[4] *Id.* at 1942-43.

[5] *What Is Generative AI?*, McKinsey & Co., (April 2, 2024), https://perma.cc/GHW4-DZSE.

[6] Stryker & Kavlakoglu, *supra*.

COMPLAINT

thereby more closely simulating the decision-making power of human intelligence.[7] As a result, deep learning systems usually require less human intervention because the system, through repeated modeling, is able to develop and learn on its own.

23.    Datasets are the foundation of this process.  Datasets are collections of information that are stored in an organized manner so that specific entries can be located, studied, and utilized.[8]  The information within a dataset can vary wildly.  It can be as simple as a table containing data points (e.g., a spreadsheet containing client information, phone numbers, addresses, names, and emails) or can include a combination of text, images, and audio (e.g., the combination of notes, photos, and voicemails saved on an individual's cellphone).[9]

24.    These datasets can be gathered from a wide variety of sources.  They can be acquired by purchasing pre-packaged datasets that others have compiled— as advertisers often do when they purchase datasets of information about potential consumers for a product.  They can also be developed by using application programming interfaces (APIs), which allow different software applications to communicate with one another.  Or datasets can be compiled from a wide variety of bespoke sources, including by licensing data from the social media platform X.

25.    All AI companies seek to acquire datasets to use in their AI model

---

[7] *Id.*

[8] Annie Badman & Matthew Kosinski, *What Is a Dataset?*, IBM, https://perma.cc/6S3B-2HNV (last visited Dec. 15, 2025).

[9] *Id.*

- 11 -

COMPLAINT

training process.  Many of the datasets contain information from publicly available and widely used resources.  Resources like Creative Commons, the Library of Congress's Free to Use and Reuse Sets, and other large repositories of information are prime sources for obtaining data for gen AI models because of both their size and the variation in data available (e.g., text, images, and videos).  As a result, most AI companies in the marketplace rely on some of the same data to train and develop their AI models.

26.     But AI companies do not rely on *all* the same data.  Some AI companies acquire and utilize data that others do not.  Indeed, what makes one company's AI model different from another company's model depends in large part on the data a company has acquired and utilized.

27.     For example, an AI company may obtain data from sources of information that are public, but not obvious locations to look for data.  Take legal data.  Most AI companies might use data from obvious sources of information like federal or state courts' websites.  But some companies might see a benefit to also obtaining data from some less obvious sources of information, such as Justia or the Government Publishing Office.  Because the latter sources might have distinct data that an AI company can use, and because that information might be presented in a different format, an AI company that relies on those specialized sources in crafting its datasets can gain a competitive advantage.  Such data enables the owner to provide unique training to its AI model that differentiates it from other AI models.

28.     Companies can also rely on different information from their

- 12 -

COMPLAINT

competitors by acquiring data from non-public sources. For example, a company may purchase test answers from a major quiz bowl competition or from a standardized test company. Or taking the legal example above, a developer may pay a company to assemble briefs addressing common legal questions to be used to train its AI model. To the extent other companies lack access to that data to train their AI models, the company that purchased data from those non-public sources gains a competitive advantage: When the owner of the non-public information trains its AI model on information its competitors are not using, it ensures that its AI model has more versatility than its competitors. In short, datasets—and in particular, the specific sources and kinds of information they contain—are the linchpin in an AI model's development process and success.

29. By using datasets that contain different forms of media, text, images, and other files in hand, AI companies can develop AI systems through the deep learning process. Before any learning occurs, the datasets need to be "cleaned" and then converted into a numeric format that a computer can read and comprehend. The cleaning process requires AI engineers to review datasets to remove unnecessary duplicate entries (e.g., repeated photos) and incomplete entries (e.g., removing phone numbers from a list that do not contain an area code). AI engineers also use this step to identify high-quality data that will be useful for the training process because it will facilitate the most learning—for example, an AI model that is meant to recognize images will initially learn more from clear, crisp photos, than from blurry images.

- 13 -

COMPLAINT

30.     The conversion process that follows is known as "tokenization." Tokenization involves translating data taken from the datasets that have been acquired and cleaned into a list of numerical representations that the model can process called tokens.[10]  A token is essentially a component of a larger dataset that represents words, characters, or phrases.  *See United States v. Google LLC*, 2025 WL 2523010, at *9 (D.D.C. Sept. 2, 2025).  The tokenization process is critical in preparing data for further processing in AI models.

31.     Creating a gen AI system usually proceeds in several stages.  The first stage is the pre-training phase, where engineers develop a foundation model—a term used to describe an AI model that is trained using a wide array of datasets aimed at covering a vast range of information and data formats (i.e., text, images, audio, etc.).[11]  The goal of this process is to use a broad base of information, so that the AI model can recognize patterns and extrapolate from the universe of information it has been asked to process.  The foundation model serves as the building block for more AI models that are fine tuned to perform specialized tasks, such as moving from an AI model that can generally generate images or videos based on user inputs to one that is specialized to perform graphic design for webpages.[12]

32.     The most common foundation models are large language models.

---

[10] Mahesh Babu, *Toeknization in Deep Learning Models*, Medium (August 29, 2025), https://perma.cc/AN5A-JYTR.

[11] Rina Diane Caballar & Cole Stryker, *What Are Foundation Models?*, IBM, https://perma.cc/5MFV-H2L6 (last visited Dec. 15, 2025).

[12] *Id.*

- 14 -
COMPLAINT

Large language models are typically designed to understand and then generate human language, but they are sometimes designed to understand and then generate image, video, sound, or music. Some models can support several kinds of content.[13] These foundation models take data inputs, convert them to tokens, predict the most likely next token in a sequence, and then convert those predicted tokens back into a language output. *See Google*, 2025 WL 2523010, at *9-10.[14] A model's ability to predict the next token depends on the quality, diversity, and quantity of the input data. *Id.* So to build out effective foundation models, developers must input huge volumes of raw data. This process is computationally intensive (requiring thousands of clustered graphics processing units), time-consuming (taking weeks of processing), and expensive (costing millions of dollars).[15] The goal of this developmental stage is to produce a foundation model with general reasoning and generative capabilities that can then be adapted for many applications. The process is akin to teaching a child to speak.

33. With a foundation model in place, the gen AI system can be trained and fine-tuned to better respond to specific content or applications. Developers may use tools such as reinforcement learning to assess the gen AI's performance and improve its processing, thus transforming the unfiltered and potentially chaotic responses of

---

[13] Stryker & Kavlakoglu, *supra*.

[14] *See also id.*

[15] *Id.*; Surden, *supra*, at 1967.

- 15 -

COMPLAINT

a foundation model into more polished and reliable outputs.[16]  This typically involves a smaller yet higher quality, focused training dataset to target specific capabilities of an AI system that has already been pretrained.[17]  In creating these higher-quality datasets, developers must employ more direct human involvement to label and curate the datasets.  If building the foundation model is like teaching a child to speak, this fine-tuning stage is like sending the child to school.

34.    Once the model is fine-tuned, it will be regularly assessed, refined, and improved.  This can occur through additional fine-tuning, or it may involve analyzing the model's actual outputs to real-world user prompts.  This is an ongoing process, akin to an employee continuing to improve at his job with periodic job-performance reviews.

**B.    xAI's Artificial Intelligence Systems.**

**1.  xAI Develops Its Own Gen AI Systems.**

35.    xAI has taken advantage of the powerful capabilities of AI models in developing its own AI systems and refining the datasets used to train those models.

36.    Beginning around March and April 2023, xAI started investing in developing its own AI model for public consumption, which later became known as Grok.

37.    xAI's engineers invested substantial amounts of time and energy in acquiring datasets from various sources across the Internet to develop and eventually

---

[16] *See also* Stryker & Kavlakoglu, *supra*.

[17] Surden, *supra*, at 1967.

- 16 -
COMPLAINT

**ER210**

train the AI models that it has produced. For the reasons outlined above, this process was key to the work xAI has performed to date. After all, acquiring datasets that are varied in source type, data type, and format is vital to xAI's ability to train AI models that are versatile enough to be adapted for consumers to use to perform a variety of tasks—whether that be providing up-to-date responses about news events or trivia, helping plan events a user wants to host, or brainstorming ideas with a user interested in launching a business.

38. As part of its development process, xAI generally used the methodology outlined above. *See supra* ¶¶31-34. xAI first acquired and refined its datasets (including finding multiple ways to tokenize or package the information for it to be processed by xAI's models)[18] to develop a foundation AI model unique to xAI.

39. From there, xAI engineers used specially constructed datasets to tweak and refine the model. xAI engineers adjusted different aspects of the xAI foundation model's code and tested the resulting variations using its datasets to see which were most effective at the tasks they were given. For example, if a variant of the model were asked to write stories, the engineers would review the resulting story for quality, creativity, and readability. Or if the variations were prompted to recognize

---

[18] By way of an example, a sentence can be tokenized by assigning a numerical signifier to each word, to each letter, each pair of characters, etc. Given there are many ways to represent a given sentence, the differing representations are all equally important to the testing and refining process, as they ensure the AI model can respond to many different inputs and settings and still yield the same result.

- 17 -

COMPLAINT

ER211

handwriting, they would be evaluated for their ability to handle different handwriting styles, fonts, and legibility in the writing samples they were given. This process is akin to pruning tree branches. Each variation of the base model is a branch that is tested by engineers to determine whether it should be discarded or left to grow and develop by repeating the process.

40. In November 2023, after a months-long effort to acquire and use datasets to develop its models, xAI succeeded in an initial limited public release of its flagship AI model, Grok-1. *See Announcing Grok, supra.* A few months later, xAI launched the full public release of Grok-1, *see* xAI, *Open Release of Grok-1* (Mar. 17, 2024), https://perma.cc/JN7Y-ZHSD, and shortly thereafter, xAI's engineers began developing Grok-2, which was rolled out to the public in August 2024, *see* xAI, *Grok-2 Beta Release* (Aug. 13, 2024), https://perma.cc/C75D-FG7E. That same process led to the release of Grok-3 in February 2025 and Grok-4 in July 2025. *See* xAI*, Company*, https://x.ai/company (last visited Dec. 14, 2025).

41. While xAI is constantly developing the next version of its AI models, it also releases updates to existing models and adds features to make them more versatile. For example, xAI recently released Grok 4.1, which operates like Grok-4 but has been trained to exhibit more interpersonal skills when a user provides an emotional prompt (like expressing grief over a lost pet), and to be more effective at creative writing. *See* xAI, *Grok 4.1* (Nov. 17, 2025), https://perma.cc/GF8C-E49M.

42. In addition, xAI continues to support prior models even after the next version is released, which gives new versions time to be fully deployed and tested

- 18 -

COMPLAINT

by the public, and gives those who use xAI's models in their products time to fully integrate the new version.  Eventually, xAI discontinues use and support for earlier models, as newer versions innovate on prior versions, adapt to new uses and tasks, and become more refined and effective.

43.   xAI seeks to foster consumer confidence in its AI models by continuing to test them against real-world tasks and providing up-to-date information about how they perform.  *See, e.g.*, xAI, *Grok 4 Fast Model Card* (last updated Sept. 19, 2025), https://perma.cc/FEK8-CYQV.  For example, xAI evaluates whether its models exhibit political bias when asked about controversial topics, as well as how its models fare when being pressured to give the wrong answer to a question.  *See id.* at 4.  These tests are valuable for consumers, as they demonstrate how well xAI's models can perform the various tasks for which consumers may want to use them (e.g., summarizing text, performing math problems, or answering questions about current events).  And because the tests replicate how a consumer would actually interact with a model and the results it would see, they help consumers assess whether using the AI model is likely to be worthwhile.

44.   Despite being around only since 2023—significantly later than many of its competitors—xAI has consistently released models that rank at the top of performance benchmarks and leaderboards, demonstrating the success of xAI's development process and the value of the datasets it has obtained and curated.

### 2. xAI Holds Trade Secrets in Several Facets of Its Datasets.

45.   Due to the critical role they play in the development process,

COMPLAINT

information about the datasets and processes AI developers use to train their AI models is a closely protected trade secret under state and federal law.

46.     Under California law, a party holds a trade secret in information that (1) "is valuable because it is unknown to others and (2) … the owner has attempted to keep secret." *Amgen Inc. v. Cal. Corr. Health Care Servs.*, 260 Cal.Rptr.3d 873, 886 (Cal. Ct. App. 2020); Cal. Civil Code §3426.1(d).  Under the parallel federal law, the DTSA, a party has a protected trade-secrets property interest in information that she intends to use in interstate commerce if (1) the information "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information" and (2) the owner "has taken reasonable measures to keep such information secret."  18 U.S.C. §1839(3).

47.     xAI's dataset information, which xAI uses to develop its AI models that are disseminated in interstate commerce, easily satisfies both standards.  They thus constitute trade secrets under both the DTSA and California law.

48.     First, dataset information is economically valuable precisely because it is unknown to others.  The specific sources of data used to construct xAI's gen AI inform both the kind of information xAI's models are trained on and how useful that information is to the model's performance.  *See O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 420 F.Supp.2d 1070, 1089 (N.D. Cal. 2006) ("Combinations of public information from a variety of different sources when combined in a novel

- 20 -
COMPLAINT

ER214

way can be a trade secret."); *accord WeRide Corp. v. Kun Huang*, 379 F.Supp.3d 834, 847 (N.D. Cal. 2019). For example, an AI developer seeking to produce an AI model capable of image generation may rely on datasets of photos from photo hosting sources such as Wikimedia Commons. But another AI company might think to use other sources of photos, such as Openverse or Public Domain Pictures, or instead license datasets containing a wide range of images from sources like Getty Images or Adobe Stock. If one company does not use a dataset used by another, its AI model may not be as well trained. If xAI were to reveal all the datasets that it uses, its competitors would immediately move to acquire those sources to ensure their models were equally as effective.

49. The amount of data that xAI uses is also valuable precisely because it is unknown to others. The breadth of information engineers rely on to develop xAI's models reveals details about the model's ability to handle a wide range of tasks. A model trained to recognize images, text, and audio, for example, would have more capabilities than one trained to recognize only text.

50. There is accordingly significant value in xAI keeping not just the content, but also the size, of its datasets secret. Many AI companies will have overlap in the datasets they use. But it is the *differences* between the datasets each company uses that gives xAI a competitive edge. If competitors could see the sources of all of xAI's datasets, or even the size of its datasets, competitors could evaluate both what data xAI has and how much they lack. And from there, they could better understand and try to fill any gap in their own models' knowledge to

- 21 -
COMPLAINT

ultimately produce a better product.

51.    xAI's processes for cleaning, modifying, and refining the datasets it has obtained are economically valuable information too.  Those details reveal the methods xAI has used to choose which datasets are appropriate for training its AI models, and which data xAI engineers believe will be most effective for training and refining the AI model's capabilities.  Those methods are economically valuable because the specific steps xAI employees take to identify the data that will be used to train xAI's models provide a roadmap for competitors to understand how to replicate xAI's development process.  Those steps shed light on the strategic choices xAI engineers have made in advancing the capabilities of its AI models—for example, whether they believe judicial opinions or other sources will be more effective at training a creative-writing AI model to write stories based on user prompts.  As a result, other companies could use information about xAI's processes for selecting and modifying datasets to undercut any competitive edge xAI holds in its development process by replicating and improving on those methods.

52.    Put simply, dataset information is "valuable because it is unknown." *Amgen Inc.*, 260 Cal.Rptr.3d at 886; *see also Comet Techs. U.S. of Am. Inc. v. Beuerman*, 2018 WL 1990226, at *3 (N.D. Cal. Mar. 15, 2018) (recognizing under the DTSA that "[a] collection of data that allows the holder to recreate one of Plaintiff's top technologies derives its value from not being generally known, because Plaintiff's competitive edge would evaporate if the public and its competitors could easily recreate its products"); *Whyte v. Schlage Lock Co.*, 125

- 22 -

COMPLAINT

Cal.Rptr.2d 277, 287 (Cal. Ct. App. 2002) (trade secrets have "independent economic value" because the information would be "valuable to a competitor" if disclosed).  To be sure, some of that information comes from publicly available sources.  But xAI's decisions about how to craft the best mixture of data from public and non-public sources—and which public and non-public sources—are what helps it to develop and train top-notch AI models.  *See O2 Micro Int'l*, 420 F.Supp.2d at 1089; *WeRide*, 379 F.Supp.3d at 847 (that plaintiff "derived much of its source code from open source code … does not mean that [plaintiff's complete] source code … was not confidential").  And decisions that xAI makes about things like how to tokenize, and whether to use an entire dataset or only a subset during the training process, are valuable and non-public too, as they are equally essential to xAI's ability to develop unique AI models.  *Abba Rubber Co. v. Seaquist*, 286 Cal.Rptr. 518, 527 (Cal. Ct. App. 1991) (noting that information is valuable to competitors "if it indicates to them a fact which they previously did not know"); *accord E. W. Bank v. Shanker*, 2021 WL 3112452, at *9 (N.D. Cal. July 22, 2021) (explaining that parties can hold trade-secrets property rights in "roadmaps related to confidential technology" because such roadmaps would enable competitors to recreate the resulting product).  In short, granular information about xAI's datasets—including the sources xAI uses, the volume of data (or tokens) xAI has and uses, the types of data xAI uses, and how xAI uses such data in the training process—is all valuable precisely because it is not known to xAI's competitors.

53.    Courts around the country already recognize that AI training data

- 23 -

COMPLAINT

**ER217**

constitute economically valuable, confidential information that warrants protection against disclosure during litigation and discovery proceedings. *See, e.g.*, Order at 2, *In re OpenAI ChatGPT Litig.*, No. 3:23-cv-3223 (N.D. Cal. Sept. 24, 2024), Dkt.182 (court order designating OpenAI's training data as "Highly Confidential – Attorneys' Eyes Only"); Order at 3, *Dow Jones v. Perplexity AI*, No. 1:24-cv-7984 (S.D.N.Y. Aug, 1, 2025), Dkt.62 (Confidentiality and Protective Order describing training data as "extremely sensitive" and designating it "Highly Confidential").

54. Given the obvious economic importance of this highly confidential data, xAI makes a significant effort to prevent its disclosure and maintain its secrecy. All employees sign confidentiality provisions when they execute their employment agreements to work for xAI, and to work in the AI development process in particular. These confidentiality provisions communicate to employees that all parts of the development process are xAI's non-public, proprietary information, that that information is to be used solely for development of xAI's models, and that none of it should be publicly disclosed. *See Whyte*, 125 Cal.Rptr.2d at 286-87; *Google LLC v. Point Fin., Inc.*, 2025 WL 1616533, at *4 (N.D. Cal. June 6, 2025).

55. xAI has also made sure that its datasets are access gated and accessible only to individuals with appropriate level of access. *See Whyte*, 125 Cal.Rptr.2d at 286-87; *WeRide*, 379 F.Supp.3d at 847; *BladeRoom Grp. Ltd. v. Facebook, Inc.*, 219 F.Supp.3d 984, 986-87 (N.D. Cal. 2017). The location of data storage is known only to the individuals that need access for an approved purpose, and xAI's systems also alert security when certain datasets are accessed or moved. That alert ensures that

- 24 -

COMPLAINT

the appropriate xAI team can contact the individual whose actions were flagged to ensure the access was authorized and make sure that the information is being used only for an authorized purpose.

56.    On top of all that, xAI has made clear to employees that they can and should report any unauthorized access that they observe to xAI's legal or incident response teams so that xAI can actively remedy any potential misuse of its datasets. That reporting structure is critical to safeguarding xAI's datasets, as it allows xAI to rely on its employees' insight on the ground to help protect and safeguard its highly valuable proprietary information.

57.    To enhance security even further, xAI has introduced role-based access requirements, which ensure that an employee's access is limited to the datasets they actually need to use. That extra layer of security helps xAI ensure that it can respond quickly to any unauthorized use and preempt any improper disclosure.

58.    xAI also has a robust confidentiality policy that underscores the confidentiality provisions in employees' employment contracts. This policy states explicitly that all information, including xAI's datasets and process and methods, is protected and non-public.

59.    In addition, xAI will implement time-limited access controls, which will require a user to gain re-approval after a set number of days, so that permission to access data does not extend beyond the needs of a particular project.

60.    In short, xAI takes extremely seriously the importance of safeguarding its datasets, information relating to them, and its methods and processes. Indeed,

- 25 -

COMPLAINT

**ER219**

xAI is constantly refining its security systems to ensure that xAI alone has access to the highly valuable information that is critical to its competitive edge in innovating AI models.  xAI thus plainly holds trade secrets in that information under California law and under the DTSA.

### C.    California Passes Assembly Bill 2013.

61.    On September 28, 2024, the Governor of California signed into law AB 2013.  The bill, entitled "Artificial Intelligence Training Data Transparency," imposes substantial information-disclosure requirements on developers of gen AI.  It is scheduled to take effect on January 1, 2026.  Cal. Civ. Code §3111.

62.    While AB 2013 itself does not contain any statement of purpose, the legislature claimed that its goal is to "provide[] transparency to consumers of AI systems and services by providing important documentation about the data used to train the services and systems they are being offered." *See Senate Floor Analysis*, *supra*, at 6; *accord* Cal. Assem., AB 2013, *Assembly Floor Analysis* 2 (Aug. 27, 2024), *available at* https://perma.cc/7SS2-UUHW.  In particular, the law's disclosure obligations purportedly aim to "help[] identify and mitigate biases," *Senate Floor Analysis*, *supra*, at 3, based on the notion that "garbage in" is "garbage out"—the quality of the data going in affects the quality of the ultimate product, *Assembly Floor Analysis*, *supra*, at 2.  Yet it is hard to see how AB 2013's requirements do anything to accomplish that goal, as they do not require gen AI companies to disclose the kinds of information that consumers typically find useful—e.g., how well an AI model has performed when given particular tasks.

- 26 -

COMPLAINT

They instead require companies to disclose information that is highly valuable to their *competitors*—namely, the very proprietary dataset information that xAI works so hard to keep secret.

63.   In particular, AB 2013 requires any "developer" of a "generative artificial intelligence system or service, or a substantial modification to a generative artificial intelligence system or service" made "publicly available to Californians for use" after January 1, 2022, to "post on the developer's internet website documentation regarding the data used by the developer to train the generative artificial intelligence system or service." Cal. Civ. Code §3111.

64.   Those disclosures must include, but are not limited to, a "high-level summary of the datasets used in the development" of the generative AI. *Id.* §3111(a). And the statute sets out a list of 12 categories of dataset information that developers must also publicly disclose:

- The sources or owners of the datasets.
- A description of how the datasets further the intended purpose of the AI.
- The number of data points included in the datasets.
- A description of the types of data points within the datasets.
- Whether the datasets include data protected by copyright, trademark, or patent.
- Whether the datasets were purchased or licensed by the developer.
- Whether the datasets include personal information.

- 27 -
COMPLAINT

- Whether the datasets include aggregate consumer information.

- Whether there was any cleaning, processing, or other modification to the datasets, and the intended purpose of those efforts.

- The time period during which the data was collected, including if the data collection is ongoing.

- The dates the datasets were first used during the development AI.

- Whether the AI system or service used or continuously uses synthetic data generation in its development.

*See id.* §3111(a)(1)-(12).

65.    These disclosure requirements apply to all AI models, with three narrow exceptions: (1) AI models used solely to help ensure security and integrity (i.e., "to detect security incidents that compromise the availability, authenticity, integrity, and confidentiality of stored or transmitted personal information," *Id.* §1798.140(ac)); (2) AI models used solely in the operation of aircraft in the national airspace; and (3) AI models developed for national security and made available only to a federal entity. *Id.* §3111(b).  Those exceptions underscore that California recognizes that the information AB 2013 requires companies to disclose is valuable precisely because it is not public.  After all, if there were no value to keeping the information secret, then it is hard to see why California would exempt such models from its requirements.

66.    AB 2013 does not define the key term "datasets."  Nor does it explain how "high-level" a "summary" must be to satisfy the law.  For example, is it

- 28 -

COMPLAINT

sufficient for a developer to disclose the "Internet" generally as the source of the dataset? Or must it include specific details and sources (e.g., "state and federal court websites" or the "Library of Congress")? And AB 2013 provides no guidance as to whether developers can simply provide a "yes" or "no" answer to questions like whether their datasets contain information that is protected intellectual property, consumer data, or personal information, or whether they must instead identify any such protected information. The same problem plagues AB 2013's requirement to disclose whether datasets are "clean[ed], process[ed], or [subject to] other modifications"; AB 2013 does not make clear whether a "yes" or "no" answer is sufficient, or if a developer must instead flesh out what cleaning or refining was done to each dataset.

67.   AB 2013 does, however, define "developer" extremely broadly to include any person or entity that "designs, codes, produces, or substantially modifies an artificial intelligence system or service." *Id.* §3110(b). The law thus will require xAI to locate, collect, summarize, and disclose extensive information about the datasets it uses or has used to train and develop each and every one of its AI models released since 2022 even if they are no longer being used, including every update or modification to an existing model.

68.   Those disclosures will not only impose onerous compliance burdens on xAI, but will also force xAI to reveal confidential information about how it develops and trains its AI models. Meanwhile, the requirements will do little to help consumers assess the things they actually care about, like whether a particular AI

- 29 -

COMPLAINT

model is effective or user-friendly. Consumers measure the value of an AI model based on *outcomes*, by testing its responsiveness to particular types of inquiries. *See, e.g.*, *Grok 4 Fast Model Card*, *supra*. The disclosures that AB 2013 requires tell consumers little, if anything, about that. Moreover, to the extent that California aims to have AB 2013's disclosure requirements "help[] identify and mitigate biases," *Senate Floor Analysis*, *supra*, at 3, based on the notion that "garbage in" is "garbage out," *Assembly Floor Analysis*, *supra*, at 2, that only underscores that AB 2013's provisions target First Amendment protected speech based on its content and viewpoint. Regardless, given xAI already discloses the results of a wide variety of tests, including the "political bias" of its AI models, *see, e.g.*, *Grok 4 Fast Model Card*, *supra*, AB 2013's requirements miss their mark.

69. Indeed, the only thing AB 2013 seems to do is force developers to provide their competitors with a roadmap to mirror their success. It gives competitors invaluable insight into how an AI model is trained, what datasets are used, what data datasets are not, and more—all information that others can exploit for their own competitive advantage. In short, it is hard to see how the copious information AB 2013 would require xAI to disclose has meaning to anyone *but* other developers trying to build their own AI models.

- 30 -
COMPLAINT

## CLAIM FOR RELIEF

### COUNT ONE
### (*Per Se* Takings)
### Takings Clause of the Fifth Amendment to the U.S. Constitution
### 42 U.S.C. §1983; *Ex parte Young*; 28 U.S.C. §§2201(a) and 2202

70.    xAI incorporates by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

71.    The Fifth Amendment to the U.S. Constitution provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V.  That prohibition on taking private property for public use without just compensation applies to the states through the Fourteenth Amendment to the U.S. Constitution.  U.S. Const. amend. XIV, §1.

72.    As the Supreme Court has long explained, "[b]y requiring the government to pay for what it takes, the Takings Clause saves individual property owners from bearing 'public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Sheetz v. Cnty. of El Dorado*, 601 U.S. 267, 273-74 (2024) (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)).

73.    The Takings Clause covers both *per se* takings and regulatory takings.

74.    A *per se* taking occurs when the government effects "a direct government appropriation or physical invasion of private property." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005).  When it comes to *per se* takings, "the Takings Clause imposes a clear and categorical obligation to provide the owner with just compensation." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147 (2021).

- 31 -
COMPLAINT

75. Whether the government has effected a regulatory taking, by contrast, depends on "factors such as the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action." *Id.* at 148. But that balancing test has "no place" when the government "appropriates for the enjoyment of third parties" "a fundamental element of the [owner's] property right," *id.* at 149-50, or "otherwise interfere[s] with the owner's right to exclude others from it," *Sheetz*, 601 U.S. at 274. "That sort of intrusion on property rights is a per se taking" that "trigger[s]" the "right to compensation" without regard to any balancing of burdens, expectations, and degree. *Id.*

76. The Supreme Court has long made clear that the Takings Clause protects intangible property rights from government appropriation. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003-04 (1984) (collecting cases that "ha[ve] found other kinds of intangible interests to be property for purposes of the Fifth Amendment's Taking[s] Clause"); *cf. City of Cincinnati v. Louisville & Nashville R.R. Co.*, 223 U.S. 390, 400 (1912) ("every description of property … [including] tangibles and intangibles alike" can be subject to appropriation). Trade secrets are one category of intangible property that receives constitutional protection against government appropriation. *Ruckelshaus*, 467 U.S. at 1003-04. Indeed, trade secrets are protected property rights under both the DTSA and California law, *see supra* ¶¶45-60, underscoring their entitlement to the protections of the Takings Clause. *See Tyler v. Hennepin Cnty.*, 598 U.S. 631, 638 (2023) (looking to governing law as

- 32 -
COMPLAINT

**ER226**

an important source for identifying property rights protected by Takings Clause).

77. The key feature of the trade-secret property right is its secrecy. By definition, a "trade secret" is information that "[d]erives independent economic value … *from not being generally known* to the public or to other persons who can obtain economic value from its disclosure or use." Cal. Civ. Code §3426.1(d) (emphasis added); 18 U.S.C. §1839(3)(B); *accord Quintara Biosciences, Inc. v. Ruifeng Biztech, Inc.*, 149 F.4th 1081, 1085 (9th Cir. 2025) ("By definition, trade secrets derive their value from nondisclosure."). It therefore follows that "[t]he property in a trade secret is the power to make use of it to the exclusion of the world," *Hartley Pen Co. v. U.S. Dist. Ct.*, 287 F.2d 324, 328 (9th Cir. 1961), making the "right to exclude" others from knowing or accessing that secret information the "*sine qua non*" of that property interest, *Cedar Point*, 594 U.S. at 150. In short, "[w]ith respect to a trade secret, the right to exclude others is central to the very definition of the property interest." *Ruckelshaus*, 467 U.S. at 1011.

78. Because the right to exclude is "one of the most treasured rights of property ownership," laws that appropriate the right to exclude work a *per se* takings. *Cedar Point*, 594 U.S. at 149, 155. The categorical duty to pay compensation is accordingly triggered whenever the government prevents a property owner from restricting others from accessing its property. *Id.*

79. By compelling xAI to disclose "how [its] datasets further the intended purpose" of xAI's models, Cal. Civ. Code §3111(a)(2), the number of data points or tokens xAI uses, *id.* §3111(a)(3), and the types of data xAI has culled for developing

- 33 -

COMPLAINT

its AI models, *id.* §3111(a)(4), AB 2013 effects a *per se* taking, as those obligations appropriate xAI's trade secrets. To the extent AB 2013 compels xAI to reveal the sources of its datasets beyond the Internet writ large, *see* Cal. Civ. Code §3111(a)(1), (6), that disclosure would appropriate xAI's trade secrets in the sources of its datasets, effecting a *per se* taking too. And while it is not at all clear what information xAI must provide to satisfy AB 2013's obligation to disclose whether its datasets contain intellectual property, *id.* §3111(a)(5), personal or aggregate consumer information, *id.* §3111(a)(7)-(8), and whether xAI uses cleaning or modification of its datasets, including the use of synthetic data, *id.* §3111(a)(9), (12), to the extent the law requires anything more than a "yes" or "no" answer, that too would appropriate xAI's trade secrets, as all of that information constitute protected trade secrets too, *see supra* ¶¶45-60. Simply put, AB 2013 would force xAI to disclose to all the world information that it has a protected property interest in keeping secret, thereby eviscerating the very core of its trade-secret property right.

80. By eliminating xAI's ability to exercise its right to exclude others from its trade secrets—the defining feature of the trade-secret property right—AB 2013 effects a *per se* taking. *See Armstrong*, 364 U.S. at 48-49 (government action that eviscerates the value of a mechanic's lien effects a categorical taking because, "[b]efore the liens were destroyed, the lienholders admittedly had compensable property," and "[i]mmediately afterwards, they had none"); *cf. Dolan v. City of Tigard*, 512 U.S. 374, 394 (1994) (government action preventing a property owner from controlling when members of the public could access her property would

- 34 -

COMPLAINT

**ER228**

"eviscerate[]" her "right to exclude"). If xAI must comply with AB 2013, then its trade secrets will be "disclosed to others," and xAI will "ha[ve] lost [its] property interest" in those trade secrets entirely. *Ruckelshaus*, 467 U.S. at 1011.

81. Because AB 2013 works a *per se* taking, California can impose its requirements (if at all) only if it provides just compensation for that which it takes. Yet AB 2013 does not contemplate compensating xAI for its lost property rights, let alone provide any mechanism to do so. California accordingly cannot enforce AB 2013 against xAI consistent with the Takings Clause.

82. xAI is therefore entitled to an order declaring that AB 2013 effects uncompensated *per se* takings of xAI's trade secrets in violation of the Takings Clause and enjoining the Attorney General from enforcing it.

**COUNT TWO**
**(Regulatory Takings)**
**Takings Clause of the Fifth Amendment to the U.S. Constitution**
**42 U.S.C. §1983; *Ex parte Young*; 28 U.S.C. §§2201(a) and 2202**

83. xAI incorporates by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

84. Because application of AB 2013's disclosure obligations to xAI would accomplish the functional equivalent of a classic taking, they constitute a regulatory taking under the Takings Clause as well.

85. As explained, to determine whether a regulatory taking has occurred, courts balance the factors set forth in *Penn Central Transportation Co. v. City of New York*: (1) "[t]he economic impact of the regulation on the claimant;" (2) "the

- 35 -
COMPLAINT

extent to which the regulation has interfered with distinct investment-backed expectations;" and (3) "the character of the governmental action." 438 U.S. 104, 124 (1978).[19] Here, all three factors support finding that AB 2013 would effect all manner of regulatory takings.

86.   First, xAI invested in and developed its trade secrets starting in March and April of 2023 (*i.e.*, well before AB 2013 was first introduced in January 2024) and continuing to today with certain investment-backed expectations. California law has protected trade secrets for decades. Indeed, its Uniform Trade Secrets Act ensures that individuals who have an interest in preserving the secrecy of their trade secrets can prevent others from unlawfully accessing them. *See* Cal. Civ. Code §§3426 *et seq.* The same is true of federal law. Private parties can invoke the DTSA's private cause of action to sue third parties who have misappropriated their trade secrets. 18 U.S.C. §1836. Federal law also authorizes the federal government to pursue criminal penalties against any party that has knowingly stolen such rights. *See id.* §§1831 *et seq.* Accordingly, xAI had a reasonable expectation that the datasets it used to train AI models, the value of which is derived from their non-disclosure, would be protected under both federal and state law. After all, California has certainly never suggested that AI developers and the models they create are somehow excluded from ordinary property rules.

---

[19] xAI reserves the right to ask the Supreme Court to overrule *Penn Central*.

- 36 -

COMPLAINT

87. xAI accordingly had no reason to know or expect that it would not be able to reap the value of its trade secrets in developing specialized datasets to train its AI models. That is especially so because the provisions at issue were not introduced until the calendar year after xAI first began acquiring and developing datasets for training its models, and several months after xAI released its first AI model to the public.

88. The Supreme Court has made clear that the government cannot "manipulate[]" or "extinguish a property interest that it recognizes everywhere else to avoid paying just compensation when it is the one doing the taking." *Tyler*, 598 U.S. at 645. Yet AB 2013's novel disclosure regime does precisely that. By compelling disclosure of xAI's valuable trade secrets, *see supra* ¶¶45-60, AB 2013 bucks the longstanding protections of a trade-secrets owner's right to keep such information secret under both federal law and California property law.

89. California has compounded that disruption of settled expectations by rendering its law retroactive to January 2022. *See, e.g.*, *INS v. St. Cyr*, 533 U.S. 289, 315 (2001) ("Retroactive statutes raise special concerns."). That retroactive aspect of AB 2013 is particularly troubling, as it targets xAI's investments made in developing those trade secrets at a time when xAI had no notice whatsoever that the highly confidential information it was developing could become subject to sweeping disclosure obligations.

90. In short, xAI could not reasonably expect California to destroy this longstanding property interest by legislative fiat, as it has done with AB 2013. *See*

- 37 -

COMPLAINT

*Murr v. Wisconsin*, 582 U.S. 383, 396 (2017) ("States do not have the unfettered authority to 'shape and define property rights and reasonable investment-backed expectations,' leaving [property-]owners without recourse against unreasonable regulations.").

91.     Second, AB 2013's enforcement would substantially interfere with the economic value of xAI's interest in the datasets and processes it has developed to assist with training its AI models.  Those datasets and processes derive their core value from their secrecy; after all, that is why they receive protection as trade secrets under California and federal law.  *See* Cal. Civ. Code §3426.1(d); 18 U.S.C. §1839(3).  By preserving the secrecy of this information, xAI maintains a competitive advantage in the AI marketplace, as the quality of its datasets and their sources and size all shape how xAI trains its AI models, which in turn informs the models' effectiveness and value to the consumer.  *See Andersen v. Stability AI Ltd.*, 2025 WL 1927796, *2 (N.D. Cal. July 14, 2025) (recognizing that forcing an AI developer to disclose AI training data to a competitor "raises serious competitive concerns" and "poses a risk of harm").  AB 2013 eviscerates the value of that information, as it forces xAI to tell other developers exactly what they need to do to improve the quality of their own AI models.

92.     For those reasons, compelled disclosure under AB 2013 would have severe economic impacts on xAI.  As explained, xAI's interest in its datasets (including their size, contents, and sources) hold value precisely because they are not publicly known.  "[D]isclosure of that data [thus] entirely extinguish[es] the

- 38 -

COMPLAINT

value of the trade secret[s]." *Pharm. Rsch. & Mfrs. of Am. v. Stolfi*, 153 F.4th 795, 839 (9th Cir. 2025). After all, even if the data can still be used to train the AI systems, the entire reason xAI keeps that information secret is so that it can produce AI models that are distinct and more effective relative to its competitors' models. *See Ruckelshaus*, 467 U.S. at 1012 ("That the data retain usefulness … even after they are disclosed—for example, as bases from which to develop new products or refine old products … —is irrelevant to the determination of the economic impact[.] … The economic value … lies in the competitive advantage over others that [xAI] enjoys by virtue of its exclusive access to the data, and disclosure or use by others of the data would destroy that competitive edge."). That is all the more important given that AI is a nascent area rife for substantial growth and development, making *any* competitive advantage key to xAI's long-term success in the space. In short, disclosure would eviscerate the value of xAI's trade secrets; its competitors cannot replicate xAI's models without the information AB 2013 would compel xAI to disclose.

93. Third, the character of the government action weighs heavily in favor of finding that AB 2013's disclosure regime would effect a regulatory taking of xAI's trade secrets. As explained, *see supra* ¶¶48-53, xAI's ability to keep dataset information private is core to its property interest in those trade secrets. Disclosure of that information therefore would eviscerate that property right. Even if AB 2013 does not amount to a *per se* taking, the fact that xAI's "property right is extinguished" once it is forced to comply with AB 2013's disclosure requirements,

- 39 -

COMPLAINT

ER233

*Ruckelshaus*, 467 U.S. at 1002, confirms that AB 2013 accomplishes the "functional[] equivalent" of a classic *per se* taking, *Lingle*, 544 U.S. at 539; *Hodel v. Irving*, 481 U.S. 704, 715-17 (1987) (holding that the total abrogation of the right to devise amounted to a taking of that property right based solely on the "extraordinary" character of the government action).

94.    The categorical obligation to disclose information to the public at large—without *any* protection for the proprietary nature of that information—reinforces the conclusion that the character of California's action weighs in favor of a taking.  Unlike more narrowly focused disclosure statutes that are triggered only once the state has made a case-specific determination that there is a public need for disclosure, AB 2013 broadly compels disclosure of trade secrets regardless of whether there is any identifiable need to make that information public.  *Cf. Stolfi*, 153 F.4th at 839-40.

95.    That is more troubling because it is not at all clear how the public is supposed to benefit from the trade secrets that AB 2013 would compel xAI to share.  After all, AB 2013 does not compel the disclosure of truthful, factual information to combat misleading claims about how AI products work, *see Zauderer v. Off. of Disciplinary Couns.*, 471 U.S. 626, 638 (1985), or alert the public of potential risks associated with them.  Indeed, it is unclear what the public is even supposed to do with the information AB 2013 would force xAI to disclose.

96.    For instance, why would consumers care how many data points are in a given training dataset?  Without the requisite technical expertise, there is no way

COMPLAINT

for a consumer to know whether, for example, an AI model related to improving driving directions that is trained on a dataset containing a thousand different road maps is better than one trained on ten thousand road maps. The consumer's best metric is the end product, not the amount of data used.

97. It is equally unclear how learning the sources of the data used to train an AI model would help a consumer evaluate its quality. A lawyer may think that a research AI model that draws from state and federal court websites and one that draws from Cornell's Legal Information Institute could yield similar results. But she may not appreciate that slight distinctions in how each source stores and displays statutory text or judicial opinions can affect an AI model's training process and, as a result, the quality of the research it can produce. Again, the best metric for assessing the relative quality of such models—and the one the lawyer would actually care about—is how each performs when given actual research tasks.

98. So too with information about how xAI intends to use a certain dataset to train its AI models. For example, if a consumer were to know that xAI intended to use a dataset drawn in part from bar trivia questions and answers a certain number of times to help train an AI model that would not give consumers insight into how valuable the model's functionality will be. After all, the consumer could not predict whether that dataset is sufficiently comprehensive, whether xAI engineers provided enough reinforcement for the AI model to learn which questions it has answered correctly, or if the AI model adequately learned how to frame its answers in a manner

- 41 -

COMPLAINT

ER235

that is easy to comprehend. Again, the user would glean more from seeing the results of tests performed on the AI model.

99. The principal beneficiary of these disclosure requirements thus are not consumers, *but rather competitors*, who will use the information to bolster their own products. Namely, competitors will use the disclosures to pinpoint deficiencies in the size of their training sets, identify source data they do not have, and spot issues in how they are using datasets to train their AI models. xAI would thus bear the entire burden of that boon to competitors through the loss of its trade-secrets property rights. *Cienega Gardens v. United States*, 331 F.3d 1319, 1338-39 (Fed. Cir. 2003) (character-of-government-action prong weighed in favor of a taking because placing the burdens of a public program on individual property owners was "the kind of expense-shifting to a few persons that amounts to a taking"). The final prong of the *Penn Central* analysis accordingly also weighs heavily in favor of finding that AB 2013's disclosure regime accomplishes a taking.

100. Moreover, because AB 2013 provides no benefit to the public at large, but transfers the entire value of xAI's trade secrets to its private-company competitors, the law cannot even satisfy the "public use" requirement of the Takings Clause. *See Kelo v. City of New London*, 545 U.S. 469, 477 (2005) ("[I]t has long been accepted that the sovereign may not take the property of *A* for the sole purpose of transferring it to another private party *B,* even though *A* is paid just compensation."). For that reason too, AB 2013 effects an unconstitutional taking.

101. At bare minimum, AB 2013's mandated disclosure of xAI's trade secrets would effect an uncompensated regulatory taking. xAI is therefore entitled to an order declaring that AB 2013 violates the Takings Clause and enjoining the Attorney General from enforcing it.

**COUNT THREE**
**(Compelled Speech)**
**First Amendment to the U.S. Constitution**
**42 U.S.C. §1983; *Ex parte Young*; 28 U.S.C. §§2201(a) and 2202**

102. xAI incorporates by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

103. Not only does AB 2013 effectuate an unconstitutional taking; it also violates the First Amendment. By forcing xAI to disclose information about its datasets—including its confidential trade secrets, *see supra* ¶¶45-60—AB 2013 compels xAI to speak in violation of its right to free speech.

104. The Supreme Court has long recognized that the First Amendment's guarantee of free speech "includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977); *see also X Corp. v. Bonta*, 116 F.4th 888 (9th Cir. 2024). That protection extends "not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995).

105. Laws compelling speech are generally treated no differently from laws restricting speech, *see, e.g.*, *Nat'l Inst. of Fam. & Life Advocs. v. Becerra* (*NIFLA*),

- 43 -
COMPLAINT

**ER237**

585 U.S. 755, 766-67 (2018), even when the government does not compel a speaker to express any particular message, *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988). As the Supreme Court has explained, the standard First Amendment analysis applies equally when the government compels speakers to convey purely factual information. *See Hurley*, 515 U.S. at 573.

106. There is a narrow limited "exception [to the] compelled speech" doctrine for government-compelled speech that aims to combat misleading advertisements. *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 843 (9th Cir. 2019); *see Zauderer*, 471 U.S. 626. But the Supreme Court has never applied the principles set forth in *Zauderer* outside the context of misleading advertising. *See NIFLA*, 585 U.S. at 768. To the contrary, the Court has consistently reaffirmed that *Zauderer* was focused only on "combat[ing] the problem of inherently misleading commercial advertisements." *Milavetz, Gallop & Milavetz P.A. v. United States*, 559 U.S. 229, 250 (2010); *see also, e.g.*, *Hurley*, 515 U.S. at 573; *United States v. United Foods*, 533 U.S. 405, 416 (2001).

107. On top of that, *Zauderer* applies only "within the class of commercial speech." *X Corp*, 116 F.4th at 900; *see also Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 756 (9th Cir. 2019) (*Zauderer* only applies to "a First Amendment claim involving compelled commercial speech"). In other words, it applies only when the government is regulating speech that "propose[s] a commercial transaction." *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1119 (9th Cir. 2024); *see also Stolfi*, 153 F.4th at 821 (finding commercial speech where compelled

- 44 -

COMPLAINT

information "communicate[d] the terms of potential commercial transaction[s]" and was "tethered to commercial transactions."). *X Corp. v. Bonta* is instructive. Because the compelled-disclosure reports at issue there did not "communicate[] the terms of an actual or potential transactions," and instead "require[d] a company to recast its content-moderation practices in language prescribed by the State," they had "few indicia of commercial speech." 116 F.4th at 901.

108. *Zauderer* plainly has no application here. AB 2013 requires xAI to disclose its dataset gathering practices in language prescribed by California. None of that information has anything to do with "propos[ing] a commercial transaction," let alone with addressing any potentially misleading advertising or claims about a product or service. *Id.* at 900. Indeed, the law applies to all AI systems available for public use "regardless of whether the terms of that use include compensation." Cal. Civ. Code §3111. This case thus does not involve the kind of compelled-speech mandate that might get lesser scrutiny under *Zauderer*.

109. To the contrary, AB 2013 is a content-based regulation that triggers strict scrutiny, as it compels xAI to disclose specific *content* related to its AI models. *X Corp*, 116 F.4th at 900; *NIFLA*, 585 U.S. at 766. Strict scrutiny applies whenever the government forces companies to disclose particular content outside the context of commercial speech, whether it be factual information about a company's service and products, *see X Corp.* 116 F.4th at 902, risks those services or products may pose, *NetChoice*, 113 F.4th at 1119, or information about where to obtain other types of products or services, *see NIFLA*, 585 U.S. at 766. Like those content-based

- 45 -

COMPLAINT

disclosures, AB 2013 forces xAI to speak a particular message it does not want to convey to the public.

110.   AB 2013 compounds the First Amendment problems by discriminating based on viewpoint.

111.   AB 2013's viewpoint discrimination is clear from its face.  AB 2013 exempts from its requirements gen AI models with certain favored "purpose[s]." Cal. Civ. Code §3111(b).  In particular, California has extended favorable treatment to AI models "whose sole purpose is to help ensure security and integrity" or "the operation of aircraft in the national airspace," or were "developed for national security, military, or defense purposes [and are] … made available only to a federal entity" by exempting them from the disclosure obligations that would otherwise apply.  *Id.* §3111(b)(1)-(3).  Those "purpose"-based distinctions, however, are proxies for viewpoint discrimination.  *See City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 74 (2022).  It compels speech "based on the ideas or opinions it conveys," but allows other speakers with different views to stay silent. *Iancu v. Brunetti*, 588 U.S. 388, 393 (2019) (ban on registering "immoral" or "scandalous" trademarks was impermissibly viewpoint-based); *see, e.g.*, *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565 (2011) (restrictions on speech "promot[ing] brand-name drugs" were impermissibly "aimed at a particular viewpoint").

112.   The First Amendment does not permit California to compel private speech based on its perception that certain ideas (i.e., information regarding data developers use to train gen AI models focused on security, aviation, or military uses)

- 46 -
COMPLAINT

are important enough to be kept secret, and that other, less-favored ideas (e.g., information regarding data developers use to train gen AI models focused on creative writing) are not, in the state's eyes, valuable enough to be kept confidential. The Supreme Court has "emphatically rejected" the notion that a legislature may "weigh[] the value of a particular category of speech against its [perceived] social costs" and compel the disclosure of speech that it deems low value over the speaker's objection. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 792 (2011).

113.   Even if the above were not enough to confirm that AB 2013 triggers strict scrutiny, AB 2013's asserted purpose confirms as much. As the California legislature made clear, AB 2013 compels speech for the purpose of "identify[ing] and mitigate[ing] biases"—particular ideas and messages that the state disfavors. *Senate Floor Analysis*, *supra*, at 3. "Given the legislature's expressed statement of purpose, it is apparent that [AB 2013] imposes burdens that are based on the content of speech and that are aimed at a particular viewpoint," triggering strict scrutiny several times over. *Sorrell*, 564 U.S. at 565.

114.   AB 2013 cannot survive any level of heightened scrutiny, let alone strict scrutiny. Under strict scrutiny, California must show that the statute "furthers a compelling governmental interest and is narrowly tailored to that end." *X Corp*, 116 F.4th at 903. But even under intermediate scrutiny California must show that AB 2013 is "narrowly tailored to serve a significant governmental interest." *McCullen v. Coakley*, 573 U.S. 464, 486 (2014). AB 2013 is plainly not narrowly tailored to advance any legitimate interest the state could assert. Its disclosure

- 47 -

COMPLAINT

ER241

obligations "are more extensive than necessary" to help "consumers … make informed decisions" about AI models. *X Corp.*, 116 F.4th at 903. Indeed, as explained, it is far from clear how the trade secrets AB 2013 would force xAI to disclose would be of any value to consumers at all. *See supra* ¶¶95-99. Reports from developers or outside certifiers who test and assess an AI model's effectiveness at performing key tasks are far more useful metrics of transparency about the effectiveness of a product. xAI already releases "Model Cards" for each of its AI models for exactly that reason. *See Grok 4 Fast Model Card*, *supra*. Those disclosures are appropriately focused on the AI model's outputs—the information actually relayed to users. By contrast, AB 2013 is directed at the model's inputs— i.e., the data used during development. An exhaustive list of the raw datasets (which can number in the hundreds or thousands) and data points (which far exceed even the datasets) used to develop and refine AI models does not give consumers any meaningful way to evaluate an AI model's effectiveness; all it does is enable competitors to replicate a highly valuable model's success. AB 2013 thus imposes onerous disclosure requirements while providing no meaningful benefit to consumers.

115. The fact that AB 2013 compels disclosures regarding all AI models released since 2022, even if they are no longer regularly used by consumers, underscores the disconnect between the law's obligations and the legislature's consumer-transparency goal.

116. In short, because AB 2013 imposes onerous disclosure obligations that

- 48 -

COMPLAINT

**ER242**

do nothing to advance its professed consumer-protection interests, it cannot survive any level of First Amendment scrutiny.  For that reason too, AB 2013 should be declared unconstitutional, and the Attorney General should be enjoined from enforcing it.

**COUNT FOUR**
**(Unconstitutional Vagueness)**
**Due Process Clause of the Fourteenth Amendment to the U.S. Constitution**
**42 U.S.C. §1983; *Ex parte Young*; 28 U.S.C. §§2201(a) and 2202**

117.  xAI incorporates by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

118.  AB 2013 is unconstitutionally vague both on its face and as applied to xAI.

119.  "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."  *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012).  A law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  *United States v. Williams*, 553 U.S. 285, 304 (2008).  "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech."  *Fox*, 567 U.S. at 253-54.  After all, vague laws risk chilling would-be speakers by forcing them "to 'steer far wider of the unlawful zone'" than they would "if the boundaries of the forbidden areas were clearly marked."  *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964).

- 49 -
COMPLAINT

For that reason, laws touching on speech must themselves speak "only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963).

120. AB 2013 is not written "with narrow specificity," and it fails to provide fair notice to a person of ordinary intelligence as to what it requires. To begin, it fails to define the key terms "dataset" or "data point." Do these refer to each individual set of data a developer might retrieve from a broad source (for example, particular websites like Creative Commons) and each particular byte of information available there? Or does it refer to a broad category of sources, like publicly available Internet data? Or does AB 2013 instead cover only the curated datasets a developer actually inputs into an AI model or all those datasets that a developer sourced before curating the particular datasets ultimately used for training? AB 2013 does not say.

121. The statute also requires developers to provide a "high-level summary" of its datasets but provides no guidance on *how much* information these summaries must disclose. For example, subsection (a)(2) requires a description of how the datasets further "the intended purpose of the artificial intelligence system or service." Cal. Civ. Code §3111(a)(2). Does this require xAI to disclose its internal strategies as to how it values each individual dataset? Or does it suffice to simply note that the dataset helps improve the AI model's effectiveness? Subsection (a)(5) suffers from the same flaw. That subsection requires developers to disclose "[w]hether the datasets include any data protected by copyright, trademark, or patent, or whether the datasets are entirely in the public domain." *Id*. §3111(a)(5).

- 50 -

COMPLAINT

**ER244**

Can xAI satisfy this with a simple "yes" or "no"?  There is no way for xAI or any other developer to know whether its "high-level summar[ies]" must be 100 words or 100 pages.  AB 2013 is thus far afield from regulating "with narrow specificity." *Button*, 371 U.S. at 433.

122.   Making matters worse, AB 2013's disclosure obligation makes clear that even the enumerated list of information is not sufficiently comprehensive to satisfy the "high-level summary" mandate.  *See* Cal. Civ. Code §3111(a) (explaining that the list must "includ[e], but [is] not limited to," that enumerated list).  There is no way of knowing what additional information must be provided to fully comply with that obligation.  That open-ended mandate plainly "invite[s] arbitrary enforcement" based on California's own assessment about whether enough information has been produced.  *Kashem v. Barr*, 941 F.3d 358, 364 (9th Cir. 2019).  Due process does not permit such standardless rules, especially when First Amendment rights are at stake.

123.  Compounding the vagueness problem, AB 2013 is internally inconsistent as to what datasets it covers.  In its operative provision, AB 2013 requires developers to disclose information "regarding the data used by the developer to train the generative artificial intelligence system or service," Cal. Civ. Code §3111, which the law defines as the "testing, validating, or fine tuning … of the artificial intelligence system or service," *id*. §3110(f).  But the law later refers to "the datasets used in the development of the generative artificial intelligence." *id*. §3111(a).  The datasets used to *train* an AI model are different from—and are far

- 51 -

COMPLAINT

fewer than—the datasets used to *develop* that AI model. But AB 2013 leaves developers guessing whether they must provide information only on training datasets, or whether they must disclose the broader universe of datasets that they might have sourced. Because the boundaries of AB 2013's disclosure requirements are not "clearly marked," *Baggett*, 377 U.S. at 372, xAI and other developers may feel compelled to disclose more information than AB 2013 requires, thereby exacerbating AB 2013's infringement on free speech—and its evisceration of xAI's trade secrets, to boot.

124. Finally, AB 2013 fails to provide fair notice as to which AI systems it covers. The law covers "a generative artificial intelligence system or service … made publicly available to Californians for use." Cal. Civ. Code §3111. But what constitutes being "made publicly available to Californians for use"? If xAI licenses an AI model it has developed to an online retailer, who in turn uses that model to provide consumers with an automated chatbot that incorporates generative AI, must xAI disclose information about the datasets used to train that AI model, even though it is only privately licensed? Does any company that incorporates and optimizes someone else's generative AI system for its own business have to disclose details on how it did so? AB 2013 does not say.

125. In short, AB 2013 is plagued with vagueness problems on everything from which AI systems it covers, to what datasets it covers, to the level of detail developers must provide to comply with its mandates. That lack of "narrow specificity" will force companies to over-disclose confidential information to ensure

COMPLAINT

compliance—a result that is exceptionally problematic in the First Amendment and trade-secret context. AB 2013 should therefore be declared unconstitutionally vague, and the Attorney General should be enjoined from enforcing it.

## RELIEF REQUESTED

For the foregoing reasons, xAI respectfully requests from the Court:

a.    A declaration, pursuant to 28 U.S.C. §§2201(a) and 2202, that the provisions of AB 2013 that are codified at Cal. Civ. Code §3111(a)(1)-(9), (12) effect an uncompensated taking of trade secrets owned by xAI in violation of the Takings Clause of the U.S. Constitution;

b.    A declaration, pursuant to 28 U.S.C. §§2201(a) and 2202, that AB 2013 unconstitutionally compels xAI's speech in violation of the First Amendment of the U.S. Constitution;

c.    A declaration, pursuant to 28 U.S.C. §§2201(a) and 2202, that AB 2013 is unconstitutionally vague in violation of the Due Process Clause of the U.S. Constitution;

d.    An order preliminarily enjoining Attorney General Bonta, as well as all officers, agents, and employees subject to his supervision, direction, or control, from enforcing the provisions of AB 2013 against xAI;

e.    An order permanently enjoining Attorney General Bonta, as well as all officers, agents, and employees subject to his supervision, direction, or control, from enforcing the provisions of AB 2013 against xAI;

- 53 -

COMPLAINT

ER247

f.    Award xAI its costs and reasonable attorney's fees incurred in this action pursuant to 42 U.S.C. §1988 and other applicable law; and

g.    Grant xAI all other such relief as the Court may deem just and proper.

Respectfully submitted,

s/Matthew D. Rowen
ERIN E. MURPHY (*pro hac vice* forthcoming)
MATTHEW D. ROWEN (Cal. Bar #292292)
JAMES Y. XI (*pro hac vice* forthcoming)
MITCHELL K. PALLAKI (*pro hac vice* forthcoming)
ILAN J. POSNER (*pro hac vice* forthcoming)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
Tel.: (202) 742-8900
erin.murphy@clementmurphy.com
matthew.rowen@clementmurphy.com
james.xi@clementmurphy.com
mitchell.pallaki@clementmurphy.com
ilan.posner@clementmurphy.com

*Attorneys for Plaintiff X.AI LLC*

December 29, 2025

- 54 -
COMPLAINT

**ER248**

Name  Adam S. Sieff (CA Bar No. 302030)

Address  350 South Grand Avenue, 27th Floor

City, State, Zip  Los Angeles, CA 90071

Phone  213-633-8618

Fax  213-633-6899

E-Mail  adamsieff@dwt.com

☐ FPD   ☐ Appointed   ☐ CJA   ☐ Pro Per   ☒ Retained

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| X.AI LLC <br><br> PLAINTIFF(S), <br> v. <br> ROB BONTA, in his official capacity as California Attorney General <br><br> DEFENDANT(S). | CASE NUMBER: <br><br> 2:25-cv-12295-JGB-SSC <br><br><br> **NOTICE OF APPEAL** |

NOTICE IS HEREBY GIVEN that _____ Plaintiff X.AI LLC _____ hereby appeals to

*Name of Appellant*

the United States Court of Appeals for the Ninth Circuit from:

**Criminal Matter**

☐ Conviction only [F.R.Cr.P. 32(j)(1)(A)]
☐ Conviction and Sentence
☐ Sentence Only (18 U.S.C. 3742)
☐ Pursuant to F.R.Cr.P. 32(j)(2)
☐ Interlocutory Appeals
☐ Sentence imposed:

☐ Bail status:

**Civil Matter**

☒ Order (specify):
Denying preliminary injunction. 28 USC 1292a1. Representation statement attached.

☐ Judgment (specify):

☐ Other (specify):

Imposed or Filed on _____. Entered on the docket in this action on  March 4, 2026 (ECF 35) .

A copy of said judgment or order is attached hereto.

March 16, 2026                         /S/ Adam S. Sieff

Date                                  Signature
                                      ☐ Appellant/ProSe   ☒ Counsel for Appellant   ☐ Deputy Clerk

**Note:**   The Notice of Appeal shall contain the names of all parties to the judgment or order and the names and addresses of the attorneys for each party.  Also, if not electronically filed in a criminal case,  the Clerk shall be furnished a sufficient number of copies of the Notice of Appeal to permit prompt compliance with the service requirements of FRAP 3(d).

Query    Reports    Utilities    Help    Log Out

ACCO,(SSCx),APPEAL,CLOSED,DISCOVERY,MANADR,STAYED

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)
### CIVIL DOCKET FOR CASE #: 2:25-cv-12295-JGB-SSC

X.AI LLC v. Rob Bonta
Assigned to: Judge Jesus G. Bernal
Referred to: Magistrate Judge Stephanie S. Christensen
Case in other court: 9th CCA, 26-01591
Cause: 42:1983 Civil Rights Act

Date Filed: 12/29/2025
Date Terminated: 03/23/2026
Jury Demand: None
Nature of Suit: 950 Constitutional - State Statute
Jurisdiction: Federal Question

**Plaintiff**

**X.AI LLC**                                    represented by   **Erin E Murphy**
Clement and Murphy PLLC
706 Duke Street
Alexandria, VA 22314
202-742-8900
Email: erin.murphy@clementmurphy.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ilan J Posner**
Clement and Murphy PLLC
706 Duke Street
Alexandria, VA 22314
202-742-8900
Email: ilan.posner@clementmurphy.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**James Y Xi**
Clement and Murphy PLLC
706 Duke Street
Alexandria, VA 22314
202-742-8900
Email: james.xi@clementmurphy.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew David Rowen**
Clement and Murphy, PLLC
706 Duke Street
Alexandria, VA 22314
202-742-8900

**ER250**

Email:
matthew.rowen@clementmurphy.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mitchell Keshava Pallaki**
Clement and Murphy, PLLC
706 Duke Street
Alexandria, VA 22314
202-742-8900
Email:
mitchell.pallaki@clementmurphy.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Adam S. Sieff**
Davis Wright Tremaine LLP
350 S. Grand Avenue, Ste 27th Floor
Los Angeles, CA 90071
213-633-8618
Fax: 213-633-6899
Email: adamsieff@dwt.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Rob Bonta**
*in his official capacity as Attorney General*
*of the State of California*

represented by **Joseph Henry Meeker**
California DOJ - Government Law Section
300 S Spring St, Suite 9150-15
Los Angeles, CA 90013
213-269-6502
Email: joe.meeker@doj.ca.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kristin A. Liska**
California Attorney General's Office
600 West Broadway, Suite 1800
San Diego, CA 92101
619-321-5878
Email: kristin.liska@doj.ca.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/29/2025 | 1 | COMPLAINT Receipt No: ACACDC-41177000 - Fee: $405, filed by plaintiff X.AI LLC. (Attorney Matthew David Rowen added to party X.AI LLC(pty:pla))(Rowen, Matthew) (Entered: 12/29/2025) |
| 12/29/2025 | 2 | CIVIL COVER SHEET filed by Plaintiff X.AI LLC. (Rowen, Matthew) (Entered: 12/29/2025) |

**ER251**

| 12/29/2025 | 3 | Notice of Action Seeking Statewide Relief filed by Plaintiff X.AI LLC. (Rowen, Matthew) (Entered: 12/29/2025) |
|---|---|---|
| 12/29/2025 | 4 | *Notice of Interested Parties and Disclosure Statement In Compliance with FRCP 7.1 and Local Rule 7.1-1.* NOTICE of Interested Parties filed by Plaintiff X.AI LLC, (Rowen, Matthew) (Entered: 12/29/2025) |
| 12/29/2025 | 5 | NOTICE of Appearance filed by attorney Matthew David Rowen on behalf of Plaintiff X.AI LLC (Rowen, Matthew) (Entered: 12/29/2025) |
| 12/29/2025 | 6 | Request for Clerk to Issue Summons on Complaint (Attorney Civil Case Opening) 1 filed by Plaintiff X.AI LLC. (Rowen, Matthew) (Entered: 12/29/2025) |
| 01/07/2026 | 7 | NOTICE OF ASSIGNMENT to District Judge Jesus G. Bernal and Magistrate Judge Stephanie S. Christensen. (car) (Entered: 01/07/2026) |
| 01/07/2026 | 8 | NOTICE TO PARTIES OF COURT-DIRECTED ADR PROGRAM filed. (car) (Entered: 01/07/2026) |
| 01/07/2026 | 9 | Notice to Counsel Re Consent to Proceed Before a United States Magistrate Judge. (car) (Entered: 01/07/2026) |
| 01/07/2026 | 10 | 21 DAY Summons Issued re Complaint (Attorney Civil Case Opening) 1 as to Defendant Rob Bonta. (car) (Entered: 01/07/2026) |
| 01/07/2026 | 11 | NOTICE OF PRO HAC VICE APPLICATION DUE for Non-Resident Attorney Erin E Murphy. A document recently filed in this case lists you as an out-of-state attorney of record. However, the Court has not been able to locate any record that you are admitted to the Bar of this Court, and you have not filed an application to appear Pro Hac Vice in this case. Accordingly, within 5 business days of the date of this notice, you must either (1) have your local counsel file an application to appear Pro Hac Vice (Form G-64) and pay the applicable fee, or (2) complete the next section of this form and return it to the court at cacd_attyadm@cacd.uscourts.gov. You have been removed as counsel of record from the docket in this case, and you will not be added back to the docket until your Pro Hac Vice status has been resolved. (car) (Entered: 01/07/2026) |
| 01/07/2026 | 12 | NOTICE OF PRO HAC VICE APPLICATION DUE for Non-Resident Attorney Ilan J Posner. A document recently filed in this case lists you as an out-of-state attorney of record. However, the Court has not been able to locate any record that you are admitted to the Bar of this Court, and you have not filed an application to appear Pro Hac Vice in this case. Accordingly, within 5 business days of the date of this notice, you must either (1) have your local counsel file an application to appear Pro Hac Vice (Form G-64) and pay the applicable fee, or (2) complete the next section of this form and return it to the court at cacd_attyadm@cacd.uscourts.gov. You have been removed as counsel of record from the docket in this case, and you will not be added back to the docket until your Pro Hac Vice status has been resolved. (car) (Entered: 01/07/2026) |
| 01/07/2026 | 13 | NOTICE OF PRO HAC VICE APPLICATION DUE for Non-Resident Attorney James Y Xi. A document recently filed in this case lists you as an out-of-state attorney of record. However, the Court has not been able to locate any record that you are admitted to the Bar of this Court, and you have not filed an application to appear Pro Hac Vice in this case. Accordingly, within 5 business days of the date of this notice, you must either (1) have your local counsel file an application to appear Pro Hac Vice (Form G-64) and pay the applicable fee, or (2) complete the next section of this form and return it to the court at cacd_attyadm@cacd.uscourts.gov. You have been removed as counsel of record from the docket in this case, and you will not be added back to the docket until your Pro Hac Vice status has been resolved. (car) (Entered: 01/07/2026) |

**ER252**

| 01/07/2026 | 14 | NOTICE OF PRO HAC VICE APPLICATION DUE for Non-Resident Attorney Mitchell Keshava Pallaki. A document recently filed in this case lists you as an out-of-state attorney of record. However, the Court has not been able to locate any record that you are admitted to the Bar of this Court, and you have not filed an application to appear Pro Hac Vice in this case. Accordingly, within 5 business days of the date of this notice, you must either (1) have your local counsel file an application to appear Pro Hac Vice (Form G-64) and pay the applicable fee, or (2) complete the next section of this form and return it to the court at cacd_attyadm@cacd.uscourts.gov. You have been removed as counsel of record from the docket in this case, and you will not be added back to the docket until your Pro Hac Vice status has been resolved. (car) (Entered: 01/07/2026) |
| --- | --- | --- |
| 01/14/2026 | 15 | Notice of Appearance or Withdrawal of Counsel: for attorney Adam S. Sieff counsel for Plaintiff X.AI LLC. Adding Adam S. Sieff as counsel of record for Plaintiff for the reason indicated in the G-123 Notice. Filed by Plaintiff X.AI LLC. (Attorney Adam S. Sieff added to party X.AI LLC(pty:pla))(Sieff, Adam) (Entered: 01/14/2026) |
| 01/14/2026 | 16 | APPLICATION of Non-Resident Attorney Erin E. Murphy to Appear Pro Hac Vice on behalf of Plaintiff X.AI LLC (Pro Hac Vice Fee - $450 Fee Paid, Receipt No. ACACDC-41277324) filed by Plaintiff X.AI LLC. (Attachments: # 1 Proposed Order) (Sieff, Adam) (Entered: 01/14/2026) |
| 01/14/2026 | 17 | APPLICATION of Non-Resident Attorney Ilan J. Posner to Appear Pro Hac Vice on behalf of Plaintiff X.AI LLC (Pro Hac Vice Fee - $450 Fee Paid, Receipt No. ACACDC-41277507) filed by Plaintiff X.AI LLC. (Attachments: # 1 Proposed Order) (Sieff, Adam) (Entered: 01/14/2026) |
| 01/14/2026 | 18 | APPLICATION of Non-Resident Attorney James Y. Xi to Appear Pro Hac Vice on behalf of Plaintiff X.AI LLC (Pro Hac Vice Fee - $450 Fee Paid, Receipt No. ACACDC-41277647) filed by Plaintiff X.AI LLC. (Attachments: # 1 Proposed Order) (Sieff, Adam) (Entered: 01/14/2026) |
| 01/14/2026 | 19 | APPLICATION of Non-Resident Attorney Mitchell K. Pallaki to Appear Pro Hac Vice on behalf of Plaintiff X.AI LLC (Pro Hac Vice Fee - $450 Fee Paid, Receipt No. ACACDC-41277724) filed by Plaintiff X.AI LLC. (Attachments: # 1 Proposed Order) (Sieff, Adam) (Entered: 01/14/2026) |
| 01/15/2026 | 20 | WAIVER OF SERVICE Returned Executed filed by Plaintiff X.AI LLC. upon Rob Bonta waiver sent by Plaintiff on 1/15/2026, answer due 3/16/2026. Waiver of Service signed by Joe Meeker. (Sieff, Adam) (Entered: 01/15/2026) |
| 01/16/2026 | 21 | Notice of Appearance or Withdrawal of Counsel: for attorney Joseph Henry Meeker counsel for Defendant Rob Bonta. Adding Joseph H. Meeker as counsel of record for Rob Bonta, in his official capacity as the Attorney General of the State of California for the reason indicated in the G-123 Notice. Filed by Defendant Rob Bonta. (Attorney Joseph Henry Meeker added to party Rob Bonta(pty:dft))(Meeker, Joseph) (Entered: 01/16/2026) |
| 01/16/2026 | 22 | NOTICE OF MOTION AND MOTION for Preliminary Injunction *Memorandum of Points and Authorities* filed by Plaintiff X.AI LLC. Motion set for hearing on 2/23/2026 at 09:00 AM before Judge Jesus G. Bernal. (Attachments: # 1 Declaration of Louis Barrett, # 2 Declaration of Christopher Stanley, # 3 Proposed Order, # 4 Proof of Service) (Sieff, Adam) (Entered: 01/16/2026) |
| 01/20/2026 | 23 | STANDING ORDER upon filing of the complaint by Judge Jesus G. Bernal. (ima) (Entered: 01/20/2026) |
| 01/23/2026 | 24 | PROOF OF SERVICE filed by Plaintiff X.AI LLC, re Initial Order upon Filing of Complaint - form only 23 served on 1/20/2026. (Sieff, Adam) (Entered: 01/23/2026) |

**ER253**

| 01/26/2026 | 25 | ORDER by Judge Jesus G. Bernal: Granting 16 Non-Resident Attorney Erin E. Murphy APPLICATION to Appear Pro Hac Vice on behalf of Plaintiffs, designating Adam S. Sieff as local counsel. (twdb) (Entered: 01/26/2026) |
| --- | --- | --- |
| 01/26/2026 | 26 | ORDER by Judge Jesus G. Bernal: Granting 17 Non-Resident Attorney Ilan J. Posner APPLICATION to Appear Pro Hac Vice on behalf of Plaintiff, designating Adam S. Sieff as local counsel. (twdb) (Entered: 01/26/2026) |
| 01/26/2026 | 27 | ORDER by Judge Jesus G. Bernal: Granting 18 Non-Resident Attorney James Y. Xi APPLICATION to Appear Pro Hac Vice on behalf of Plaintiff, designating Adam S. Sieff as local counsel. (twdb) (Entered: 01/26/2026) |
| 01/26/2026 | 28 | ORDER by Judge Jesus G. Bernal: Granting 19 Non-Resident Attorney Mitchell K. Pallaki APPLICATION to Appear Pro Hac Vice on behalf of Plaintiff, designating Adam S. Sieff as local counsel. (twdb) (Entered: 01/26/2026) |
| 02/02/2026 | 29 | Notice of Appearance or Withdrawal of Counsel: for attorney Kristin A. Liska counsel for Defendant Rob Bonta. Adding Kristin A. Liska as counsel of record for Rob Bonta for the reason indicated in the G-123 Notice. Filed by Defendant Rob Bonta. (Attorney Kristin A. Liska added to party Rob Bonta(pty:dft))(Liska, Kristin) (Entered: 02/02/2026) |
| 02/02/2026 | 30 | OPPOSITION to NOTICE OF MOTION AND MOTION for Preliminary Injunction *Memorandum of Points and Authorities* 22 filed by Defendant Rob Bonta. (Attachments: # 1 Declaration of Kristin A. Liska (with Exhibits 1-6))(Meeker, Joseph) (Entered: 02/02/2026) |
| 02/09/2026 | 31 | REPLY in support of NOTICE OF MOTION AND MOTION for Preliminary Injunction *Memorandum of Points and Authorities* 22 filed by Plaintiff X.AI LLC. (Sieff, Adam) (Entered: 02/09/2026) |
| 02/23/2026 | 32 | MINUTES OF Motion Hearing held before Judge Jesus G. Bernal: HEARING ON MOTION FOR PRELIMINARY INJUNCTION (DKT. NO. 22 ). The filing shall be made not later than noon, on Friday, February 27, 2026. The motion stands submitted. SEE DOCUMENT FOR FURTHER INFORMATION. Court Reporter: CS-RS-1. (twdb) (Entered: 02/26/2026) |
| 02/27/2026 | 33 | RESPONSE filed by Defendant Rob Bontato Order on Motion for Preliminary Injunction,, Motion Hearing, 32 -- *Defendant's Response to Court's February 23 Order* (Liska, Kristin) (Entered: 02/27/2026) |
| 03/02/2026 | 34 | STATEMENT x.AI LLC's Statement Regarding Defendant Rob Bonta's Response to the Court's February 23 Order filed by Plaintiff X.AI LLC re: Order on Motion for Preliminary Injunction,, Motion Hearing, 32 . (Sieff, Adam) (Entered: 03/02/2026) |
| 03/04/2026 | 35 | MINUTES (IN CHAMBERS) by Judge Jesus G. Bernal: Order: (1) DENYING Plaintiff's Motion for a Preliminary Injunction (Dkt. No. 22) 22 . SEE DOCUMENT FOR FURTHER INFORMATION. (twdb) (Entered: 03/05/2026) |
| 03/16/2026 | 36 | Joint STIPULATION to Stay Case pending Appeal filed by Plaintiff X.AI LLC. (Attachments: # 1 Proposed Order)(Sieff, Adam) (Entered: 03/16/2026) |
| 03/16/2026 | 37 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by Plaintiff X.AI LLC. Appeal of Order on Motion for Preliminary Injunction 35 . (Appeal Fee - $605 Fee Paid, Receipt No. ACACDC-41747652.) (Attachments: # 1 035 Order Denying Preliminary Injunction)(Sieff, Adam) (Entered: 03/16/2026) |
| 03/16/2026 | 38 | REPRESENTATION STATEMENT re Notice of Appeal to 9th Circuit Court of Appeals, 37 . (Sieff, Adam) (Entered: 03/16/2026) |

| 03/17/2026 | 40 | NOTIFICATION from Ninth Circuit Court of Appeals of case number assigned and briefing schedule. Appeal Docket No. 26-1591 assigned to Notice of Appeal to 9th Circuit Court of Appeals, 37 as to plaintiff X.AI LLC. (mat) (Entered: 03/19/2026) |
| --- | --- | --- |
| 03/18/2026 | 39 | TRANSCRIPT ORDER re: Court of Appeals case number 26-1591, as to Plaintiff X.AI LLC for Court Smart (CS). Court will contact Melissa Strobel at melissastrobel@dwt.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the transcription company. (Sieff, Adam) (Entered: 03/18/2026) |
| 03/23/2026 | 41 | ORDER RE JOINT STIPULATION TO STAY PENDING APPEAL by Judge Jesus G. Bernal 36 . SEE DOCUMENT FOR FURTHER INFORMATION. (Made JS-6. Case Terminated.) (twdb) (Entered: 03/23/2026) |
| 03/25/2026 | 42 | TRANSCRIPT for proceedings held on February 23, 2026 (9:15 a.m.to 10:21 a.m.). Electronic Court Recorder: BABYKIN COURTHOUSE SERVICES, phone number (626)963-0566. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 4/15/2026. Redacted Transcript Deadline set for 4/27/2026. Release of Transcript Restriction set for 6/23/2026. (mci) (Entered: 03/25/2026) |
| 03/25/2026 | 43 | NOTICE OF FILING TRANSCRIPT filed for proceedings February 23, 2026 (9:15 a.m.to 10:21 a.m.) re Transcript 42 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (mci) TEXT ONLY ENTRY (Entered: 03/25/2026) |
| 03/25/2026 | 44 | TRANSCRIPT ORDER re: Court of Appeals case number 26-1591, as to Non-Party for Court Smart (CS). Court will contact Cortney Busch at cortney@lasst.org with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the transcription company. (mg) (Entered: 03/25/2026) |

| PACER Service Center | | | |
| --- | --- | --- | --- |
| **Transaction Receipt** | | | |
| 04/28/2026 07:29:06 | | | |
| **PACER Login:** | clementmurphy | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:25-cv-12295-JGB-SSC End date: 4/28/2026 |
| **Billable Pages:** | 6 | **Cost:** | 0.60 |

**ER255**

**CERTIFICATE OF SERVICE**

I hereby certify that on May 14, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the ACMS system.  I certify that all participants in this case are registered ACMS users and that service will be accomplished by the ACMS system.

s/Erin E. Murphy
Erin E. Murphy