No. 26-1591

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

X.AI LLC,

*Plaintiff-Appellant*,

V.

ROB BONTA, in his official capacity as Attorney General of the State of California,

*Defendant-Appellee*.

## On Appeal from the United States District Court
## for the Central District of California
No. 2:25-cv-12295

## ANSWERING BRIEF FOR DEFENDANT-APPELLEE

ROB BONTA
  *Attorney General of California*
THOMAS S. PATTERSON
  *Senior Assistant Attorney General*
ANYA M. BINSACCA
  *Supervising Deputy Attorney General*
KRISTIN A. LISKA
JOSEPH H. MEEKER
  *Deputy Attorneys General*
STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
300 South Spring Street, Suite 1702
Los Angeles, CA  90013-1230
Telephone: (213) 269-6502
Fax: (916) 731-2124
Joe.Meeker@doj.ca.gov
*Attorneys for Appellee*

July 15, 2026

# TABLE OF CONTENTS

**Page**

Introduction ............................................................................. 1

Statement of Jurisdiction ......................................................... 4

Statement of the Issues ............................................................ 4

Constitutional and Statutory Provisions ................................... 4

Statement of the Case .............................................................. 5

    I.    Generative Artificial Intelligence .............................. 5

    II.    AB 2013 ................................................................... 6

    III.    Procedural History .................................................. 9

Standard of Review ................................................................. 12

Summary of Argument ............................................................ 13

Argument ................................................................................. 17

    I.    AB 2013 Does Not Violate the First Amendment ................... 17

        A.    AB 2013 regulates commercial speech, so the disclosure requirement does not trigger strict scrutiny ................................................................... 17

        B.    AB 2013 is constitutional under the *Zauderer* standard for compelled commercial speech .................. 26

        C.    AB 2013 is constitutional as a regulation of commercial speech under intermediate scrutiny ........... 29

            1.    AB 2013 directly advances a substantial governmental interest. ....................................... 30

            2.    AB 2013 meets the tailoring requirement of intermediate scrutiny ......................................... 33

    II.    AB 2013 Is Not a Taking ....................................................... 34

        A.    xAI cannot receive injunctive relief for an alleged Takings Clause violation ............................................. 34

        B.    xAI has not shown that it holds trade secrets in the information subject to disclosure under AB 2013. ....... 36

**TABLE OF CONTENTS**
**(continued)**

Page

C.    AB 2013 does not effect a taking of xAI's alleged trade secrets ................................................................. 44

      1.    AB 2013 is not a per se taking ............................ 44

      2.    AB 2013 is not a regulatory taking ..................... 45

            a.    AB 2013 does not frustrate reasonable investment-backed expectations............... 47

            b.    xAI has not shown that disclosures under AB 2013 will have significant economic impacts ..................................... 50

            c.    AB 2013 serves an important public purpose ...................................................... 51

III.    AB 2013 Is Not Unconstitutionally Vague ............................ 53

IV.    The Equities Do Not Favor Preliminary Injunctive Relief ..... 56

V.    Any Injunctive Relief Should Be Narrowly Tailored ............. 58

Conclusion ................................................................................... 60

Statement of Related Cases........................................................... 61

Certificate of Compliance ............................................................. 62

# TABLE OF AUTHORITIES

**Page**

CASES

*Agins v. Tiburon*
447 U.S. 255 (1980)................................................................52

*Am. Beverage Ass'n v. City & Cnty. of San Francisco*
916 F.3d 749 (9th Cir. 2019) (en banc) ...............................27, 29

*adidas Am., Inc. v. Skechers USA, Inc.*
890 F.3d 747 (9th Cir. 2018) ................................................12

*American Meat Inst. v. U.S. Dep't of Agriculture*
760 F.3d 18 (D.C. Cir. 2014)................................................33

*Baird v. Bonta*
81 F.4th 1036 (9th Cir. 2023) ...............................................13

*Bolger v. Youngs Drug Products Corp.*
463 U.S. 60 (1983)............................................................17, 18

*Botosan v. Paul McNally Realty*
216 F.3d 827 (9th Cir. 2000) ................................................55

*California Redevelopment Ass'n v. Matosantos*
53 Cal. 4th 231 (2011) ........................................................58

*CDK Glob. LLC v. Brnovich*
16 F.4th 1266 (9th Cir. 2021) ...............................................52

*Cedar Point Nursery v. Hassid*
594 U.S. 139 (2021)..........................................................44, 45

*ChromaDex, Inc. v. Elysium Health, Inc.*
301 F. Supp. 3d 963 (C.D. Cal. 2017).....................................37

*CTIA - The Wireless Ass'n v. City of Berkeley, California*
928 F.3d 832 (9th Cir. 2019) .........................................*passim*

iii

## TABLE OF AUTHORITIES
### (continued)

Page

*Doe v. Harris*
772 F.3d 563 (9th Cir. 2014) ...................................................................31

*Drakes Bay Oyster Co. v. Jewell*
747 F.3d 1073 (9th Cir. 2014) .................................................................57

*Fang Lin Ai v. United States*
809 F.3d 503 (9th Cir. 2015) ..............................................................54, 55

*First Interstate Bank v. California*
197 Cal. App. 3d 627 (1987) ....................................................................35

*Gonzales v. Carhart*
550 U.S. 124 (2007)..................................................................................53

*Gregorio T. By & Through Jose T. v. Wilson*
59 F.3d 1002 (9th Cir. 1995) ...................................................................13

*Hoffman Estates v. Flipside, Hoffman Estates, Inc.*
455 U.S. 489 (1982)............................................................................53, 54

*IMDb.com v. Becerra*
962 F.3d 1111, 1122 (9th Cir. 2020) ........................................................22

*In re Elec. Arts, Inc.*
298 F. App'x 568 (9th Cir. 2008) ..............................................................43

*Inteliclear, LLC v. ETC Glob. Holdings, Inc.*
978 F.3d 653 (9th Cir. 2020) .................................................37, 41, 42, 43

*Klein v. City of San Clemente*
584 F.3d 1196 (9th Cir. 2009) ..................................................................32

*Knick v. Twp. of Scott*
588 U.S. 180 (2019)..................................................................................35

*Lingle v. Chevron U.S.A. Inc.*
544 U.S. 528 (2005)..................................................................................52

iv

# TABLE OF AUTHORITIES
## (continued)

Page

*Lucas v. South Carolina Coastal Council*
  505 U.S. 1003 (1992)................................................................48

*MAI Sys. Corp. v. Peak Computer, Inc.*
  991 F.2d 511 (9th Cir. 1993) ...................................................37

*Mallet & Co. v. Lacayo*
  16 F.4th 364 (3d Cir. 2021) .....................................................41

*Maryland v. King*
  567 U.S. 1301 (2013)..........................................................16, 57

*Nat'l Ass'n of Wheat Growers v. Bonta*
  85 F.4th 1263 (9th Cir. 2023) ........................................27, 28, 30

*Nationwide Biweekly Admin., Inc v. Owen*
  873 F.3d 716 (9th Cir. 2017) ...................................................29

*NetChoice v. Bonta*
  113 F.4th 1101 (9th Cir. 2024) ................................................23

*Oakland Tribune, Inc. v. Chronicle Publ'g Co.*
  762 F.2d 1374 (9th Cir. 1985) .................................................56

*Oregon Ass'n of Hosps. & Health Sys. v. Oregon*
  734 F. Supp. 3d 1139 (D. Or. 2024) .........................................56

*Papachristou v. City of Jacksonville*
  405 U.S. 156 (1972)................................................................53

*Penn Central Transportation Co. v. New York City*
  438 U.S. 104, 124 (1978)...............................................45, 46, 53

*Pharm. Rsch. & Manufacturers of Am. v. Stolfi*
  153 F.4th 795 (9th Cir. 2025) ...........................................*passim*

v

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Professional Compounding Centers of America, Inc. v. Sodergren*
No. 25-cv-2799, 2026 WL 194519 (E.D. Cal. January 26, 2026) ......................................................................................36

*PruneYard Shopping Ctr. v. Robins*
447 U.S. 74 (1980).............................................................................50

*Ruckelshaus v. Monsanto*
467 U.S. 986 (1984)....................................................................*passim*

*San Francisco Apartment Ass'n v. City & Cnty. of San Francisco*
881 F.3d 1169 (9th Cir. 2018) .......................................................22

*Santa Barbara Sch. Dist. v. Superior Court*
13 Cal. 3d 315 (1975) .....................................................................59

*Sheetz v. Cnty. of El Dorado*
601 U.S. 267 (2024)........................................................................45

*Southwest Voter Registration Educ. Project v. Shelley*
344 F.3d 914 (9th Cir.2003) (en banc) .........................................12

*Stormans, Inc. v. Selecky*
586 F.3d 1109 (9th Cir. 2009) .......................................................58

*Turner Broad. Sys., Inc. v. F.C.C.*
512 U.S. 622 (1994)...................................................................25, 26

*United States v. Stratics Networks Inc.*
721 F. Supp. 3d 1080 (S.D. Cal. 2024)......................................15, 54

*Vivid Ent., LLC v. Fielding*
774 F.3d 566 (9th Cir. 2014) .........................................................58

*Walker v. Univ. Books, Inc.*
602 F.2d 859 (9th Cir. 1979) .........................................................37

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Ward v. Rock Against Racism*
  491 U.S. 781 (1989)...................................................................55

*Warsoldier v. Woodford*
  418 F.3d 989 (9th Cir. 2005) .....................................................12

*Weiss v. People ex rel. Dep't of Transportation*
  9 Cal. 5th 840 (2020) .................................................................35

*Winter v. Nat. Res. Def. Council, Inc.*
  555 U.S. 7 (2008)..................................................................13, 57

*X Corp. v. Bonta*
  116 F.4th 888 (9th Cir. 2024) .........................................18, 23, 24

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*
  471 U.S. 626 (1985).............................................................*passim*

STATUTES

18 U.S.C.
  § 1839(3).....................................................................................37
  § 1905.........................................................................................49

28 U.S.C.
  § 1292(a)(1) .................................................................................4
  § 1331...........................................................................................4

# TABLE OF AUTHORITIES
## (continued)

**Page**

Cal. Civ. Code
§ 3110...........................................................................................................8
§ 3110(b)......................................................................................................8
§ 3110(c)......................................................................................................8
§ 3111...........................................................................................................8
§ 3111(a)...............................................................................................*passim*
§ 3111(a)(1)................................................................................................8
§ 3111(a)(5)................................................................................................8
§ 3111(a)(7)................................................................................................8
§ 3111(a)(9)..............................................................................................40
§ 3111(a)(12)..............................................................................................8
§ 3111(b)..............................................................................................17, 26
§ 3111(b)(1)................................................................................................9
§ 3111(b)(2)................................................................................................9
§ 3111(b)(3)................................................................................................9
§ 3426.1(d)...............................................................................................37

Pure Food and Drugs Act of 1906, Pub. L. No. 59-384, 34 Stat.
768, 770-71 .............................................................................................34

## CONSTITUTIONAL PROVISIONS

Cal. Const. article I
§ 19(a) ......................................................................................................35

U.S. Const.
First Amendment ................................................................................*passim*
Fifth Amendment................................................................................36, 44

## RULES AND REGULATIONS

16 C.F.R.
§ 305.1......................................................................................................34

Fed. R. App. P.
4(a)(1)(A)...................................................................................................4

## TABLE OF AUTHORITIES
### (continued)

Page

Fed. R. Civ. P.
  12(b)(6) ...............................................................................................42

OTHER AUTHORITIES

Ashley Altus, *Responsible enterprise LLMs: Addressing accuracy and [Large Language Model] bias challenges*, Outshift (May 6, 2024) ................................................5

Belle Lin, *Open-Source Companies Are Sharing Their AI Free. Can They Crack OpenAI's Dominance?*, The Wall Street Journal (Mar. 21, 2024), *available at* https://www.wsj.com/articles/open-source-companies-are-sharing-their-ai-free-can-they-crack-openais-dominance-26149e9c ..............................................................20

Cade Metz et al., *How Tech Giants Cut Corners to Harvest Data for A.I.*, The New York Times (Apr. 6, 2024), *available at* https://www.nytimes.com/2024/04/06/technology/tech-giants-harvest-data-artificial-intelligence.html.........................................6

*Copyright and Artificial Intelligence Part 3: Generative AI Training (Pre-publication Version)*, United States Copyright Office (May 2025), *available at* https://www.copyright.gov/ai/Copyright-and-Artificial-Intelligence-Part-3-Generative-AI-Training-Report-Pre-Publication-Version.pdf................................................6

Darrell M. West, *The coming AI Backlash will shape future regulation,* Brookings.edu (May 27, 2025), *available at* https://www.brookings.edu/articles/the-coming-ai-backlash-will-shape-future-regulation/ ........................................47

Grok, *Plans, available at* https://grok.com/plans (last visited July 14, 2026) ................................................20

ix

# TABLE OF AUTHORITIES
## (continued)

**Page**

Hadas Kotek et al., *Gender bias and stereotypes in Large Language Models*, (Collective Intelligence Conference (CI '23)) *available at* https://dl.acm.org/doi/10.1145/3582269.3615599 ........................................5

Meghan J. Ryan, *Ghost-Hunting in AI and the Law* (2024) 99 Tul. L. Rev. 121, 141 ....................................................................5

Ryan Mac et al., *Elon Musk Merges SpaceX With His A.I. Start-Up xAI*, The New York Times (Feb. 2, 2026), *available at* https://www.nytimes.com/2026/02/02/technology/spacex-xai-deal.html ................................................................................19

Scott J. Mulligan, *AI trained on AI garbage spits out AI garbage*, MIT Technology Review (Jul. 24, 2024), *available at* https://www.technologyreview.com/2024/07/24/1095263/ai-that-feeds-on-a-diet-of-ai-garbage-ends-up-spitting-out-nonsense/ (screenshot capture available at https://perma.cc/B62C-FMPB) ........................................5, 6, 30

x

**INTRODUCTION**

In September 2024, the California Legislature passed AB 2013, which requires developers of generative artificial intelligence models to disclose certain information about the datasets used to train their models. More than a year later, Plaintiff-Appellant xAI, a generative AI developer, brought suit to enjoin AB 2013. Despite the long delay in bringing suit and the lack of any imminent enforcement action, xAI requested immediate preliminary relief. The district court found that xAI failed to meet its burden to show that it was entitled to the extraordinary remedy of a preliminary injunction. This Court should affirm the district court's decision.

This case implicates important issues that warrant careful consideration on a full record. Generative AI is a transformative technology, but that potential comes with risks. Just like humans, AI models can exhibit bias and make mistakes. And users may not be able to detect those problems based on an AI model's outputs alone. Because an AI's outputs are a function of the data the model was trained on, information about that training data can help reveal a model's deficiencies. To that end, AB 2013 requires developers to release a high-level summary of the datasets used to train their AI models, including information such as the source of the dataset, what types of data the dataset includes, and whether the dataset includes potentially sensitive information such as consumer and user information. AB 2013

1

does not require developers to share the actual training data found within each dataset. Nor does it require developers to provide any information about how the model transforms the data it has been trained on into novel outputs. But AB 2013's modest disclosures will help consumers identify and mitigate an AI model's biases, allow them to assess whether the AI's outputs are reliable, and give them insight into whether a developer has been a responsible steward of sensitive information, among other things. The law went into effect on January 1, 2026, and developers have begun making disclosures pursuant to the statute.

Plaintiff-Appellant xAI sought to preliminarily enjoin AB 2013 on the grounds that the statute requires xAI to engage in compelled speech, operates as an unconstitutional taking of xAI's trade secrets, and is unconstitutionally vague. The district court denied xAI's request for preliminary relief because xAI failed to show that it was likely to succeed on the merits of any of its constitutional claims. xAI now appeals the denial to this Court.

The district court reached the correct result. On the First Amendment claim, the district court faithfully applied U.S. Supreme Court and Ninth Circuit precedent in concluding that AB 2013 regulated commercial speech, so the law is not subject to strict scrutiny. AB 2013 requires AI developers to disclose important factual information that will help consumers decide if they will use a generative AI model relative to other options on the market. That is classic commercial speech.

The district court correctly concluded that the high-level information that the statute requires to be disclosed could be useful to consumers in deciding which models to use. Because AB 2013 advances an important governmental interest in providing transparency to consumers, the statute, at minimum, survives the intermediate scrutiny standard applicable to commercial speech.

xAI's takings claim fares no better. As a threshold matter, xAI cannot receive a preliminary injunction as a remedy for this claim because equitable relief is unavailable in a takings suit. But the claim also fails on the merits. As the district court observed, xAI's claim fundamentally falters for xAI's failure to demonstrate that it held trade secrets in the high-level summary information that AB 2013 requires to be disclosed. And even if xAI had identified trade secrets subject to disclosure, xAI has not shown that disclosure of those secrets operates as a taking.

The district court was also right to reject xAI's vagueness claim. The statute provides a comprehensible standard governing the required disclosures, uses terms with plain and commonsense meanings, and gives developers like xAI adequate notice of what the law requires.

Finally, in addition to failing to demonstrate a likelihood of success on the merits, xAI failed to show that any of the other factors merited granting it the extraordinary remedy of preliminary injunctive relief. Most significantly, xAI's

3

long delay in seeking relief undercuts its assertion that it faces imminent harm absent relief. Accordingly, this Court should affirm the district court's decision.

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. §1331. That court denied xAI's motion for a preliminary injunction on March 4, 2026, and xAI filed a timely notice of appeal on March 16, 2026. *See* Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. §1292(a)(1).

## STATEMENT OF THE ISSUES

1.     Whether xAI is likely to succeed in showing that AB 2013 violates xAI's First Amendment rights.

2.     Whether xAI is likely to succeed in showing that AB 2013 effects an unconstitutional taking in violation of the Takings Clause.

3.     Whether xAI is likely to succeed in showing that AB 2013 is unconstitutionally vague.

4.     Whether xAI has shown that the balance of equities favors preliminarily enjoining AB 2013.

## CONSTITUTIONAL AND STATUTORY PROVISIONS

All pertinent constitutional and statutory provisions are contained in the addendum to the brief submitted by Plaintiff-Appellant xAI. *See* Pl's. Br. at 4, Add. 1a-5a; *see* Local Rule 28-2.7.

4

## STATEMENT OF THE CASE

### I. GENERATIVE ARTIFICIAL INTELLIGENCE

Generative Artificial Intelligence ("generative AI") models are computer programs capable of creating content, such as text and images, "without the need for actual human intervention." Meghan J. Ryan, *Ghost-Hunting in AI and the Law* (2024) 99 Tul. L. Rev. 121, 141. These models are "trained" by being exposed to large quantities of data. *See id* at 142. Generative AI models then draw on patterns present within the training data to generate contextually relevant responses to user prompts. *Id*. This means that generative AI models are "only as accurate, reliable, or unbiased as the training data from which they're built." Ashley Altus, *Responsible enterprise LLMs: Addressing accuracy and [Large Language Model] bias challenges*, Outshift (May 6, 2024).[1] Models may perpetuate or even amplify biases found in the training data, including racial and gender stereotypes. *See id*; *see also* Hadas Kotek et al., *Gender bias and stereotypes in Large Language Models* (Collective Intelligence Conference (CI '23)).[2]

The largest AI models are trained using repositories of billions of web pages. *See* Scott J. Mulligan, *AI trained on AI garbage spits out AI garbage*, MIT

---

[1] *Available at* https://outshift.cisco.com/blog/responsible-enterprise-llms-llm-bias.

[2] *Available at* https://dl.acm.org/doi/10.1145/3582269.3615599.

Technology Review (Jul. 24, 2024). [3] Developers may also incorporate training data from licensed or non-public sources. *See Copyright and Artificial Intelligence Part 3: Generative AI Training (Pre-publication Version)*, United States Copyright Office (May 2025). [4] In the race to train generative AI models, some developers have swept up sensitive or potentially objectionable data, including copyrighted works that were not licensed for training, consumer and user data, and even "synthetic data" that was itself generated by an AI model. *See* Cade Metz et al., *How Tech Giants Cut Corners to Harvest Data for A.I.*, The New York Times (Apr. 6, 2024). [5] Inaccurate data may cause models to become less accurate over time and lead to outputs with false information, which are sometimes called AI "hallucinations." *See Mulligan*, supra at 5.

## II.   AB 2013

In light of the growing use of generative AI products and the importance of training data to such products, the California Legislature enacted Assembly Bill 2013 (AB 2013) in September 2024. As the author of the bill explained, "[m]any consumers have valid questions about how these AI systems and services are

---

[3] *Available at* https://www.technologyreview.com/2024/07/24/1095263/ai-that-feeds-on-a-diet-of-ai-garbage-ends-up-spitting-out-nonsense/ (screenshot capture available at https://perma.cc/B62C-FMPB)

[4]*Available at* https://www.copyright.gov/ai/Copyright-and-Artificial-Intelligence-Part-3-Generative-AI-Training-Report-Pre-Publication-Version.pdf.

[5] *Available at* https://www.nytimes.com/2024/04/06/technology/tech-giants-harvest-data-artificial-intelligence.html.

created, and if they truly are better than what they seek to replace." ER-131 (Assembly Committee Rpt p. 8). In order to "build consumer confidence" in AI products, the bill's author stated, "we need to start with the foundations, and for AI that is the selection of training data." *Id*.

AB 2013 is meant to "provide[] transparency to consumers of AI systems and services by providing important documentation about the data used to train the services and systems they are being offered, including if synthetic data has or is being used to fill gaps in data sources." *Id*. The Legislature reasoned that "requiring transparency about the training data used for AI systems helps identify and mitigate biases, addressing hallucinations and other problematic outputs, and shines the light on various other issues, such as privacy and copyright concerns." ER-146 (Senate Committee Rpt. p. 5).

To this end, AB 2013 "impose[s] modest requirements on developers of AI systems and services in exchange for providing Californians with a fuller understanding of the state's AI information ecosystem." ER-131. AB 2013 applies to developers of "generative artificial intelligence" systems and services. It defines "generative artificial intelligence" as "artificial intelligence that can generate derived synthetic content . . . that emulates the structure and characteristics of the

artificial intelligence's training data." Cal. Civ. Code § 3110(c).[6] In turn, "developer" is defined as "a person, partnership, state or local government agency, or corporation that designs, codes, produces, or substantially modifies an artificial intelligence system or service for use by members of the public." § 3110(b).

Under AB 2013, the developer of a generative artificial intelligence system or service must post on their website "documentation regarding the data used by the developer to train the generative artificial intelligence system or service." § 3111. Such documentation must include, but is not limited to, "[a] high-level summary of the datasets used in the development of the generative artificial intelligence system or service" that covers twelve specific categories of information that pertain to the source, nature, and use of the datasets. § 3111(a). The enumerated categories include the sources or owners of the dataset, § 3111(a)(1); whether the datasets include data protected by copyright, trademark, or patent, § 3111(a)(5); whether the datasets include personal information, § 3111(a)(7); and whether the system uses "synthetic data" in its development, § 3111(a)(12), among other things.

These disclosure requirements apply to any generative artificial intelligence service or system released after January 1, 2022, and "made publicly available for Californians to use." § 3111. AB 2013 exempts from these disclosure requirements

---

[6] All statutory references are to the California Civil Code unless otherwise specified.

generative systems or services that general consumers are unlikely to use, specifically those "whose sole purpose is to help ensure security and integrity," or "whose sole purpose is the operation of aircraft in national airspace." § 3111(b)(1), (b)(2). It also exempts generative AI systems or services "developed for national security, military, or defense purposes" that are "made available only to a federal entity." § 3111(b)(3).

## III. PROCEDURAL HISTORY

Plaintiff xAI is a software company that develops generative AI models. ER-201, ¶ 17. In December 2025, shortly before AB 2013 went into effect but more than a year after the bill was signed into law, xAI brought an official-capacity suit against California Attorney General Rob Bonta in the Central District of California, challenging AB 2013 as unconstitutional. xAI alleged that the statute 1) required xAI to engage in unconstitutional compelled speech; 2) effected an unconstitutional taking of its trade secrets; and 3) was unconstitutionally vague. ER-198-200, ¶¶ 10-13. Shortly after filing suit, xAI published disclosures pursuant to AB 2013 to its website. *See* ER-166-76. xAI has taken the position that the disclosures it has made do not disclose any of its trade secrets. *See* Pl's. Br., at 13.

xAI then sought a preliminary injunction in the district court. Following briefing and a hearing, the district court denied xAI's motion on the ground that xAI had not demonstrated a likelihood of success on the merits of any of its claims.

On the First Amendment claim, the district court acknowledged that AB 2013 required developers like xAI to engage in compelled speech. ER-10. But it rejected xAI's arguments that strict scrutiny should apply. Instead, looking to recent Ninth Circuit precedent, the district court determined that AB 2013 regulated commercial speech that was subject to a lower tier of scrutiny. ER-12. The district court noted that the disclosures mandated by AB 2013 provided consumers with information relevant to actual and potential commercial transactions—specifically, whether they would choose to use one generative AI model over another option in the market. ER-11. And it determined that the required disclosures did not indicate an attempt to influence a model's inputs or outputs to align with specific political views. ER-11-12. Instead, the statute merely "provide[s] consumers with the information necessary to make judgments about [xAI's]—and all other AI model developers'—model quality based on the data that goes into them." ER-12.

The district court then concluded that AB 2013 was subject to intermediate scrutiny, which meant that the law must advance a substantial government interest by means that are not more extensive than necessary. ER-12. On that point, the district court observed that the statute sought to "achieve the goal of transparency for consumers," ER-13, and it rejected xAI's argument that consumers were incapable of evaluating generative AI models by reviewing a model's training data, stating that such an argument "strains credulity," ER-12. Although the court noted

10

that the litigation process may eventually demonstrate that AB 2013's high-level summaries are of "limited utility" to consumers, it concluded that based on the record before it, xAI had not demonstrated that it was likely to succeed on the merits of its First Amendment challenge. ER-13.

On the takings claim, the district court elected to dispose of the claim on the ground that xAI had failed to show that it had trade secrets in the information that must be disclosed pursuant to AB 2013.[7] *See* ER-7-8. Although the district court acknowledged that "hypothetically, datasets and details about them could be trade secrets," ER-8, the district court determined that xAI had failed to identify any distinct trade secrets that it held in the information that AB 2013 requires xAI to disclose, such as "the sources, sizes, and cleaning methods of its datasets," ER-7. The district court noted that xAI "ha[d] not identified any dataset or approach to cleaning and using datasets that is distinct from its competitors," which could demonstrate that it held trade secrets in that information. ER-8. And the district court noted that xAI relied on "abstraction and hypotheticals" rather than concrete information on xAI's practices. ER-7. Thus, the district court concluded that xAI had failed to show that it was likely to succeed "in proving that trade secrets are at play here," ER-8, as xAI was required to do to prevail on its takings claim.

---

[7] The district court did not address the State's argument that injunctive relief was not an available remedy for xAI's takings claim. *See* ER-55 (Oral Arg. Tr. 34:2-5); ER-99.

11

Finally, as to xAI's vagueness claim, the district court concluded that AB 2013 provides developers like xAI fair warning of what the law requires. The court noted that although the statute does not expressly define what was meant by a "high-level summary," the statute included a list of the information that the summary must include. ER 13-14. The court further observed that xAI had failed to show that certain terms, such as "dataset," are ambiguous by industry standards, and indeed noted that xAI "appear[ed] to know what 'dataset' refers to in other parts of its Complaint." ER-13.

Because the court concluded that xAI had not demonstrated a likelihood of success on the merits of its claims, the court denied xAI's motion for an injunction without reaching the other injunction factors. ER-14. This appeal followed.

## STANDARD OF REVIEW

"A district court's decision regarding preliminary injunctive relief is reviewed for an abuse of discretion." *Warsoldier v. Woodford*, 418 F.3d 989, 993 (9th Cir. 2005). This court reviews underlying legal issues de novo and factual findings for clear error. *adidas Am., Inc. v. Skechers USA, Inc*., 890 F.3d 747, 753 (9th Cir. 2018). This review "is limited and deferential." *Southwest Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir.2003) (en banc). "As long as the district court got the law right, it will not be reversed simply because the

12

appellate court would have arrived at a different result if it had applied the law to the facts of the case." *Gregorio T. By & Through Jose T. v. Wilson*, 59 F.3d 1002, 1004 (9th Cir. 1995) (internal quotation marks omitted).

As for the relevant legal standard, "analyz[ing] a preliminary injunction motion requires a district court to determine whether a movant has established that (1) [it] is likely to succeed on the merits of [its] claim, (2) [it] is likely to suffer irreparable harm absent the preliminary injunction, (3) the balance of equities tips in [its] favor, and (4) a preliminary injunction is in the public interest." *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023); *see Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24.

## SUMMARY OF ARGUMENT

xAI has failed to show that it is entitled to the extraordinary remedy of a preliminary injunction. xAI has not shown a likelihood of success on the merits of its claims, nor has it shown that the other preliminary injunction factors weigh in its favor.

I. xAI has not shown that it is likely to succeed on its claim that AB 2013 violates the First Amendment. The district court correctly concluded that AB 2013 regulates commercial speech, so it is not subject to strict scrutiny. xAI's narrow

view of what constitutes commercial speech is contrary to precedent, which

provides that speech is commercial so long as it provides parties to actual or

potential commercial transactions with information about those transactions. *See*

*Pharm. Rsch. & Manufacturers of Am. v. Stolfi*, 153 F.4th 795, 820 (9th Cir. 2025).

That is precisely what AB 2013 does: it provides potential consumers with

"product-specific economic information" that allows them to evaluate a generative

AI model relative to its competitors in the market. *See id.* at 821. Because this case

implicates compelled commercial speech, this Court should apply the *Zauderer*

standard. Under this standard, AB 2013 is permissible because the disclosures that

the law requires are purely factual and noncontroversial. AB 2013 also satisfies

intermediate scrutiny. Contrary to xAI's assertions, the district court clearly

recognized that AB 2013 furthers interests beyond mere consumer curiosity.

Among other things, dataset information allows consumers to make more informed

choices about the AI models they use, and as the district court observed, xAI's

arguments to the contrary strain credulity.

II. Nor has xAI shown that it is entitled to an injunction predicated on its

takings claim. Injunctive relief is generally unavailable for a takings claim because

the plaintiff can seek compensation for the taking after the fact. Because xAI may

seek compensation for any alleged taking in a damages suit against the state, it is

not entitled to an injunction to remedy its takings claim. But even if xAI could

14

receive injunctive relief on the alleged Takings Clause violation, the district court was correct when it found that xAI had failed to show that it held trade secrets in any of the information that must be disclosed under AB 2013. xAI's allegations about the supposed trade secrets at issue are too vague. And although xAI faults the district court for not expressly addressing the declarations it submitted in support of its injunction motion, those declarations are no less vague and conclusory than the allegations in its complaint. Nothing in xAI's submissions shows that it holds trade secrets in the limited, high-level disclosures required under AB 2013.

Moreover, even if xAI could identify trade secrets in information subject to disclosure under AB 2013, xAI can't show that such disclosure would effect a taking. xAI's *per se* taking argument, based on a purported "right to exclude," misapplies the doctrine and contravenes both Supreme Court and Circuit precedent. AB 2013 does not effect a regulatory taking, either. xAI has not shown that AB 2013's limited disclosures would diminish the value of their alleged trade secrets. And xAI should have expected that it could become subject to modest transparency requirements in light of generative AI's importance and the public's growing calls for regulation.

III. xAI has not shown that it is likely to succeed on its claim that AB 2013 is unconstitutionally vague. The law provides developers with adequate notice of

what it requires, and it plainly passes the low standard for specificity applicable to civil business regulations. *See United States v. Stratics Networks Inc.,* 721 F. Supp. 3d 1080, 1112 (S.D. Cal. 2024). The statute provides a comprehensible standard governing the required disclosures, provides an express list of information to be provided, and uses terms with plain and commonsense meanings.

IV. The remaining preliminary injunction factors counsel against granting xAI's request for injunctive relief. xAI's long delay in seeking injunctive relief— waiting more than a year after the law was passed—undercuts xAI's position that it is entitled to immediate preliminary relief. The balance of equities and the public interest do not favor injunctive relief either. A State "suffers a form of irreparable injury" when it is "enjoined . . . from effectuating statutes enacted by representatives of its people." *Maryland v. King*, 567 U.S. 1301, 1303 (2013) (internal quotation marks and citation omitted). And enjoining AB 2013 would further work harm by denying consumers the ability to make informed choices about the generative AI models they use.

16

## ARGUMENT

### I.     AB 2013 DOES NOT VIOLATE THE FIRST AMENDMENT

#### A.     AB 2013 regulates commercial speech, so the disclosure requirement does not trigger strict scrutiny

The district court correctly concluded that AB 2013 does not trigger strict scrutiny. xAI contends that AB 2013 triggers strict scrutiny both because it compels direct disclosure of certain factual information and because it draws content-based distinctions on speech by exempting AI models with sensitive purposes, such as those related to national security. *See* Pl's. Br. at 20 (citing § 3111(b)). Both arguments fail.

First, AB 2013 falls under the commercial-speech exception to strict scrutiny. "A direct disclosure requirement that compels individuals to speak a particular message or alters the content of protected speech is generally viewed as a content-based 'compelled speech' requirement subject to strict scrutiny, unless the content of the direct disclosure requirement qualifies as 'commercial speech,' which is entitled to less constitutional protection." *Stolfi*, 153 F.4th at 810 (alterations and internal quotation marks omitted). The "core notion of commercial speech [is] 'speech which does no more than propose a commercial transaction.'" *Id*. at 815 (quoting *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 66-67 (1983)). "Courts view this definition as just a starting point, however, and instead try to give effect to a 'common-sense distinction' between commercial speech and other

17

varieties of speech." *X Corp. v. Bonta*, 116 F.4th 888, 900 (9th Cir. 2024) (quoting *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1115 (9th Cir. 2021)).

In particular, this Court has repeatedly applied the commercial speech doctrine in cases where "the compelled disclosures . . . did not 'propose a commercial transaction,' . . . because they nonetheless provided parties to 'actual or potential' commercial transactions with information about those transactions." *Stolfi*, 153 F.4th at 821. "Courts also consider the three so-called '*Bolger* factors': (1) whether the speech is an advertisement, (2) whether the speech refers to a particular product, and (3) whether the speaker has an economic motivation." *Id.* at 820 (referring to *Bolger*, 463 U.S. at 66). However, this Court has been clear that speech may be commercial speech even if it is "not a clear fit" with these factors. *Id.* (quoting *X Corp.,* 116 F.4th at 901). And in some cases, this Court has concluded that speech is commercial without applying the factors identified in *Bolger*. *See id.* at 821 n.17.

Thus, although the question of whether a particular law regulates commercial speech is fact-specific, the Ninth Circuit has held that laws mandating disclosure of "product-specific economic information" are regulations of commercial speech. *Id.* at 820; *see also id*. at 826 (law requiring prescription drug manufacturers to report information on pricing to government regulated commercial speech); *CTIA - The Wireless Ass'n v. City of Berkeley, California*, 928 F.3d 832, 841 (9th Cir. 2019)

(ordinance requiring cell phone retailers to disclose information about radio-frequency-exposure guidelines). That is precisely what AB 2013 does. Under AB 2013, developers are required to provide a list of information regarding the datasets used to train their generative AI products, such as information regarding the size of the dataset, whether the dataset contains synthetic information, and whether the data in the dataset was cleaned or manipulated. *See* § 3111(a). All of this information relates to the AI products that developers have made available for consumer use, and the disclosure of this information provides consumers with information they can use when deciding whether to use a generative AI product or which generative AI product to use. Thus, AB 2013 "improves the free flow of commercial information" for consumers. *Stolfi*, 153 F.4th at 822 (internal quotation marks omitted). Just like a law requiring the disclosure of ingredients in food or specific chemicals in products, AB 2013 requires disclosure of the inputs into a product: the datasets used to train generative AI products. Such speech is commercial speech.

The district court's conclusion was thus entirely consistent with Ninth Circuit precedent, and xAI's arguments are not persuasive. Contrary to xAI's assertions, AB 2013's disclosure requirements are plainly related to commercial transactions. xAI is a subsidiary of SpaceX, a for-profit company. *See* Ryan Mac et al., *Elon Musk Merges SpaceX With His A.I. Start-Up xAI*, The New York Times (Feb. 2,

2026).[8] Grok, xAI's "flagship model," *see* ER-212, ¶ 40, is a product that is made available to consumers, and individuals and business can purchase access to the model.[9] Moreover, xAI asserts that it has made significant investments in developing its AI models. *See* Pl's. Br. at 52-53. Presumably, it did so because it expects to recoup its costs by undertaking commercial transactions with users. After all, even offering "free" use of AI model may entice consumers to pay for more advanced models and features offered by the developer. *See* Belle Lin, *Open-Source Companies Are Sharing Their AI Free. Can They Crack OpenAI's Dominance?*, The Wall Street Journal (Mar. 21, 2024).[10] And Grok is just one of the many models on the market that consumers may elect to use, all of which are the subject of potential commercial transactions.

xAI attempts to distinguish *Stolfi*, on which the district court primarily relied, on the ground that *Stolfi* concerned a government reporting requirement, not a public disclosure requirement. *See* Pl's. Br. at 30. The facts in *Stolfi* are closer to the facts of this case than xAI suggests: Although the regulation in *Stolfi* required disclosure to the government in the first instance, the information provided to the

---

[8] *Available at* https://www.nytimes.com/2026/02/02/technology/spacex-xai-deal.html.

[9] *See* Grok, *Plans*, (last visited July 14, 2026), available at https://grok.com/plans.

[10] *Available at* https://www.wsj.com/articles/open-source-companies-are-sharing-their-ai-free-can-they-crack-openais-dominance-26149e9c.

government would still be disclosed to the public. *See Stolfi*, 153 F.4th at 806. Thus, *Stolfi* is plainly analogous to this case. More important, however, is that whether a law mandates government disclosures or public disclosures is irrelevant to the analysis used to determine whether the law regulates commercial speech. Whether a compelled-speech law is a government reporting requirement or a public disclosure requirement can be relevant to whether the law is presumptively subject to strict scrutiny as an initial matter, *see Stolfi*, 153 F.4th at 810-11, but that distinction has nothing to say about whether the commercial speech exception to strict scrutiny applies. In *Stolfi* itself, this Court ultimately concluded that even if government reporting requirements *were* presumptively subject to strict scrutiny, the reporting requirement at issue in that case was a commercial speech regulation subject to either intermediate scrutiny or lower scrutiny under the *Zauderer* standard.[11] *See id.* at 819. So *Stolfi* provides an on-point example of how the commercial speech doctrine applies to disclosure requirements that would otherwise be subject to strict scrutiny.

In any event, *Stolfi* was not breaking new ground. It draws on a long line of cases concluding that compelled disclosure of information relevant to a potential transaction, even if not proposing a transaction, is commercial speech. For

---

[11] The *Zauderer* standard is discussed in full below. *See* Argument § I.B, *infra* at 26-29.

example, in *San Francisco Apartment Ass'n v. City & Cnty. of San Francisco*, 881 F.3d 1169, 1176 (9th Cir. 2018), this Court concluded that an ordinance requiring landlords to disclose a list of tenants' rights organizations to tenants regulated commercial speech. Similarly, in *CTIA*, 928 F.3d at 841-42, this Court applied the commercial-speech doctrine to a requirement for cell phone retailers to provide warnings about federal radio-frequency-radiation-exposure guidelines. Like the regulations at issue in those cases, AB 2013 requires developers to disclose information that will allow potential consumers to better understand the consequences of entering into a commercial transaction—here, selecting an AI model to use relative to other options on the market or foregoing an AI model altogether.

Similarly, the district court's conclusion is entirely in accord with those cases where this Court has determined a disclosure did *not* concern commercial speech. For example, in *IMDb.com v. Becerra*, this Court concluded that the content found in profiles on IMDb's website was not commercial speech because the content was "encyclopedic, not transactional." 962 F.3d 1111, 1122 (9th Cir. 2020). xAI analogizes *IMDb.com* to this case to argue that factual information is not commercial speech even if it could help a third party, such as a casting director, decide whether they wanted to hire a particular entertainment-industry professional. *See* Pl's. Br. at 27. But *IMDb.com* is inapposite, because even if the

22

speech in IMDb's database could be relevant to *a* hypothetical commercial transaction, the transaction in question was not a transaction *with the speaker*. IMDb is not in the business of selling actors, so it makes sense that the information IMDb provides is not transactional. But AI developers are in the business of selling AI models.

The district court's conclusion is similarly in accord with *X Corp. v Bonta*, 116 F.4th 888 (9th Cir. 2024), and *NetChoice v. Bonta*, 113 F.4th 1101 (9th Cir. 2024). In those cases, this Court determined that the law at issue did not regulate commercial speech—despite the fact that it regulated business entities—because it compelled companies to speak "subjective and political or ideological" information. *Stolfi*, 153 F.4th at 818. In *X Corp.*, the law required social media companies to engage in the "intensely political exercise" of identifying "what they believed to be 'Hate speech or racism,' 'Extremism or radicalization,' 'Disinformation or misinformation' and 'Foreign political interference.'" *Stolfi*, 153 F.4th at 823 (discussing *X Corp.*, 116 F.4th at 896). Similarly, in *NetChoice*, the law at issue required companies to "opine on highly controversial issues of public concern," such as whether certain content posed potential harms to children. *NetChoice*, 113 F.4th at 1120. By contrast, AB 2013 does not require developers to "opine on fraught political issues[.]'" *Stolfi*, 153 F.4th at 818. Nor does it require developers to "express a[] . . . normative view about" their products or to "define

23

their [products] in value-laden, state prescribed language." *Id*. at 823. Instead, it solely requires developers to disclose "product-specific, economic information about their products," namely objective information regarding the datasets used to train their generative AI products. *Id*. That is a classic regulation of commercial speech.

xAI contends that this conception of commercial speech—that is to say, the doctrine as consistently applied by this Court—has no limiting principle, arguing that such a reading would enable states to compel disclosures on any topic that may be of interest to consumers, *see* Pl's. Br. at 27-28. This argument misses the mark, for three reasons. First, xAI's list of hypothetical disclosures—including a law requiring social media companies to disclose "where their employees went to school, what they majored in, and what textbooks they read," Pl's. Br. at 28— ignores that the "commercial speech analysis is fact-driven," *X Corp.*, 116 F.4th at 900, making it ill-suited to this simplified analogizing.

Second, xAI's hypothetical disclosures are completely untethered from the product that is the subject of the hypothetical transaction. AB 2013 doesn't require AI developers to disclose general information about themselves as a business entity; rather, it requires developers to provide information specific to the AI model made available to consumers. Such information is plainly related to a consumer's decision to select and use that specific model. *See Stolfi*, 153 F.4th at

24

822 (finding commercial speech where information is "closely tethered to the sale of a product[.]")

Third, xAI conflates whether compelled speech is "commercial" with the question of whether the law compelling that speech is lawful. Any law regulating commercial speech would still need to satisfy intermediate scrutiny or lower scrutiny under *Zauderer*, which would prevent any overbroad, irrelevant, or burdensome disclosures.

xAI's argument that the district court's logic would categorize all speech by a business as commercial speech is similarly unavailing. *See* Pl's. Br. at 28. For speech to be commercial, it must still provide "product-specific economic information" about an actual or potential transaction. *See Stolfi*, 153 F. 4th at 820-21. AB 2013's disclosures plainly fall under this umbrella because they provide product-specific information about AI models that a consumer may elect to use relative to others in the market. The law thus regulates commercial speech.

Finally, as for xAI's argument that AB 2013 applies to certain types of AI models and not others, that distinction does not implicate the First Amendment. *See Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 660 (1994) ("It would be error to conclude, however, that the First Amendment mandates strict scrutiny for any speech regulation that applies to one medium (or a subset thereof) but not others.") Although laws that distinguish between different types of speakers may

25

warrant strict scrutiny if they "distort the market for ideas" or "target[] a small number of speakers," *see id.*, that is not the case here. AB 2013 applies to all developers of AI systems and services. There are exceptions that apply only to three sensitive categories of AI systems: those whose sole purpose is "security and integrity" or operation of aircraft, and national security systems made available only to federal entities. § 3111(b). There is no suggestion that making the limited disclosures required by AB 2013 for all other categories of systems will distort the market for ideas by causing developers to abandon their current models and pivot to ones that fall within one of these three exceptions. And there is no suggestion that AB 2013's "objective [is], in fact, the suppression of certain ideas." *Turner Broad. Sys.,* 512 U.S. at. 660. Moreover, the differential treatment of certain sensitive models is "justified by special characteristics" of the regulated entities, *see id*. at 661; specifically, AB 2013 exempts AI systems that consumers are unlikely to use, and where confidentiality is a matter of safety and security.

**B.     AB 2013 is constitutional under the *Zauderer* standard for compelled commercial speech**

Because AB 2013 regulates commercial speech, it is subject to either intermediate scrutiny or the lower standard applicable to compelled commercial speech known as the *Zauderer* standard. *See Stolfi*, 153 F.4th at 810-11 (citing *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651 (1985)). The district court determined that an intermediate-scrutiny

26

analysis fit the facts of this case better than the *Zauderer* standard. But AB 2013's disclosure requirement falls under *Zauderer*, and the *Zauderer* standard provides this Court with an alternative ground to affirm the district court's decision.

Although courts in this circuit apply intermediate scrutiny "in commercial speech cases where the government acts to restrict or prohibit speech," they apply the *Zauderer* standard "to compelled, as distinct from restricted or prohibited, commercial speech." *CTIA*, 928 F.3d at 842. *Zauderer* arose in the context of commercial advertisements, but its application is not limited to that context: *Zauderer* "provides the appropriate framework to analyze a First Amendment claim involving compelled commercial speech." *Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 756 (9th Cir. 2019) (en banc); *see also CTIA,* 928 F.3d at 842; *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1273 (9th Cir. 2023) (applying *Zauderer* to herbicide warning label requirement). To withstand scrutiny under *Zauderer*, the compelled commercial speech must be "(1) purely factual, (2) noncontroversial, and (3) not unjustified or unduly burdensome." *Am. Beverage Ass'n*, 916 F.3d at 756.

AB 2013 meets these requirements. First, the disclosures required under AB 2013 are purely factual. Each of the categories of information that AB 2013 specifies should be included in the high-level summary are objective, factual inquires—e.g., whether the dataset includes data protected by intellectual property

27

law, whether the dataset includes personal or aggregate consumer information, and how the dataset furthers the purpose of the generative AI product. § 3111(a). Because AB 2013 requires only the "disclosure of accurate, factual information," it meets the first requirement of Zauderer. *Nat'l Ass'n of Wheat Growers*, 85 F.4th at 1276.

Second, the required disclosures under AB 2013 are noncontroversial. The information that developers must post provides background details on the datasets used to train generative AI. There is nothing controversial about the number of data points in a dataset or the types of data points included in a dataset. AB 2013 does not, for instance, require a developer to take a position "in a heated political controversy" or "convey a message fundamentally at odds with its mission," *CTIA*, 928 F.3d at 845. Nor does it require a developer to wade into an ongoing scientific or technical debate. *See Nat'l Ass'n of Wheat Growers*, 85 F.4th at 1278 (required warning was controversial in light of existing scientific debate about whether chemical caused cancer). Although AB 2013's disclosures implicate controversial policy issues around AI safety, accuracy, and bias, the fact that compelled speech "may implicate controversial public policy issues . . . is insufficient to transform [] required [disclosures] into noncommercial speech." *Stolfi*, 153 F.4th at 824. The information that AB 2013 actually requires to be disclosed is simple, objective, and

28

not inherently controversial. Thus, AB 2013 meets the second requirement of *Zauderer*.

Third, AB 2013 is not unjustified or unduly burdensome. The Legislature was clear that the justification of AB 2013 was to provide consumers with useful information regarding generative AI products. *See* ER 148-49. As for undue burden, "[a] disclosure is 'unduly burdensome' when the burden 'effectively rules out' the speech it accompanies." *Nationwide Biweekly Admin., Inc v. Owen*, 873 F.3d 716, 734 (9th Cir. 2017) (citation omitted). Here, AB 2013 requires only that AI model developers make a single public disclosure somewhere on their website. It does not "interfere with advertising or threaten to drown out messaging by the [developers] subject to the requirement." *CTIA*, 928 F.3d at 949; *cf. Am. Beverage Ass'n*, 916 F.3d at 757 (required warning taking up 20% of package drowned out manufacturer's own speech on package). Rather, AB 2013 "do[es] not rule out [xAI's] ability" to speak "effectively or otherwise" on any topic it wishes to. *Nationwide Biweekly*, 873 F.3d at 734. It is therefore not unduly burdensome. AB 2013 is thus constitutional under *Zauderer*.

## C. AB 2013 is constitutional as a regulation of commercial speech under intermediate scrutiny

Although the district court applied intermediate scrutiny to AB 2013 rather than *Zauderer*, the district court nevertheless concluded that AB 2013 satisfied that higher standard. That conclusion was correct. For AB 2013 to survive intermediate

29

scrutiny as a regulation of commercial speech, it must (1) "directly advance[] a substantial governmental interest" and (2) be "not more extensive than necessary to serve that interest." *Nat'l Ass'n of Wheat Growers*, 85 F.4th at 1282-83. AB 2013 satisfies both requirements.

### 1. AB 2013 directly advances a substantial governmental interest.

AB 2013 directly advances a substantial governmental interest. The law's purpose is to provide consumers and users of generative AI products with important information related to the products they might use. This is not merely "transparency for its own sake." *Stolfi*, 153 F.4th at 826. Rather, as the bill's author explained, AB 2013 requires the disclosure of information that consumers can use "to better evaluate if they have confidence in the AI system or service, compare competing systems and services, or put into place mitigation measures to address any shortcomings of the particular system or service." ER-131 (Assembly Committee Rpt. p. 8.) After all, the datasets used to train generative AI play a central role in how the generative AI product will work in the future. *See Mulligan*, *supra* at 5. Shortcomings in the dataset used—such as a dataset that contains child sex abuse materials or synthetic data—can lead to shortcomings in the generative AI product. *See id.*; *see also* ER-128-130 (Assembly Committee Rpt. p. 5-7). Moreover, consumers of generative AI products are often operating at an information deficit given the reluctance of companies to provide information

30

regarding the datasets used to train their products—a practice that has led to widespread calls for greater disclosure and transparency from experts and academics. *See* ER-145-148 (Senate Committee Rpt. p. 4-7). As this Court has recognized, "[t]he State has a substantial interest in reducing those asymmetries, facilitating informed commercial transactions, and improving the efficiency of the [generative AI] market." *Stolfi*, 153 F.4th at 826.

Contrary to xAI's assertions, the district court clearly recognized that AB 2013 furthers that substantial interest. Otherwise, there would be no reason for the district court to note that xAI's arguments that training data would be of no use to consumers were implausible. *See* ER-12. This demonstrates that the district court did *not* agree with xAI that the statute served only "consumer curiosity"; rather, the court was *endorsing* the view that consumers could review training data to make "useful evaluation[s]" of AI models. *See id.* Although the district court noted that xAI may eventually be able to demonstrate that AB 2013's disclosures have limited utility for consumer decision-making, its decision makes clear that xAI failed to show that State's proffered interest was invalid. ER-13. This is not, as xAI contends, "flipping the burden." *See* Pl's. Br. at 38. After xAI established that AB 2013 warranted some level of First Amendment scrutiny, California then established that the statute furthers the State's substantial interest in allowing consumers to make informed decisions about what AI models to use. *See Doe v.*

31

*Harris*, 772 F.3d 563, 570 (9th Cir. 2014). And although California had the burden to justify AB 2013, xAI ultimately bore the burden to show that it would succeed on the merits of its claims. *See Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009). Because xAI failed to demonstrate that California's proffered justification was invalid, the district court correctly concluded that xAI failed to establish a likelihood of success on its First Amendment claim.

xAI resists this conclusion and reiterates its rejected arguments for why training data information is not useful to consumers. Those arguments fare no better here. As the State has demonstrated, the high-level summaries that AB 2013 requires address specific information about training data sets that *would* be valuable to consumers. The use of synthetic data in a training dataset, for instance, might raise concerns for consumers about the accuracy and reliability of a generative AI product. As the legislative history notes, the use of synthetic data can lead to a generative AI product breaking down over time. *See* ER-130. Consumers may also have greater confidence in a generative AI product that uses a larger dataset for training or data collected over a longer window of time. Consumers looking for generative AI to perform specialized tasks may find it useful to know the labels or characteristics of data in the dataset—for instance, whether the dataset contains images versus text would matter to a consumer looking for a generative AI product to create images. As for xAI's contention that consumers can evaluate a

model's bias and reliability by the model's outputs, *see* Pl's. Br. at 34, AB 2013's disclosures are necessary precisely *because* it may be difficult for consumers to identify a model's deficiencies by its outputs alone. It is unreasonable to expect consumers to fact check the generative AI models they use or to compare outputs across models. Similarly, it is unreasonable to require consumers to rely on developer-authored assessments of a model's efficacy, such as xAI's "Model Cards," *see id.*, when there is no guarantee that such assessments are accurate and objective.

AB 2013 plainly provides consumers with useful and relevant information that they may consider when selecting which AI models to use. Thus, it furthers a substantial government interest.

### 2. AB 2013 meets the tailoring requirement of intermediate scrutiny

AB 2013 is not more extensive than necessary to serve the government's interest in allowing consumers to make informed choices about the generative AI models they use. After all, "[t]o the extent that the government's interest is in assuring that consumers receive particular information," the "means-end fit is self-evidently satisfied when the government acts only through a reasonably crafted mandate to disclose 'purely factual and uncontroversial information' about attributes of the product or service being offered." *American Meat Inst. v. U.S. Dep't of Agriculture*, 760 F.3d 18, 26 (D.C. Cir. 2014). That is precisely what AB

2013 does. And for the reasons explained above, the information disclosed under AB 2013 will be more useful to consumers for evaluating a generative AI model than information about a model's outputs alone.

Moreover, all that AB 2013 requires is a "high level summary" of certain information. *See* § 3111(a). AB 2013 does not require companies to disclose the underlying datasets themselves. And under AB 2013, developers "remain free to disseminate their own messages directly to consumers and to the public at large." *Stolfi*, 153 F.4th at 828. Overall, AB 2013 imposes no more onerous a disclosure regime than the numerous other laws that require public disclosure of information related to a business's products. *See, e.g.*, Pure Food and Drugs Act of 1906, Pub. L. No. 59-384, 34 Stat. 768, 770-71 (requiring drug labels to list presence and amount of certain ingredients); 16 C.F.R. § 305.1 (requiring consumer appliances to carry a label describing water use, energy consumption, and energy cost). Just like those laws, AB 2013 is a constitutional regulation of commercial speech. Thus, xAI is unlikely to succeed on the merits of its claim that AB 2013 violates the First Amendment.

## II.  AB 2013 IS NOT A TAKING

### A.  xAI cannot receive injunctive relief for an alleged Takings Clause violation

Although the district court did not address this issue, the general principle that injunctive relief is unavailable as a remedy for a takings claim provides a clear basis

for affirming the decision below. "[E]quitable relief is generally unavailable" to remedy a taking because "nearly all state governments provide just compensation remedies to property owners who have suffered a taking"—an "adequate remedy at law." *Knick v. Twp. of Scott*, 588 U.S. 180, 200-201 (2019). If "an adequate provision for obtaining just compensation exists, there is no basis to enjoin the government's action effecting a taking." *Id*. Here, equitable relief is unavailable because California law expressly allows parties to seek just compensation for takings of property. *See Weiss v. People ex rel. Dep't of Transportation*, 9 Cal. 5th 840, 853 (2020) ("The California Constitution gives property owners the right to have a jury determine the compensation they are owed when a public entity takes or damages their property." (citing Cal. Const., art. I, § 19(a)). Such compensation is sought through an inverse condemnation suit, which may be brought for alleged takings of personal property. *See First Interstate Bank v. California*, 197 Cal. App. 3d 627, 635 (1987).

This principle applies even when the subject of the taking is a trade secret. For example, in *Ruckelshaus v. Monsanto*, the Supreme Court concluded that even if the regulation at issue in that case effected a taking of Monsanto's trade secrets, injunctive relief was unavailable because Monsanto could seek compensation in the Court of Federal Claims. 467 U.S. 986, 1019 (1984). Thus, to the extent xAI contends it has a property interest in information required to be disclosed under AB

35

2013, xAI may seek compensation for the alleged taking in a suit against the State. But this suit seeks only declaratory and injunctive relief, not compensation. *See* ER 247-248. Because xAI cannot receive injunctive relief to remedy the alleged taking, its request for that relief should be denied. *See Professional Compounding Centers of America, Inc. v. Sodergren*, No. 25-cv-2799, 2026 WL 194519, *9-10 (E.D. Cal. January 26, 2026) (injunctive relief unavailable for alleged state taking of trade secrets because plaintiff did not "allege[] it will be prevented from bringing suit" against California for just compensation).

### B. xAI has not shown that it holds trade secrets in the information subject to disclosure under AB 2013.

In any event, xAI's takings claim also fails on the merits. Confidential information may be protectable property under the Fifth Amendment to the extent that the information is "cognizable as a trade-secret property right under [state] law." *Stolfi*, 153 F.4th at 832 (quoting *Ruckelshaus*, 467 U.S. at 1003-04 (alteration in original)). However, xAI fails to show that it holds a trade-secret property right in the information that AB 2013 requires it to disclose. *Cf. Ruckelshaus*, 467 U.S. at 1001-02 (finding a taking where parties stipulated that information to be disclosed "contains or relates to trade secrets[.]") Thus, xAI has not shown that it is likely to succeed on the merits of its trade-secrets takings claim.

Under both federal and California law, information is a trade secret if it (1) is valuable because it is unknown to others and (2) the owner has attempted to keep

36

the information secret. *See* § 3426.1(d); 18 U.S.C. § 1839(3); *see also ChromaDex, Inc. v. Elysium Health, Inc.*, 301 F. Supp. 3d 963, 971 (C.D. Cal. 2017) (providing that state and federal law share "substantially similar definition[s]" of a trade secret). If information is publicly available or widely known in an industry, it is not a trade secret. *See Walker v. Univ. Books, Inc.*, 602 F.2d 859, 865 (9th Cir. 1979). To prove ownership of a trade secret, a party "must identify the trade secrets and carry the burden of showing they exist." *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 522 (9th Cir. 1993). Trade secrets must be identified with sufficient particularity to allow a factfinder to determine whether the information is, in fact, a trade secret. *Inteliclear, LLC v. ETC Glob. Holdings, Inc.,* 978 F.3d 653, 658 (9th Cir. 2020). Although these cases arise in the context of trade-secret misappropriation claims, what a plaintiff must show to demonstrate the existence of a trade secret in such cases informs whether xAI has asserted an intellectual property right under state and federal law. Regardless of the specific context, a party asserting a trade secret must provide enough detail to allow a trier of fact who likely lacks the "requisite expertise to define what the plaintiff leaves abstract" to determine whether a trade secret exists. *Id.*

Here, xAI must show that it holds a trade-secret right in the information developers must include in their high-level summary, such as the source of its training datasets, a general range of the number of data points in the datasets, and a

37

description of the types of data points within the datasets. *See* § 3111(a). The district court correctly found that xAI's vague and conclusory submissions failed to make that showing.

Take xAI's assertion that information about the "source[s]" and sizes of its datasets—separate from the actual data within those datasets—is valuable because it is unknown to others. xAI fails to support that assertion with evidence. xAI acknowledges that it uses data that is common to all developers, including large repositories of publicly available information. *See* ER-186 (Stanley Decl. ¶ 10). xAI states that after initial training, most AI models are trained with supplemental data, but it provides only conclusory statements about why that supplemental data is competitively important. *See* ER-189-90, ¶ 20-23. Significantly, much of xAI's argument on this point relies on speculation on how other developers would react to xAI's disclosures. *See id*, ¶ 21 ("If xAI were to reveal to its competitors the sources of data it uses to train its AI models . . . [t]hey would then immediately seek to acquire that data to plug any hole in its models' training."). xAI similarly provides only speculation regarding whether AB 2013's limited disclosures would allow competitors to acquire and use the data xAI relies on in its training. *Id*. at 190, ¶ 23 (stating than even "[h]ints" about the sources of xAI's data "would be invaluable to xAI's competitors, who have the technical know-how to work backwards and figure out what xAI is trying to accomplish.")

Because xAI's declarations are vague and speculative as to the competitive importance of the information that AB 2013 actually requires it to disclose, it is irrelevant that those declarations are unrebutted. As the district court explained, "hypothetically, datasets and details about them could be trade secrets." ER-8. But to show that it was likely to succeed on the merits of its takings claim, xAI had to show that it had a trade-secret right in the specific information that must be disclosed pursuant to AB 2013. Here, xAI's speculation about the technological and deductive capacities of its competitors fails to meet that burden. xAI has not shown that the limited disclosures required by AB 2013 will allow competitors to find xAI's datasets or allow xAI's competitors to incorporate them into their models; much less that a competitor's use of such a dataset, even if discovered, would destroy xAI's competitive edge.

Relatedly, xAI's arguments about the value of "training data" conflate information about datasets—such as the source and size of the datasets used in training—with information about how a developer *uses* its training data. *See* ER-182 ¶ 15. The sources xAI cites suggest that *how* a model is trained is just as important as *what* it's trained on. *See* Pl's. Br. at 42 ("Knowing exactly how a rival *processes their training data* is like getting a peek at their playbook before the championship game." (quoting *Meta Halts Mercor Partnership After AI Training Data Breach*, The Tech Buzz (Apr. 3, 2026) (emphasis added)). But contrary to

xAI's assertions, AB 2013 does not require xAI to disclose information about its training methodologies, including information about how xAI cleans, modifies, or refines its training data. *See* Pl's. Br. at 44. Although AB 2013 requires developers to disclose "whether" a developer cleaned, processed, or modified training data, *see* § 3111(a)(9), the statute, by its terms, does not require developers to disclose what the processing entailed or how the processing was performed. And xAI hasn't shown that information about the sources and sizes of its training data would be valuable to someone who didn't know how xAI *used* that data. As xAI notes, companies "guard their training methodologies as fiercely as Coca-Cola protects its recipe." Pl's. Br., at 42. But that analogy illustrates the flaw in xAI's argument. Even if Coca-Cola's *recipe* is a trade secret, the *ingredients* in Coke are not: as is well-known and widely accepted, Coke must print those on the side of the bottle. Coke's secret is how those ingredients are mixed together and in what quantities. Here, xAI has not shown that it has a trade secret right in the ingredients they use—the datasets used in training—that is distinct from the recipe they use to turn that data into a useful model. Moreover, as explained above, AB 2013 does not even require developers to disclose their "ingredients" in detail. Developers are not required to disclose the datasets themselves and instead must only provide general information about them, such as the source and size of the dataset. In the same way that Coke is not required to disclose the specific ingredients that differentiate it

40

from Pepsi, *see* Pl's. Br. at 40, AB 2013 does not require developers to provide the actual data that differentiates their models from others.

Most important, though, is that—as the district court found—xAI has not shown that it actually uses unique or unknown data sets such that information about the existence of those datasets is a trade secret. The evidence that xAI cites to refute this conclusion, *see* Pl's. Br. at 46, speaks in generalities about the AI industry but says little about xAI itself. *See* ER-188 ¶¶ 8-17. The best evidence that xAI can marshal on this point is the statement that xAI curates datasets with a "unique makeup." *See* Pl's. Br. at 46 (citing ER-191 ¶ 24). But this falls far short of what is required to identify a trade secret with particularity. xAI does not identify any unique datasets that it has used or plans to use in the development of its model; nor does it explain why those unique datasets are valuable because they are unknown. Instead, xAI relies on "'catchall' phrases [and] merely identifying categories of information," which are insufficient to establish a trade secret. *InteliClear*, 978 F.3d at 659 (citing *Imax Corp. v. Cinema Techs., Inc.,* 152 F.3d 1161, 1167 (9th Cir. 1998)). Without more, the district court was prevented from determining whether xAI did, in fact, have trade secrets in the information subject to disclosure under AB 2013. *See* ER-8; *see also Mallet & Co. v. Lacayo*, 16 F.4th 364, 385 (3d Cir. 2021) (reversing preliminary injunction where claimed trade secrets were so generally described that court was "unable to conduct an informed

41

appellate review, assessing the alleged trade secret information against other information that the record may reveal is publicly available, easily generated, or widely applicable or learned in the industry.")

xAI resists this conclusion and contends that no more specificity was required. But the cases it cites for that proposition were decided at the pleadings stage. *See* Pl's. Br. at 49 (*citing Novation Sols., Inc. v. Issuance Inc*., 2023 WL 5505908, at \*7 (C.D. Cal. June 27, 2023) and *Alta Devices v. LG Elecs*., 343 F.Supp.3d 868, 881 (N.D. Cal. 2018)). Here, xAI is seeking a preliminary injunction, which requires xAI not just to show that it has stated a claim but that it is likely to succeed on the merits of that claim. And, unlike when deciding a motion to dismiss under Rule 12(b)(6), the district court here was not required to read xAI's trade secret allegations in the light most favorable to xAI. *See* Pl's. Br., at 47. As discussed above, this Court has been clear that past the motion to dismiss stage, a plaintiff can no longer rely on "'catchall phrases' or merely identifying categories of information." *InteliClear*, 978 F.3d at 659 (citing *Imax*, 152 F.3d at 1167). That is precisely what xAI has done here: it contends that it has trade secrets in information about the sources and sizes of its datasets without providing any specificity about why that information is unique or valuable. *Cf. id.* at 658 (trade secret identified where declarant "described specific features" of software, including "the specific tables, table columns . . . and methodologies" that were

42

allegedly trade secrets.) The district court was thus right to conclude that xAI's vague assertions failed to "carr[y] the heavy burden of showing a likelihood of success in proving that trade secrets are at play here." ER-8.

Even if xAI is correct that a party asserting the existence of a trade secret need not disclose the trade secret itself, *see* Pl's. Br. at 49, xAI had to provide at least enough detail to allow the district court to determine whether a trade secret existed. It failed to do so. If xAI felt that even a small amount of additional detail would jeopardize its alleged trade secrets, it could have sought to file its motion and materials under seal, as the plaintiffs in *InteliClear* did. *See* 978 F.3d at 659; *see also In re Elec. Arts, Inc.*, 298 F. App'x 568, 569 (9th Cir. 2008) (potential disclosure of trade secrets provided basis to file under seal).

Finally, xAI contends that the district court erred by citing only the allegations in xAI's complaint in its written opinion. xAI had the burden to show that it was likely to succeed on the merits of its takings claim, so it was reasonable for the district court to look to xAI's complaint to determine whether xAI had shown a likelihood of success on the claims xAI pleaded. And as the district court correctly observed, xAI's complaint deals in "generalizations and hypotheticals" that failed to establish that AB 2013 implicates trade secrets. ER-8. xAI's additional evidence does not change that conclusion. For the reasons explained above, xAI's declarations on this point are just as vague and conclusory as its

43

complaint. Thus, the district court's logic applies with equal force to all of xAI's submissions on the injunction motion. The bottom line is that across all of xAI's submissions, xAI failed to demonstrate that AB 2013 requires it to disclose any information in which xAI actually holds trade secrets.

## C. AB 2013 does not effect a taking of xAI's alleged trade secrets

Even if xAI could show that AB 2013 requires xAI to disclose trade secrets, the district court still properly denied xAI's injunction because xAI has not shown that the disclosure operates as a taking.

The Supreme Court has identified two types of Fifth Amendment takings: "per se" takings and "regulatory" takings. *See Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147-49 (2021). A per se taking occurs when the government "physically acquires private property for a public use." *Id.* at 147-48. A regulatory taking occurs when the government "imposes regulations that restrict an owner's ability to use his own property." *Id.* at 148. AB 2013 is not a taking under either standard.

### 1. AB 2013 is not a per se taking

xAI contends that AB 2013 operates as a "per se" taking because mandatory disclosure of trade secrets vitiates the fundamental right to exclude others from one's property and extinguishes the value of the trade secrets. This argument is foreclosed by Ninth Circuit precedent. In *Stolfi*, the plaintiffs argued that the government-mandated disclosure of their trade secrets was a "per se" taking,

44

despite the lack of a physical seizure, because it denied plaintiffs all economically beneficial use of those secrets. 153 F.4th at 833. This Court rejected that argument, noting that in the only Supreme Court case addressing an alleged taking of trade secrets, *Ruckelshaus*, "the [Supreme] Court categorized the alleged taking as a regulatory taking" and analyzed the alleged taking using the *Penn Central* factors. *Id*. This Court further reasoned that plaintiff's argument based on a complete elimination of value was limited to cases decided in the land-use-regulation context. *See id*. Accordingly, this Court treated plaintiffs' trade-secret disclosure claim as a regulatory taking governed by *Penn Central*.

xAI acknowledges this aspect of *Stolfi* only in a footnote, despite it being directly on-point precedent. *See* Pl's. Br. at 51 n.5. Instead, xAI relies on cases where courts found per se takings dealing with the right to exclude from *land*—not access to information. *See Sheetz v. Cnty. of El Dorado,* 601 U.S. 267, 274 (2024) (discussing land-use regulation); *Cedar Point Nursery*, 594 U.S. at 149 (discussing the right to access physical property). But this Court rejected that analogy in *Stolfi*. 153 F.4th at 833. Because there is no physical property implicated here, xAI's per se takings claim fails.

### 2. AB 2013 is not a regulatory taking

xAI's regulatory takings claim also fails. In assessing whether AB 2013 effects a regulatory taking, it is relevant that xAI's suit is a pre-enforcement

challenge to AB 2013: xAI is essentially contending that the law violates the constitution regardless of the circumstances under which the law is applied, at least as to xAI. Accordingly, its suit is ultimately a "claim[] of facial invalidity" that "rest[s] on speculation about the law's coverage and its future enforcement." *Stolfi*, 153 F.4th at 834 (citations and quotation marks omitted). Such pre-enforcement challenges "threaten to short circuit the democratic process by preventing duly enacted laws from being implemented in constitutional ways." *Id.* For this reason, courts impose a high burden on plaintiffs asserting such pre-enforcement challenges: xAI must show that AB 2013 operates as an unlawful taking under every possible application of the law. *See id.*

xAI's takings claim is premised on the fact that AB 2013 requires disclosure of trade secrets. As shown above, xAI has not established that AB 2013 ever requires disclosure of trade secrets, let alone that it does so in every instance. *See* § II.B, *supra* at 36-44. But assuming for the sake of argument that AB 2013 could require developers to disclose trade secrets under certain circumstances, those disclosures are not a taking. Pursuant to *Penn Central Transportation Co. v. New York City*, in deciding whether a regulatory taking has occurred, courts consider (1) the regulation's interference with reasonable investment-backed expectations, (2) the economic impact of the regulation, and (3) the character of the government

46

action. 438 U.S. 104, 124 (1978); *Stolfi,* 153 F.4th at 834.[12] All three factors counsel that AB 2013 does not effect a taking

### a. AB 2013 does not frustrate reasonable investment-backed expectations

xAI contends that AB 2013 is a taking because it made investments in AI and dataset development with the expectation that its dataset information would remain confidential. But xAI has not shown that its AB 2013 disclosures will upset reasonable investment-backed expectations "in every instance," *see Stolfi*, 153 F.4th at 834, or even in *this* instance, for two main reasons.

First, investment-backed expectations are "necessarily tempered" in areas "that ha[ve] long been the source of public concern and the subject of government regulation." *See Stolfi.*, 153 F.4th at 834 (quoting *Ruckelshaus*, 467 U.S. at 1007) (alteration in original). Although generative AI is novel, it is clearly a subject of public concern, with increasingly prevalent calls for government regulation and transparency. *See*, *e.g.*, Darrell M. West, *The coming AI Backlash will shape future*

---

[12] xAI's assertion that *Rucklehaus* "squarely holds" that a regulation's interference with reasonable investment-backed expectations is "the only *Penn Central* factor that matters in this context," Pl's. Br. at 53, overstates that holding. The Court in *Rucklehaus* considered only that factor because under the facts of that case, the force of that factor was "overwhelming, at least with respect to certain of the data" subject to disclosure. *Ruckelshaus*, 467 U.S. at 1005. *Ruckelshaus* does not suggest that the other factors are categorically irrelevant to whether disclosure of trade secrets is a taking.

*regulation,* Brookings.edu (May 27, 2025).[13] In light of the potentially world-changing consequences of the technology's rapid adoption and the robust public debate about AI safety, xAI should have expected that it would face increased regulatory scrutiny. *See Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1027-28 (1992) ("by reason of the State's traditionally high degree of control over commercial dealings, [a property owner] ought to be aware of the possibility that new regulation might even render his property economically worthless."). Because xAI should have foreseen that it would be required to make the sorts of limited disclosures contemplated by AB 2013, those disclosures do not upset xAI's investment-backed expectations.

Second, the government did not provide any assurances to xAI that the information subject to AB 2013, or any other information about its training data, would be kept confidential. *Ruckelshaus* is instructive here. That case considered whether the Environmental Protection Agency (EPA) would effect a taking of Monsanto's trade secrets if the EPA publicly disclosed information that Monsanto had previously provided to the EPA. *Ruckelshaus*, 467 U.S. at 998-99. Notably, the statute that required Monsanto to disclose pesticide information to the EPA had been amended during the period relevant to the litigation. Specifically, in 1972, the

---

[13] *Available at* https://www.brookings.edu/articles/the-coming-ai-backlash-will-shape-future-regulation/.

statute was amended to allow submitters to protect their trade secrets from disclosure by designating them as trade secrets at the time of submission. *See id.* at 1010-11. The Court concluded that for disclosures submitted after 1972, Monsanto had a reasonable expectation that the trade secrets submitted would not be shared beyond the EPA, because the statute gave Monsanto "explicit assurance" that the EPA could not disclose the information publicly. *Id.* at 1011. But the court reached a different conclusion for the information Monsanto submitted before 1972. Because the statute at that time did not contain an "express promise" that Monsanto's submissions would not be disclosed, it had no reasonable expectation that the information it submitted would remain private. *Id.* at 1008. The Court then determined that the Trade Secrets Act, 18 U.S.C. § 1905—which prohibits government employees from disclosing trade-secret information revealed to them in the course of their duties—did not provide Monsanto a basis for expecting its data would not be disclosed. *Ruckelshaus*, 467 U.S. at 1009. The Court further held that Monsanto had no reasonable expectation of confidentiality in information it disclosed to the EPA after the relevant statute was further amended in 1978 to clarify that the information provided could be disclosed to the public. *See id.* at 1006.

*Ruckelshaus* differs from this case because AB 2013 does not require developers to provide their information to the government first. But the case still

49

demonstrates the circumstances under which a company has a reasonable expectation that its trade secrets will not be disclosed to the public. And it is notable that in the only Supreme Court case considering an alleged unconstitutional taking of trade secrets, the Court concluded that the most important factor in deciding whether such an expectation was reasonable was whether there was an express promise from the government that such information would not be disclosed. Thus, *Ruckelshaus* counsels that in the context of a trade secrets takings claim, if the government has not provided separate assurances of confidentiality, companies do not have a reasonable expectation that their trade secrets will not be disclosed.

### b.    xAI has not shown that disclosures under AB 2013 will have significant economic impacts

xAI has not shown that the limited disclosures it is required to make under AB 2013 will have significant economic impacts. To prevail on this factor, xAI must demonstrate that the regulation "will unreasonably impair the value or use of [the plaintiff's] property." *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 83 (1980). Here, xAI has not shown that *every* disclosure made pursuant to AB 288 "will necessarily disclose the information that provides the trade secret owner with its 'competitive edge.'" *See Stolfi*, 153 F.4th at 834. Indeed, for the reasons explained above, xAI has not shown that revealing basic information about the datasets it uses would diminish the value of those datasets to xAI.

50

It is true that compilations of public information, when combined in a novel way, can be a trade secret. *See* Pl's. Br. at 43. But even if xAI could show that AB 2013 implicated that type of trade secret, when a trade secret comprises a compilation of information, revealing "a portion of the data making up [a] claimed trade secret" does not necessarily destroy the trade secret's economic value. *Stolfi*, 153 F.4th at 839. For example, information about individual datasets that xAI uses in training would not necessarily reveal xAI's trade secrets about how those datasets are used in combination. Accordingly, xAI cannot show that "[AB 2013] mandates broad disclosure of *all* the data making up a claimed trade secret in every case," as it must do to prevail on its pre-enforcement challenge. *See id.* at 839 (emphasis in original). Although the statute identifies specific pieces of information to be disclosed, xAI has not demonstrated that revealing each of those individual data points would disclose any trade secrets whatsoever. Because xAI has not shown that every AB 2013 disclosure would significantly diminish the value of its alleged trade secrets, this factor does not support xAI's takings claim either.

### c.    AB 2013 serves an important public purpose

Finally, the character of the governmental action at issue counsels that AB 2013 is not a taking. In evaluating this factor, courts consider whether the government action "affects property interests through some public program

adjusting the benefits and burdens of economic life to promote the common good." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005) (internal quotation marks omitted). This analysis "necessarily requires a weighing of private and public interests." *Agins v. Tiburon*, 447 U.S. 255, 260-61 (1980). The character of the government action weighs against finding a taking where a significant public interest in the regulation outweighs a property owner's private interest in its use of the property. *See Stolfi*, 153 F.4th at 839.

This factor weighs against xAI because AB 2013 serves important public purposes, including informing individuals about how their data is used to train AIs, making users and copyright owners aware of whether models were trained on copyrighted material, and allowing consumers to evaluate training data for biases and other flaws. Transparency about the data used to train these models will help users make informed decisions about which generative AI systems they use and trust.

The Legislature decided that in light of the risks posed by AI, AI developers must make limited disclosures about the data driving their systems. *See CDK Glob. LLC v. Brnovich*, 16 F.4th 1266, 1283 (9th Cir. 2021) (no taking where legislature determined that challenged law "promotes the common good through the advancement of consumer privacy and competition."). The public's interest in transparency outweighs xAI's interests in its alleged trade secrets.

Because all three *Penn Central* factors support the conclusion that AB 2013 does not constitute an unlawful taking, xAI's takings claim fails.

## III. AB 2013 IS NOT UNCONSTITUTIONALLY VAGUE

xAI is unlikely to succeed on the merits of its "void for vagueness" claim because AB 2013 provides adequate notice of what is required under the statute. The void-for-vagueness doctrine applies to both criminal and civil statutes, but civil laws generally receive less exacting vagueness scrutiny. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982) ("The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment."). Courts consistently evaluate the vagueness of the law in light of the sophistication of the persons or entities subject to the law. *See, e.g.*, *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162-63 (1972) (striking down a vagrancy law under the "person of ordinary intelligence" standard); *Gonzales v. Carhart*, 550 U.S. 124, 149 (2007) (applying a "doctors of ordinary intelligence" standard to a law prohibiting certain medical procedures).

"In reviewing a business regulation for facial vagueness, [] the principal inquiry is whether the law affords fair warning of what is proscribed." *Hoffman Ests.*, 455 U.S. at 503. And "[i]n the context of civil statutes regulating economic activity, the standard [for fair notice] is sufficiently low that statutes are

53

unconstitutionally vague only where they are 'so vague and indefinite as really to be no rule or standard at all.'" *United States v. Stratics Networks Inc.*, 721 F. Supp. 3d 1080, 1112 (S.D. Cal. 2024) (quoting *Boutilier v. INS*, 387 U.S. 118, 123 (1967)); *see also Fang Lin Ai v. United States*, 809 F.3d 503, 514 (9th Cir. 2015) ("the question is whether the scheme that subjects Appellants to FICA taxes is so vague and indefinite as really to be no rule or standard at all." (internal quotation marks omitted)). This low standard is appropriate given the relative sophistication of the entities subject to business regulation and the fact that a "regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process." *Hoffman Ests.*, 455 U.S. at 498.

With those standards in mind, AB 2013 is not unconstitutionally vague. The statue provides a comprehensible standard governing the required disclosures. Although the term "high-level summary" is not expressly defined, the phrase has a plain, commonsense meaning: an overview of a topic done in a more abstract and general, rather than granular and detailed, manner. Moreover, as the district court observed, AB 2013 provides a list of the specific information to include within this summary. ER-14. Similarly, the terms "dataset" and "data point" have plain, commonsense meanings.[14] And although xAI contends that those terms are subject

---

[14] *See, e.g.*, https://www.merriam-webster.com/dictionary/data (defining "data" as "factual information" and "information in digital form that can be

(continued…)

to various interpretations, xAI has not shown that either term is ambiguous by industry standards. *See* ER-13. As for xAI's other arguments seizing on purported discrepancies between terms such as "training" data versus "development" data, *see* Pl's. Br. at 56, the district court correctly concluded that xAI did not develop the record on how those terms are actually used in the industry, *see* ER-14. Thus, xAI failed to show that those terms were ambiguous, much less that they rendered the statute as a whole "so vague and ambiguous as really to be no rule or standard at all." *Fang Lin Ai*, 809 F.3d at 514.

In all, AB 2013 provides regulated developers fair warning regarding its requirements: to provide a general description about the information sets used to train their generative AI product that covers the specified list of information. Contrary to xAI's assertions, a statute need not provide "perfect clarity and precise guidance" to pass constitutional muster. *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989). The fact that xAI can propose competing interpretations of AB 2013's requirements does not make the statute unduly vague. A civil statute passes muster so long as it regulates conduct "according 'to an imprecise but comprehensible normative standard.'" *Botosan v. Paul McNally Realty*, 216 F.3d 827, 836 (9th Cir. 2000) (quoting *Coates v. City of Cincinnati*, 402 U.S. 611, 614

---

transmitted or received"); https://www.merriam-webster.com/dictionary/dataset (defining "dataset" as "a collection of data taken from a single source or intended for a single project").

(1971)). "The Supreme Court and the Ninth Circuit have recognized that '[m]any statutes will have some inherent vagueness' and that a certain quantum of vagueness is permissible—and even necessary." *Oregon Ass'n of Hosps. & Health Sys. v. Oregon*, 734 F. Supp. 3d 1139, 1154 (D. Or. 2024), *aff'd*, 2025 WL 1833815 (9th Cir. July 3, 2025) (citing *Rose v. Locke*, 423 U.S. 48, 49-50 (1975)). AB 2013 meets this standard and is not unduly vague.

## IV.  THE EQUITIES DO NOT FAVOR PRELIMINARY INJUNCTIVE RELIEF

Because the district court concluded that xAI was unlikely to succeed on the merits of its claims, it did not reach the other preliminary injunction factors. But xAI failed to establish those requirements as well. First, xAI's delay in seeking a preliminary injunction undercuts their assertion that they face a risk of irreparable harm. *See Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm."). AB 2013 was passed in September 2024, nearly 14 months before xAI brought suit. xAI has not explained why it could not have brought its challenge soon after the bill was passed, which would have given the district court the opportunity to evaluate its claims on a less-rushed schedule and a more fulsome record. Moreover, xAI has not shown that immediate relief is necessary or warranted at this time. xAI has already made disclosures pursuant to the statute and there are no pending enforcement actions

56

against xAI. xAI has not shown that time is of the essence here or that they are at risk of irreparable harm.

Second, the balance of equities and public interest do not favor injunctive relief. Where, as here, the government is the opposing party, the last two factors of the preliminary injunction analysis—the balance of equities and public interest— merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). To analyze these factors, the Court "balance[s] the competing claims of injury" and "consider[s] the effect of granting or withholding the requested relief," paying "particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quotation marks and citations omitted).

A State "suffers a form of irreparable injury" when it is "enjoined . . . from effectuating statutes enacted by representatives of its people." *Maryland v. King*, 567 U.S. 1301, 1303 (2013) (internal quotation marks and citation omitted). And enjoining AB 2013 would further work harm by denying consumers the ability to make informed choices about the gen AI models they use. In contrast, any burden on xAI from denying injunctive relief is minimal—particularly given that xAI has already released disclosures under AB 2013. *See* ER-166.

## V.   ANY INJUNCTIVE RELIEF SHOULD BE NARROWLY TAILORED

Injunctive relief "must be tailored to remedy the specific harm alleged." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009) (internal quotation marks and citation omitted). xAI asks this Court to instruct the district court to grant xAI's motion for a preliminary injunction. *See* Pl's. Br. at 59. If this Court decides to overrule the district court and order it to grant the injunction—which it should not do—it should tailor such relief to reach only those parts of AB 2013 that xAI has substantiated are 1) likely invalid under xAI's claims and that 2) will harm xAI. Because xAI has already provided disclosures under AB 2013, this Court should confine any injunctive relief to solely preventing any further, specific, unconstitutional disclosure required by AB 2013 rather than enjoining the statute as a whole.

Such tailoring is particularly appropriate here given that the subcategories of information that must be included in a report are severable. Federal courts apply California law when analyzing severability. *Vivid Ent., LLC v. Fielding*, 774 F.3d 566, 574 (9th Cir. 2014). California courts apply a three-part test to determine severability: the invalid part of the law "must be grammatically, functionally, and volitionally separable." *California Redevelopment Ass'n v. Matosantos*, 53 Cal. 4th 231, 271 (2011) (citation omitted). The provisions of AB 2013 that list specific categories of information to include in a report meet the requirements for

58

severability. Because each category of information is listed separately, the provisions are clearly grammatically separable—any offending provision can simply be excised, leaving the remainder grammatically intact. Similarly, each of them are functionally separable, as removing one subset of information does not impair the functionality of the reporting requirement in general or the remaining categories of information to be included. Finally, the requirement for volitional separability is met, because it is "eminently reasonable to suppose that those who favor the [Act] would be happy to achieve at least some substantial portion of their purpose." *Santa Barbara Sch. Dist. v. Superior Court*, 13 Cal. 3d 315, 332 (1975). Thus, if this Court were to direct the district court to grant xAI's injunction, it should also order relief tailored to solely the portions of the law that xAI establishes are likely unconstitutional and that will affect xAI beyond the scope of the disclosures already made.

//

//

//

//

//

//

//

59

**CONCLUSION**

For the foregoing reasons, this Court should affirm the district court's

decision.

Dated:  July 15, 2026          Respectfully submitted,

*/s/ Joseph Meeker*
Joseph H. Meeker

ROB BONTA
  *Attorney General of California*
THOMAS S. PATTERSON
  *Senior Assistant Attorney General*
ANYA M. BINSACCA
  *Supervising Deputy Attorney General*
KRISTIN A. LISKA
JOSEPH H. MEEKER
  *Deputy Attorneys General*

## STATEMENT OF RELATED CASES

The State is not aware of any related cases, as defined by Ninth Circuit Rule 28-

2.6, that are currently pending in this Court and are not already consolidated here.

July 15, 2026

/s/ Joseph Meeker
Joseph Meeker

61

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Circuit R. 32-1 because this brief contains 13,965 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman type.

July 15, 2026

/s/ Joseph Meeker
Joseph Meeker

# CERTIFICATE OF SERVICE

Case Name: **X.AI LLC v. Rob Bonta (Appeal)**        No.   **26-1591**

I hereby certify that on <u>July 15, 2026</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

- **ANSWERING BRIEF FOR DEFENDANT-APPELLEE**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>July 15, 2026</u>, at Los Angeles, California.

| | |
|---|---|
| Linda Zamora | */s/ Linda Zamora* |
| Declarant | Signature |

SA2026301504
68465127