No. 26-1591

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## X.AI LLC,

*Plaintiff-Appellant,*

v.

## ROB BONTA, in his official capacity as Attorney General of the State of California,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Central District of California
No. 2:25-cv-12295-JGB-SSC
Hon. Jesus G. Bernal

### BRIEF OF AMICI CURIAE
### CENTER FOR AI AND DIGITAL POLICY, INTERNATIONAL
### ASSOCIATION FOR SAFE AND ETHICAL ARTIFICIAL
### INTELLIGENCE,  AND AI EXPERTS
### IN SUPPORT OF DEFENDANT-APPELLEE AND AFFIRMANCE

MARC ROTENBERG
IVAN FONG
CHRISTABEL RANDOLPH
CENTER FOR AI AND DIGITAL POLICY
1100 13th St. NW, Suite 800
Washington, DC 20005
(202) 415-6788
rotenberg@caidp.org
*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

The Center for AI and Digital Policy is a nonprofit, nongovernmental organization. The organization has no parent corporation. No publicly held corporation owns 10 percent or more of the organization.

The International Association for Safe and Ethical Artificial Intelligence is a nonprofit, nongovernmental organization. It has no parent corporation, and no publicly held corporation owns 10 percent or more of the organization.

# TABLE OF CONTENTS

INTEREST OF AMICI CURIAE ........................................................................1

RULE 29 STATEMENT....................................................................................5

SUMMARY OF ARGUMENT ..........................................................................6

ARGUMENT ....................................................................................................7

I. Training-data transparency is a baseline scientific requirement for evaluating generative AI systems.........................................................7

    A. Training data is the basis of a generative AI system...........................7

    B. Dataset documentation is an established research practice ................10

    C. Data documentation is necessary to assess reliability, validity, reproducibility, and appropriate use.......................................................13

    D. Output-only testing cannot substitute for training-data documentation ...........................................................................................................15

II. There are concrete harms when training data is not disclosed. ...............17

    A. Opaque training data creates concrete privacy risks .........................17

    B. Undisclosed proprietary materials prevent evaluation of legal provenance ...............................................................................................19

    C. Undocumented dataset composition obscures bias, representational gaps, and language exclusion................................................................20

    D. Non-public curation and synthetic-data practices conceal risks of contamination, feedback loops, and model collapse..............................21

    E. Opaque datasets impede independent investigation of harmful outputs ...........................................................................................................23

III. AB 2013 reflects an emerging scientific and international consensus on training-data documentation.........................................................................26

    A. U.S. government standards for training-data provenance and attribution support transparency and accountability ..............................26

iii

B. Voluntary disclosure remains inadequate, especially for data acquisition, copyright status, downstream impacts, and training-data provenance ..................................................................28

C. The forward-looking EU AI Act requires a public summary of the content used to train general-purpose AI models...................................29

D. AB 2013 is part of a broader response to the same accountability challenge ...................................................................32

CONCLUSION ..................................................................36

APPENDIX I: STATUTORY DEFINITIONS ...........................................38

APPENDIX II: DEFINITIONS OF ADDITIONAL KEY TERMS............40

CERTIFICATE OF COMPLIANCE ..........................................42

# TABLE OF AUTHORITIES

**Statutes**

Cal. Civ. Code § 3111 (West 2026). ...........................................................................1

**Foreign and International Authorities**

*Hiroshima Process International Code of Conduct for Organizations Developing Advanced AI Systems* 1–5 (Oct. 30, 2023). ......................................................31

Regulation (EU) 2024/1689 of the European Parliament and of the Council art. 53(1)(d), recital 107, 2024 O.J. (L 1689) 1; European Commission, *Explanatory Notice and Template for the Public Summary of Training Content for General-Purpose AI Models* (July 24, 2025). ...................................................................30

Regulation (EU) 2024/1689 of the European Parliament and of the Council of 13 June 2024 *Laying Down Harmonised Rules on Artificial Intelligence,* art. 53, 2024 O.J. (L 1689) 1........................................................................................29

UNESCO, *Recommendation on the Ethics of Artificial Intelligence* (2021). .........31

**Legislative Materials**

A. 6578-B, 248th Leg., Reg. Sess. § 1432 (N.Y. 2026)...........................................32

**Other Authorities**

Abeba Birhane & Vinay Uday Prabhu, *Large Image Datasets: A Pyrrhic Win for Computer Vision?*, in Proceedings of the IEEE/CVF Winter Conference on Applications of Computer Vision 1537, 1542 (2021). .......................................20

Alexander Wan et al., *The 2025 Foundation Model Transparency Index* 1, 6–12, 17–25 (2025), https://doi.org/10.48550/arXiv.2512.10169................................12

Alondra Nelson & Seth Lazar, *AI Safety on Whose* Terms?, Science, July 14, 2023, at 138. ............................................................................................................36

CAIDP, *Artificial Intelligence and Democratic Values 2026* (April Yoder ed., 2026)...............................................................................................................34

CAIDP, *Statement for the Record: AB 2013, AI Training Data Transparency*, at 1 (Aug. 19, 2024)...............................................................................................1

CAIDP, *Universal Guidelines for Artificial Intelligence* (2018) ...........................34

Daron Acemoglu & Simon Johnson, *Power and Progress: Our Thousand-Year Struggle Over Technology and Prosperity* (PublicAffairs 2023).......................35

David Thiel, *Identifying and Eliminating CSAM in Generative ML Training Data and Models* 3–5, 10–12 (Stanford Internet Observatory Dec. 23, 2023). ..........24

Emily M. Bender & Batya Friedman, *Data Statements for Natural Language Processing: Toward Mitigating System Bias and Enabling Better Science,* 6 Transactions of the Ass'n for Computational Linguistics 587 (2018). ...11, 14, 21

Emily M. Bender et al., *On the Dangers of Stochastic Parrots: Can Language Models Be Too Big?*, in Proceedings of the 2021 ACM Conference on Fairness, Accountability, and Transparency 610, 615 (2021). ...........................................17

Frank Pasquale, *The Black Box Society* (2015). ...................................................33

Independent Int'l Sci. Panel on Artificial Intelligence, *Preliminary Report of the Independent International Scientific Panel on AI: Evidence-Based Assessment of Opportunities, Risks and Impacts of Artificial Intelligence* 11 (July 2026)...8, 15, 27

Joseph E. Stiglitz, *Information and the Change in the Paradigm in Economics*, 92 American Economic Review 460 (2002). ...........................................................33

Nat'l Inst. of Standards & Tech., U.S. Dep't of Com., *Artificial Intelligence Risk Management Framework (AI RMF 1.0)* 21–23 (2023). ...............................25, 26

Off. of Mgmt. & Budget, Exec. Off. of the President, Memorandum M-25-21, *Accelerating Federal Use of AI Through Innovation, Governance, and Public Trust* 16 (Apr. 3, 2025). ................................................................27

Rahul Rao, *AI-Generated Data Can Poison Future AI Models*, Scientific American (July 28, 2023).......................................................................................22

Rishi Bommasani et al., *The Foundation Model Transparency Index v1.1*: May 2024 (Stan. Ctr. for Rsch. on Found. Models 2024). ...................................10, 28

Safiya Umoja Noble, *Algorithms of Oppression* (2018). ........................................20

Samuel Gehman et al., *RealToxicityPrompts: Evaluating Neural Toxic Degeneration in Language Models*, in Findings of the Association for Computational Linguistics: EMNLP 2020 3356, 3356–69 (2020). ....................24

Timnit Gebru et al., *Datasheets for Datasets,* 64 Commc'ns ACM 86, 86 (2021).10

U.S. Gov't Accountability Off., GAO-25-107651, *Artificial Intelligence: Generative AI Training, Development, and Deployment Considerations* 10 (2024). ...............................................................................................26

Yoshua Bengio et al., *International AI Safety Report* 2026, 25–26 (Dep't for Sci., Innovation & Tech., Research Series No. DSIT 2026/001, 2026)......................27

Yoshua Bengio et al., *Managing Extreme AI Risks Amid Rapid Progress,* 384 Science 842, 842 (2024). ......................................................................28

**INTEREST OF AMICI CURIAE**

The Center for AI and Digital Policy ("CAIDP") is an independent research organization focused on the governance of artificial intelligence. CAIDP conducts comparative research, trains policy researchers, and participates in national and international AI governance processes, with a focus on transparency, accountability, human rights, and democratic values.

AB 2013 requires the developer of an AI system to post on the developer's internet website "documentation regarding the data used by the developer to train the generative artificial intelligence system." Cal. Civ. Code § 3111 (West 2026). The "high-level" summary sets out twelve data categories, including the "sources or owners of the datasets." *Id.* at § 3111(a).

CAIDP endorsed AB 2013. The California Training Data Transparency Act establishes "basic transparency requirements for developers of AI systems and services." CAIDP, *Statement for the Record: AB 2013, AI Training Data Transparency*, at 1 (Aug. 19, 2024),[1] CAIDP wrote that transparency is essential because high-risk AI uses in areas such as "employment, housing, and lending" can produce "unaccountable, opaque and often unfair results." *Id.* at 2. The

---

[1] https://www.caidp.org/app/download/8615264863/CAIDP-AB2013-08192024.pdf

disclosures required by AB 2013 correspond to established scientific practices for evaluating generative AI systems.

The International Association for Safe and Ethical Artificial Intelligence ("IASEAI"), an international nonprofit that brings together experts in AI safety, ethics, policy, and governance, also joins as amicus in support of appellee. IASEAI has a particular interest in training-data transparency because public documentation of training-data sources enables researchers, regulators, and affected communities to identify risks, evaluate developers' claims, and support evidence-based safeguards for advanced AI systems.

CAIDP files this brief with IASEAI and AI experts who have studied the technical, safety, security, and social implications of advanced AI systems and support the disclosure requirements of AB 2013.

*Experts in Training Data Transparency and AI Accountability* (Affiliations for identification only)

**Ricardo Baeza-Yates,** Co-Chair of the AI Subcommittee of ACM's U.S. Technology Policy Committee and expert member of the IEEE AI Committee, OECD Global Partnership on AI, and World Economic Forum.

**Abeba Birhane**, Adjunct Assistant Professor in the School of Computer Science and Statistics at Trinity College Dublin and founder of the AI Accountability Lab.

**Emily M. Bender,** Thomas L. and Margo G. Wyckoff Endowed Professor of Linguistics and Director of the Computational Linguistics Laboratory, University of Washington.

**Virginia Dignum**, Professor of Responsible Artificial Intelligence and Director of the AI Policy Lab, Umeå University; member of the United Nations High-Level Advisory Body on Artificial Intelligence.

**Merve Hickok**, President and Policy Director, Center for AI and Digital Policy; author, *From Trustworthy AI Principles to Public Procurement Practices* (2024).

**Margaret Mitchell,** Chief Ethics Scientist at Hugging Face; founder and former co-lead of Google's Ethical AI team; co-author of the influential "Model Cards for Model Reporting" framework**.**

**Gabriela Ramos,** former Assistant Director-General for Social and Human Sciences at UNESCO and a leading architect of the UNESCO Recommendation on the Ethics of Artificial Intelligence.

3

**Stuart Russell**, OBE, FRS, Distinguished Professor of Computer Science at the University of California, Berkeley and President of the International Association for Safe and Ethical AI.

**Bruce Schneier**, Adjunct Lecturer at Harvard Kennedy School and Fellow at the Berkman Klein Center for Internet and Society; author, *Data and Goliath: The Hidden Battles to Collect Your Data and Control Your World* (2015).

**Moshe Y. Vardi**, University Professor and Karen Ostrum George Distinguished Service Professor in Computational Engineering, Rice University; member, National Academy of Engineering and National Academy of Sciences.

## RULE 29 STATEMENT

All parties have consented to the filing of this brief. No party's counsel authored this brief in whole or in part. No party or party's counsel contributed money intended to fund preparing or submitting this brief. No person other than CAIDP, the amici, or their counsel contributed money intended to fund preparing or submitting this brief.

## SUMMARY OF ARGUMENT

The data transparency requirements of AB 2013 address a core concern of AI model development: a generative AI system cannot be meaningfully evaluated without basic information about the data on which the system was trained. Training data shapes a generative AI system's functionality, limits, bias, privacy exposure, safety profile, and failure modes.  Undisclosed training data can conceal personal information, benchmark contamination, copyrighted or illegal material, representational bias, synthetic feedback loops, and domain mismatch. These problems cannot be reliably assessed from model outputs alone.

Leading researchers have developed model documentation practices, including datasheets, model cards, data statements, the CLeAR framework, and foundation-model transparency indexes to address these challenges. Established practices call for structured summaries of sources, collection periods, curation, rights, and known limitations. This level of information allows researchers, users, and downstream developers to assess risk while preserving reasonable protection for confidential operational details.

AB 2013 requires developers of generative AI systems to disclose high-level information about dataset sources, ownership, format, volume, collection period, copyright status, personal data, and synthetic data to enable a better assessment of the model. As the court below stated, "In the marketplace of AI models, A.B. 2013

6

requires AI model developers to provide information about training datasets, thereby giving the public information necessary to determine whether they will use—or rely on information produced by— Plaintiff's model relative to the other options on the market." *X.AI LLC v. Bonta*, No. 2:25-cv-12295-JGB-SSC, slip op. at 9 (C.D. Cal. Mar. 4, 2026). Each category addresses a recognized assessment need: provenance, modality and scale, timeliness and contamination, rights status, privacy risk, or synthetic-data feedback.

Training data transparency is critical because generative AI systems are deployed broadly. The same system may be used for education, work, health, creative production, cybersecurity, public services, and legal information. The developer cannot know every downstream use. Public documentation gives downstream actors a basis to decide whether a system is suitable for their use case or context. Without that information, users must rely on marketing claims, selective benchmark results, and perceived reliability.

**ARGUMENT**

## I. Training-data transparency is a baseline scientific requirement for evaluating generative AI systems.

### A. Training data is the basis of a generative AI system.

Generative AI systems are trained on large collections of text, images, audio, video, code, and other data. The United Nations Independent International Scientific Panel on Artificial Intelligence similarly explains that "modern systems

7

learn from experience represented by data" and that learning from human-created text, images, and code "provides the 'pre-training' basis of today's foundation models."[2] The composition of those collections affects the model's learned patterns, functional performance, limitations, and propensity to reproduce harmful material. Meaningful evaluation requires more than a model name and selected outputs; researchers also need the sources and characteristics of the training material.

Modern generative models often combine many data streams. Training corpora may include public web pages, books, news, code repositories, social media, licensed collections, user interactions, academic articles, image repositories, video captions, and synthetic content. These sources differ in reliability, rights status, demographic and language coverage, toxicity, privacy sensitivity, and temporal relevance.

Training data also affects what developers describe as "capability." A model may perform well in a subject because the corpus contains many examples from that subject. The same model may perform poorly in another subject because the corpus contains few examples from that field. A model may appear to reason when

---

[2] Independent Int'l Sci. Panel on Artificial Intelligence, *Preliminary Report of the Independent International Scientific Panel on AI: Evidence-Based Assessment of Opportunities, Risks and Impacts of Artificial Intelligence* 11 (July 2026) [hereinafter *UN Scientific Panel Report*].

the training data included similar problems. A model may appear current when older material merely covers a familiar pattern. These distinctions matter for evidence-based assessment.

Collection period provides one concrete example. A model trained mostly on data collected before a certain date may miss later events, scientific discoveries, security vulnerabilities, laws, medical guidance, or public health warnings. Users may not detect the gap from the answer. The resulting output may appear fluent and confident. Documentation of collection periods helps identify where a model may be stale, incomplete, or unsuitable for a time-sensitive use.

Modality provides another example. A model trained primarily on text may not be reliable for image interpretation. A multimodal model trained on weakly labeled images may carry errors from those labels. A model trained on code may reproduce insecure coding patterns. A model trained on audio may perform unevenly across accents, dialects, recording conditions, and languages. These issues arise from the data foundation and cannot be understood from the interface alone.

Provenance matters as well. The same words or images may carry different implications depending on where the material came from. Data collected from a public government source differs from data scraped from a private forum. Licensed content differs from content obtained without permission. Human-created content

9

differs from AI-generated content. Provenance supports reliability assessment, rights assessment, and safety assessment.

Training data is therefore a core element of the system. A generative AI system released into the world is not only a set of model weights and an interface. The system is the product of data collection, filtering, labeling, deduplication, licensing, removal, augmentation, and fine-tuning. Documentation of that process is a basic part of responsible engineering.

**B. Dataset documentation is an established research practice**

The AI research community has recognized the documentation problem for years. As Timnit Gebru has explained, "The machine learning community currently has no standardized process for documenting datasets, which can lead to severe consequences in high-stakes domains."[3] That observation applies with greater force to foundation models and generative AI systems, where one corpus may support thousands of downstream applications. Rishi Bommasani writes, "Transparency is a vital precondition for public accountability, scientific innovation, and effective governance."[4]

---

[3] Timnit Gebru et al., *Datasheets for Datasets*, 64 Commc'ns ACM 86, 86 (2021).
[4] Rishi Bommasani et al., *The Foundation Model Transparency Index v1.1*: May 2024 (Stan. Ctr. for Rsch. on Found. Models 2024).

Datasheets address the frequent reuse of datasets for tasks, populations, and social contexts beyond those for which the data was collected. Documentation reveals those limits before reliance. Data Statements for Natural Language Processing respond to a similar problem in language systems.[5] Because language data reflects particular speakers, dialects, domains, and social contexts, performance in one community may not generalize to another.

Model Cards for Model Reporting extends the same principle of standardized documentation to trained models.[6] Mitchell and coauthors proposed model cards to describe model details, intended uses, evaluation data, performance metrics, ethical considerations, and caveats. Without requiring disclosure of trade secrets, model cards describe a model, its evaluation, and appropriate limits on use.

The CLeAR Documentation Framework reaches the same conclusion for modern AI systems.[7] CLeAR treats transparency as a structured practice. The framework recommends documentation of collection, licensing, evaluation,

---

[5] Emily M. Bender & Batya Friedman, *Data Statements for Natural Language Processing: Toward Mitigating System Bias and Enabling Better Science,* 6 Transactions of the Ass'n for Computational Linguistics 587 (2018).
[6] Margaret Mitchell et al., *Model Cards for Model Reporting*, in Proceedings of the Conference on Fairness, Accountability, and Transparency 220, 220–29 (2019), https://doi.org/10.1145/3287560.3287596.
[7] Kasia Chmielinski et al., *The CLeAR Documentation Framework for AI Transparency: Recommendations for Practitioners & Context for Policymakers* (Shorenstein Ctr. on Media, Pol. & Pub. Pol'y, Harv. Kennedy Sch. 2024).

accountability, and review. Although regulators, researchers, developers, and end users may need different levels of detail, each requires enough information to make a reasoned judgment. Stanford's Foundation Model Transparency Index confirms that voluntary disclosure remains uneven, particularly concerning training-data sources, acquisition, filtering, copyright status, and downstream impacts, making models and developer claims difficult to compare.[8]

Training-data documentation supports reproducibility because data is part of an AI system's method. Even when exact reproduction is impossible, documentation permits meaningful comparison and assessment. Documentation helps researchers understand whether a result likely follows from broad data exposure, targeted fine-tuning, benchmark contamination, or model design.

Documentation also supports error correction. When a model produces harmful or incorrect outputs, investigators need to know whether the problem may originate in training data. Investigators need to know whether the model was exposed to toxic material, outdated material, private material, biased labels, or synthetic content. Without documentation, error analysis becomes guesswork. The developer may be the only actor with useful information.

---

[8] Alexander Wan et al., *The 2025 Foundation Model Transparency Index* 1, 6–12, 17–25 (2025), https://doi.org/10.48550/arXiv.2512.10169

**C. Data documentation is necessary to assess reliability, validity, reproducibility, and appropriate use**

AB 2013 requires disclosure of information that corresponds to these documentation practices. Dataset source information is essential because different sources have different reliability, rights, quality, and safety characteristics. A model trained on curated scientific databases raises different questions from a model trained on broad web scrapes. A model trained on user submissions raises different privacy questions from a model trained on public-domain material.

Ownership information distinguishes internal, licensed, public, user, and third-party data and identifies possible contractual, confidentiality, or provenance concerns. Format matters because text, images, video, audio, code, and structured data produce different risks and capabilities. Image data can include faces, location details, and sensitive contexts. Audio data can include voices and accents. Code data can include vulnerabilities and licensing issues. Structured data can include personal records. Format is a basic technical descriptor for any data-dependent system.

Copyright status also bears on provenance by identifying whether content came from public-domain, licensed, open, unknown, or scraped sources. Personal-data disclosure addresses privacy, memorization, re-identification, and security risk. When a training corpus includes personal data, developers and researchers need to know the type and scale of that inclusion. Personal data can include names,

13

addresses, images of people, voices, medical facts, employment records, or user interactions. A high-level disclosure can identify risk without exposing the data itself.

Synthetic-data disclosure has become especially important. Synthetic data can improve coverage and reduce some costs. Synthetic data can also introduce new risks. When AI-generated text, images, code, or labels are added to training data, researchers need to know that fact. Synthetic content may amplify errors, create feedback loops, reduce diversity, or make evaluation misleading.

These minimum descriptors help researchers, developers, institutions, and affected communities assess whether a model is reliable and appropriate for a proposed use. The categories also help avoid overclaiming. Generative AI developers often describe systems as general, capable, and safe. Those claims may be accurate in some contexts and incomplete in others. A public summary of training data helps determine the context. The summary lets users compare the scope of the data to the scope of the claim. That comparison is central to evidence-based evaluation. Bender and Friedman observe, "For test data, the characteristics of the dataset will affect what can be measured about system performance and thus provide important context for scientific claims."[9]

---

[9] Bender & Friedman, supra note 5, at 589.

**D. Output-only testing cannot substitute for training-data documentation**

Output-only testing reveals behavior under selected prompts but not the content, provenance, or defects of the training corpus. Memorization in a model may remain undetectable until a particular prompt elicits the memorized content. A model may conceal bias until a particular domain or community is affected. A model may conceal contamination because the output looks like correct reasoning.

Red-team testing, benchmarking, and user feedback remain valuable, but each samples behavior under chosen prompts, tasks, and evaluation criteria. None can reconstruct the training corpus or determine whether it contains personal information or material from a particular source. Testing therefore cannot substitute for documentation.

Output testing can also mislead when models are optimized for evaluation. The UN Scientific Panel identifies this precise limitation: "If correct answers to tests have (inadvertently) been memorized by the AI model as part of the training process, then its performance on these tests may not generalize to similar questions."[10] The Panel identifies this as a problem of "data contamination."[11] Developers may tune models to perform well on known benchmarks or to avoid known harmful prompts. That may improve safety in some settings. That may also

---

[10] *UN Scientific Panel Report*, supra note 2, at 15.
[11] *Id.*

15

create a false sense of reliability. If the training corpus included benchmark data, performance results may overstate general ability. Documentation of collection period and source overlap helps detect this problem.

Documentation complements testing: documentation identifies likely sources of risk, testing examines behavior, and post-deployment monitoring identifies incidents and changes over time. Together these methods form a safety and accountability process. Without documentation, the process begins with a blind spot.

The blind spot is especially large for closed models. Independent researchers cannot inspect the training process. Downstream developers cannot audit the corpus. Users cannot know whether a model's answer reflects reliable sources, scraped rumors, synthetic outputs, or outdated pages. In that setting, high-level documentation provides a modest and necessary substitute for direct access.

Documentation also helps interpret negative results. When a model fails on a language, dialect, or domain, the cause may be limited training data. The cause may be poor labels. The cause may be filtering. The cause may be alignment. Documentation helps researchers distinguish these possibilities. A disclosure of data sources and composition narrows the range of likely explanations.

Documentation does not guarantee safety, fairness, or accuracy; it makes those qualities assessable by replacing unsupported trust with reviewable evidence.

16

As Bender and her coauthors explain, "While documentation allows for potential accountability . . . undocumented training data perpetuates harm without recourse. Without documentation, one cannot try to understand training data characteristics in order to mitigate some of these attested issues or even unknown ones."[12]

## II. There are concrete harms when training data is not disclosed.

### A. Opaque training data creates concrete privacy risks

Generative AI models can retain and reproduce parts of their training data. When a training corpus includes personal information, passwords, private communications, medical facts, children's data, images, or other sensitive records, the model may expose information that should not have been exposed. Researchers and affected people need to know whether personal information was used before they can evaluate the risk.

The risk extends beyond verbatim reproduction: a model may disclose personal information through paraphrase, inference, or the combination of details drawn from different sources. These risks depend in part on the data used for training and fine-tuning.

---

[12] Emily M. Bender et al., *On the Dangers of Stochastic Parrots: Can Language Models Be Too Big?*, in Proceedings of the 2021 ACM Conference on Fairness, Accountability, and Transparency 610, 615 (2021).

The difficulty of removing information from a model, once trained, makes front-end data governance especially important. Once a model absorbs private or improper material, removing it may be difficult, unreliable, or require retraining—particularly when its source was not documented. Documentation at the front end helps identify risks before those risks become embedded in the system.

Personal-data transparency also matters for institutions that use AI. Schools, employers, hospitals, public agencies, and small businesses may rely on generative AI systems. Those institutions need to know whether a model was trained on user data, customer data, scraped profiles, or other personal sources. Many institutions lack the technical capacity to test for these risks independently. A high-level disclosure gives them a starting point.

The privacy concern has a security dimension. Training data can contain credentials, keys, internal documents, private code, or operational details. A model that memorizes such material may become a channel for exposure. Source and personal-data disclosures help identify whether a model may contain these categories. This information supports risk assessment before a system is deployed in sensitive settings.

18

**B. Undisclosed proprietary materials prevent evaluation of legal provenance**

Generative AI systems are trained on large corpora assembled from the web, licensed sources, user submissions, code repositories, books, news, images, and other works. Those sources may be public domain, licensed, contractually restricted, personal, or proprietary. A high-level disclosure of source categories and rights status allows creators, downstream users, and researchers to understand the provenance of training materials.

Rights status also affects technical behavior. A model trained heavily on a particular collection may reproduce distinctive expression, formatting, style, or code. A code model trained on repositories with different licenses may suggest code whose origins matter to downstream developers. An image model trained on particular collections may imitate known artists or commercial styles. Disclosure does not resolve every dispute. Disclosure allows the risk to be identified. As competitive pressure drives developers to assemble ever-larger corpora, documentation helps distinguish deliberate data governance from opportunistic accumulation.

Downstream users have their own reason to care. Businesses and public institutions may incorporate generative AI outputs into products, services, lessons, reports, or code. If the model's training data raises provenance concerns, those

19

users may face reputational, operational, or compliance risks. Public summaries help users make informed choices among models.

### C. Undocumented dataset composition obscures bias, representational gaps, and language exclusion

Models trained on unbalanced data can perform unevenly across populations, languages, cultures, professions, or regions. Bias is not only a question of offensive outputs. Bias may appear also in lower accuracy, missing context, poor translation, weak domain performance, or failure to recognize local knowledge. These failures often trace back to data composition.

Underrepresentation can be difficult to see from aggregate benchmarks. A model may score well overall and still fail for a smaller group. A model may perform well in English and poorly in low-resource languages. A model may perform well on common topics and poorly on local law, local medicine, or local public services.

Large image datasets illustrate the point. Large-scale image datasets may include offensive labels and harmful representational practices.[13] Data and ranking systems can reinforce social hierarchies.[14] These examples demonstrate a basic fact

---

[13] Abeba Birhane & Vinay Uday Prabhu, *Large Image Datasets: A Pyrrhic Win for Computer Vision?*, in Proceedings of the IEEE/CVF Winter Conference on Applications of Computer Vision 1537, 1542 (2021).

[14] Safiya Umoja Noble, *Algorithms of Oppression* (2018).

of machine learning: systems reflect the data and classification choices used to build them.

Data statements directly address this problem. Documentation of language varieties, speaker communities, annotation choices, and collection context support better science and reduce system bias. [15] The same logic applies to generative AI models that now mediate information, education, translation, and professional work.

### D. Non-public curation and synthetic-data practices conceal risks of contamination, feedback loops, and model collapse.

Benchmark contamination presents a direct scientific risk. Public benchmarks are used to compare model performance. If benchmark questions or answers appear in the training corpus, reported performance may measure exposure rather than general ability. Information about collection periods and source overlap helps independent researchers evaluate whether benchmark results are reliable.

Because benchmark scores influence public perception and procurement, contamination may cause schools, agencies, companies, and researchers to mistake memorization for general capability. Documentation of data sources and collection dates helps put benchmark claims in context.

---

[15] Bender & Friedman, supra note 5, at 587.

Synthetic-data feedback presents another risk. Developers increasingly use AI-generated content in training or fine-tuning. Carefully designed synthetic data can expand rare cases, support evaluation, and reduce reliance on sensitive sources, but recursively generated material can also degrade model quality. Researchers have warned that AI-generated data can "poison future AI models."[16]

When models train recursively on earlier model outputs, errors may compound, functionality may decline, rare events may disappear, and fluency may increase even as grounding deteriorates. Disclosure of synthetic-data use helps distinguish human-created sources from generated sources and helps researchers assess feedback-loop risks.

Curation practices also matter. Developers may remove material, add material, deduplicate, filter, label, translate, summarize, or generate synthetic examples. These choices shape the model. A public statement of major curation practices helps researchers understand how a system was produced. The statement also helps users understand why a system may behave differently from another model trained on similar source categories.

Domain mismatch creates a related danger. A model trained largely on public web text may not be reliable for clinical guidance, legal advice, education,

---

[16] Rahul Rao, *AI-Generated Data Can Poison Future AI Models*, Scientific American (July 28, 2023).

finance, public benefits, or emergency response. A model trained mostly on English data may not serve multilingual communities. A model trained on data collected before a particular date may not incorporate later events, regulations, or technical changes. Collection period, modality, domain, and volume are therefore basic facts.

Domain mismatch can be dangerous because generative AI models appear to speak with confidence. A user may receive a polished answer in a domain where the model lacks a sound data foundation. A downstream developer may build an application on top of that model. A public institution may deploy the system to people who cannot opt out. Documentation helps identify where caution is required.

### E. Opaque datasets impede independent investigation of harmful outputs

Opaque datasets impede incident investigation. When a model produces unsafe advice, discriminatory results, hallucinations, or illegal content, investigators need to know where the failure may have originated. The failure may reflect harmful training material, underrepresentation, outdated guidance, or synthetic feedback. Documentation makes the investigation faster and more reliable.

Researchers at the Stanford Internet Observatory identified links to known and suspected child sexual abuse material in LAION-5B, a large dataset used to train generative image models.[17] That finding illustrates why provenance and curation records are necessary. When developers can document sources and screening practices, outside evaluators can assess whether the process was designed to exclude dangerous or illegal material. When developers cannot provide those records, public assurance becomes difficult.

This risk extends beyond one dataset or one modality. Image, video, and text collections can contain abusive, violent, nonconsensual, or toxic content. Broad web scrapes can pull material from hostile, criminal, or exploitative contexts. Toxic and harmful material in training data can contribute to toxic model outputs.[18] A model trained on extremist content, harassment, explicit abuse, or misinformation may reproduce those patterns. Alignment methods may suppress some outputs and may not remove the underlying exposure. Documentation helps researchers understand whether harmful outputs reflect training data, post-training choices, or deployment safeguards that failed.

---

[17] David Thiel, *Identifying and Eliminating CSAM in Generative ML Training Data and Models* 3–5, 10–12 (Stanford Internet Observatory Dec. 23, 2023).
[18] Samuel Gehman et al., *RealToxicityPrompts: Evaluating Neural Toxic Degeneration in Language Models*, in Findings of the Association for Computational Linguistics: EMNLP 2020 3356, 3356–69 (2020).

Transparency also improves safety culture.[19] In security, disclosure practices can help identify vulnerabilities and create incentives to fix them. AI systems are not identical to security systems: hiding defects does not remove defects. Structured disclosure makes risks easier to find, discuss, and reduce. Structured disclosure also creates incentives for developers to maintain better internal records.

Transparency can also improve competition and procurement. When buyers know the data foundation of a system, they can compare models on substance. Buyers can ask whether a system has appropriate data for their use. Buyers can prefer models with better documentation, better provenance, and better safety practices. Without requirements for documentation, competition may reward scale, secrecy, and marketing rather than quality.

Across the system lifecycle, documentation supports pre-deployment risk assessment, appropriate use, incident investigation, and accountability.[20] Documentation does not make generative AI safe by itself. Documentation makes safety claims testable.

---

[19] Nat'l Inst. of Standards & Tech., U.S. Dep't of Com., *Artificial Intelligence Risk Management Framework (AI RMF 1.0)* 21–23 (2023).
[20] *Id.*

**III. AB 2013 reflects an emerging scientific and international consensus on training-data documentation.**

    **A. U.S. government standards for training-data provenance and attribution support transparency and accountability**

NIST's Artificial Intelligence Risk Management Framework identifies transparency, documentation, and accountability as core features of trustworthy AI.[21] The framework emphasizes that AI risks should be mapped, measured, and managed. Those steps require information about the data used to develop and evaluate a system. NIST treats documentation as part of risk management rather than cosmetic reporting. But problems remain, according to the Government Accountability Office, "the transparency of training data for generative AI models has worsened over time and information contained in model cards on training data does not meet guidelines proposed by researchers."[22]

OMB guidance likewise treats information about training data as necessary to evaluate high-impact AI. OMB Memorandum M-25-21 requires an assessment of "the quality and appropriateness of the relevant data and model capability," supported by a summary of the data used in the system's "design, development, training, testing, and operation." The summary must address the data-collection

---

[21] Nat'l Inst. of Standards & Tech., U.S. Dep't of Com., *Artificial Intelligence Risk Management Framework (AI RMF 1.0)* 21–23 (2023).

[22] U.S. Gov't Accountability Off., GAO-25-107651, *Artificial Intelligence: Generative AI Training, Development, and Deployment Considerations* 10 (2024).

and preparation process, the data's fitness for the intended purpose, and, where applicable, information concerning classes protected by federal nondiscrimination laws.[23]

The UN Scientific Panel identifies an "information asymmetry in safety validation between companies and society."[24] Frontier developers retain proprietary visibility into their systems, while government experts generally receive only the testing information developers choose to provide.[25] The Panel concludes that, without standardized and independent assessment, assurance of safety largely depends on developer goodwill.[26] The International AI Safety Report 2026 emphasizes evidence-based assessment of general-purpose AI systems.[27] Together, these reports recognize that advanced AI risks require scientific assessment, including evidence about training data.

Bengio and coauthors have warned that "Present governance initiatives lack the mechanisms and institutions to prevent misuse and recklessness, and barely

---

[23] Off. of Mgmt. & Budget, Exec. Off. of the President, Memorandum M-25-21, *Accelerating Federal Use of AI Through Innovation, Governance, and Public Trust* 16 (Apr. 3, 2025).

[24] UN Scientific Panel Report, supra note 2, at 15.

[25] *Id.*

[26] *Id.*

[27] Yoshua Bengio et al., *International AI Safety Report 2026* 25–26 (Dep't for Sci., Innovation & Tech., Research Series No. DSIT 2026/001, 2026).

27

address autonomous systems."[28] Training-data disclosure provides evidence needed to evaluate claims about safety and reliability.

### B. Voluntary disclosure remains inadequate, especially for data acquisition, copyright status, downstream impacts, and training-data provenance

The Stanford Foundation Model Transparency Index provides a concrete measure of the current transparency deficit. Its findings show that voluntary disclosure remains incomplete. Leading developers often provide limited information about data acquisition, data sources, copyright status, filtering, labor, and downstream effects. That pattern matters because foundation models are used by many downstream actors who cannot inspect the training process themselves.

The Foundation Model Transparency Index states the central point directly: "Transparency is a vital precondition for public accountability, scientific innovation, and effective governance."[29] AB 2013 reflects that premise. The statute asks for baseline data information that makes accountability possible.

Uneven voluntary disclosure prevents meaningful comparison; a market that rewards better documentation requires a common floor. Baseline disclosure can support competition by making data governance visible. This benefit matters for

---

[28] Yoshua Bengio et al., *Managing Extreme AI Risks Amid Rapid Progress*, 384 Science 842, 842 (2024).

[29] Bommasani et al., *Foundation Model Transparency Index v1.1*.

28

smaller developers, researchers, public agencies, and institutions that lack private access to model providers.

Private assurances do not substitute for public documentation. Large commercial partners may obtain confidential information through contract. Independent researchers, journalists, creators, public interest organizations, schools, and small businesses often cannot. Public summaries reduce that asymmetry. Public summaries also allow claims to be checked across the field rather than in isolated private channels.

### C. The forward-looking EU AI Act requires a public summary of the content used to train general-purpose AI models

The EU AI Act, the most comprehensive framework for AI governance, takes a similar approach for general-purpose AI models. Article 53 requires providers to publish a "sufficiently detailed summary of the content used for training" while accounting for trade secrets and confidential business information.[30] Like AB 2013, Article 53 recognizes that assessment does not require disclosure of every training example. A summary can identify source categories, major collections, time periods, modalities, curation practices, rights

---

[30] Regulation (EU) 2024/1689 of the European Parliament and of the Council of 13 June 2024 Laying Down Harmonised Rules on Artificial Intelligence, art. 53, 2024 O.J. (L 1689) 1.

status, and synthetic-data use. The summary helps the public understand what kind of system has been released.

The EU approach further confirms the emerging scientific consensus favoring training-data transparency. General-purpose AI models are deployed across borders. Downstream uses may affect education, employment, creative markets, research, public administration, and personal life. Public summaries create a common basis for assessment across jurisdictions and sectors.

The balance reflected in the EU AI Act is similar to the balance reflected in established documentation practices. Datasheets, model cards, data statements, and transparency indexes focus on structured summaries. They provide practical information about sources, collection, composition, intended uses, and limitations.

The European Commission's general-purpose AI ("GPAI") training-content template implements the EU AI Act obligation by requiring a comprehensive overview of the data used to train a model, identification of the main data collections, and an explanation of other data sources used.[31] The template operationalizes the same principle that underlies AB 2013. Because foundation-model training data may combine web crawls, licensed collections, code, images,

---

[31] Regulation (EU) 2024/1689 of the European Parliament and of the Council art. 53(1)(d), recital 107, 2024 O.J. (L 1689) 1; European Commission, *Explanatory Notice and Template for the Public Summary of Training Content for General-Purpose AI Models* (July 24, 2025).

user interactions, academic materials, synthetic examples, and fine-tuning datasets, a coherent summary provides information that capability marketing cannot.

The template also supports accountability as models, training corpora, curation practices, and synthetic-data use change over time. A structured summary allows researchers to compare versions and ask whether changes in behavior correspond to changes in data. AB 2013 likewise requires an updated notification before a developer makes a "substantial modification" publicly available in California. Cal. Civ. Code § 3111(a) (West 2026).

The G7 Hiroshima Process and the UNESCO Recommendation on AI Ethics, two other influential AI governance frameworks, point in the same direction. The G7 Hiroshima Process emphasizes responsible development and use of advanced AI systems, including transparency, accountability, risk mitigation, pre-deployment assessment, and post-deployment reporting.[32] UNESCO's Recommendation on the Ethics of Artificial Intelligence recognizes that transparency and explainability are necessary so people can understand AI decisions, request explanations, and contest outcomes.[33]

Despite differences in legal status and detail, their convergence is significant. Technical researchers, standards bodies, international organizations,

---

[32] *Hiroshima Process International Code of Conduct for Organizations Developing Advanced AI Systems* 1–5 (Oct. 30, 2023).
[33] UNESCO, *Recommendation on the Ethics of Artificial Intelligence* (2021).

and legislatures increasingly recognize that advanced AI governance requires evidence. Training-data summaries provide a core part of that evidence.

### D. AB 2013 is part of a broader response to the same accountability challenge

Similar proposals in other states reflect a broader response to the rapid deployment of poorly documented generative AI systems. *See, e.g.,* A. 6578-B, 248th Leg., Reg. Sess. § 1432 (N.Y. 2026) (requiring developers to publish a high-level summary of the datasets used to train publicly available generative AI models or services). AB 2013 fits within this broader approach. AB 2013's required disclosures map directly onto recognized concerns involving provenance, modality and scale, timeliness, benchmark contamination, copyright, privacy, and synthetic-data feedback.

AB 2013 also addresses a market in which developers make broad claims about capability, safety, and usefulness while downstream users lack the information needed to assess them. A high-level documentation requirement narrows that information gap. The requirement lets researchers and users compare systems on more than marketing statements and selective benchmark scores.

Because general-purpose systems may be used across education, employment, health, public services, law, creative work, cybersecurity, and research, developers cannot anticipate every downstream use. The public therefore

32

needs baseline information about the data foundations of the system. That information helps downstream actors decide whether a system is appropriate for their context.

Training-data documentation can benefit developers as well. Disclosure requirements also encourage better internal records, quality control, and incident response by requiring developers to track sources, collection periods, personal data, rights status, and synthetic-data use.

Structured disclosure gives affected people, creators, users, and researchers a common factual basis for determining what data was used and whether system and benchmark claims are reliable. The need for evidence is especially strong where powerful systems are controlled by a small number of actors. Opaque systems shape information and opportunity.[34] Information asymmetry shows that markets function poorly when key information is concentrated on one side.[35] Generative AI creates a similar asymmetry. Developers know much more about the data foundation than users, researchers, creators, and affected communities. Training-data transparency responds modestly to this asymmetry. AB 2013 requires neither model weights nor disclosure of every prompt, parameter, or internal method—

---

[34] Frank Pasquale, *The Black Box Society* (2015).
[35] Joseph E. Stiglitz, *Information and the Change in the Paradigm in Economics*, 92 Am. Econ. Rev. 460 (2002).

only baseline information about the data foundation needed for independent assessment.

Democratic oversight depends on the same principle. AI systems increasingly influence public knowledge, education, employment, creative markets, and access to services. The public cannot assess those systems if the data foundation remains hidden. CAIDP's work on AI and democratic values has repeatedly emphasized that transparency is a foundation for accountability.[36] The *Universal Guidelines for Artificial Intelligence*, endorsed by more than 300 experts and 60 organizations, including leading scientific societies, establish both a right to transparency and a principle of data-quality.[37] Meaningful oversight requires enough information to evaluate, challenge, and improve these systems.

The amici's position is modest: generative AI systems should be accompanied by meaningful documentation of source categories, ownership, modality, volume, collection period, rights status, personal data, and synthetic-data

---

[36] CAIDP, *Artificial Intelligence and Democratic Values 2026* (April Yoder ed., 2026) (identifying algorithmic transparency, including the ability to contest adverse outcomes, as a principal AI-policy recommendation)

[37] CAIDP, *Universal Guidelines for Artificial Intelligence* (2018) ("Right to Transparency: All individuals have the right to know the basis of an AI decision that concerns them. This includes access to the factors, the logic, and techniques that produced the outcome"; "Data Quality: Institutions must establish data provenance, and assure quality and relevance for the data input into algorithms.").

use. Those facts support scientific evaluation, public understanding, and responsible deployment.

Training-data transparency helps smaller developers and researchers. Large firms may have private access to model providers, internal audits, or commercial assurances. Smaller actors often rely on public documentation, published summaries, and available technical reports. When those materials omit the data foundation, smaller actors face greater uncertainty. Baseline disclosure makes the market more legible and reduces dependence on private channels.

The same is true for public agencies and educational institutions. They must make procurement and deployment decisions about complex systems. They need to know whether a model was trained on data suitable for their population and task. A model used in a classroom, benefits office, or public-health setting should not be chosen on brand recognition alone. Training-data summaries give officials a more concrete basis for oversight.

Technological progress does not automatically produce shared benefit; institutions and rules shape how the benefits and burdens of technology are distributed. [38] Training-data disclosure contributes to that institutional setting by making the inputs to generative AI systems visible enough for assessment.

---

[38] Daron Acemoglu & Simon Johnson, *Power and Progress: Our Thousand-Year Struggle Over Technology and Prosperity* (PublicAffairs 2023).

AI safety should not be defined only in narrow technical terms. "What is needed is a sociotechnical approach to AI safety that integrates technical expertise with insights from the social sciences, humanities, and the public."[39] Training data is both technical, because it shapes model behavior, and social, because it derives from human communities, institutions, labor, and creative work.

Finally, documentation supports cumulative science. AI research advances when findings can be compared, challenged, and reproduced. Opaque training data prevents researchers from knowing whether differences among models come from architecture, scale, fine-tuning, or data. That weakens the evidence base. AB 2013 addresses that weakness by requiring information that allows scientific comparisons to be more meaningful.

**CONCLUSION**

Training data transparency is a baseline requirement for generative AI systems, supported by established research practices and current governance frameworks. It addresses risks that output testing alone cannot assess and provides the information needed to evaluate system reliability, limitations, and safety. AB 2013 reflects that evidence-based scientific consensus through targeted, high-level disclosures tied directly to recognized assessment needs.

---

[39] Alondra Nelson & Seth Lazar, *AI Safety on Whose* Terms?, Science, July 14, 2023, at 138.

CAIDP, IASEAI, and the AI experts respectfully urge affirmance.

Respectfully submitted,

MARC ROTENBERG
IVAN FONG
CHRISTABEL RANDOLPH
CENTER FOR AI AND DIGITAL POLICY
1100 13th St. NW, Suite 800
Washington, DC 20005
rotenberg@caidp.org

*Counsel for Amici Curiae*

37

## APPENDIX I: STATUTORY DEFINITIONS

*TITLE 15.2. Artificial Intelligence Training Data Transparency*

*3110.*

For purposes of this title, the following definitions shall apply:

(a) "**Artificial intelligence**" means an engineered or machine-based system that varies in its level of autonomy and that can, for explicit or implicit objectives, infer from the input it receives how to generate outputs that can influence physical or virtual environments.

(b) "**Developer**" means a person, partnership, state or local government agency, or corporation that designs, codes, produces, or substantially modifies an artificial intelligence system or service for use by members of the public. For purposes of this subdivision, "members of the public" does not include an affiliate as defined in subparagraph (A) of paragraph (1) of subdivision (c) of Section 1799.1a, or a hospital's medical staff member.

(c) "**Generative artificial intelligence**" means artificial intelligence that can generate derived synthetic content, such as text, images, video, and audio, that emulates the structure and characteristics of the artificial intelligence's training data.

(d) "**Substantially modifies**" or "substantial modification" means a new version, new release, or other update to a generative artificial intelligence system or

38

service that materially changes its functionality or performance, including the results of retraining or fine tuning.

(e) "**Synthetic data generation**" means a process in which seed data are used to create artificial data that have some of the statistical characteristics of the seed data.

(f) "**Train a generative artificial intelligence system or service**" includes testing, validating, or fine tuning by the developer of the artificial intelligence system or service.

39

## APPENDIX II: DEFINITIONS OF ADDITIONAL KEY TERMS

**Agentic artificial intelligence system** — An AI system capable of planning and carrying out multistep tasks toward a defined goal with limited human intervention, including by using external tools or services, or functioning in digital or physical environments.

**Benchmark contamination** — The presence of benchmark questions, answers, or closely related material in training data, which can make model performance appear stronger than it is.

**Dataset documentation** — Structured information describing a dataset's sources, composition, collection, curation, intended uses, limitations, and maintenance.

**Data provenance** — Information about where data originated, how it was obtained, who created or controlled it, and how it was processed.

**Data statement** — Documentation describing the linguistic, demographic, geographic, social, or contextual characteristics of language data**.**

**Foundation model** — A model trained on broad data at scale that can be adapted for many downstream tasks and applications.

**General-purpose AI model** — An AI model with a wide range of functionalities that can support multiple downstream systems or uses.

**Low resource language** — A language for which limited digital text, speech, annotated datasets, computational tools, or evaluation benchmarks are available for developing and assessing AI systems.

**Memorization** — A model's retention of specific training examples or distinctive portions of them, potentially allowing later reproduction.

**Model card** — Standardized documentation describing a model's intended uses, evaluation methods, performance, limitations, and relevant risks.

**Model collapse** — Degradation that may occur when models are repeatedly trained on AI-generated data, causing errors to compound and data diversity to decline.

**Synthetic data** — Data generated or substantially modified by an AI system rather than directly produced or recorded by humans or natural processes.

**Training data** — The data used to develop the statistical patterns, parameters, and capabilities of an AI model.

**Training dataset** — An organized collection of data used during model training, including text, images, audio, code, structured data, or synthetic material.

# CERTIFICATE OF COMPLIANCE

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-1591

I am the attorney or self-represented party.

**This brief contains** 6,944 **words, including** 0 **words** manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  ☐ it is a joint brief submitted by separately represented parties.
  ☐ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** *Mau Rtg* **Date** July 21, 2026
*(use "s/[typed name]" to sign electronically-filed documents)*

Feedback or questions about this form? Email us at forms@ca9.uscourts.gov

Form 8      Rev. 12/01/22

42