No. 26-1591

# United States Court of Appeals for the Ninth Circuit

X.AI LLC,

*Plaintiff-Appellant,*

– v. –

ROB BONTA, in his official capacity as
Attorney General of the State of California,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
LOS ANGELES, CENTRAL CALIFORNIA IN CASE NO. 2:25-CV-12295-JGB-SSC,
JESUS G. BERNAL, DISTRICT JUDGE

## *AMICI CURIAE* BRIEF OF INTELLECTUAL PROPERTY SCHOLARS IN SUPPORT OF APPELLEE AND AFFIRMANCE

CHRISTOPHER J. MORTEN
PATRICK K. LIN
KENDRA NEUMANN
DANIEL S. HARAWA
WASHINGTON SQUARE LEGAL
SERVICES, INC.
*Counsel for Amici Curiae Intellectual Property Scholars*
Furman Hall, 245 Sullivan Street
New York, New York 10012
(212) 998-6433

CP COUNSEL PRESS    (800) 4-APPEAL • (392638)

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 34. Disclosure Statement under FRAP 26.1 and Circuit Rule 26.1-1

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form34instructions.pdf*

**9th Cir. Case Number(s)** | 26-1591

Name(s) of party/parties, prospective intervenor(s), or amicus/amici filing this form:

Intellectual Property Scholars

Under FRAP 26.1 and Circuit Rule 26.1-1, I make the following disclosures:

1. I disclose the following information required by FRAP 26.1(a) and/or Circuit Rule 26.1-1(b) for any nongovernmental corporation, association, joint venture, partnership, limited liability company, or similar entity[1] which is a party, prospective intervenor, or amicus curiae in any proceeding, or which the government identifies as an organizational victim below in section 2 of this form,[2] or which is a debtor as disclosed below in section 3 of this form.

   a. Does the party, prospective intervenor, amicus, victim, or debtor have any parent companies? Parent companies include all companies that control the entity directly or indirectly through intermediaries.
   ○ Yes      ◉ No

   If yes, identify all parent corporations of each entity, including all generations of parent corporations *(attach additional pages as necessary)*:

   b. Is 10% or more of the stock of the party, prospective intervenor, amicus, victim, or debtor owned by a publicly held corporation or other publicly held entity?
   ○ Yes      ◉ No

---

[1] A corporate entity must be identified by its full corporate name as registered with a secretary of state's office and, if its stock is publicly listed, its stock symbol or "ticker."

[2] To the extent it can be obtained through due diligence.

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 34**                    i                    *New 12/01/24*

If yes, identify all such owners for each entity *(attach additional pages as necessary)*:

2. In a criminal case, absent good cause shown, the government must identify here any organizational victim of the alleged criminal activity:

n/a

3. In a bankruptcy case, the debtor, the trustee, or, if neither is a party, the appellant must identify here each debtor not named in the court of appeals caption:

n/a

4. Are you aware of any judge serving on this Court who participated at any stage of the case, either in district court, administrative proceedings, or in related state court proceedings?

○ Yes    ◉ No

If yes, list the name of the judge and the case name, case number, and name of court of the related proceedings:

I certify that *(select only one)*:

◉ this is the first disclosure statement filed in the above-referenced case by the above-identified party/parties, prospective intervenor(s), or amicus/amici, and this disclosure statement complies with FRAP 26.1 and Circuit Rule 26.1-1.

○ the party/parties, prospective intervenor(s), or amicus/amici submitting this supplemental disclosure statement has previously filed a compliant disclosure statement in this case, and this updated disclosure statement discloses changed or additional information.

○ I have reviewed this form, FRAP 26.1, and Circuit Rule 26.1-1 and, to the best of my knowledge, have no information to disclose at this time.

**Signature** s/ Christopher J. Morten    **Date** July 22, 2026
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 34**                     ii                     *New 12/01/24*

# TABLE OF CONTENTS

26.1 CORPORATE DISCLOSURE STATEMENT ................................................ i

TABLE OF CONTENTS .................................................................................. iii

TABLE OF AUTHORITIES ........................................................................... iv

INTEREST OF AMICI CURIAE ....................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................2

ARGUMENT .................................................................................................3

I.   The district court correctly discerned that xAI has not established the existence of trade secrets implicated by the Act. ....................................3

II.  *Monsanto* confirms that California effects no taking by requiring public disclosure of summaries of generative AI training data—even if those summaries contain trade secrets. ....................................5

   A.  Under *Monsanto*, a regulatory takings analysis, not a *per se* takings analysis, must apply to any alleged taking of a trade secret. ....................................7

   B.  Under *Monsanto*, no takings claim vis-à-vis trade secrets can succeed without reasonable investment-backed expectations grounded in a governmental promise of secrecy. ....................................11

   C.  Under *Monsanto*, xAI's takings claim must fail because xAI has not shown that California ever promised xAI secrecy. ....................................19

III.  xAI's interpretation of takings law would debilitate transparency and regulatory law. ....................................21

   A.  Other powerful companies are challenging transparency and regulatory laws under the cover of the Takings Clause. ....................................21

   B.  xAI's view of the law could harm regulation of artificial intelligence and other technology regulation ....................................22

   C.  xAI's view of the law could hamper governments' abilities to collect and disseminate other important information protective of public health and safety. ....................................25

CONCLUSION .............................................................................................31

APPENDIX A ...............................................................................................32

CERTIFICATE OF COMPLIANCE .................................................................34

STATEMENT OF RELATED CASES ..............................................................35

CERTIFICATE OF SERVICE .........................................................................36

## TABLE OF AUTHORITIES

**Cases**

*Becker v. City of Hillsboro, Mo.*, 125 F.4th 844 (8th Cir. 2025)..............................8

*Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021) .................................. 5, 10, 18

*Clemente Props., Inc. v. Pierluisi-Urrutia*, 165 F.4th 1 (1st Cir. 2026)............. 9, 10

*Colony Cove Props., LLC v. City of Carson*, 888 F.3d 445 (9th Cir. 2018) ...........11

*Corn Prods. Ref. Co. v. Eddy*, 249 U.S. 427 (1919)...............................................17

*Hartley Pen Co. v. U.S. District Court*, 287 F.2d 324 (9th Cir. 1961)....................16

*Kaiser Aetna v. United States*, 444 U.S. 164 (1979) .................................................7

*Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470 (1974) .................................. 15, 18

*Love Terminal Partners, L.P. v. United States*, 889 F.3d 1331
  (Fed. Cir. 2018) ................................................................................................ 8, 12

*Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992) ........................................ 9, 17

*MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511 (9th Cir. 1993).....................4

*Meriden Trust & Safe Deposit Co. v. F.D.I.C.*, 62 F.3d 449 (2d Cir. 1995).............8

*Penn Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104 (1978) ...................................7

*Pharm. Rsch. & Mfrs. of Am. v. Stolfi*, 153 F.4th 795 (9th Cir. 2025)............ passim

*Philip Morris, Inc. v. Reilly*, 312 F.3d 24 (1st Cir. 2002) (en banc) .....................8, 9

*PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980) .....................................7

*Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984) ........................................ passim

*Vanda Pharms., Inc. v. United States*, 174 Fed. Cl. 513 (2025).............................22

*Winston Rsch. Corp. v. Minn. Mining & Mfg. Corp.*, 350 F.2d 134 (9th
  Cir. 1965).............................................................................................................4

**Statutes**

18 U.S.C. § 1833 ......................................................................................................16

18 U.S.C. § 1839 ......................................................................................................16

18 U.S.C. § 1905 ......................................................................................................15

42 U.S.C. § 11023 ............................................................................................... 26, 27

42 U.S.C. § 11042 ........................................................................................27

Cal. Civ. Code § 3426 *et seq* ....................................................................20

Cal. Civ. Code § 3426.1 ...................................................................... 16, 20

Cal. Health & Safety Code § 111792.6 .......................................................30

Cal. Leg., Cosmetic Fragrance and Flavor Ingredient Right to Know Act
of 2020, S. 312, 2019-2020 Leg., Reg. Sess. (2020)...............................30

W. Va. Leg., S. 373, 81st Sess. (2014) .......................................................29

## Rules & Regulations

40 C.F.R. § 370 .................................................................................... 26, 27

Appendix B to 40 C.F.R. § 355 ...................................................................27

## Other Authorities

Caity Coyne & Lori Kersey, *10 years after chemical spill, concerns
remain for future incidents,* W. Va. Watch (Jan. 9, 2024) ....................28

*CERCLA and EPCRA Continuous Release Reporting*, Env't Prot. Agency
(June 8, 2026) .........................................................................................27

Deepa Varadarajan, *Trade Secret Fair Use*, 83 Fordham L. Rev. 1401
(2014)......................................................................................................28

*FAQs*, Cal. Dep't Pub. Health..................................................................30

Jarrett Renshaw et al., *Exclusive: Trump team wants to scrap car-crash
reporting rule that Tesla opposes*, Reuters (Dec. 17, 2024) .................25

John Manuel, *Crisis and Emergency Risk Communication: Lessons from
the Elk River Spill*, 122 Env't Health Persps. A214 (Aug. 1, 2014)............. 28, 29

Julius Hattingh, *xAI's Trade Secrets Challenge and the Future of AI
Transparency*, Institute for Law & AI (Jan. 2026) ...............................23

Ken Ward Jr., *Information on leak's 2nd chemical 'very limited'*,
Charleston Gazette (Jan. 22, 2014)........................................................28

Luis Rijo, *xAI sues California over law forcing AI firms to reveal training
secrets*, PPC Land (Jan. 2, 2026).........................................................23

Maranda L. Johnston, *The Right to Know: Putting Public Health and
Safety Above Trade Secret Protections,* 74 Emory L.J. 157 (2024) ...................30

Mark MacCarthy, *The evolving safety and policy challenges of self-driving cars*, Brookings (July 31, 2024) ...............................................................25

Melissa K. Bianchi et al., *Court rules for PhRMA in challenge to Oregon drug price transparency law*, Hogan Lovells Cadwalader LLP (Apr. 1, 2024)................................................................................................................22

Micah Musser, *AI Regulation and the Looming Problem of the Takings Clause*, Lawfare (Jun. 12, 2026) .....................................................................23

Nat'l Highway Traffic Safety Admin., Third Amended Standing General Order 2021-01 (amended 2025) ......................................................................24

Pamela Samuelson, *Principles for Resolving Conflicts Between Trade Secrets and the First Amendment*, 58 Hastings L.J. 777 (2007) ...........................6

*Prescription Drug Price Transparency Program Results And Recommendations – 2025*, Or. Dep't of Consumer & Bus. Servs. ......................26

*Standing General Order on Crash Reporting*, Nat'l Highway Traffic Safety Admin. ................................................................................................24

*Tier II Forms and Instructions*, Env't Prot. Agency (June 22, 2026) .....................27

W. Va. Dep't Env't Prot., Order Issued Under the Water Pollution Control Act West Virginia Code, Chapter 22, Article 11 and the Groundwater Protection Act West Virginia Code, Chapter 22, Article 12 (2014) ....................29

vi

## INTEREST OF AMICI CURIAE[1]

*Amici curiae* are scholars of intellectual property. *Amici* have no personal interest in the outcome of this litigation but share a professional interest in seeing trade secrecy and takings laws applied in a manner that is doctrinally coherent; promotes innovation and competition; and protects consumers, public safety, and public health.

*Amici* believe that Appellant xAI has fundamentally misinterpreted the Supreme Court's and this Court's precedents on the intersection of trade secrecy and takings law. Endorsement of xAI's view of the law would flout precedent and imperil state and federal transparency and regulatory law.

*Amici* present this brief to assist the Court in its analysis of xAI's request for a preliminary injunction enjoining California Assembly Bill 2013 ("A.B.2013" or "the Act") on the alleged basis that the Act violates the Takings Clause. *Amici* express no view on other claims raised by xAI.

A list of *amici* is provided in Appendix A.

---

[1] *Amici* submit this brief pursuant to Federal Rule of Appellate Procedure 29(a)(2). All parties have consented to its timely filing. No counsel for any party authored this brief in whole or in part, and no entity or person, aside from the *amici curiae* and their counsel, made any monetary contribution intended to fund the preparation or submission of this brief. *Amici* file this brief in their individual capacities as scholars; they provide institutional affiliations solely for purposes of identification. The positions taken in this brief are those of *amici* alone and should not be attributed to any institution with which *amici* are affiliated.

1

## INTRODUCTION AND SUMMARY OF ARGUMENT

The district court properly denied a preliminary injunction against California Assembly Bill 2013 ("A.B.2013" or "the Act") based on xAI's claim that the Act violates the Takings Clause. As the district court correctly reasoned, xAI has not adequately alleged—and probably can never prove—that information affected by the Act constitute trade secrets under California law. On this basis alone, the district court's treatment of xAI's takings claim deserves affirmance.

Our brief provides an additional basis to affirm the district court's denial of a preliminary injunction on the basis of xAI's takings claim. Even *if* summaries of generative artificial intelligence ("AI") training data were valid trade secrets, this Court should still affirm the district court's dismissal of xAI's request for a preliminary injunction based on the Takings Clause.

xAI's takings claim must fail because xAI cannot establish that it and other developers of generative AI were ever given a promise by the State of California that their training data would remain perpetually secret and immune from regulation or public disclosure. Absent such a promise of secrecy, no takings claims arising from governmental interference with a trade secret can succeed. This legal rule is a central holding of the U.S. Supreme Court's decision in *Ruckelshaus v. Monsanto* (1984), the precedent that controls this case.

2

xAI cites *Monsanto* repeatedly but characterizes it misleadingly. xAI claims that *Monsanto* instructs a *per se* takings analysis to government interference with trade secrets; to the contrary, *Monsanto* instructs a stringent, multi-pronged test for regulatory takings that requires, *inter alia*, an affirmative governmental promise of secrecy to support a viable takings claim. In effect, xAI asks the Court to ignore what *Monsanto* actually held—and to subvert this Court's own recent decision in *PhRMA v. Stolfi* (9th Cir. 2025), which applied *Monsanto* correctly.

xAI's misrepresentations of trade secrecy and takings law are dangerous. To accept xAI's legal test for takings of trade secrets would not only flout the Supreme Court's carefully crafted interplay of trade secrecy and federal takings law; xAI's test would also stymie state and federal transparency law and technology regulation. More companies would weaponize the Takings Clause against transparency and regulation they dislike. Consumers and public safety would suffer.

## ARGUMENT

I.     **The district court correctly discerned that xAI has not established the existence of trade secrets implicated by the Act.**

As the district court correctly held, xAI's claims do not merit a preliminary injunction of A.B.2013 on the basis that it violates the Takings Clause because xAI has not adequately alleged—and probably can never prove—that any information implicated by the Act actually constitutes a trade secret under California state law.

3

That statute, concerning "Artificial Intelligence Training Data Transparency," is not intended to disturb the trade secrets of xAI or any other developer of generative AI systems or services. Instead, the Act merely requires generative AI developers to report and disclose "a high-level summary of the datasets used in the development of the generative artificial intelligence system or service addressing, but not limited to, twelve enumerated topics." *X.AI LLC v. Bonta*, No. 2:25-cv-12295, 2026 WL 626926, at *1 (C.D. Cal. Mar. 4, 2026) (cleaned up).

The district court correctly held that the burden is xAI's, as plaintiff and proponent of trade secrecy, to show that any trade secrets exist within these informational topics. *Id.* at *4. *Cf. MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 522-23 (9th Cir. 1993) (partially reversing injunction in a private-party misappropriation case where plaintiff did not specifically identify software-based trade secrets); *Winston Rsch. Corp. v. Minn. Mining & Mfg. Corp.*, 350 F.2d 134, 143-44 (9th Cir. 1965) (partially reversing injunction in a private-party misappropriation case where vague terms did not differentiate between valid trade secrets and generalized non-trade secret information). The district court correctly held that xAI failed to do so: xAI offers "general arguments about datasets, dataset sizes, cleaning methods, and configurations of data, but has not identified any dataset or approach to cleaning and using datasets that is distinct from its

4

competitors in a manner warranting trade secret protection." *X.AI*, 2026 WL 626926, at *5. On this basis alone, the district court's denial of a preliminary injunction should be affirmed.

II. ***Monsanto* confirms that California effects no taking by requiring public disclosure of summaries of generative AI training data—even if those summaries contain trade secrets.**

xAI's opening brief relies upon the Supreme Court's landmark decision on trade secrecy and takings law, *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984). *See* xAI Opening Br. at 39, 40, 41, 51, 52, 53, 54.

We agree with xAI that *Monsanto* controls its takings claim. But, properly applied, *Monsanto precludes* that claim—even *if* xAI somehow manages to prove the existence of trade secret information in the topics affected by A.B.2013.

*Monsanto* thus offers the Court an independent basis on which to reject xAI's takings claim and its request for a preliminary injunction based on that claim.

xAI insists that *Monsanto* holds that a state or federal government's disclosure of a trade secret effects a *per se* taking. For example, xAI states that "[c]ompelled disclosures of trade secrets, like those required by A.B.2013, fall comfortably within [the] *per se* framework" elaborated in *Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021), and other *per se* takings cases. xAI Opening Br. at 51.

Yet *Monsanto* declined to apply a *per se* analysis to alleged takings of trade secrets. In fact, given the facts of this appeal, *Monsanto* forecloses the possibility of even a regulatory taking by California. In *Monsanto*, Monsanto's most aggressive takings claims were soundly rejected by the Supreme Court, and the Court articulated legal rules that generally protect governmental agencies' power to gather, use, and disseminate information, even when that information qualifies as a trade secret. As Professor Pamela Samuelson has written, "[t]he strong property right theory that Monsanto propounded was soundly trounced in *Ruckelshaus* [*v. Monsanto*]." Pamela Samuelson, *Principles for Resolving Conflicts Between Trade Secrets and the First Amendment*, 58 Hastings L.J. 777, 809 (2007).

This Court interpreted and applied *Monsanto* faithfully in a precedential opinion issued just last year: *Pharm. Rsch. & Mfrs. of Am. v. Stolfi*, 153 F.4th 795 (9th Cir. 2025). xAI cites *Stolfi* just once, in a footnote. xAI Opening Br. at 51-52 n.5. While xAI tries to lead the Court away from *Stolfi*, *Stolfi* dictates the outcome here. As *Stolfi* articulated, takings claims arising from governmental inference with trade secrets must be analyzed "as a potential regulatory taking governed by the standards articulated in *Penn Central*," and those standards accommodate sensible transparency regulations that result in public disclosure of trade secrets. *Stolfi*, 153 F.4th at 834, 838, 840.

**A. Under *Monsanto*, a regulatory takings analysis, not a *per se* takings analysis, must apply to any alleged taking of a trade secret.**

*Monsanto* unequivocally embraced a regulatory takings analysis for alleged takings of trade secrets. As it took up Monsanto's takings claims, the Supreme Court wrote that it had previously identified "several factors that should be taken into account when determining whether a governmental action has gone beyond 'regulation' and effects a 'taking.' Among those factors are: 'the character of the governmental action, its economic impact, and its interference with reasonable investment-backed expectations.'" *Monsanto*, 467 U.S. at 1005 (quoting *PruneYard Shopping Center v. Robins*, 447 U.S. 74, 83 (1980) and citing two other landmark regulatory takings cases: *Kaiser Aetna v. United States*, 444 U.S. 164, 175 (1979), and *Penn Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104, 124 (1978)). Eliminating any confusion that *Penn Central*'s familiar three-factor regulatory takings test applied, the Court continued, "[i]t is to the last of these three factors that we now direct our attention, for we find that the force of this factor is so overwhelming, at least with respect to certain of the data submitted by Monsanto to EPA [(the Environmental Protection Agency)], that it disposes of the taking question regarding those data." *Monsanto*, 467 U.S. at 1005. The bulk of the *Monsanto* opinion then occupies itself with scrutinizing the reasonableness of Monsanto's investment-backed expectations of ongoing trade secrecy.

Just last year, in *Stolfi*, this Court rejected the argument that *Monsanto* supports application of a *per se* analysis to alleged takings of trade secrets. *Stolfi*, F.4th at 833-34. There, PhRMA (the nation's largest pharmaceutical industry trade organization) argued that an Oregon transparency law that contemplated disclosure of certain pharmaceutical pricing information "should be considered a *per se*, 'categorical' taking because it 'denies [manufacturers] all economically beneficial or productive use' of their" alleged trade secrets by potentially disclosing them to competitors and the public. *Id.* at 833. This Court correctly rejected PhRMA's argument, noting that *Monsanto* had "categorized the alleged taking [of trade secrets] as a regulatory taking and looked to the *Penn Central* factors." *Id.* Other circuits agree: *Monsanto* should be understood as a regulatory takings case. *See, e.g.*, *Philip Morris, Inc. v. Reilly*, 312 F.3d 24, 33 (1st Cir. 2002) (en banc); *Meriden Trust & Safe Deposit Co. v. F.D.I.C.*, 62 F.3d 449, 454 (2d Cir. 1995); *Becker v. City of Hillsboro, Mo.*, 125 F.4th 844, 858 (8th Cir. 2025); *Love Terminal Partners, L.P. v. United States*, 889 F.3d 1331, 1342 n.1 (Fed. Cir. 2018). We are not aware of any circuit that has embraced xAI's and PhRMA's contention that *Monsanto* instructs a *per se* analysis to apply to alleged takings of trade secrets.[2] Nor has the Supreme Court done so.

---

[2] xAI cites repeatedly a concurrence in the First Circuit's *Philip Morris v. Reilly* decision, which endorsed a *per se* test for alleged takings of trade secrets under a strained reading of *Monsanto*. xAI Opening Br. at 51-52 (citing *Reilly*, 312 F.3d at

*Stolfi*'s interpretation of *Monsanto* is not only faithful to *Monsanto* and consistent with other circuits; *Stolfi*'s interpretation is also the only theoretically sensible application of the Takings Clause to trade secrets and other intangible property. The Supreme Court has always acknowledged that the manner in which the Takings Clause protects private property may differ based on the nature of the property right affected. As *Stolfi* concluded, "*Lucas* explicitly distinguished land from personal property, explaining that 'in the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, [a plaintiff] ought to be aware of the possibility that new regulation might even render his property economically worthless.'" *Stolfi*, 153 F.4th at 833 (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1027-28 (1992)).

In rejecting an alleged *per se* taking of another variety of intellectual property—a trademark—the First Circuit recently elaborated on the fundamental conceptual differences between real and intangible property and the consequences those differences carry for takings doctrine. *Clemente Props., Inc. v. Pierluisi-Urrutia*, 165 F.4th 1 (1st Cir. 2026). Unlike real property, intellectual property is *nonrivalrous*. Many users can use and enjoy information protected by intellectual property rights at once without hindering each other's enjoyment, making

---

51 (Selya, J., concurring in judgment)). The First Circuit's majority opinion—endorsed en banc—rejected the concurrence's reading of *Monsanto*. *Reilly*, 312 F.3d at 33 n.5.

9

unauthorized use of intellectual property less invasive than unauthorized use of land:

> We do not think that infringement of intangible intellectual property can be analyzed using the same categorical approach as takings involving the physical possession or occupation of property. . . . [T]here is a meaningful difference between small or partial invasions of physical property, as opposed to intangible property. In the case of physical property, allowing even one individual to temporarily occupy or possess the property physically displaces the owner from possession or control of that portion of the property, however small. Even in *Cedar Point*, where agricultural employers might still be able to use their land for farming despite the presence of union organizers for limited periods, we think it conceptually meaningful that as long as an organizer was physically present on the property, it meant that the owners could not use or occupy whatever square foot of land that organizer's boots were planted on. *Cedar Point*, 594 U.S. at 149. It's in this context that the Supreme Court adopted an approach that categorically deems the invasion a taking and treats the scope of the invasion as "bear[ing] only on the amount of compensation." *Id*. at 153. . . . Use of a trademarked word or image does not necessarily have the same effect.

*Clemente Props.*, 165 F.4th at 32, 33, 34 (some citations omitted). The First Circuit observed that the fact that the aggrieved trademark holders had "not identified any cases in which invasions of intangible property rights were treated as physical takings implicitly supports preservation of the division between physical and non-physical takings." *Id.* at 35 (citing, *inter alia*, *Monsanto*, 467 U.S. at 1005).

If California were, hypothetically, to use its eminent domain power to seize xAI's data centers and other real property, that act could actually deprive xAI of its ability to develop and profit from Grok. That unlikely act would be subject to a *per*

10

*se* takings analysis. Or—to invoke Coca-Cola, as xAI often does—if California seized Coca-Cola's factories and prevented the company from manufacturing and selling Coke, that act would likewise be analyzed as a *per se* taking. By contrast, transparency regulations that merely ask companies to reveal information about how they do business—and do not prohibit them from doing business or invade their real property—cannot be analyzed as such.

### B. Under *Monsanto*, no takings claim vis-à-vis trade secrets can succeed without reasonable investment-backed expectations grounded in a governmental promise of secrecy.

*Monsanto* presents the three key factors a court must weigh when analyzing a regulatory takings claim: "the character of the governmental action, its economic impact, and its interference with reasonable investment-backed expectations." *Monsanto*, 467 U.S. at 1005 (cleaned up); *see also Stolfi*, 153 F.4th at 834 (articulating these factors).

Not all investment-backed expectations suffice to support a regulatory takings claim; those expectations must be objectively *reasonable*. *See Monsanto*, 467 U.S. at 1005-06 ("A reasonable investment-backed expectation must be more than a unilateral expectation or an abstract need." (cleaned up)); *Colony Cove Props., LLC v. City of Carson*, 888 F.3d 445, 452 (9th Cir. 2018) ("To form the basis for a taking claim, a purported distinct investment-backed expectation must be objectively reasonable.").

11

In a takings claim alleging a taking of a trade secret by a government actor, objectively reasonable expectations specifically require proof that the information at issue would not, someday, be disclosed by that actor. *Monsanto* held that, in the absence of a statutory "guarantee of confidentiality to submitters of data," parties submitting trade secrets to federal agencies have "no reasonable, investment-backed expectation that [their] information would remain inviolate in the hands of" the agencies. *Monsanto*, 467 U.S. at 1008.

*Stolfi* distilled this lesson correctly: Disclosure of trade secrets submitted by Monsanto to EPA during a period of years prior to 1972 "when the statutory scheme was silent as to the disclosure of trade secret information" simply "could not constitute an unconstitutional taking." *Stolfi*, 153 F.4th at 836. The Federal Circuit agrees: "In *Ruckelshaus* [*v. Monsanto*] . . . the Supreme Court concluded that plaintiffs only had a reasonable expectation in the confidentiality of trade secrets disclosed to [EPA] in pesticide registration applications to the extent that the relevant statute explicitly guaranteed confidentiality at the time of submission." *Love Terminal*, 889 F.3d at 1345.

xAI's opening brief states that *Monsanto* "held that the only *Penn Central* factor that mattered was an owner's investment-backed expectation that his trade secrets would remain confidential." xAI Opening Br. at 51-52 n.5. This sentence of xAI's brief happens to be true—true in the sense that the *absence* of a reasonable

12

investment-backed expectation grounded in a governmental promise of secrecy is, on its own, enough to doom a takings claim. *Monsanto* disposed of multiple takings claims brought by Monsanto against EPA on the sole basis that Monsanto had failed to establish any promise of secrecy during the relevant time periods. *See Monsanto*, 467 at 1005-08 (rejecting takings claims from 1978 onward, when the relevant statute, the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), expressly promised disclosure); *id.* at 1008-10 (rejecting takings claims from the period prior to 1972, when FIFRA was silent on whether EPA and Congress would maintain secrecy).

But when *Monsanto* sided with Monsanto on its takings claims arising during a period of about six years (1972-1978) throughout which FIFRA had expressly promised ongoing confidentiality of submissions to EPA, the Court did not stop with the reasonable investment-backed expectations inquiry. Instead, after finding that Monsanto had a reasonable expectation of ongoing confidentiality, *id.* at 1010-11, the Court proceeded to weigh the other two key regulatory takings factors: the economic impact on Monsanto, *id.* at 1011-12 (determining "the economic impact of the EPA action on Monsanto's property right"), and the character of EPA's action, *id.* at 1012 (rejecting EPA's "view [of] the situation").

In other words, federal agencies' disclosures of trade secrets *may*, but *do not necessarily*, effect compensable takings under the Fifth Amendment. *Id.* at 1004-

13

06. The entire *Penn Central* analysis must be applied to determine whether a taking has occurred. Even when a plaintiff demonstrates that a regulator has disclosed a trade secret, Takings Clause liability cannot attach unless the plaintiff also proves it had a reasonable, investment-backed expectation of nondisclosure—backed by a governmental promise of secrecy—and the final analysis, weighing all factors, favors the plaintiff.

Stolfi faithfully applied *Monsanto*. *See Stolfi*, 153 F.4th at 834-38 (applying *Monsanto* and concluding, "we cannot say that every disclosure of a trade secret under [the challenged Oregon transparency law] will upset reasonable investment-backed expectations"). *Stolfi* weighed the economic impact and character of Oregon's transparency law but observed correctly that, under *Monsanto*, the absence of reasonable investment-backed expectations alone is enough to doom a trade secret takings claim. *Id.* at 838.

xAI omits all this doctrine from its opening brief—presumably because it precludes xAI's takings claim.

*Monsanto* is not only binding precedent; it also makes conceptual sense. *Monsanto*'s requirement that a plaintiff alleging a taking of trade secrets prove some promise of secrecy aligns takings doctrine with trade secret misappropriation doctrine. As the Supreme Court has explained, trade secret law is *unlike* patent law, which "operates against the world, forbidding any use of the invention for

14

whatever purpose for a significant length of time." *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 490 (1974). By contrast, trade secrets are not enforceable against every defendant under the sun; "trade secret law does not forbid the discovery of the trade secret by fair and honest means." *Id.* "Where patent law acts as a barrier, trade secret law functions relatively as a sieve." *Id.* State and federal trade secret misappropriation laws do not, perforce, create a promise that trade secrets will remain immune from disclosure by state and federal regulators. *Cf. Monsanto*, 467 U.S. at 1008 ("[T]he Trade Secrets Act[3] is not a guarantee of confidentiality to submitters of data, and, absent an express promise, Monsanto had no reasonable, investment-backed expectation that its information would remain inviolate in the hands of EPA.").

xAI's opening brief misleadingly implies that state and federal trade secret rights should be made enforceable against any and all government actors, regardless of whether those actors breached a specific promise of secrecy to the trade secret holders. xAI's implication is wrong; it mischaracterizes not just *Monsanto* but the statutes in which it purports to find such a promise. The federal

---

[3] The federal Trade Secrets Act is a longstanding federal statute that generally prohibits officers and employees of federal agencies from disclosing information that "concerns or relates to the trade secrets, processes, operations, style of work, or apparatus," or other protected information unless "authorized by law." 18 U.S.C. § 1905.

15

Defend Trade Secrets Act cited by xAI[4] explicitly does not apply against state governments. *See* 18 U.S.C. § 1833(a)(1) ("This chapter does not prohibit or create a private right of action for—(1) any otherwise lawful activity conducted by a governmental entity of the United States, a State, or a political subdivision of a State . . . ."). Nor has xAI established[5] that California's implementation of the Uniform Trade Secrets Act (UTSA) operates against State regulation or promises perpetual secrecy to the holders of all trade secrecy rights created by that Act. *See infra* § II.C.

xAI also quotes, out of context, this Court's decision in *Hartley Pen Co. v. U.S. District Court*: "The property in a trade secret is the power to make use of it to the exclusion of the world." 287 F.2d 324, 328 (9th Cir. 1961) (internal citation omitted, quoted at xAI Opening Br. at 51). xAI omits language from the next paragraph of *Hartley Pen*, which emphasizes trade secrecy's limits:

> It must not be inferred from the foregoing quotation that a trade secret need never be disclosed. A trade secret must and should be disclosed where upon a proper showing it is made to appear that such disclosure is relevant and necessary to the proper presentation of a plaintiff's or defendant's case.

*Hartley Pen*, 287 F.2d at 328.

In effect, the possibility of future government use and disclosure of trade secrets—in connection with consumer protection regulation or other legitimate

---

[4] xAI's Opening Br. at 51 (citing 18 U.S.C. § 1839).
[5] *Id.* (citing Cal. Civ. Code § 3426.1(d)).

goals—acts as a default background limitation on trade secret rights. *See Lucas*, 505 U.S. at 1027 ("[T]he property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers; as long recognized, some values are enjoyed under an implied limitation and must yield to the police power." (cleaned up)). Legislatures create trade secret rights in certain varieties of economically valuable information, to promote innovation and regulate business morality, but they reserve the right to regulate and even to require disclosure of that same information to protect the public.

To adopt xAI's view and make trade secret rights inviolable and enforceable against any and all state and federal government regulators, regardless of any promise of perpetual secrecy, would upend that reservation and wreak havoc on transparency and regulation, as we argue below. *See infra* § III. *Monsanto* observed as much: Regulatory limitations on trade secret rights "are the burdens we all must bear in exchange for the advantage of living and doing business in a civilized community." *Monsanto*, 467 U.S. at 1007 (cleaned up); *see also Corn Prods. Ref. Co. v. Eddy*, 249 U.S. 427, 431-432 (1919) ("The right of a manufacturer to maintain secrecy as to his compounds and processes must be held subject to the right of the State, in the exercise of its police power and in promotion of fair dealing, to require that the nature of the product be fairly set forth"); *Stolfi*,

17

153 F.4th at 834-38. Just a few years ago, in *Cedar Point*, the Supreme Court observed that under its takings precedents, "government health and safety inspection regimes will generally not constitute takings." 594 U.S. at 161 (citing *Monsanto*, 467 U.S. at 1007).

xAI suggests that if A.B.2013 remains on the books, the Act will "necessarily disincentivize xAI (and other developers) from developing unique, high-quality datasets." xAI's Opening Br. at 35 n.2. The district court correctly observed that xAI "has not identified any dataset or approach to cleaning and using datasets that is distinct from its competitors in a manner warranting trade secret protection," undermining the company's claim to have created something unique, innovative, and unknown to competitors. *X.AI*, 2026 WL 626926, at *5.

Even if it were true that A.B.2013 mandated disclosure of actual, unique trade secrets and thereby rebalanced the playing field of competition, such legislative intervention would be reasonable and legal. Regulation of innovation, economic competition, business morality, and consumer protection are quintessential political questions, the domains of state legislatures. As the Supreme Court has explained, "[j]ust as the States may exercise regulatory power over writings so may the States regulate with respect to discoveries. States may hold diverse viewpoints in protecting intellectual property relating to invention . . . ." *Kewanee*, 416 U.S. at 479.

18

California's legislature made California's trade secrecy law and should remain free to level its protections up or down to serve various public policy goals. Should the legislature wish to create even *stronger* protections for trade secrets in certain industries—perhaps on the theory that doing so will strengthen private incentives to invest and innovate—the legislature may write new statutes that expressly promise secrecy and exempt those trade secrets from future governmental disclosure. (It is only in this scenario that viable takings claims arise, if and only if California later breaks that promise.) Alternatively, should California's legislature wish to *weaken* protections for other trade secrets and create new public disclosure mandates—perhaps to strengthen competition, regulation, or public oversight—it may do that as well. *See Monsanto*, 467 U.S. at 1015 (concluding that mandating data sharing with competitors serves "a procompetitive purpose [] well within the police power of Congress" and noting further that "public disclosure can provide an effective check on the decisionmaking processes of EPA and allows members of the public to determine the likelihood of individualized risks peculiar to their use of the product").

### C. Under *Monsanto*, xAI's takings claim must fail because xAI has not shown that California ever promised xAI secrecy.

Under *Monsanto*, properly applied, xAI's takings claim—and request for a preliminary injunction based on that claim—must fail.

xAI points only to the text of the UTSA itself, as enacted by California's legislature. *See* xAI's Opening Br. at 42, 51 (citing Cal. Civ. Code § 3426.1(d)). The provision cited by xAI merely defines a trade secret; it does not promise that California regulators will never gather and disclose trade secrets so defined.

Like other states', California's implementation of the UTSA[6] does not make trade secret rights enforceable against the world. Instead, California's trade secrecy statute defines certain wrongs, such as use of improper means to obtain the trade secret and breach of an affirmative duty to maintain secrecy, that render certain defendants liable for misappropriation. Cal. Civ. Code § 3426.1(a),(b). Acquisition and dissemination of information by a regulator, pursuant to a statutory command, is not included within California's statutory definition of improper means.

xAI has not alleged that any other California statute or source of law promises secrecy of summaries of generative AI training data.

As such, xAI's trade secret rights, which arise from California law, come with a background limitation—the possibility of regulatory use and disclosure. In this respect they are just like Monsanto's trade secret rights, which arose from Missouri law and carried the same limitation.

Ultimately, all xAI can do is insist that it has invested much money and effort in gathering training data and keeping it secret, and that xAI will be harmed

---

[6] *See* Cal. Civ. Code § 3426 *et seq*.

if any information finds its way to xAI's competitors. Even if this were true, it does not sustain a takings claim. Recall that *Monsanto* accepted that Monsanto's information on its pesticides constituted trade secrets protected at state law; resulted from extensive, multi-year investment in research and development; and was fiercely protected from the company's competitors. *Monsanto*, 467 U.S. at 998. *Monsanto* even agreed with Monsanto that "[t]he economic value of [Monsanto's] property right lies in the competitive advantage over others that Monsanto enjoys by virtue of its exclusive access to the data, and disclosure [by EPA] or use by others of the data would destroy that competitive edge." *Id.* at 1012. Yet Monsanto still lost all its takings claims except those arising during the six-year period during which Congress and EPA had affirmatively, explicitly promised to keep pesticide trade secrets secret.

So too should xAI lose.

### III. xAI's interpretation of takings law would debilitate transparency and regulatory law.

#### A. Other powerful companies are challenging transparency and regulatory laws under the cover of the Takings Clause.

While xAI is wrong on the law, its Takings Clause argument has become worryingly common. If accepted by this and other courts, xAI's argument would dramatically expand Takings Clause litigation, permitting virtually any company

21

subjected to a transparency mandate or other regulatory law to challenge the law as an unconstitutional taking.

Recently, both PhRMA and Vanda Pharmaceuticals presented similar, incorrect readings of *Monsanto* in challenges to state and federal regulations they dislike. *Stolfi*, 153 F.4th at 807; *Vanda Pharms., Inc. v. United States*, 174 Fed. Cl. 513, 517 (2025). These challenges have failed—so far—but have already raised significant questions about the scope of state and federal governments' power to regulate technology and have chilled some enforcement of transparency laws. *See, e.g.*, Melissa K. Bianchi et al., *Court rules for PhRMA in challenge to Oregon drug price transparency law*, Hogan Lovells Cadwalader LLP (Apr. 1, 2024).[7]

This Court correctly rebuffed PhRMA's invitation last year to diverge from *Monsanto* and adopt PhRMA's extreme view of takings law. *Stolfi*, 153 F.4th at 840. The Court must hold the line again. If the Court deviates from *Monsanto* and *Stolfi*, more corporate litigants will flood the court with takings claims. If the Supreme Court wishes to revisit *Monsanto*, it may, but until then this Court must continue to uphold the current law.

### B. xAI's view of the law could harm regulation of artificial intelligence and other technology regulation.

---

[7] https://www.hlc.com/en/publications/court-rules-for-phrma-in-challenge-to-oregon-drug-price-transparency-law.

22

Given the novel, consequential, and rapidly-changing nature of AI, many legislators have introduced laws requiring increased transparency, both in the training of AI and its impacts. *See, e.g.*, Luis Rijo, *xAI sues California over law forcing AI firms to reveal training secrets*, PPC Land (Jan. 2, 2026);[8] Micah Musser, *AI Regulation and the Looming Problem of the Takings Clause*, Lawfare (Jun. 12, 2026).[9] States have struggled to design substantive AI regulations in part because AI training, input data, and outcomes remain opaque and ever-shifting. Transparency laws are all the more important to better understand this technology. *See id.*; *see also* Julius Hattingh, *xAI's Trade Secrets Challenge and the Future of AI Transparency*, Institute for Law & AI (Jan. 2026).[10]

A ruling in favor of xAI would threaten states' fledgling regulation of AI. Given that AI is evolving so quickly, it is hard for legislators and regulators to guess today what transparency measures might be needed in the future. Accordingly, the Court must leave the door open for states to pass new transparency laws without allowing companies to challenge every law as a taking of trade secrets.

---

[8] https://ppc.land/xai-sues-california-over-law-forcing-ai-firms-to-reveal-training-secrets/.

[9] https://www.lawfaremedia.org/article/ai-regulation-and-the-looming-problem-of-the-takings-clause.

[10] https://law-ai.org/xais-trade-secrets-challenge-and-the-future-of-ai-transparency/.

In some areas where AI is rapidly progressing, the life-saving nature of transparency mandates is already clear. For example, consider "self-driving cars" (cars equipped with AI that provides advanced driver assistance or fully automated driving systems). Since 2021, the National Highway Transportation Safety Administration (NHTSA) has released reports on crashes and incidents of these self-driving cars, following its General Order requiring manufacturers to report such incident information. *Standing General Order on Crash Reporting*, Nat'l Highway Traffic Safety Admin. (last visited Jul. 3, 2026).[11] NHTSA's 2021 General Order explicitly informed manufacturers that incident information—with limited exceptions—is not considered by the agency to be proprietary information and thus will be made publicly available, regardless of manufacturers' assertions of trade secrecy. Nat'l Highway Traffic Safety Admin., Third Amended Standing General Order 2021-01 (amended 2025), at 10.[12] NHTSA's Order emphasized that "[m]aking a request for confidential treatment does not ensure that the information claimed to be confidential will be determined to be confidential"; the agency reserves the right to reject manufacturers' claims of confidentiality. *Id*.

NHTSA's disclosure program helps inform would-be buyers, investors, and the broader public about the risks of new self-driving car technology. It also helps

---

[11] https://www.nhtsa.gov/laws-regulations/standing-general-order-crash-reporting.
[12] https://www.nhtsa.gov/sites/nhtsa.gov/files/2025-04/third-amended-SGO-2021-01_2025.pdf.

24

shape state and municipal regulation of these cars. Mark MacCarthy, *The evolving safety and policy challenges of self-driving cars*, Brookings (July 31, 2024).[13]

If the Court embraces xAI's view of the law, NHTSA may be prevented from disclosing crash data. Tesla (like xAI, an Elon Musk company) and other carmakers have criticized NHTSA's disclosure program—but stopped short of filing claims alleging a taking of trade secrets. *See* Jarrett Renshaw et al., *Exclusive: Trump team wants to scrap car-crash reporting rule that Tesla opposes*, Reuters (Dec. 17, 2024).[14] If NHTSA comes to fear that its disclosure of crash information is subject to a viable takings challenge, it may cease disclosure. This could jeopardize public knowledge of the risks involved with this application of AI, harming passenger and pedestrian safety.

### C. xAI's view of the law could hamper governments' abilities to collect and disseminate other important information protective of public health and safety.

xAI's erroneous view of the law could also impact governments' abilities to regulate other industries beyond AI. xAI's view of the law could stymie regulators' ability to collect and disseminate myriad information protective of public health and safety.

---

[13] https://www.brookings.edu/articles/the-evolving-safety-and-policy-challenges-of-self-driving-cars/.

[14] https://www.reuters.com/business/autos-transportation/trump-transition-recommends-scrapping-car-crash-reporting-requirement-opposed-by-2024-12-13/.

This Court's recent *Stolfi* decision took up one important health regulation: Oregon's Prescription Drug Price Transparency Act was enacted to "reduce information asymmetries in the pharmaceutical market and provide drug purchasers with leverage in negotiations with manufacturers." *Stolfi*, 153 F.4th at 827. While the district court enjoined the act, this Court reversed and upheld the act. Oregon's Department of Consumer and Business Services is now publishing annual reports and recommendations,[15] "working to deepen the state's understanding of the factors that influence prescription drug prices and how drug prices affect Oregonians." *Prescription Drug Price Transparency Program results and recommendations – 2025*, Or. Dep't of Consumer & Bus. Servs., at 8.[16]

Below we offer two further examples of public health and safety regulations threatened by xAI's view of the law, covering chemical spills and cosmetics.

### 1. Chemical spills

Federal requirements on reporting chemical spills are codified in the Emergency Planning and Community Right-to-Know Act (EPCRA). 42 U.S.C. § 11023; 40 C.F.R. § 370. The requirements apply exclusively to certain hazardous materials. *See CERCLA and EPCRA Continuous Release Reporting*, Env't Prot.

---

[15] *See Annual Reports*, Or. Dep't of Consumer & Bus. Servs., https://dfr.oregon.gov/drugtransparency/pages/annual-reports.aspx.
[16] https://dfr.oregon.gov/drugtransparency/Documents/20251204-dpt-hearing/Prescription-Drug-Price-Transparency-Annual-Report-2025.pdf.

Agency (June 8, 2026).[17] When EPCRA applies, it is clear what companies must report to EPA and the public. *See* 42 U.S.C. § 11023; 40 C.F.R. § 370. EPCRA allows affected companies to withhold certain narrow categories of trade secret information, such as specific chemical formulas, from public disclosure but requires disclosure of general information about the chemical spilled, as well as any adverse health impacts. 42 U.S.C. § 11042.

EPCRA's requirements only apply to a specific subset of chemicals, those designated as "extremely hazardous substances." Appendix B to 40 C.F.R. § 355. As EPA has made clear, states retain authority to require reporting on a broader list of chemicals and, importantly, to require companies report more information than the minimum required under EPCRA. *See Tier II Forms and Instructions*, Env't Prot. Agency (June 22, 2026).[18]

If the Court adopts xAI's view of the law, state regulators may no longer be able to require companies to report additional information beyond what is required under EPCRA. This is because companies could allege that state reporting mandates interfere with chemical trade secrets.

Censoring state governments' hazardous chemical transparency laws could have disastrous consequences, as a 2014 chemical spill highlights. In the 2014 Elk River Oil Spill, two chemicals leaked from a Freedom Industries facility into a

---

[17] https://www.epa.gov/epcra/cercla-and-epcra-continuous-release-reporting.
[18] https://www.epa.gov/epcra/tier-ii-forms-and-instructions.

West Virginia river and contaminated the drinking water of over 300,000 people. *See* Caity Coyne & Lori Kersey*, 10 years after chemical spill, concerns remain for future incidents,* W. Va. Watch (Jan. 9, 2024);[19] Ken Ward Jr., *Information on leak's 2nd chemical 'very limited'*, Charleston Gazette (Jan. 22, 2014).[20] Despite the acknowledged danger of these substances, neither had been added to EPCRA's list of "extremely hazardous substances," so reporting was not required under federal law. *See* Coyne & Kersey, *supra*. Freedom Industries did not report the chemical spill for several hours, and, once it did, was reticent to share additional information. *See* John Manuel, *Crisis and Emergency Risk Communication: Lessons from the Elk River Spill*, 122 Env't Health Persps. A214 (Aug. 1, 2014).[21] Most notably, the company did not report to state officials that a second chemical had spilled for two weeks, and, once this information became public, it initially refused to disclose the makeup of the second chemical, claiming trade secrecy. *See* Ward, *supra*; *see also* Deepa Varadarajan, *Trade Secret Fair Use*, 83 Fordham L. Rev. 1401, 1443 (2014). Freedom Industries only disclosed the chemical makeup of both substances pursuant to an order by the West Virginia Department of Environmental Protection. *See* W. Va. Dep't Env't Prot., Order Issued Under the

---

[19] https://westvirginiawatch.com/2024/01/09/10-years-after-chemical-spill-concerns-remain-for-future-incidents/.

[20] https://www.wvgazettemail.com/news/special_reports/information-on-leaks-2nd-chemical-very-limited/article_1665a278-2ecb-5e6c-98b1-54f9a117bae5.html.

[21] https://pmc.ncbi.nlm.nih.gov/articles/PMC4122537/.

Water Pollution Control Act West Virginia Code, Chapter 22, Article 11 and the Groundwater Protection Act West Virginia Code, Chapter 22, Article 12 (2014).[22] In total, 600 people visited the emergency department to treat symptoms associated with the chemical spill, some of which likely could have been averted by quicker and more complete reporting, according to an independent investigation. *See* Manuel, *supra*.

After this incident, West Virginia passed a law that strengthened monitoring and disclosure requirements for companies working with hazardous chemicals, but that law did not mention trade secrecy at all, let alone promise to keep trade secrets secret in perpetuity. W. Va. Leg., S. 373, 81st Sess. (2014).[23] Under xAI's view of the law, West Virginia's statute and similar laws in other states could nonetheless face takings challenges.

## 2. Cosmetics

California has recently taken an active role in trying to ensure cosmetics are safe, a role that could come under attack under xAI's version of takings law.

The Food and Drug Administration (FDA) regulates cosmetics, including by requiring cosmetic manufacturers to label the ingredients in their products. *See* Maranda L. Johnston, *The Right to Know: Putting Public Health and Safety Above*

---

[22] https://dep.wv.gov/pio/Documents/Freedom%20Industries%20Order.pdf.

[23] https://www.wvlegislature.gov/Bill_Text_HTML/2014_SESSIONS/RS/signed_bills/senate/SB373%20SUB2%20ENR_signed.pdf.

*Trade Secret Protections,* 74 Emory L.J. 157 (2024). However, FDA explicitly exempts fragrances and flavors from mandatory disclosure by allowing companies to claim these ingredients as "trade secrets" and withhold them from product labels. *Id.* at 175.

To fill this gap, California passed a law that mandates cosmetics makers to disclose the use of flavors or fragrances that are known or suspected allergens, carcinogens, or other safety risks. Cal. Leg., Cosmetic Fragrance and Flavor Ingredient Right to Know Act of 2020, S. 312, 2019-2020 Leg., Reg. Sess. (2020).[24] California regulators maintain an updated list of known or suspected dangerous substances regularly used in cosmetics, and manufacturers must publicly report whether their products contain any of these additives, regardless of any trade secrecy claims under federal law or the law of other states. Cal. Health & Safety Code § 111792.6(b)(1). California's cosmetics law is important because many frequently used fragrances and flavors are allergenic and can cause other health impacts, such as cancer, birth defects, and reproductive challenges. *See FAQs*, Cal. Dep't Pub. Health.[25]

If the Court were to accept xAI's view of the law, manufacturers could challenge California's labeling statute as unconstitutional, despite its clear public

---

[24] https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201920200SB312.

[25] https://cscpsubmit.cdph.ca.gov/submission/faqs (last visited July 17, 2026).

health benefits. California regulators might be unable to add any new additives to their list of dangerous flavors and fragrances, because manufacturers could argue reporting on new additives is a taking of information that was previously a trade secret. Thus, xAI's version of the law could significantly impede consumers' efforts to research the safety of cosmetics and chill states' efforts to inform consumers about potential toxins in consumer products.

## CONCLUSION

For the foregoing reasons, the Court should affirm the decision of the district court.

Date: July 22, 2026

Respectfully submitted,

*/s/ Christopher J. Morten*
Christopher J. Morten
    *Counsel of Record*
Patrick K. Lin
Kendra Neumann
Daniel S. Harawa
Washington Square Legal Services, Inc.
245 Sullivan Street, 5th Floor
New York, NY 10012
cjm531@nyu.edu
212-998-6643
*Counsel for Amici Curiae Intellectual Property Scholars*

31

## APPENDIX A

### List of Signatories
### (*Amici Curiae* Intellectual Property Scholars)

(*Amici* sign on their own behalf. Institutions are listed for identification only. Views expressed in this brief do not necessarily reflect the views, if any, of listed institutions.)

Michael A. Carrier, JD
Board of Governors Professor of Law, Rutgers Law School

Bernard Chao, JD
Professor of Law & Maxine Kurtz Research Scholar, University of Denver Sturm College of Law

Jorge L. Contreras, JD
Distinguished University Professor, University of Utah S.J. Quinney College of Law

Laura Dolbow, JD
Associate Professor of Law, University of Colorado Law School

Rochelle C. Dreyfuss, JD, MS
Pauline Newman Professor of Law Emerita, New York University School of Law

Charles Duan, JD
Assistant Professor of Law, American University Washington College of Law

Katrina G. Geddes, LLM, MPP, JSD
Assistant Professor, Ohio State University Moritz College of Law

Yaniv Heled, JSD, LLM
Professor of Law, Georgia State University College of Law

Cynthia M. Ho, JD
Clifford E. Vickrey Research Professor, Loyola University Chicago School of Law

Aaron S. Kesselheim, MD, JD, MPH
Professor of Medicine, Harvard Medical School

Shweta Kumar, JD
Assistant Professor of Law, University of Kentucky Rosenberg College of
     Law

Patrick K. Lin, JD
Clinical Teaching Fellow, New York University School of Law

Christopher J. Morten, JD, PhD
Associate Professor of Law, New York University School of Law

Timothy E. Murphy, JD, MS
Assistant Professor of Law, University of Idaho College of Law

Sharon K. Sandeen, JD, LLM
Robins Kaplan LLP Distinguished Professor in Intellectual Property Law,
     Mitchell Hamline School of Law

Joshua D. Sarnoff, JD
Raymond P. Niro Professor of Intellectual Property Law, DePaul University
     College of Law

Katherine J. Strandburg, JD, PhD
Pauline Newman Professor of Law, New York University School of Law

Dan Traficonte, JD, PhD
Associate Professor of Law and Public Policy, Northeastern University

S. Sean Tu, JD, PhD
Professor of Law, University of Alabama School of Law

Deepa Varadarajan, JD
Associate Professor, Georgia State University College of Law

Liza Vertinsky, JD, MA, PhD
Professor of Law, University of Maryland Francis King Carey School of
     Law

33

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-1591

I am the attorney or self-represented party.

**This brief contains** 6,854 **words, including** 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
- ☐ it is a joint brief submitted by separately represented parties.
- ☐ a party or parties are filing a single brief in response to multiple briefs.
- ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [ ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Christopher J. Morten **Date** July 22, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*

34

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form17instructions.pdf

**9th Cir. Case Number(s)** 26-1591

The undersigned attorney or self-represented party states the following:

◉ I am unaware of any related cases currently pending in this court.

○ I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

○ I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** s/ Christopher J. Morten   **Date** July 22, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17**   35   *New 12/01/2018*

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of July, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

*/s/ Christopher J. Morten*
Christopher J. Morten
Washington Square Legal Services, Inc.
245 Sullivan Street, 5th Floor
New York, NY 10012
cjm531@nyu.edu
212-998-6643
*Counsel for Amici Curiae Intellectual Property Scholars*
