No. 26-1591

_____

# IN THE UNITED STATES COURT OF
# APPEALS FOR THE NINTH CIRCUIT

_____

## X.AI LLC,

*Plaintiff-Appellant,*

v.

## ROB BONTA,
### in his official capacity as Attorney General of California,

*Defendant-Appellee.*

On Appeal from the United States District
Court for the Central District of California
No. 2:25-cv-12295-JGB-SSC
Hon. Jesus G. Bernal

_____

## BRIEF OF *AMICUS CURIAE* THE CENTER FOR INVESTIGATIVE
## REPORTING IN SUPPORT OF DEFENDANT-APPELLEE

_____

Claire Z. Abbadi
Andrew G. Celli, Jr.
Emery Celli Brinckerhoff
Abady Ward & Maazel LLP
One Rockefeller Plaza, 8th Floor
New York, New York 10020
(212) 763-5000
*Counsel for Amicus Curiae*

D. Victoria Baranetsky
Brooke Henderson
The Center for Investigative Reporting
222 Sutter Street, Suite 600
San Francisco, California 94108
(415) 321-1700
vbaranetsky@cir.org
*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...............................................................................ii-ix

INTEREST OF AMICUS CURIAE .....................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................2

ARGUMENT .......................................................................................................6

    I.  THE FIRST AMENDMENT PROTECTS THE PUBLIC'S RIGHT
        TO KNOW AND RECEIVE INFORMATION UNDER THE
        COMMERCIAL SPEECH DOCTRINE.....................................................6

    II.  TRANSPARENCY LAWS LIKE A.B. 2013 ARE ESSENTIAL TO
         PROTECT THE PRESS'S ABILITY TO REPORT AND THE
         PUBLIC'S RIGHT TO KNOW. .................................................................16

    III.A.B. 2013 FITS COMFORTABLY WITHIN A LONG TRADITION
         OF FACTUAL DISCLOSURE LAWS THAT COURTS HAVE
         UPHELD AGAINST NEARLY IDENTICAL OBJECTIONS...............22

         A.    A.B. 2013 is governed by *Zauderer* which courts have
               applied to disclosures similarly beneficial to the public...........23

         B.    Even under intermediate scrutiny, the public's interest in
               training-data disclosure independently sustains A.B. 2013......24

    IV. X.AI'S CHALLENGE REFLECTS A BROADER CAMPAIGN
        TO RECAST TRANSPARENCY LAWS AS "COMPELLED SPEECH"
        —A STRATEGY THAT COMES DIRECTLY AT THE EXPENSE OF
        INVESTIGATIVE JOURNALISM. ..........................................................25

CONCLUSION....................................................................................................32

CORPORATE DISCLOSURE STATEMENT .....................................................33

CERTIFICATE OF COMPLIANCE....................................................................33

i

# TABLE OF AUTHORITIES

**Cases**

*Am. Beverage Ass'n v. City & Cnty. of San Francisco*
916 F.3d 749 (9th Cir. 2019) ........................................................................23

*Am. Meat Inst. v. USDA*
760 F.3d 18 (D.C. Cir. 2014) .......................................................... 15, 23, 24

*Bd. of Educ., Island Trees Union Free Sch. Dist*
*No. 26 v. Pico*, 457 U.S. 853 (1982) ............................................................4, 6

*Branzburg v. Hayes*
408 U.S. 665 (1972) ......................................................................................17

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Commn of New York*
447 U.S. 557 (1980) .......................................................... 7, 22, 25

*Cf. IMDb.com, Inc. v. Becerra*
962 F.3d 1111 (9th Cir. 2020) .......................................................................24

*Cf. X Corp. v. Bonta*
116 F.4th 888 (9th Cir. 2024) ........................................................................14

*Cohen v. Cowles Media Co.*
501 U.S. 663 (1991) ......................................................................................16

*CTIA – The Wireless Ass'n v. City of Berkeley, Ca.*
928 F.3d 832 (9th Cir. 2019) .....................................................................8, 24

*Env't Def. Ctr., Inc. v. EPA*
344 F.3d 832 (9th Cir. 2003) ..........................................................................8

*Estes v. Texas*
381 U.S. 532 (1965) ......................................................................................16

*Garcia v. Character Technologies, Inc. et al.*
No. 6:24-cv-01903-ACC-DCI (M.D. Fla. filed Oct. 22, 2024) ....................13

*Kleindienst v. Mandel*
408 U.S. 753 (1972) ........................................................................................6

*Md. Shall Issue, Inc. v. Anne Arundel Cnty.*
    91 F.4th 238 (4th Cir. 2024) ...................................................................24

*Milavetz, Gallop & Milavetz, P.A. v. United States*
    559 U.S. 229 (2010) ..................................................................................4, 6

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*
    460 U.S. 575 (1983) ...................................................................................17

*N.Y. State Rest. Ass'n v. N.Y.C. Bd. of Health*
    556 F.3d 114 (2d Cir. 2009) ......................................................................24

*N.Y. Times Co. v. United States*
    403 U.S. 713 (1971) ...................................................................................17

*Nat'l Ass'n of Mfrs. v. SEC*
    748 F.3d 359 (D.C. Cir. 2014) ...................................................... 29, 30, 31

*Nat'l Ass'n of Wheat Growers v. Bonta*
    85 F.4th 1263 (9th Cir. 2023) ........................................................... 23, 26

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*
    272 F.3d 104 (2d Cir. 2001) ............................................................ 7, 17, 24

*Nat'l Retail Fed'n v. James*
    806 F. Supp. 3d 427 (S.D.N.Y. 2025) ............................................. 8, 18, 28

*Nat'l Ass'n of Mfrs v. SEC, reaff'd on reh'g*
    800 F.3d 518 (D.C. Cir. 2015) ..................................................................29

*Neb. Press Ass'n. v. Stuart*
    427 U.S. 539 (1976) ...................................................................................16

*Pharm. Care Mgmt. Ass'n v. Rowe*
    429 F.3d 294 (1st Cir. 2005) .....................................................................18

*Pharm. Rsch. & Mfrs of Am. v. Stolfi*
    153 F.4th 795 (9th Cir. 2025) ........................................................ 23, 25, 27

*R.J. Reynolds Tobacco Co. v. FDA*
    96 F.4th 863 (5th Cir. 2024) ............................................................. 24, 26

iii

*Richmond Newspapers, Inc. v. Virginia*
448 U.S. 555 (1980)...............................................................................6

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*
487 U.S. 781 (1988).............................................................................14

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*
425 U.S. 748 (1976)...........................................................................6, 7

*X Corp. v. Bonta*
116 F.4th 888 (9th Cir. 2024) ............................................................26

*X.AI LLC v. Bonta*
No. 2:25-cv-12295-JGB-SSC (C.D. Cal. Mar. 4, 2026) .............................22

*X.AI LLC v. Weiser*
No. 1:26-cv-01515, 2026 WL 968127, (D. Colo. Apr. 9, 2026)..................26

*Zauderer v. Off. of Disciplinary Couns.*
471 U.S. 626 (1985)..........................................................................5, 23

*Zerilli v. Smith*
656 F.2d 705 (D.C. Cir. 1981)..............................................................17

**Statutes**

17 C.F.R. §§ 243.100–243.103 ...............................................................19

42 U.S.C. §§ 11001–11050......................................................................19

Apr. 28, 2024 Assembly Privacy and Consumer Protection Analysis (AB 2013)
("Assemb. Comm. Rep.")..................................................................8

Cal. Civ. Code §§ 1798.100–1798.199.100...............................................19

California Civil Code ("Cal. Civ. Code") § 3111(a)(1)–(12)......................... 13, 24

Food and Drug Administration Safety and Innovation Act (FDASIA)
Pub. L. No. 112-144, 126 Stat. 993 (2012) ......................................19

June 25, 2025 S. Judiciary Comm. Analysis (AB 2013)
("S. Comm. Rep.")............................................................................9

Nutrition Labeling and Education Act of 1990,
    Pub. L. No. 101-535, 104 Stat. 2353 ............................................................19

**Other Authorities**

A.G. Sulzberger, *A.I., Journalism and the Uncertain Future of the Public
    Square*, The New York Times Company (June 1, 2026),
    https://www.nytco.com/press/a-i-journalism-and-the-uncertain-future-of-the-
    public-square/ ........................................................................................12

*Adam Smith's First Amendment*
    128 HARV. L. REV. F. 165 (2015) ..............................................................7

Al Shaw & Lylla Younes, *The Most Detailed Map of Cancer-Causing
    Industrial Air Pollution in the U.S.*, ProPublica (Aug. 28, 2023),
    https://projects.propublica.org/toxmap/ ......................................................20

Alex Reisner, *These 183,000 Books Are Fueling the Biggest Fight in
    Publishing and Tech*, The Atlantic (Sept. 25, 2023),
    https://www.theatlantic.com/technology/archive/2023/09/books3-database-
    generative-ai-training-copyright-infringement/675363/ ..............................12

Apple Inc., Specialized Disclosure Report (Form SD) (May 28, 2026),
    https://www.sec.gov/Archives/edgar/data/320193/0001140361260
    23149/ef20073373_sd.htm ........................................................................31

Bahrad A. Sokhansanj & Mackenzie Arnold, *First Amendment Questions
    for AI Transparency Laws*, Lawfare (June 22, 2026),
    https://www.lawfaremedia.org/article/first-amendment-questions-for-ai-
    transparency-law..........................................................................................26

Beth Stackpole, *Bringing Transparency to the Data Used to Train Artificial
    Intelligence*, MIT Sloan (Mar. 3, 2025), https://mitsloan.mit.edu/
    ideas-made-to-matter/bringing-transparency-to-data-used-to-train-
    artificial-intelligence....................................................................................9

*Blake Brittain, Google, AI firm settle lawsuit over teen's suicide linked to
    Chatbot*, Reuters (Jan. 7, 2026) ................................................................13

Brit McCandless Farmer, *AI chatbots raise safety concerns for children, experts
    warn*, CBS News (Dec. 7, 2025), https://www.cbsnews.com/news/ai-
    chatbots-raise-safety-concerns-for-children-experts-warn-60-minutes ........21

Caroline Chen & Riley Wong, *Black Patients Miss Out On Promising Cancer Drugs*, ProPublica (Sept. 19, 2018), https://www.propublica.org/article/black-patients-miss-out-on-promising-cancer-drugs ................................................................................20

Caroline O'Donovan, *Here's How Apple Is Doing on Conflict Minerals*, BuzzFeed News (Mar. 27, 2017), https://www.buzzfeednews.com/article/carolineodonovan/apple-reports-conflict-mineral-progress-as-president-trump ................................................30

*Consumer Reports Investigation Uncovers Kroger's Widespread Data Collection of Loyalty Program Members to Create Secret Shopper Profiles*, Consumer Reports (May 21, 2025), https://www.consumerreports.org/media-room/press-releases/2025/05/consumer-reports-investigation-uncovers-krogers-widespread-data-collection-of-loyalty-program-members-to-create-secret-shopper-profiles. ................................................21

*Digging for Transparency: How U.S. Companies Are Only Scratching the Surface of Conflict Minerals Reporting,* Glob. Witness & Amnesty Int'l (Apr. 22, 2015), https://globalwitness.org/en/campaigns/conflict-resources/digging-transparency/ ......................................................30

Douglas MacMillan, David Ovalle & Aaron Schaffer, *Arrested by AI: Police Ignore Standards After Facial Recognition Matches*, Wash. Post (Jan. 13, 2025), https://www.washingtonpost.com/business/interactive/2025/police-artificial-intelligence-facial-recognition/ ......................................................11

Emily Chasan, *U.S. Firms Struggle to Trace 'Conflict Minerals'*, Wall St. J. (Aug. 3, 2015), https://www.wsj.com/articles/u-s-firms-struggle-to-trace-conflict-minerals-1438636575 ..........................................................30

European Broadcasting Union and BBC, *News Integrity in AI Assistants: An international PSM study* (Oct 2025), https://www.ebu.ch/files/live/sites/ebu/files/Publications/Intelligence/open/EBU-IntelligenceBBC_News_Integrity_in_AI_Assistants_Report_2025.pdf ......21

Garance Burke & Hilke Schellmann, *Researchers Say an AI-Powered Transcription Tool Used in Hospitals Invents Things No One Ever Said*, Associated Press (Oct. 26, 2024, 2:22 PM),

vi

https://apnews.com/article/ai-artificial-intelligence-health-business-90020cdf5fa16c79ca2e5b6c4c9bbb14 ...........................................................10

Helen Norton, *Powerful Speakers and Their Listeners*,
90 U. COLO. L. REV. 441 (2019) ...................................................................18

Jaimi Dowdell et al., *As AI Enters the Operating Room, Reports Arise of Botched Surgeries and Misidentified Body Parts*, Reuters (Feb. 9, 2026, 6:30 AM), https://strategichealthcare.net/wp-content/uploads/2026/02/As-AI-enters-the-operating-room.pdf ...........................................................10

Jason Proctor, *Air Canada Found Liable for Chatbot's Bad Advice on Plane Tickets*, CBC News (Feb. 15, 2024, 3:38 PM), https://www.cbc.ca/news/canada/british-columbia/air-canada-chatbot-lawsuit-1.7116416 ...........................................................10

Jeffrey Dastin, *Insight - Amazon Scraps Secret AI Recruiting Tool That Showed Bias Against Women*, Reuters (Oct. 10, 2018, 8:50 PM), https://www.reuters.com/article/world/insight-amazon-scraps-secret-ai-recruiting-tool-that-showed-bias-against-women-idUSKCN1MK0AG/ ......11

Jennifer King & Caroline Meinhardt, *Rethinking Privacy in the AI Era: Policy Provocations for a Data-Centric World*, Stanford Univ. Inst. For Human-Centered Artificial Intelligence (Feb. 2024), https://hai.stanford.edu/policy/white-paper-rethinking-privacy-ai-era-policy-provocations-data-centric-world. .......................................................13

Joseph Menn, Jim Finkle, & Dustin Volz, *Yahoo security problems a story of too little, too late*, Reuters (Dec. 18, 2016), https://www.reuters.com/article/technology/yahoo-security-problems-a-story-of-too-little-too-late-idUSKBN1480AM/ .........................20

Julie Ray, *Americans Express Real Concerns About Artificial Intelligence*, Gallup, (Aug. 26, 2024), https://perma.cc/E49N-ZAAA ................................3

Kate Azevedo, *Corporate Cyber Incident Reporting Is Missing the Mark*, Bloomberg News (Jun. 17, 2024) https://news.bloomberglaw.com/bloomberg-law-analysis/corporate-cyber-incident-reporting-is-missing-the-mark ............................................19

Kelly McCarthy, *How Delta Is Using AI for Ticket Pricing and What It Means for Air Travel*, ABC News (Aug. 4, 2025),

vii

https://abcnews.com/GMA/Travel/delta-ai-ticket-pricing-means-air-travel/story?id=124343088 ...............................................................29

Kelvin Chan & Matt O'Brien, *Getty Images and Stability AI Face Off in British Copyright Trial That Will Test AI Industry*, Associated Press (June 9, 2025), https://apnews.com/article/getty-images-stability-ai-copyright-trial-stable-diffusion-580ba200a3296c87207983f04cda4680 ......12

Kevin Schaul, Szu Yu Chen & Nitasha Tiku, *Inside the Secret List of Websites That Make AI Like ChatGPT Sound Smart*, Wash. Post (Apr. 19, 2023), https://www.washingtonpost.com/technology/interactive/2023/ai-chatbot-learning/ ...............................................................12

Latest U.S. Map of Copyright Suits v. AI companies. Total = 87, ChatGPT Is Eating the World Blog (Mar. 5, 2026), https://chatgptiseatingtheworld.com/2026/03/05/latest-u-s-map-of-copyright-suits-v-ai-companies-total-87-mar-5-2026/ ...........................................11

Mark Follman, *The Chilling Role of ChatGPT in Mass Shootings and Other Violence*, Mother Jones (Apr. 10, 2026), https://www.motherjones.com/media/2026/04/chatgpt-tumbler-ridge-fsu-openai-chatbots-mass-shootings/ ........................................... 13, 21

MIT Mmgt., *When AI Gets It Wrong: Addressing AI Hallucinations and Bias* (last visited July 22, 2026), https://mitsloanedtech.mit.edu/ai/basics/addressing-ai-hallucinations-and-bias/ ...............................................................21

Nat'l Conf. of State Legislatures, *Artificial Intelligence 2025 Legislation* (July 10, 2025) https://www.ncsl.org/technology-and-communication/artificial-intelligence-2025-legislation ................................14

Quinnipiac Univ., *The Age of Artificial Intelligence: Americans' AI Use Increases While Views on It Sour, Quinnipiac University Poll on AI Finds; 7 In 10 Think AI Will Cut Jobs With Gen Z The Most Pessimistic* (Mar. 30, 2026) https://perma.cc/C524-VQJ6 ..............................3

Rachel Dolan, *Understanding the Medicaid Prescription Drug Rebate Program*, KFF, (Nov. 2019), https://www.kff.org/wp-content/uploads/2019/11/Understanding-the-Medicaid-Prescription-Drug-Rebate-Program-updated-3.2021.pdf .....................................28

viii

Seamus Webster, *Elizabeth Warren Just Accused Kroger of Price Gouging as 'Families Struggle to Pay to Put Food on the Table'*, Fortune (Aug. 13, 2024), https://fortune.com/2024/08/13/elizabeth-warren-supermarket-kroger-price-gouging-dynamic-pricing-digital-labels/ .................................29

Shayne Longpre et al., *A Large-Scale Audit of Dataset Licensing and Attribution in AI*, Nature Machine Intelligence, 6, 975-987, (Aug. 30, 2024), https://perma.cc/H2HV-LL2X .................................3

*The California Report on Frontier AI Policy*, (June 17, 2025), https://perma.cc/4DGD-9GMN .........................................................2

*Transparency in AI Is on the Decline*, Stanford Report (Dec. 9, 2025), https://news.stanford.edu/stories/2025/12/foundation-model-transparency-index-ai-companies-information ...................... 2, 3, 18

U.S. Dep't of Just., Off. of the Inspector Gen., *Audit of the DEA's and FBI's Efforts to Integrate Artificial Intelligence and Other Emerging Technology Within the U.S. Intelligence Community*, 11 (Dec. 2024), https://oig.justice.gov/sites/default/files/reports/25-014.pdf .........................21

*Uber Accused of Charging People More If Their Phone Battery Is Low*, Vice (Apr. 11, 2023), https://www.vice.com/en/article/uber-surge-pricing-phone-battery/. .................................................................................29

*Updated Statement on the Effect of the Court of Appeals Decision on the Conflict Minerals Rule*, SEC Div. of Corp. Fin. (Apr. 7, 2017), https://www.sec.gov/newsroom/speeches-statements/corpfin-updated-statement-court-decision-conflict-minerals-rule ............................31

xAI, *Pricing*, https://x.ai/pricing (last visited July 22, 2026) .................................24

Yogita Patel, *Kraft Heinz, Phillips 66 Targeted by Fake Securities Filings*, Wall St. J. (Sept. 24, 2015) https://www.wsj.com/articles/kraft-heinz-phillips-66-targeted-by-fake-securities-filings-1443133132.........................20

Ziad Obermeyer et al., *Dissecting Racial Bias in an Algorithm Used to Manage the Health of Populations*, 366 Science 447 (Oct. 25, 2019)..............................11

## INTEREST OF AMICUS CURIAE[1]

The Center for Investigative Reporting ("CIR") respectfully submits this brief as Amicus Curiae in support of Appellee. Founded in 1976, the Center for Investigative Reporting, Inc. is the nation's oldest nonprofit investigative newsroom in the country. CIR runs the brands Mother Jones, Reveal, and CIR Studios and is known for its ground-breaking journalism.

CIR's sole purpose is to benefit the public by reporting investigative stories for public consumption. For decades CIR has published valuable, one-of-kind, award-winning reporting. CIR has won numerous awards, including News Emmy awards, George Foster Peabody Awards, the Hillman Prize, Alfred I. duPont-Columbia University awards, George Polk Awards, Edward R. Murrow Awards and has been a finalist for the Pulitzer Prize in 2012, 2013, 2018, 2019, 2020 and 2025 as well as an Academy Award nominee in 2018.

CIR has a substantial interest in ensuring that reporters can access the information they need in order to produce groundbreaking journalism, and that the public can access the free flow of information necessary to make informed

---

[1] In accordance with Federal Rule of Appellate Procedure ("FRAP") 29(a)(4)(E), amicus certifies (1) this brief was authored entirely by counsel for amicus curiae and not counsel for any party, in whole or in part; (2) no party or counsel for any party contributed money to preparing or submitting this brief; and (3) apart from amicus curiae, their members, and their counsel, no other person contributed money to the preparation or submission of this brief. All parties have consented to the filing of this brief.

decisions, as consumers, voters, and citizens. Protecting journalism and access to information are not incidental to democracy—they are essential to it.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The district court correctly denied x.AI's motion for a preliminary injunction against California Assembly Bill 2013 ("A.B. 2013" or "the Act") on First Amendment grounds. A.B. 2013 requires AI developers to publish a brief, "high-level" factual summary of the datasets used to train their products—information the public urgently needs and cannot get anywhere else, given how opaque AI systems remain.[2] What went into an AI models' training data is not an insignificant detail—it is the single largest determinant of how that model will behave. The sources a model was trained on shape whether the tool hallucinates, whether it incorporates bias, copyrighted or private information without consent, and how reliable its outputs are.

---

[2] *Transparency in AI Is on the Decline*, Stanford Report (Dec. 9, 2025), https://news.stanford.edu/stories/2025/12/foundation-model-transparency-index-ai-companies-information (finding industry average in transparency for AI companies dropped to 40/100 in 2025, down from 58/100 in 2024. The report also states x.AI specifically scored 14/100—one of the lowest scores in the Index's history —and the report states x.AI shares "no information about the data used to build their models"); Joint Cal. Pol'y Working Grp. on AI Frontier Models, *The California Report on Frontier AI Policy*, 4, 24 (June 17, 2025), https://perma.cc/4DGD-9GMN (finding that "the most influential foundation model developers are extremely opaque on critical topics" and describing "systemic opacity in key areas").

Despite the increasing, widespread reliance on AI, most Americans do not trust the AI systems they use, often citing hallucination, bias, safety, privacy and copyright concerns. *See* Julie Ray, *Americans Express Real Concerns About Artificial Intelligence*, Gallup, (Aug. 26, 2024, https://perma.cc/E49N-ZAAA) (2024 survey finding that 85% of Americans are concerned about AI); Quinnipiac Univ., *The Age of Artificial Intelligence: Americans' AI Use Increases While Views on It Sour, Quinnipiac University Poll on AI Finds; 7 In 10 Think AI Will Cut Jobs With Gen Z The Most Pessimistic* (Mar. 30, 2026) https://perma.cc/C524-VQJ6 (76% of respondents reporting that they can't trust AI "hardly ever" (27%) or "only some of the time" (49%)). This is especially true as independent audits find that AI companies are growing less transparent.[3] A.B. 2013 responds to that knowledge gap with a modest remedy: a single public disclosure of high-level, factual information about training data. It asks nothing more of AI developers than food manufacturers, drug companies, and dozens of other regulated industries that have long been required to provide useful consumer information.

---

[3] Stanford Report, *supra* note 2; *see also* Shayne Longpre et al., *A Large-Scale Audit of Dataset Licensing and Attribution in AI*, Nature Machine Intelligence, 6, 975–987, (Aug. 30, 2024), https://perma.cc/H2HV-LL2X (audit of more than 1,800 AI training datasets finding their source and license terms to be largely untraceable).

CIR submits this brief to address two interests this appeal implicates beyond the parties' own: the public's constitutional interest in receiving the information that A.B. 2013 requires, and the press's derivative interest in gathering and reporting on that information on the public's behalf. Both interests support affirmance.

*First*, this brief explains that the Supreme Court has long recognized a right to receive information as a "corollary" of the right to speak it, *see Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982), and that principle carries particular force in the commercial speech context, where courts have consistently upheld factual disclosure mandates precisely because of "the information's value to consumers." *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 249–50 (2010). X.AI's characterization of the public's interest in AI training data as mere "curiosity" mirrors an argument industry has made—and lost—before, in materially similar circumstances. *See infra* Section I.

*Second*, the press's ability to perform its function—to inform the public— depends on access to the kind of information A.B. 2013 makes public. Without it, journalists are left to relitigate factual disputes with AI companies one denial at a time—a dynamic that has already played out, to the public's detriment, in reporting

on algorithmic pricing, drug pricing, and other opaque corporate practices. This dynamic infringes on the press' right to access information. *See infra* Section II.

*Third*, the public's interest in A.B. 2013's disclosure data is pivotal and leans in favor of upholding the law, regardless of whether this court rules under the *Zauderer v. Off. of Disciplinary Couns.*, 471 U.S. 626 (1985) standard, and even under intermediate scrutiny. The same public and press interests in resolving the information asymmetry leans in favor of upholding A.B. 2013. *See infra* Section III.

*Fourth*, this case is not an isolated dispute over one statute. It is the latest instance of a broader litigation strategy in which industry actors recast factual disclosure requirements as compelled speech to avoid sharing information the public and press need. This brief details three examples—where a compelled-speech challenge to a disclosure law measurably degraded the public record available to journalists, thereby hurting the public. *See infra* Section IV.

For these reasons, and those set forth below, Amicus respectfully urges the Court to affirm the district court's denial of x.AI's motion for a preliminary injunction.

5

## ARGUMENT

### I. THE FIRST AMENDMENT PROTECTS THE PUBLIC'S RIGHT TO KNOW AND RECEIVE INFORMATION UNDER THE COMMERCIAL SPEECH DOCTRINE

The First Amendment protects the interests of the listener, not just speakers. The Supreme Court has long recognized that the First Amendment secures not only the right to speak but also the right to receive information. *See Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26*, 457 U.S. at 867 (stating the right to receive information is a direct corollary to the right to speak); *see also Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976) ("where a speaker exists," First Amendment protection extends "to the communication, to its source and to its recipients both"); *Kleindienst v. Mandel*, 408 U.S. 753, 762–63 (1972) (recognizing First Amendment interests of U.S. citizens who sought to "hear" and "meet" with a foreign scholar); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 576 (1980) ("Free speech carries with it some freedom to listen.").

Courts have been uniquely protective of listener's rights in the commercial speech context because the constitutional protection is justified in large part by the value of the information to the public. *See Milavetz*, 559 U.S. at 249–50 ("First Amendment protection for commercial speech is justified in large part by the information's value to consumers . . . ."). By ensuring that consumers can make

6

intelligent and informed decisions, their rights are considered critical. *See Va. State Bd. of Pharmacy*, 425 U.S. at 764 (First Amendment protects "consumer's interest in the free flow of commercial information."); *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 561–62 (1980) ("Commercial expression not only serves the economic interest of the speaker, but also assists consumers and furthers the societal interest in the fullest possible dissemination of information."); Robert Post & Amanda Shanor, Commentary, *Adam Smith's First Amendment*, 128 HARV. L. REV. F. 165, 170 (2015) (the "value of commercial speech lies in the rights of *listeners* to receive information" so they can make "informed decisions.").

This vital role of the listener's right to know often offsets the speaker's right to remain silent in the commercial speech context. *See Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 114–15 (2d Cir. 2001) ("mandated disclosure of accurate, factual, commercial information does not offend the core First Amendment values of promoting efficient exchange of information or protecting individual liberty interests"). Courts routinely find laws like A.B. 2013 do not infringe on a speaker's autonomy; rather, they facilitate the "free flow of commercial information" essential to a functioning marketplace. *Va. State Bd. of Pharmacy*, 425 U.S. at 764.

Various similar laws have therefore survived compelled speech challenges, based on the benefits to the consumer. *See Nat'l Retail Fed'n v. James*, 806 F.

7

Supp. 3d 427, 443 (S.D.N.Y. 2025) (surviving a compelled speech argument for disclosures about the use of algorithms in setting prices); *CTIA – The Wireless Ass'n v. City of Berkeley, Ca.*, 928 F.3d 832, 836, 841–42 (9th Cir. 2019) (regulations requiring retailers to provide warnings about federal radio-frequency radiation exposure guidelines for cell phone users); *Env't Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 849–851 (9th Cir. 2003) (rejecting a compelled speech challenge to an EPA regulation that required municipal storm sewer providers to educate the public about the dangers of improper waste disposal).

Here, A.B. 2013's clear legislative purpose was to aid consumers' economic understanding of the AI products, underpinning the commercial use. As conceded in x.AI's complaint, the law was passed by the legislature to provide "transparency to consumers of AI systems and services." Complaint ("Compl.") ¶ 27, *X.AI LLC v. Bonta*, No. 2:25-cv-12295-JGB-SSC, ECF No. 1. Indeed, as the bill's authors explained "many consumers have valid questions about how these AI systems and services are created," and "we need to start with the foundations, and for AI that is the selection of training data." Apr. 28, 2024 Assembly Privacy and Consumer Protection Analysis (A.B. 2013) at 8. The Legislature reasoned that "requiring transparency about the training data used for AI systems helps identify and mitigate biases, addressing hallucinations and other problematic outputs, and

8

shines the light on various other issues, such as privacy and copyright concerns." June 25, 2025 S. Judiciary Comm. Analysis (A.B. 2013) at 5.

The district correctly court acknowledged this public interest in transparency, as a key factor in denying x.AI's motion for preliminary injunction, stating that "A.B. 2013 requires AI model developers to provide information about training datasets, thereby giving the public information necessary to determine whether they will use—or rely on information produced by—Plaintiff's model relative to the other options on the market." Order Denying Plaintiff's Motion for Preliminary Injunction ("Order") at 9, *X.AI LLC v. Bonta*, No. 2:25-cv-12295-JGB-SSC, ECF No. 35. Still, x.AI claims that this information is not useful, and consumers can identify efficiency from the outputs alone. Brief for Appellant ("Appellant's Br.") at 45, *X.AI LLC v. Bonta*, No. 26-1591, ECF 15.1.

But the public concerns—regarding hallucinations, bias, copyright and privacy—that the Legislature identified in enacting A.B. 2013 are not abstract or theoretical. They have already played out in real life with dangerous, real consequences, underscoring the consumer interest in this data which is vital to understanding these problems.[4]

---

[4] *See* Beth Stackpole, *Bringing Transparency to the Data Used to Train Artificial Intelligence*, MIT Sloan (Mar. 3, 2025), https://mitsloan.mit.edu/ideas-made-to-matter/bringing-transparency-to-data-used-to-train-artificial-intelligence (explaining that AI training datasets are often "poorly understood" leading consumer problems.)

- **Hallucinations** based on poor data sets degrade the reliability of outputs people depend on for consequential consumer decision-making. For instance, an AI transcription tool used by more than 30,000 clinicians across 40 health systems was found to fabricate statements, including medical treatments that never occurred.[5] A 2025 study of FDA approved AI medical devices found that nearly half of all recalls occurred within the devices' first year on the market—roughly double the rate of other approved devices.[6] Even routine consumer interactions are not immune: Air Canada's customer-service chatbot gave a passenger false information about how to apply for a bereavement discount.[7]

- **Biased data** also produces its own concrete harms, which revealing datasets can help untangle. For instance, Amazon's AI recruiting tool,

---

[5] Garance Burke & Hilke Schellmann, *Researchers Say an AI-Powered Transcription Tool Used in Hospitals Invents Things No One Ever Said*, Associated Press (Oct. 26, 2024, 2:22 PM), https://apnews.com/article/ai-artificial-intelligence-health-business-90020cdf5fa16c79ca2e5b6c4c9bbb14.

[6] Jaimi Dowdell et al., *As AI Enters the Operating Room, Reports Arise of Botched Surgeries and Misidentified Body Parts*, Reuters (Feb. 9, 2026, 6:30 AM), https://strategichealthcare.net/wp-content/uploads/2026/02/As-AI-enters-the-operating-room.pdf.

[7] Jason Proctor, *Air Canada Found Liable for Chatbot's Bad Advice on Plane Tickets*, CBC News (Feb. 15, 2024, 3:38 PM), https://www.cbc.ca/news/canada/british-columbia/air-canada-chatbot-lawsuit-1.7116416.

trained on a decade of the company's hiring data, revealed why the tool penalized resumes containing the word "women's" thereby downgrading all-women's colleges.[8] Similarly, a widely used health-care algorithm was found to systematically underestimate how sick Black patients were because the model incorporated past health care spending data.[9] In Missouri, a man spent more than a year in jail after facial-recognition software wrongly generated his name as a match for a crime he did not commit.[10]

- **Copyright** concerns regarding the unlicensed used of third-party data has led to nearly 90 major active copyright lawsuits against AI developers.[11] As Arthur Sulzberger, publisher of the New York

---

[8] Jeffrey Dastin, *Insight - Amazon Scraps Secret AI Recruiting Tool That Showed Bias Against Women*, Reuters (Oct. 10, 2018, 8:50 PM), https://www.reuters.com/article/world/insight-amazon-scraps-secret-ai-recruiting-tool-that-showed-bias-against-women-idUSKCN1MK0AG/.

[9] Ziad Obermeyer et al., *Dissecting Racial Bias in an Algorithm Used to Manage the Health of Populations*, 366 Science 447 (Oct. 25, 2019).

[10] Douglas MacMillan, David Ovalle & Aaron Schaffer, *Arrested by AI: Police Ignore Standards After Facial Recognition Matches*, Wash. Post (Jan. 13, 2025), https://www.washingtonpost.com/business/interactive/2025/police-artificial-intelligence-facial-recognition/.

[11] Latest U.S. Map of Copyright Suits v. AI companies. Total = 87, ChatGPT Is Eating the World Blog (Mar. 5, 2026), https://chatgptiseatingtheworld.com/2026/03/05/latest-u-s-map-of-copyright-suits-v-ai-companies-total-87-mar-5-2026/; Kelvin Chan & Matt O'Brien, *Getty Images and Stability AI Face Off in British Copyright Trial That Will Test AI Industry*, Associated Press (June 9, 2025), https://apnews.com/article/getty-images-stability-ai-copyright-trial-stable-diffusion-580ba200a3296c87207983f04cda4680.

Times, stated in a recent speech, "A.I. companies take 'data' without consent or compensation" and their justifications for doing so "keep shifting."[12] Given that half of the top ten sites used to train AI models belong to news publishers,[13] CIR is one of the more than dozen newsrooms, including the New York Times, Daily News and Ziff Davis—that have challenged the unlicensed use of their journalism in AI training.

- **Privacy** and **safety** concerns are yet two more deeply vital worries of the public. Because developers are not required to document what went into their models, individuals whose personal data was swept into AI's training sets have no reliable way to know if their

---

[12]A.G. Sulzberger, *A.I., Journalism and the Uncertain Future of the Public Square,* The New York Times Company (June 1, 2026), https://www.nytco.com/press/a-i-journalism-and-the-uncertain-future-of-the-public-square/; *see also* Alex Reisner, *These 183,000 Books Are Fueling the Biggest Fight in Publishing and Tech*, The Atlantic (Sept. 25, 2023), https://www.theatlantic.com/technology/archive/2023/09/books3-database-generative-ai-training-copyright-infringement/675363/ (dataset of more than 183,000 books was used to train generative AI models without authors' permission).

[13]*See* Kevin Schaul, Szu Yu Chen & Nitasha Tiku, *Inside the Secret List of Websites That Make AI Like ChatGPT Sound Smart*, Wash. Post (Apr. 19, 2023), https://www.washingtonpost.com/technology/interactive/2023/ai-chatbot-learning/.

information is being used.[14] Last, but most concerning are the serious safety concerns about AI that have led to some fatal conclusions.[15]

A.B. 2013 responds directly to these countless documented public concerns, and it does so modestly: only requiring "high-level," factual summaries about datasets' sources, purpose, use, modifications, collection periods, and other objective information. California Civil Code ("Cal. Civ. Code") § 3111(a)(1)–(12). These categories allow the public to understand things like: (1) where the data originated, (2) how it connects to the use, (3) what are potential biases, (4) whether intellectual property infringement is possible, (5) whether privacy concerns may exist, and (6) whether preprocessing might influence reliability. The statute's demand of these facts discloses important consumer information but does not require a developer to disclose the underlying dataset, nor does it require it to express any view about that data. *Cf. X Corp. v. Bonta*, 116 F.4th 888, 899–901

---

[14] Jennifer King & Caroline Meinhardt, *Rethinking Privacy in the AI Era: Policy Provocations for a Data-Centric World*, Stanford Univ. Inst. For Human-Centered Artificial Intelligence (Feb. 2024), https://hai.stanford.edu/policy/white-paper-rethinking-privacy-ai-era-policy-provocations-data-centric-world.

[15] Complaint, *Garcia v. Character Technologies, Inc. et al.*, No. 6:24-cv-01903-ACC-DCI (M.D. Fla. filed Oct. 22, 2024), ECF No. 1; *see also* Blake Brittain, *Google, AI firm settle lawsuit over teen's suicide linked to Chatbot*, Reuters (Jan. 7, 2026), https://www.reuters.com/world/google-ai-firm-settle-florida-mothers-lawsuit-over-sons-suicide-2026-01-07/ (describing how a 14-year-old died by suicide after months conversing with a chatbot); Mark Follman, *The Chilling Role of ChatGPT in Mass Shootings and Other Violence*, Mother Jones (Apr. 10, 2026), https://www.motherjones.com/media/2026/04/chatgpt-tumbler-ridge-fsu-openai-chatbots-mass-shootings/.

(9th Cir. 2024) (distinguishing factual disclosures from "language prescribed by the State"). California's statute is also no outlier: all 50 states introduced AI-related legislation in 2025, and thirty-eight states adopted roughly 100 measures.[16]

x.AI seeks to minimize this nationwide consumer interest as a mere "curious[ity]" about corporate information. It claims that consumers' desire to know about AI datasets is no different than "informing donors how the money they contribute is spent." Appellant's Br. at 439–44 (quoting *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 798 (1988)). However, informing donors how *donated* money is spent is much different, under the First Amendment, than informing consumers about critical products they will use, consume, and rely on for the most intimate and vital questions in their lives. AI products can influence life or death consumer decisions, which is why the district court was correct to note that A.B. 2013 provides consumers with information relevant to actual commercial transactions—including, whether they would choose to use one generative AI model over another option in the market. Order at 9.

In fact, another industry has relied on this "curiosity" argument before, in a closely analogous context, and rightly lost. In *Am. Meat Inst. v. USDA*, the meat industry challenged a country-of-origin labeling requirement by arguing that the

---

[16] Nat'l Conf. of State Legislatures, *Artificial Intelligence 2025 Legislation* (July 10, 2025) https://www.ncsl.org/technology-and-communication/artificial-intelligence-2025-legislation.

government's asserted interest amounted to nothing more than satisfying consumers' "idle curiosity." 760 F.3d 18, 23 (D.C. Cir. 2014) (en banc). The en banc D.C. Circuit rejected that framing, holding that consumers' interest in knowing the origin of what they buy is a substantial one, sufficient to sustain a factual disclosure mandate under *Zauderer*—even though the disclosure served no anti-deception purpose. *Am. Meat Inst.*, 760 F.3d at 23–27. The same reasoning applies with at least equal force here: knowing what data trained the AI system a consumer is using, is no more "idle" than knowing where one's meat came from— given AI's opacity deficit and impact on consumers documented above, it is at least equally more consequential.

The district court was therefore correct to reject x.AI's "consumer curiosity" framing and to recognize instead that the disclosure of training data aids the public's "useful evaluation[s]" of AI models, evaluations which the First Amendment protects. Order at 10. Accepting x.AI's framing would gut the listener doctrine across the commercial speech landscape. While a speaker's rights are not lost "merely because compensation is received," Appellant's Br. at 40 (citations omitted), by the same logic, a consumer's First Amendment interest in understanding a product is not lost merely because the seller would rather not explain it.

15

## II. TRANSPARENCY LAWS LIKE A.B. 2013 ARE ESSENTIAL TO PROTECT THE PRESS'S ABILITY TO REPORT AND THE PUBLIC'S RIGHT TO KNOW.

The public's right to receive information is, in large part, exercised through the press, which serves as a "a mighty catalyst" in informing the citizenry. *Estes v. Texas*, 381 U.S. 532, 539 (1965). Journalists perform the specialized function of gathering, analyzing, verifying and disseminating information the public could not otherwise obtain for itself. *See, e.g.*, *Cohen v. Cowles Media Co.*, 501 U.S. 663, 669 (1991) (describing the press's efforts to "gather and report the news"); *Neb. Press Ass'n. v. Stuart*, 427 U.S. 539, 561 (1976) (noting the press's "traditional function of bringing news to the public promptly"). As press scholar David Anderson has explained, the press "adds value" for the public in part by "making the information more easily digestible, or by adding…comparative perspective."[17] Where time, knowledge and other limitations may keep the general public from "participating directly," the press is the institution that does the "hard work of finding out what is happening in the democracy, and then pass[ing] along the information to those who could not or would not glean it for themselves."[18]

---

[17] David A. Anderson, *The Press and Democratic Dialogue*, 127 HARV. L. REV. F. 331, 331 (2014).

[18] RonNell Andersen Jones, *What the Supreme Court Thinks of the Press and Why It Matters*, Ala. L. Rev. 253, 257 (2014).

16

That vital democratic function depends on access to information. Without mandated transparency, the press is often unable to analyze and report on complex systems, like AI, in ways that are digestible for the average citizen. Recognizing this vital role of the press, courts have held that effective journalism requires the press to have meaningful access to information. *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575 (1983) ("An untrammeled press is a vital source of public information, and an informed public is the essence of working democracy") (cleaned up); *Zerilli v. Smith*, 656 F.2d 705, 710–11 (D.C. Cir. 1981) ("unfettered press" is a "vital source of information" and is weakened whenever "the ability of journalists to gather news is impaired") (citing *N.Y. Times Co. v. United States*, 403 U.S. 713, 717 (1971) (Black, J., concurring)); *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972) ("without some protection for seeking out the news, freedom of the press could be eviscerated").

Protection for the transparency laws—and its benefit to the public and press' right—is often at its zenith in precisely these conditions—where powerful speakers control more information about intricate subjects that their audiences cannot obtain elsewhere because of informational asymmetries. *See Sorrell*, 272 F.3d at 114–15 (upholding Vermont's mercury-lamp labeling law which was designed to inform consumers of a public health hazard they could not otherwise detect, and holding that "mandated disclosure of accurate, factual, commercial information does not

17

offend the core First Amendment values of promoting efficient exchange of information or protecting individual liberty interests"); *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 310 (1st Cir. 2005) (upholding Maine's Unfair Prescription Drug Practices Act, which forced pharmacy benefit managers to disclose information like, financial arrangements, drug substitutions, and rebates because the public had no way to access it); *see also* Helen Norton, *Powerful Speakers and Their Listeners*, 90 U. COLO. L. REV. 441, 441–42 (2019) (stating the law "understands the First Amendment to permit the government to regulate the speech of comparatively knowledgeable or powerful speakers when that expression frustrates their listeners' autonomy, enlightenment, and self-governance interests— values at the heart of the Free Speech Clause.")

An informational asymmetry between AI developers and the public about AI training data—could hardly be starker.[19] At least one court has already found informational asymmetries involving algorithmic information leans in favor of upholding compelled speech laws. *See, e.g.*, *Nat'l Retail Fed'n v. James*, 806 F. Supp. 3d 427, 439 (S.D.N.Y. 2025) (citing non-disclosure of material information as a justification for disclosure).

---

[19] Stanford Report, *supra* note 2 (2025 report assessing transparency among AI companies and concluding that "[t]he entire industry is systemically opaque about four critical topics: training data, training compute, how models are used, and the resulting impact on society").

A.B. 2013 is akin to many other laws and regulations that have helped reporters publish on complex, opaque topics, like toxic chemicals, food labeling, and financial filings to balance the distribution of information between corporations and the public. *See, e.g.*, 17 C.F.R. §§ 243.100–243.103 (Regulation Fair Disclosure) (requiring public companies to disclose material information to all investors, not selectively to analysts); Cal. Civ. Code §§ 1798.100–1798.199.100 (California Consumer Privacy Act) (requiring disclosure of personal data collected, sold, or shared); 42 U.S.C. §§ 11001–11050 (Emergency Planning and Community Right-to-Know Act) (requiring public reporting of toxic chemical releases); Nutrition Labeling and Education Act of 1990, Pub. L. No. 101-535, 104 Stat. 2353 (codified as amended in scattered sections of 21 U.S.C.A) (requiring standardized food labeling); Food and Drug Administration Safety and Innovation Act (FDASIA), Pub. L. No. 112-144, 126 Stat. 993 (2012) (requiring adverse event and clinical trial disclosures). These laws have helped reporters and researchers tell vital stories about otherwise obscure corporate conduct.

For instance, reporters at the *Wall St. Journal*, *Bloomberg*, and *Reuters* have all been able to tell stories of corporate anomalies and loopholes, bases on scoops from SEC 8-K filings triggered by Regulation Fair Disclosure.[20] Similarly, relying

---

[20] Kate Azevedo, *Corporate Cyber Incident Reporting Is Missing the Mark*, Bloomberg News (Jun. 17, 2024) https://news.bloomberglaw.com/bloomberg-law-analysis/corporate-cyber-incident-reporting-is-missing-the-mark (compiling SEC

on disclosures from the EPA Toxic Release Inventory, ProPublica published a map identifying more than 1,000 "toxic hot spots" across the country caused by industrial air pollution, exposing certain Americans to medical risks in their communities of residence, *see* Al Shaw & Lylla Younes, *The Most Detailed Map of Cancer-Causing Industrial Air Pollution in the U.S.*, ProPublica (Aug. 28, 2023), https://projects.propublica.org/toxmap/. Using the FDASIA's drug trial disclosures, ProPublica revealed the underrepresentation of Black and Native American participants in clinical trials. *See* Caroline Chen & Riley Wong, *Black Patients Miss Out On Promising Cancer Drugs*, ProPublica (Sept. 19, 2018), https://www.propublica.org/article/black-patients-miss-out-on-promising-cancer-drugs. Similarly, Consumer Reports relied on the Oregon Consumer Privacy Act's to tell the story how Kroger's "income predictor" data profiles could inaccurately sort shoppers and affect which discounts they saw. *Consumer Reports Investigation Uncovers Kroger's Widespread Data Collection of Loyalty Program*

---

filings, Bloomberg exposed a loophole companies were submitting filings to comply but stating their incidents were "*materiality was not determined*") (emphasis added); Yogita Patel, *Kraft Heinz, Phillips 66 Targeted by Fake Securities Filings*, Wall St. J. (Sept. 24, 2015) https://www.wsj.com/articles/kraft-heinz-phillips-66-targeted-by-fake-securities-filings-1443133132 (reporting on SEC filings' revealing highly anomalous buyout associated with Warren Buffett's Berkshire Hathaway portfolio); Joseph Menn, Jim Finkle, & Dustin Volz, *Yahoo security problems a story of too little, too late*, Reuters (Dec. 18, 2016), https://www.reuters.com/article/technology/yahoo-security-problems-a-story-of-too-little-too-late-idUSKBN1480AM/ (leveraged SEC filings to investigate Yahoo's failures to notify investors about a hack).

20

*Members to Create Secret Shopper Profiles*, Consumer Reports (May 21, 2025),

https://www.consumerreports.org/media-room/press-releases/2025/05/consumer-reports-investigation-uncovers-krogers-widespread-data-collection-of-loyalty-program-members-to-create-secret-shopper-profiles.

While the press has already played a vital role in reporting on AI data, and how it has led to misrepresentations,[21] hallucinations,[22] harmful behavior with children,[23] and professional impact problems,[24] more information is necessary to report on AI and A.B. 2013 provides exactly the kind of transparency journalists

---

[21] *See* European Broadcasting Union and BBC, *News Integrity in AI Assistants: An international PSM study* (Oct. 2025), https://www.ebu.ch/files/live/sites/ebu/files/Publications/Intelligence/open/EBU-Intelligence-BBC_News_Integrity_in_AI_Assistants_Report_2025.pdf (Research by the European Broadcasting Union found that the leading A.I. assistants significantly misrepresented the news in nearly half of all answers.

[22] MIT Mmgt., *When AI Gets It Wrong: Addressing AI Hallucinations and Bias* (last visited July 22, 2026), https://mitsloanedtech.mit.edu/ai/basics/addressing-ai-hallucinations-and-bias/.

[23] Mark Follman, *The Chilling Role of ChatGPT in Mass Shootings and Other Violence*, Mother Jones (Apr. 10, 2026), https://www.motherjones.com/media/2026/04/chatgpt-tumbler-ridge-fsu-openai-chatbots-mass-shootings/; Brit McCandless Farmer, *AI chatbots raise safety concerns for children, experts warn*, CBS News (Dec. 7, 2025), https://www.cbsnews.com/news/ai-chatbots-raise-safety-concerns-for-children-experts-warn-60-minutes/.

[24] U.S. Dep't of Just., Off. of the Inspector Gen., *Audit of the DEA's and FBI's Efforts to Integrate Artificial Intelligence and Other Emerging Technology Within the U.S. Intelligence Community*, 11 (Dec. 2024), https://oig.justice.gov/sites/default/files/reports/25-014.pdf (reporting the FBI's concern that most commercially available AI products lack "adequate transparency of their software components.").

need. Without it, journalists have no way to truly evaluate the AI systems that increasingly shape public knowledge.[25] Undermining A.B. 2013 would therefore intrude not only on the public's right to receive information but on the press's own First Amendment right to gather and report it.

## III. A.B. 2013 FITS COMFORTABLY WITHIN A LONG TRADITION OF FACTUAL DISCLOSURE LAWS THAT COURTS HAVE UPHELD AGAINST NEARLY IDENTICAL OBJECTIONS.

The commercial speech doctrine has long recognized the public interest in compelled factual disclosures. Whether reviewed under the deferential *Zauderer* standard or under the higher intermediate scrutiny, A.B. 2013 survives because both standards are animated by the same principle: the consumer's interest in useful information. *See Milavetz*, 559 U.S. at 249–50 ("First Amendment protection for commercial speech is justified in large part by the information's value to consumers . . . ."); *Cent. Hudson*, 447 U.S. at 561–62 ("Commercial expression not only serves the economic interest of the speaker, but also assists consumers and furthers the societal interest in the fullest possible dissemination of

---

[25]While the average member of the public might not conduct in-depth-analysis of a dataset as compared to a journalist, consumers still stand to gain from transparency. *X.AI LLC v. Bonta*, No. 2:25-cv-12295-JGB-SSC, slip op. at 10–11 (C.D. Cal. Mar. 4, 2026) ("[i]t strains credulity to essentially suggest that no consumer is capable of making a useful evaluation of Plaintiff's AI models by reviewing information about the datasets used to train them and that therefore there is no substantial government interest advanced by this disclosure statute.)

22

information."); *Zauderer*, 471 U.S. at 651 (applying rational-basis test to uphold commercial disclosure requirements that serve consumers' interests as listeners).[26]

### A. A.B. 2013 is governed by *Zauderer* which courts have applied to disclosures similarly beneficial to the public.

Purely factual, noncontroversial, and not unduly burdensome disclosures are reviewed under *Zauderer*, not heightened scrutiny. Courts have repeatedly upheld laws like A.B. 2013 under *Zauderer* despite First Amendment objections functionally identical to x.AI's because of the importance to the public.

In *Pharm. Rsch. & Mfrs. of Am. v. Stolfi*, this Circuit upheld a requirement that drug manufacturers report product-specific pricing and market information, holding that such laws protect consumer's interest in the "free flow of commercial information." 153 F.4th 795, 821–24 (9th Cir. 2025). The en banc D.C. Circuit reached the same conclusion in *Am. Meat Inst.*, holding that *Zauderer*'s deferential standard governs factual, uncontroversial disclosure mandates generally—not only those aimed at correcting deception—and that a government interest in enabling informed consumer decisions is, standing alone, substantial enough to sustain such a mandate. 760 F.3d at 26–27 (en banc). Other circuits agree that *Zauderer* is not

---

[26] CIR takes the position that *Zauderer* supplies the appropriate framework to evaluate AB 2013. *See Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 756 (9th Cir. 2019) (en banc). Nevertheless, even if the Court were to apply the more demanding standard for non-commercial speech, AB 2013 still advances a substantial governmental interest. *See Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263 (9th Cir. 2023).

limited to anti-deception interests. *See CTIA—The Wireless Ass'n v. City of Berkeley*, 928 F.3d at 844–48; *R.J. Reynolds Tobacco Co. v. FDA*, 96 F.4th 863, 880–88 (5th Cir. 2024) ("*Zauderer* does not require the state to assert an anti-deception interest."); *Md. Shall Issue, Inc. v. Anne Arundel Cnty.*, 91 F.4th 238, 251 (4th Cir. 2024).

A.B. 2013 requires only product-specific, factual information about the data used to build a generative AI product. Cal. Civ. Code § 3111(a)(1)-(12). That is no different in kind from requiring a food manufacturer to list its ingredients, a restaurant to post calorie counts, or a light-bulb maker to disclose mercury content. *See N.Y. State Rest. Ass'n v. N.Y.C. Bd. of Health*, 556 F.3d 114, 136 (2d Cir. 2009); *Am. Meat Inst.*, 760 F.3d at 26–27; *Sorrell*, 272 F.3d at 114–15. Every fact A.B. 2013 requires x.AI to disclose concerns the product x.AI sells directly to consumers. *See* x.AI, *Pricing*, https://x.ai/pricing (last visited July 22, 2026). This distinguishes A.B. 2013 from the general, product-unconnected disclosures x.AI invokes. *Cf. IMDb.com, Inc. v. Becerra*, 962 F.3d 1111, 1122 (9th Cir. 2020) (encyclopedic information listed on a website).

**B.      Even under intermediate scrutiny, the public's interest in training-data disclosure independently sustains A.B. 2013.**

Should this Court agree with the district court that intermediate scrutiny rather than *Zauderer* governs, A.B. 2013 still survives, because the consumer interest that justifies deference under *Zauderer* also satisfies intermediate

24

scrutiny's requirement that a regulation directly advance a substantial governmental interest through means no more extensive than necessary. *See Cent. Hudson*, 447 U.S. at 566.

A consumer's interest is not "transparency for its own sake." *Stolfi*, 153 F.4th at 826. Here, training data determines how a generative AI product will behave—including its propensity toward the fabrication and error that increasingly affects the public relying on these tools, from litigants citing invented case law to patients receiving fabricated medical guidance. *See supra* Section I. Consumers and, critically, journalists reporting on these products are operating at an acute information deficit: without disclosure, they cannot evaluate a model's reliability. A.B. 2013 remedies that deficit through the narrowest possible means—a single public summary addressing categories of information that touch nothing proprietary about how a model functions. That is precisely the kind of "narrowly drawn" measure directly advancing a substantial interest that intermediate scrutiny requires. *Cent. Hudson*, 447 U.S. at 566; *see also Stolfi*, 153 F.4th at 826 (state has substantial interest in reducing information asymmetries).

## IV. X.AI'S CHALLENGE REFLECTS A BROADER CAMPAIGN TO RECAST TRANSPARENCY LAWS AS "COMPELLED SPEECH"— A STRATEGY THAT COMES DIRECTLY AT THE EXPENSE OF INVESTIGATIVE JOURNALISM.

x.AI's suit is not an isolated dispute about one statute. It is the latest instance of a strategy industry actors have deployed with increasing frequency in recent

25

years: recharacterizing disclosure laws as unconstitutional compelled speech, in an effort to avoid sharing information with the public—information the press acting on the public's behalf—often needs. Bahrad A. Sokhansanj & Mackenzie Arnold, *First Amendment Questions for AI Transparency Laws*, Lawfare (June 22, 2026), https://www.lawfaremedia.org/article/first-amendment-questions-for-ai-transparency-law. Indeed, x.AI has extended a version of this same anti-disclosure strategy to a different state within months of its California filing, arguing in a suit against Colorado's algorithmic-discrimination law that mandated disclosures about its bias-mitigation practices unconstitutionally compel its speech. *X.AI LLC v. Weiser*, No. 1:26-cv-01515, 2026 WL 968127 (D. Colo. Apr. 9, 2026). And in *X Corp. v. Bonta*, 116 F.4th 888 (9th Cir. 2024), brought by Musk's own X Corp — the company used the same "compelled speech" theory against a transparency statute aimed at public accountability, and it succeeded. Other industry actors have found success with this theory. *R.J. Reynolds Tobacco Co. v. FDA*, 96 F.4th 863 (5th Cir. 2024); *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263 (9th Cir. 2023).

As already stated, mandated disclosures provide the essential leads and data points that allow reporters to investigate whether corporate claims match reality. When transparency laws are struck down, the press is blinded, and the public is left without the critical oversight needed to evaluate the products and services that

26

shape their lives. Below are examples of three areas where a law quashed as compelled speech has threatened reporting on a subject of important public interest.

First, *Stolfi*, now pending before the Supreme Court on a petition for certiorari. There, a pharmaceutical trade association ("PhRMA") challenged a state law requiring drug manufacturers to disclose their reasoning for certain price increases, arguing the disclosure violated the First Amendment. The Ninth Circuit rejected that argument, holding the disclosure requirement less intrusive than a mandated label and squarely justified by consumers' interest in resolving the "information asymmetries" between manufacturers and the public they cannot bridge on their own. *Stolfi*, 153 F.4th at 826. PhRMA has now asked the Supreme Court to adopt a broader theory of compelled commercial speech—and x.AI itself filed an amicus brief in that case in support of PhRMA.

The stakes of *Stolfi* are not abstract. Drug-pricing opacity is already a significant obstacle for journalists and policymakers trying to explain to the public why the prices they pay are what they are. KFF Health News produces some of the country's most cited health-policy journalism, has devoted entire explainers simply to untangling how manufacturer rebates flow through the Medicaid drug rebate program—a system that remains opaque even to policy specialists. *See, e.g.*, Rachel Dolan, *Understanding the Medicaid Prescription Drug Rebate Program*,

KFF, (Nov. 2019), chrome https://www.kff.org/wp-content/uploads/2019/11/Understanding-the-Medicaid-Prescription-Drug-Rebate-Program-updated-3.2021.pdf. A disclosure law requiring manufacturers to explain, in their own words, why they raised a given price would give reporters a primary record to check against manufacturers' public claims, rather than having to reconstruct pricing logic secondhand. If PhRMA succeeds in recasting that disclosure as compelled speech, that record disappears before it exists.

Second, in *Nat'l Retail Fed'n v. James*, a retail trade association challenged New York's algorithmic pricing disclosure law—which requires businesses that set individualized prices using personal data to say so—on the theory that the mandate forced them to convey the message. The district court rejected that argument, holding the required disclosure was purely factual. That decision is now on appeal to the Second Circuit, where the appellant will make essentially the same argument x.AI makes here: that being made to state a fact about one's own product or practices is tantamount to being forced to speak.

The current reporting landscape on algorithmic pricing shows what opacity exists when no disclosure law applies. When Delta disclosed that it was expanding AI-driven fare pricing, the ensuing coverage consisted almost entirely of the company's own assurances that it does not use personal data—reporters had no independent way to test the claim. As one industry analyst told ABC News, "the

28

transparency is only based on what Delta is sharing." Kelly McCarthy, *How Delta Is Using AI for Ticket Pricing and What It Means for Air Travel*, ABC News (Aug. 4, 2025), https://abcnews.com/GMA/Travel/delta-ai-ticket-pricing-means-air-travel/story?id=124343088. When Vice and a Belgian newspaper separately tested whether Uber charges more to riders with low phone batteries, Uber flatly denied it, and reporters were left with small, self-funded experiments rather than data disclosed by the company. *Uber Accused of Charging People More If Their Phone Battery Is Low*, Vice (Apr. 11, 2023), https://www.vice.com/en/article/uber-surge-pricing-phone-battery/. And when Senators Warren and Casey pressed Kroger about whether its digital shelf labels enable "surge pricing," Kroger's own answer was a denial—that reporter covering the story had no independent means to confirm or refute. Seamus Webster, *Elizabeth Warren Just Accused Kroger of Price Gouging as 'Families Struggle to Pay to Put Food on the Table'*, Fortune (Aug. 13, 2024), https://fortune.com/2024/08/13/elizabeth-warren-supermarket-kroger-price-gouging-dynamic-pricing-digital-labels/. Each of these stories illustrates the same gap: that without a legal requirement to disclose data journalists are stuck relitigating factual disputes with the companies themselves, one denial at a time.

Third, *Nat'l Ass'n of Mfrs. v. SEC*, 748 F.3d 359 (D.C. Cir. 2014), *reaff'd on reh'g*, 800 F.3d 518 (D.C. Cir. 2015) presents yet a third instructive example in

29

what is lost when disclosure mandates fail, even in part. A Dodd-Frank disclosure regime required public companies to trace their supply chains and report whether their products contained metals that ultimately financed armed conflicts in the Democratic Republic of the Congo. In the first year, watchdogs like Amnesty International, and national press outlets used the filings to chart what companies knew about the minerals in their products. *See, e.g.*, *Digging for Transparency: How U.S. Companies Are Only Scratching the Surface of Conflict Minerals Reporting,* Glob. Witness & Amnesty Int'l (Apr. 22, 2015), https://globalwitness.org/en/campaigns/conflict-resources/digging-transparency/; Emily Chasan, *U.S. Firms Struggle to Trace 'Conflict Minerals'*, Wall St. J. (Aug. 3, 2015), https://www.wsj.com/articles/u-s-firms-struggle-to-trace-conflict-minerals-1438636575; Caroline O'Donovan, *Here's How Apple Is Doing on Conflict Minerals*, BuzzFeed News (Mar. 27, 2017), https://www.buzzfeednews.com/article/carolineodonovan/apple-reports-conflict-mineral-progress-as-president-trump. But weeks before the first filing deadline, the D.C. Circuit held that requiring issuers to publish the descriptor stating that an item had, "not been found to be 'DRC conflict free'" violated the First Amendment, even under *Zauderer*, because the characterization required "a metaphor that conveys moral responsibility." 748 F.3d at 371. The holding was deliberately narrow as the Court only struck the "description requirement" and held there was

30

no issue as to "any other aspect of the conflict minerals report or required disclosures." *Id*. at 373, n. 8 & n.14

Still, striking this part of the statute ultimately led to corroding of the overall transparency regime. After the D.C. Circuit ruling, the SEC announced it would not recommend enforcement against companies that omitted the due diligence report and independent audit altogether. *Updated Statement on the Effect of the Court of Appeals Decision on the Conflict Minerals Rule,* SEC Div. of Corp. Fin. (Apr. 7, 2017), https://www.sec.gov/newsroom/speeches-statements/corpfin-updated-statement-court-decision-conflict-minerals-rule. Reporters had to work from what companies filed willingly, and without the force of the disclosure, companies scaled back. Even Apple, now files a bare-bones disclosure expressly relying on the 2017 SEC statement. Apple Inc., Specialized Disclosure Report (Form SD) (May 28, 2026), https://www.sec.gov/Archives/edgar/data/320193/000114036126023149/ef20073373_sd.htm.

All three examples point to the same throughline: when a state requires a company to disclose relevant facts about a product, reporters build public understanding directly on that disclosure. When a company succeeds in blocking the disclosure, reporters are pushed to report dueling denials, and secondhand reconstructions of information the company already holds. CIR asks this Court to

31

ensure the public and the press obtain the information they need to evaluate a product for themselves.

## CONCLUSION

For the foregoing reasons, *Amicus* respectfully urges the Court to recognize the First Amendment interests of the press and the public at stake in denying x.AI's motion for preliminary injunction.

Dated:      July 22, 2026
New York, New York

THE CENTER FOR INVESTIGATIVE
REPORTING
/s/ *D. Victoria Baranetsky*

D. Victoria Baranetsky
Brooke Henderson
The Center for Investigative Reporting
222 Sutter St., Ste. 600
San Francisco, CA 94108
(415) 321-1700
*Counsel for Amicus Curiae*

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP
/s/ *Claire Z. Abbadi*

Claire Z. Abbadi
Andrew G. Celli, Jr.
One Rockefeller Plaza, 8th Floor
New York, New York 10020
(212) 763-5000
*Counsel for Amicus Curiae*

32

## CORPORATE DISCLOSURE STATEMENT

The Center for Investigative Reporting is a nonprofit, nongovernmental organization. The organization has no parent corporation. No publicly held corporation owns 10 percent or more of the organization.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 34. Disclosure Statement under FRAP 26.1 and Circuit Rule 26.1-1

*Instructions for this form:* <u>http://www.ca9.uscourts.gov/forms/form34instructions.pdf</u>

**9th Cir. Case Number(s)** _____

Name(s) of party/parties, prospective intervenor(s), or amicus/amici filing this form:

Under FRAP 26.1 and Circuit Rule 26.1-1, I make the following disclosures:

1.  I disclose the following information required by FRAP 26.1(a) and/or Circuit Rule 26.1-1(b) for any nongovernmental corporation, association, joint venture, partnership, limited liability company, or similar entity[1] which is a party, prospective intervenor, or amicus curiae in any proceeding, or which the government identifies as an organizational victim below in section 2 of this form,[2] or which is a debtor as disclosed below in section 3 of this form.

    a.  Does the party, prospective intervenor, amicus, victim, or debtor have any parent companies? Parent companies include all companies that control the entity directly or indirectly through intermediaries.
        Yes          No

        If yes, identify all parent corporations of each entity, including all generations of parent corporations *(attach additional pages as necessary)*:

    b.  Is 10% or more of the stock of the party, prospective intervenor, amicus, victim, or debtor owned by a publicly held corporation or other publicly held entity?
        Yes          No

---

[1] A corporate entity must be identified by its full corporate name as registered with a secretary of state's office and, if its stock is publicly listed, its stock symbol or "ticker."

[2] To the extent it can be obtained through due diligence.

*Feedback or questions about this form? Email us at* <u>forms@ca9.uscourts.gov</u>

If yes, identify all such owners for each entity *(attach additional pages as necessary)*:

2.  In a criminal case, absent good cause shown, the government must identify here any organizational victim of the alleged criminal activity:

3.  In a bankruptcy case, the debtor, the trustee, or, if neither is a party, the appellant must identify here each debtor not named in the court of appeals caption:

4.  Are you aware of any judge serving on this Court who participated at any stage of the case, either in district court, administrative proceedings, or in related state court proceedings?
    Yes          No

    If yes, list the name of the judge and the case name, case number, and name of court of the related proceedings:

I certify that *(select only one)*:

    this is the first disclosure statement filed in the above-referenced case by the above-identified party/parties, prospective intervenor(s), or amicus/amici, and this disclosure statement complies with FRAP 26.1 and Circuit Rule 26.1-1.

    the party/parties, prospective intervenor(s), or amicus/amici submitting this supplemental disclosure statement has previously filed a compliant disclosure statement in this case, and this updated disclosure statement discloses changed or additional information.

    I have reviewed this form, FRAP 26.1, and Circuit Rule 26.1-1 and, to the best of my knowledge, have no information to disclose at this time.

**Signature** _____ **Date** _____
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 34**                                          2                                          *New 12/01/24*

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)**

I am the attorney or self-represented party.

**This brief contains _____ words,** including _____ words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

☐ complies with the word limit of Cir. R. 32-1.

☐ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

☐ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

☐ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

☐ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    ☐ it is a joint brief submitted by separately represented parties.
    ☐ a party or parties are filing a single brief in response to multiple briefs.
    ☐ a party or parties are filing a single brief in response to a longer joint brief.

☐ complies with the length limit designated by court order dated                 .

☐ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**                                                  **Date**
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 8**                                                      *Rev. 12/01/22*