**No. 26-1591**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

**X.AI LLC,**

*Plaintiff-Appellant,*

v.

**ROB BONTA,**

in his official capacity as Attorney General of the State of California,

*Defendant-Appellee.*

---

On Appeal from the United States District Court
for the Central District of California
No. 2:25-cv-12295-JGB-SSC
Hon. Jesus G. Bernal

**BRIEF OF AMICUS CURIAE MINDEROO CENTRE FOR
TECHNOLOGY AND DEMOCRACY AT THE UNIVERSITY OF
CAMBRIDGE IN SUPPORT OF DEFENDANT-APPELLEE AND
AFFIRMANCE**

MINDEROO CENTRE FOR TECHNOLOGY
AND DEMOCRACY
THE UNIVERSITY OF CAMBRIDGE
The Entopia Building
1 Regent Street
Cambridge CB2 1GG
United Kingdom

Gina Neff, Director
James J. Ward
Taryn J. Ward

*Authorized Representatives of
Amicus Curiae*

i

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, amicus curiae states: the Minderoo Centre for Technology and Democracy is an independent research centre of the University of Cambridge. The University of Cambridge is a chartered educational institution in the United Kingdom. Neither the Centre nor the University has a parent corporation, and no publicly held corporation owns 10% or more of any stock in either, as neither issues stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ...................................................... ii

TABLE OF CONTENTS ...................................................................... iii

INTEREST OF AMICUS CURIAE ......................................................... 1

RULE 29 STATEMENT ........................................................................ 3

SUMMARY OF ARGUMENT ............................................................... 4

ARGUMENT ...................................................................................... 6

   I.   THE COMPELLED DISCLOSURES ARE FACTUAL STATEMENTS OF A KIND THE INDUSTRY ITSELF CREATED AND ALREADY PUBLISHES 6

      A.   The disclosure format is the industry's own invention ............................ 6

      B.   Opaque training data is a known source of harm ................................... 7

      C.   The market has complied with AB 2013, publicly and without incident 10

      D.   Appellant's own disclosures ................................................ 11

      E.   The required statements are statements the industry already makes voluntarily ................................................................... 13

II.    DISCLOSURE OF WHAT DATA WAS USED REVEALS NOTHING ABOUT HOW A MODEL WAS BUILT ........................................................... 14

A.    The statute's text: categories, ranges, and "whether," but never "how" 14

B.    The technical record: model capability is created by process and curation, not by data identity ........................................................... 15

C.    The limit case: perfect knowledge of the corpus yields no knowledge of the model ........................................................... 17

III.    AB 2013 IS A MODEST ENTRANT IN A GLOBAL FAMILY OF TRAINING-DATA TRANSPARENCY OBLIGATIONS ................................ 19

A.    The European Union's public training-content summary ..................... 19

B.    Item for item, AB 2013 asks for less ........................................................... 21

C.    The wider family: jurisdictions in force and pending ........................... 23

D.    Voluntary transparency decays; mandated transparency is used ........... 25

CONCLUSION ........................................................... 26

CERTIFICATE OF COMPLIANCE ........................................................... 27

CERTIFICATE OF SERVICE ........................................................... 28

iv

# TABLE OF AUTHORITIES

*Page(s)*

**CASES**

*X.AI LLC v. Bonta*, No. 2:25-cv-12295-JGB-SSC

    (C.D. Cal. Mar. 4, 2026) ............................................................passim

**STATUTES AND REGULATIONS**

18 U.S.C. § 1839(3) ...................................................................18

Cal. Civ. Code § 1798.140 (West 2026) ...........................................10, 23

Cal. Civ. Code § 3111 (West 2026) .............................................passim

Cal. Civ. Code § 3426.1(d) (West 2026)...............................................18

Colo. Rev. Stat. § 6-1-1702 (2026) .....................................................24

**RULES**

Fed. R. App. P. 26.1 ......................................................................ii

Fed. R. App. P. 29 ................................................................. iii, 3, 27

Fed. R. App. P. 32 .......................................................................27

Fed. R. Evid. 201(b)(2) ...............................................................12

9th Cir. R. 32-1...........................................................................27

v

**FOREIGN AND INTERNATIONAL AUTHORITIES**

Regulation (EU) 2024/1689 of the European Parliament and of the Council of 13

June 2024 Laying Down Harmonised Rules on Artificial Intelligence, art.

53(1)(d), art. 78, recital 107, 2024 O.J. (L 1689) ..................................passim

European Commission, *Explanatory Notice and*

*Template for the Public Summary of Training Content for*

*General-Purpose AI Models* (July 24, 2025)....................................12, 19,22

*Interim Measures for the Management of Generative*

*Artificial Intelligence Services* (China, eff. Aug. 15, 2023) .........................23

*Framework Act on the Development of Artificial Intelligence and Establishment of*

*a Foundation for Trust* ...............................................................................24

**LEGISLATIVE MATERIALS**

Assemb. B. 412, 2025-2026 Reg. Sess. (Cal. 2025) ..............................................24

Generative AI Copyright Disclosure Act of 2024,

H.R. 7913, 118th Cong. (2024).......................................................................24

*Projeto de Lei No. 2.338, de 2023* (Braz.) .............................................................24

**OTHER AUTHORITIES**

Anthropic, *Training Data Documentation Pursuant to California Civil Code*

*Section 3111 (AB 2013)* ..................................................................11, 22, 23

Boyko et al., *An Interdisciplinary Outlook on Large Language Models for Scientific Research*, arXiv:2311.04929 (Nov. 3, 2023) ................................ 16

Rishi Bommasani et al., *The Foundation Model Transparency Index* (Stan. Ctr. for Rsch. on Found. Models 2023-2025) .......................................................... 25

Timnit Gebru et al., *Datasheets for Datasets*, 64 Commc'ns ACM 86 (2021) (first circulated as arXiv:1803.09010 (2018)) ....................................................... 6

MCTD, *Data Not Found: Social Media Data Transparency for Information Integrity* (Apr. 2026) ............................................................................. i, 1, 25

MCTD, *Written Evidence to the Joint Committee on Human Rights* (RAI0067) (Sept. 2025) ................................................................................................ i, 1, 7

MCTD, *Written Evidence to the Information Commissioner's Office Consultation on the Lawful Basis for Web Scraping to Train Generative AI Models* (Feb. 2024) .......................................................................................... i, 1, 25

Margaret Mitchell et al., *Model Cards for Model Reporting*, in Proceedings of the Conference on Fairness, Accountability, and Transparency 220 (2019) ........ 6

OpenAI, *GPT-4 Technical Report*, arXiv:2303.08774 (Mar. 15, 2023) ................. 25

OpenAI, *Training Data Summary Pursuant to California Civil Code Section 3111* ........................ 10, 11, 22, 23

Semmelrock et al., *Reproducibility in Machine-Learning-Based Research: Overview, Barriers and Drivers*, arXiv:2406.14325 (June 20, 2024) .......... 16

Shumailov et al., *AI Models Collapse When Trained on Recursively Generated Data*, 631 Nature 755 (2024) .......................................................................... 8

David Thiel, *Identifying and Eliminating CSAM in Generative ML Training Data and Models* (Stanford Internet Observatory Dec. 20, 2023) .......................... 8

U.S. Copyright Off., *Copyright and Artificial Intelligence, Part 3: Generative AI Training* (Pre-Publication Version, May 2025) ............................................. 13

xAI, *Public Summary of Training Content for Grok 4.5* (July 8, 2026) .......... *passim*

## INTEREST OF AMICUS CURIAE

The Minderoo Centre for Technology and Democracy ("MCTD" or "the Centre") is an independent team of academic researchers at the University of Cambridge. The Centre's research examines the power relationships between digital technologies, society, and democratic institutions, with particular focus on the governance of data and artificial intelligence: how AI systems are documented, measured, and made accountable to the publics they affect.

The questions presented in this appeal sit at the center of the Centre's published research program. In February 2024, the Centre submitted written evidence to the United Kingdom Information Commissioner's Office consultation on the lawful basis for web scraping to train generative AI models, analyzing the legal treatment of training-data collection and urging transparency and independent researcher access. In September 2025, the Centre submitted written evidence to the United Kingdom Parliament's Joint Committee on Human Rights addressing the human-rights consequences of opacity in AI training data. In April 2026, the Centre published *Data Not Found: Social Media Data Transparency for Information Integrity*, the first systematic evaluation of platform data-transparency conditions across fifteen major platforms in three regulatory environments — the European Union, the United Kingdom, and Brazil. The Centre's forthcoming

report on measurable indicators for responsible AI examines documentation and disclosure as the foundational instrument of AI governance.

Amicus takes no position on appellant's business or models and does not brief the First Amendment standards that govern this appeal; the parties have done so. The Centre writes solely to place before the Court the factual, technical, and comparative record its research addresses: what training-data disclosures actually contain, how the industry itself created and practices this genre of documentation, what such disclosures can and cannot reveal about how models are built, and how equivalent obligations already operate in other jurisdictions.

## RULE 29 STATEMENT

Amicus curiae has moved for leave to file this brief pursuant to Federal Rule of Appellate Procedure 29(a)(3).  Counsel for the Appellee has consented, but counsel for Appellant has not yet indicated whether they consent.

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), amicus curiae states that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund the preparation or submission of this brief; and no person other than amicus curiae contributed money intended to fund the preparation or submission of this brief.

## SUMMARY OF ARGUMENT

The parties dispute the constitutional standards that govern California's training-data disclosure law and their application. Amicus does not join that dispute. Whatever standard this Court applies, its application will turn in part on questions of fact about which the Centre's research, and the public record, have much to say: what information AB 2013 actually compels; whether that information is of a kind the industry itself treats as factual and publishable; what such disclosures do and do not reveal about how a generative AI model is built; and how California's requirement compares with obligations already in force elsewhere in the world.

The record answers those questions. *First*, the compelled disclosures are statements of fact in a format the industry itself invented, promotes, and practices in order to prevent documented harms — and appellant has published two such documents in the past seven months, one under AB 2013 and one under the European Union's parallel obligation (Part I). *Second*, as a technical matter, disclosure of what data was *used* does not disclose anything about how a model was *built*: the capabilities and value of a generative AI system are created by the training process — the proprietary curation, proportions, procedures, reinforcement learning, and the resulting weights. The statute does not require anyone to disclose these (Part II). *Third*, AB 2013 imposes requirements which are less extensive than

4

most of the global family of training-data transparency obligations, both in force and pending, with which developers — including appellant — already comply (Part III).

Amicus offers these three bodies of fact for the Court's use under whatever legal framework it concludes governs, and respectfully submits that they bear on every claim in the case.

5

## ARGUMENT

## I. THE COMPELLED DISCLOSURES ARE FACTUAL STATEMENTS OF A KIND THE INDUSTRY ITSELF CREATED AND ALREADY PUBLISHES

### A. The disclosure format is the industry's own invention

The California State Assembly did not invent the genre of documentation AB 2013 requires. Summaries about training data arose from the community of artificial-intelligence researchers, working at the industry's leading laboratories, as a statement of the field's own best practice. "Datasheets for datasets" — structured factual summaries of a training dataset's sources, composition, collection methods, and intended uses — were proposed by industry researchers in 2018 and later formalized in the field's flagship professional journal. Gebru et al., *Datasheets for Datasets*, 64 Commc'ns ACM 86 (2021) (first circulated as arXiv:1803.09010 (2018)). "Model cards" — companion disclosures describing a model's training data, capabilities, and limitations — followed the next year. Mitchell et al., *Model Cards for Model Reporting*, in Proceedings of the Conference on Fairness, Accountability, and Transparency 220 (2019). Both formats were adopted voluntarily across the industry and promoted to policymakers as evidence of

6

responsible development. Appellant itself publishes model cards. Pl's Br. at 34; AG Br. at 33.

### B.     Opaque training data is a known source of harm

The industry did not build this documentation genre for its own sake. It built it because the contents of a training corpus determine, and can silently compromise, the behavior of the resulting system — and because those defects are, by the nature of these systems, nearly impossible to detect after the fact from outputs alone. Amicus addressed precisely this problem in written evidence submitted to the United Kingdom Parliament's Joint Committee on Human Rights in September 2025. *See* MCTD, *Written Evidence* (RAI0067) (Sept. 2025), https://committees.parliament.uk/writtenevidence/142618/pdf/. That submission identified a lack of transparency around the data AI systems ingest as the primary factor driving their capacity for harm, distinguishing three sites of opacity: the provenance of training data, the manner in which systems process it, and the outputs they generate. The first is the subject of AB 2013.

The submission's central observation bears directly on the utility question the district court flagged. ER-13. Because these systems are large and opaque — "black box" in the settled term — it is often impossible to know what data was used to train a system, how that data was labeled, or what inferences the system

7

will draw from it; and the resulting defects cannot reliably be identified before harm arises. That is the structural reason categorical provenance disclosure matters: it lets consumers, researchers, and regulators anticipate from a model's inputs the problems its outputs would otherwise reveal only after the fact. A reader cannot audit the weights that drive a model's performance, but a reader can review and understand a datasheet explaining what data is included in the model.

The catalogue of documented harms traceable to training-data composition is not hypothetical. Undisclosed inclusion of unlawful material is a demonstrated risk: a widely used public image-training corpus was found to contain child sexual abuse material and was withdrawn from distribution after independent researchers identified it — a discovery made possible only by scrutiny of the dataset's provenance, not the models trained on it. *See* David Thiel, *Identifying and Eliminating CSAM in Generative ML Training Data and Models* (Stanford Internet Observatory Dec. 20, 2023), https://purl.stanford.edu/kh752sm9123. Training on undisclosed synthetic data is also documented to degrade model performance over successive generations — the phenomenon that appellee discusses in the answering brief at page 6, and which the peer-reviewed literature has called "model collapse." *See, e.g.*, Shumailov et al., *AI Models Collapse When Trained on Recursively Generated Data*, 631 Nature 755 (2024).

And training data scraped indiscriminately from the open web is a documented vector for privacy exposure, as amicus detailed in separate written evidence to the United Kingdom's data-protection regulator, and as European enforcement action against undisclosed large-scale scraping has confirmed. In each instance, the harm was latent in the composition of the corpus and became visible through disclosure of what the corpus contained — the precise category of fact AB 2013 requires.

This record also answers a premise implicit in appellant's position: that the disclosures are unnecessary because developers may be trusted to describe their own data. Amicus's submission to the UK Parliament reached the opposite conclusion, and it did not depend on any assumption of bad faith. Where the material capable of causing harm is unlawful, embarrassing, or commercially sensitive, unverified self-description is structurally least reliable in exactly the cases that matter most. The disincentives for non-robust disclosure are self-evident, and a reader has no independent means of checking the reliability of what is disclosed. That is why amicus's evidence to Parliament urged mandatory, standardized transparency rather than reliance on voluntary reporting: a uniform disclosure obligation, applied to every developer alike, is what makes any single developer's statement meaningful by rendering it comparable and non-optional. AB 2013 supplies exactly that — a common, categorical baseline that the

compliant developers surveyed below have shown can be met without revealing anything proprietary.

The point for present purposes is narrow and factual. The categories of information AB 2013 compels are the categories that the field itself identified, in its own documentation practices and in evidence to legislators, as the ones a reader needs in order to anticipate where a model's failures will come from.

### C. The market has complied with AB 2013, publicly and without incident

When AB 2013 took effect on January 1, 2026, the market's leading developers complied — publicly, promptly, and without any observed competitive consequence. OpenAI's "Training Data Summary Pursuant to California Civil Code Section 3111" runs approximately five short paragraphs. It describes sources categorically (publicly available data, third-party partnerships, user and trainer data, synthetic data); states scale as datasets containing trillions of tokens of text, image, audio, and audiovisual content; acknowledges that the data "may be protected by copyright" alongside public-domain material; acknowledges personal information as defined in § 1798.140, with user opt-outs; describes processing as "a variety of techniques"; and dates collection from approximately 2018, with first development use in 2021. It names not one dataset.

10

Anthropic's "Training Data Documentation Pursuant to California Civil Code Section 3111 (AB 2013)" proceeds through twelve enumerated headings tracking the statutory categories: source categories, including a general-purpose web crawler honoring robots.txt; training purposes; scale in ranges "typical of frontier large language models"; data types; intellectual-property status — expressly characterizing the inclusion of public content that "may include material covered by third-party intellectual property rights" as "consistent with standard industry practice"; acquisition methods; personal-information mitigation; category-level processing disclosure (deduplication, classification, safety filtering); and synthetic-data use. Again, this was provided with no named datasets. No compliant developer — OpenAI, Anthropic, Google, Character.AI, and, as explained *infra*, xAI — has identified any specific dataset, and every published disclosure tracks the statute's "high-level summary" language.

### D.      Appellant's own disclosures

Appellant has itself produced this precise kind of document — twice. First, on December 30, 2025, shortly after filing this suit, appellant published disclosures pursuant to AB 2013 on its website. ER-166–76. Appellant's own briefing describes that publication as a high-level, limited disclosure that does not reveal its trade secrets. Pl's Br. at 13; AG Br. at 9.

11

Second, on July 8, 2026 — one week before the answering brief in this appeal was filed — appellant published a "Public Summary of Training Content for Grok 4.5" on its website, pursuant to Article 53(1)(d) of the European Union's AI Act and using the European AI Office's mandatory template, for a model with a stated Union-market placement date of July 14, 2026. This document is explored in greater depth *infra*, but appellant disclosed:

> more than 10 trillion tokens of text; more than 1 billion images; more than 1 million hours each of audio and video; a named crawler ("xAI Web Crawler") with a stated collection period of January 2024 through June 2026 and identified categories of crawled domains (academic and research repositories, patent and technical databases, legal and government resources, document-sharing platforms, community sites, and region-specific portals); user data subject to opt-outs; synthetic data generated by Grok and internal models; illegal-content screening by filtering, keyword rules, and model-based classifiers; and multilingual corpus characteristics.

This Court may take judicial notice of the existence and contents of appellant's published compliance documents. Fed. R. Evid. 201(b)(2). Amicus presents these materials not to dispute any finding below, but because they postdate the record through no fault of any party and bear on the questions this Court must decide.

12

**E.      The required statements are statements the industry already makes voluntarily**

Each of the twelve categories § 3111(a) enumerates calls for a statement of fact about the contents and provenance of training data — the same statements that appear, in nearly identical language, in the voluntary and compliance documents described above. That includes the disclosure of whether datasets contain material protected by copyright: every compliant developer already makes that statement, in hedged factual terms ("may include material covered by third-party intellectual property rights"); the United States Copyright Office's 2025 report treats the practice as factual background, AG Br. at 6; and appellant's own EU summary goes further, affirming licensing agreements with rightsholders. Whether a corpus contains copyrighted material is a statement about the corpus, not a position on any question in litigation — and it is a statement the entire industry, appellant included, already utters in its own documents.

## II. DISCLOSURE OF WHAT DATA WAS USED REVEALS NOTHING ABOUT HOW A MODEL WAS BUILT

### A. The statute's text: categories, ranges, and "whether," but never "how"

The development of a generative AI system proceeds through a value chain: dataset selection, mixture proportions, filtering and deduplication pipelines, training procedures and curricula, reinforcement learning, and the resulting model weights. AB 2013's text touches only the first link, and only at category level: it requires a "high-level summary," § 3111(a); it permits data-point counts in "general ranges"; and it asks "whether" datasets were cleaned, processed, or modified — not what the processing entailed or how it was performed. § 3111(a)(9); AG Br. at 40. The statute requires no datasets, no methods, no mixtures, no weights, and no architecture. Crucially, the statute also does not require that a developer explain the reason a particular dataset was selected for inclusion in a training-data corpus. In other words, compliance with AB 2013 mandates disclosure of what data is present in the corpus but not *why*, or what motivated the reasons for inclusion or exclusion.

The first enumerated item confirms the point rather than qualifying it. Section 3111(a)(1) asks for "the sources or owners of the datasets" — the

categories from which material was drawn and the parties from whom it was obtained — not an inventory of the datasets themselves. The statutory command is a "high-level summary," § 3111(a), and the Attorney General reads the provision as satisfied by categorical description. AG Br. at 40. Industry practice confirms that reading: as Part I demonstrates, every developer that has published under AB 2013 has answered item (1) with source categories, and not one has named a dataset. Appellant's own AB 2013 publication does the same. ER-166–76.

**B.     The technical record: model capability is created by process and curation, not by data identity**

It is not the existence or identity of datasets that determines the outputs, character, capability, or uniqueness of a generative AI system. The functionality of such a system is created by the training *process*: the iterative adjustment of billions of parameters and weights across repeated passes over the data, under choices — mixture proportions, ordering, filtering, curricula — that are nowhere recorded in a summary of sources. Beyond pre-training, each system is further shaped by reinforcement learning, which is guidance of the model toward preferred outputs. This proceeds in two principal varieties: reinforcement learning from human feedback ("RLHF") and reinforcement learning from AI feedback ("RLAIF"). Those processes depend on the particular human evaluators or AI systems

15

providing the feedback, which necessarily differ from firm to firm and from human to human by construction.

The machine-learning literature independently documents that training runs are not reproducible even by the developer itself. Surveys of reproducibility in machine learning report that results vary between training runs "even with identical code, data, and hyperparameters," owing to inherent nondeterminism in training, meaning that there is no preset outcome that is necessarily going to occur in a training run. This is attributable to a variety of structural factors that are unavoidable in the training process: random initialization, stochastic optimization, data ordering, and hardware-level floating-point behavior. Semmelrock et al., *Reproducibility in Machine-Learning-Based Research: Overview, Barriers and Drivers*, arXiv:2406.14325 (June 20, 2024).

For large language models specifically, the literature adds that the parallelized, distributed character of training at scale means "subtle differences in the learning process can lead to significant variations in the model's behavior," and that the computational scale required "may make it infeasible to reproduce the exact training conditions or retrain the model from scratch." Boyko et al., *An Interdisciplinary Outlook on Large Language Models for Scientific Research*, arXiv:2311.04929 (Nov. 3, 2023). If anything, that "infeasibility" claim is modest in its skepticism: the irreproducibility introduced by the RLHF and RLAIF

16

regimens now standard across the generative AI industry means that no two training runs will be the same. From a technical perspective, two developers given the same data would not build the same model, and the same developer, given its own data twice, would not build the same model twice.

The industry's own conduct locates its competitive investment accordingly. Appellant's declarant states that it uses "data that is common to all developers, including large repositories of publicly available information," ER-186 (Stanley Decl. ¶ 10), and appellant's complaint acknowledges that many AI companies will have overlap in the datasets they use. The source appellant itself cites for competitive sensitivity concerns *process*, not inventory: "knowing exactly how a rival *processes* their training data is like getting a peek at their playbook." Pl's Br. at 42. What differentiates developers working from overlapping public corpora is curation and training, which is to say: which subsets are selected, in what proportions, filtered how, and trained by what procedure.

## C.     The limit case: perfect knowledge of the corpus yields no knowledge of the model

An illustration makes the point precise. Assume that all human knowledge, in all its forms, were reduced to digitally accessible format — every book, every photograph, every song — and provided to a generative AI system for training.

17

The training-data summary for that system would be simple: *everything there is*. A competitor reading that summary would know with certitude exactly what data the developer used but would know nothing at all about how the model was trained, what its parameters are, or what was created in the process. Perfect knowledge of the corpus yields zero knowledge of the model.

Real systems only strengthen the conclusion. Every actual training corpus is a proprietary subset of available data, and it is the boundaries of the subset, the proportions of the mixture, and the processing applied to it that embody the developer's choices. A high-level summary states the categories from which a corpus was drawn; it does not state how much was drawn, from where within each category, in what proportion, or subject to what filtering. If something less than everything is used, but precisely how much less — and which parts — is never revealed, the internal training corpus remains unknowable to outsiders. Categorical disclosure leaves the compilation exactly as secret as it was. And under both California and federal statutory definitions, trade-secret protection extends only to information that is not "generally known." Cal. Civ. Code § 3426.1(d); 18 U.S.C. § 1839(3). The categorical facts § 3111(a) requires are, as Part I demonstrates, published industry-wide, including — for the information in appellant's Grok 4.5 summary — by appellant itself, to the world.

To be precise about what this argument does and does not claim: the summaries are not thereby valueless. They answer different questions for different audiences. But to replicate the training process would require far more than the summaries mandated under AB 2013 require, including the engineering information, subset boundaries, mixtures, procedures, and weights.

## III. AB 2013 IS A MODEST ENTRANT IN A GLOBAL FAMILY OF TRAINING-DATA TRANSPARENCY OBLIGATIONS

### A. The European Union's public training-content summary

The Centre observes and analyzes the regulatory frameworks that apply to generative AI around the world. Across those frameworks there is a growing consensus: disclosure of datasets, general training principles, and the sourcing of training data is desirable to ensure transparency in models and protection for consumers. California's AB 2013 sits comfortably within that consensus and, if anything, is less demanding than the approaches adopted elsewhere.

The most developed obligation is the European Union's. Article 53(1)(d) of the EU AI Act, Regulation (EU) 2024/1689, requires providers of general-purpose AI models to draw up and make publicly available a sufficiently detailed summary of the content used for training, according to a template published by the EU AI Office in July 2025. The obligation became applicable in August 2025; the

19

European Commission's enforcement powers take effect on August 2, 2026. The Act's own recitals state the calibration:

> In order to increase transparency on the data that is used in the pre-training and training of general-purpose AI models, including text and data protected by copyright law, it is adequate that providers of such models draw up and make publicly available a sufficiently detailed summary of the content used for training the general-purpose AI model. While taking into due account the need to protect trade secrets and confidential business information, this summary should be generally comprehensive in its scope instead of technically detailed to facilitate parties with legitimate interests, including copyright holders, to exercise and enforce their rights under Union law . . . .

Regulation (EU) 2024/1689, recital 107.

Compliance may be demonstrated through joining the voluntary Code of Practice or by "alternative adequate means"; the route is the provider's choice, but the obligation to publish summaries is not. Section 3.1 of appellant's own Grok 4.5 summary records both halves of that proposition: xAI is not a signatory to the Code of Practice, but it does make its required disclosures. Notably, the public summary is distinct from the technical documentation a provider furnishes to the AI Office and national authorities on request, which the AI Act holds in confidence under Article 78. The public summary is the tier at issue here, and the tier appellant has performed.

20

### B.     Item for item, AB 2013 asks for less

Measured against the EU template, California's statute asks for less at every point of overlap. The EU template requires per-modality disclosure of training-data volumes in banded ranges across text, image, audio, and video; identification of the provider's crawlers by name, their periods of operation, their behavior, and the categories of domains crawled; disclosure of whether datasets were commercially licensed from rightsholders; a description of measures taken to respect rights reservations under the EU's text-and-data-mining regime; identification of the models used to generate synthetic training data; and a description of measures taken to remove illegal content. Section 3111(a), by contrast, prescribes no template, no per-modality banding, and no crawler identification; it permits general ranges; and it asks "whether" — never how — data was cleaned or processed. Item by item, *see* Table 1 *infra*, the California statute is the more modest instrument. Appellant's AB 2013 submission speaks for itself, but a comparison with what appellant provided to the European Union highlights the higher burden imposed under the AI Act. xAI has not filed a legal challenge in any European court against enforcement of the AI Act.

**Table 1.** California Civil Code § 3111(a), the EU AI Office template as completed by appellant, and compliant peer California disclosures.

| AB 2013 item (Cal. Civ. Code § 3111(a)) | xAI Grok 4.5 EU summary (July 8, 2026) | Peer AB 2013 disclosures (OpenAI / Anthropic) |
|---|---|---|
| (1) Sources or owners of datasets | Named crawler; crawl period 01/2024–06/2026; domain categories; third-party, user, contractor, internal sources | Generalized source categories; Anthropic names its crawler practice |
| (2) How datasets further the intended purpose | "Improve language understanding, reasoning, and overall capabilities"; per-modality descriptions | OpenAI: help systems understand language and the world; Anthropic: enumerated training objectives |
| (3) Number of data points (general ranges) | Checked bands: >10T tokens; >1B images; >1M hrs audio; >1M hrs video | OpenAI: "trillions of tokens"; Anthropic: "billions of tokens," ranges typical of frontier models |
| (4) Types/labels of data points | Scientific text, legal/official documents, social media, source code; photographs, artworks, infographics; per-modality | Anthropic § 4: text/image/preference/safety data types |
| (5) Copyright / trademark / patent status | § 2.2.1: commercial licensing agreements concluded with rightsholders (a fortiori admission) | Both: "may be protected by copyright" + public-domain acknowledgment |
| (6) Purchased or licensed | Yes — licensed (text, image) + other third-party private datasets | Both acknowledge commercial arrangements / partnerships |

22

| (7) Personal information (§ 1798.140(v)) | User data disclosed; "advanced data filtering processes to reduce personal information" | Both: incidental PI acknowledged; mitigation and opt-outs described |
|---|---|---|
| (8) Aggregate consumer information (§ 1798.140(b)) | No direct EU analogue — one-sentence answer under AB 2013 | Anthropic § 8 answers it in two sentences |
| (9) Cleaned / processed / modified | Curated and filtered for quality and safety; illegal-content screening: filtering, keyword rules, model-based classifiers | Anthropic § 9: dedupe, classification, safety filtering, privacy processing |
| (10) Collection time period | Through June 2026; continuous refinement noted | OpenAI: since ~2018, ongoing; Anthropic: ongoing, per model card |
| (11) Dates datasets first used | Placement date + version dating | OpenAI: first used in development 2021; Anthropic: per model releases since 2023 |
| (12) Synthetic data use | Yes — generated by Grok and internal models (identifies the generating models) | Both: yes, synthetic/internally generated data in the mix |

The only § 3111(a) items without a direct analogue in appellant's own EU publication are a CCPA-defined yes-or-no and the trademark-and-patent halves of a single item.

## C.    The wider family: jurisdictions in force and pending

The European obligation is the most developed, but not alone. In China, the Interim Measures for the Management of Generative Artificial Intelligence

23

Services (in force since August 15, 2023) impose statutory duties on providers regarding the lawful sourcing of training data and empower regulators to require providers to describe the sources, scale, and types of their training data. In South Korea, the Framework Act on the Development of Artificial Intelligence and Establishment of a Foundation for Trust (enacted January 21, 2025, effective January 22, 2026) and its Enforcement Decree impose transparency obligations on operators of generative AI, prescribing the form and content of required disclosures. In the United States, Colorado's Artificial Intelligence Act (effective 2026) requires developers of covered systems to furnish deployers documentation describing, among other things, the types of data used to train the system. Colo. Rev. Stat. § 6-1-1702 (2026).

The direction of travel is equally legible in pending measures: Brazil's Senate approved Bill No. 2,338/2023, a comprehensive AI framework addressing training-data use, in December 2024; the Generative AI Copyright Disclosure Act, H.R. 7913, was introduced in the 118th Congress to require notice of copyrighted works used in training; and further California measures on training-data documentation have been introduced, including AB 412. Whatever the fate of any individual bill, the pattern across legal systems is consistent: legislatures and regulators have adopted the reasoning of the European Union's recital 107 and call for high-level, categorical, public disclosure.

24

### D. Voluntary transparency decays; mandated transparency is used

The Centre's own research addresses why these legislatures acted. In *Data Not Found* (2026), the Centre evaluated data-transparency conditions across fifteen major platforms in three regulatory environments and found that meaningful access for independent scrutiny tracks the presence of a regulatory framework — with Brazil, lacking a dedicated framework, recording the lowest access of the three. The generative AI field furnishes its own example: the GPT-4 technical report expressly declined to disclose any detail of its training data, citing "the competitive landscape." Stanford's Foundation Model Transparency Index systematically scores developer disclosures, documenting both their research utility and the variability of voluntary practice.

The published disclosures are used. They are used by researchers, through transparency indices and independent study; the Centre's ICO submission urged researcher access to training data precisely because such study is otherwise impossible. And they are used by rightsholders, for whom training-content summaries are the informational predicate for exercising their rights — again, the express design purpose of the European Union's parallel obligation. Regulation (EU) 2024/1689, recital 107. On the global spectrum of what regulators have required — from individualized notification obligations under European data-protection law, which the Centre's ICO submission analyzed and for whose breach

25

European regulators have imposed fines, to the European Union's templated public summary — California's single high-level website posting sits at the modest end.

## CONCLUSION

Amicus respectfully submits this brief in an effort to assist the Court in parsing the technological and operational context in which training-data summaries sit. Both industry practice and global engagement with generative AI systems provide important framing for the questions presented for the Court to determine.

Dated: July 22, 2026

Respectfully submitted,

/s/ Gina Neff
GINA NEFF
*Director*

JAMES J. WARD
TARYN J.M. WARD

MINDEROO CENTRE FOR
TECHNOLOGY
AND DEMOCRACY
University of Cambridge
The Entopia Building, 1 Regent Street
Cambridge CB2 1GG, United Kingdom

*Authorized Representatives of*
*Amicus Curiae*

26

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) and Ninth Circuit Rule 32-1 because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), it contains 4,834 words, which is no more than one-half the 14,000 words permitted for a party's principal brief.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman type.

Dated: July 22, 2026

/s/ Gina Neff
GINA NEFF
*Authorized Representative of Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit through the Court's Electronic Document Submission System. I further certify that I have served a copy of the foregoing on all parties via electronic mail.

Dated: July 22, 2026

/s/ Gina Neff
GINA NEFF
*Authorized Representative of Amicus Curiae*