**No. 26-1591**

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

X.AI LLC,

*Plaintiff-Appellant*,

v.

ROB BONTA, in his official capacity as
Attorney General of the State of California,

*Defendant-Appellee*.

On Appeal from the United States District Court for the
Central District of California,
No. 2:25-cv-12295

# REPLY BRIEF FOR APPELLANT

ERIN E. MURPHY
*Counsel of Record*
JAMES Y. XI
MITCHELL K. PALLAKI
ILAN J. POSNER
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Plaintiff-Appellant*

September 4, 2026

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... ii

INTRODUCTION .......... 1

ARGUMENT .......... 4

I. xAI Is Likely To Succeed On Its First Amendment Claim .......... 4

A. A.B.2013 Does Not Regulate "Commercial Speech" .......... 4

B. A.B.2013 Flunks Any Level of Scrutiny .......... 12

II. xAI Is Likely To Succeed On Its Takings Claims .......... 18

A. A.B.2013 Eviscerates xAI's Trade Secrets .......... 19

B. A.B.2013 Effects Uncompensated Takings of xAI's Trade Secrets .......... 22

C. xAI May Obtain Injunctive Relief to Prevent Disclosure of Its Trade Secrets .......... 26

III. xAI Is Likely To Succeed On Its Vagueness Claim .......... 28

IV. The Remaining Preliminary Injunction Factors Favor xAI .......... 29

CONCLUSION .......... 31

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

### Cases

*44 Liquormart v. Rhode Island*,
517 U.S. 484 (1996) .......... 1

*Agins v. City of Tiburon*,
447 U.S. 255 (1980) .......... 26

*Alford v. Walton Cnty.*,
159 F.4th 844 (11th Cir. 2025) .......... 23, 24

*Alta Devices v. LG Elecs.*,
343 F.Supp.3d 868 (N.D. Cal. 2018) .......... 22

*Am. Beverage Ass'n v. City & Cnty. of S.F.*,
916 F.3d 749 (9th Cir. 2019) .......... 10, 14

*Am. Meat Inst. v. USDA*,
760 F.3d 18 (D.C. Cir. 2014) .......... 3, 7

*Amgen v. Cal. Corr. Health Care Servs.*,
260 Cal.Rptr.3d 873 (Cal. Ct. App. 2020) .......... 20

*Ams. for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021) .......... 1, 18

*Armstrong v. United States*,
364 U.S. 40 (1960) .......... 24

*Baird v. Bonta*,
81 F.4th 1036 (9th Cir. 2023) .......... 30

*Barber v. Charter Twp. of Springfield*,
31 F.4th 382 (6th Cir. 2022) .......... 27

*Bolger v. Youngs Drug Prods. Corp.*,
463 U.S. 60 (1983) .......... 1, 7

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011) .......... 1

*CDK Glob. v. Brnovich*,
16 F.4th 1266 (9th Cir. 2021)....................26

*Cedar Point Nursery v. Hassid*,
594 U.S. 139 (2021).................... 24, 27

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*,
447 U.S. 557 (1980)....................10

*City of Cincinnati v. Discovery Network*,
507 U.S. 410 (1993)....................4, 9

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
657 F.3d 936 (9th Cir. 2011)....................17

*CTIA – The Wireless Ass'n v. City of Berkeley*,
928 F.3d 832 (9th Cir. 2019).................... 10, 16

*Curtin v. Benson*,
222 U.S. 78 (1911)....................23

*Cuviello v. City of Vallejo*,
944 F.3d 816 (9th Cir. 2019).................... 29, 30

*Desert Outdoor Advert. v. City of Moreno Valley*,
103 F.3d 814 (9th Cir. 1996)....................16

*Doe v. Harris*,
772 F.3d 563 (9th Cir. 2014)....................17

*E. Enters. v. Apfel*,
524 U.S. 498 (1998)....................27

*Edenfield v. Fane*,
507 U.S. 761 (1993)....................17

*Foothills Christian Ministries v. Johnson*,
148 F.4th 1040 (9th Cir. 2025)....................30

*Hartley Pen Co. v. U.S. Dist. Ct.*,
287 F.2d 324 (9th Cir. 1961)....................24

*Hodel v. Irving*,
481 U.S. 704 (1987)....................23

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*,
515 U.S. 557 (1995).................... 8, 14

*IMDb.com v. Becerra*,
962 F.3d 1111 (9th Cir. 2020) ....................9

*In re R.M.J.*,
455 U.S. 191 (1982).................... 13

*InteliClear v. ETC Glob. Holdings*,
978 F.3d 653 (9th Cir. 2020)....................22

*Knick v. Twp. of Scott*,
588 U.S. 180 (2019)....................26

*Lingle v. Chevron U.S.A.*,
544 U.S. 528 (2005).................... 23, 26

*Lucas v. S.C. Coastal Council*,
505 U.S. 1003 (1992)....................23

*Masterpiece Cakeshop v. Colo. Civil Rights Comm'n*,
584 U.S. 617 (2018)....................18

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
559 U.S. 229 (2010)....................14

*Moody v. NetChoice*,
603 U.S. 734 (2024).................... 16, 17

*NAACP v. Button*,
371 U.S. 415 (1963)....................28

*Nat'l Ass'n of Mfrs. v. SEC*,
800 F.3d 518 (D.C. Cir. 2015) ....................14

*Nat'l Ass'n of Wheat Growers v. Bonta*,
85 F.4th 1263 (9th Cir. 2023).................... 10, 15

*Nationwide Biweekly Admin. v. Owen*,
873 F.3d 716 (9th Cir. 2017)....................................................................11

*NetChoice v. Bonta*,
113 F.4th 1101 (9th Cir. 2024)..............................................................4, 9

*NIFLA v. Becerra*,
585 U.S. 755 (2018)...................................................................... *passim*

*PG&E v. Pub. Util. Comm'n*,
475 U.S. 1 (1986)..........................................................................18

*Philip Morris v. Reilly*,
312 F.3d 24 (1st Cir. 2002) ............................................... 20, 21, 24, 26

*PhRMA v. O'Day*,
2026 WL 1780177 (U.S. June 22, 2026) ..............................................11

*PhRMA v. Stolfi*,
153 F.4th 795 (9th Cir. 2025)....................................................11, 12, 23

*PhRMA v. Williams*,
64 F.4th 932 (8th Cir. 2023)..................................................................27

*Riley v. Nat'l Fed'n of the Blind*,
487 U.S. 781 (1988).................................................................11, 15

*Rodriguez Diaz v. Garland*,
53 F.4th 1189 (9th Cir. 2022)..................................................................23

*Rubin v. Coors Brewing*,
514 U.S. 476 (1995)..........................................................................1

*Ruckelshaus v. Monsanto*,
467 U.S. 986 (1984).............................................................. 3, 24, 25

*S.F. Apartment Ass'n v. City & Cnty. of S.F.*,
881 F.3d 1169 (9th Cir. 2018)..................................................................11

*Selby Realty v. City of San Buenaventura*,
514 P.2d 111 (Cal. 1973)..........................................................................27

*Uber Techs. v. City of Seattle*,
168 F.4th 1202 (9th Cir. 2026)....................10

*United States v. California*,
173 F.4th 1060 (9th Cir. 2026)....................30

*United States v. Kirilyuk*,
29 F.4th 1128 (9th Cir. 2022)....................23

*United States v. Nosal*,
844 F.3d 1024 (9th Cir. 2016)....................22

*United States v. Trumbull*,
114 F.4th 1114 (9th Cir. 2024)....................28

*United States v. United Foods*,
533 U.S. 405 (2001).................... 1, 8, 9, 14

*United States v. Williams*,
553 U.S. 285 (2008)....................29

*Wash. Post v. McManus*,
944 F.3d 506 (4th Cir. 2019)....................8

*X Corp. v. Bonta*,
116 F.4th 888 (9th Cir. 2024).................... 1, 7, 8

*Zauderer v. Off. of Disciplinary Couns.*,
471 U.S. 626 (1985).................... 7, 10, 13, 14

*Zunum Aero v. Boeing*,
2025 WL 2364602 (9th Cir. Aug. 14, 2025)....................22

**Statutes**

15 U.S.C. §1454(c)(3)....................21

Cal. Civ. Code §3111(a)....................29

Cal. Civ. Code §3111(a)(2).................... 15, 21

Cal. Civ. Code §3111(a)(3)....................21

Cal. Civ. Code §3111(a)(4)....................21

Cal. Civ. Code §3111(a)(9) ........................................................................ 15, 21

**Other Authorities**

Joint Mot. for Judg. & Final Stip. Judg., *Cedar Point Nursery v. Hassid*, No.1:16-cv-185 (E.D. Cal. Sept. 1, 2021) ............................................27

Antonin Scalia & Bryan A. Garner, *Reading Law* (2012) ...................................... 28

## INTRODUCTION

The Supreme Court has repeatedly warned California not to "mark off new categories of speech for diminished constitutional protection." *NIFLA v. Becerra*, 585 U.S. 755, 767 (2018); *see Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 610-11 (2021); *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 792-94 (2011). The Court's approach to "commercial speech" is an exception to that rule. *See 44 Liquormart v. Rhode Island*, 517 U.S. 484, 522-23 (1996) (Thomas, J., concurring in part); *Rubin v. Coors Brewing*, 514 U.S. 476, 493 (1995) (Stevens, J., concurring in judgment). But the Court has "defined" that category narrowly to reach only "speech that does no more than propose a commercial transaction." *United States v. United Foods*, 533 U.S. 405, 409 (2001). And for decades, both the Supreme Court and this Court have policed that definition "carefully to ensure that speech deserving of greater constitutional protection is not inadvertently suppressed." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983); *see X Corp. v. Bonta*, 116 F.4th 888, 900 (9th Cir. 2024).

California's brief eviscerates that careful approach. California does not dispute that the traditional definition of "commercial speech" is inapt here. Resp.Br.17. After all, A.B.2013 does not regulate voluntary speech that "proposes a commercial transaction," *Bolger*, 463 U.S. at 66-67—it applies *even if xAI is not speaking at all*. And California does not even try to argue that any of the *Bolger*

factors favors characterizing A.B.2013 as a regulation of "commercial speech." California instead insists that A.B.2013 regulates "commercial speech" because it requires AI companies to communicate "product-specific" information about AI models that are available for purchase. Resp.Br.24. And it claims that the disclosure requirement satisfies intermediate scrutiny because it serves the state's purportedly substantial interest in "provid[ing] consumers and users … with important information related to the products they might use." Resp.Br.30.

That sweeping position has no basis in law and lacks any limiting principle. Under California's logic, states could compel private parties to disclose all sorts of "product-specific" information about products available for purchase. And because such efforts would almost always provide consumers with "important information" about "products they might use," virtually all such requirements would satisfy intermediate scrutiny. Consumers would surely like to know why Hermès and Rolex price their goods how they do, and how they select which customers get to purchase a coveted Birkin bag or Daytona watch. Consumers would also like to know how Meta and X decide what third-party content to recommend, and how Erewhon prices its groceries. Some consumers may want to know whether a local hospital has ever employed a doctor that has provided abortions or sex-change surgeries for minors. Others may want to know the educational background or political affiliations of a company's employees. Under California's view of the law, there would be "no end

to the information that states could require manufacturers to disclose." *Am. Meat Inst. v. USDA*, 760 F.3d 18, 31-32 (D.C. Cir. 2014) (en banc) (Kavanaugh, J., concurring). Thankfully, that is not how the First Amendment works.

California's disregard of basic First Amendment principles is bad enough. But its view of the Takings Clause makes things worse. According to California, AI companies lack "reasonable investment-backed expectations" in their trade secrets because they choose to operate in a rapidly developing industry with "world-changing consequences." Resp.47-48. That position conflicts with the Supreme Court's analysis in *Ruckelshaus v. Monsanto*, 467 U.S. 986 (1984), and threatens grave consequences to boot. Rapidly developing and highly competitive industries that involve world-changing technologies are where trade-secret protections matter most. Yet by California's telling, states could force companies to disclose protected trade secrets so long as they have the temerity to innovate in an industry that states may want to regulate sometime in the future. Whether a law is about datasets used to train AI, source code for AI models, or business strategies for developing new uses of this "world-changing" technology, all such information would be at risk of forced disclosure. That is not and cannot be the law.

As for xAI's vagueness claim, even now California cannot say what its law requires. This Court should therefore vacate the district court's decision denying xAI's motion for preliminary injunction.

# ARGUMENT

## I. xAI Is Likely To Succeed On Its First Amendment Claim.

### A. A.B.2013 Does Not Regulate "Commercial Speech."

1. California concedes that a disclosure requirement that "compels individuals to speak a particular message or alters the content of protected speech is generally viewed as a content-based 'compelled speech' requirement subject to strict scrutiny." Resp.Br.17. And it does not dispute that A.B.2013 compels xAI to speak a message it does not wish to speak. California nevertheless insists that A.B.2013 escapes strict scrutiny because it falls within the "commercial-speech exception." Resp.Br.17. But both the Supreme Court and this Court have repeatedly confirmed that "*the test* for identifying commercial speech" is whether the speech "does no more than propose a commercial transaction." *City of Cincinnati v. Discovery Network*, 507 U.S. 410, 423 (1993); *see NetChoice v. Bonta*, 113 F.4th 1101, 1119 (9th Cir. 2024). California does not dispute that A.B.2013's disclosures do not fit that bill. Nor does it even try to argue that the speech A.B.2013 compels satisfies *any Bolger* factor. Resp.Br.18-26. California instead argues that "laws mandating disclosure of 'product-specific economic information' are regulations of commercial speech," Resp.Br.18, and that such laws satisfy "intermediate scrutiny" so long as they further the state's interest "in allowing consumers to make informed decisions about what [products] to use," Resp.Br.30-31.

California never seriously grapples with the astounding implications of that claim. By California's telling, the government can compel companies to reveal all kinds of sensitive information about their products so long as some consumers may find that information useful in deciding whether to use the product. The only limit to the government's ability to compel speech would be its creativity. Under California's view, states could compel technology companies to disclose details about the training their engineers receive on the theory that the information may help the public "better evaluate if they have confidence" in the products designed by those engineers. Resp.Br.30. After all, "[s]hortcomings in the [training] … can lead to shortcomings in the … product." Resp.Br.30. States could compel manufacturers to disclose every component and every engineering technique used to manufacture a particular piece of equipment on the ground that "the use of [certain components and techniques] can lead to a … product breaking down over time." Resp.Br.32. States could even compel a newspaper to disclose a reporter's educational background and political affiliations since they "might raise concerns … about the accuracy and reliability" of its articles. Resp.Br.32.

Indeed, if it really were the case that a state could compel disclosure of "product-specific" information anytime consumers might find that information useful, then California could compel companies to reveal confidential trade secrets about their products—as this case illustrates. Could a state require The Coca-Cola

Company to disclose the formula for Coke? That is "product-specific" information that consumers may want to know when choosing between Coke and Pepsi. What about Google's algorithm for search? That too is "product-specific" information consumers may want to know when deciding between Google and Bing.

California's response only underscores that its position lacks any limiting principle. It insists that the "commercial speech analysis is fact-driven." Resp.Br.24. But the only fact that matters under California's approach is whether the law compels "product-specific" information that consumers may find useful in making purchasing decisions. Resp.Br.25. California insists that there is a difference between forcing disclosure of "general information about … a business entity," as opposed to "information specific to [a product] made available to consumers." Resp.Br.24. But California never tries to explain why that distinction should matter under its conception of "commercial speech." If (as California claims) the touchstone for "commercial speech" is whether the information "will allow potential consumers to better understand the consequences of entering into a commercial transaction," Resp.Br.22, then it is unclear why general information about a business would not qualify; after all, consumers may want to know all sorts of information about a business before deciding whether to purchase its products or services. California's felt need to gerrymander unprincipled exceptions just confirms that its entire approach to "commercial speech" is flawed.

California next insists that laws regulating commercial speech "still need to satisfy intermediate scrutiny." Resp.Br.25. That is a curious claim, as California's principal position is that laws that compel commercial speech should be evaluated under the more permissive approach of *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985). At any rate, intermediate scrutiny hardly solves California's problems since California thinks that virtually all disclosure requirements satisfy intermediate scrutiny. If (as California apparently believes) providing consumers with information they might want is a sufficiently important governmental interest, then requiring a company to provide that information will virtually always advance that interest, and the "means-end fit" that intermediate scrutiny requires will be "self-evidently satisfied." Resp.Br.30-34. As Justice Kavanaugh has explained, such a "circular formulation … drain[s]" intermediate scrutiny "of any meaning in the context of compelled commercial disclosures." *Am. Meat Inst.*, 760 F.3d at 31 (Kavanaugh, J., concurring in judgment).

2. Thankfully, neither the Supreme Court nor this Court has ever embraced such a sweeping conception of "commercial speech." To the contrary, both have repeatedly admonished that courts must police the definition of commercial speech "carefully to ensure that speech deserving of greater constitutional protection is not inadvertently suppressed." *Bolger*, 463 U.S. at 66; *X Corp.*, 116 F.4th at 900. And this Court has already rejected California's effort to radically reconceptualize what

constitutes commercial speech. As this Court explained, "the test for whether speech is commercial" cannot turn "on whether the speech is 'directed to potential consumers and may presumably play a role in the decision of whether to use the platform.'" *X Corp.*, 116 F.4th at 902 n.10. Otherwise, "basically any compelled disclosure by any business about its activities would be commercial and subject to a lower tier of scrutiny." *Id.* at 902. "Protection under the First Amendment cannot be vitiated so easily." *Id.*

California tries to distinguish *X Corp.*, noting that the California law there compelled statements that were "subjective and political." Resp.Br.23. But the Supreme Court has made clear that the compelled-speech doctrine applies "not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 573 (1995). Indeed, the "Court has emphasized that there is *no constitutional difference* between 'compelled statements of opinion' and 'compelled statements of fact.'" *Wash. Post v. McManus*, 944 F.3d 506, 518 (4th Cir. 2019) (emphasis added). And it has specifically rejected the contention that the First Amendment applies with less force to speech that "does not compel the expression of political or ideological views." *United Foods*, 533 U.S. at 411.

Whether a compelled-speech law regulates "commercial speech" thus turns not on whether the speech being compelled is a statement of fact or opinion, but

whether it "does no more than propose a commercial transaction." *Id.* at 409. This Court's decision in *IMDb.com v. Becerra*, 962 F.3d 1111 (9th Cir. 2020), illustrates the point. One could have said there (as California says here) that California's law did not require anyone to "opine on fraught political issues," "express a normative view about their products," or "define their products in value-laden, state prescribed language." Resp.Br.23-24. And one could have said there (as California says here) that the law merely required disclosure of "product-specific," "objective information" regarding the plaintiff's services. Resp.Br.24. Yet this Court nevertheless held that the law did not regulate commercial speech because the content on IMDb did not "propose a commercial transaction." 962 F.3d at 1122.[1] That is "*the test*" both the Supreme Court and this Court have repeatedly applied to determine whether speech is commercial. *Discovery*, 507 U.S. at 423; *see NetChoice*, 113 F.4th at 1119.

None of the cases California cites supports its contrary view. *CTIA – The Wireless Association v. City of Berkeley* involved a city ordinance that required cell phone retailers to include health and safety warnings *when selling cell phones*. 928

[1] California suggests that IMDb is not engaged in any commercial activity because "IMDb is not in the business of selling actors." Resp.Br.23. But IMDb *is* in the business of providing facts about the entertainment industry through a "subscription-based service," 962 F.3d at 1117, which is the service California sought to regulate by compelling IMDb to disclose factual information it did not wish to disclose.

F.3d 832, 838 (9th Cir. 2019). Requiring a retailer to include certain information at the point-of-sale is a classic commercial-speech regulation. When a company is voluntarily engaging in commercial speech (such as by persuading consumers to purchase a product at the point-of-sale), the government can sometimes restrict that speech or compel the speaker to include certain factual and uncontroversial information to ensure that the speech is not misleading, *Zauderer*, 471 U.S. at 651, or require the speaker to provide "health and safety warnings," *NIFLA*, 585 U.S. at 775; *see Am. Beverage Ass'n v. City & Cnty. of S.F.*, 916 F.3d 749, 756 (9th Cir. 2019) (en banc); *Uber Techs. v. City of Seattle*, 168 F.4th 1202, 1215-16 (9th Cir. 2026).[2] But the relaxed scrutiny for commercial-speech regulations has no role to play when (as here) the company is *not speaking at all*, let alone engaging in commercial speech. In that context, a government-mandated disclosure requirement that compels a company to speak is not "regulat[ing]" commercial speech. *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 562 (1980). It is just compelling speech. And when it does so in a way that dictates the content of the

[2] California's analogy to drug and ingredient labels is therefore inapt. Resp.Br.34. When a company includes labeling on products that it sells to the consumer, the company is engaging in classic commercial speech (*i.e.*, proposing a commercial transaction). That is why states may require the company to include some factual and noncontroversial information on the labels. *See, e.g.*, *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1275 (9th Cir. 2023).

company's speech (as here), strict scrutiny applies. *See NIFLA*, 585 U.S. 766; *Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 795 (1988).

For similar reasons, *San Francisco Apartment Association v. City & County of San Francisco* is inapposite. That case involved a local ordinance that required landlords to provide tenants with certain disclosures when engaged in discussions "about the possibility of entering into a buyout agreement." 881 F.3d 1169, 1176 (9th Cir. 2018). In other words, it required landlords to disclose information when they were proposing a transaction. *Nationwide Biweekly Administration v. Owen* involved a California law that required a mortgage company to "make certain truthful disclosures *in its mail solicitations*." 873 F.3d 716, 721 (9th Cir. 2017) (emphasis added). That, too, was a classic regulation of commercial speech.

That leaves California's reliance on this Court's divided decision in *PhRMA v. Stolfi*. 153 F.4th 795 (9th Cir. 2025), *cert pending*, No.25-1018 (U.S. filed Feb. 20, 2026).[3] But as California does not dispute, *Stolfi* involved a government-reporting requirement, not a public-disclosure requirement. *Id.* at 805. California attempts to elide that distinction by noting that the information could still be disclosed publicly by the government. Resp.Br.20-21. But that was true only if Oregon determined that doing so was in "[t]he public interest." *Stolfi*, 153 F.4th at

[3] The Supreme Court recently called for the views of the Solicitor General. *See PhRMA v. O'Day*, 2026 WL 1780177 (U.S. June 22, 2026).

806. And while the *pharmaceutical industry plaintiff* argued that the law was in essence a public-disclosure requirement, the majority disagreed, concluding that it would be a "mistake[]" to subject government-reporting requirements to the same "extensive First Amendment analysis" that typically applies to public-disclosure requirements. *Id.* at 813. *Stolfi* thus expressly disclaimed articulating any "new legal test" for evaluating public-disclosure requirements. *Id.* at 822 n.18. And it made clear that speech must at the very least involve "*economic* information … tethered to commercial transactions" to be commercial. *Id.* at 821; *see id.* at 822 n.18 (describing the disclosures as "incidental to a commercial transaction").

*Stolfi*'s holding was thus decidedly narrow: When a government-reporting requirement "is closely tethered to the sale of a product," "it is properly categorized as commercial speech." *Id.* at 822. That does not begin to support the state's sweeping contention that compelled-speech requirements escape strict scrutiny whenever they force the disclosure of information that the public may find useful in deciding whether to use a product. Op.Br.30.

**B. A.B.2013 Flunks Any Level of Scrutiny.**

Even assuming A.B.2013 regulates commercial speech, it cannot withstand any level of heightened scrutiny.

1. While strict scrutiny should apply, at the very least it should be intermediate scrutiny, not (as California contends) the narrow exception for misleading commercial speech set forth in *Zauderer*. *Contra* Resp.Br.26-29. As the district court correctly concluded, "the Supreme Court's limited use of *Zauderer* outside of misleading advertisement regulations counsels against its application in this case." ER-12.

*Zauderer* upheld a requirement that attorneys who advertise their willingness to represent clients for a contingency fee must disclose whether the client must pay court costs in the event of a loss. 471 U.S. at 639-53. The Court declined to apply strict scrutiny, reasoning that while "commercial speech" (*i.e.*, speech that "propose[s] a commercial transaction") is "entitled to the protection of the First Amendment," it is entitled to "protection somewhat less extensive than that afforded 'noncommercial speech.'" *Id.* at 637. "Because the extension of First Amendment protection to commercial speech is justified principally by the value to consumers of the information such speech provides," an advertiser has only a "minimal" interest in withholding information necessary to avoid misleading consumers. *Id.* at 651. And because the government can ban misleading advertising outright, *see In re R.M.J.*, 455 U.S. 191, 203 (1982), it may preclude misleading commercial advertisements by requiring disclosures of "purely factual and uncontroversial information" to "prevent[] deception of consumers," *Zauderer*, 471 U.S. at 651.

Such disclosures constitute "one of the acceptable less restrictive alternatives to actual suppression of speech." *Id.* at 651 & n.14.

The Supreme Court has "emphatically and, one may infer, intentionally" confined *Zauderer* to the context of correcting misleading advertising. *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 522-23 (D.C. Cir. 2015). Indeed, California does not dispute that the Court has *never* applied *Zauderer* outside that context. To the contrary, it has consistently described *Zauderer* as limited to efforts to "combat the problem of inherently misleading commercial advertisements" by mandating "only an accurate statement." *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 250 (2010); *see Hurley*, 515 U.S. at 573 (similar). And it has repeatedly declined to apply *Zauderer* when the required disclosure is not "necessary to make voluntary advertisements nonmisleading for consumers." *United Foods*, 533 U.S. at 416. While this Court has applied *Zauderer* to "health and safety warnings" too, *see Am. Beverage*, 916 F.3d at 756; *cf. NIFLA*, 585 U.S. at 775 (suggesting that "health and safety warnings" may fall within *Zauderer*'s scope given their historical pedigree), it has never suggested that *Zauderer* applies to a compelled-speech mandate like A.B.2013 that is wholly disconnected from any commercial transaction or advertising. California identifies no case that has.

On top of that, A.B.2013 compels disclosure of information that is not "purely factual and uncontroversial," so *Zauderer* is inapplicable anyway. 471 U.S. at 651.

As explained, the point of A.B.2013 is to help consumers identify models that "perpetuate" or "amplify biases." ER-94; ER-155. Just as California could not require a newspaper to disclose its editorial policies to smoke out potential "bias" in reporting, California may not compel xAI to disclose information about its datasets to try to smoke out bias in its AI models. Op.Br.33-34. Moreover, A.B.2013 demands that xAI describe "how the datasets further [an AI system's] intended purpose" and discuss "the intended purpose" of its "cleaning, processing, or other modification" efforts. Cal. Civ. Code §3111(a)(2), (9). Those provisions, which target subjective information about xAI's internal business strategies, *see* ER-191.¶25, refute California's claim that A.B.2013 is concerned only with "objective, factual inquires," Resp.Br.27. Confidential product-development processes are the opposite of "purely factual and uncontroversial" information. *See Wheat Growers*, 85 F.4th at 1278.

2. In all events, A.B.2013 flunks any heightened standard. California's insists that A.B.2013 provides consumers "with important information related to the products they might use." Resp.Br.30. Not even the district court was willing to sustain that argument. It instead concluded that the only interest California had validly asserted was satisfying "consumer curiosity." ER-13. But as the court also observed (and California does not dispute), that "is generally insufficient as a substantial state interest," ER-13. *See Riley*, 487 U.S. at 798.

That alone compels reversal. Op.Br.37-38. California halfheartedly argues otherwise, claiming (as the district court did) that because xAI bore the preliminary-injunction burden, it also bore the burden of proving that A.B.2013 flunks the scrutiny analysis. Resp.Br.32. But that impermissible attempt to shift the burden defies this Court's precedent. Op.Br.37-38. Even at the preliminary-injunction stage, it is not enough for California to "proffer[] [a] justification," Resp.Br.32; California must "affirmatively establish[]" that A.B.2013 likely satisfies intermediate scrutiny. *Desert Outdoor Advert. v. City of Moreno Valley*, 103 F.3d 814, 819 (9th Cir. 1996). While California tries to recast the opinion below as purportedly "endorsing the view" that A.B.2013 helps consumers "make 'useful evaluation[s]' of AI models," Resp.Br.31, the district court clearly stated otherwise: though the court hypothesized that "litigation may reveal" some legitimate interest underlying A.B.2013, it held that this "remains to be seen," ER-13. Without a legitimate interest, A.B.2013 flunks any level of scrutiny. *See CTIA*, 928 F.3d at 844 (*Zauderer* requires a "substantial" government interest).

To the extent California has articulated any interest beyond "transparency," that interest "is very much related to the suppression of free expression." *Moody v. NetChoice*, 603 U.S. 734, 740 (2024). California made clear below that the "important information" it seeks to convey to consumers is information to help users identify "hateful posts" or "politically incorrect" and "divisive" content. ER-107;

*see* Resp.Br.2. But a state may not regulate speech "to achieve its own conception of speech nirvana." *Moody*, 603 U.S. at 742.

In all events, A.B.2013 is nowhere close to narrowly tailored to achieve any of its stated interests. California never seriously explains why consumers cannot evaluate a model's "shortcomings" by assessing its outputs. Resp.Br.30. Under intermediate scrutiny, the state must prove that its "recited harms are real," that "the regulation will in fact alleviate these harms in a direct and material way," *Doe v. Harris*, 772 F.3d 563, 577 (9th Cir. 2014), and that it considered (but rejected) less restrictive alternatives, *see Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 948 (9th Cir. 2011) (en banc). And under *Zauderer*, a disclosure law is "unjustified or unduly burdensome" if it is disproportionate to its goals. *NIFLA*, 585 U.S. at 776-77. Yet the best California can muster is that it "*may* be difficult for consumers to identify a model's deficiencies by its outputs alone," that the use of synthetic data "*might* raise concerns for consumers," that consumers "*may* also have greater confidence in a generative AI product that uses a larger dataset," and that consumers "*may* find it useful to know the labels or characteristics of data in the dataset." Resp.Br.32-33 (emphases added). But "mere speculation or conjecture" is insufficient under both intermediate scrutiny, *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993), and *Zauderer*, *see NIFLA*, 585 U.S. at 776. While California insists that it is "unreasonable to expect" consumers to judge AI models

based on their outputs (such as by checking Westlaw or Google to see if a case supplied by AI is real), Resp.Br.33, it defies common sense to think that consumers can analyze the highly "technical details about the datasets and processes companies use to train their models," ER-198.¶8. And in all events, "the prime objective of the First Amendment is not efficiency." *Ams. for Prosperity*, 594 U.S. at 614-15.

Even if some disclosures provided by some companies may offer some specific details about the datasets they use, that alone tells users nothing about what efforts developers have undertaken to mitigate biases or inaccuracies. Op.Br.36; ER-191.¶26. While California insists that developers "remain free to disseminate their own messages directly to consumers," Resp.Br.34, the prospect that developers may feel obligated to explain away or provide context for speech that they are compelled to disseminate only doubles the compulsion. California cannot "require speakers to affirm in one breath that which they deny in the next." *Masterpiece Cakeshop v. Colo. Civil Rights Comm'n*, 584 U.S. 617, 663 (2018) (Thomas, J., concurring in part) (quoting *PG&E v. Pub. Util. Comm'n*, 475 U.S. 1, 16 (1986) (plurality op.)).

## II. xAI Is Likely To Succeed On Its Takings Claims.

California's response to xAI's takings claims is equally flawed. California largely runs away from the merits, devoting most of its analysis to threshold issues about whether injunctive relief is available and whether xAI adequately

demonstrated that its trade-secrets property rights are at issue. None of those arguments has merit.

### A. A.B.2013 Eviscerates xAI's Trade Secrets.

California claims that xAI failed to demonstrate that it holds trade secrets in its dataset information. That claim is inexplicable. xAI's declarant explained that "xAI invests substantial time and energy in acquiring high-quality data," ER-186.¶9; "developers … acquire and utilize datasets that others do not," ER186.¶10; the use of "unique datasets" differentiates "one company's AI model from another," ER186.¶11; and "xAI spends significant amounts of time and resources to specially curate and label particular data into effective fine-tuning datasets," including "through proprietary tools that xAI has built to assist with identifying high-quality data during the data collection process," ER188.¶16. xAI's declarant likewise explained that the sources of the datasets and their makeup are commercially valuable precisely because they are unknown to others. As he explained, "knowing what datasets a developer uses to train a specific AI model provides invaluable insight into how that model operates," ER187.¶11, and that "AI developers are constantly trying to figure out what data they are missing that other developers are using," so "[i]f xAI were to reveal to its competitors the sources of data it uses to train its AI models, those competitors would know what data xAI has, what data it lacks, and where to look for such data," and "[t]hey would then immediately seek to

acquire that data to plug any holes in its models' training," ER189.¶21; *see* ER.189-91.¶¶20-25. In short, the record contains ample evidence that xAI's dataset information is "valuable because it is unknown." *Amgen v. Cal. Corr. Health Care Servs.*, 260 Cal.Rptr.3d 873, 886 (Cal. Ct. App. 2020).

California tries to dismiss those attestations as "vague and conclusory." Resp.Br.37-38. But the declaration explains with specificity how competitors could use A.B.2013's disclosures to improve their own products. *See, e.g.*, ER190.¶22 ("[I]f xAI's competitors learned that xAI was collecting datasets focused on medical data, they would be able to deduce from that information what kinds of tasks xAI is trying to teach its AI models to perform and what data xAI considers useful or high quality for training the model to perform th[e] task[s]."); ER190-91.¶¶23-25. California says that "much of xAI's argument … relies on speculation on how other developers would react to xAI's disclosures." Resp.Br.38. To the contrary, xAI's declarant explains that competitors would likely use A.B.2013's disclosures to reverse engineer xAI's models because *he* would do exactly that if given similar insight into competitors' datasets. *E.g.*, ER-190.¶23. As courts have long recognized, a competitor's effort to "reverse engineer" a rival's product is proof positive that the information derives value from its secrecy. *Philip Morris v. Reilly*, 312 F.3d 24, 27 (1st Cir. 2002) (en banc).

That likewise defeats California's claim that A.B.2013 does not require disclosure of trade secrets because it compels disclosure of "ingredients" that go into an AI model, not the "recipe." Resp.Br.40-41. For one thing, A.B.2013 requires disclosures about the size of and types of data that go into xAI's datasets. Cal. Civ. Code §3111(a)(3). That is not just an ingredients list; it is a full-blown recipe. It requires xAI to reveal the precise proportions and specific types of data it uses to train its models, enabling its competitors to replicate xAI's success. *See* ER.190-91.¶¶23-24. But in all events, ingredients are often trade secrets precisely because they provide valuable insight into how to make the finished product. *See Reilly*, 312 F.3d at 27; Op.Br.42-43. That is why federal law allows companies to withhold trade secrets from an ingredients list, 15 U.S.C. §1454(c)(3), and why Coke lists "natural flavors" on it label rather than identifying the ingredients that differentiate it from Pepsi, Op.Br.40. Moreover, while California insists that A.B.2013 "does not require xAI to disclose information about its training methodologies," Resp.Br.39-40, that claim cannot be squared with A.B.2013's text, which requires a "description of how the datasets further" the AI model's purposes, "a description of the types of data" in datasets, and the "intended purpose" of xAI's decisions regarding "cleaning" and "processing" datasets—all details about xAI's training methodologies. Cal. Civ. Code §3111(a)(2), (4), (9). Put differently, A.B.2013 targets valuable information that gives competitors insight into the make-up of each dataset—and therefore xAI's

models, ER-190-91.¶24—which *are* the protected trade secrets, *United States v. Nosal*, 844 F.3d 1024, 1042 (9th Cir. 2016) ("a compilation that affords a competitive advantage and is not readily ascertainable" constitutes a trade secret).

California thus falls back on the claim that xAI did not describe its trade secrets with "sufficient particularity." *InteliClear v. ETC Glob. Holdings*, 978 F.3d 653, 658 (9th Cir. 2020). But as this Court explained in rejecting a similar argument (at the summary-judgment stage, no less), courts have never required parties to disclose their trade secrets to assert their claims. *See id.* Even in the context of a misappropriation claim, the plaintiff just needs to provide enough information for the defendant to "ascertain at least the boundaries within which the secret lies." *Alta Devices v. LG Elecs.*, 343 F.Supp.3d 868, 881 (N.D. Cal. 2018); *see Zunum Aero v. Boeing*, 2025 WL 2364602, at *1 (9th Cir. Aug. 14, 2025) (similar). xAI easily cleared that bar.[4]

### B. A.B.2013 Effects Uncompensated Takings of xAI's Trade Secrets.

1. On the merits of xAI's takings arguments, California has little to say. California insists that *Stolfi* forecloses xAI's argument that A.B.2013 effects a *per se* taking. But *Stolfi* did not address whether appropriating a trade-secret-holder's right to exclude is a *per se* taking. *Stolfi* merely rejected a takings claim predicated on the

[4] California tries to defend the district court's exclusive focus on xAI's allegations rather than its evidence. Resp.Br.43-44. But it has no answer to cases from this Court confirming that was an abuse of discretion. Op.Br.45-47.

alleged loss of all economic value in the plaintiff's trade secrets. 153 F.4th at 833 (citing *Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992)). Courts have made clear that a loss-of-all-economic-value-takings claim implicates a "different *per se* rule," *Alford v. Walton Cnty.*, 159 F.4th 844, 855 n.6 (11th Cir. 2025), than a claim premised on the appropriation of the right to exclude—which is xAI's claim here, Op.Br.50-52. *See Lingle v. Chevron U.S.A.*, 544 U.S. 528, 538 (2005). "Prior precedent that does not 'squarely address' a particular issue does not bind later panels on the question." *United States v. Kirilyuk*, 29 F.4th 1128, 1134 (9th Cir. 2022).[5]

California next insists that the *per se* analysis applies only when the government interferes with "physical property," not intangible property. Resp.Br.45; *see* IP.Scholars.Amicus.Br.9-11. But the Supreme Court has long held that the "prevention of a legal and essential use" of property—"an attribute of [property] ownership"—is a *per se* taking. *Curtin v. Benson*, 222 U.S. 78, 86 (1911). "To take [that right] away," the Court continued, is "to take his property away." *Id.* A *per se* taking thus requires neither a physical intrusion nor physical property. *See Hodel v. Irving*, 481 U.S. 704, 715-17 (1987) (*per se* taking when government "abrogat[ed]"

[5] *Stolfi* also dealt with a facial challenge and concluded that "the economic impact of a disclosure will likely vary case by case." 153 F.4th at 833. xAI, however, raises an as-applied takings challenge, focusing on A.B.2013's application to xAI and addressing the economic impact on xAI alone. *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1203 (9th Cir. 2022); *contra* Resp.Br.46 (claiming without citation that xAI seeks to invalidate A.B.2013 "regardless of the circumstances").

an "essential stick[] in the bundle of [property] rights"); *Alford*, 159 F.4th at 854 (*per se* taking when owners were denied access to their own property), *Armstrong v. United States*, 364 U.S. 40, 48-49 (1960) (government destruction of plaintiffs' ability to bring a lawsuit vindicating their rights in liens effected a categorical taking of *intangible* property). And there is "no principled reason to refrain from extending per se takings analysis" to intangible property rights. *Reilly*, 312 F.3d at 51 (Selya, J., concurring in judgment). After all, the core of the trade-secret property right is the right to exclude. *Ruckelshaus*, 467 U.S. at 1011; *Hartley Pen Co. v. U.S. Dist. Ct.*, 287 F.2d 324, 328 (9th Cir. 1961). When the government forces the owner of a trade secret to disclose it, the government eviscerates that "fundamental element of the property right." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 158 (2021). That is a *per se* taking.

2. Even if regulatory-takings principles controlled here, xAI has amply demonstrated a regulatory taking. Op.Br.52-55. California does not seriously dispute that, after *Ruckelshaus*, the only relevant question is whether the statute interferes with "reasonable investment-backed expectations." 467 U.S. at 1005. And California does not dispute that both California and federal law protect xAI's trade secrets, or that xAI has not disclosed its trade secrets with the understanding that they may be made public. *Contra* IP.Scholars.Amicus.Br.20-21. It instead just argues that xAI "should have expected that it would face increased regulatory

scrutiny" because AI is "a subject of public concern." Resp.Br.47-48. That argument is remarkable. By California's lights, states may require companies to disclose their trade secrets for everyone to see so long as they have the temerity to operate in an important industry. Agriculture is important. Could California require farmers to disclose proprietary information about how they grow their crops? The energy industry is important too. Could California require energy companies to disclose proprietary information about their latest innovations? The list goes on. If anything, California has things backwards. Trade-secret protection should be at its zenith in the most competitive and burgeoning industries, where protecting intellectual property is essential to fostering innovation and ingenuity.

As to "economic impact," the state insists that xAI has not shown that "revealing basic information about the datasets it uses" would severely undermine the value of its datasets. Resp.Br.50-51. But the uncontroverted record shows otherwise: As xAI's declarant explains, xAI keeps details regarding its training datasets secret because competitors could use that information to improve their own training processes and undercut xAI's competitive edge. ER-189-91.¶¶20-25. Hence, *contra* Resp.Br.51, it "is irrelevant" that xAI need not reveal its entire development process. *Ruckelshaus*, 467 U.S. at 1012. The core economic burden imposed by disclosure is the risk that competitors will use (even partial) information about xAI's development processes to replicate xAI's success. Op.Br.42-44, 46-47.

A.B.2013's disclosures "make it much easier to reverse engineer" xAI's models. *Reilly*, 312 F.3d at 41. In this trillion-dollar industry, the economic impact of those disclosures is "potentially tremendous." *Id.*

As to the last factor, California insists (as it did below) that the character of the governmental action weighs against a taking because A.B.2013 "serves important public purposes." Resp.Br.52. That contention relies on a formulation that is no longer good law. *See Lingle*, 544 U.S. at 548 (overruling the part of *Agins v. City of Tiburon*, 447 U.S. 255 (1980), California cites); *accord CDK Glob. v. Brnovich*, 16 F.4th 1266, 1283 (9th Cir. 2021) (whether a challenged law "serve[s] public purposes" "is not" generally analyzed under *Penn Central*). That aside, it simply regurgitates the misguided assertion that A.B.2013 advances public transparency. Resp.Br.52. In reality, the record amply demonstrates that A.B.2013's disclosures benefit only xAI's competitors. *See supra* pp.17-22; ER-191-92.¶26.

### C. xAI May Obtain Injunctive Relief to Prevent Disclosure of Its Trade Secrets.

With nowhere else to turn, California attempts to evade the merits entirely by claiming that "injunctive relief is unavailable as a remedy for [the] takings claim." Resp.Br.34. That is not the law.

As the Supreme Court explained, "equitable relief is generally unavailable" for takings violations, unless the litigant has no "adequate remedy at law." *Knick v. Twp. of Scott*, 588 U.S. 180, 200-01 (2019). There is no adequate remedy at law

here. California highlights its inverse-condemnation action. Resp.Br.35. But that provision applies only *after* a taking occurs—*not before*. *Selby Realty v. City of San Buenaventura*, 514 P.2d 111, 119-20 (Cal. 1973). Since A.B.2013's compelled disclosure of trade secrets "authorizes a repetitive … series of new, *per se* takings," xAI can use that inverse-condemnation action only if it "repeatedly bring[s] new suits" each time it must publicly disclose its trade secrets. *PhRMA v. Williams*, 64 F.4th 932, 942 (8th Cir. 2023). That is "precisely the sort of legal inadequacy that would make equitable relief" available. *Id.*; *accord Barber v. Charter Twp. of Springfield*, 31 F.4th 382, 388-89 (6th Cir. 2022) (an "impending" taking supports a claim for injunctive relief).

The Supreme Court has long recognized that "individuals threatened with a taking" can seek "equitable relief for Takings Clause violations" via pre-enforcement actions. *E. Enters. v. Apfel*, 524 U.S. 498, 521-22 (1998) (plurality op.). Indeed, in *Cedar Point*, the Court never doubted that the plaintiffs could seek injunctive relief to avert a future taking. *See* 594 U.S. at 145. And on remand in *Cedar Point*, California agreed to a permanent injunction prohibiting it from enforcing the access law. *See* Joint Mot. for Judg. & Final Stip. Judg., *Cedar Point Nursery v. Hassid*, No.1:16-cv-185 (E.D. Cal. Sept. 1, 2021), Dkts.37, 39. xAI likewise can seek equitable relief to prevent California from destroying its trade secrets.

## III. xAI Is Likely To Succeed On Its Vagueness Claim.

On vagueness, California invokes the wrong standard, ignores xAI's arguments, and regurgitates the district court's faulty analysis.

California first argues that A.B.2013 receives "less exacting … scrutiny," Resp.Br.53, but its concession that A.B.2013 implicates the First Amendment confirms otherwise. With speech rights at stake, California must regulate "with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963). California attempts to justify a lower standard by suggesting that xAI could have "clarif[ied] the meaning of the regulation by its own inquiry," Resp.Br.54—but xAI *and the district court* tried to do just that. Despite being given an express opportunity to provide clarity, California refused to do so. *See* Op.Br.13-14. Its refusal to explain what A.B.2013 requires heightens the risk of "arbitrary enforcement." Op.Br.57.

California next asserts that the term "high-level summary" is not vague. But its arguments lead nowhere. Though the term may have a "commonsense meaning," Resp.Br.54, that confuses ambiguity with vagueness. A term is ambiguous if "two or more meanings applies"; it is vague if its "meaning has uncertain application to various factual situations." Antonin Scalia & Bryan A. Garner, *Reading Law* 32 (2012); *see United States v. Trumbull*, 114 F.4th 1114, 1124 (9th Cir. 2024) (Bea, J., concurring). A.B.2013 is not vague because "high-level summary" lacks a plain meaning; it is vague because telling xAI to disclose information in an "abstract and

general" manner, Resp.Br.54, is too indeterminate to provide xAI "fair notice" as to what disclosures are required. *United States v. Williams*, 553 U.S. 285, 304 (2008). The same is true of "dataset" and "data point." *Contra* Resp.Br.54-55. And while California parrots the district court's claim that "high-level summary" cannot be vague because A.B.2013 lists *some* of the information to be included, Resp.Br.54, that reads out of the statute the key caveat that disclosures are "not limited to" those enumerated categories. Cal. Civ. Code §3111(a).

## IV. The Remaining Preliminary Injunction Factors Favor xAI.

California does not deny that xAI faces irreparable harm from the deprivation of its constitutional rights and loss of its trade secrets. It just accuses xAI of delaying too long in seeking relief. Resp.Br.56. But xAI sued before A.B.2013 took effect and filed its preliminary-injunction motion shortly after. Op.Br.13. Besides, delay is not a "determinative" consideration; and "courts are loath to withhold relief solely on that ground." *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019) (emphasis omitted). Any delay "is not particularly probative" here anyway, since xAI will suffer "ongoing" constitutional injuries. *Id*. California also suggests that preliminary relief is inappropriate because xAI made limited disclosures under A.B.2013 and there are no pending enforcement actions. Resp.Br.56-57. But California refuses to disavow enforcement against xAI or take a position—even at the district court's request—on whether xAI's disclosures suffice. *See* Op.Br.13-14.

That is fatal. Under "established precedent," a law "need not be enforced against a speaker to pose a threat to his free speech rights." *Cuviello*, 944 F.3d at 833. And "a failure to *disavow*" enforcement plainly establishes "a credible threat" to those rights. *Foothills Christian Ministries v. Johnson*, 148 F.4th 1040, 1050 (9th Cir. 2025). Since A.B.2013 is likely unconstitutional, the "finding of irreparable harm 'follows inexorably.'" *United States v. California*, 173 F.4th 1060, 1069 (9th Cir. 2026). So do the remaining factors, as a state suffers no harm when it is "enjoined from constitutional violations." *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023). All factors thus favor equitable relief.[6]

[6] xAI does not oppose an injunction "solely preventing" California from enforcing A.B.2013 to compel xAI to make additional disclosures. Resp.Br.58.

## CONCLUSION

This Court should vacate the district court's order and instruct it to grant xAI's motion for preliminary injunction.

Respectfully submitted,

s/Erin E. Murphy
ERIN E. MURPHY
*Counsel of Record*
JAMES Y. XI
MITCHELL K. PALLAKI
ILAN J. POSNER
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Plaintiff-Appellant*

September 4, 2026

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Circuit R. 32-1 because this brief contains 6,992 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman type.

September 4, 2026

s/Erin E. Murphy
Erin E. Murphy

## CERTIFICATE OF SERVICE

I hereby certify that on September 4, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the ACMS system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the ACMS system.

s/Erin E. Murphy
Erin E. Murphy